Court of Appeal Case No. 26-3553

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

TED ENTERTAINMENT, INC.,
Plaintiff and Respondent,

vs.

DOE DEFENDANTS

Defendants and Appellants.

Appeal From Order Denying Motion to Quash Or, In The Alternative,
Protective Order
Issued April 29, 2026

Hon. Sallie Kim
Northern District of California Case No. 3:25-mc-80296-SK

## MOTION TO DISMISS FOR LACK OF JURISDICTION; DECLARATION OF ROM BAR-NISSIM IN SUPPORT

ROM BAR-NISSIM (SBN 293356)
ROM@HEAHBARNISSIM.COM
Heah Bar-Nissim LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

**Attorneys for Plaintiff and Respondent
Ted Entertainment, Inc.**

1

# TABLE OF CONTENTS

I.     **INTRODUCTION**.................................................................1

II.    **STATEMENT OF RELEVANT FACTS**.........................3

III.   **DISCUSSION** .........................................................6

      A.    **The Order is Not an Appealable Final Order**.......6

      B.    **The Order Does Not Qualify as an Appealable Collateral Order**.........................................................10

      C.    **The *Perlman* Exception Does Not Apply**..............15

IV.   **CONCLUSION**...................................................17

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Arista Records, LLC v. Doe 3*,

  604 F.3d 110 (2d Cir. 2010) ............................................................. 14

*Bagdasarian Prods., LLC v. Twentieth Century Fox Film Cor.*,

  674 F.3d 1267 (9th Cir. 2012) ........................................................... 7

*Barnes v Sea Hawaii Rafting, LLC*,

  889 F.3d 517 (9th Cir. 2018) ............................................................. 8

*Baugher v. GoDaddy.com LLC*,

  2021 WL 4942658 (D. Ariz. Oct. 22, 2021).................................... 14

*City of Las Vegas v. Foley*,

  747 F.2d 1294 (9th Cir. 1984) ........................................................... 7

*Cognosphere Pte. Ltd. v. X Corp.*,

  2024 WL 4227594 (N.D. Cal. Sept. 18, 2024)..................... 14, 15, 17

*Cohen v. Beneficial Indus. Loan Corp.*,

  337 U.S. 541 (1949)..................................................................... 7, 10

*Digital Equipment Corp. v. Desktop Direct, Inc.*,

  511 U.S. 863 (1994)................................................................... 11, 13

*Fantasia v. Diodato*,

   154 F.4th 1123 (9th Cir. 2025) ........................................................ 7

*Firestone Tire & Rubber v. Risjord*,

   449 U.S. 368 (1981) ........................................................................ 11

*Flack N. California Corp. v. Scott Griffith Collaborative Sols., LLC*,

   25 F.4th 763 (9th Cir. 2022) ............................................................ 7

*Garraway v. Ciufo*,

   113 F.4th 1210 (9th Cir. 2024) ................................................. 11, 13

*Gelboim v. Bank of Am. Corp.*,

   574 U.S. 405 (2015) .......................................................................... 7

*Geo Group, inc. v. Menocal*,

   607 U.S. ---, 146 S.Ct. 774 (2026) ........................................ 7, 10, 11

*Gopher Media LLC v. Melone*,

   154 F.4th 696 (9th Cir. 2025) .................................................. 6, 12, 14

*Harper & Row Publishers, Inc. v. Nation Enters.*,

   471 U.S. 539 (1985) ........................................................................ 14

*Hartley Pen Co. v. United States Dist. Court*,

   287 F.2d 324 (9th Cir. 1961) ............................................................ 8

*In re Grand Jury Investigation*,

   966 F.3d 991 (9th Cir. 2020) ............................................................ 8

*In re Kirkland*,

    75 F.4th 1030 (9th Cir. 2023) ........................................................... 8

*In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*,

    634 F.3d 557, (9th Cir. 2011) ........................................................... 8

*Johnson v. Jones*,

    515 U.S. 304 (1995) ........................................................................ 12

*KL Group v. Case, Kay & Lynch*,

    829 F.2d 909 fn. 5 (9th Cir. 1987) ............................................... 7, 15

*Legal Aid Society v. Dunklop*,

    618 F.2d 48 (9th Cir. 1980) ............................................................ 15

*Miller v. Gammie*,

    335 F.3d 889 (9th Cir. 2003) ........................................................... 8

*Mohawk Indus., Inc. v. Carpenter*,

    558 U.S. 100 (2009) ................................................................. 13, 14

*Perlman v. United States*,

    247 U.S. 7 (1918) ........................................................................... 16

*Planned Parenthood Federation of America, Inc. v. Center for*

    *Medical Progress*,

    890 F.3d 828 (9th Cir. 2018) .......................................................... 12

*Richardson-Merrell, Inc v. Koller*,

   472 U.S. 424 (1985)..........................................................................11

*Ritzen Group, Inc. v. Jackson Masonry, LLC*,

   589 U.S. 35 (2020)...............................................................................7

*Signature Mgmt. Team, LLC v. Automattic, Inc.*,

   941 F.Supp.2d 1145 (N.D. Cal. 2013).............................................14

*United States v. Acad. Mortg. Corp.*,

   968 F.3d 996 (9th Cir. 2020) ...............................................................8

*United States v. Austin*,

   416 F.3d 1016 (9th Cir. 2005) ..........................................................16

*Van Cauwenberghe v. Biard*,

   486 U.S. 517 (1988).........................................................................11

*Will v. Hallock*,

   546 U.S, 345 (2006)..................................................................11, 13

## **Statutes**

18 U.S.C. §§ 2701-2713 .....................................................................16

28 U.S.C. § 1782................................................................................7

28 U.S.C. § 1291.................................................................. 1, 6, 7, 10

Cal. Civ. Proc. Code § 425.16(b)(1)...................................................12

5

## **<u>Rules</u>**

Federal Rule of Evidence 501 ........................................................... 16

Respondent-Plaintiff Ted Entertainment, Inc. ("Respondent") hereby submits its motion to dismiss ("Motion") the present appeal of Appellants-Defendants the Doe Defendants (collectively, "Appellants") for lack of jurisdiction.

## I. INTRODUCTION

This Court lacks jurisdiction to hear the present appeal because it does not involve an appealable order and no exception applies. This appeal concerns an order denying a motion to quash or, in the alternative, protective order (the "Order"). In their notice of appeal, Appellants claimed the Order was immediately appealable: (1) as a final order; (2) as a collateral order; or (3) under the *Perlman* exception.

None of the bases for jurisdiction claimed by Appellants apply. First, the Order is a discovery order – which does not qualify as a final order under 28 U.S.C. § 1291. Rather, the proper procedure was to file a petition for writ of mandamus – which Appellants have done. *See Doe Defendants v. United States District Court for the Northern District of California* (9th Cir. Case No. 26-3513) (the "Mandamus Appeal"). Therefore, the present appeal should be dismissed because it does not involve an appealable order and Appellants right to appeal

1

the Order is persevered with the Mandamus Appeal.

Second, the Order fails to satisfy the conditions for an appealable collateral order. An order fails to qualify as an appealable collateral order if the order addresses the merits of the claim. Here, the Order addressed the merits of Respondent's claim by finding it made a *prima facie* evidentiary showing of contributory copyright infringement against Appellants. Therefore, the Order cannot constitute as an appealable collateral order.

Finally, the *Perlman* exception does not apply. To qualify as an appealable order under the *Perlman* exception, the subpoena at issue must seek privileged documents. Here, the subpoenas at issue do not seek privileged documents. Rather, they seek personal identifying information that Appellants voluntarily provided to Reddit, Inc. and Discord, Inc. so Respondent can name and serve Appellants (collectively, the "Subpoenas"). Therefore, since the Subpoenas do not seek privileged information, the *Perlman* exception does not apply.

Therefore, for the reasons set forth in this Motion, Respondent respectfully requests that this Court dismiss the present appeal for lack of jurisdiction.

## II.  STATEMENT OF RELEVANT FACTS

On June 19, 2025, Respondent initiated three copyright actions: (1) *Ted Entertainment, Inc. v. Saber et al.* (C.D. Cal. Case No. 2:25-cv-05564-WLH-PD) (the "Underlying Action"); (2) *Ted Entertainment, Inc. v. Majed et al.* (C.D. Cal. Case No. 2:25-cv-05565-JFW-MAA); and (3) *Ted Entertainment, Inc. v. Caviness et al.* (W.D. Mo. Case No. 4:25-cv-00459-BCW). Declaration of Rom Bar-Nissim ("RBN Decl., ¶ 2), Exs. 1-3.

Appellants were named as Doe Defendants in all three cases and charged with contributory copyright infringement of Respondent's copyrighted work. RBN Decl., ¶ 2, Ex. 1, ¶¶ 82-87, Ex. 2, ¶¶ 73-78, Ex. 3 ¶¶ 74-79. Specifically, the complaints alleged that Appellants made various posts on Reddit that promoted infringing watch parties of Respondent's copyrighted work immediately upon its release for the express purpose of denying Respondent views and revenue. *Id.*

On July 16, 2025, Respondent and counsel for defendant Alexandra Marwa Saber p/k/a Denims ("Denims") filed a stipulation (the "Stipulation") in the Underlying Action. RBN Decl., ¶ 3, Ex. 4. The Stipulation asked the Court to grant Respondent leave to conduct

3

expedited discovery and issue subpoenas to Reddit, Inc. and Discord, Inc. for the personal identifying information of certain accounts tied to Appellants (*i.e.*, the Subpoenas). *Id.* On July 31, 2025, the Honorable Wesley L. Hsu granted the Stipulation. *Id.*, Ex. 5.

On August 4, 2025, Respondent served the Subpoenas. RBN Decl., ¶ 4. That same day, counsel for Appellants contacted counsel for Respondent requesting the Subpoenas and informing counsel that Appellants intended to file a motion to quash the Subpoenas. *Id.*

On September 22, 2025, Appellants initiated a miscellaneous action in the United States District Court for the Northern District of California entitled *In re Subpoenas to Reddit, Inc. and Discord, Inc.* (N.D. Cal. Case No. 3:25-mc-80296-SK) (the "Miscellaneous Action"). RBN Decl, ¶ 6, Ex. 6. In the Miscellaneous Action, Appellants sought to quash the Subpoenas or, in the alternative, obtain a protective order that would only allow their identities to be revealed to the Court and not Respondent, its counsel or Respondent's owners ("Appellants' Motion"). *Id.*

On September 23, 2025, the Miscellaneous Action was assigned to the Honorable Sallie Kim. RBN Decl., ¶ 7. On January 20, 2025 (after briefing was complete), Appellants and Respondent filed

their consent to magistrate jurisdiction. *Id.*

On April 29, 2026, Judge Kim issued an order denying Appellants' Motion (*i.e.*, the Order). RBN Decl., ¶ 8, Ex. 7. As to the motion to quash, Judge Kim found: (1) Respondent made a *prima facie* evidentiary showing of contributory copyright infringement against Appellants (which included underlying direct infringement by Denims) (*id.*, Ex. 7, pp. 5:24-10:10); and (2) the balance of equities favored disclosure because, without the information, Respondent would be unable to pursue its claims of contributory copyright infringement against Appellants (*id.*, Ex. 7, pp. 10:11-11:15).

As to the motion for protective order, it was denied because Respondent had to know Appellants' identities to pursue its claims against them in the Underlying Action. RBN Decl., ¶ 8, Ex. 7, pp. 11:16-12:3. The Order also ordered that no party "disclose the identities" of Appellants or "any other information about" them. *Id.*, Ex. 7, pp. 11:27-12:1. The Order left it to Judge Hsu in the Underlying Action to determine whether Appellants could proceed in the Underlying Action anonymously. *Id.*, Ex. 7, p. 12:1-3.

On May 29, 2026, Appellants initiated two appeals of the Order. RBN Decl., ¶ 9. First, Appellants filed a notice of appeal –

5

which initiated the present appeal. *Id.* Second, Appellants filed a petition for writ of mandamus in an appeal entitled *Doe Defendants v. United States District Court for the Northern District of California, San Francisco* (9th Cir. Case No. 26-3513) (*i.e.*, the Mandamus Appeal). *Id.* As of this filing, this Court has not ordered Respondent to file an answering brief to the Mandamus Appeal. *Id.*

On June 15, 2026, Respondent's counsel discussed the present Motion with counsel for Appellants telephonically pursuant to Circuit Rule 27-1(5). RBN Decl., ¶ 10. Appellants' counsel opposed the Motion because it would result in dismissal of the present appeal. *Id.* Appellants' counsel and Respondents' counsel were able to agree to delay the filing of the present motion so as to not interfere with Appellants' counsel's preplanned vacation to visit her family. *Id.*

## III.   DISCUSSION

### A.   The Order is Not an Appealable Final Order

As a general matter, this Court's "jurisdiction is limited to appeals from a final decision by the district court." *Gopher Media LLC v. Melone*, 154 F.4th 696, 701 (9th Cir. 2025) (citing 28 U.S.C. § 1291). Known as the "final-judgment rule," the rule prevents "piecemeal appeals, promotes the efficient administration of justice and preservers the proper balance between trial and appellate courts."

*Geo Group, inc. v. Menocal*, 607 U.S. ---, 146 S.Ct. 774, 781 (2026) (internal quotation marks omitted).

Under 28 U.S.C. Section 1291, "an order is generally considered final and appealable when it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Fantasia v. Diodato*, 154 F.4th 1123, 1128 (9th Cir. 2025) (quoting *Ritzen Group, Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37 (2020); *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 409 (2015)). In other words, if the "matter remains open, unfinished, or inconclusive, there may be no intrusion by appeal." *Flack N. California Corp. v. Scott Griffith Collaborative Sols., LLC*, 25 F.4th 763, 765 (9th Cir. 2022) (quoting *Bagdasarian Prods., LLC v. Twentieth Century Fox Film Cor.*, 674 F.3d 1267, 1270 (9th Cir. 2012); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

"[D]iscovery orders are interlocutory and nonappealable under 28 U.S.C. § 1291" – *i.e.*, not final orders. *KL Group v. Case, Kay & Lynch*, 829 F.2d 909, 918 fn. 5 (9th Cir. 1987)[1] (citing *City of Las*

---

[1] *KL Group* involved a protective order. 829 F.2d at 918 fn.5. In miscellaneous actions brought under 28 U.S.C. Section 1782 (*i.e.*, an

*Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984); *Hartley Pen Co. v. United States Dist. Court*, 287 F.2d 324, 326-27 (9th Cir. 1961)); *see also In re Kirkland*, 75 F.4th 1030, 1048 (9th Cir. 2023) (an "order denying a motion to quash a Rule 45 subpoena generally cannot be immediately appealed") (internal brackets omitted) (quoting *United States v. Acad. Mortg. Corp.*, 968 F.3d 996, 1006 (9th Cir. 2020)).

Rather, discovery orders can only be appealed by: (1) "discretionary interlocutory review"; or (2) by "seek[ing] mandamus." *In re Kirkland*, 75 F.4th at 1048 (quoting *In re Grand Jury Investigation*, 966 F.3d 991, 994 (9th Cir. 2020)). Indeed, "[w]hen appellate jurisdiction is lacking," this Court "can treat the notice of appeal as a petition for writ of mandamus." *Barnes v Sea Hawaii Rafting, LLC*, 889 F.3d 517, 529 (9th Cir. 2018) (internal ellipses omitted) (quoting *Miller v. Gammie*, 335 F.3d 889, 895 (9th Cir. 2003) (en banc)).

Here, the lack of finality of the Order is self-evident. The

---

action to obtain discovery for a pending or contemplated foreign proceeding), a discovery order may be considered final. *See e.g., In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*, 634 F.3d 557, (9th Cir. 2011).

Subpoenas were authorized in the Underlying Action. RBN Decl., ¶ 3, Exs. 4-5. The Miscellaneous Action was directed at quashing the Subpoenas or, in the alternative, obtaining a protective order to prevent disclosure of the Doe Defendants' personal identifying information to anyone other than the Court. *Id.*, ¶ 6, Ex. 6.

The Order did not end the Underlying Action. To the contrary, the Order explicitly recognizes the Underlying Action is where the merits of Respondent's claim of contributory copyright infringement against Appellants – along with any affirmative defenses – shall ultimately be decided. RBN Decl., ¶ 8, Ex. 7, pp. 8:15-22, 11:5-9. Specifically, the Order found that Respondent made a *prima facie* showing of contributory copyright infringement against Appellants and – whether the underlying direct infringement constituted fair use – shall be decided in the Underlying Action and not in the Miscellaneous Action.[2] *Id.*, Ex. 7, pp. 5:24-11:15.

Appellants' conduct further demonstrates that they recognize

---

[2] The Order also recognized that: (1) as of the date the Order was filed, Denims' motion for partial judgment on the pleadings based on the fair use defense was pending in the Underlying Action; and (2) whether Appellants could proceed anonymously in the Underlying Action would be decided by Judge Hsu and not Judge Kim. RBN Decl., ¶ 8, Ex. 7, p. 8:19-22.

that the Order is not a final order under 28 U.S.C. Section 1291. As discussed above, Appellants have filed two appeals: (1) the present appeal; and (2) the Mandamus Appeal. RBN Decl., ¶ 9. By initiating the Mandamus Appeal, Appellants knew the Order was not an appealable final order.

Nor should this Court convert Appellants' notice of appeal into a petition for writ of mandamus. Appellants have already filed a petition for writ of mandamus of the Order in the Mandamus Appeal. RBN Decl., ¶ 9. Therefore, Appellants will not suffer any prejudice by the dismissal of the present appeal instead of converting Appellants' notice of appeal into a petition for writ of mandamus.

In sum, this Court lacks jurisdiction for the present appeal because it is an appeal of a non-final order.

### B. The Order Does Not Qualify as an Appealable Collateral Order

In *Cohen*, the Supreme Court carved out a "small class of decisions" that are appealable despite not constituting final orders. *Geo Grp.*, 146 S.Ct. at 781 (internal quotation marks omitted) (quoting *Cohen*, 337 U.S. at 546). Known as the "collateral-order doctrine," the Supreme Court emphasized the carveout is "narrow, stringent and of modest scope." *Geo Grp.*, 146 S.Ct. at 781 (internal

10

quotation marks omitted) (quoting *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994); *Will v. Hallock*, 546 U.S, 345, 350 (2006)); *see also Garraway v. Ciufo*, 113 F.4th 1210, 1215 (9th Cir. 2024) ("On multiple occasions, the Supreme Court has admonished that the collateral order doctrine is a 'narrow exception,' to be 'strictly applied'") (internal citations omitted) (quoting *Firestone Tire & Rubber v. Risjord*, 449 U.S. 368, 374 (1981); *Richardson-Merrell, Inc v. Koller*, 472 U.S. 424, 431 (1985)).

To qualify as an appealable order under the collateral-order doctrine, "three non-negotiable conditions" must be present: the order must: "(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." *Geo Gro.*, 146 S.Ct. at 781 (quoting *Will*, 546 U.S. at 349; *Van Cauwenberghe v. Biard*, 486 U.S. 517, 722 (1988)). "Failure of any component of that three-part test is fatal." *Geo Grp.*, 146 S.Ct. at 781.

The Order fails to qualify as a collateral-order under the second condition. "An issue is completely separate from the merits if it is 'significantly different' and 'conceptually distinct' from the 'fact-related legal issues that likely underly the plaintiff's claim on the

11

merits.'" *Gopher Media*, 154 F.4th at 701 (quoting *Johnson v. Jones*, 515 U.S. 304, 314 (1995)).

The Ninth Circuit's decision in *Gopher Media* is highly instructive. The *en banc* panel reversed circuit precedent and held that the denial of an anti-SLAPP motion is not immediately appealable under the collateral order doctrine because it fails to satisfy the second condition. *Gopher Media*, 154 F.4th at 699. To determine an anti-SLAPP motion, the "second step" requires a court to "decide whether 'the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." *Id.* at 702 (quoting Cal. Civ. Proc. Code § 425.16(b)(1)). Consequently, "the anti-SLAPP analysis intertwines factual and legal questions" concerning the merits of the case that will also "reemerge at trial" or "at later procedural stages" in the case. *Gopher Media*, 154 F.4th 702-03.

Here, the Order was "inextricably intertwined with the merits of the litigation" because it found that Respondent carried its burden to make a *prima facie* showing of contributory copyright infringement against the Doe Defendants. *See Gopher Media*, 154 F.4th at 702 (quoting *Planned Parenthood Federation of America, Inc. v. Center for Medical Progress*, 890 F.3d 828, 836 (9th Cir. 2018) (Gould J.,

12

concurring)); RBN Decl, ¶ 8, Ex. 7, pp. 5:24-10:11.

The Order also fails to qualify as a collateral-order under the third condition. Under the third condition, "whether an order is 'effectively unreviewable' – 'cannot be answered without a judgment about the value of interests that would be lost through the rigorous application of a final judgment requirement." *Garraway v. Ciufo*, 113 F.4th 1210, 1216 (9th Cir. 2024) (quoting *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 878-79 (1994)). Therefore, under the third condition, "the decisive consideration is whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Garraway*, 113 F.4th at 1216 (quoting *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (2009); *Will*, 546 U.S. 345, 352-53).

Once again, *Gopher Media* is instructive. In overturning circuit precedent that the denial of an anti-SLAPP motion qualified as a collateral-order, the Ninth Circuit found:

> Although we still recognize that some important interest may be lost if a defendant must wait to appeal a final judgment in an anti-SLAPP case—such as the potential unfairness of having to defend a meritless action all the way through trial—this lost interest does not render the decision "effectively unreviewable" for purposes of the collateral order doctrine because deferring review of these motions until final judgment will not "so imperil

the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders."

*Gopher Media*, 154 F.4th at 703 (quoting *Mohawk Indus.*, 558 U.S. at 108).

As *Gopher Media* illustrates, the Order does not implicate a substantial public interest or some particular value of a high order. The "First Amendment rights to anonymous speech are not absolute" and there is "no First Amendment right to commit copyright infringement." *Cognosphere Pte. Ltd. v. X Corp.*, 2024 WL 4227594, *3 (N.D. Cal. Sept. 18, 2024) (citing *Signature Mgmt. Team, LLC v. Automattic, Inc.*, 941 F.Supp.2d 1145, 1154 (N.D. Cal. 2013); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 555-56, 569 (1985)).

Indeed, "to the extent that anonymity is used to mask copyright infringement or to facilitate such infringement by other persons, it is unprotected by the First Amendment." *Baugher v. GoDaddy.com LLC*, 2021 WL 4942658, *2 (D. Ariz. Oct. 22, 2021) (quoting *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 118 (2d Cir. 2010); citing *Harper & Row*, 471 U.S. at 568). Further, "because the account information was voluntarily provided by the account holders to the internet service provider, there is an argument that this account holder

14

information is not itself subject of First Amendment protections."
*Cognosphere*, 2024 WL. 4227594, *3.

Here, this case is about whether the Appellants engaged in contributory copyright infringement. RBN Decl., ¶ 2, Ex. 1. The Order authorizes: (1) the Subpoenas seeking personal identifying information on the Doe Defendants to proceed; and (2) that information can be shared with Respondent, its owners and its counsel. *Id.*, ¶ 8, Ex. 7, pp. 11:24-12:3. It defers the decision of whether the Doe Defendants can proceed anonymously to the Court in the Underlying Action. *Id.*, Ex. 7, p. 11:1-3. Since there is no First Amendment protection for copyright infringement and the Doe Defendants' information cannot be made public at this point in time, there is no substantial public interest at stake.

In sum, to "consider [the Order] a final order 'would be an unwarranted expansion of the collateral order doctrine.'" *KL Group*, 829 F.2d at 918 fn. 5 (quoting *Legal Aid Society v. Dunklop*, 618 F.2d 48, 51 (9th Cir. 1980)).

### C.     The *Perlman* Exception Does Not Apply

The "Supreme Court created an exception to the final judgment rule by treating a discovery order (a subpoena) directed at a

disinterested third-party custodian of privileged documents as immediately appealable." *United States v. Austin*, 416 F.3d 1016, 1024 (9th Cir. 2005) (citing *Perlman v. United States*, 247 U.S. 7 38 (1918)).

This exception to the final judgment rule does not apply because the Subpoenas do not seek privileged documents. Rather, they seek various personal identifying information from Reddit and Discord regarding Appellants.[3] RBN Decl., ¶ 3, Ex. 2. Those documents do not qualify for any privilege recognized under Federal Rule of Evidence 501. Nor is the personal identifying information the Doe Defendants (which they voluntarily provided to Reddit and Discord) privileged. Indeed, "because the account information was voluntarily provided by the account holders to the internet service

---

[3] Respondent has significantly narrowed the scope of information requested in the Subpoenas. RBN Decl., ¶ 5. For example, Respondent no longer seeks "All DOCUMENTS and COMMUNICATIONS" containing the personal identifying information to avoid issues with the Stored Communications Act (18 U.S.C. §§ 2701-2713). *Id.* Instead, Respondent only seeks documents that summarize the personal identifying information of the various users. *Id.* Further, Respondent narrowed the scope of requests 15-16 in the Reddit subpoena from seeking information on H3Snark moderators from January 1, 2025 through February 28, 2025 to only January 31, 2025 (*i.e.*, the date of infringement). *Id.*

provider, there is an argument that this account holder information is not itself the subject of First Amendment protections." *Cognosphere*, 2024 WL 4227594, *3.

Therefore, the Order is not appealable under the *Perlman* exception.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Respondents respectfully request that this Court dismiss the present appeal.

DATED: July 3, 2026      **Heah Bar-Nissim LLP**

By:   */s/ Rom Bar-Nissim*
        Rom Bar-Nissim
        Attorneys for Plaintiff and
        Respondent Ted Entertainment,
        Inc.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure ("FRAP") 27(d) and Ninth Circuit Rule ("9th Cir. Rule") 27-1(1)(d), counsel certifies that this motion to dismiss for lack of jurisdiction contains 3,273 words and is less than 20 pages, excluding the items exempted by FRAP Rule 27(a)(2)(B) and 9th Cir. Rule 27-1(1)(d).

This Motion complies with the formatting, typeface and type styles requirements of FRAP Rules 27(d)(1)(D-E) and 32(a)(5-6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font that is double-spaced.

DATED: July 3, 2026                    By: /s/ Rom Bar-Nissim

## DECLARATION OF ROM BAR-NISSIM

I, Rom Bar-Nissim, do hereby state and declare as follows:

1.     I am an attorney at law, duly licensed to practice law in the State of California and the United States Court of Appeals for the Ninth Circuit.  I am a partner at the law firm of Heah Bar-Nissim LLP and counsel of record for Respondent-Plaintiff Ted Entertainment, Inc. ("Respondent"). I have personal knowledge of the facts contained in this declaration and, if called and sworn as a witness, I could and would competently testify thereto. I make this declaration in support of Respondent's motion to dismiss the appeal of Appellants-Defendants the Doe Defendants (collectively, "Appellants") for lack of jurisdiction.

2.     On June 19, 2025, Respondent initiated three copyright actions: (1) *Ted Entertainment, Inc. v. Saber et al.* (C.D. Cal. Case No. 2:25-cv-05564-WLH-PD) (the "Underlying Action"); (2) *Ted Entertainment, Inc. v. Majed et al.* (C.D. Cal. Case No. 2:25-cv-05565-JFW-MAA) (the "Majed Action"); and (3) *Ted Entertainment, Inc. v. Caviness et al.* (W.D. Mo. Case No. 4:25-cv-00459-BCW) (the "Caviness Action"). Appellants were named as Doe Defendants in all three cases and charged with contributory copyright infringement of

1

Respondent's copyrighted work. Specifically, the complaints alleged that Appellants made various posts on Reddit that promoted infringing watch parties of Respondent's copyrighted work immediately upon its release for the express purpose of denying Respondent views and revenue. A true and correct copy of the complaint in the Underlying Action is attached hereto and incorporated herein as **Exhibit 1**. A true and correct copy of the complaint in the Majed Action is attached hereto and incorporated herein as **Exhibit 2**. A true and correct copy of the complaint in the Caviness Action is attached hereto and incorporated herein as **Exhibit 3.**

3. On July 16, 2025, Respondent and counsel for the defendant in the Underlying Action – Alexandra Marwa Saber p/k/a Denims ("Denims") – filed a stipulation (the "Stipulation") in the Underlying Action. The Stipulation asked the Court to grant Respondent leave to conduct expedited discovery and issue subpoenas to Reddit, Inc. and Discord, Inc. for the personal identifying information of certain accounts tied to Appellants (collectively, the "Subpoenas"). A true and correct copy of the Stipulation (including attachments) are attached hereto and incorporated herein as **Exhibit 4**. On July 31, 2025, the Honorable Wesley L. Hsu granted the

Stipulation. A true and correct copy of the July 31, 2026 order granting the Stipulation is attached hereto and incorporated herein as **Exhibit 5.**

4.      On August 4, 2025, Respondent served the Subpoenas on Reddit, Inc. and Discord, Inc. That same day, counsel for Appellants contacted me requesting a copy of the Subpoenas and informing me that Appellants intended to file a motion to quash the Subpoenas.

5.      Subsequently, Respondent significantly narrowed the scope of the information requested in the Subpoenas. For example, Respondent no longer seeks "All DOCUMENTS and COMMUNICATIONS" containing the personal identifying information to avoid issues with the Stored Communications Act (18 U.S.C. §§ 2701-2713). Instead, Respondent only seeks documents that summarize the personal identifying information of the various users. Further, Respondent narrowed the scope of requests 15-16 in the Reddit Subpoena from seeking information on H3Snark moderators from January 1, 2025 through February 28, 2025 to only January 31, 2025 (*i.e.*, the date of infringement).

6.      On September 22, 2025, Appellants initiated a miscellaneous action in the United States District Court for the

Northern District of California entitled *In re Subpoenas to Reddit, Inc. and Discord, Inc.* (N.D. Cal. Case No. 3:25-mc-80296-SK) (the "Miscellaneous Action"). In the Miscellaneous Action, Appellants sought to quash the Subpoenas or, in the alternative, obtain a protective order that would only allow their identities to be revealed to the Court and not Respondent, its counsel or Respondent's owners ("Appellants' Motion"). A true and correct copy of Appellants' Motion is attached hereto and incorporated herein as **Exhibit 6.**

7.      On September 23, 2025, the Miscellaneous Action was assigned to the Honorable Sallie Kim. On January 20, 2025 (after briefing was complete), Appellants and Respondent filed their consent to magistrate jurisdiction.

8.      On April 29, 2026, Judge Kim issued an order denying Appellants' Motion (the "Order"). A true and correct copy of the Order is attached hereto and incorporated herein as **Exhibit 7.**

9.      On May 29, 2026, Appellants initiated two appeals of the Order. First, Appellants filed a notice of appeal – which initiated the present action. Second, Appellants filed a petition for writ of mandamus in an appeal entitled *Doe Defendants v. United States District Court for the Northern District of California, San Francisco*

(9th Cir. Case No. 26-3513) (the "Mandamus Appeal"). As of this filing, this Court has not ordered Respondent to file an answering brief to the Mandamus Appeal.

10.    On June 15, 2026, I discussed the present motion with counsel for Appellants telephonically pursuant to Circuit Rule 27-1(5). Appellants' counsel opposed the motion because it would result in dismissal of the present appeal. Appellants' counsel and I were able to agree to delay the filing of the present motion so as to not interfere with Appellants' counsel's preplanned vacation to visit her family.

I declare under penalty of perjury that the contents of this declaration are true and correct. Executed this 3rd day of July 2026 in Los Angeles, California.

/s/ Rom Bar-Nissim

Rom Bar-Nissim

# EXHIBIT 1

Rom Bar-Nissim (SBN: 293356)
Rom@HeahBarNissim.com
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

Attorneys for Plaintiff
Ted Entertainment, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TED ENTERTAINMENT, INC., a California Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ALEXANDRA MARWA SABER f/k/a MARWA TALATT ABDELMONEM p/k/a DENIMS, an individual, and DOES 1-10<br><br>Defendants. | Case No.: 2:25-cv-5564<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |



The Nightmare on Denims Street

"We're relying on you to stay live so we don't have to give the Nuke views. Yeah, I'm gonna stream it. Since he's confirmed it's coming out today, I'm gonna stream it." – Denims Prior to Reacting to *Content Nuke: Hasan Piker*

"Well guys, if you enjoyed not giving any views to that terrible video, [give me a] follow, subscribe, throw a prime if you like [my] content."
    - Denims After Reacting to *Content Nuke: Hasan Piker*

1
COMPLAINT

## I.    INTRODUCTION

1.    This lawsuit is about ending the practice of lazy reaction videos that copy entire copyrighted works and purposefully siphon views and revenue away from the original. Over seven years ago, the owners of Plaintiff Ted Entertainment, Inc. ("TEI") – Ethan and Hila Klein – established the legal standard for fair use reaction videos in *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34 (S.D.N.Y. 2017). As a genre, reaction videos "vary widely in terms of purpose, structure, and the extent to which they rely on potentially copyrighted material." Reaction videos, "like the Klein video" that "intersperse *short* segments of another's work with criticism and commentary," constitute fair use.[1]  In contrast, reaction videos that are "more akin to a *group viewing session*" do not. *Id.*, at 40 fn.1, 45-47 (emphasis added).

2.    This case involves a "group viewing session" hosted by Defendant Alexandra Marwa Saber f/k/a Marwa Talatt Abdelmonem p/k/a Denims ("Denims"). Denims specifically intended her "group viewing session" to siphon views and revenue away from TEI's copyrighted works: (1) *Content Nuke: Hasan Piker* ("*The Nuke*"); and (2) *The H3 Show #105: Countdown to Doomsday* ("*Countdown Episode*") (collectively, the "Works"). Denims timed her "group viewing sessions" to coincide with the exact moment TEI released the Works. Her timing was intended to capitalize on the intense public interest in the Works and siphon the maximum amount of views and revenue away from the Works to herself by showing the Works in their entirety (or nearly in their entirety).

3.    The moderators of the H3Snark subreddit (the "H3Snark Mods") heavily promoted Denims' "group viewing sessions" as an alternative to the original Works on the H3Snark subreddit ("H3Snark"). As a direct result, Denims' "group viewing sessions" of the Works peaked at approximately 45,800 concurrent views – when her previous stream only achieved approximately 3,300. Denims greatly

---

[1] The Kleins' video from *Hosseinzadeh* was entitled *The Big, The BOLD, The Beautiful* and is available here: https://youtu.be/CXUs5FOo-JE?si=74MWM26Wn26KmO4o

profited from her "group viewing session" of the Works through advertising revenue, donations and paid subscriptions.

4.     Like most lazy reaction videos, Denims peppers her "group viewing session" of TEI's Works with primarily brief and sporadic observations – which can be categorized as follows:

a.     Most frequently, Denims will watch long, unadulterated portions of the Works and briefly pause to give short, surface-level and often repetitive observations that provide little to no "new information, new aesthetics, new insights or understandings" on the original Works. *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith ("Warhol")*, 598 U.S. 508, 541 (2023).

b.     Other times, Denims' "commentary" has little to "no critical bearing on the style or substance" of the Works. *Warhol,* 598 U.S. at 510. Rather, she goes off on tangents regarding unrelated subjects or shadowboxes demonstrably false misrepresentations of the contents of the Works.

c.     On the rare occasions when Denims does provide sporadic and brief commentary on the style or substance of the Works, she spreads misinformation that is refuted moments later by the Works themselves or by the most cursory level of research. On the rarer occasions where she actually shows the factual basis for claim, her statements are refuted by the cited source itself. Such misinformation fails to serve "copyright's goal of enriching public knowledge." *Warhol*, 598 U.S. at 531. To the contrary, such misinformation diminishes it.

d.     Finally, Denims will even do an "empty chair reaction" (as shown above), where she goes off-camera for an extended period of time while letting the video play to keep her audience entertained.

5.     The poverty of Denims' commentary – coupled with her highly commercial use of the Works that she specifically intended to serve as substitute for the originals – fails to justify copying TEI's Works in their entirety (or nearly in their entirety). Rather, Denims' "group viewing session" is a quintessential example

of copyright infringement – *i.e.*, the unauthorized exploitation of TEI's Works "to get attention [and] avoid the drudgery in working up something fresh." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994). This lawsuit is to hold Denims accountable for her infringement and the H3Snark Mods accountable for materially contributing to her infringement.

## JURISDICTION AND VENUE

6. This action arises under the Copyright Act, 17 U.S.C. § 101, *et seq.*

7. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331, 1338(a-b).

8. Venue in this judicial district is proper under 28 U.S.C. §§ 1391(c) and 1400(a) because a substantial part of the acts and omissions giving rise to the claims occurred in this judicial district.

## PARTIES

9. TEI is a California corporation with its principal place of business located in Los Angeles County, CA. TEI is a production company that produces content for social media, namely YouTube.

10. Denims is an online streamer who releases content on social media platforms, namely Twitch, and resides in Van Nuys, California.

11. The H3Snark Mods are comprised of Does Nos. 1-10. The true names and exact location of Does Nos. 1-10 are presently unknown to TEI, which therefore sues said Doe defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and exact locations when the same have been ascertained. Below is a summary of what is known about Does Nos. 1-6.

a. Doe No. 1 is female, the founder of H3Snark and one of the H3Snark Mods. She previously used the Reddit username "u/ozempicdealer" – which Doe No. 1 subsequently deleted. Her last post using this handle was on February 12, 2025. Doe No. 1 also uses the Discord handle "yoggiebearx" and the screen name "parishilton."

b.      Doe No. 2 is female, resides in Canada and is the head moderator of the H3Snark Mods. Doe No. 2 currently uses the following Reddit usernames: (1) u/h3snarkmodteam2; (2) u/RomanPeee; and (3) u/Right_Salamander (currently idle). Previously, Doe No. 2 used the following Reddit usernames – which were either deleted by Doe No. 2 or suspended by Reddit for violating its Content Policy: (1) u/kavkav2 (deleted); (2) u/h3snarkmodteam3 (deleted); (3) u/Wrong_Salamanderr (deleted); (4) u/Right_Salamanderr (suspended); (5) u/PurePress (suspended); and (6) u/KitchenMukbangStar (deleted). On Discord, Doe No. 2 uses the screen names "Sally" and "allitern."

c.      Doe No. 3 began as a user of H3Snark and was subsequently made an H3Snark Mod. Initially, Doe No. 3 used the Reddit username "u/sarahornejewetts" – which she subsequently deleted. After deleting this account, Doe No. 3 used the Reddit username "u/jewettsarahorne."

d.      Doe No. 4's account name on Discord is "rozzwhalenm."

e.      Doe No. 5 is male and goes by the name Tony. Doe No. 5 was made an H3Snark Mod. His account name on Discord is "frompu."

f.      Doe No. 6 was made an H3Snark Mod. Doe No. 6's account name on Discord is "No_Reception."

g.      Doe Nos. 7-10 are the remaining H3Snark Mods.

## FACTUAL ALLEGATIONS

### Background of TEI

12.     TEI was founded in 2016 by Ethan and Hila Klein. The Kleins rose to prominence on YouTube with two channels, "h3h3Productions" (their primary channel) and "Ethan and Hila"[2] (their secondary channel). The Kleins created highly stylized reaction videos to other YouTube videos. The Kleins' reaction videos "intersperse[d] relatively short segments" of the original video "with long

_____
[2] The "Ethan and Hila" channel was later renamed to "Hila Klein."

segments of the Kleins' commentary." *Hosseinzadeh*, 276 F.Supp.3d at 40. After TEI was established, the Kleins assigned both channels to TEI.

13.    In 2016, the Kleins were sued for copyright infringement, defamation and misrepresentation under 17 U.S.C. Section 512(f) by Matt Hosseinzadeh p/k/a Matt Hoss/The Bold Guy ("Matt Hoss"). The copyright claim concerned a reaction video uploaded to their "Ethan and Hila" YouTube channel. The video, entitled *The Big, The Bold, The Beautiful* (the "Klein video"), was a critical and humorous reaction to Matt Hoss' video, *Bold Guy vs. Parkour Girl* (the "Hoss video"). As the Court in *Hosseinzadeh* explained:

> The Klein video opens with commentary and discussion between Ethan and Hila Klein, followed by segments of the Hoss video which they play, stop, and continue to comment on and criticize. The Klein video, which is almost fourteen minutes long, intersperses relatively short segments of the Hoss video with long segments of the Kleins' commentary, ultimately using three minutes and fifteen seconds of the five minute, twenty-four second long Hoss video. The Klein video is harshly critical of the Hoss video, and includes mockery of [Matt Hoss'] performance and what the [Kleins] consider unrealistic dialog and plotlines. In addition, defendants' commentary refers to the Hoss video as quasi-pornographic and reminiscent of a "Cringetube" genre of YouTube video known for "cringe"-worthy sexual content. As critical as it is, the Klein video is roughly equivalent to the kind of commentary and criticism of a creative work that might occur in a film studies class.

*Hosseinzadeh*, 276 F.Supp.3d at 40 (footnote and internal citations omitted).

14.    On August 23, 2017, the Court granted summary judgment for the Kleins on all of Matt Hoss' claims. *Hosseinzadeh*, 276 F.Supp.3d at 45-48. For the copyright infringement claim, the Court found the Klein video made a fair use of the Hoss video.

15.    In 2017, TEI established *The H3 Podcast* channel on YouTube. On the new channel, TEI produced podcast episodes that were less structured than the reaction videos the Kleins previously made. To ensure any use of unlicensed copyrighted content qualified as fair use, TEI formulated and refined best practices based on the principles from *Hosseinzadeh*, which included: (1) whenever feasible, prescreening the original work and outlining the criticism and commentary before

the broadcast; (2) ensuring the commentary was directly related to the style and/or substance of the original work; (3) only broadcasting the portion of the original work that would be subject to critique; (4) pausing the original work frequently to provide critique; and (5) ensuring that the duration of commentary was substantially longer than the portion of the original work show immediately before the commentary.

**Denims: The Alt-Left's Answer to Kellyanne Conway**

16.     Denims LARPs (*i.e.*, live action role play) as a revolutionary from the comfort of her bedroom in California. She is a prolific purveyor of misinformation and speaks with great confidence on topics where her knowledge leaves much to be desired. Denims repeatedly inserts herself into public controversies by employing poor judgment, knee-jerk contrarianism and a consistent impulse to defend the indefensible – including copyright infringement, terrorism and extremism.

17.     Denims is one of the most loyal and ardent defenders of Hasan Piker p/k/a HasanAbi ("Hasan") – the most prominent alt-left streamer on Twitch. Much like Scientologists engage in "fair game,"[3] Denims ruthlessly attacks with reckless abandon anyone who disagrees with her or Hasan. She parrots Hasan's style, rhetoric, and content strategy (*i.e.*, regularly streaming "react" content with minimal transformation or commentary). As such, she has assumed a leading role in Hasan's "Waiting Room" – a collective of streamers who cultishly follow Hasan and parasitically leach off of his audience by streaming before and after him.

18.     On November 17, 2023 (in a now deleted video),[4] Denims read Osama bin Laden's "Letter to America" in its entirety on stream. She frequently expressed agreement and support for the letter, such as:

a.     "America deserved 9/11. I can't disavow facts man. I can't

---

[3] Wikipedia, "Fair game (Scientology)," *available at*: https://en.wikipedia.org/wiki/Fair_game_(Scientology)

[4] Frequently when Denims is embroiled in controversy, she will delete her streams to conceal her conduct. As such, many citations are to third-party videos expressing critique of Denims through excerpts of her now deleted streams.

disavow reality. That's not how that works bro."[5]

b.      "[Denims reading from the letter] 'Why do they attack us in New York and Washington? If [Ariel] Sharon is a man of peace in the eyes of [George] Bush, then we are also men of peace! America does not understand the language of manners and principles, so we are addressing it using the language it understands.' [Denims response] He's not wrong about that. The US only understands violence."[6]

c.      "[bin Landen's] criticisms of the United States are all correct."[7]

d.      Despite Twitch's prohibition on terrorist propaganda,[8] Twitch gave Denims a slap on the wrist by banning her for just a day.[9]

19.    On December 12, 2022 (in a now deleted video), Denims responded to the December 8, 2022 video of June Nicole Lapine p/k/a ShoeOnHead – which critiqued Balenciaga's advertising campaign that depicted minors in highly sexualized BDSM attire.[10] Rather than acknowledge the widespread concern, Denims took the absurdly grotesque position of defending Balenciaga's advertising campaign and attempted to paint ShoeOnHead as homophobic (despite ShoeOnHead not mentioning homosexuality whatsoever).[11]

---

[5] Hinged Media, *Twitch Streamer Denims banned for saying America Deserved 9/11* (November 22, 2023) at 0:35-46, *available at*: https://youtu.be/ZFn5EvA4NzY?si=64qYcduRzYadGOv8&t=35

[6] *Id.* at 1:09-1:47.

[7] *Id.* at 2:23-2:27; *see also* Destiny, *reading reading reading, preparing for Finkelstein* (Nov. 17, 2023), at 3:28:02-4:24:24, 4:44:30-4:46:19 *available at*: https://www.youtube.com/live/EtP8nTN_mLI?si=BH9GwaSwHogHtWgk&t=12482 (showing clip in its entirety with accompanying critique).

[8] Twitch, "Community Guidelines: Terrorism and Violent Extremism," *available at*: https://safety.twitch.tv/s/article/Community-Guidelines?language=en_US

[9] *See* https://x.com/StreamerBans/status/1727413649315119370

[10] ShoeOnHead, *The Creepy Balenciaga Scandal & Why I Was "'Cancelled'"* (Dec. 8, 2022), *available at*: https://youtu.be/f0GeDNP_2mw?si=EmZIISIXwtqplgPX

[11] Rob's Media Archive, *Denims Downplaying The Balenciaga* (Dec. 13, 2024), at 1:29:21-3:37:13, *available at*: https://youtu.be/PSHIn_rUFc8?si=Uo_tlp2roVnm5Tft&t=5361

8

COMPLAINT

20.    Denims' involvement in the public controversy known as "Reactgate" provides great insight into her willful disregard for copyright. In early 2022, Hasan and Denims (along with several other Twitch streamers) received intense criticism for conducting "group viewing sessions" of third-party copyrighted content without permission. In these "group viewing sessions," streamers (like Hasan and Denims) would watch entire copyrighted works with little to no commentary – sometimes even letting the video play when they were not present or while the streamer was sleeping. The controversy reached a fever pitch when these "group viewing sessions" involved mainstream television shows and films.

a.    On February 1, 2022, the online content creator known as Jay Exci released a video entitled *Hasan Piker, Jinx, and the Issue of "Reaction" Content*.[12] In the video, Jay Exci drew a distinction between reaction videos that provide substantive critique and/or additional insights into the original work and lazy reaction videos that resemble "group viewing sessions." In particular, Jay Exci focused on Hasan's "group viewing sessions," including: (1) his poverty of commentary; (2) his penchant for doing an "empty chair reaction" where he lets the video play while he is completely off screen; and (3) his failure to credit the author of the original video or link to the original content.

b.    In a now-deleted response video, Denims defended the unauthorized use of copyrighted content by asserting that viewers prefer watching streamers over original uploads, particularly when the material is "curated." She claimed that established fair use standards are irrelevant to live streaming (including Twitch content) and need not be transformative through substantial commentary or editing. Rather, Denims claimed that a streamer's personality alone can justify the unauthorized rebroadcast of copyrighted material.[13]

[12] Jay Exci, *Hasan Piker, Jinx, and the Issue of "Reaction" Content* (Feb. 1, 2022), *available at*: https://youtu.be/_TVSfHbpR6k?si=Ai5RtbZfC9zExQad

[13] MooLer, *EFAP #180 – Denims vs. Jay Exci: The disastrous state of Twitch streamers w/ Stich & ShortFatOtaku* (April 3, 2022), *available at*: https://youtu.be/y6VfwO_VnOo?si=kSAlO1GHXONXnGmS

c.      On February 6, 2025, Denims and Jay Exci conducted a debate about the propriety of "group viewing sessions" that was moderated by the online content creator named Chud Logic (the "Debate Video").[14] During the debate, Denims makes several damning statements about her personal perception on the unauthorized use of copyrighted content. Some notable moments are listed below.

i.      Early on in the debate, Denims acknowledges that she uses third-party content as "filler" and that it siphons views away from the original:

> I just want to be clear on my opinion on, like, filler content and stuff. Like, I think filler content … you shouldn't do it. ***I know I do it as a react streamer***. And I try to do it only with *Vox* videos or *Vice* videos (and stuff like that) because I'm not, like, directly ripping from one content creator and not like a whole team and stuff. And most of those videos have, like, five million views. I only get, like, 500 viewers. Likely, I'm not even going to be taking out, ***I'm taking may 50 views from the video***. ***It's a lot harder to feel, like, I guess bad about that.***

Debate Video at 8:50-9:18.

ii.      Shortly thereafter, Denims accepts her own bias in the situation and her desire to use third-party content: "Maybe I'm coping, because I'm a reactor and ***I want to have that content***." Debate Video at 9:42-9:45.

iii.      Later in the debate, Denims sets forth her theory to justify a "group viewing session" of third-party content: that Twitch streamers are "curators" that provide a "communal" experience of watching content with their audience who do not want to take the time to find YouTube content on their own.

1.      "You know, I'm sure if you click on a random part of the video, I might not be saying anything – sure, whatever – I might walk away from the screen. But it's about, like the communal thing. … It's not about the actual show at a certain point. It's like, oh, it's the same reason you watch shows with your friends. You want to watch it with other people, right." Debate Video at 28:06-28:27.

---

[14] Chud Logic, *Jay Exci vs Denims CLASH in Contentious DEBATE! – Hasan/React Streamer Debate* (Feb. 6, 2022), *available at*: https://youtu.be/Y1elepqFtWg?si=vRxjvwuZuqduDVHG

10
COMPLAINT

2. "I think when it comes to streamers on Twitch, a lot of people go watch streamers on Twitch for their react content almost as a curator. So, they don't actually want to go through YouTube themselves and watch a bunch of videos. And they probably never will go through YouTube and click a bunch of videos. They like going to Twitch because they like to have it as, like, this streamer is curating fun content that I want to watch." Debate Video at 28:52-29:18.

3. "I think that, like, people who are watching content on Twitch – curated Twitch content on Twitch – aren't necessarily people that would be watching content on YouTube." Debate Video at 30:18-28.

4. "A lot of the time, the reason that they go and watch react streamers is because they don't want to have to do the effort of going and scrolling through YouTube and clicking on recommends. Debate Video at 36:33-36:42.

5. "The people who watch Twitch content are specifically there to watch it so they don't have to scroll through YouTube and find a video that they like." Debate Video at 37:01-37:08.

iv. Denims, however, ultimately concedes that, when a viewer watches content "curated" by a Twitch streamer, it serves as a substitute for the original:

1. "There's no point of watching something a second time. You already watched it. Maybe, like, if you're watching it with some other people or something or it's been a long time, you might re-watch the video. *But once you watch the video in one place, it's pretty unlikely that you're going to go back and watch it again*." Debate Video at 30:00-30:13.

2. "If someone watches content on someone else's stream, *there is a very low likelihood that they're going to go watch it separately* and give you the view or the like." Debate Video at 36:00-36:13.

**Background of H3Snark**

21.     H3Snark is part of a genre of message boards – known as subreddits – on the website, Reddit. Snark subreddits consist of "fallen fans" of a particular entertainer. Over time, there have been numerous snark subreddits regarding TEI's podcasts and of the Klein. Many were banned by Reddit for violating its Content Policy – such as r/Frenemies and r/Frenemies2.

22.     H3Snark was created on August 30, 2023 by Doe No. 1 – who was a fanatical Trisha Paytas ("Trisha") fan. Doe No. 1 became a "fallen fan" when the TEI series, *Frenemies* (which was co-hosted by Ethan and Trisha), ended abruptly in June 2021.

23.     H3Snark became a haven for "fallen fans" of TEI's podcasts and the Kleins. While the average viewer would move on with their lives after becoming disinterested in a podcast, H3Snark "fallen fans" religiously watch TEI produced content with orgiastic hatred. H3Snark enables these deranged and chronically unemployed fallen fans to share their perverse pleasure of hate-watching TEI content with others by providing infringing clips and links to TEI content.

24.     Beginning in the fall of 2023, H3Snark experienced a surge of new users who were "fallen fans" of the TEI series, *Leftovers.* As mentioned, the show was co-hosted by Ethan and Hasan (who is the most prominent alt-left streamer on the website, Twitch). On September 14, 2023, Ethan and Hasan debated various issues concerning China and Taiwan, such as whether Taiwan should be independent, the propriety of China's subjugation of Tibet and the genocide of the Uyghurs.[15] Due to Ethan pushing back on Hasan's pro-China positions, several *Leftover* fans who had an ecclesiastical parasocial relationship with Hasan flocked to H3Snark because they felt Ethan was critiquing them personally.

25.     The surge of new users to H3Snark exploded after October 7, 2023.

[15] H3 Podcast, "Joe Biden Is Getting Impeached – Leftovers #57," at 50:06 (September 14, 2023), *available at*: https://www.youtube.com/live/EeFuFKH-uOo?si=J3-Z-J7jWtkpv_Bu&t=3006

The Kleins are dual Israeli-American citizens. Hila was born and raised in Israel, where she served as a secretary during her mandatory conscription into the Israeli Defense Forces ("IDF").[16] While both Ethan and Hila are highly supportive of Palestinian self-determination and extremely critical of Israel and its government, the Kleins support a two-state solution as the best interim solution to the conflict.[17]

26.   In the wake of October 7th, Hasan emerged as the modern incarnation of The Grand Mufti Hajj Amin Al-Husseini ("Al-Husseini").[18] Like Al-Husseini, Hasan became a passionate advocate and highly charismatic leader of the

[16] H3 Podcast Highlights, *Hila From H3H3 Discusses Her Time In the Israeli Military (IDF)*, YouTube (Apr. 23, 2022), at 0:40–1:04, *available at*: https://www.youtube.com/watch?v=ytOl5hbTrCY.

[17] H3 Podcast, *i made a mistake. i'm sorry. – H3TV #93* (October 9, 2023), at 2:03:40-2:03:58, 2:05:14-2:05:20, 3:35:56-3:36:17, *available at*: https://www.youtube.com/live/ZNFeRPMOu8g?si=4jE4j8SsuGKOuiPL; H3 Podcast, *Israel vs. Gaza – Leftovers #61* (Oct. 12, 2023), at 8:26-9:20, 1:15:22-1:15:38, 2:52:33-2:52:41, *available at*: https://www.youtube.com/live/JFznOHunD_c?si=vtd4HrejPjU6kzzx; H3 Podcast, *Jay Shetty Exposed By Ex-Girlfriend & He Lied About Being A Monk – After Dark #139* (March 2, 2024), at 2:24:16-2:24:31, *available at*: https://www.youtube.com/live/5XrPXgcKwVc?si=893H-4SIKBG46jLD

[18] World War Two, *The Nazi-Islam Alliance? – Amin al-Husseini – WW2 Biography Special* (Dec. 21, 2021), *available at*: https://youtu.be/K07j-wuL8sw?si=en3seNLjS0JRmxHj; The World History Channel, *Why Did The Grand Mufti Of Palestine Collaborate With Nazi Germany?* (Jan. 30, 2025), *available at*: https://youtu.be/aVeXPFY7shI?si=ZT4GYoa27xKF6-kG; Casual Historian, *How the Zionists responded to World War Two and the Holocaust* (Feb. 8, 2025), *available at*: https://youtu.be/w6NrUiUhYiA?si=EswHI27G-9MW8OH4; Casual Historian, *The Palestine Mandate: The Origins of the Israeli-Palestinian Conflict (Supercut)* (Dec. 28, 2023), *available at*: https://youtu.be/vUuR-3tw9p8?si=EzAVrpG5IZHUKa8Y; United States Holocaust Memorial Museum, Holocaust Encyclopedia, "Hajj Amin al-Husayni: Wartime Propagandist," *available at*: https://encyclopedia.ushmm.org/content/en/article/hajj-amin-al-husayni-wartime-propagandist?parent=en%2F11094; United States Holocaust Memorial Museum, Holocaust Encyclopedia, "Hajj Amin Al-Husayni: Arab nationalist and Muslim Leader," *available at*: https://encyclopedia.ushmm.org/content/en/article/hajj-amin-al-husayni-arab-nationalist-and-muslim-leader?parent=en%2F11104; Wikipedia, "Amin al-Husseini," *available at*: https://en.wikipedia.org/wiki/Amin_al-Husseini

Palestinian cause.[19] Like Al-Husseini, Hasan used his massive platform to spread genocidal rhetoric about anyone advocating for the right of Jewish self-determination in their ancestral homeland (*i.e.*, Zionists).[20] The primary difference between Hasan and Al-Husseini is that Al-Husseini worked with the Nazis and advocated the annihilation of Jews[21] – while Hasan advocates the annihilation of all Zionists. Since the vast majority of Jews in the United States say caring about Israel is "essential" or "important," this would necessarily include the vast majority of Jews[22] – even if they support the Palestinian cause and vehemently condemn the actions of the Israeli government.

[19] Benny Morris, *1948: A History of the First Arab–Israeli War*, p. 23 (Yale Univ. Press 2008).

[20] Philip Mattar, *The Mufti of Jerusalem: Al-Hajj Amin Al-Husayni and the Palestinian National Movement* 105–06 (Rev. ed. Columbia Univ. Press 1992); Britannica, "Zionism," *available at*: https://www.britannica.com/topic/Zionism; Jewish Virtual Library, "Zionism: A Definition of Zionism," *available at*: https://www.jewishvirtuallibrary.org/a-definition-of-zionism; *see also* Tracy Wilkinson, Los Angeles Times, "Is Zionism patriotism or racism? Big disagreements over a word in use for 125 years" (May 22, 2024), *available at:* https://www.latimes.com/world-nation/story/2024-05-22/zionism-disagreement-over-a-word-in-use-for-125-years; Jewish Virtual Library, "Zionism: Table of Contents," *available at*: https://www.jewishvirtuallibrary.org/zionism

[21] Jeffrey Herf, *Nazi Propaganda for the Arab World*, p. 213 (Yale Univ. Press 2009); Kause-Michael Mallman and Martin Cuppers (Translated by Krista Smith) *Nazi Palestine* (2010); David Patterson, *A Genealogy of Evil: Anti-Semitism from Nazism to Islamic Jihad* (Cambridge Univ. Press 2010).

[22] Backa A. Alper, Pew Research Center, "How U.S. Jews are experiencing the Israel-Hamas war" (April 2, 2024), *available at*: https://www.pewresearch.org/short-reads/2024/04/02/how-us-jews-are-experiencing-the-israel-hamas-war/; Justin Nortey, Pew Research Center, "U.S. Jews have widely differing views on Israel" (May 21, 2021), *available at*: https://www.pewresearch.org/short-reads/2021/05/21/u-s-jews-have-widely-differing-views-on-israel/; The Jewish Majority, "New Poll: Jewish Voice for Peace Does Not Represent Vast majority of U.S. Jewish Community" (Feb. 12, 2025), *available at*: https://img1.wsimg.com/blobby/go/2921c434-f7d7-43f4-ade6-3a5591444c85/downloads/97dc308b-4559-4e42-a55e-53c77f75c044/Press%20release%202.11.2025.pdf?ver=1739292818681

COMPLAINT



Al-Husseini Meets Adolf Hitler, November 28, 1941

Al-Husseini With His Close Friend Heinrich Himmler, 1943

"Arabs, rise as one man and fight for your sacred rights. Kill the Jews wherever you find them. This pleases God, history and religion. This saves your honor. God is with you." – Al Husseini (March 1, 1944 on Nazi radio)

15

COMPLAINT

27.     On October 12, 2023, the last episode of *Leftovers* aired. It comprised of a discussion between Ethan and Hasan regarding the Israel/Palestine conflict and the events of October 7th.[23] During the discussion, Ethan expressed his support of the Palestinian cause and empathy for their suffering, along with condemning Israeli Prime Minister Benyamin Netanyahu. At the same time, Ethan attempted to humanize the victims of October 7th to Hasan in the hope that empathy and mutual understanding could begin the heal the divide. Hasan was unpersuaded and the relationship with Ethan and Hasan began to deteriorate.

28.     In the aftermath of the falling out between Ethan and Hasan, H3Snark became a radioactive hub of "fallen fans" of TEI content and the Kleins. It became a focal point for spreading vicious lies, outlandish conspiracy theories and hallucinatory misrepresentations about the Kleins.

**The Rampant Copyright Infringement on H3Snark**

29.     Despite their hatred towards the Kleins, the users of H3Snark had an insatiable appetite for TEI's content. The H3Snark users, however, did not want TEI to receive any views or advertising revenue from their consumption of TEI's content. As a result, H3Snark became a locus of copyright infringement of TEI content – as detailed below.

30.     One method the H3Snark Mods employed to consume TEI content was to share links of TEI content on YewTube – a website that provides unauthorized access to YouTube videos and publicly performs them, which constitutes copyright infringement. *See Hunley v. Instagram, LLC,* 73 F.4th 1060, 1073-74 (9th Cir. 2023). YewTube had particular appeal to H3Snark Mods and H3Snark users because a video watched on YewTube does not result in a view or advertising revenue to the original on YouTube.

31.     H3Snark Mods conducted live chats during TEI's live broadcasts. During the live chats, the H3Snark Mods would spam the chat with YewTube links

[23] H3 Podcast, "Israel vs Gaza – Leftovers #61" (October 12, 2023), *available at*: https://www.youtube.com/live/JFznOHunD_c?si=Cbfod032xwJ5e-FQ

of the broadcast. Once the livestream ended, the H3Snark Mods concealed the evidence of their copyright infringement by deleting the live chat logs. Below are true and correct screenshots of the H3Snark mods spamming the live chat with YewTube links to TEI copyrighted content.





32. Doe No. 3 (*i.e.*, u/sarahornejewetts) encouraged H3Snark users to use YewTube as an alternative to watching the TEI's video on its official channel by commenting on certain posts. Doe No. 3's comments were later wiped. Due to Doe No. 3's efforts, the user was anointed as one of the H3Snark Mods. Some examples of Doe No. 3 inducing copyright infringement of TEI content are contained below:

a. In August 2024, the u/PearlUnicorn created the post: "For those who wonder why Snarkers watch, moments like the second button failure." Below

is a true and correct screenshot of Doe No. 3 stating: "*We encourage folks to watch on yewtube since it doesn't play ads or contribute to their view counts*." As can be noted, Doe No. 3's comment was subsequently wiped from August 2024 post.





b. On August 28, 2024, the H3Snark Moderators created a post entitled "MEGATHREAD: The H3 Show – Aug 28 2024." Below is a true and correct screenshot of Doe No. 3 providing a link to the TEI video *Content Court: Jack Doherty – H3 Show #48* on YewTube.[24] As can be noted, Doe No. 3's comment has been wiped from the August 28, 2024 post.

[24] While Doe No. 3's post just contained a hyperlink labeled "Watch on Yewtube," the link would direct users to https://yewtu.be/watch?v=DCw4csgcEsk.

19
COMPLAINT



33.     Under the H3Snark wiki page for "tools-tips-guides," H3Snark Mods also instructed H3Snark users on how to create clips of TEI content so these clips could be posted on H3Snark. At one point, the H3Snark Mods even instructed users how to download "Members-Only" content (*i.e.*, TEI content only accessible to paying members) so that they could be posted on H3Snark. To hide their inducement of copyright infringement, the H3Snark Mods deleted the portion on downloading "Members-Only" content from the guide. A true and correct screenshot of the portion regarding "Members-Only" content is provided below.

**TEI Issues Takedown Notices for Infringing Posts and Comments on H3Snark**

34. TEI began to fight back against the copyright infringement on H3Snark by issuing takedown notices pursuant to 17 U.S.C. Section 512(c)(3) ("DMCA Takedowns"). TEI was extremely surgical about which H3Snark posts would be subject to DMCA Takedowns. Relying on the most pertinent fair use decisions,[25] TEI issued DMCA Takedowns only for: (1) posts/comments that uploaded an entire TEI episode onto Reddit – particularly paywalled TEI content; (2) comments that provided a YewTube link to entire episodes of TEI content; or (3) posts that contained a clip of TEI content with a descriptive, non-critical title and the comments were locked by the H3Snark Mods or there were no comments after several hours.

a. August 1, 2024 DMCA Takedown: On August 1, 2024, TEI issued a DMCA Takedown for the H3Snark post entitled "H3 Live Show Behind the Scenes." The post contained a complete version of TEI's video *H3 Podcast BTS #53* – which was "Members Only" content (*i.e.*, accessible only to paying members of *The H3 Podcast* YouTube channel). On August 2, 2024 (*i.e.* one day later), Reddit honored this DMCA Takedown.

b. August 30, 2024 DMCA Takedown: On August 30, 2024, TEI issued a DMCA Takedown for a comment by Doe No. 3 (*i.e.*, u/sarahornejewetts) on the H3Snark Post entitled "MEGATHREAD: The H3 Show - Aug 28, 2024" (the "8/30/24 Takedown"). The comment contained a YewTube link to the TEI video *Content Court: Jack Doherty – H3 Show #48.*[26] On September 9, 2024 (*i.e.*, nine days later), Reddit honored the 8/30/24 Takedown.

[25] *In re DMCA Subpoena to Reddit, Inc.*, 441 F.Supp.3d 875, 883-886 (N.D. Cal. 2020); *Hughes v. Benjamin*, 437 F.Supp.3d 382, 390-394 (S.D.N.Y. 2020); *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1157-1164 (9th Cir. 2022); *Warhol*, 598 U.S. at 525-550; *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 627-631 (9th Cir. 2003); *Hosseinzadeh*, 276 F.Supp.3d at 41-42, 45-47; *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170-1183 (9th Cir. 2012).

[26] The comment for u/sarahornejewetts (*i.e.*, Doe No. 3) no longer exists on the post, but a screenshot of it is show in connection with Paragraph 32.b, *supra*.

c.  September 18, 2024 DMCA Takedown: On September 18, 2024, TEI issued a DMCA Takedown for the H3Snark post entitled "Ethan and Dan confirm that posting to snark will get you banned" (the "9/18/24 Takedown"). The post solely comprised of a clip from the TEI video *Ethan Debates Anti-Semitic Sneako Fan – H3 Show #55*. The post contained no comments because the H3Snark Mods locked the post. Reddit never informed TEI whether the 9/18/24 Takedown was honored.

d.  November 22, 2024 DMCA Takedowns: On November 22, 2024, TEI issued two DMCA Takedowns

i.  First Takedown: The first DMCA Takedown was for the H3Snark post "ethan talks positively about celebrity poker tour's sponsor, a sports gambling app named fliff h3 show #83." The post contained a clip from the TEI video *We Play Poker w/ Ninja, Impractical Jokers, & More! – H3 Show #83*. The post contained two comments: (1) "Dude ur flair is actually fucking frying me rn" (original spelling); and (2) "The downfall is real man." The post contained no further comments because the H3Snark Mods locked the post. On November 29, 2024 (*i.e.*, seven days later), Reddit informed TEI that it honored this DMCA Takedown.

ii.  Second Takedown: The second DMCA Takedown was for the H3Snark post entitled "Ethan describes his issues with Hasan as 'personal beef.'" This post contained a clip from the TEI video entitled *Logan Paul Posted F\*\*\*KING INSANE Cringe – H3 Show #84*. At the time this DMCA Takedown was issued, the post had been up for over two hours and had no comments at that time (but 130 upvotes).[27] On December 5, 2024 (*i.e.*, nearly two weeks later), Reddit informed TEI that it honored this DMCA Takedown.

---

[27] After this DMCA Takedown was issued (but before Reddit honored it), the post received additional comments. A true and correct PDF printout of the post taken on November 22, 2024 is attached hereto as Exhibit A. *Compare* Ex. A *with* https://www.reddit.com/r/h3snark/comments/1gxofik/ethan_describes_his_issues_with_hasan_as_personal/

22
COMPLAINT

e.    November 26, 2024 DMCA Takedowns: On November 26, 2024, TEI issued two DMCA Takedowns.

i.    First Takedown: The first DMCA Takedown was for the H3Snark post "LB says '[far leftists] hate israel because israel is backed by the west' and this can lead to antisemitism. Ethan agrees, then says freedom of religion, speech, press, and to 'control what happens in your own work space' would be under state-control in communism – h3 show #85." (original spelling and brackets). The post contained a clip from the TEI video entitled *I Haven't Been Well – H3 Show #85*. The post contained no comments because the H3Snark Mods locked the post. On December 6, 2024 (*i.e.*, ten days later), Reddit informed TEI that it honored this DMCA Takedown.

ii.    Second Takedown: The second DMCA Takedown for the H3Snark post "Lena asks Lonerbox about civilians and doesn't get a direct answer: 'It's always civilians are dying… BUT… and then theres a reason for justifying it.'" (original ellipses and spelling) (the "Second 11/26/24 Takedown"). The post contained a clip from the TEI video entitled *I Haven't Been Well – H3 Show #85*. The post contained no comments because the H3Snark Mods locked the post. On December 6, 2024 (*i.e.*, ten days later), Reddit informed TEI that it honored this DMCA Takedown.

**The H3Snark Mods' Efforts to Issue Fraudulent Counternotifications**

35.    The H3Snark Mods made a concerted effort to issue fraudulent counternotifications to TEI's DMCA Takedowns, as detailed below:

a.    On January 15, 2025, Reddit informed TEI that a so-called counternotification was issued against both the 8/30/24 Takedown the 9/18/24 Takedown (the "First Fraudulent Counternotification").[28] The First Fraudulent Counternotification was issued on October 18, 2024 – *i.e.*, Reddit informed TEI

---

[28] A true and correct copy of the First Fraudulent Counternotification is attached hereto as Exhibit B.

23
COMPLAINT

nearly three months later.

i. On its face, the First Fraudulent Counternotification failed to satisfy the requirements of 17 U.S.C. Section 512(g)(3) because it failed to include: (1) the issuer's address and telephone number; (2) consent to jurisdiction and service of process; and (3) a statement made under penalty of perjury.

ii. Further, the First Fraudulent Counternotification contained numerous indicia of being fraudulent because: (1) it was a single counternotification for posts made by two different users (*i.e.* u/sarahornejewetts and u/obrienpotatoes); and (2) it misrepresented that the 8/30/24 Takedown was for the post and not the comment with the YewTube link.

iii. It was also evident the First Fraudulent Counternotification was issued by the H3Snark Mods because it stated: (1) "We are writing to contest the removal of two posts from ***our subreddit*** under alleged copyright claims" (emphasis added); (2) "***We believe these reports may have been filed by fans rather than the legitimate copyright holder***" (emphasis added) – despite the fact that TEI's counsel's contact information was provided in both the 8/30/24 Takedown and 9/18/24 Takedown; and (3) the name of the issuer was "Michael Anderson" – a generic name that would make it impossible to identify the issuer of the First Fraudulent Counternotification.

iv. On January 16-17, 2025 (*i.e.*, two days after receiving the First Fraudulent Counternotification), TEI explained in exacting detail the facts and law demonstrating the First Fraudulent Counternotification was invalid. On March 18, 2025 (*i.e.*, over two months later), Reddit responded that it agreed that the First Fraudulent Counternotification was invalid – but claimed that it would refuse to honor the 8/30/24 Takedown because the post only linked to TEI's video on YouTube. The same day, TEI explained to Reddit that this was false because the 8/30/24 Takedown explicitly stated it was directed at the comment by Doe No. 3 (*i.e.*, u/sarahornejewetts) and contained a YewTube link, including providing a

screenshot for the comment. To date, Reddit has not responded.

      b.      Additionally, on March 18, 2025 (the same day Reddit informed TEI that the First Fraudulent Counternotification was invalid), Reddit notified TEI that another counternotification was issued regarding the 9/18/24 Takedown (the "Second Fraudulent Counternotification").[29] The Second Fraudulent Counternotification was issued on December 5, 2024 (*i.e.*, Reddit notified TEI three and a half months later).

      i.      The Second Fraudulent Counternotification contained no indicia that the issuer considered the four fair use factors prior to issuing the Second Fraudulent Counternotification – which is unlawful. *See Hosseinzadeh*, 276 F.Supp.3d at 36; *Hughes*, 437 F.Supp.3d at 394-395; *cf Lenz v. Universal Music Group*, 815 F.2d 1145, 1149, 1154-55 (9th Cir. 2016). Further, the language of the Second Fraudulent Counternotification demonstrated the issuer – u/obrienpotatoes – did not understand fair use in general, by stating: (1) "This was an abuse of the fair use system" (which is bizarre because u/obrienpotates was claiming fair use, not TEI); and (2) the conclusory assertion "Even so, it would still be allowed under fair use" without any analysis. This is further emphasized by an April 11, 2025 post on X by @obrienpotatoes1. In the post, @obrienpotatoes posted the cease and desist letter sent by TEI's counsel and defended the Reddit post by claiming it was only "A MINUTE AND A HALF LONG CLIP" – *i.e.*, only focusing on the amount used and not the other fair use factors.[30]

      ii.      The Second Fraudulent Counternotification also echoed language similar to the First Fraudulent Counternotification – indicating the H3Snark Mods worked with u/obrienpotatoes to issue the Second Fraudulent Counternotification: "This subreddit has also been mercy to many ***bad faith brigades*** recently, so ***I do not believe this appeal was filed by the actual copyright***

[29] A true and correct copy of the Second Fraudulent Counternotification is attached hereto as Exhibit C.

[30] *See* https://x.com/obrienpotatoes1/status/1910711822212067372

<div align="center">25</div>
<div align="center">COMPLAINT</div>

*owner*" (emphasis added) – despite the 9/18/24 Takedown containing TEI's counsel's contact information.

iii.    Additionally, after the Second 11/26/24 Takedown was issued, one of the H3Snark Mods (who later deleted their account) left a comment on the post stating: "I reached out via DM to discuss how to appeal these, if you're willing to fill out the form." This further emphasizes the H3Snark Mods coordinated a campaign of issuing fraudulent counternotifications to enable H3Snark's copyright infringement of TEI's works.

c.    The H3Snark Mods went on a public relations campaign to paint TEI's DMCA Takedowns as fraudulent to cover up their copyright infringement. To achieve this objective, the H3Snark Mods authored several posts misrepresenting the facts.[31]

d.    After Ethan became vocal about pursuing claims against H3Snark, the H3Snark Mods began deleting their posts, comments and accounts *en masse* to perpetuate their false narrative and conceal their copyright infringement (along with other illegal activity, such as organized harassment and defamation).

e.    On March 5, 2025, a YouTuber by the name of "The Law" posted a video on YouTube entitled *Dear H3Snark, I see you.*[32] In the video, The Law admits he was a former H3Snark user who came to reject the obsessive and destructive behavior he saw taking over the subreddit. He documented the acts of copyright infringement by H3Snark users and H3Snark Mods (and other unlawful

[31]https://www.reddit.com/r/h3snark/comments/1h851se/false_copyright_strike_tracker_megathread_ethan/;
https://www.reddit.com/r/h3snark/comments/1fdmu80/h3ethan_klein_is_abusing_the_copyright_system_by/;
https://www.reddit.com/r/h3snark/comments/1h79qk3/another_false_copyright_strike_likely_from_ethan/;
https://www.reddit.com/r/h3snark/comments/1hvtb5v/confirmed_ethan_klein_hired_an_attorney_to_issue/

[32] The Law, *Dear H3Snark, I see you.* (March 3, 2025), *available at:*
https://youtu.be/lfjbgNjo0Oc?si=zbNomCBmxySgCuvU

conduct), including their attempts to conceal their unlawful conduct. The video documents:

i.     The H3Snark Mods deleted posts after Ethan announced plans to pursue legal action against H3Snark for harassment (1:18-1:41);

ii.     How the H3Snark Mods abused the live chat feature on Reddit to promote harassment and defamatory statements, including promoting some of the egregious offenders into H3Snark Mods (2:02-4:54);

iii.     How the H3Snark Mods use "sock puppet accounts" (*i.e.*, using a false online identity for deceptive purposes) to conceal their identities while engaging in harassment – which were deleted after Ethan announced he would pursue legal action against H3Snark (4:55-6:51); and

iv.     How the H3Snark Mods purposefully lied about TEI's DMCA Takedowns to conceal their copyright infringement and obfuscate their intent to siphon views and ad revenue away from TEI (6:52-9:11).

**TEI Creates and Registers *The Nuke***

36.     By the fall of 2024, Ethan and Hila Klein's concern reached a fever pitch over Hasan radicalizing his audience with propaganda from Ansar Allah a/k/a The Houthis, Hezbollah and Hamas. The Kleins were equally concerned with Twitch's refusal to enforce its Community Guidelines against Hasan and his so-called "Waiting Room" – *i.e.*, other Twitch streamers, like Denims, who parrot Hasan and parasitically leach off his audience by broadcasting immediately before or after his streams.

37.     Hasan and his Waiting Room hijacked the necessary and important discussion of the Israeli-Palestinian conflict and the Gaza War. They employed genocidal rhetoric that painted all Israelis as subhuman warranting annihilation. The term "Zionist" lost all meaning and quickly mutated into a thinly-veiled dog whistle for Jews.[33] To combat the tsunami of hateful rhetoric, Ethan and Hila Klein –

[33] The term "Zionist" was used as a slur to paint anyone who supported the (continued).

through TEI – created *Content Nuke: Hasan Piker.*

38.    *The Nuke* was written, shot and edited from December 2024 through January 2025. On January 27, 2024 (*i.e.*, four days before the Nuke was publicly released on TEI's h3h3Productions YouTube channel), TEI submitted its application to register *The Nuke* with the United States Copyright Office (the "USCO"). On January 28, 2025, the USCO received the deposit copy of the Nuke (the "Deposit Copy"). The registration number for *The Nuke* is PAu 4-256-429.

39.    The Deposit Copy varied slightly from the broadcast version of *The Nuke* (the "Broadcast Version"). First, the Deposit Copy did not contain the conclusion and sponsor segment that was contained in the Broadcast Version. Second, to prevent *The Nuke* from being age-restricted by YouTube (which would limit its reach), TEI was required to fully blur out the footage of the Houthis entering the bridge of the *Galaxy Leader* and black out the footage of Hamas releasing hostages from November 2023. Third, minor visual edits were made. Ultimately, all of the Deposit Copy was incorporated into the broadcast version of the Nuke comprised of the Deposit Copy.[34]

existence of Israel or a two-state solution as a Kahanist (Jewish Supremacist) or Israeli Religious Nationalist. In the most recent Israeli Legislative Election in 2022, the coalition of these parties only received 10.84% of the vote. Wikipedia, "Kahanism" *available at*: https://en.wikipedia.org/wiki/Kahanism; Institute for Middle Eastern Understanding, "Fact Sheet: Meir Kahane & The Extremist Kahanist Movement" (May 17, 2024), *available at*: https://imeu.org/article/fact-sheet-meir-kahane-the-extremist-kahanist-movement; Wikipedia, "National Religious Party," *available at*: https://en.wikipedia.org/wiki/National_Religious_Party; The Israel Democracy Institute, "National Religious Party (Mafdal)," *available at*: https://en.idi.org.il/israeli-elections-and-parties/parties/national-religious-party/; Wikipedia, "2022 Israeli legislative election," *available at*: https://en.wikipedia.org/wiki/2022_Israeli_legislative_election.

[34] TEI is concurrently-filing with this Complaint a Notice of Lodging accompanied by a flash drive containing various video exhibits referenced in the Complaint (the "Flash Drive"). A true and correct copy of the Deposit Copy is located on the Flash Drive as Exhibit D. A true and correct copy of the Broadcast Version is located on (continued).

***The Nuke***

40.     *The Nuke* is a tragi-comic documentary critiquing Hasan and Twitch. It contains of original footage, highly edited montages, parodic skits and archival materials (a great deal of which are owned by TEI). *The Nuke* can be divided into seven sections: (1) The Prologue; (2) The Twitch Parody Sketch; (3) The Houthi Section; (4) The Hezbollah Section; (5) The Hamas Section; (6) The Twitch Section; and (7) The Conclusion.

a.     The Prologue (Ex. E at 0:00:00-0:25:40): The Prologue walks the audience through Ethan's thesis of *The Nuke*: that Hasan radicalizes his audience with genocidal and antisemitic terrorist propaganda.

i.     While admitting both of himself and Hasan are polarizing figures with controversial takes, Ethan explains he grew concerned with Hasan's rhetoric after hearing him excuse Russian and Chinese genocide and imperialism, namely Hasan's positions on Crimea, Tibet, Taiwan and the Uyghurs.

ii.     Once October 7th occurred, Ethan's concerns were exacerbated. He received a torrent of antisemitic comments from Hasan's audience and saw Hasan downplay the sexual violence perpetrated by Hamas on October 7th.

iii.     Ethan explains that the primary difference of opinion between him and Hasan (and his audience). While both are aligned on supporting the Palestinian cause – including condemning Israeli Prime Minister Benyamin Netanyahu, Israeli settlements and Israeli settlers – they differ in one key aspect regarding how to solve the conflict: Ethan believes in a two-state solution, while Hasan (and his audience) believe in a one-state solution.

iv.     Ethan articulates the concerns Israelis have with a one-state solution: Israel has been at war with its Arab neighbors since the country's inception. As a nation of refugees, the idea of suddenly becoming a minority raises legitimate concerns – particularly for the Mizrahi Jews (*i.e.*, Jews from Arab the Flash Drive as Exhibit E.

29
COMPLAINT

countries) who were expelled from Arab countries.

v.    Ethan then shows archival footage of Hasan: (1) supporting terrorism and glorifying terrorists; (2) admitting to hiding his "power level" (*i.e.*, extremism) because it is a more palatable way to introduce young people into the "radicalization funnel"; (3) conceding to being a propagandist; and (4) expressing vitriolic hatred of liberals. Ethan further points out that Twitch takes no action to moderate Hasan.

vi.    Ethan ends The Prologue by expressing his underlying fear that he played a role in mainstreaming Hasan and that he radicalized Ethan's audience.

b.    The Twitch Parody Sketch (Ex. E at 0:25:41-0:30:39): The next section involves Ethan parodying a Twitch advertising executive. In the scene, Ethan mocks how Twitch has embraced Hasan's extremist rhetoric and rebrands terrorism as socially acceptable. After the sketch ends, Ethan shows a media bias report that ranked Hasan as one of the most extreme and unreliable news sources.

c.    The Houthis Section (Ex. E at 0:30:40-0:55:33): The Houthi Section focuses on Hasan radicalizing his audience by glorifying and disseminating Houthi propaganda.

i.    Ethan begins with an overview of various Houthi atrocities and how they contradict leftist values. Examples include recruiting child soldiers, shelling and blocking aid to civilians, ruining agricultural land with mines, oppressing women and members of the LGBTQ community, torturing and killing women and slavery. Ethan also highlights the Houthi's antisemitism – such as performing Nazi salutes and the slogan on their flag calling for "Death to Israel" and "Curse Upon the Jews."

ii.    Ethan critiques Hasan's coverage of the Houthis by using his stream with Nick Polom p/k/a Nmplol ("Nick") as a case study. Hasan exploits Nick's political naiveté by putting on a Houthi propaganda music video and leaving

Nick alone who watches in abject horror. Ethan cites Twitch's Community Guidelines – which explicitly prohibit showing terrorist propaganda for any purpose. Despite this, Twitch refuses to enforce its Community Guidelines against Hasan. Hasan downplays to Nick the fact that the Houthi propaganda video is terrorist propaganda by describing the video as merely a "musical" and the Houthis as "musical people." When Hasan mischaracterizes the hijacking of the ship the *Galaxy Leader* as an effective deterrent against Israel, Ethan debunks Hasan's assertions that the ship was in Houthi waters, destined to Israel or an Israeli ship. Ethan also excoriates Hasan for minimizing the Houthis taking the crew of the *Galaxy Leader* hostage.

iii. Ethan also critiques Hasan's misguided belief that, if Israeli commerce is disrupted, Israelis will leave Israel. Ethan demonstrates 80% of Israelis were born in the country and have nowhere else to go. This is exacerbated by the fact that the majority of Jewish Israelis fled (or are descendants from those who fled) Arab countries. The argument that Jews will "return where they came from" is ahistorical and denies the connection of Jews to the Middle East. Rather, it furthers an antisemitic conspiracy theory that questions the origins of the Jews in an attempt to brand Jewish Israelis as outsiders and colonizers.

iv. Ethan shows another example of Hasan watching and praising a different Houthi propaganda music video. To mock Hasan's laudatory coverage of this video, Ethan juxtaposes the Houthi music video with a highly edited version of the Miami Boys Jewish Choir singing "Yerushalim."

v. Ethan lambasts Hasan's interview of the Houthi terrorist Rashid Al-Haddad a/k/a Tim "Houthi" Chalamet ("Al-Haddad"). Al-Haddad became a viral sensation on TikTok when he shot footage of himself boarding the *Galaxy Leader*. Ethan mocks Hasan's self-described "journalism" through a montage of Hasan acting like a fan girl, asking frivolous questions and blindly accepting Al-Haddad's answers – particularly his absurd claim that he danced with

the crew taken hostage and that he successfully convinced the crew to hate Israel.

vi. Ethan exposes Hasan's subsequent attempts to downplay Al-Haddad's Houthi connections as disingenuous and a form of bigotry. Not only did Hasan believe he was speaking with a Houthi and promoted the interview as being with a Houthi, Al-Haddad's social media posts admitted and reinforced this fact. When confronted with Al-Haddad's social media posts that fail to distinguish between Jews and Zionists, Hasan engages in all forms of apologia to excuse Al-Haddad's genocidal and antisemitic rhetoric. Hasan even grotesquely compares Al-Haddad to Anne Frank – which Ethan mocks as the Twitch advertising executive.

vii. The Houthi section ends with Ethan excoriating Hasan with a montage of him cynically deflecting and evading criticism by exploiting the term "genocide." This hypocrisy is highlighted by footage of Hasan from a few years ago where he was unable to locate Yemen on a map (and even confusing it with Israel).

d. The Hezbollah Section (Ex. E at 0:55:44-1:01:43): The Hezbollah Section focuses on Hasan radicalizing his audience by disseminating and glorifying Hezbollah propaganda.

i. Ethan begins by highlighting some of Hezbollah's atrocities and how they contradict leftist values. Examples include engaging in terrorism resulting in the deaths of thousands of civilians, the assassination of Lebanese Prime Minister Rafik Al-Hariri, hijacking airplanes, firing 15,000 rockets in civilian areas, being a designated terrorist group and its participation in the Syrian genocide to prop up the dictator Bashar Al-Assad.

ii. Next, Ethan critiques Hasan by juxtaposing scenes of him downplaying and excusing Hezbollah's genocidal terrorism and praising Hassan Nasrallah (Hezbollah's former leader) with Nasrallah's numerous antisemitic and genocidal statements against Jews.

iii. Ethan goes on to critique Hasan's lazy and ignorant

<div align="center">32
COMPLAINT</div>

apologia for Hezbollah and analysis of the conflict, such as branding any criticism of Hezbollah as Islamophobic and Hasan telling Nick that Israel attacked Lebanon because "they were just there." Ethan refutes these assertions by demonstrating Hezbollah began firing rockets at Israel the day after October 7th, killed over 100 Israelis and displaced over 200,000. Ethan questions how Hasan's falsehoods help his position when, in reality, Hasan's misrepresentations only exacerbate the conflict.

e. The Hamas Section (Ex. E at 1:01:44-1:11:50): The Hamas Section focuses on Hasan radicalizing his audience by disseminating and glorifying Hamas propaganda, coupled with denying the atrocities of October 7th.

i. Ethan begins by highlighting some of Hamas' atrocities and how they contradict leftist values. Examples include recruiting children, committing hundreds of suicide bombings that target civilians, firing 50,000 rockets into civilian areas, oppression of women, punishing homosexuality by death, stealing aid intended for Gazans for its own military use or exploiting Gazans by selling the aid back to them.

ii. Next, Ethan critiques Hasan's reaction to a Hamas propaganda video from November 2023 involving the release of Israeli hostages. Hasan gushes effusively over Hamas' treatment of the hostages. He even makes the absurd claim that hostages released in the future will chose to stay in Gaza rather than return to Israel. When a member of Hasan's audience points out the hostages are traumatized, Hasan claims the hostages are "just chillin." Ethan correctly points out that these scenes are staged by Hamas, that the hostages are still being held at gunpoint and provided instructions on how to behave, such as "keep waving."

iii. Ethan goes on to lambast Hasan's reaction to a Hamas propaganda video depicting Hamas creating homemade sniper rifles. Hasan plays the entire clip without any commentary or criticism. Once complete, Hasan's explanation for showing the video is a nonsensical word salad of buzzwords that

have nothing to do with the contents of the video.

iv. Ethan goes on to address Hasan's grotesque denial of sexual violence perpetrated by Hamas on October 7th. He shows a montage of numerous clips of Hasan explicitly denying the sexual violence of October 7th and scoffing at President Biden and Vice-President Harris discussing said violence. Ethan refutes Hasan's denials by showing clips of victim testimony from Sheryl Sandberg's documentary *Screams Before Silence* and displayed the conclusion of a United Nations report that stated:

> Overall, based on the totality of information gathered from multiple and independent sources at the different locations, there are reasonable grounds to believe that conflict-related sexual violence occurred at several locations across the Gaza periphery, including in the form of rape and gang rape, during the 7 October 2023 attacks. Credible circumstantial information which may be indicative of some forms of sexual violence, including genital mutilation, sexualized torture, or cruel, inhuman and degrading treatment, was also gathered.

v. Ethan concludes the section by addressing the heart of the matter. Hasan exacerbates the Israeli-Palestinian conflict by denying the suffering of Israeli victims to hold up Hamas as unimpeachable. As Ethan poignantly states:

> This conflict will never end until people realize that Palestinian liberation and Israeli security are not mutually exclusive. You need both. And it can be done, but not while people like Hasan lie, propagandize and incite hate. It's people like him, ironically, that prolong the conflict indefinitely. There's no space for conversation. There is no space for rational thought. There is no space for nuance. My position on Palestine is like five degrees off from where Hasan is. And to him and his community, I'm the devil. I'm a Nazi. It's delusional thinking. And it's destructive to their own cause.

f. The Twitch Section (Ex. E at 1:11:51-1:40:29): The Twitch Section explores the role Twitch plays in enabling Hasan and his Waiting Room to violate Twitch's Community Guidelines.

i. Ethan begins by critiquing Twitch's Chief Executive Officer, Dan Clancy ("Clancy"). He points to Clancy's ineffectiveness as a CEO, namely rolling back his initiative to change revenue splits and the size of sponsor logos on stream – along with laying off significant portions of Twitch staff. Clancy explicitly states he is a fan of Hasan and is aware of his rhetoric. Clancy even sang

34

COMPLAINT

Hasan "Happy Birthday" and forced Twitch employees to sing along while being filmed. Ethan also discusses the creepiness of Clancy's penchant for e-girls (*i.e.*, young, female Twitch streamers whose streams are about highlighting their physical assets) by pointing to two examples of Clancy's stories feature on the Twitch app being completely populated by e-girls.

ii. Next, Ethan discusses another Twitch streamer who is a member of Hasan's Waiting Room, Morgan Kamal Majed p/k/a Frogan, by showcasing numerous instances of her moral bankruptcy. Despite Frogan claiming to support the Palestinian cause, she condemned the large streamer, Ludwig Ahgren ("Ludwig"), by telling him to keep his $10,000 donation to Palestine because Ludwig decided not to organize a charity drive for Palestinians (even though he encouraged his viewers to donate).

iii. Ethan also highlights numerous instances of Frogan's cruelty. In one clip, Frogan wishes soldiers to get PTSD. A few days later (when the clip caused tremendous controversy), Frogan watched the clip while giggling and justifying her take. Despite veterans receiving protected status under Twitch's Community Guidelines, Twitch did nothing to sanction Frogan for these statements. In another clip, Frogan conducts a subathon (a marathon to acquire paid subscriptions) where she promises to make a cake recreating September 11th if she reaches a certain goal. Once again, Twitch did nothing. Ethan highlights the tweet that Frogan made on the morning of October 7th, while the massacre was still ongoing. Frogan's tweet stated: "leftists preach and foam at the mouth at the thought of a revolution happening in america, but as soon as it happens in the middle east what they're doing is wrong" (original spelling). Ethan juxtaposes this tweet with audio of cell phone conversations of victims of October 7th speaking with their parents during their final moments.

iv. Ethan critiques how Twitch props up Frogan, by refusing to sanction her, giving her awards and featuring her on Twitch's home page. He

<div align="center">35

COMPLAINT</div>

also mocks Frogan being nominated by her friends twice for a rising star award.

v.    Most notably, Ethan lambasts Twitch for allowing Frogan to host a panel at TwitchCon 2024. The panel involved a racial tier list with "Arab" at the top and "Loves Sabra" at the bottom. While the premise of the tier list is who can say the word "Habibi" (an Arabic term of affection), the term "Loves Sabra" was a dog whistle for Jews and Israelis for several reasons. First, Sabra is a well-known Israeli commercial hummus brand that is on the Boycott, Divestment and Sanctions list. Second, the term "Sabra" means a Jew born in Israel. Third, it falsely asserts Israelis misappropriated Arab culture and identity. As evidenced by a clip from Frogan's podcast, the purpose of disseminating this disinformation is to deny the long historical ties of Jews to the Middle East and the Levant. Ethan further highlights the hypocrisy and bigotry of these false claims by noting Arab culture and cuisine is Israeli culture and cuisine because the majority of Israeli Jews are from Arab countries or direct descendants of Jews from Arab countries. Fourth, Ethan was put in the "Loves Sabra" category with Denims "joking" that there should be a lower category for Zionist. Fifth, Ethan notes that Ben Shapiro ("Shapiro") is put in the thumbnail for the video with Ethan – despite Shapiro not being put on the list whatsoever. Rather, the only explanation is that both Ethan and Shapiro are Jewish and married to women born in Israel. Sixth, Ethan notes that the title of the video is *How Arab Are These Twitch Streamers?!* – which belies the assertion that the ranking was merely about hummus. Ethan concludes this segment by pointing out the hypocrisy of the panelists claiming to be concerned with minorities, while refusing to acknowledge why their tier list makes a Jewish man uncomfortable. Finally, Ethan marvels that Twitch approved the panel in the first place.

vi.    Ethan critiques a Q&A session Clancy conducted on Twitch shortly after the controversy over the racial tier list erupted. Several chatters for the Q&A session asked Clancy to address the antisemitism on Twitch – all of

whom were banned from the chat.

vii.    Ethan addresses the yearlong ban Twitch imposed to prevent Israeli users from creating new Twitch accounts. The ban was enacted on October 13, 2023 (*i.e.*, six days after October 7th) – which is also the Global Day of Jihad (a day of mass rage called for by Hamas leader, Khaled Mashal).[35]  Despite numerous instances of Israeli Twitch streamers communicating directly with Twitch about the issue and trying to raise awareness online, Twitch either ignored or obfuscated the issue until there was a massive public outcry.

viii.    Ethan goes on to excoriate Twitch for reinstating three well-known antisemites shortly after the ban was discovered: (1) Al-Haddad; (2) Nicolas 'Nico' Kenn De Balinthazy p/k/a Sneako; and (3) Amrou Fudl p/k/a Mryon Gaines from Fresh and Fit. Once again, Twitch reversed course after a public outcry.

ix.    Ethan points out how antisemitism and anti-Israel animus appears institutionalized at Twitch. Ethan cites two Twitch employees in leadership positions who made antisemitic and anti-Israel posts online. First is Fadzai Madzingira ("Madzingira") – who was investigated and suspended from her role in the British media regulatory agency, Oxcom. Madzingira was called out in the middle of the United Kingdom's Parliament for her anti-Israel and antisemitic posts shortly after October 7th. After she resigned, Madzingira was hired by Twitch as a Senior Manager in Twitch's Trust & Safety Policy department (*i.e.*, the department

---

[35] Andrew Jeong, Washington Post, "France Bans Pro-Palestinian Protests Amid Call for Hamas 'Day of Rage'" (Oct. 13, 2023) *available at*: https://www.washingtonpost.com/world/2023/10/13/france-palestine-protest-hamas-day-of-rage/; Simon Wiesenthal Ctr., "Hamas Call for Worldwide 'Day of Rage'", (Oct. 2023), *available at*: https://www.wiesenthal.com/about/news/hamas-call-for-worldwide.html; ABC News Live, "Hamas Declares 'Day of Rage'" (Oct. 13, 2023), https://www.youtube.com/watch?v=dOoNLREwxJs; Meredith Deliso, ABC News, "Hamas 'Day of Rage' Protests Break Out in Middle East and Beyond" (Oct. 13, 2023), https://abcnews.go.com/International/hamas-day-rage-protests-break-middle-east/story?id=103955873.

responsible for the Community Guidelines). Another example is Bridget Kyeremateng – who is Twitch's Senior Manager for Inclusive Marketing – and has a history of making antisemitic and anti-Israel posts, including shortly after October 7th.

x.      Ethan concludes the section by critiquing Twitch's biased and inconsistent enforcement of its Community Guidelines. He uses the ban of Steven Bonnell II p/k/a Destiny ("Destiny") as a case study. Destiny was permanently banned from Twitch for calling the streamer and transactivist Clara Sorrenti p/k/a Keffals "inbred." A montage is shown of Hasan repeatedly referring to Jews and Israelis as "inbred" or laughing at Jews being called "inbred." Hasan received no punishment from Twitch because he is Clancy's favorite streamer. Ethan recaps other examples of Hasan flagrant violations of Twitch's Community Guidelines that resulted in no consequences. Not only did Hasan call Jews and Israelis "inbred" and platformed terrorists and terrorist propaganda, Hasan threatened Senator Tom Cotton by replying to Senator Cotton's tweet with a schematic of the weapon used to assassinate Japanese Prime Minister Shinzo Abi. This is followed by a montage of numerous instances of alt-left streamers on Twitch, including Denims, making death threats without any (or minimal) consequences from Twitch.

g.      Conclusion (Ex. E at 1:40:30-1:42:05: Ethan ends *The Nuke* by summarizing the two reasons why he made the video. First, to stop Hasan's infiltration of mainstream media. Second, to hold Twitch accountable for enabling antisemitic and anti-Israel animus on its platform.

**The *Countdown Episode* and its Registration**

41.      On January 31, 2025, TEI made a live broadcast of the *Countdown Episode* immediately before releasing *The Nuke*. The *Countdown Episode* covered various topics and was 1:06:21 in duration. A true and correct copy of the Deposit Copy is located on the Flash Drive as Exhibit F.

42. After TEI discovered that Denims infringed the *Countdown Episode*, it registered *Countdown Episode* with the USCO on March 31, 2025 and given the registration number PAu004257253.

**H3Snark Promotes Denims as a Substitute to Watching *The Nuke***

43. Throughout January 2025, Ethan built up public interest in *The Nuke* by frequently discussing it on *The H3 Show*. The audience of Hasan and his Waiting Room – who comprised a large portion of the users on H3Snark – anticipated *The Nuke* with religious fervor to defend their proverbial Grand Mufti from criticism. These fanatics, however, did not want to watch the authorized version *The Nuke* because TEI would reap the benefits from the views and resulting advertising revenue.

44. The H3Snark Mods knew that there was a huge demand to watch *The Nuke* through unauthorized channels and promoted "group viewing sessions" of *The Nuke* as follows:

a. On January 30, 2025 (*i.e.*, the day before the *Countdown Episode* and *The Nuke* were released), Doe No. 3 (*i.e.*, u/jewettornesarah) – as an H3Snark Mod and on behalf of the H3Snark Mods – created a pinned post entitled "MEGATHREAD | Content Nuke – Where to Watch & Discussion" ("First Inducement Post"). As a pinned community post, the First Inducement Post was featured at the very top of the H3Snark page in the "Community highlights" section before any other posts were visible. The H3Snark Mods did this to maximize the visibility of the First Inducement Post. The First Inducement Post featured Denims as a place "to watch the nuke without showing support for H3" (*i.e.*, TEI) and a link was provided to her stream on Twitch. The First Inducement Post also stated that Denims "supported" H3Snark "by engaging directly with [the H3Snark Mods] directly."  A true and correct PDF printout of the First Inducement Post is attached hereto as Exhibit G.

b. On January 31, 2025 (*i.e.*, the day the *Countdown Episode* and

*The Nuke* were released), the H3Snark Mods created and updated a pinned community post entitled "Ethan Klein's Content Nuke on Hasan Piker | H3Snark Megathread" (the "Second Inducement Post"). The Second Inducement Post was also a pinned community post that was featured at the very top of the H3Snark page to maximize visibility. The Second Inducement Post featured Denims as a place "to watch reactions to this video" (*i.e.*, *The Nuke*) and a link was provided to her stream on Twitch. A true and correct PDF printout of the Second Inducement Post is attached hereto as Exhibit H.

    c.    On January 31, 2025 (*i.e.*, the day the *Countdown Episode* and *The Nuke* were released), the H3Snark Mods created another pinned community post entitled "DENIMS is LIVE reacting now to today's H3 podcast episode and the 'content nuke' video Ethan is publishing in about an hour" (the "Third Inducement Post"). The Third Inducement Post was also a pinned community post that was featured at the very top of the H3Snark page to maximize visibility. A true and correct PDF printout of the Third Inducement Post is attached hereto as Exhibit I.

    d.    At some point after January 31, 2025, the H3Snark Mods deleted the First Inducement Post, Second Inducement Post and Third Inducement Post to conceal their contributory infringement of the *Countdown Episode* and *The Nuke*.

45.    The H3Snark Mods were well aware of Denims' reputation for copyright infringement and lazy reaction videos. As such, the H3Snark Mods knew that it was highly likely Denims' reaction to the *Countdown Episode* and *The Nuke* would be an infringing "group viewing session" of the Works and not a fair use. The H3Snark Mods coordinated with Denims to direct H3Snark users to Denims' "group viewing session" of the *Countdown Episode* and *The Nuke*.

**The Law of Fair Use and Reaction Videos**

46.    Fair use is codified in Section 107 of the Copyright Act. The statute

sets forth four non-exclusive factors courts consider to evaluate fair use:

1. [T]he purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
2. [T]he nature of the copyrighted work;
3. [T]he amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
4. [T]he effect of the use upon the potential market for or value of the copyrighted work

47. The first fair use factor "relates to the problem of substitution" – *i.e.*, whether the new work "supersedes" or "supplant[s]" the original. *Warhol*, 598 U.S. at 527. The "central question" is whether the secondary work "adds something new, with a further purpose or different character." *Id.* at 528. The mere fact that a secondary use has "some further purpose" or "add[s] something new … does **not** render such uses fair." *Id.* at 528-529 (emphasis added). Rather, "whether an allegedly infringing use has a further purpose or different character" is "a **matter of degree**, and the degree of difference **must** be weighed against other considerations, like commercialism." *Id.* at 532 (emphasis added).

48. While a "use that has a further purpose or different character is said to be 'transformative[,]' … 'transformativeness' is a matter of degree." *Warhol*, 598 U.S. at 529. Indeed, "an overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works." *Id.* "To preserve that right, the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." *Id.*

49. The "first factor also relates to the justification for the use" both in the "broad sense" and the "narrower sense." *Warhol*, 598 U.S. at 531-532. A use is justified in the "broad sense" if it has a "distinct purpose" that "furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." *Id.* at 531. A use is justified in the "narrower sense" when it "is reasonably necessary to achieve the user's new purpose." *Id.* Such justification is "particularly relevant to assessing fair use" where "wide

41
COMPLAINT

dissemination of a secondary work would otherwise run the risk of substitution for the original or licensed derivatives." *Id.* Again, "the question of justification is one of degree." *Id.*

50.     A "critical book review" illustrates how a secondary use must be justified both in the broad and narrow sense. *Warhol*, 598 U.S. at 528 fn. 4. In the broad sense, the use of the original serves "a different purpose than the book" (*i.e.*, criticism and commentary). *Id.* In the narrow sense, "each quoted passage within the review likely serves a different purpose (an object of criticism) than it does in the book." *Id.* Critically, this "may not always be so" and "a court must consider each use within the whole to determine whether the copying is fair." *Id.* Consequently, "[e]ven book reviews are not entitled to a presumption of fairness." *Id.,* 598 U.S. at 532 fn. 7.

51.     There are several indicia of when a use for criticism or commentary is not sufficiently transformative to justify a secondary use.

a.     When the "commentary has no critical bearing on the substance or style of the original composition, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." *Warhol*, 598 U.S. at 530-531. Indeed, "a loose topical connection" with the original work is equally problematic. *McGucken*, 42 F.4th at 1159.

b.     When "a defendant copies more than is necessary to facilitate 'comment or criticism.'" *Penguin Random House LLC v. Colting*, 270 F.Supp.3d 736, 751 (S.D.N.Y. 2017). "The law is clear that, to be considered transformative criticism, the aspects of a work that reproduce another's protected expression must be in service of commentary on that work. It is not enough for part of a work to have a transformative purpose." *Id.*

c.     When the "use" of the copyrighted work "is not consistently transformative." *Elvis Presley*, 349 F.3d at 628. For example when "clips are

played without much interruption, if any" or "used in excess of [the] benign purpose." *Id.* at 629.

d.     The use of "voice overs," "headlines or captions" or "wholesale copying sprinkled with written commentary," fails to sufficiently transform a copyrighted work under the first fair use factor. *Monge*, 88 F.3d at 1174, 1176; *Elvis Presley*, 349 F.3d at 628-629. Additionally, "[w]hen a copyrighted work is used simply to illustrate what that work already depicts, the infringer adds no further purpose or different character" and "copyright law treats the infringer as freeriding on the inherent value of the original work." *McGucken*, 42 F.4th at 1158.

e.     The first fair use factor "does not" favor "any user who wants to reach different buyers, in different markets, consuming different products." *Warhol*, 598 U.S. at 548 fn. 22.

52.     As mentioned, the degree to which a secondary use has a different purpose or character, "must be weighed against other considerations, like commercialism." *Warhol*, 598 U.S. at 525. "The undisputed commercial character of [the defendant's] use, though not dispositive, tends to weigh against a finding of fair use." *Id.* at 537.

53.     Commercialism examines "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise." *Elvis Presley*, 349 F.3d at 627. Courts consider whether the defendant was "motivated by profits" and "profited from the publication." *Monge*, 688 F.3d at 1176. Further, if the defendant "is not advertising a scholarly critique or historical analysis, but instead seeks to profit at least in part from the inherent entertainment value" of the original, the use is commercial. *Elvis Presley*, 349 F.3d at 628. Finally, commercialism exists "when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work." *Blanch v. Koons, 467 F.3d 244, 253 (2d Cir. 2006)*.

54.     In *Hosseinzadeh*, the Court found the first fair use factor favored fair

use because the Klein video was "quintessential criticism and comment … on the Hoss video" – namely consistent "mockery" of Matt Hoss' "performance … dialog and plotlines." 276 F.Supp.3d at 40, 45-46. The Klein video was consistently transformative by "intersperse[ing] relatively short segments of the Hoss video with long segments of the Kleins' commentary." *Id.* at 40.

55.     The second fair use factor (*i.e.*, "the nature of the copyrighted work") "typically has not been terribly significant in the overall fair use balancing." *McGucken*, 42 F.4th at 1161. This factor examines "the extent to which [the original work] is creative and whether it is unpublished." *Id.* Even when a work "document[s] a real event," the work can still be "creative because [it is] the product of many technical and artistic decisions." *Id.* Whether a work is published is defined by whether the author exhausted the "right to control the first public appearance" of the work. *Monge*, 688 F.3d at 1178. The mere fact a work is published "does not weigh in favor of fair use." *McGucken*, 42 F.4th at 1162.

56.     In *Hosseinzadeh*, the Court found the second fair use factor "weigh[ed] against a finding of fair use" because the Hoss video was "a creative work" – despite the work being published. 276 F.Supp.3d at 46.

57.     The third fair use factor examines "the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *McGucken*, 42 F.4th at 1162. Consequently, the third fair use "factor circles back to the first factor because the extent of permissible copying varies with the purpose and character of the use." *Id.*

58.     When "the amount used is substantial with respect to the infringing work, it is evidence of the value of the copyrighted work." *Elvis Presley*, 349 F.3d at 630. Indeed, "[c]opying an entire work militates against a finding of fair use." *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 744 (9th Cir. 2019). If, however, "the new user only copies as much as necessary for his or her intended use, this factor will not weigh against the new user." *Elvis Presley*, 349 F.3d at 630.

44
COMPLAINT

59.     In *Hosseinzadeh*, the Court found that the third fair use factor was "neutral" because, while the Klein video copied "a great deal" of the Hoss video, "the 'extent' and 'quality and importance' of the video clips used by [the Kleins] were … plainly necessary to the commentary and critique." 276 F.Supp.3d at 46.

60.     The fourth fair use factor is the "undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 536, 566 (1985). "While the first fair use factor considers whether and to what extent an original work and secondary use have substitutable purposes, the fourth factor focuses on actual or potential market substitution." *Warhol*, 598 U.S. at 536 fn. 12.

61.     The fourth fair use factor "encompasses both (1) the extent of market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original and the market for derivative works." *McGucken*, 42 F.4th at 1163. Even when there is "little direct evidence of actual market harm" caused by the secondary use, "to negate fair use," the plaintiff "need only show that if the challenged use should become widespread, it would adversely affect the ***potential*** market for the copyrighted work." *Id.* (original emphasis).

62.     The fourth fair use factor also "must take into account the public benefits the copying will likely produce." *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 35 (2021). In other words, does the use "serve copyright's goal of enriching public knowledge." *Warhol*, 598 U.S. at 531 (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (Level, J.). When the original work is associated with "dangerous misinformation," it does not serve the public benefit and results in "actual and reputational harm" to the market for the original work – even when the "primary markets … do not meaningfully overlap." *National Academy of Television Arts and Sciences, Inc. v. Multimedia System Design, Inc.,*

551 F.Supp.3d 408 (S.D.N.Y. 2021).

63.    In *Hosseinzadeh*, the Court found the fourth fair use factor "weighs in favor of a determination of fair use." 276 F.Supp.3d at 47. The Klein video did not "usurp[] demand for the copyrighted work, thereby resulting in a loss for the infringee or unjust enrichment for the infringer." *Id.* at 46. To the contrary, "the Klein video [did] not serve as a market substitute for the Hoss video" because the Klein video "transform[ed] the Hoss video from a skit into fodder for caustic, moment-by-moment commentary and mockery." *Id.* at 47. Consequently, "the Klein video [did] not offer a substitute for the original." *Id.*

**Denims' "Group Viewing Session" Failed to Make a Fair Use of the**
***Countdown Episode***

64.    It is readily apparent that the primary and overriding purpose of Denims' use of the *Countdown Episode* was to commercially exploit a "group viewing session" of the *Countdown Episode* and have it serve as a substitute for the original.[36] This is evidence by:

        a.    Watching long sections of the *Countdown Episode* without any (or very little interruption) – frequently for several minutes at a time.[37]

        b.    In a completely separate instance, Denims provides an "empty chair reaction" – *i.e.*, letting the *Countdown Episode* play while Denims is completely off-screen. At a certain point, Denims informs her audience that: "She is

[36] Denims' broadcast on Twitch on January 31, 2025 was over ten hours long. Due to the file size, Denims' January 31, 2025 broadcast is separated into two video files. A true and correct copy of Part 1 of Denims' January 31, 2025 broadcast is located on the Flash Drive as Exhibit J. A true and correct copy of Part 2 of Denims' January 31, 2025 broadcast is located on the Flash Drive as Exhibit K.

[37] *See e.g.,* Ex. K at 9:30-12:09, 12:14-14:36, 14:55-16:25, 17:45-18:51, 19:06-20:25, 24:09-25:22, 23:40-26:40, 26:48-27:18, 27:25:30:22, 30:27-32:23, 33:41-35:59; 36:05-36:37, 37:22-38:16, 38:20-39:07, 42:53-44:36, 44:43-45:21, 45:24-46:06, 46:17-46:48, 46:52-48:04, 48:23-50:40, 50:45-51:49, 51:58-54:12, 54:19-54:43, 54:48-56:44, 57:02-58:42, 59:08-59:54, 1:00:01-1:01:45, 1:01:57-1:02:50, 1:03:16-1:04:04, 1:04:06-1:05:36, 1:07:47:1:09:05, 1:09:13-1:10:20, 1:11:39-1:13:05, 1:13:45-1:14:22, 1:14:35-1:15:18.

going to pee." Ex. K at 39:08. For two minutes and twenty-one seconds, Denims lets the *Countdown Episode* play while she is off-screen relieving herself. *Id.* at 39:18-41:40. When she returns, Denims is silent for an additional minute. *Id.* at 41:41-42:41.

c.     In total, Denims' "group viewing session" of the *Countdown Episode* was 1:03:56. During the group viewing session, Denims provided approximately: (1) four minutes and forty-three seconds of brief and superficial commentary that usually has little critical bearing on the *Countdown Episode*;[38] (2) forty-three seconds of partially related commentary on the *Countdown Episode* that meanders into unrelated topics;[39] and (3) two minutes and twelve seconds of unrelated or unintelligible comments.[40] In simple terms, out of a total runtime of 1:03:56, the *Countdown Episode* played uninterrupted for nearly 88% of the total runtime.

d.     Denims also had the *Countdown Episode* take up approximately three-quarters of the screen, while she only occupies approximately a quarter of the screen that deemphasizes her presence. Denims' objective was to provide a large and unobstructed view of the *Countdown Episode* to her audience – which further emphasizes her primary purpose was to provide a substitute for the original.

e.     Denims' use of the *Countdown Episode* was clearly commercial. Not only did she receive paid subscriptions, donations and advertising revenue during her "group viewing session" (*see e.g.*, Ex. K at 24:02-08), she used the *Countdown Episode* to advertise her "group viewing session" of the *Nuke*, as evidenced by:

---

[38] *See e.g.*, Ex. K at 12:09-13, 14:37-54, 16:26-27, 17:02-16, 17:37-44, 32:24-33:40, 36:00-04, 37:19-21, 38:17-19, 42:42-52, 44:37-42, 45:22-23, 46:07-16, 46:49-51, 51:50-57, 54:13-18, 54:44-47, 56:45-57:01, 58:43-44, 58:52-59:07, 59:55-1:00:00, 1:01:46-56, 1:05:37-43, 1:05:55-1:06:47, 1:07:02-07, 1:07:44-46, 1:09:6-12, 1:10:21-28, 1:10:58-11:02, 1:11:31-38, 1:15:19-26.

[39] *See e.g.,* Ex. K at 18:52-19:05, 50:41-44, 1:02:51-1:03:15

[40] *See e.g.*, Ex. K at 20:20-23:39, 23:40-47, 24:02-08, 25:23-40, 26:41-47, 27:19-31, 30:23-26, 36:38-39, 48:05-22, 1:04:05, 1:07:20-22, 1:13:06-44, 1:14:23-24.

i. Early on in her "group viewing session," Denims adds a chyron at the top of the screen stating: "CONTENT NUKE DROPS AT 1:30 PM PST." *See e.g.,* Ex. K at 0:34 (original emphasis).

ii. Early on in her "group viewing session," Denims adds a countdown timer for when *The Nuke* will be publicly released. *See e.g.,* Ex. K at 16:48.

iii. Encouraging people to watch her "group viewing session" of *The Nuke* by stating: "***If you want to watch it, you know, come enjoy the watch party somewhere else***." Ex. K at 23:40-47.

65. As to the second fair use factor, the fact that the *Countdown Episode* was simultaneously broadcast with Denims' "group viewing session" does not weigh in her favor. Further, while containing numerous factual elements, the *Countdown Episode* contains numerous creative elements, which weigh against fair use.

66. As to the third fair use factor, this factor weighs heavily against fair use. It is readily apparent Denims' use was excessive for any potential criticism of the *Countdown Episode* – particularly in light of the minimal level of commentary and highly commercial nature of Denims' "group viewing session."

67. The fourth (and most important) fair use factor weighs heavily against fair use. It is readily apparent that Denims intended (and succeeded) to provide a market substitute for the *Countdown Episode* for the reasons set forth below:

a. Broadcasting her "group viewing session" of the *Countdown Episode* at the same time the *Countdown Episode* was broadcast.

b. Showing nearly the entire *Countdown Episode* with minimal commentary.

c. The First Inducement Post, the Second Inducement Post and the Third Inducement Post by the H3Snark Mods.

d. Due to Denims' siphoning the audience for the *Countdown*

48

COMPLAINT

*Episode* to her "group viewing session," TEI lost views and advertising revenue it would ordinarily receive from the individuals who watched Denims' "group viewing session" instead of the *Countdown Episode*.

e.    If Denims' conduct were to become widespread (*i.e.*, simultaneously broadcasting a TEI podcast episode with minimal commentary), it would result in further lost views and advertising revenue to TEI.

**Denims' "Group Viewing Session" Failed to Make a Fair Use of *The Nuke***

68.    As demonstrated below, Denims' "group viewing session" of *The Nuke* exemplifies her beliefs about copyright that she expressed during Reactgate. Denims' "group viewing session" of *The Nuke* epitomizes: (1) her unfounded opinion that copyright infringement and fair use principles are inapplicable in the context of livestreaming (particularly on Twitch); (2) her misguided notion that she is not obligated to transform a copyrighted work with substantial, critical commentary and editing; and (3) her narcissistic and misplaced sense of privilege that her "personality" is sufficient to justify the highly commercial, unauthorized exploitation of a copyrighted work in its entirety.

69.    Denims' "group viewing session" of *The Nuke* was the pinnacle of her career. At its peak, Denims' "group viewing session" of *The Nuke* received approximately 45,800 concurrent viewers. This was exponentially more concurrent viewers than Denims ever received in her entire career. Denims' "group viewing session" of *The Nuke* also put Denims' online career into overdrive. In the days leading up to her "group viewing session," Denims' peak concurrent viewers ranged from approximately 3,100-4,500. After her "group viewing session" of *The Nuke*, Denims' concurrent viewers ranged from 5,100 to 6,700. Below are true and correct screenshots from the page for Denims' Twitch channel on Twitch Tracker –

a website that compiles statistical data on Twitch Streamers:





70.    It is readily apparent that the primary and overriding purpose of Denims' "group viewing session" of *The Nuke* was to provide a substitute for the original. It is equally obvious that any "commentary" of *The Nuke* was an afterthought.

a.    Denims made numerous statements explicitly stating her "group viewing session" was intended to serve as a substitute for *The Nuke.*

i.    Denims entitled her "group viewing session": "ETHAN KLEIN HASAN CONTENT NUKE **WATCH PARTY** THIS IS NOT A DRILL" (original and added emphasis).

ii.    Shortly before her "group viewing session" of *The Nuke*, Denims reads a message from her chat stating: "***We're relying on you to stay live so we don't give more views to the Nuke***." Denims replies with: "***Yeah, I'm going to. I'm going to stream it since he [i.e., Ethan] confirmed it's coming out today. We're going to stream it***." Ex. J at 4:48:38-4:48:48.

iii.    Immediately prior to and throughout Denims' "group

viewing session" of *The Nuke*, she prominently displayed a chyron at the top of the screen that stated: "***Watching Hasan Content Nuke From Ethan Klein***." Ex. K at 1:15:03.

iv. During Denims' "group viewing session," Denims responds to a chatter by stating: "***Unfortunately, we are watching the Ethan Nuke***." Ex. K at 2:06:09-23

v. Immediately after her "group viewing session" of *The Nuke*, Denims states:

1. "***Well guys, if you enjoyed not giving any views to that terrible video, follow, subscribe, throw a prime, if you like the content, if you enjoyed your time here***." Ex. K at 5:07:45-58.

2. "***I appreciated you guys tuning in with me because, I'm going to be honest, I did not want to watch that by myself***." Ex. K at 5:08:04-09.

vi. On February 1, 2025 (*i.e.*, the day after Denims' "group viewing session" of *The Nuke*),[41] Denims stated:

> Later, after streaming, I found out I got signal boosted by Hasan, Hascord and the Subreddit – what is it called – H3Snark. And I know ***all of those people didn't want to give the video [i.e., The Nuke] another view***. ***Which is why they watched it with me.*** And probably a lot of people – 'cause they ended their H3 Show immediately before releasing the video – ***so there probably was a lot of people that came to watch it here***, because they wanted to see what someone who would disagree with it would say.

vii. Denims attempt to feign ignorance of H3Snark is transparently (and comically) false. Rather, it is clear that Denims and the H3Snark Mods coordinated their efforts. Indeed, after ending her "group viewing session" of *The Nuke*, Denims' screen shows that she had the H3Snark subreddit on her screen the entire time. Ex. K at 5:07:16.

[41] A true and correct clip from Denims' February 1, 2025 is located on the Flash Drive as Exhibit L.

b. Denims begins her "group viewing session" of *The Nuke* one minute after *The Nuke* was released to the public. Ex. K at 1:15:19. The timing of Denims' "group viewing session" of *The Nuke* demonstrates that she did not prescreen it to formulate her opinions prior to broadcast. Rather, Denims timed her "group viewing session" to occur immediately after *The Nuke* was released to capitalize on the great public interest in *The Nuke* and siphon as many viewers as possible away from the original to herself. In other words, her priority was to personally and financially benefit from providing a substitute for the original and any commentary and criticism was a mere afterthought.

c. On *seventy-four* separate occasions, Denims' "group viewing session" consisted of watching *The Nuke* for *thirty seconds or more with no commentary whatsoever* (or, at most, an unintelligible word or phrase). In total, these excerpts comprise over 70 minutes of *The Nuke* – *i.e.*, *70% of its total runtime*. The poverty of Denims' commentary – coupled by frequently showing long, unadulterated portions of *The Nuke* – further demonstrates that the overriding and dominant purpose of Denims' "group viewing session" was to serve as a substitute for the original and not to provide critical commentary.

| | Timestamps from Denims' "Group Viewing Session" Comprising 30 Seconds or More of Just *The Nuke* | Total Duration |
|---|---|---|
| 1 | 1:15:38-1:16:09 | 42 Seconds |
| 2 | 1:16:56-1:19:10 | 135 Seconds |
| 3 | 1:19:33-1:20:59 | 90 Seconds |
| 4 | 1:21:41-1:22:11 | 31 Seconds |
| 5 | 1:24:12-1:25:14 | 63 Seconds |
| 6 | 1:25:43-1:27:28 | 106 Seconds |
| 7 | 1:36:01-1:37:10 | 70 Seconds |
| 8 | 1:37:44-1:38:15 | 32 Seconds |

|  | Timestamps from Denims' "Group Viewing Session" Comprising 30 Seconds or More of Just *The Nuke* | Total Duration |
|---|---|---|
| 9 | 1:39:16-1:39:55 | 40 Seconds |
| 10 | 1:41:47-1:43:05 | 79 Seconds |
| 11 | 1:46:59-1:48:12 | 74 Seconds |
| 12 | 1:48:18-1:49:15 | 58 Seconds |
| 13 | 1:57:33-1:58:07 | 35 Seconds |
| 14 | 1:58:51-2:00:37 | 47 Seconds |
| 15 | 2:00:58-2:01:29 | 32 Seconds |
| 16 | 2:01:56-2:02:45 | 50 Seconds |
| 17 | 2:03:31-2:04:07 | 37 Seconds |
| 18 | 2:06:24-2:07:24 | 61 Seconds |
| 19 | 2:11:07-2:12:01 | 55 Seconds |
| 20 | 2:12:26-2:13:04 | 39 Seconds |
| 21 | 2:13:30-2:14:20 | 51 Seconds |
| 22 | 2:16:19-2:17:08 | 50 Seconds |
| 23 | 2:17:16-2:18:00 | 45 Seconds |
| 24 | 2:18:15-2:19:40 | 86 Seconds |
| 25 | 2:20:34-2:22:20 | 107 Seconds |
| 26 | 2:29:01-2:31:19 | 139 Seconds |
| 27 | 2:32:01-2:33:00 | 60 Seconds |
| 28 | 2:33:32-2:35:10 | 99 Seconds |
| 29 | 2:39:46-2:41:04 | 79 Seconds |
| 30 | 2:42:04-2:43:53 | 110 Seconds |
| 31 | 2:45:04-2:45:35 | 32 Seconds |
| 32 | 2:45:47-2:47:04 | 78 Seconds |

COMPLAINT

|  | **Timestamps from Denims' "Group Viewing Session" Comprising 30 Seconds or More of Just *The Nuke*** | **Total Duration** |
|---|---|---|
| 33 | 2:47:26-2:47:56 | 31 Seconds |
| 34 | 2:48:04-2:49:50 | 107 Seconds |
| 35 | 2:51:20-2:52:29 | 70 Seconds |
| 36 | 2:57:25-2:58:13 | 49 Seconds |
| 37 | 2:59:23-3:00:39 | 77 Seconds |
| 38 | 3:04:52-3:05:36 | 45 Seconds |
| 39 | 3:06:16-3:07:17 | 62 Seconds |
| 40 | 3:10:42-3:11:21 | 40 Seconds |
| 41 | 3:12:02-3:12:57 | 56 Seconds |
| 42 | 3:16:59-3:17:46 | 48 Seconds |
| 43 | 3:17:49-3:18:20 | 32 Seconds |
| 44 | 3:24:15-3:25:32 | 78 Seconds |
| 45 | 3:25:48-3:36:53 | 66 Seconds |
| 46 | 3:28:23-3:29:49 | 87 Seconds |
| 47 | 3:26:27-3:37:38 | 72 Seconds |
| 48 | 3:40:15-3:40:55 | 41 Seconds |
| 49 | 3:41:29-3:42:48 | 80 Seconds |
| 50 | 3:44:41-3:45:33 | 53 Seconds |
| 51 | 3:48:32-3:49:12 | 41 Seconds |
| 52 | 3:51:04-3:43:45 | 105 Seconds |
| 53 | 3:56:03-3:56:56 | 54 Seconds |
| 54 | 3:59:16-3:59:50 | 35 Seconds |
| 55 | 4:00:44-4:02:23 | 40 Seconds |
| 56 | 4:12:58-4:13:32 | 35 Seconds |

|  | Timestamps from Denims' "Group Viewing Session" Comprising 30 Seconds or More of Just *The Nuke* | Total Duration |
|---|---|---|
| 57 | 4:19:37-4:20:09 | 33 Seconds |
| 58 | 4:21:51-4:22:36 | 46 Seconds |
| 59 | 4:23:49-4:24:30 | 42 Seconds |
| 60 | 4:25:57-4:26:30 | 34 Seconds |
| 61 | 4:28:24-4:29:10 | 47 Seconds |
| 62 | 4:36:07-4:36:47 | 41 Seconds |
| 63 | 4:38:05-4:39:40 | 96 Seconds |
| 64 | 4:39:47-4:40:25 | 39 Seconds |
| 65 | 4:41:17-4:42:12 | 56 Seconds |
| 66 | 4:43:11-4:44:23 | 73 Seconds |
| 67 | 4:45:39-4:46:11 | 33 Seconds |
| 68 | 4:46:49-4:47:32 | 44 Seconds |
| 69 | 4:47:52-4:48:30 | 39 Seconds |
| 70 | 4:52:41-4:53:41 | 61 Seconds |
| 71 | 4:54:53-4:55:31 | 39 Seconds |
| 72 | 5:00:50-5:01:36 | 47 Seconds |
| 73 | 5:04:00-5:04:31 | 32 Seconds |
| 74 | 5:05:24-5:06:20 | 115 Seconds |

d. For the majority of her "group viewing session," Denims speaks briefly after showing a much longer excerpt of *The Nuke*. The fact that the excerpts Denims shows of *The Nuke* frequently eclipse her statements further emphasizes that the primary purpose of her "group viewing session" was to provide a substitute for the original and any "commentary" was merely an afterthought.

55
COMPLAINT

e.      During Denims' group viewing session, she admits she is not providing sufficient commentary because she does not want to pause frequently. This further emphasizes the primary purpose of her "group viewing session" was to "watch" *The Nuke* and any "commentary" was an afterthought.

i.      "*If I sat here and explained why he was wrong for like half of these things, we would be here for another 20 hours. I've gone in and tried to explain why he's incorrect on like one in every 10 incorrect takes because I'm not trying to spend an entire week here*."[42] Ex. K at 3:00:53-3:01:36.

ii.      "*I don't even understand what to say about because, yeah, this is wrong because of this, this, this, this. Another wrong take. Another wrong take. Okay, well, I just paused it for 10 minutes. I feel bad pausing it again 'cause surely there'll be something better here*." Ex. K at 3:01:49-3:02:09.

f.      Denims' admission that she failed to address the majority of points raised in *The Nuke* is self-evident. This further emphasizes that Denims' primary purpose was to host a "group viewing session" of *The Nuke* and that any criticism was an afterthought.

i.      Denims fails to address the following points raised in the Prologue of *The Nuke*: (1) Ethan's criticism of Hasan's takes on Russian and Chinese imperialism and genocide, particularly Crimea and the Uyghurs; (2) the torrent of antisemitic comments Ethan received from Hasan's chat after October 7th; (3) the primary difference of opinion between Ethan and Hasan on the Israel-Palestine conflict; (4) footage showing Hasan supporting terrorism and expressing hatred of liberals; and (5) Ethan's concern that Hasan radicalized his audience.

ii.      Denims fails to address the majority of the Twitch Parody Sketch.

iii.      Denims fails to address the following points raised in the

---

[42] As explained below, Denims does a horrendous job of explaining why the points raised in *The Nuke* are supposedly wrong – including cursory and unsubstantiated assertions, flat out misrepresentations and even proving herself wrong.

Houthi Section of *The Nuke*: (1) Ethan's criticism of Houthi atrocities, namely recruiting child soldiers, shelling and blocking aid to civilians, ruining agricultural land, oppression of women and slavery, including how this contradicts leftist values; (2) how Hasan violated Twitch's community guidelines by promoting and glorifying Houthi propaganda to Nick, including the Houthi music video and the hijacking of the *Galaxy Leader*; (3) Ethan's criticism of Hasan's glorification of another Houthi music video and its juxtaposition to the Miami Boys Choir; (4) the majority of Ethan's criticisms of Hasan holding himself out as a journalist and his interview of Al-Haddad; (5) the evidence demonstrating that Al-Haddad is a member of the Houthis; and (6) how Hasan uses genocide to deflect criticism.

iv.     Denims fails to address the following points raised in the Hezbollah Section of *The Nuke*: (1) Ethan's criticisms of Hezbollah's atrocities, including how this contradicts leftist values; (2) the majority of Ethan's criticism of Hasan attempting to radicalize Nick; and (3) Hasan's apologia for Hezbollah.

v.      Denims fails to address the following points raised in the Hamas Section of *The Nuke*: (1) Ethan's criticism of Hamas atrocities and its leaders, along with how this contradicts leftist values; (2) Ethan's criticism of Hasan glorifying Hamas propaganda; and (3) Ethan's thesis on how to achieve peace in the conflict.

vi.     Denims fails to address the following points raised in the Twitch Section of *The Nuke*: (1) Clancey's ineffectiveness as a CEO and forcing Twitch employees to participate in Hasan's "Happy Birthday" video; (2) Ethan's criticism of Frogan's purity test of Ludwig and how Twitch props up Frogan; (3) the reasons why the racial tier list made Ethan uncomfortable; (4) Clancy banning people asking about antisemitism during the Q&A session; (5) Twitch re-platforming and hiring antisemites; and (6) Twitch's biased and inconsistent enforcement of its Community Guidelines.

g.      Denims even mocks *The Nuke* for making a fair use of third-

party clips by stating: "***Isn't it weird that a lot of these clips are like 5 seconds short. Not 5 seconds long. 5 seconds short***." Ex. K at 1:43:23-32. This statement reveals Denims' complete and total ignorance of fair use – particularly in the context of reaction videos.

h.       When Denims does speak during her "group viewing session," most of her statements are brief – particularly in relation to the preceding segment shown of *The Nuke* – and have no critical bearing (or minimal critical bearing) on the style or substance of *The Nuke*. Below are some examples:

i.       On numerous occasions, Denims makes utterances that are completely incoherent or unclear. Ex. K at 1:19:11-15, 1:21:00-07, 1:22:12-14, 2:12:02-04, 2:14:55-56, 2:37:05-14, 2:47:57-2:48:03, 3:24:35-3:24-14, 4:24:47-56, 4:31:01-18; 4:52:36-40.

ii.       Denims spends time speaking with her chat about topics completely unrelated or only minimally related to *The Nuke*. Ex. K at 3:19:42-3:20:19, 3:20:24-34, 3:23:35-3:24:14, 3:29:45-3:30:14, 3:37:46-50, 3:38:52-3:39:12, 3:43:41-55, 3:48:13-16, 3:50:15-30, 3:50:44-3:51:03, 4:02:32-35, 4:21:34-50, 4:22:37-52, 4:31:40-53, 4:34:14-44, 4:42:17-19

iii.       Denims spends time discussing unrelated (or minimally related) topics, such as: (1) an unrelated meme (Ex. K at 1:37:37-43); (2) conducting a poll (*id.* at 1:38:23-33); (3) referencing the length of *The Nuke* (*id.* at 1:58:48-50, 4:46:35-38); (4) announcing a raid (*i.e.*, another streamer directing their audience to Denims) (*id.* at 2:06:05-08); (5) attacking a chatter who critiques her (*id.* at 2:39:09-45); (6) claiming she is "going insane" (*id.* at 2:45:36-46); (7) that she wants to play the videogame *Marvel Rivals* (*id.* at 3:01:37-48); (8) her cat (*id.* at 4:20:10-32); (9) that the streamer Imane Anys p/k/a Pokimaine (who, like Denims, is of Moroccan ancestry) speaks fake Arabic (*id.* at 4:32:58-4:33:06); (10) making crass jokes about Ben Shapiro and his love life (*id.* at 4:35:39-4:36:06); and (11) a technical issue (*id.* at 4:40:58-4:41:07).

iv.     Denims frequently makes superficial comments with little to no elaboration, such as: (1) *The Nuke* resembles a "high school project" or "middle school project" (Ex. K at 1:21:14-40, 5:04:58-5:05:23); (2) narrating what is depicted (*id.* at 1:46:42-50); (3) that Ethan is "so brave" (*id.* 2:03:28-30); (4) Ethan's performance resembles someone on the "first day of acting class" (*id.* at 2:16:17-18); (5) that she is "going to die of cringe" and begs it to "end" (*id.* at 2:17:09-15); (6) that Ethan is "crashing out" (*id.* 2:19:41-2:20:03); (7) complaining about the editing (*id.* 2:41:05-07, 4:43:56-4:54:08); (8) that the video treats the audience as "morons" and is trying to "trick" them (*id.* at 3:46:23-37); (9) that Ethan is putting out "garbage" (*id.* at 3:59:51-56); (10) complimenting her own outfit (*id.* at 4:30:29-30); and (11) excitement that a particular clip of her is shown in *The Nuke* (*id.* 4:57:40-51).

v.     Since Denims did not prescreen *The Nuke*, she frequently expresses confusion about a particular excerpt of *The Nuke* she just watched. *See e.g.*, Ex. K at 1:39:16-55, 1:41:47-1:43:22, 1:38:34-1:39:15, 1:46:59-1:48:17, 3:03:21-49, 3:40:15-3:41:28, 4:38:05-4:39:40.

i.     Since Denims did not prescreen *The Nuke*, she frequently makes comments that are later contradicted by *The Nuke* itself. If Denims' primary purpose was to comment on *The Nuke*, she could have easily avoided these embarrassing moments by watching *The Nuke* beforehand and taking the time to formulate her critique. The reason Denims failed to do so is obvious: her primary purpose was to host a "group viewing session" of *The Nuke* immediately upon its release and any commentary was an afterthought. Below are some examples of Denims making comments on *The Nuke* that are later refuted by *The Nuke* itself:

i.     In the section of *The Nuke* discussing Hasan's apologia of China's genocide and enslavement of the Uyghurs, she claims that Ethan fails to point out how Hasan is wrong.  Ex. K at 1:21:41-1:22:39, 1:24:12-1:25:42. Shortly after making these comments, *The Nuke* provides the evidence that Denims claims

was absent. *Id.* at 1:25:43-1:27:28, 1:36:01-1:37:10. After seeing the evidence, Denims just expresses confusion. *Id.* at 1:37:11-13.

          ii.      In the section discussing the type of fans Hasan attracts (such as the online content creator Dating and Money), Denims claims that Dating and Money is not a Hasan fan, but a fan of another streamer. Immediately after making this comment, *The Nuke* shows a clip of Dating and Money meeting Hasan and effusively praising him. Ex. K at 2:00:58-2:03:10.

          iii.      In the section discussing Al-Haddad, Denims claims there is no evidence demonstrating he is a member or supporter of the Houthis. Ex. K at 2:47:05-25. Shortly thereafter, *The Nuke* shows Al-Haddad's social media posts that refute this assertion and Denims provides no comment.[43] *Id.* at 2:55:25-2:56:25.

          iv.      In the section discussing Nasrallah, Denims claims that the difference between Ethan and Hasan is that Ethan praised former Israeli Minister of Defense, Yoav Gallant (which is false), and Hasan never praised Nasrallah. Immediately after making the claim, Denims plays an excerpt of *The Nuke* where Hasan praises Nasrallah. Ex. K at 3:14:55-3:17:48.

          v.      In the section discussing the systematic use of rape on October 7th, Denims repeatedly denies any rapes occurred. She is immediately confronted with the headlines from news organizations, victim testimony and a United Nations report refuting her denials. Ex. K at 3:33:49-3:35:34, 3:42:49-3:45:33.

          vi.      When Ethan cites the ban of Destiny as an example of Twitch's inconsistent enforcement of its community guidelines, Denims claims that the ban was due to Destiny's statements condoning Kyle Rittenhouse killing

---

[43] On or around May 21, 2025, in response to a direct question about his Houthi affiliation, Al-Hadad stated in Arabic, "Yemenis are Houthi"—an expression that, in the Yemeni dialect implies the "true" Yemenis are Houthi. His phrasing appeared calculated to affirm solidarity while technically avoiding a direct acknowledgment. *See* https://imgur.com/a/pnYUfi8

protestors – only to realize that the ban was due to Destiny calling Keffals "inbred." Ex. K at 4:50:32-4:52:10.

j. Due to Denims' inability to critique the style or substance of *The Nuke*, she frequently goes on long and completely unrelated tangents that have nothing to do with the style or substance of *The Nuke*. Some notable examples are provided below:

i. After Ethan's critique of Hasan's apologia of Chinese imperialism and authoritarianism, Denims goes on a nonsensical tangent about the Chinese credit score system – which is not discussed or referenced in *The Nuke* whatsoever. Ex. K at 1:22:40-1:24:11.

ii. After Ethan's critique of Hasan's apologia of China's genocide of the Uyghurs, Denims goes on a rambling diatribe about: (1) that no one cares about the Uyghurs; (2) western media; (3) the United States is worse than China; (4) falsely stating that disabled Americans lose disability benefits when they get married;[44] (5) incarceration levels in the United States; and (6) the treatment of transgender individuals in the United States. Ex. K at 1:25:43-1:35:51.

iii. After Ethan's critique of Frogan, Denims goes on a protracted tangent about how Frogan is more American than her. Ex. K at 4:14:35-4:19:36.

k. True to form, Denims makes statements based on hallucinatory misrepresentations of the contents of *The Nuke*. By shadowboxing an imaginary version of *The Nuke* completely divorced from reality, Denims fails to address the actual style or substance of the original. Some notable examples include:

i. In the section of *The Nuke* concerning Ethan and Hasan's discussion shortly after October 7th, Ethan critiques an online figure supported by Hasan who legitimizes killing Israeli infants by calling them "baby settlers" (and

[44] Social Security Administration, "If I get married, will it affect my benefits?" (Jan. 23, 2025), *available at*: https://www.ssa.gov/faqs/en/questions/KA-02172.html

Hasan's attempt to justify the use of the term). Denims misrepresents the excerpt and claims Ethan called Palestinian infants "baby terrorists" and Hasan attempted to humanize the infants of Israeli settlers. Ex. K at 1:43:55-1:45:19.

ii.    In the section where Ethan critiques Hasan's "head mod," Denims claims that Ethan called Frogan the "head mod" – despite Ethan never making such a statement. Ex. K at 1:37:44-1:38:22.

iii.    After Ethan explains that he is now called a "Nazi" after advocating a two-state interim solution, Denims claims Ethan asserted that Hasan told people to call him a Nazi – which Ethan never claimed.[45] Ex. K at 2:00:45-57.

iv.    After Ethan critiques Hasan's claim that the Houthis hijacked ships to cause Israelis to *leave* Israel from the economic inconvenience, Denims rewrites the excerpt by claiming Hasan stated the Houthis are placing economic pressure on Israelis to induce them *to pressure their government* to end the war in Gaza. Ex. K at 2:36:47-2:37:04.

v.    After Ethan shows photographs he took in Israel of Mizrahi Jews preparing and selling hummus, Denims makes the bizarre claim that Ethan is assuming they are Israelis – despite Ethan having just explained that they were photographs of Mizrahi Jews from Israel. Ex. K at 4:28:24-4:29:11.

l.    Again, true to form, Denims repeatedly makes brief, blithe and unsubstantiated assertions throughout her "group viewing session" of *The Nuke*. The vast majority of these remarks are misleading or false. Denims' unwillingness or inability to substantiate her assertions further emphasize that Denims' primary purpose was – not to critique *The Nuke* – but to provide a substitute for it.  If the opposite were true, Denims would have taken the time to compile the evidence to substantiate her assertions. Examples include:

[45] On April 24, 2025, Hasan stated that "any kind of fucking Zionist tendencies, should be treated in the same way as being a fucking rabid neo-nazi." HasanAbiVODs, *HasanAbi April 24, 2025* – (Apr. 25, 2025), at 7:56:04-7:57:41 *available at*: https://youtu.be/Ny_EZm7s80I?si=NEVU0_DjufIoQiy6&t=28564

i.      After Ethan critiques Hasan for employing rhetoric that reveals he does not consider Israelis to be human (Ex. K at 1:43:33-39), Denims makes the conclusory assertion that Ethan defamed Hasan without any further explication. *Id.* at 1:43:40-54.

ii.      Frequently, Denims claims that Ethan uses clips out of context – yet she never shows or explains the omitted context. *See e.g.*, Ex. K at 1:40:23-30; 2:43:53-2:44:16; 3:00:53-3:01:36, 3:37:39-3:38:29.

iii.      Denims repeatedly claims that Ethan praised Israel's former Minister of Defense, Yoav Gallant. Ex. K at 2:00:38-44, 3:15:55-3:16:15. This is false, as demonstrated below.

1.      On November 6, 2024, Hila critiqued Israeli Prime Minister Benyamin Netanyahu by stating: "Just the other day, Bibi fired a really good guy that a lot of people are pissed about and he fired him 'cause they had a disagreement." Ethan clarified by stating he was a "moderating voice in the War Room."[46] This was correct insofar as Netanyahu fired Gallant – in large part – due to Gallant's criticism of Netanyahu's handling of the War in Gaza and the Israeli public protested Gallant's dismissal.[47]

2.      On November 8, 2024, after Hila was criticized for calling Gallant a "really good guy," Ethan clarified and provided context to the statements – with Hila adding: "I feel like the reason I brought it up was mainly to express the frustration with Bibi and him firing the one guy that was somewhat, you know, attempting at moderation. It wasn't really so much to say that Gallant is a good guy. I shouldn't have used that word. That was a bad choice on my part,

[46] H3 Podcast, *Post Election Cope Stream – H3 Show #77* (Nov. 6, 2024) at 3:38-3:56, *available at*: https://www.youtube.com/live/8aBch1GPY08?si=eFTvmQ-5rxsqQAUh&t=218.

[47] Tamar Michaelis, Tara John and Mick Krever, CNN, "Netanyahu fires Israeli Defense Minister Yoav Gallant, after months of clashes over war and politics" (Nov. 6, 2024), *available at*: https://www.cnn.com/2024/11/05/middleeast/netanyahu-yoav-gallant-intl-latam

considering stuff that he has said that I was not even thinking of."[48]

iv.     Denims claims that propaganda does not require lying. Ex. K at 2:09:26-33. The Oxford English Dictionary disagrees and defines propaganda as "[t]he systematic dissemination of information, esp. in a biased or misleading way, in order to promote a particular cause or point of view."[49]

v.     Denims repeatedly invokes the online content creator Ostonox without providing any further explanation on how it is relevant. Ex. K at 2:10:55-2:11:06, 3:39:22-28.

vi.     Denims repeatedly makes the misleading claim that Ethan performed a Nazi salute. Ex. K at 2:20:31-33, 3:49:13-16. Denims intentionally omits the fact that Ethan was making fun of Elon Musk performing a Nazi salute at President Trump's inauguration.[50]

vii.     After Ethan refutes Hasan's contentions about why the Houthis hijacked the *Galaxy Leader* (Ex. K at 2:33:32-2:35:10), Denims claims that half of what Ethan showed is false without identifying the falsehoods – let alone demonstrating how they were false. *Id.* at 2:35:11-27.

viii.     Denims claims that it is impossible that 60% of Israelis are from the Middle East. Ex. K at 2:38:49-2:39:08. Unsurprisingly, Denims' statement is baseless. A 2019 peer-reviewed study found that well over 55% of Israeli Jews are either fully or partially Mizrahi, Sephardi or Ethiopian heritage.[51] More recent data from the Jewish People Policy Institute confirms that a substantial

[48] Ethan Klein, *Hasan Piker Is A Weaselly Little Liar* (Nov. 8, 2024), *available at*: https://youtu.be/telKFaTvQqU?si=mSFC2pB9DHgc48yi

[49] Oxford English Dictionary, " Propaganda" *available at*: https://www.oed.com/dictionary/propaganda_n?tl=true

[50] H3 Podcast, *Content Nuke: Markiplier – H3 Show #103* (Jan. 29, 2025) at 36:20-56:27, *available at*: https://www.youtube.com/watch?v=oDdnL6Pd9qU&t=1415s

[51] Lewis-Epstein, N. & Cohen, Y., Journal of Ethnic and Migration Studies, "Ethnic origin and identity in the Jewish population of Israel" (Vol. 45, No. 8, 2019) at 1327-1346, *available at*: https://doi.org/10.1080/1369183X.2018.1440490.

majority of Israelis self-identify as Mizrahi or mixed origin.[52]

ix. Denims misleadingly claims that the Houthis were designated as a terrorist organization only after Hasan's January 16, 2024 interview with Al-Haddad. Ex. K at 2:47:05-25. Prior to February 2021, the Houthis were designated as a Specially Designated Global Terrorist ("SDGT") and a Foreign Terrorist Organization ("FTO"). In February 2021, President Biden delisted the Houthis from both lists. On January 17, 2024 (*i.e.*, the day after Hasan's interview with Al-Haddad), President Biden redesignated the Houthis as a SDGT.[53]

x. After showing excerpts of Hasan's interview with Al-Haddad (Ex. K at 2:48:04-2:49:50), Denims claims that there was a mistranslation during the interview. It should come as no surprise that Denims fails to identify what was mistranslated – let alone correct the translation. *Id.* at 2:49:51-2:50:01.

xi. After the section where Ethan critiques Hasan's coverage of the release of Israeli hostages (Ex. K at 3:28:23-3:29:49), Denims claims that YouTube does not require censoring such footage and implies Ethan is doing so to intentionally obfuscate the facts. She also makes the outlandish claim that Hamas treated the Israeli hostages well. *Id.* at 3:29:50-3:33:48. All of this is false. In order for TEI to monetize *The Nuke*, YouTube required that footage of hostages (such as the release of Israeli hostages and the Houthi takeover of the *Galaxy Leader*) be censored. Further, it is well documented that Hamas killed, sexually assaulted, tortured and starved the Israeli hostages – including forcing them to participate in grotesque propaganda at gunpoint. These abuses are confirmed by multiple human rights organizations:

1. Human Rights Watch documented unlawful

[52] Jewish People Policy Institute, *Ethnic Self-Identification Survey Findings*, available at: https://ij.jppi.org.il/english/videos/Yemini.

[53] Jennifer Hansler, CNN "Biden administration re-designates Houthis as Specially Designated Global Terrorists" (Jan. 17, 2024), *available at*: https://www.cnn.com/2024/01/16/politics/biden-administration-houthis-global-terrorist-entity

abduction, extrajudicial executions, torture, coerced media appearances, and sexual violence.[54]

2. Amnesty Internation detailed systematic beatings, humiliation, denial of medical care and psychological abuse of both hostages and their families.[55]

3. The United Nations Human Rights Council found that Palestinian armed groups engaged in war crimes and, in certain cases, crimes against humanity.[56]

xii. Later, during the section where Ethan points out that Hamas ordered the hostages to "keep waving" (Ex. K at 3:35:17-34), Denims claims that the individual who said "keep waving" directed the statement to someone other than the hostages. *Id.* at 3:35:35-40. Once again, Denims' statement is false. In the video (which Denims claims to have seen), it is evident the statement was directed at the hostages because they immediately start waving in response.[57]

[54] Human Rights Watch, "'I Can't Erase All the Blood from My Mind': Palestinian Armed Groups' October 7 Assault on Israel (July 17, 2024), *available at*: https://www.hrw.org/report/2024/07/17/i-cant-erase-all-blood-my-mind/palestinian-armed-groups-october-7-assault-israel; *see also* Human Rights Watch, "Questions and Answers: Hamas-Led Armed Groups' October 7, 2023 Assault on Israel, 'Sexual and Gender-Based Violence'" (July 17, 2024), *available at*: https://www.hrw.org/news/2024/07/17/questions-and-answers-hamas-led-armed-groups-october-7-2023-assault-israel.

[55] Amnesty International, "Israel/OPT: Amenesty International's Research into Hamas-Led Attacks of 7 October 2023 and Treatment of Hostages" (Dec. 2, 2024), *available at*: https://www.amnesty.org/en/documents/mde15/8803/2024/en/;

[56] United Nations Human Rights Council, "Report of the Independent International Commission of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel" (June 12, 2024), *available at*: https://www.ohchr.org/en/documents/country-reports/ahrc5626-report-independent-international-commission-inquiry-occupied

[57] India Today, " 'Keep Waving,' Hamas terrorists order hostages during release" (Nov. 23, 2023), *available at*: https://www.indiatoday.in/world/video/keep-waving-hamas-terrorists-order-hostages-during-release-2468140-2023-11-27; Jerusalem Post, "Hamas tells hostages to 'keep waving' in propaganda video of handoff in (continued).

66
COMPLAINT

xiii.	Denims repeatedly claims that *The New York Times* and President Biden had to retract claims of rape occurring on October 7th. Ex. K at 3:42:49-3:43:40, 3:45:53-3:46:19, 3:46:43-3:48:06. This is false. *The New York Times* did not retract its article about rapes occurring on October 7th.[58] While President Biden did clarify his statement that forty babies were beheaded on October 7th,[59] he never retracted the claims of rape occurring on October 7th.[60]

xiv.	After showing an excerpt of United Nations report on sexual violence occurring on October 7th (Ex. K at 3:44:41-3:45:33),[61] Denims

Gaza" (Nov. 26, 2023), *available at*: https://www.jpost.com/middle-east/article-775156

[58] Jeffrey Gettleman, Anat Schwartz and Adam Sella, The New York Times, "'Screams Without Words': How Hamas Weaponized Sexual Violence on Oct. 7" (December 28, 2023 and updated March 25, 2024), *available at*: https://www.nytimes.com/2023/12/28/world/middleeast/oct-7-attacks-hamas-israel-sexual-violence.html?smid=url-share; Elias Atienza, CheckYourFact, "Fact Check: Did The New York Times Retract Its Story on Hamas and Sexual Violence?" (Jan. 5, 2024), *available at*: https://checkyourfact.com/2024/01/05/fact-check-new-york-times-story-hamas/#google_vignette

[59] Peter Alexander, Summer Concepcion and Megan Lebowitz, NBC News, "White House clarifies Biden's claim he saw photos of terrorists beheading children in Israel-Hamas war" (Oct. 11, 2023 updated Oct. 12, 2023), *available at*: https://www.nbcnews.com/politics/white-house/biden-deliver-remarks-roundtable-jewish-community-leaders-rcna119865

[60] *See e.g.,* Darlene Superville, Associated Press, "Biden calls reports of Hamas raping Israeli hostages 'appalling,' says world can't look away" (Dec. 5, 2023), *available at*: https://apnews.com/article/biden-hamas-rape-israel-sexual-violence-1af759b6ebeb017a10ad91182350a1e7?utm_source=copy&utm_medium=share; Kevin Liptak, CNN, "Biden decries Hamas sexual assaults and says they must be forcefully condemned" (Dec. 5, 2023), *available at*: https://edition.cnn.com/2023/12/05/politics/biden-condemns-hamas-sexual-assaults-democrats; Cheyenne Haslett, ABC News, "Biden speaks of Oct. 7 and commitment to getting hostages home at Hanukkah reception" (Dec. 16, 2024), *available at*: https://abcnews.go.com/Politics/biden-speaks-oct-7-commitment-hostages-home-hanukkah/story?id=116851278

[61] Office of the Special Representative of the Secretary-General on Sexual Violence in Conflict, "Mission report: Official visit of the Office of the SRSG-SVC to Israel and the occupied West Bank: 29 January – 14 February 2024", *available at*: (continued).

claims the report was discredited without any supporting evidence. *Id.* at 3:45:34-40. Not only is Denims' statement cruelly and grotesquely false, the United Nations report was affirmed by multiple credible sources, such as:

1.     Humans Right Watch cited the United Nations' report in Human Rights Watch's own report – which also independently found evidence of sexual and gender-based violence during the October 7th attacks.[62]

2.     Physicians for Human Rights Israel confirmed it would rely on the United Nations report.[63]

3.     In February 2024, the Association of Rape Crisis Centers in Israel published a report that aligns with the findings of the United Nations report.[64]

4.     The United Kingdom's Minister for the Middle East cited the United Nations' report at the UN Security Council that there was "reasonable grounds" and "clear and convincing" evidence of sexual and gender-based violence occurring on October 7th.[65]

https://news.un.org/en/sites/news.un.org.en/files/atoms/files/Mission_report_of_SRSG_SVC_to_Israel-oWB_29Jan_14_feb_2024.pdf

[62] Human Rights Watch, "Questions and Answers: Hamas-Led Armed Groups' October 7, 2023 Assault on Israel 'Sexual and Gender-Based Violence" (July 17, 2024), *available at*: https://www.hrw.org/news/2024/07/17/questions-and-answers-hamas-led-armed-groups-october-7-2023-assault-israel;

[63] Physicians for Human Rights Israel, "Clarification Regarding Gender-Based Violence in the Context of October 7 Events" (May 23, 2024), *available at*: https://www.phr.org.il/en/clarification/.

[64] Association of Rape Crisis Centers in Israel, "Silent Cry – Sexual Violence Crimes on October 7" (Feb. 2024), *available at*: https://www.1202.org.il/en/information-and-data/reports-and-articles/october-7-sexual-violence-crimes-report/

[65] Ahmad, Lord, "The UK is deeply concerned by Special Representative Patten's findings of sexual violence on 7 October: UK statement at the UN Security Council" (March 11, 2024), *available at*: https://www.gov.uk/government/speeches/the-uk-is-deeply-concerned-by-special-representative-pattens-findings-of-sexual-violence-on-7-october-uk-statement-at-the-un-security-council

5.    The European Union Council found that Hamas committed systematic sexual violence as a weapon of war on October 7th.[66]

6.    The International Criminal Court prosecutor announced grounds to charge Hamas leadership with crimes against humanity based upon on systematic rapes and sexual assaults occurring on October 7th.[67]

xv.    When Ethan discusses Frogan's statements that she wished soldiers in the United States military get PTSD and lose their health insurance, Denims claims Frogan apologized for the comment immediately afterwards. Ex. K at 4:00:23-43. This is false three times over: not only did Frogan fail to immediately apologize, she never apologized and even doubled down on the statement.

1.    On or shortly before October 16, 2024, Frogan made the aforementioned statement.[68]

2.    On or shortly before October 20, 2024, Frogan doubled down on her statement by reacting to it, giggling and claiming her statement was "based."[69]

3.    Only after Frogan was publicly excoriated for her cruel comments, Frogan made a post on X that attempted to justify her statement. At the end of her post, Frogan tepidly walked back her vicious attack on veterans by adding: "i realize that wishing people harm isn't the best way to talk about these issues and that i could have talked about these topics in a more sensitive way."[70]

---

[66] Reuters, "EU sanctions Hamas wings over sexual violence on Oct. 7" (April 12, 2024), *available at*: https://www.reuters.com/world/eu-sanctions-hamas-wings-over-sexual-violence-oct-7-2024-04-12/

[67] Khan, K. "Statement of ICC Prosecutor Karim A.A. Khan KC on applications for arrest warrants in the situation in the State of Palestine" (May 2024), *available at:* https://www.icc-cpi.int/news/statement-icc-prosecutor-karim-aa-khan-kc-applications-arrest-warrants-situation-state

[68] *See* N1ghtm4re, "Frogan wishes PTSD on US Soldiers and no Health Care" (Oct. 16, 2024), *available at*: https://youtu.be/ST23KqsB_uI?si=x5dTqmIhWaCVbEWx

[69] *See* https://x.com/nicholasdeorio/status/1848145789006074322

[70] *See* https://x.com/fr0gan/status/1848179969312051507

69
COMPLAINT

(original spelling).

xvi. Also, during the same section, Denims attempts to deflect criticism from Frogan by claiming she was emotional due to a recent article about the IDF bulldozing Palestinians. Ex. K at 4:09:28-4:12:57. This is false twice over. First, the purported video documenting the alleged bulldozing of Palestinians was debunked as being filmed in Egypt a decade prior.[71] Second, the news reports on this purported event occurred in December 2023 – *i.e.*, ten months prior to Frogan's statements in October 2024.

xvii. After Ethan discusses Frogan offering to make a cake recreating 9/11, Denims claims that Frogan was given a thirty-day ban for doing so. Ex. K at 4:13:33-38. This is false. Frogan was given a thirty-day ban for her involvement in the racial tier list at TwitchCon 2024. This is evidenced by the fact that all the other panelists – including Denims – received the same punishment at the same time.[72]

xviii. Denims makes the completely unsubstantiated claim that – like Frogan and Hasan – Ethan also made jokes about 911. Ex. K at 4:14:26-34.

xix. Denims also makes the unsubstantiated claim that Ethan denied the IDF engaged in systematic rape. Ex. K at 4:23:30-45. This is false. Ethan acknowledged that the IDF engaged in sexual violence, exhibited genuine curiosity about learning more, evaluated additional sources, repeatedly stated that he was not denying the claim and even Hasan admitted that he misspoke by asserting such claims of systemic rape were well-documented.[73]

[71] France24, "This videos does not show Israel bulldozing Palestinians at Gaza's Kamal Adwan Hospital" (Dec. 19, 2023) *available at*: https://f24.my/A0b9

[72] Alyssa Mercante, Kotaku, "Twitch Bans Several Arab Streamers Following 'Habibi' Ratings Panel At TwitchCon" (Oct. 21, 2024), *available at*: https://kotaku.com/twitch-ban-fr0gan-denims-capri-raffoul-adl-ethan-klein-1851677969

[73] H3 Podcast, *Israel vs Gaza – Leftovers #61* (Oct. 12, 2023) at 3:37:33-3:45:03 *available at*: https://www.youtube.com/live/JFznOHunD_c?si=b6N7tJgP_lUekAyb&t=13053

xx.       After Ethan criticizes Frogan's podcast for stating that Israelis cannot "claim" hummus, Denims states that the podcast's critique was not that Israelis "claim" hummus, but they claim to have "invented" it. Ex. K at 4:27:52-4:28:53. This is false. As made clear by the podcast episode itself, the participants (including Frogan) never mentioned "inventing" hummus; rather, they took issue with Israelis "claiming" hummus.[74]

xxi.       Denims – who is not Jewish – makes the grotesquely bigoted statement that it is antisemitic to associate Zionism (*i.e.*, the Jewish right to self-determination in their ancestral homeland)[75] with Judaism. Ex. K at 4:33:48-4:34:02. Shortly thereafter, a chatter confronts Denims by explaining that approximately 90% of Jews are Zionists. Without any substantiation, Denims claims that this was derived from a poll with a sample size of twenty-six and that one-third of Jews think Israel is committing genocide in Gaza. *Id.* at 4:34:45-4:35:18. Denims' assertion is completely and totally baseless.

1.       A 2019-2020 Pew Research Center survey of 4,718 American Jews found 82% considered caring about Israel to be "essential" or "important" to what it means to be Jewish.[76]

---

[74] Ayyrabs Podcast, *Living Through a War in Lebanon | ft, @DoNotWorryPodcast* (Oct. 2, 2024), at 42:25-44:10 *available at:* https://youtu.be/GgUNY5qjbPc?si=ajp1sN_oGNQcbv4Z&t=2545

[75] A "Zionist" is someone who believes in the right of Jewish self-determination in their ancestral homeland. It is a broad umbrella that includes those who "consider the rights of Palestinians to be fundamental to Zionism's success." Frequently, "policies carried out by the Israeli government that harm and suppress Palestinians are often conflated by anti-Zionists as representing Zionism as a whole." This conflation has "a marginalizing effect on Jews" and is often "indistinguishable from anti-Semitism in its expression" because it uses "anti-Semitic tropes." Encyclopedia Brittanica, "Zionism" *available at*: https://www.britannica.com/topic/Zionism

[76] Justin Nortey, Pew Research Center "U.S. Jews have widely differing views on Israel" (May 21, 2021) *available at*: https://www.pewresearch.org/short-reads/2021/05/21/u-s-jews-have-widely-differing-views-on-israel/; Pew Research Center, "Jewish Americans in 2020, Appendix A: Survey methodology" (May 11, 2021) *available at*: https://www.pewresearch.org/religion/2021/05/11/appendix-a-survey-methodology-4-2/

71
COMPLAINT

2.    In another poll conducted in December 2024 of 800 American-Jewish adults, "70% think anti-Zionist movements are antisemitic by definition" and only "9% strongly disagree with that statement."[77]

m.    On the exceedingly rare instances where Denims does cite extrinsic sources, Denims (unsurprisingly) completely misrepresents the source material. This further evidences she was utterly unprepared to provide criticism of *The Nuke* and the extent of her criticism suffers as a result. Below are some notable examples:

i.    During the section where Ethan discusses the forced expulsion of Mizrahi Jews from Arab countries, Denims makes the maliciously ahistorical assertion that Jews were treated well in Arab countries – even claiming to be well read on the subject. It is evident that Denims fundamentally fails to grasp the horrors Jews endured in Arab countries.

1.    For example, Denims claims that Vichy France (*i.e.*, Nazi occupied France) sent Moroccan Jews to Israel. To "support" her claim, Denims pulls up the Wikipedia article entitled "History of Jews in Morocco" (the "Wikipedia Article") (but strategically conceals the Wikipedia Article's title).[78] Ex. K at 1:51:20-1:58:13. The Wikipedia Article refutes her "well read" assertion: Vichy France sent Moroccan Jews to Europe to be exterminated and not Israel.

2.    Further, it is painfully obvious that Denims either did not read the Wikipedia Article or failed to understand it. The Wikipedia Article documents 1,000 years of Moroccan Jews being massacred, subjugated under the

---

[77] The Jewish Majority, "New Poll: Jewish Voice for Peace Does Not Represent Vast Majority of U.S. Jewish Community" (February 12, 2025), *available at*: https://img1.wsimg.com/blobby/go/2921c434-f7d7-43f4-ade6-3a5591444c85/downloads/97dc308b-4559-4e42-a55e-53c77f75c044/Press%20release%202.11.2025.pdf?ver=1739292818681
[78] Wikipedia, "History of Jews in Morocco" *available at*: https://en.wikipedia.org/wiki/History_of_the_Jews_in_Morocco. In a moment of great irony, Denims later critiques *The Nuke's* citations to Wikipedia for Nasrallah's antisemitic statements. Ex. K at 2:35:27-38.

72
COMPLAINT

*dhimmi* apartheid system (including forced to pay *jizya*, wear certain clothing, live in certain areas, employ restrictive modes of transportation and prohibited from engaging in certain types of work),[79] rape, state sanctioned abuse, destruction of synagogues, ethnic cleansing and forced conversion. One of the most tragically absurd episodes documented in the Wikipedia Article involved the Sultan Sulaiman finally allowing the Jews of Fez to wear shoes. So many Jews were slaughtered by their Arab neighbors as a result that the Jews of Fez begged the Sultan to repeal the edict – which he did.

ii.     Denims makes the incendiary claim that Ethan is scared of Arabic and the Muezzin call. She frantically tries to find the clip to support her assertion, but gives up. Ex. K at 2:54:25-2:55:24. After someone in her chat sends her a link, she eagerly plays the clip. When it is evident that her claim is a grossly inaccurate mischaracterization, Denims' excitement evaporates as she silently moves on from the point. *Id.* at 2:56:26-2:57:24.

n.     During her "group viewing session," *The Nuke* takes up approximately three-quarters of the screen for Denims' "group viewing session" – while Denims sequesters herself to the right-hand quarter to deemphasize her presence. Denims' objective was to provide a large and unobstructed view of *The Nuke* to her audience – which further emphasizes her primary purpose was to provide a substitute for the original.

o.     To be certain, Denims (albeit infrequently and inconsistently) makes a highly transformative use of *The Nuke*. Where *The Nuke* seeks to expose how Hasan radicalizes people online to be antisemitic and anti-Israeli, Denims attempts to use *The Nuke* for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan. The transformative

---

[79] *See also* Bernard Lewis, *The Jews of Islam* (1984); Efraim Karsh, *Islamic Imperialism: A History* (2006); Mark R. Cohen, *Under Crescent and Cross: The Jews in the Middle Ages* (1994); Bat Ye'or, *The Dhimmi: Jews and Christians Under Islam* (1985).

nature of these moments are undermined (if not erased) by showing far more of *The Nuke* than is necessary to achieve this purpose. Some examples are identified above, but also include:

i. Denims will repeatedly glorify terrorism and terrorists, such as: (1) glorifying the Houthis' footage of the hijacking of the *Galaxy Leader* (Ex. K at 2:36:17-46); (2) glorifying the leader of Hezbollah, Hassan Nasrallah (*id.* at 3:18:21-3:19:17); (3) attacking a chatter critiquing her glorification of Hezbollah (*id.* 3:22:15-3:23:08); (4) excusing the homophobia of terrorist groups (*id.* at 3:36:54-3:37:39); (5) glorifying Hamas propaganda (*id.* at 3:35:41-3:36:11); and (6) excusing the antisemitism of terrorists (*id.* at 2:23:12-2:25:18, 2:27:41-2:29:00, 3:12:48-3:13:07, 3:13:15-36).

ii. Denims also attempts (albeit unsuccessfully) to excuse Hasan's hypocrisies, such as: (1) his highly consumerist spending (Ex. K at 3:18:01-14); and (2) his defense of Hamas (*id.* at 3:49:17-23).

iii. Denims repeatedly attempts to justify her own antisemitism and – even more absurd – paint Ethan as an antisemite. Ex. K at 2:59:19-27, 4:29:11-31, 4:29:53-4:30:05, 4:33:48-4:35:18, 4:36:48-4:37:12, 4:46:12-34.  In one instance, Denims goes on a long tangent by showing a clip in its entirety of Norman Finkelstein[80] with little commentary to justify her own bigotry.

[80] Finkelstein is best known for his discredited book *The Holocaust Industry* and for DePaul University denying him tenure on the grounds of unprofessional conduct. He is widely dismissed by academics and historians as an idealogue. *See* Norman G. Finkelstein, *Brief Comments on the Nation's "Rebuttal" to My Exchange with Omer Bartov*, NormanFinkelstein.com (2000), *available at* https://web.archive.org/web/20090321185503/http://normanfinkelstein.com/article.php?pg=3&ar=165; Omer Bartov, New York Times "A Tale of Two Holocausts," (Aug. 6, 2000) *available at:* https://archive.nytimes.com/www.nytimes.com/books/00/08/06/reviews/000806.06bartovt.html.; Wikipedia, "The Holocaust Industry," *available at*: https://en.wikipedia.org/wiki/The_Holocaust_Industry. Debra Cassens Weiss, American Bar Association Journal, "No Tenure for DePaul's Finkelstein; Harvard Law Prof's 'Tempest' a Factor" (June 11, 2007), *available at*: (continued).

*Id.* at 2:22:44-2:29:00.

   iv. Denims also caries water for Clancy. When Ethan critiques Clancy's obsession with e-girls on the Twitch platform, Denims seeks to excuse this lecherous behavior by making the tone-deaf claim that Clancy's obsession with e-girls is a sign of his virility. Ex. K at 3:51:04-3:53:45.

   p. Finally, Denims' use of *The Nuke* was highly commercial. This is evidenced by:

   i. Her statement: "***Well guys, if you enjoyed not giving any views to that terrible video, <u>follow, subscribe, throw a prime, if you like the content, if you enjoyed your time here</u>***." Ex. K at 5:07:45-58.

   ii. On 174 separate occasions during her "group viewing session" of *The Nuke*, Denims receives paid subscriptions, donations and bits. Each of these paid subscriptions and donations would result in a graphic being superimposed over *The Nuke*.

   iii. Denims ran advertisements during her "group viewing session" of *The Nuke* and received advertising revenue as a result.

   iv. On her Twitch page where Denims' "group viewing session" was located, Denims placed buttons soliciting paid subscriptions and donations beneath the video of Denims' "group viewing session" of *The Nuke*.

   v. The clear coordination between Denims and the H3Snark Mods (and others) to direct as many viewers to her "group viewing session" of *The Nuke* to avoid giving views and advertising revenue to TEI.

https://www.abajournal.com/news/article/no_tenure_for_depauls_finkelstein_harvard_law_profs_tempest_a_factor; David Cesarani, Times Higher Educ. "Finkelstein's Final Solution" (Aug. 4, 2000), *available at*: http://www.timeshighereducation.co.uk/books/finkelsteins-final-solution/155953.article; "Academic Freedom and Palestine-Israel: The Case of Beyond Chutzpah," 35 J. Palestine Stud. 94 (2006), *available at:* https://www.palestine-studies.org/sites/default/files/attachments/jps-articles/jps.2006.35.2.85.pdf.

71. As to the second fair use factor, the fact *The Nuke* was released a minute prior to Denims' "group viewing session" does not weigh in her favor. Further, while containing numerous documentary and factual elements, *The Nuke* contains numerous creative elements, which weigh against fair use.

72. As to the third fair use factor, this factor weighs heavily against fair use. It is readily apparent Denims' use was excessive for any potential criticism of *The Nuke* – particularly in light of minimal level of commentary and highly commercial nature of Denims' "group viewing session." This is especially true when Denims repeatedly provides brief statements (many of which have little to not critical bearing on *The Nuke*) after showing long unadulterated segments of *The Nuke.*

73. The fourth (and most important) fair use factor weighs the most heavily against fair use. It is readily apparent that Denims intended (and succeeded) to provide a market substitute for *The Nuke* for the reasons set forth below:

      a. The statements identified in Paragraphs 70.a and 70.p.i above.

      b. Showing *The Nuke* in its entirety with minimal commentary.

      c. Starting her "group viewing session" a minute after *The Nuke* was released to the public when the interest in *The Nuke* was at its apex.

      d. The First Inducement Post, Second Inducement Post and Third Inducement Post by the H3Snark Mods.

      e. Due to Denims' siphoning the audience for *The Nuke* to her "group viewing session," TEI lost views and advertising revenue it would ordinarily receive from the individuals who watched Denims' "group viewing session" instead of *The Nuke*.

      f. Denims' conduct did become widespread. Several other members of Hasan's Waiting Room conducted a "group viewing session" of *The Nuke* immediately after its release – which resulted in further lost views and lost advertising revenue to TEI.

## FIRST CLAIM FOR RELIEF

### (For Direct Copyright Infringement – Against Denims)

74. TEI incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

75. TEI is the sole of the of the copyrights in the *Countdown Episode* and *The Nuke*.

76. TEI registered its copyrights in the *Countdown Episode* and *The Nuke* with the USCO.

77. Denims accessed: (1) the *Countdown Episode* from TEI's YouTube channel, H3Podcast; and (2) *The Nuke* from TEI's YouTube channel, h3h3Productions.

78. TEI did not grant any license, authorization or consent for Denims to exploit the *Countdown Episode* or *The Nuke* in any manner. Rather, Denims' "group viewing session" of the *Countdown Episode* and *The Nuke* constituted an unauthorized reproduction, public performance and derivative work of the *Countdown Episode* and *The Nuke* in violation of TEI's rights as set forth in 17 U.S.C. Section 106.

79. Due to Denims' acts of copyright infringement, TEI has suffered damages in an amount to be established at trial.

80. Due to Denims' acts of copyright infringement, Denims obtained profits she would not have realized but for her infringement of TEI's copyrights in the *Countdown Episode* and *The Nuke*.

81. Denims' acts of copyright infringement were done with actual or constructive knowledge of TEI's rights, such that said acts of copyright infringement were willful, intentional, malicious and/or taken with reckless disregard for TEI's rights.

## SECOND CLAIM FOR RELIEF

### (Contributory Copyright Infringement – Against The H3Snark Mods)

82. TEI incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

83. The H3Snark Mods (and each one of them) knew Denims' "group viewing session" would infringe TEI's copyrights in the *Coundown Episode* and *The Nuke*.

84. The H3Snark Mods (and each one of them) are responsible for the First Inducement Post, Second Inducement Post and Third Inducement Post.

85. The First Inducement Post, Second Inducement Post and Third Inducement Post induced, caused and/or materially contributed to Denims' infringement of the *Countdown Episode* and *The Nuke*.

86. Due to the H3Snark Mods' contributory infringement, TEI has suffered damages in an amount to be established at trial.

87. The H3Snark Mods' acts of contributory infringement were made with actual or constructive knowledge of TEI's rights, such that said acts of contributory infringement were willful, intentional, malicious and/or taken with reckless disregard for TEI's rights.

## PRAYER FOR RELIEF

WHEREFORE, TEI prays for judgment against Denims and the H3Snark Mods (collectively, "Defendants") as follows:

a. That TEI be awarded Defendants' (and each of their) profits, plus TEI's losses, attributable to Defendants' infringement of the *Countdown Episode*, the exact sum to be proven at the time of trial.

b. That TEI be awarded Defendants' (and each of their) profits, plus TEI's losses, attributable to Defendants' infringements of *The Nuke*, the exact sum to be proven at the time of trial; or, if elected, statutory damages in the amount of

$150,000 as available under 17 U.S.C. Section 504;

  c. TEI be awarded it reasonable attorneys' fees and costs under 17 U.S.C. Section 505;

  d. TEI be awarded pre-judgment interest as allowed by law; and

  e. TEI be awarded such further relief as the Court deems proper.

### f.  JURY TRIAL DEMAND

 TEI demands a jury trial on all issues so triable pursuant to Federal Rule of Civil Procedure 38 and the 7th Amendment to the United State Constitution.

Dated: June 19, 2025      **HEAH BAR-NISSIM LLP**

        By   /s/ Rom Bar-Nissim
          ROM BAR-NISSIM
          Attorneys for Plaintiff Ted
          Entertainment, Inc.

# EXHIBIT 2

Rom Bar-Nissim (SBN: 293356)
Rom@HeahBarNissim.com
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

Attorneys for Plaintiff
Ted Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TED ENTERTAINMENT, INC., a California Corporation,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN KAMAL MAJED p/k/a FROGAN, an individual, and DOES 1-10<br><br>Defendants. | Case No.: 2:25-cv-5565<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |



Frogan: Reacting by Exiting

"Time to watch the new Nuke ethically. Hell yeah!"

"Thank you guys so much. I do appreciate everyone's support. And thank you for watching it with me"

– Frogan Prior to Reacting to *Content Nuke: Hasan Piker*

"I came from the H3Snark reddit."

"I found my way from Reddit."

– Frogan Reading Comments in Chat Prior to Reacting to *Content Nuke: Hasan Piker*

"Can I use the bathroom please? I'll leave it playing!"

– Frogan Reacting to *Content Nuke: Hasan Piker*

## **INTRODUCTION**

1.      This lawsuit is about ending the practice of lazy reaction videos that copy entire copyrighted works and purposefully siphon views and revenue away from the original. Over seven years ago, the owners of Plaintiff Ted Entertainment, Inc. ("TEI") – Ethan and Hila Klein – established the legal standard for fair use reaction videos in *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34 (S.D.N.Y. 2017). As a genre, reaction videos "vary widely in terms of purpose, structure, and the extent to which they rely on potentially copyrighted material." Reaction videos, "like the Klein video" that "intersperse *short* segments of another's work with criticism and commentary," constitute fair use.[1]  In contrast, reaction videos that are "more akin to a *group viewing session*" do not. *Id.*, at 40 fn.1, 45-47 (emphasis added).

2.      This case involves a "group viewing session" hosted by Defendant Morgan Kamal Majed p/k/a Frogan ("Frogan"). Frogan specifically intended her "group viewing session" to siphon the maximum number of views and revenue away from TEI's copyrighted work *Content Nuke: Hasan Piker* ("*The Nuke*") to herself. Frogan successfully achieved her objective by releasing her "group viewing session" of *The Nuke* immediately after its official release and showing it in its entirety. Frogan greatly profited from her "group viewing session" of *The Nuke* through advertising revenue, donations and paid subscriptions.

3.      The moderators of the H3Snark subreddit (the "H3Snark Mods") knew that Frogan's "group viewing session" would serve as a substitute for watching *The Nuke* on TEI's YouTube channel. As such, the H3Snark Mods successfully promoted Frogan's "group viewing session" on the H3Snark subreddit ("H3Snark") as a substitute for watching *The Nuke* on TEI's YouTube channel.

4.      Like most lazy reaction videos, Frogan's "group viewing session" of *The Nuke* suffers from a poverty of critical commentary.

---

[1] The Kleins' video from *Hosseinzadeh* was entitled *The Big, The BOLD, The Beautiful* and is available here: https://youtu.be/CXUs5FOo-JE?si=74MWM26Wn26KmO4o

a.      Most frequently, Frogan plays long, unadulterated portions of *The Nuke* to her viewers. In the majority of instances, she does not even pay attention to *The Nuke* and, instead, is on her phone. Frogan even performs an "empty chair reaction" where she goes off-camera for several minutes while *The Nuke* keep playing to keep her audience entertained.

b.      On the few occasions Frogan does speak during her "group viewing session" of *The Nuke*, it is to provide repetitive statements on her favorite subject – not the plight of Palestinians, but herself.

c.      Other times, Frogan provides short, surface-level observations that provide little to no "new information, new aesthetics, new insights or understandings" on *The Nuke*. *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith* ("*Warhol*"), 598 U.S. 508, 541 (2023). The vast majority of these observations have little to no "critical bearing on the style or substance" of *The Nuke*. *Id.* at 510. Rather, Frogan's "commentary" primarily consists of repetitive *ad hominem* attacks on Ethan without any reference to *The Nuke* itself.

5.      Frogan's unauthorized, highly commercial exploitation of *The Nuke* is a quintessential example of copyright infringement – *i.e.*, using copyrighted content "to get attention [and] avoid the drudgery in working up something fresh." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994). This lawsuit is to hold Frogan accountable for her infringement of *The Nuke* and the H3Snark Mods accountable for their contributory infringement.

**JURISDICTION AND VENUE**

6.      This action arises under the Copyright Act, 17 U.S.C. § 101, *et seq.*

7.      This Court has federal question jurisdiction under 28 U.S.C. §§ 1331, 1338(a-b).

8.      Venue in this judicial district is proper under 28 U.S.C. §§ 1391(c) and 1400(a) because a substantial part of the acts and omissions giving rise to the claims occurred in this judicial district.

3
COMPLAINT

**PARTIES**

9.     TEI is a California corporation with its principal place of business located in Los Angeles County, CA. TEI is a production company that produces content for social media, namely YouTube.

10.     Frogan is an online streamer who releases content on social media platforms, namely Twitch, and resides in Los Angeles, California.

11.     The H3Snark Mods are comprised of Does Nos. 1-10. The true names and exact location of Does Nos. 1-10 are presently unknown to TEI, which therefore sues said Doe defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and exact locations when the same have been ascertained. Below is a summary of what is known about Does Nos. 1-6.

a.     Doe No. 1 is female, the founder of H3Snark and one of the H3Snark Mods. She previously used the Reddit username "u/ozempicdealer" – which Doe No. 1 subsequently deleted. Her last post using this handle was on February 12, 2025. Doe No. 1 also uses the Discord handle "yoggiebearx" and the screen name "parishilton."

b.     Doe No. 2 is female, resides in Canada and is the head moderator of the H3Snark Mods. Doe No. 2 currently uses the following Reddit usernames: (1) u/h3snarkmodteam2; (2) u/RomanPeee; and (3) u/Right_Salamander (currently idle). Previously, Doe No. 2 used the following Reddit usernames – which were either deleted by Doe No. 2 or suspended by Reddit for violating its Content Policy: (1) u/kavkav2 (deleted); (2) u/h3snarkmodteam3 (deleted); (3) u/Wrong_Salamanderr (deleted); (4) u/Right_Salamanderr (suspended); (5) u/PurePress (suspended); and (6) u/KitchenMukbangStar (deleted). On Discord, Doe No. 2 uses the screen names "Sally" and "allitern."

c.     Doe No. 3 began as a user of H3Snark and was subsequently made an H3Snark Mod. Initially, Doe No. 3 used the Reddit username

"u/sarahornejewetts" – which she subsequently deleted. After deleting this account, Doe No. 3 used the Reddit username "u/jewettsarahorne."

        d.     Doe No. 4's account name on Discord is "rozzwhalenm."

        e.     Doe No. 5 is male and goes by the name Tony. Doe No. 5 was made an H3Snark Mod. His account name on Discord is "frompu."

        f.     Doe No. 6 was made an H3Snark Mod. Doe No. 6's account name on Discord is "No_Reception."

        g.     Doe Nos. 7-10 are the remaining H3Snark Mods.

<div align="center">

**FACTUAL ALLEGATIONS**

</div>

**Background of TEI**

12.    TEI was founded in 2016 by Ethan and Hila Klein. The Kleins rose to prominence on YouTube with two channels, "h3h3Productions" (their primary channel) and "Ethan and Hila"[2] (their secondary channel). The Kleins created highly stylized reaction videos to other YouTube videos. The Kleins' reaction videos "intersperse[d] relatively short segments" of the original video "with long segments of the Kleins' commentary." *Hosseinzadeh*, 276 F.Supp.3d at 40. After TEI was established, the Kleins assigned both channels to TEI.

13.    In 2016, the Kleins were sued for copyright infringement, defamation and misrepresentation under 17 U.S.C. Section 512(f) by Matt Hosseinzadeh p/k/a Matt Hoss/The Bold Guy ("Matt Hoss"). The copyright claim concerned a reaction video uploaded to their "Ethan and Hila" YouTube channel. The video, entitled *The Big, The Bold, The Beautiful* (the "Klein video"), was a critical and humorous reaction to Matt Hoss' video, *Bold Guy vs. Parkour Girl* (the "Hoss video"). As the Court in *Hosseinzadeh* explained:

> The Klein video opens with commentary and discussion between Ethan and Hila Klein, followed by segments of the Hoss video which they play, stop, and continue to comment on and criticize. The Klein video, which is almost fourteen minutes long, intersperses relatively short segments of the Hoss video with long segments of the Kleins'

[2] The "Ethan and Hila" channel was later renamed to "Hila Klein."

<div align="center">

5

COMPLAINT

</div>

> commentary, ultimately using three minutes and fifteen seconds of the five minute, twenty-four second long Hoss video. The Klein video is harshly critical of the Hoss video, and includes mockery of [Matt Hoss'] performance and what the [Kleins] consider unrealistic dialog and plotlines. In addition, defendants' commentary refers to the Hoss video as quasi-pornographic and reminiscent of a "Cringetube" genre of YouTube video known for "cringe"-worthy sexual content. As critical as it is, the Klein video is roughly equivalent to the kind of commentary and criticism of a creative work that might occur in a film studies class.

*Hosseinzadeh*, 276 F.Supp.3d at 40 (footnote and internal citations omitted).

14. On August 23, 2017, the Court granted summary judgment for the Kleins on all of Matt Hoss claims. *Hosseinzadeh*, 276 F.Supp.3d at 45-48. For the copyright infringement claim, the Court found the Klein video made a fair use of the Hoss video.

15. In 2017, TEI established *The H3 Podcast* channel on YouTube. On the new channel, TEI produced podcast episodes that were less structured than the reaction videos the Kleins previously made. To ensure any use of unlicensed copyrighted content qualified as fair use, TEI formulated and refined best practices based on the principles from *Hosseinzadeh*, which included: (1) whenever feasible, prescreening the original work and outlining the criticism and commentary before the broadcast; (2) ensuring the commentary was directly related to the style and/or substance of the original work; (3) only broadcasting the portion of the original work that would be subject to critique; (4) pausing the original work frequently to provide critique; and (5) ensuring that the duration of commentary was substantially longer than the portion of the original work show immediately before the commentary.

### Frogan: ضربتني و بكت سبقتني و اشتكت

16. Frogan began streaming in June 2019 and on a more regular basis in August 2021. Frogan's career peaked in August 2022 when she averaged 738 viewers a stream. Ever since, Frogan has steadily lost popularity. In January 2025 (*i.e.*, the month of Frogan's "group viewing session" of *The Nuke*), Frogan

averaged 160 viewers a stream.[3]

17.     Frogan holds herself out as an expert. The area of her expertise, however, has yet to reveal itself. She claims to be a "public health expert,"[4] yet, Frogan admits her academic and professional career in public health was stunted by her lack of self-discipline. According to Frogan, her academic advisor conducted an intervention to ensure she would complete her master's degree. Frogan also admitted to abandoning her brief career in public health after her "boss wanted to discuss [her] performance with the manager of [her] department."[5]

18.     Frogan frequently portrays herself as a victim, particularly to cast herself as a Muslim woman persecuted by "Zionists." The inconsistencies in her evolving narratives, however, reveal that she is not a victim at the hand of others – but her own. The following examples illustrate this pattern:

a.     The Professor who Failed Her: On August 7, 2016, Frogan posted on X that her "professor made [her] write about the Arab Israeli conflict and gave [her] a **D** on the *paper*" when she was "the only hijabi in the class."[6] Nearly a year later, the story changed to make the professor seem worse. On June 10, 2017, Frogan posted on X that her professor gave her an "**F**" because what she "said about Israel was '*wrong*.'"[7] Several years later, the story mutated further to make the professor seem divorced from reality. On May 8, 2021, Frogan posted on X that her "professor assigned" her, "the only Arab in the class, to do a ***project*** about the Arab/Israeli conflict and failed [her] when [she] talked about ***how Palestine is occupied by Israel***."[8] In this instance, Frogan provided a screenshot summarizing two slides from this "paper" or "project" – one of which contains a glaring

[3] TwitchTracker, Frogan, *available at*: https://twitchtracker.com/frogan/statistics.
[4] Frogan, "About," *available at:* https://www.twitch.tv/frogan/about
[5] Visionaries, *How Frogan Went from Public Health Expert to Streamer Awards Winner | Visionaries Podcast*" (Mar. 25, 2023) at 2:34-2:44, 4:10-4:32 *available at*: https://youtu.be/LMYi1r2DCnw?si=vr1BPwjW1jz81WHR&t=154
[6] *See* https://x.com/fr0gan/status/762514029881401344.
[7] *See* https://x.com/fr0gan/status/873770100775686145
[8] https://x.com/fr0gan/status/1391231483910754304

inaccuracy that Frogan admits was wrong. In the slide, Frogan claimed that there were "[o]ver *400 million Palestinians* … liv[e] in refugee camps in occupied territories and other Arab states." According to the UNWRA, there are only *1.5 million* Palestinians living in refugee camps.[9] This glimpse into Frogan's paper and its obvious inaccuracy reveals why Frogan received a low grade: her paper was "wrong" because it contained factual inaccuracies. Instead, Frogan painted herself the victim of a fanatical professor who discriminated against her and promulgated a counterfactual narrative that Israel is not occupying the West Bank and Gaza.[10]

　　　　b.　　The "Zionist" Therapist: On October 24, 2019, Frogan posted on X that she "went to therapy for the first time" and, "after talking about [her] dad fleeing the Israel Lebanon war[,]" she was "taken aback" when her therapist responded with: "***Im [sic] Israeli do you have any issues with me being your therapist***"[11] (original spelling; added emphasis).

　　　　　　i.　　As a self-described "public health expert," Frogan should have realized that her therapist was adhering to: (1) the American Counseling Association's Code of Ethics (Sections A.1.a, A.2.a-c);[12] and (2) the American

[9] UNWRA, "Palestinian Refugees" *available at*: https://www.unrwa.org/palestine-refugees

[10] Frogan repeatedly exhibits a fundamental lack of understanding of Middle East and Lebanon. For example, on October 15, 2024, Frogan watched a speech by Israeli Prime Minister Benyamin Netanyahu that referenced the Druze. In response, Frogan began to say "Who the fuck are…" before being cut-off by her co-hosts who explained they discussed the Druze in the prior episode. Ayyrabs Podcast, *What is Israel's Plan with Lebanon?* (Oct. 15, 2024), at 44:41-44:57 *available at*: https://youtu.be/zrnc6j6zNy4?si=I6AzzncQIdju9rRE&t=2681. Wikipedia, "History of Lebanon: Late 19th century to early 20th century," *available at*: https://en.wikipedia.org/wiki/History_of_Lebanon#Late_19th_century_to_early_20th_century. The Druze (along with the Maronite Catholics) founded modern Lebanon in the early 18th century. Muslims have historically oppressed the Druze as apostates. Wikipedia, "Druze: Relationship with Muslims," *available at*: https://en.wikipedia.org/wiki/Druze#Relationship_with_Muslims

[11] *See* https://x.com/fr0gan/status/1187442866341236743

[12] American Counseling Association, *2014 ACA Code of Ethics*, *available at*: (continued).

Psychological Association's Ethical Principles of Psychologists and Code of Conduct (Principles A, E, Rules 3.01, 3.04, 3.06).[13]

ii.  Several years later, Frogan's story about her therapist mutated. On February 29, 2024, Frogan posted on X about her "**bad experience with a _Zionist_ therapist**."[14] (added emphasis). When Ethan responded that Frogan was using "Zionist" as a dog-whistle for Jews (which was clearly the case), Frogan made another post that that painted the therapist as absurdly rabid and unethical.[15] Below is a true and correct screenshot of the post.



19.  Prior to October 7th, Frogan was an effusive fan of Ethan and the

https://www.counseling.org/docs/default-source/default-document-library/ethics/2014-aca-code-of-ethics.pdf?sfvrsn=55ab73d0_1

[13] American Psychological Association, "Ethical Principles of Psychologists and Code of Conduct," _available at_: https://www.apa.org/ethics/code

[14] _See_ https://x.com/fr0gan/status/1763389138915779043

[15] https://x.com/fr0gan/status/1763751586617332205

podcast series he co-hosted with Hasan Piker p/k/a HasanAbi ("Hasan"), entitled *Leftovers.* Once October 7th occurred, Frogan's social media activity demonstrated her support for Hamas and endorsement of blood libel conspiracy theories. Below are some examples:

a. At 2:28 a.m. PST/5:28 a.m. EST on October 7th (*i.e.*, when Jews and Israelis were gripped by panic and fear for their loved ones), Frogan posted on X: "***leftists preach and foam at the mouth at the thought of a revolution happening in america [sic], but as soon as it happens in the middle east what they're doing is wrong***."[16] Due to the insensitivity and timing of the post, Ethan decided to quietly unfollow Frogan.

b. Shortly thereafter, Frogan liked a post on X by Aleksa Vulović p/k/a Boy Boy that was posted on October 7th, which stated: "It's game over for Israel, James Bond is officially fighting for Hamas." Below is a true and correct screenshot of the post.



---

[16] *See* https://x.com/fr0gan/status/1710587819385614829.

c.      On October 11, 2023, Frogan made a public scene over Ethan unfollowing her and posted on X: "tfw [that feeling when] one of your favorite content creators unfollows for being pro palestine. LMAO."[17] (original spelling). She then went to Hasan's Discord to indulge in self-pity and pleaded with Ethan to refollow her.[18]

d.      On November 17, 2023 (when it was falsely reported that Israel bombed the Al-Shifa Hospital), Frogan liked a tweet spreading grotesque blood libel that falsely claimed Israel "***admitted to harvesting skin and organs from dead Palestinians to use for skin grafts and organ transplants***" and "***the majority of skin in Israel skin banks was stolen from Palestinians they killed***." Below is a true and correct screenshot of the post.



[17] *See* https://x.com/fr0gan/status/1712060807758905494
[18] Star Crossed, *Who is Frogan? The history behind Hasan's VILEST Mod [Stardust]*, (Feb. 14, 2025), at 24:59-25:34, *available at*: https://youtu.be/TnBVnQBJKtY?si=ukqOfomDYXp-LTvU&t=1499; *see also* Star Crossed, *Frogan: Cruel, Bigoted, and Loving It [Stardust]*, (Feb. 14, 2025) at 11:06-14:29, *available at*: https://www.youtube.com/watch?v=_1mVeSYKCEg&t=666s

11
COMPLAINT

20.    Frogan serves as one of the moderators of Hasan's chat. Far from being neutral arbiter, Frogan weaponizes her role as Hasan's enforcer to ruthlessly silence dissent and cruelly target her enemies – while elevating those who excuse and justify terror and violence. For example, on November 9, 2023 (*i.e.*, after Frogan created a public controversy over Ethan unfollowing her), Hasan and Ethan discussed the Israel/Palestine conflict. Hasan's chat was replete with hateful and bigoted comments about Ethan, which Frogan refused to moderate out of vindictiveness towards Ethan.[19]

**Background of H3Snark**

21.    H3Snark is part of a genre of message boards – known as subreddits – on the website, Reddit. Snark subreddits comprise of "fallen fans" of a particular entertainer. Over time, there have been numerous snark subreddits regarding TEI's podcasts and of the Kleins. Many were banned by Reddit for violating its Content Policy – such as r/Frenemies and r/Frenemies2.

22.    H3Snark was created on August 30, 2023 by Doe No. 1 – who was a fanatical Trisha Paytas ("Trisha") fan. Doe No. 1 became a "fallen fan" when the TEI series, *Frenemies* (which was co-hosted by Ethan and Trisha), ended abruptly in June 2021.

23.    H3Snark became a haven for "fallen fans" of TEI's podcasts and the Kleins. While the average viewer would move on with their lives after becoming disinterested in a podcast, H3Snark "fallen fans" religiously watch TEI produced content with orgiastic hatred. H3Snark enables these deranged and chronically unemployed fallen fans to share their perverse pleasure of hate-watching TEI content with others by providing infringing clips and links to TEI content.

24.    Beginning in the fall of 2023, H3Snark experienced a surge of new users who were "fallen fans" of the TEI series, *Leftovers.* As mentioned, the show

[19] HasanAbi VODs, *HasanAbi November 9, 2023 – Israel Palestine, Debating Ethan H3H3 on Israel, 3rd GOP Debate* (Nov. 10, 2023), at 4:11:44-4:57:39, *available at*: https://youtu.be/4y7v0ewLFOQ?si=x71_2gsDqgXxI8GW&t=15104

was co-hosted by Ethan and Hasan (who is the most prominent alt-left streamer on the website, Twitch). On September 14, 2023, Ethan and Hasan debated various issues concerning China and Taiwan, such as whether Taiwan should be independent, the propriety of China's subjugation of Tibet and the genocide of the Uyghurs.[20] Due to Ethan pushing back on Hasan's pro-China positions, several *Leftover* fans who had an ecclesiastical parasocial relationship with Hasan flocked to H3Snark because they felt Ethan was critiquing them personally.

25.    The surge of new users to H3Snark exploded after October 7, 2023. The Kleins are dual Israeli-American citizens. Hila was born and raised in Israel, where she served as a secretary during her mandatory conscription into the Israeli Defense Forces ("IDF").[21] While both Ethan and Hila are highly supportive of Palestinian self-determination and extremely critical of Israel and its government, the Kleins support a two-state solution as the best interim solution to the conflict.[22]

26.    In the wake of October 7th, Hasan emerged as the modern incarnation of The Grand Mufti Hajj Amin Al-Husseini ("Al-Husseini").[23] Like Al-Husseini,

[20] H3 Podcast, "Joe Biden Is Getting Impeached – Leftovers #57," at 50:06 (September 14, 2023), *available at*: https://www.youtube.com/live/EeFuFKH-uOo?si=J3-Z-J7jWtkpv_Bu&t=3006

[21] H3 Podcast Highlights, *Hila From H3H3 Discusses Her Time In the Israeli Military (IDF)*, YouTube (Apr. 23, 2022), at 0:40–1:04, https://www.youtube.com/watch?v=ytOl5hbTrCY.

[22] H3 Podcast, *i made a mistake. i'm sorry. – H3TV #93* (October 9, 2023), at 2:03:40-2:03:58, 2:05:14-2:05:20, 3:35:56-3:36:17, *available at*: https://www.youtube.com/live/ZNFeRPMOu8g?si=4jE4j8SsuGKOuiPL; H3 Podcast, *Israel vs. Gaza – Leftovers #61* (Oct. 12, 2023), at 8:26-9:20, 1:15:22-1:15:38, 2:52:33-2:52:41, *available at*: https://www.youtube.com/live/JFznOHunD_c?si=vtd4HrejPjU6kzzx; H3 Podcast, *Jay Shetty Exposed By Ex-Girlfriend & He Lied About Being A Monk – After Dark #139* (March 2, 2024), at 2:24:16-2:24:31, *available at*: https://www.youtube.com/live/5XrPXgcKwVc?si=893H-4SIKBG46jLD

[23] World War Two, *The Nazi-Islam Alliance? – Amin al-Husseini – WW2 Biography Special* (Dec. 21, 2021), *available at*: https://youtu.be/K07j-wuL8sw?si=en3seNLjS0JRmxHj; The World History Channel, *Why Did The Grand Mufti Of Palestine Collaborate With Nazi Germany?* (Jan. 30, 2025), (continued).

Hasan became a passionate advocate and highly charismatic leader of the Palestinian cause.[24]  Like Al-Husseini, Hasan used his massive platform to spread genocidal rhetoric about anyone advocating for the right of Jewish self-determination in their ancestral homeland (*i.e.*, Zionists).[25] The primary difference between Hasan and Al-Husseini is that Al-Husseini worked with the Nazis and advocated the annihilation of Jews[26]– while Hasan advocates the annihilation of all Zionists. Since the vast majority of Jews in the United States say caring about Israel is "essential" or "important," this would necessarily include the vast majority of

*available at*: https://youtu.be/aVeXPFY7shI?si=ZT4GYoa27xKF6-kG; Casual Historian, *How the Zionists responded to World War Two and the Holocaust* (Feb. 8, 2025), *available at*: https://youtu.be/w6NrUiUhYiA?si=EswHI27G-9MW8OH4; Casual Historian, *The Palestine Mandate: The Origins of the Israeli-Palestinian Conflict (Supercut)* (Dec. 28, 2023), *available at*: https://youtu.be/vUuR-3tw9p8?si=EzAVrpG5IZHUKa8Y; United States Holocaust Memorial Museum, Holocaust Encyclopedia, "Hajj Amin al-Husayni: Wartime Propagandist," *available at*: https://encyclopedia.ushmm.org/content/en/article/hajj-amin-al-husayni-wartime-propagandist?parent=en%2F11094; United States Holocaust Memorial Museum, Holocaust Encyclopedia, "Hajj Amin Al-Husayni: Arab nationalist and Muslim Leader," *available at*: https://encyclopedia.ushmm.org/content/en/article/hajj-amin-al-husayni-arab-nationalist-and-muslim-leader?parent=en%2F11104; Wikipedia, "Amin al-Husseini," *available at*: https://en.wikipedia.org/wiki/Amin_al-Husseini

[24] Benny Morris, *1948: A History of the First Arab–Israeli War*, p. 23 (Yale Univ. Press 2008).

[25] Philip Mattar, *The Mufti of Jerusalem: Al-Hajj Amin Al-Husayni and the Palestinian National Movement*, pp. 105–06 (Rev. ed. Columbia Univ. Press 1992); Britannica, "Zionism," *available at*: https://www.britannica.com/topic/Zionism; Jewish Virtual Library, "Zionism: A Definition of Zionism," *available at*: https://www.jewishvirtuallibrary.org/a-definition-of-zionism; *see also* Tracy Wilkinson, Los Angeles Times, "Is Zionism patriotism or racism? Big disagreements over a word in use for 125 years" (May 22, 2024), *available at:* https://www.latimes.com/world-nation/story/2024-05-22/zionism-disagreement-over-a-word-in-use-for-125-years; Jewish Virtual Library, "Zionism: Table of Contents," *available at*: https://www.jewishvirtuallibrary.org/zionism

[26] Jeffrey Herf, *Nazi Propaganda for the Arab World*, p. 213 (Yale Univ. Press 2009); Kause-Michael Mallman and Martin Cuppers (Translated by Krista Smith) *Nazi Palestine* (2010); David Patterson, *A Genealogy of Evil: Anti-Semitism from Nazism to Islamic Jihad* (Cambridge Univ. Press 2010).

COMPLAINT

Jews[27] – even if they support the Palestinian cause and vehemently condemn the actions of the Israeli government.



Al-Husseini Meets Adolf Hitler, November 28, 1941



Al-Husseini With His Close Friend Heinrich Himmler, 1943

"Arabs, rise as one man and fight for your sacred rights. Kill the Jews wherever you find them. This pleases God, history and religion. This saves your honor.

[27] Backa A. Alper, Pew Research Center, "How U.S. Jews are experiencing the Israel-Hamas war" (April 2, 2024), *available at*: https://www.pewresearch.org/short-reads/2024/04/02/how-us-jews-are-experiencing-the-israel-hamas-war/; Justin Nortey, Pew Research Center, "U.S. Jews have widely differing views on Israel" (May 21, 2021), *available at*: https://www.pewresearch.org/short-reads/2021/05/21/u-s-jews-have-widely-differing-views-on-israel/; The Jewish Majority, "New Poll: Jewish Voice for Peace Does Not Represent Vast majority of U.S. Jewish Community" (Feb. 12, 2025), *available at*: https://img1.wsimg.com/blobby/go/2921c434-f7d7-43f4-ade6-3a5591444c85/downloads/97dc308b-4559-4e42-a55e-53c77f75c044/Press%20release%202.11.2025.pdf?ver=1739292818681

COMPLAINT

God is with you." – Al Husseini (March 1, 1944 on Nazi radio)

27.     On October 12, 2023, the last episode of *Leftovers* aired. It comprised of a discussion between Ethan and Hasan regarding the Israel/Palestinian conflict and the events of October 7th.[28] During the discussion, Ethan expressed his support of the Palestinian cause and empathy for their suffering, along with condemning Israeli Prime Minister Benyamin Netanyahu. At the same time, Ethan attempted to humanize the victims of October 7th to Hasan in the hope that empathy and mutual understanding could begin the heal the divide. Hasan was unpersuaded and the relationship with Ethan and Hasan began to deteriorate.

28.     In the aftermath of the falling out between Ethan and Hasan, H3Snark became a radioactive hub of "fallen fans" of TEI content and the Kleins. It became a focal point for spreading vicious lies, outlandish conspiracy theories and hallucinatory misrepresentations about the Kleins.

**The Rampant Copyright Infringement on H3Snark**

29.     Despite their hatred towards the Kleins, the users of H3Snark had an insatiable appetite for TEI's content. The H3Snark users, however, did not want TEI to receive any views or advertising revenue from their consumption of TEI's content. As a result, H3Snark became a locus of copyright infringement of TEI content – as detailed below.

30.     One method the H3Snark Mods employed to consume TEI content was to share links of TEI content on YewTube – a website that provides unauthorized access to YouTube videos and publicly performs them, which constitutes copyright infringement. *See Hunley v. Instagram, LLC,* 73 F.4th 1060, 1073-74 (9th Cir. 2023). YewTube had particular appeal to H3Snark Mods and H3Snark users because a video watched on YewTube does not result in a view or advertising revenue to the original on YouTube.

[28] H3 Podcast, "Israel vs Gaza – Leftovers #61" (October 12, 2023), *available at*: https://www.youtube.com/live/JFznOHunD_c?si=Cbfod032xwJ5e-FQ

31.    H3Snark Mods conducted live chats during TEI's live broadcasts. During the live chats, the H3Snark Mods would spam the chat with YewTube links of the broadcast. Once the livestream ended, the H3Snark Mods concealed the evidence of their copyright infringement by deleting the live chat logs. Below are true and correct screenshots of the H3Snark mods spamming the live chat with YewTube links to TEI copyrighted content.





32.    Through various comments to posts, Doe No. 3 (*i.e.*, u/sarahornejewetts) encouraged H3Snark users to use YewTube as an alternative to watching the TEI's video on its official channel. Doe No. 3's comments were later wiped.  Due to Doe No. 3's efforts, the user was anointed as one of the H3Snark Mods. Some examples are contained below.

a.    In August 2024, the u/PearlUnicorn created the post: "For those who wonder why Snarkers watch, moments like the second button failure." Below

is a true and correct screenshot of Doe No. 3 stating: "***We encourage folks to watch on yewtube since it doesn't play ads or contribute to their view counts***." As can be noted, Doe No. 3's comment was subsequently wiped from August 2024 post.





b.      On August 28, 2024, the H3Snark Moderators created a post entitled "MEGATHREAD: The H3 Show – Aug 28 2024." Below is a true and correct screenshot of Doe No. 3 providing a link to the TEI video *Content Court: Jack Doherty – H3 Show #48* on YewTube.[29] As can be noted, Doe No. 3's comment has been wiped from the August 28, 2024 post.

[29] While Doe No. 3's post just contained a hyperlink labeled "Watch on Yewtube," the link would direct users to https://yewtu.be/watch?v=DCw4csgcEsk.

19
COMPLAINT



33.     Under the H3Snark wiki page for "tools-tips-guides," H3Snark Mods also instructed H3Snark users on how to create clips of TEI content so these clips could be posted on H3Snark. At one point, the H3Snark Mods even instructed users how to download "Members-Only" content (*i.e.*, TEI content only accessible to paying members) so that they could be posted on H3Snark. To hide their inducement of copyright infringement, the H3Snark Mods deleted the portion on downloading "Members-Only" content from the guide. A true and correct screenshot of the portion regarding "Members-Only" content is provided below.

**TEI Issues Takedown Notices for Infringing Posts and Comments on H3Snark**

34.     TEI began to fight back against the copyright infringement on H3Snark by issuing takedown notices pursuant to 17 U.S.C. Section 512(c)(3) ("DMCA Takedowns"). TEI was extremely surgical about which H3Snark posts would be subject to DMCA Takedowns. Relying on the most pertinent fair use decisions,[30] TEI issued DMCA Takedowns only for: (1) posts/comments that uploaded an entire TEI episode onto Reddit – particularly paywalled TEI content; (2) comments that provided a YewTube link to entire episodes of TEI content; or (3) posts that contained a clip of TEI content with a descriptive, non-critical title and the comments were locked by the H3Snark Mods or there were no comments after several hours.

a.     August 1, 2024 DMCA Takedown: On August 1, 2024, TEI issued a DMCA Takedown for the H3Snark post entitled "H3 Live Show Behind the Scenes." The post contained a complete version of TEI's video *H3 Podcast BTS #53* – which was "Members Only" content (*i.e.*, accessible only to paying members of *The H3 Podcast* YouTube channel). On August 2, 2024 (*i.e.* one day later), Reddit honored this DMCA Takedown.

b.     August 30, 2024 DMCA Takedown: On August 30, 2024, TEI issued a DMCA Takedown for a comment by Doe No. 3 (*i.e.*, u/sarahornejewetts) on the H3Snark Post entitled "MEGATHREAD: The H3 Show - Aug 28, 2024" (the "8/30/24 Takedown"). The comment contained a YewTube link to the TEI video *Content Court: Jack Doherty – H3 Show #48*.[31] On September 9, 2024 (*i.e.*, nine days later), Reddit honored the 8/30/24 Takedown.

[30] *In re DMCA Subpoena to Reddit, Inc.*, 441 F.Supp.3d 875, 883-886 (N.D. Cal. 2020); *Hughes v. Benjamin*, 437 F.Supp.3d 382, 390-394 (S.D.N.Y. 2020); *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1157-1164 (9th Cir. 2022); *Warhol*, 598 U.S. at 525-550; *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 627-631 (9th Cir. 2003); *Hosseinzadeh*, 276 F.Supp.3d at 41-42, 45-47; *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170-1183 (9th Cir. 2012).

[31] The comment for u/sarahornejewetts (*i.e.*, Doe No. 3) no longer exists on the post, but a screenshot of it is show in connection with Paragraph 32.b, *supra*.

c. September 18, 2024 DMCA Takedown: On September 18, 2024, TEI issued a DMCA Takedown for the H3Snark post entitled "Ethan and Dan confirm that posting to snark will get you banned" (the "9/18/24 Takedown"). The post solely comprised of a clip from the TEI video *Ethan Debates Anti-Semitic Sneako Fan – H3 Show #55*. The post contained no comments because the H3 Snark Mods locked the post. Reddit never informed TEI whether the 9/18/24 Takedown was honored.

d. November 22, 2024 DMCA Takedowns: On November 22, 2024, TEI issued two DMCA Takedowns

i. First Takedown: The first DMCA Takedown was for the H3Snark post "ethan talks positively about celebrity poker tour's sponsor, a sports gambling app named fliff h3 show #83." The post contained a clip from the TEI video *We Play Poker w/ Ninja, Impractical Jokers, & More! – H3 Show #83*. The post contained two comments: (1) "Dude ur flair is actually fucking frying me rn" (original spelling); and (2) "The downfall is real man." The post contained no further comments because the H3Snark Mods locked the post. On November 29, 2024 (*i.e.*, seven days later), Reddit informed TEI that it honored this DMCA Takedown.

ii. Second Takedown: The second DMCA Takedown was for the H3Snark post entitled "Ethan describes his issues with Hasan as 'personal beef.'" This post contained a clip from the TEI video entitled *Logan Paul Posted F\*\*\*KING INSANE Cringe – H3 Show #84*. At the time this DMCA Takedown was issued, the post had been up for over two hours and had no comments at that time (but 130 upvotes).[32] On December 5, 2024 (*i.e.*, nearly two weeks later), Reddit informed TEI that it honored this DMCA Takedown.

[32] After this DMCA Takedown was issued (but before Reddit honored it), the post received additional comments. A true and correct PDF printout of the post taken on November 22, 2024 is attached hereto as Exhibit A. *Compare* Ex. A *with* https://www.reddit.com/r/h3snark/comments/1gxofik/ethan_describes_his_issues_ with_hasan_as_personal/

22

e.     November 26, 2024 DMCATakedowns: On November 26, 2024, TEI issued two DMCA Takedowns.

i.     First Takedown: The first DMCA Takedown was for the H3Snark post "LB says '[far leftists] hate israel because israel is backed by the west' and this can lead to antisemitism. Ethan agrees, then says freedom of religion, speech, press, and to 'control what happens in your own work space' would be under state-control in communism – h3 show #85." (original spelling and brackets). The post contained a clip from the TEI video entitled *I Haven't Been Well – H3 Show #85*. The post contained no comments because the H3Snark Mods locked the post. On December 6, 2024 (*i.e.*, ten days later), Reddit informed TEI that it honored this DMCA Takedown.

ii.     Second Takedown: The second DMCA Takedown for the H3Snark post "Lena asks Lonerbox about civilians and doesn't get a direct answer: 'It's always civilians are dying… BUT… and then theres a reason for justifying it.'" (original ellipses and spelling) (the "Second 11/26/24 Takedown"). The post contained a clip from the TEI video entitled *I Haven't Been Well – H3 Show #85*. The post contained no comments because the H3Snark Mods locked the post. On December 6, 2024 (*i.e.*, ten days later), Reddit informed TEI that it honored this DMCA Takedown.

**The H3Snark Mods' Efforts to Issue Fraudulent Counternotifications**

35.     The H3Snark Mods made a concerted effort to issue fraudulent counternotifications to TEI's DMCA Takedowns, as detailed below:

a.     On January 15, 2025, Reddit informed TEI that a so-called counternotification was issued against both the 8/30/24 Takedown the 9/18/24 Takedown (the "First Fraudulent Counternotification").[33] The First Fraudulent Counternotification was issued on October 18, 2024 – *i.e.*, Reddit informed TEI nearly three months later.

---

[33] A true and correct copy of the First Fraudulent Counternotification is attached hereto as Exhibit B.

23
COMPLAINT

i. On its face, the First Fraudulent Counternotification failed to satisfy the requirements of 17 U.S.C. Section 512(g)(3) because it failed to include: (1) the issuer's address and telephone number; (2) consent to jurisdiction and service of process; and (3) a statement made under penalty of perjury.

ii. Further, the First Fraudulent Counternotifications contained numerous indicia of being fraudulent because: (1) it was a single counternotification for posts made by two different users (*i.e.* u/sarahornejewetts and u/obrienpotatoes); and (2) it misrepresented that the 8/30/24 Takedown was for the post and not the comment with the YewTube link.

iii. It was also evident the First Fraudulent Counternotification was issued by the H3Snark Mods because it stated: (1) "We are writing to contest the removal of two posts from ***our subreddit*** under alleged copyright claims" (emphasis added); (2) "***We believe these reports may have been filed by fans rather than the legitimate copyright holder***" (emphasis added) – despite the fact that TEI's counsel's contact information was provided in both the 8/30/24 Takedown and 9/18/24 Takedown; and (3) the name of the issuer was "Michael Anderson" – a generic name that would make it impossible to identify the issuer of the First Fraudulent Counternotification.

iv. On January 16-17, 2025 (*i.e.*, two days after receiving the First Fraudulent Counternotification), TEI explained in exacting detail the facts and law demonstrating the First Fraudulent Counternotification was invalid. On March 18, 2025 (*i.e.*, over two months later), Reddit responded that it agreed that the First Fraudulent Counternotification was invalid – but claimed that it would refuse to honor the 8/30/24 Takedown because the post only linked to TEI's video on YouTube. The same day, TEI explained to Reddit that this was false because the 8/30/24 Takedown explicitly stated it was directed at the comment by Doe No. 3 (*i.e.*, u/sarahornejewetts) and contained a YewTube link, including providing a screenshot for the comment. To date, Reddit has not responded.

24
COMPLAINT

b.      Additionally, on March 18, 2025 (the same day Reddit informed TEI that the First Fraudulent Counternotification was invalid), Reddit notified TEI that another counternotification was issued regarding the 9/18/24 Takedown (the "Second Fraudulent Counternotification").[34] The Second Fraudulent Counternotification was issued on December 5, 2024 (*i.e.*, Reddit notified TEI three and a half months later).

i.      The Second Fraudulent Counternotification contained no indicia that the issuer considered the four fair use factors prior to issuing the Second Fraudulent Counternotification – which is unlawful. *See Hosseinzadeh*, 276 F.Supp.3d at 36; *Hughes*, 437 F.Supp.3d at 394-395; *cf Lenz v. Universal Music Group*, 815 F.2d 1145, 1149, 1154-55 (9th Cir. 2016). Further, the language of the Second Fraudulent Counternotification demonstrated the issuer – u/obrienpotatoes – did not understand fair use in general, by stating: (1) "This was an abuse of the fair use system" (which is bizarre because u/obrienpotatoes was claiming fair use, not TEI); and (2) the conclusory assertion "Even so, it would still be allowed under fair use" without any analysis. This is further emphasized by an April 11, 2025 post on X by @obrienpotatoes1. In the post, @obrienpotatoes posted the cease and desist letter sent by TEI's counsel and defended the Reddit post by claiming it was only "A MINUTE AND A HALF LONG CLIP" – *i.e.*, only focusing on the amount used and not the other fair use factors.[35]

ii.      The Second Fraudulent Counternotification also echoed language similar to the First Fraudulent Counternotification – indicating the H3Snark Mods worked with u/obrienpotatoes to issue the Second Fraudulent Counternotification: "This subreddit has also been mercy to many **bad faith brigades** recently, so **I do not believe this appeal was filed by the actual copyright owner**" (emphasis added) – despite the 9/18/24 Takedown containing TEI's

[34] A true and correct copy of the Second Fraudulent Counternotification is attached hereto as Exhibit C.

[35] *See* https://x.com/obrienpotatoes1/status/1910711822212067372

25

COMPLAINT

counsel's contact information.

iii.     Additionally, after the Second 11/26/24 Takedown was issued, one of the H3Snark Mods (who later deleted their account) left a comment on the post stating: "I reached out via DM to discuss how to appeal these, if you're willing to fill out the form." This further emphasizes the H3Snark Mods coordinated a campaign of issuing fraudulent counternotifications to enable H3Snark's copyright infringement of TEI's works.

c.     The H3Snark Mods went on a public relations campaign to paint TEI's DMCA Takedowns as fraudulent to cover up their copyright infringement. To achieve this objective, the H3Snark Mods authored several posts misrepresenting the facts.[36]

d.     After Ethan became vocal about pursuing claims against H3Snark, the H3Snark Mods began deleting their posts, comments and accounts *en masse* to perpetuate their false narrative and conceal their copyright infringement (along with other illegal activity, such as organized harassment and defamation).

e.     On March 5, 2025, a YouTuber by the name of "The Law" posted a video on YouTube entitled *Dear H3Snark, I see you.*[37] In the video, The Law admits he was a former H3Snark user who came to reject the obsessive and destructive behavior he saw taking over the subreddit. He documented the acts of copyright infringement by H3Snark users and H3Snark Mods (and other unlawful conduct), including their attempts to conceal their unlawful conduct. The video

[36]https://www.reddit.com/r/h3snark/comments/1h851se/false_copyright_strike_tracker_megathread_ethan/;
https://www.reddit.com/r/h3snark/comments/1fdmu80/h3ethan_klein_is_abusing_the_copyright_system_by/;
https://www.reddit.com/r/h3snark/comments/1h79qk3/another_false_copyright_strike_likely_from_ethan/;
https://www.reddit.com/r/h3snark/comments/1hvtb5v/confirmed_ethan_klein_hired_an_attorney_to_issue/
[37] The Law, *Dear H3Snark, I see you.* (March 3, 2025), *available at:*
https://youtu.be/lfjbgNjo0Oc?si=zbNomCBmxySgCuvU

26
COMPLAINT

documents:

    i.    The H3Snark Mods deleted posts after Ethan announced plans to pursue legal action against H3Snark for harassment (1:18-1:41);

    ii.    How the H3Snark Mods abused the live chat feature on Reddit to promote harassment and defamatory statements, including promoting some of the egregious offenders into H3Snark Mods (2:02-4:54);

    iii.    How the H3Snark Mods use "sock puppet accounts" (*i.e.*, using a false online identity for deceptive purposes) to conceal their identities while engaging in harassment – which were deleted after Ethan announced he would pursue legal action against H3Snark (4:55-6:51); and

    iv.    How the H3Snark Mods purposefully lied about TEI's DMCA Takedowns to conceal their copyright infringement and obfuscate their intent to siphon views and ad revenue away from TEI (6:52-9:11).

**TEI Creates and Registers *The Nuke***

36.    By the fall of 2024, Ethan and Hila Klein's concern reached a fever pitch over Hasan radicalizing his audience with propaganda from Ansar Allah a/k/a The Houthis, Hezbollah and Hamas. The Kleins were equally concerned with Twitch's refusal to enforce its Community Guidelines against Hasan and his so-called "Waiting Room" – *i.e.*, other Twitch streamers, like Frogan, who parrot Hasan and parasitically leach off his audience by broadcasting immediately before or after his streams.

37.    Hasan and his Waiting Room hijacked the necessary and important discussion of the Israeli-Palestinian conflict and the Gaza War. They employed genocidal rhetoric that painted all Israelis as subhuman warranting annihilation. The term "Zionist" lost all meaning and quickly mutated into a thinly-veiled dog whistle for Jews.[38] To combat the tsunami of hateful rhetoric, Ethan and Hila Klein –

[38] The term "Zionist" was used as a slur to paint anyone who supported the existence of Israel or a two-state solution as a Kahanist (Jewish Supremacist) or (continued).

through TEI – created *Content Nuke: Hasan Piker.*

38.	*The Nuke* was written, shot and edited from December 2024 through January 2025. On January 27, 2024 (*i.e.*, four days before the Nuke was publicly released on TEI's h3h3Productions YouTube channel), TEI submitted its application to register *The Nuke* with the United States Copyright Office (the "USCO"). On January 28, 2025, the USCO received the deposit copy of the Nuke (the "Deposit Copy"). The registration number for *The Nuke* is PAu 4-256-429.

39.	The Deposit Copy varied slightly from the broadcast version of *The Nuke* (the "Broadcast Version"). First, the Deposit Copy did not contain the conclusion and sponsor segment that was contained in the Broadcast Version. Second, to prevent *The Nuke* from being age-restricted by YouTube (which would limit its reach), TEI was required to fully blur out the footage of the Houthis entering the bridge of the *Galaxy Leader* and black out the footage of Hamas releasing hostages from November 2023. Third, minor visual edits were made. Ultimately, all of the Deposit Copy was incorporated into the broadcast version of the Nuke comprised of the Deposit Copy.[39]

---

Israeli Religious Nationalist. In the most recent Israeli Legislative Election in 2022, the coalition of these parties only received 10.84% of the vote. Wikipedia, "Kahanism" *available at*: https://en.wikipedia.org/wiki/Kahanism; Institute for Middle Eastern Understanding, "Fact Sheet: Meir Kahane & The Extremist Kahanist Movement" (May 17, 2024), *available at*: https://imeu.org/article/fact-sheet-meir-kahane-the-extremist-kahanist-movement; Wikipedia, "National Religious Party," *available at*: https://en.wikipedia.org/wiki/National_Religious_Party; The Israel Democracy Institute, "National Religious Party (Mafdal)," *available at*: https://en.idi.org.il/israeli-elections-and-parties/parties/national-religious-party/; Wikipedia, "2022 Israeli legislative election," *available at*: https://en.wikipedia.org/wiki/2022_Israeli_legislative_election.

[39] TEI is concurrently-filing with this Complaint a Notice of Lodging accompanied by a flash drive containing various video exhibits referenced in the Complaint (the "Flash Drive"). A true and correct copy of the Deposit Copy is located on the Flash Drive as Exhibit D. A true and correct copy of the Broadcast Version is located on the Flash Drive as Exhibit E.

***The Nuke***

40. *The Nuke* is a tragi-comic documentary critiquing Hasan and Twitch. It contains original footage, highly edited montages, parodic skits and archival materials (a great deal of which are owned by TEI). *The Nuke* can be divided into seven sections: (1) The Prologue; (2) The Twitch Parody Sketch; (3) The Houthi Section; (4) The Hezbollah Section; (5) The Hamas Section; (6) The Twitch Section; and (7) The Conclusion.

a. The Prologue (Ex. E at 0:00:00-0:25:40): The prologue walks the audience through Ethan's thesis of *The Nuke*: that Hasan radicalizes his audience with genocidal and antisemitic terrorist propaganda.

i. While admitting both of himself and Hasan are polarizing figures with controversial takes, Ethan explains he grew concerned with Hasan's rhetoric after hearing him excuse Russian and Chinese genocide and imperialism, namely Hasan's positions on Crimea, Tibet, Taiwan and the Uyghurs.

ii. Once October 7th occurred, Ethan's concerns were exacerbated. He received a torrent of antisemitic comments from Hasan's audience and saw Hasan downplay the sexual violence perpetrated by Hamas on October 7th.

iii. Ethan explains that the primary difference of opinion between him and Hasan (and his audience). While both are aligned on supporting the Palestinian cause – including condemning Israeli Prime Minister Benyamin Netanyahu, Israeli settlements and Israeli settlers, they differ in one key aspect regarding how to solve the conflict: Ethan believes in a two-state solution, while Hasan (and his audience) believe in a one-state solution.

iv. Ethan articulates the concerns Israelis have with a one-state solution: Israel has been at war with its Arab neighbors since the country's inception. As a nation of refugees, the idea of suddenly becoming a minority raises legitimate concerns – particularly for the Mizrahi Jews (*i.e.*, Jews from Arab countries) who were expelled from Arab countries.

v.     Ethan then shows archival footage of Hasan: (1) supporting terrorism and glorifying terrorists; (2) admitting to hiding his "power level" (*i.e.*, extremism) because it is a more palatable way to introduce young people into the "radicalization funnel"; (3) conceding to being a propagandist; and (4) expressing vitriolic hatred of liberals. Ethan further points out that Twitch takes no action to moderate Hasan.

vi.     Ethan ends The Prologue by expressing his underlying fear that he played a role in mainstreaming Hasan and that he radicalized Ethan's audience.

b.     The Twitch Parody Sketch (Ex. E at 0:25:41-0:30:39): The next section involves Ethan parodying a Twitch advertising executive. In the scene, Ethan mocks how Twitch has embraced Hasan's extremist rhetoric and rebrands terrorism as socially acceptable. After the sketch ends, Ethan shows a media bias report that ranked Hasan as one of the most extreme and unreliable news sources.

c.     The Houthis Section (Ex. E at 0:30:40-0:55:33): The Houthi Section focuses on Hasan radicalizing his audience by glorifying and disseminating Houthi propaganda.

i.     Ethan beings with an overview of various Houthi atrocities and how they contradict leftist values. Examples include recruiting child soldiers, shelling and blocking aid to civilians, ruining agricultural land with mines, oppressing women and members of the LGBTQ community, torturing and killing women and slavery. Ethan also highlights the Houthi's antisemitism – such as performing Nazi salutes and the slogan on their flag calling for "Death to Israel" and "Curse Upon the Jews."

ii.     Ethan critiques Hasan's coverage of the Houthis by using his stream with Nick Polom p/k/a Nmplol ("Nick") as a case study. Hasan exploits Nick's political naiveté by putting on a Houthi propaganda music video and leaving Nick alone who watches in abject horror. Ethan cites Twitch's Community

30
COMPLAINT

Guidelines – which explicitly prohibit showing terrorist propaganda for any purpose. Despite this, Twitch refuses to enforce its Community Guidelines against Hasan. Hasan downplays the fact that the Houthi propaganda video is terrorist propaganda to Nick by describing the video as merely a "musical" and the Houthis as "musical people." When Hasan mischaracterizes the hijacking of the ship the *Galaxy Leader* as an effective deterrent against Israel, Ethan debunks Hasan's assertions that the ship was in Houthi waters, destined to Israel or an Israeli ship. Ethan also excoriates Hasan for minimizing the Houthis taking the crew of the *Galaxy Leader* hostage.

iii.	Ethan also critiques Hasan's misguided belief that, if Israeli commerce is disrupted, Israelis will leave Israel. Ethan demonstrates 80% of Israelis were born in the country and have nowhere else to go. This is exacerbated by the fact that the majority of Jewish Israelis fled (or are descendants from those who fled) Arab countries. The argument that Jews will "return where they came from" is ahistorical and denies their connection of Jews to the Middle East. Rather, it furthers an antisemitic conspiracy theory that questions the origins of the Jews in an attempt to brand Jewish Israelis as outsiders and colonizers.

iv.	Ethan shows another example of Hasan watching and praising a different Houthi propaganda music video. To mock Hasan's laudatory coverage of this video, Ethan juxtaposes the Houthi music video with a highly edited version of the Miami Boys Jewish Choir singing "Yerushalim."

v.	Ethan lambasts Hasan's interview of the Houthi terrorist Rashid Al-Haddad a/k/a Tim "Houthi" Chalamet ("Al-Haddad"). Al-Haddad became a viral sensation on TikTok when he shot footage of himself boarding the *Galaxy Leader*. Ethan mocks Hasan's self-described "journalism" through a montage of Hasan acting like a fan girl, asking frivolous questions and blindly accepting Al-Haddad's answers – particularly his absurd claim that he danced with the crew taken hostage and that he successfully convinced the crew to hate Israel.

vi.     Ethan exposes Hasan's subsequent attempts to downplay Al-Haddad's Houthi connections as disingenuous and a form of bigotry. Not only did Hasan believe he was speaking with a Houthi and promoted the interview as being with a Houthi, Al-Haddad's social media posts admitted and reinforced this fact. When confronted with Al-Haddad's social media posts that fail to distinguish between Jews and Zionists, Hasan engages in all forms of apologia to excuse Al-Haddad's genocidal and antisemitic rhetoric. Hasan even grotesquely compares Al-Haddad to Anne Frank – which Ethan mocks as the Twitch advertising executive.

vii.     The Houthi section ends with Ethan excoriating Hasan with a montage of him cynically deflecting and evading criticism by exploiting the term "genocide." This hypocrisy is highlighted by footage of Hasan from a few years ago where he was unable to locate Yemen on a map (and even confusing it with Israel).

d.     The Hezbollah Section (Ex. E at 0:55:44-1:01:43): The Hezbollah Section focuses on Hasan radicalizing his audience by disseminating and glorifying Hezbollah propaganda.

i.     Ethan begins by highlighting some of Hezbollah's atrocities and how they contradict leftist values. Examples include engaging in terrorism resulting in the deaths of thousands of civilians, the assassination of Lebanese Prime Minister Rafik Al-Hariri, hijacking airplanes, firing 15,000 rockets in civilian areas, being a designated terrorist group and its participation in the Syrian genocide to prop up the dictator Bashar Al-Assad.

ii.     Next, Ethan critiques Hasan by juxtaposing scenes of him downplaying and excusing Hezbollah's genocidal terrorism and praising Hassan Nasrallah (Hezbollah's former leader) with Nasrallah's numerous antisemitic and genocidal statements against Jews.

iii.     Ethan goes on to critique Hasan's lazy and ignorant apologia for Hezbollah and analysis of the conflict, such as branding any criticism

32

COMPLAINT

of Hezbollah as Islamophobic and Hasan telling Nick that Israel attacked Lebanon because "they were just there." Ethan refutes these assertions by demonstrating Hezbollah began firing rockets at Israel the day after October 7th, killed over 100 Israelis and displaced over 200,000. Ethan questions how Hasan's falsehoods help his position when, in reality, Hasan's misrepresentations only exacerbate the conflict.

e. The Hamas Section (Ex. E at 1:01:44-1:11:50): The Hamas Section focuses on Hasan radicalizing his audience by disseminating and glorifying Hamas propaganda, coupled with denying the atrocities of October 7th.

i. Ethan begins by highlighting some of Hamas' atrocities and how they contradict leftist values. Examples include recruiting children, committing hundreds of suicide bombings that target civilians, firing 50,000 rockets into civilian areas, oppression of women, punishing homosexuality by death, stealing aid intended for Gazans for its own military use or exploiting Gazans by selling the aid back to them.

ii. Next, Ethan critiques Hasan's reaction to a Hamas propaganda video from November 2023 involving the release of hostages. Hasan gushes effusively over Hamas' treatment of the hostages. He even makes the absurd claim that hostages released in the future will chose to stay in Gaza rather than return to Israel. When a member of Hasan's audience points out the hostages are traumatized, Hasan claims the hostages are "just chillin." Ethan correctly points out that these scenes are staged by Hamas, that the hostages are still being held at gunpoint and provided instructions on how to behave, such as "keep waving."

iii. Ethan goes on to lambast Hasan's reaction to a Hamas propaganda video depicting Hamas creating homemade sniper rifles. Hasan plays the entire clip without any commentary or criticism. Once complete, Hasan's explanation for showing the video is a nonsensical word salad of buzzwords that have nothing to do with the contents of the video.

33
COMPLAINT

iv.      Ethan goes on to address Hasan's grotesque denial of sexual violence perpetrated by Hamas on October 7th. He shows a montage of numerous clips of Hasan explicitly denying the sexual violence of October 7th and scoffing at President Biden and Vice-President Harris discussing said violence. Ethan refutes Hasan's denials by showing clips of victim testimony from Sheryl Sandberg's documentary *Screams Before Silence* and displayed the conclusion of a United Nations report that stated:

> Overall, based on the totality of information gathered from multiple and independent sources at the different locations, there are reasonable grounds to believe that conflict-related sexual violence occurred at several locations across the Gaza periphery, including in the form of rape and gang rape, during the 7 October 2023 attacks. Credible circumstantial information which may be indicative of some forms of sexual violence, including genital mutilation, sexualized torture, or cruel, inhuman and degrading treatment, was also gathered.

v.      Ethan concludes the section by addressing the heart of the matter. Hasan exacerbates the Israeli-Palestinian conflict by denying the suffering of Israeli victims to hold up Hamas as unimpeachable. As Ethan poignantly states:

> This conflict will never end until people realize that Palestinian liberation and Israeli security are not mutually exclusive. You need both. And it can be done, but not while people like Hasan lie, propagandize and incite hate. It's people like him, ironically, that prolong the conflict indefinitely. There's no space for conversation. There is no space for rational thought. There is no space for nuance. My position on Palestine is like five degrees off from where Hasan is. And to him and his community, I'm the devil. I'm a Nazi. It's delusional thinking. And it's destructive to their own cause.

f.      The Twitch Section (Ex. E 1:11:51-1:40:29): The Twitch Section explores the role Twitch plays in enabling Hasan and his Waiting Room to violate Twitch's Community Guidelines.

i.      Ethan begins by critiquing Twitch's Chief Executive Officer, Dan Clancy ("Clancy"). He points to Clancy's ineffectiveness as a CEO, namely rolling back his initiative to change revenue splits and the size of sponsor logos on stream – along with laying off significant portions of Twitch staff. Clancy explicitly states he is a fan of Hasan and is aware of his rhetoric. Clancy even sang Hasan "Happy Birthday" and forced Twitch employees to sing along while being

34
COMPLAINT

filmed. Ethan also discusses the creepiness of Clancy's penchant for e-girls (*i.e.*, young, female Twitch streamers whose streams are about highlighting their physical assets) by pointing to two examples of Clancy's stories feature on the Twitch app being completely populated by e-girls.

ii.     Next, Ethan discusses Frogan by showcasing numerous instances of her moral bankruptcy. Despite Frogan claiming to support the Palestinian cause, she condemned the large streamer, Ludwig Ahgren ("Ludwig"), by telling him to keep his $10,000 donation to Palestine because Ludwig decided not to organize a charity drive for Palestinians (even though he encouraged his viewers to donate).

iii.     Ethan also highlights numerous instances of Frogan's cruelty. In one clip, Frogan wishes soldiers to get PTSD. A few days later – after the clip caused tremendous controversy – Frogan watched the clip while giggling and justifying her take. Despite veterans receiving protected status under Twitch's Community Guidelines, Twitch did nothing to sanction Frogan for these statements. In another clip, Frogan conducts a subathon (a marathon to acquire paid subscriptions) where she promises to make a cake recreating September 11th if she reaches a certain goal. Once again, Twitch did nothing. Ethan highlights the tweet that Frogan made on the morning of October 7th, while the massacre was still ongoing, that is referenced above. Ethan juxtaposes this tweet with audio of cell phone conversations of victims of October 7th speaking with their parents during their final moments.

iv.     Ethan critiques how Twitch props up Frogan, by refusing to sanction her, giving her awards and featuring her on Twitch's home page. He also mocks Frogan being nominated for a rising star award by her friends twice.

v.     Most notably, Ethan lambasts Twitch for allowing Frogan to host a panel at Twitchcon 2024. The panel involved a racial tier list with "Arab" at the top and "Loves Sabra" at the bottom. While the premise of the tier list is who

35
COMPLAINT

can say the word "Habibi" (an Arabic term of affection), the term "Loves Sabra" was a dog whistle for Jews and Israelis for several reasons. First, Sabra is a well-known Israeli commercial hummus brand that is on the Boycott, Divestment and Sanctions list. Second, the term "Sabra" means a Jew born in Israel. Third, it falsely asserts Israelis misappropriated Arab culture and identity. As evidenced by a clip from Frogan's podcast, the purpose of disseminating this disinformation is to deny the long historical ties of Jews to the Middle East and the Levant. Ethan further highlights the hypocrisy and bigotry of these false claims by noting Arab culture and cuisine is Israeli culture and cuisine because the majority of Israeli Jews are from Arab countries or direct descendants of Jews from Arab countries. Fourth, Ethan was put in the "Loves Sabra" category with Denims (another member of Hasan's Waiting Room) "joking" that there should be a lower category for Zionist. Fifth, Ethan notes that Ben Shapiro ("Shapiro") is put in the thumbnail for the video with Ethan – despite Shapiro not being put on the list whatsoever. Rather, the only explanation is that both Ethan and Shapiro are Jewish and married to women born in Israel. Sixth, Ethan notes that the title of the video is *How Arab Are These Twitch Streamers?!* – which belies the assertion that the ranking was merely about hummus. Ethan concludes this segment to point out the hypocrisy of the panel claiming to be concerned with minorities, while refusing to acknowledge why their tier list makes a Jewish man uncomfortable. Finally, Ethan marvels that Twitch approved the panel in the first place.

vi.       Ethan critiques a Q&A session Clancy conducted on Twitch shortly after the controversy over the racial tier list erupted. Several chatters for the Q&A session asked Clancy to address the antisemitism on Twitch – all of whom were banned from the chat.

vii.      Ethan addresses the yearlong ban Twitch imposed to prevent Israeli users from creating new Twitch accounts. The ban was enacted on October 13, 2023 (*i.e.*, six days after October 7th) – which is also the Global Day of

Jihad (a day of mass rage, called for by Hamas leader, Khaled Mashal).[40] Despite numerous instances of Israeli Twitch streamers communicating directly with Twitch about the issue and trying to raise awareness online, Twitch either ignored or obfuscated the issue until there was a massive public outcry.

viii. Ethan goes on to excoriate Twitch for reinstating three well-known antisemites shortly after the ban was discovered: (1) Al-Haddad; (2) Nicolas 'Nico' Kenn De Balinthazy p/k/a Sneako; and (3) Amrou Fudl p/k/a Mryon Gaines from Fresh and Fit. Once again, Twitch reversed course after a public outcry.

ix. Ethan points out how antisemitism and anti-Israel animus appears institutionalized at Twitch. Ethan cites two Twitch employees in leadership positions who made antisemitic and anti-Israel posts online. First is Fadzai Madzingira ("Madzingira") – who was investigated and suspended from her role in the British media regulatory agency, Oxcom. Madzingira was called out in the middle of the United Kingdom's Parliament for her anti-Israel and antisemitic posts shortly after October 7th. After she resigned, Madzingira was hired by Twitch as a Senior Manager in Twitch's Trust & Safety Policy department (*i.e.*, the department responsible for the Community Guidelines). Another example is Bridget Kyeremateng – who is Twitch's Senior Manager for Inclusive Marketing – and has a history of making antisemitic and anti-Israel posts, including shortly after October 7th.

[40] Andrew Jeong, Washington Post, "France Bans Pro-Palestinian Protests Amid Call for Hamas 'Day of Rage'" (Oct. 13, 2023) *available at*: https://www.washingtonpost.com/world/2023/10/13/france-palestine-protest-hamas-day-of-rage/; Simon Wiesenthal Ctr., "Hamas Call for Worldwide 'Day of Rage'", (Oct. 2023), *available at*: https://www.wiesenthal.com/about/news/hamas-call-for-worldwide.html; ABC News Live, "Hamas Declares 'Day of Rage'" (Oct. 13, 2023), https://www.youtube.com/watch?v=dOoNLREwxJs; Meredith Deliso, ABC News, "Hamas 'Day of Rage' Protests Break Out in Middle East and Beyond" (Oct. 13, 2023), https://abcnews.go.com/International/hamas-day-rage-protests-break-middle-east/story?id=103955873.

x.      Ethan concludes the section by critiquing Twitch's biased and inconsistent enforcement of its Community Guidelines. He uses the ban of Steven Bonnell II p/k/a Destiny ("Destiny") as a case study. Destiny was permanently banned from Twitch for calling the streamer and transactivist Clara Sorrenti p/k/a Keffals "inbred." A montage is shown of Hasan repeatedly referring to Jews and Israelis as "inbred" or laughing at Jews being called "inbred." Hasan received no punishment from Twitch because he is Clancy's favorite streamer. Ethan recaps other examples of Hasan flagrant violations of Twitch's Community Guidelines that resulted in no consequences. Not only did Hasan call Jews and Israelis "inbred" and platformed terrorists and terrorist propaganda, Hasan threatened Senator Tom Cotton by replying to Senator Cotton's tweet with a schematic of the weapon used to assassinate Japanese Prime Minister Shinzo Abi. This is followed by a montage of numerous instances of alt-left streamers on Twitch making death threats without any (or minimal) consequences from Twitch.

g.      Conclusion (Ex. E at 1:40:30-1:42:05: Ethan ends *The Nuke* by summarizing the two reasons why he made the video. First, to stop Hasan's infiltration of mainstream media. Second, to hold Twitch accountable for enabling antisemitic and anti-Israel animus on its platform.

**H3Snark Promotes Frogan as a Substitute to Watching *The Nuke***

41.      Throughout January 2025, Ethan built up public interest in *The Nuke* by frequently discussing it on *The H3 Show*. The audience of Hasan and his Waiting Room – who comprised a large portion of the users on H3Snark – anticipated *The Nuke* with religious fervor to defend their proverbial Grand Mufti from criticism. These fanatics, however, did not want to watch the authorized version *The Nuke* because TEI would reap the benefits from the views and resulting advertising revenue.

42.      The H3Snark Mods knew that there was a huge demand to watch *The Nuke* through unauthorized channels and promoted "group viewing sessions" of

*The Nuke* as follows:

a. On January 30, 2025 (*i.e.*, the day before *The Nuke* was released), Doe No. 3 (*i.e.*, u/jewettornesarah) – as an H3Snark Mod and on behalf of the H3Snark Mods – created a pinned post entitled "MEGATHREAD | Content Nuke – Where to Watch & Discussion" ("First Inducement Post"). As a pinned community post, the First Inducement Post was featured at the very top of the H3Snark page in the "Community highlights" section before any other posts were visible. The H3Snark Mods did this to maximize the visibility of the First Inducement Post. The First Inducement Post featured Frogan as a place "to watch the nuke without showing support for H3" (*i.e.*, TEI) and a link was provided to her stream on Twitch. The First Inducement Post also stated that Frogan "supported" H3Snark "by engaging directly with [the H3Snark Mods] directly."  A true and correct PDF printout of the First Inducement Post is attached hereto as Exhibit F.

b. On January 31, 2025 (*i.e.*, the day *The Nuke* was released), the H3Snark Mods created and updated a pinned community post entitled "Ethan Klein's Content Nuke on Hasan Piker | H3 Snark Megathread" (the "Second Inducement Post"). The Second Inducement Post was also a pinned community post that was featured at the very top of the H3Snark page to maximize visibility. The Second Inducement Post featured Frogan as a place "to watch reactions to this video" (*i.e.*, *The Nuke*) and a link was provided to her stream on Twitch. A true and correct PDF printout of the Second Inducement Post is attached hereto as Exhibit G.

c. At some point after January 31, 2025, the H3Snark Mods deleted the First Inducement Post and Second Inducement Post to conceal their contributory infringement of *The Nuke*.

43. The H3Snark Mods were well aware of Frogan's reputation for copyright infringement and lazy reaction videos. As such, the H3Snark Mods knew that it was highly likely Frogan's reaction to *The Nuke* would be an infringing

"group viewing session" of *The Nuke* and not a fair use. The H3Snark Mods coordinated with Frogan to direct H3Snark users to Frogan's "group viewing session" of *The Nuke* noting she was "*Live but not reacting yet*" to the Nuke. Ex G (original emphasis).

## The Law of Fair Use and Reaction Videos

44.    Fair use is codified in Section 107 of the Copyright Act. The statute sets forth four non-exclusive factors courts consider to evaluate fair use:

1.    [T]he purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
2.    [T]he nature of the copyrighted work;
3.    [T]he amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
4.    [T]he effect of the use upon the potential market for or value of the copyrighted work

45.    The first fair use factor "relates to the problem of substitution" – *i.e.*, whether the new work "supersedes" or "supplant[s]" the original. *Warhol*, 598 U.S. at 527. The "central question" is whether the secondary work "adds something new, with a further purpose or different character." *Id.* at 528. The mere fact that a secondary use has "some further purpose" or "add[s] something new … does ***not*** render such uses fair." *Id.* at 528-529 (emphasis added). Rather, "whether an allegedly infringing use has a further purpose or different character" is "a ***matter of degree***, and the degree of difference ***must*** be weighed against other considerations, like commercialism." *Id.* at 532 (emphasis added).

46.    While a "use that has a further purpose or different character is said to be 'transformative[,]' … 'transformativeness' is a matter of degree." *Warhol*, 598 U.S. at 529. Indeed, "an overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works." *Id.* "To preserve that right, the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." *Id.*

47.    The "first factor also relates to the justification for the use" both in the

"broad sense" and the "narrower sense." *Warhol*, 598 U.S. at 531-532. A use is justified in the "broad sense" if it has a "distinct purpose" that "furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." *Id.* at 531. A use is justified in the "narrower sense" when it "is reasonably necessary to achieve the user's new purpose." *Id.* Such justification is "particularly relevant to assessing fair use" where "wide dissemination of a secondary work would otherwise run the risk of substitution for the original or licensed derivatives." *Id.* Again, "the question of justification is one of degree." *Id.*

48.     A "critical book review" illustrates how a secondary use must be justified both in the broad and narrow sense. *Warhol*, 598 U.S. at 528 fn. 4. In the broad sense, the use of the original serves "a different purpose than the book" (*i.e.,* criticism and commentary). *Id.* In the narrow sense, "each quoted passage within the review likely serves a different purpose (an object of criticism) than it does in the book." *Id.* Critically, this "may not always be so" and "a court must consider each use within the whole to determine whether the copying is fair." *Id.* Consequently, "[e]ven book reviews are not entitled to a presumption of fairness." *Id.,* 598 U.S. at 532 fn. 7.

49.     There are several indicia of when a use for criticism or commentary is not sufficiently transformative to justify a secondary use.

a.     When the "commentary has no critical bearing on the substance or style of the original composition, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." *Warhol*, 598 U.S. at 530-531. Indeed, "a loose topical connection" with the original work is equally problematic. *McGucken*, 42 F.4th at 1159.

b.     When "a defendant copies more than is necessary to facilitate 'comment or criticism.'" *Penguin Random House LLC v. Colting*, 270 F.Supp.3d

41
COMPLAINT

736, 751 (S.D.N.Y. 2017). "The law is clear that, to be considered transformative criticism, the aspects of a work that reproduce another's protected expression must be in service of commentary on that work. It is not enough for part of a work to have a transformative purpose." *Id.*

c.      When the "use" of the copyrighted work "is not consistently transformative." *Elvis Presley*, 349 F.3d at 628. For example when "clips are played without much interruption, if any" or "used in excess of [the] benign purpose." *Id.* at 629.

d.      The use of "voice overs," "headlines or captions"  or "wholesale copying sprinkled with written commentary," fails to sufficiently transform a copyrighted work under the first fair use factor. *Monge*, 88 F.3d at 1174, 1176; *Elvis Presley*, 349 F.3d at 628-629. Additionally, "[w]hen a copyrighted work is used simply to illustrate what that work already depicts, the infringer adds no further purpose or different character" and "copyright law treats the infringer as freeriding on the inherent value of the original work." *McGucken*, 42 F.4th at 1158.

e.      The first fair use factor "does not" favor "any user who wants to reach different buyers, in different markets, consuming different products." *Warhol*, 598 U.S. at 548 fn. 22.

50.     As mentioned, the degree to which a secondary use has a different purpose or character, "must be weighed against other considerations, like commercialism." *Warhol*, 598 U.S. at 525. "The undisputed commercial character of [the defendant's] use, though not dispositive, tends to weigh against a finding of fair use." *Id.* at 537.

51.     Commercialism examines "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise." *Elvis Presley*, 349 F.3d at 627. Courts consider whether the defendant was "motivated by profits" and "profited from the publication." *Monge*, 688 F.3d at 1176. Further, if the defendant "is not advertising a scholarly critique or

42

COMPLAINT

historical analysis, but instead seeks to profit at least in part from the inherent entertainment value" of the original, the use is commercial. *Elvis Presley*, 349 F.3d at 628. Finally, commercialism exists "when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work." *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006).

52.     In *Hosseinzadeh*, the Court found the first fair use factor favored fair use because the Klein video was "quintessential criticism and comment … on the Hoss video" – namely consistent "mockery" of Matt Hoss' "performance … dialog and plotlines." 276 F.Supp.3d at 40, 45-46. The Klein video was consistently transformative by "intersperse[ing] relatively short segments of the Hoss video with long segments of the Kleins' commentary." *Id.* at 40.

53.     The second fair use factor (*i.e.*, "the nature of the copyrighted work") "typically has not been terribly significant in the overall fair use balancing." *McGucken*, 42 F.4th at 1161. This factor examines "the extent to which [the original work] is creative and whether it is unpublished." *Id.* Even when a work "document[s] a real event," the work can still be "creative because [it is] the product of many technical and artistic decisions." *Id.* Whether a work is published is defined by whether the author exhausted the "right to control the first public appearance" of the work. *Monge*, 688 F.3d at 1178. The mere fact a work is published "does not weigh in favor of fair use." *McGucken*, 42 F.4th at 1162.

54.     In *Hosseinzadeh*, the Court found the second fair use factor "weigh[ed] against a finding of fair use" because the Hoss video was "a creative work" – despite the work being published. 276 F.Supp.3d at 46.

55.     The third fair use factor examines "the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *McGucken*, 42 F.4th at 1162. Consequently, the third fair use "factor circles back to the first factor because the extent of permissible copying varies with the purpose and character of the use." *Id.*

43
COMPLAINT

56.    When "the amount used is substantial with respect to the infringing work, it is evidence of the value of the copyrighted work." *Elvis Presley*, 349 F.3d at 630. Indeed, "[c]opying an entire work militates against a finding of fair use." *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 744 (9th Cir. 2019). If, however, "the new user only copies as much as necessary for his or her intended use, this factor will not weigh against the new user." *Elvis Presley*, 349 F.3d at 630.

57.    In *Hosseinzadeh*, the Court found that the third fair use factor was "neutral" because, while the Klein video copied "a great deal" of the Hoss video, "the 'extent' and 'quality and importance' of the video clips used by [the Kleins] were … plainly necessary to the commentary and critique." 276 F.Supp.3d at 46.

58.    The fourth fair use factor is the "undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 536, 566 (1985). "While the first fair use factor considers whether and to what extent an original work and secondary use have substitutable purposes, the fourth factor focuses on actual or potential market substitution." *Warhol*, 598 U.S. at 536 fn. 12.

59.    The fourth fair use factor "encompasses both (1) the extent of market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original and the market for derivative works." *McGucken*, 42 F.4th at 1163. Even when there is "little direct evidence of actual market harm" caused by the secondary use, "to negate fair use," the plaintiff "need only show that if the challenged use should become widespread, it would adversely affect the ***potential*** market for the copyrighted work." *Id.* (original emphasis).

60.    The fourth fair use factor also "must take into account the public benefits the copying will likely produce." *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 35 (2021). In other words, does the use "serve copyright's goal of enriching

public knowledge." *Warhol*, 598 U.S. at 531 (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (Level, J.). When the original work is associated with "dangerous misinformation," it does not serve the public benefit and results in "actual and reputational harm" to the market for the original work – even when the "primary markets … do not meaningfully overlap." *National Academy of Television Arts and Sciences, Inc. v. Multimedia System Design, Inc.*, 551 F.Supp.3d 408 (S.D.N.Y. 2021)*.

61.     In *Hosseinzadeh*, the Court found the fourth fair use factor "weighs in favor of a determination of fair use." 276 F.Supp.3d at 47. The Klein video did not "usurp[] demand for the copyrighted work, thereby resulting in a loss for the infringee or unjust enrichment for the infringer." *Id.* at 46. To the contrary, "the Klein video [did] not serve as a market substitute for the Hoss video" because the Klein video "transform[ed] the Hoss video from a skit into fodder for caustic, moment-by-moment commentary and mockery." *Id.* at 47. Consequently, "the Klein video [did] not offer a substitute for the original." *Id.*

**Frogan's "Group Viewing Session" Failed to Make a Fair Use of *The Nuke***

62.     It is readily apparent that the primary and overriding purpose of Frogan's use of *The Nuke* was to commercially exploit a "group viewing session" of *The Nuke* and have it serve as a substitute for the original.[41] This is evidenced by:

a.     Frogan's statements demonstrating that she intended for her "group viewing session" to serve as a substitute for *The Nuke*, such as:

i.     On January 30, 2025 (*i.e.*, the day before *The Nuke* was released), Frogan made a statement on stream demonstrating her "group viewing session" – along with the group viewing sessions of her friends – would serve as a substitute for the original:[42]

---

[41] A true and correct copy of Frogan's January 31, 2025 broadcast is located on the Flash Drive as Exhibit H.

[42] A true and correct copy of a clip from Frogan's January 30, 2025 stream is located on the Flash Drive as Exhibit I.

*He [i.e., Ethan] wants to maximize numbers [i.e., views].* Here's the thing though. *No matter what, there are going to be people [i.e., other creators] that they [i.e., the audience] would rather watch it with* – no matter what time he goes live. Denims goes live at like 7:00 in the morning. Sean goes live early as fuck. MikeFromPA also goes on early as fuck. I go live in the afternoon, but lately I've been going live a little bit earlier.

*See* Ex. I.

      ii.    Shortly before watching *The Nuke*, Frogan made the following statements acknowledging: (1) that her "group viewing session" of *The Nuke* was a substitute for watching the original; and (2) H3Snark was funneling audience members to Frogan's "group viewing session" of *The Nuke*, with statements such as:

    1.    "We have a bingo card. Uh, the Snark Reddit made it. Shout out to them." Ex. H at 19:53;

    2.    "Thank you guys so much! I do appreciate everyone's support. And thank you for *watching* it [*The Nuke*] with me." Ex. H at 34:04;

    3.    "[Reading chatter] First time viewer. *Time to watch the new nuke ethically*. [Frogan's response] Hell yeah!" Ex. H at 38:54;

    4.    "[Reading chatter] If found my way from Reddit! [Frogan's response] Hi guys! Welcome Reddit people! Reddit people! Reddit people!" Ex. H at 52:16;

    5.    "[Reading chatter] I came from the H3Snark reddit. Ethan is so pathetic, while Hasan is unbothered and having a great time. [Frogan's response] Exactly!" Ex. H at 54:09;

    6.    "[Reading chatter] We're going to watch live. Right? [Frogan's response]. *We're going to watch it live. Yes!*" Ex. H at 1:09:38.

    b.    Frogan begins her "group viewing session" of *The Nuke* one minute after *The Nuke* was released to the public. Ex. H at 1:10:34. The timing of

Frogan's "group viewing session" of *The Nuke* demonstrates that she did not prescreen it to formulate her opinions prior to broadcast. Rather, Frogan timed her "group viewing session" to occur immediately after *The Nuke* was released to capitalize on the great public interest in *The Nuke* and siphon as many viewers as possible away from the original to herself. In other words, her priority was to personally and financially benefit from providing a substitute for the original and any commentary and criticism was a mere afterthought.

        c.      On forty separate occasions, Frogan's "group viewing session" comprises of watching *The Nuke* (primarily at 1.5 to 1.75 speed) for thirty seconds or more with no commentary whatsoever (or, at most, including an unintelligible word or phrase). In most instances, Frogan is not even paying attention to *The Nuke*. Rather, her head is buried in her phone texting someone else. In the aggregate, these excerpts comprise 72 minutes (or approximately 70%) of *The Nuke*. The poverty of Frogan's commentary – coupled by showing long, unadulterated portions of *The Nuke* – further demonstrates Frogan intended her "group viewing session" to serve as a substitute for the original.

| | Timestamps of Excerpt from Frogan's Group Viewing Session | Total Duration of Excerpt from Frogan's Group Viewing Session | Speed *The Nuke* is Played | Duration of *The Nuke* Shown (Accounting for Speed) |
|---|---|---|---|---|
| 1 | 1:12:43-1:13:31 | 48 Seconds | Normal | 48 Seconds |
| 2 | 1:14:39-1:15:10 | 31 Seconds | Normal | 31 Seconds |
| 3 | 1:15:26-1:16:25 | 59 Seconds | Normal | 58 Seconds |
| 4 | 1:16:34-1:17:21 | 47 Seconds | Normal | 47 Seconds |
| 5 | 1:18:39-1:19:19 | 40 Seconds | Normal | 40 Seconds |
| 6 | 1:19:54-1:20:53 | 59 Seconds | Normal | 59 Seconds |
| 7 | 1:24:10-1:24:44 | 34 Seconds | 1.75 | 59.5 Seconds |
| 8 | 1:25:47-1:26:45 | 58 Seconds | 1.75 Speed | 101.5 Seconds |
| 9 | 1:26:49-1:27:26 | 37 Seconds | 1.75 Speed | 64.75 Seconds |

| | Timestamps of Excerpt from Frogan's Group Viewing Session | Total Duration of Excerpt from Frogan's Group Viewing Session | Speed *The Nuke* is Played | Duration of *The Nuke* Shown (Accounting for Speed) |
|---|---|---|---|---|
| 10 | 1:27:29-1:28:20 | 51 Seconds | 1.75 Speed | 89.25 Seconds |
| 11 | 1:28:40-1:29:10 | 30 Seconds | 1.75 Speed | 52.5 Seconds |
| 12 | 1:31:05-1:32:58 | 113 Seconds | 1.75 Speed | 197.75 Seconds |
| 13 | 1:35:38-1:36:28 | 50 Seconds | 1.75 Speed | 87.5 Seconds |
| 14 | 1:38:04-1:39:27 | 83 Seconds | 1.75 Speed | 145.25 Seconds |
| 15 | 1:41:18-1:41:55 | 37 Seconds | 1.75 Speed | 64.75 Seconds |
| 16 | 1:48:21-1:49:01 | 40 Seconds | 1.5 Speed | 60 Seconds |
| 17 | 1:52:27-1:53:06 | 39 Seconds | 1.5 Speed | 58.5 Seconds |
| 18 | 1:55:37-1:57:32 | 115 Seconds | 1.5 Speed | 172.5 Seconds |
| 19 | 1:57:39-1:59:18 | 99 Seconds | 1.5 Speed | 148.5 Seconds |
| 20 | 2:00:49-2:02:07 | 78 Seconds | 1.5 Speed | 117 Seconds |
| 21 | 2:04:19-2:05:00 | 41 Seconds | 1.5 Speed | 61.5 Seconds |
| 22 | 2:05:55-2:06:38 | 43 Seconds | 1.5 Speed | 64.5 Seconds |
| 23 | 2:06:57-2:07:56 | 59 Seconds | 1.5 Speed | 88.5 Seconds |
| 24 | 2:09:38-2:10:17 | 39 Seconds | 1.5 Speed | 58.5 Seconds |
| 25 | 2:10:39-2:12:30 | 111 Seconds | 1.5 Speed | 166.5 Seconds |
| 26 | 2:13:23-2:14:59 | 99 Seconds | 1.5 Speed | 148.5 Seconds |
| 27 | 2:20:51-2:22:35 | 104 Seconds | 1.75 Speed | 182 Seconds |
| 28 | 2:22:46-2:24:13 | 87 Seconds | 1.75 Speed | 152.25 Seconds |
| 29 | 2:27:25-2:28:11 | 46 Seconds | 1.75 Speed | 80.5 Seconds |
| 30 | 2:32:48-2:34:00 | 72 Seconds | 1.75 Speed | 108 Seconds |
| 31 | 2:34:36-2:35:50 | 74 Seconds | 1.75 Speed | 129.5 Seconds |
| 32 | 2:36:18-2:37:35 | 77 Seconds | 1.75 Speed | 134.75 Seconds |
| 33 | 2:37:39-2:39:10 | 91 Seconds | 1.5 Speed | 136.5 Seconds |
| 34 | 2:47:20-2:48:04 | 44 Seconds | 1.5 Speed | 66 Seconds |

48
COMPLAINT

|    | Timestamps of Excerpt from Frogan's Group Viewing Session | Total Duration of Excerpt from Frogan's Group Viewing Session | Speed *The Nuke* is Played | Duration of *The Nuke* Shown (Accounting for Speed) |
|----|---|---|---|---|
| 35 | 2:54:43-2:55:30 | 47 Seconds | 1.5 Speed | 70.5 Seconds |
| 36 | 3:16:28-3:17:23 | 55 Seconds | 1.5 Speed | 82.5 Seconds |
| 37 | 3:22:08-3:22:48 | 40 Seconds | 1.5 Speed | 60 Seconds |
| 38 | 3:23:56-3:25:01 | 65 Seconds | 1.5 Speed | 97.5 Seconds |
| 39 | 3:25:38-3:26:34 | 56 Seconds | 1.5 Speed | 84 Seconds |
| 40 | 3:27:40-3:28:24 | 44 Seconds | 1.5 Speed | 66 Seconds |

d.      In a completely separate instance from those listed above, Frogan provides an "empty chair reaction" – *i.e.*, letting *The Nuke* play while Frogan is completely off-screen. At a certain point, Frogan asks her audience: "Can I use the bathroom please? ***I'll leave it [i.e., The Nuke] playing***." Ex. H at 2:15:00-2:15:10. For one minute and fifty-one seconds, Frogan lets *The Nuke* play at 1.5 speed (*i.e.*, a total of two minutes and forty-six seconds of original) while she is off-screen relieving herself. *Id.* at 2:15:11-2:17:02. When she returns, Frogan is practically silent for an additional minute and three seconds (*i.e.*, at total of one minute and thirty-four seconds of *The Nuke*). *Id.* at 2:17:03-2:18:06.

e.      Even when Frogan does pause *The Nuke*, those moments frequently comprise of painfully pregnant pauses as Frogan struggles to find something to say. Many of these excruciating moments of silence (or primarily silence) last ten seconds or longer.[43] The consistent "dead air" during Frogan's "group viewing session" further emphasizes that commenting on and critiquing *The*

[43] *See e.g.*, Ex. H at 1:29:11-23, 1:29:28-59, 1:33:09-1:33:23, 1:37:32-42 1:40:41-1:41:00, 1:45:04-18, 1:45:52-1:46:16, 1:47:05-25, 1:47:45-1:48:20, 1:49:20-32, 1:50:09-22, 1:51:03-49, 1:59:35-50, 2:00:32-48, 2:20:17-39, 2:32:33-47, 2:34:08-2:34:35, 2:39:30-40, 2:42:29-59, 2:47:09-19, 2:50:20-31, 2:55:31-52, 3:02:48-3:03:06, 3:04:30-50, 3:05:00-11, 3:05:26-47, 3:07:00-10, 3:08:41-53, 3:15:34-48, 3:20:13-30, 3:22:49-3:23:09

49
COMPLAINT

*Nuke* was an afterthought to the primary purpose of Frogan's "group viewing session" – *i.e.*, to financially capitalize on the public interest in *The Nuke* by siphoning views away from the original and to herself. If the opposite were true, Frogan would have taken her time to formulate her thoughts and select the portions of *The Nuke* she intended to critique.

f.    Frogan also uses her "group viewing session" to infringe on other copyrighted works. For example, the intro of Frogan's "group viewing session" consists of playing numerous songs in their entirety by the artist Bad Bunny, while a countdown clock is displayed for when her stream will begin. Ex. H at 0:00:00-0:13:19. On another occasion she plays an uninterrupted twenty-nine second excerpt of *Arab Money (Remix)* by the artist Busta Rhymes without any commentary or criticism. *Id.* at 1:50:23-52.

g.    Frogan fails to address the vast majority of points raised in *The Nuke*, which further emphasizes that Frogan's primary purpose was to host a "group viewing session" of *The Nuke* and that any criticism was an afterthought. The points from *The Nuke* that Frogan fails to address are detailed below:

i.    Frogan fails to address the following points raised in the Prologue of *The Nuke*: (1) Hasan's take on the Uyghurs in China; (2) the primary political difference between Ethan and Hasan on the Israeli/Palestinian conflict; (3) Ethan's support of the Palestinian cause; (3) the underlying concern of the Mizrahi Jews (and Israelis in general) with the one-state solution; (4) Hasan's support of terrorism; (5) Ethan's commentary on Hasan and his friends discussing how they radicalize their audience through the "radicalization funnel"; (6) Hasan conceding he is a propogandist; and (7) Hasan's hatred of liberals.

ii.    Frogan fails to address the following points raised in the Twitch Parody Sketch of *The Nuke*: (1) Twitch embracing extremist rhetoric; (2) Twitch rebranding terrorism; and (3) the media bias report demonstrating Hasan is not a reliable source of information.

iii. Frogan fails to address nearly every point raised in the Houthis Section of *The Nuke*, namely: (1) Hasan glorifying and disseminating Houthi propaganda; (2) the Houthis' atrocities and how they contradict leftist values; (3) the critiques of Hasan indoctrinating Nick (*e.g.*, the Houthi music video, calling the video a "musical," calling the Houthis "musical people," debunking Hasan's assertions on the hijacking of the *Galaxy Leader*, the critiques of Hasan's belief that the Jews will just leave Israel if commerce is disrupted and that the majority of Israelis are Jews from Arab countries); (4) the entire segment concerning Al-Haddad; (5) that Hasan deflects criticism by pulling the genocide card; and (6) Hasan being unable to locate Yemen on the map.

iv. Frogan fails to address a single substantive point raised in the Hezbollah Section of *The Nuke*, notably: (1) Hasan glorifying and disseminating Hezbollah propaganda; (2) Hezbollah's atrocities and how they contradict leftist values; (3) Hasan praising Nasrallah and Nasrallah's antisemitic statements; and (4) Hasan's apologia of Hezbollah.

v. Frogan also fails to address a single substantive point raised in the Hamas Section of *The Nuke*, notably: (1) Hasan disseminating and glorifying Hamas propaganda; (2) Hamas' atrocities and how they contradict leftist values; (3) the critique of Hasan's reaction to the hostage release video, the sniper rifle video and Hasan's analysis of the same; (4) the critique of Hasan's denial of sexual violence on October 7th; and (4) the critique that Hasan denies the suffering of Israeli victims to make Hamas unimpeachable.

h. Frogan's poverty of commentary on *The Nuke* is so blatantly obvious that her chat consistently lambasts her lack of commentary. Notable examples are provided below.

i. On at least three occasions, Frogan reads chats calling her out for her failure to address the points raised in *The Nuke*, such as:

1. "***Don't you have anything to say?***" Ex. H at

<div align="center">

51

COMPLAINT

</div>

2:24:50-2:25:31.

2. "***Could you make at least one good point?***" Ex. H at 2:26:34-46.

3. "***How anyone listens or watches you is insane?!***" Ex. H at 3:08:00-15.

ii. Frogan's response to these critiques effectively concedes she is incapable of providing substantive commentary by stating:

1. "***Like what commentary do you want me to add? By like, oh, this guys a fucking idiot, he's mentally ill and he's having a mental breakdown and uploaded it to fucking YouTube***" Ex. H at 2:25:16-31.

2. "***What do you want me to make a point on?***" Ex. H at 2:26:34-46.

3. Calling people a "***Bitch***" (Frogan's personal favorite). Ex. H at 3:08:00-15.

iii. On at least three occasions, Frogan reads chats calling her out for being a hypocrite, such as:

1. Frogan dragging the crew into the dispute (Ex. H at 3:15:49-3:16:00), despite Frogan previously stating that the crew should be left alone (*id.* at 2:19:17-47, 2:20:40-50).

2. Frogan is not a pacifist (Ex. H at 3:31:26-3:34:05), despite claiming to be a pacifist (*id.* at 3:30:47-3:31:12).

3. Frogan not being aware of the context of a clip (Ex. H at 1:23:20-26), despite accusing Ethan of using clips out-of-context (*id.* at 1:22:09-29).

iv. Finally, on at least two occasions, Frogan reads chats calling her out for engaging in "damage control" and "running defense." Ex. H at 3:14:11-17, 3:28:25-27.

i. When Frogan does share her thoughts during her "group

52

COMPLAINT

viewing session," most of her statements that have no critical bearing (or minimal critical bearing) on the style or substance of *The Nuke*. Below are some examples:

       i.     One of the most frequent utterances by Frogan is expressing excitement over the appearance (or non-appearance) of her friends in *The Nuke. See e.g.*, Ex. H at 1:39:31, 1:39:47-55, 1:46:56-1:47:04, 2:10:18-19, 2:19:03-08, 3:02:13-35, 3:03:18-20, 3:03:26-27, 3:05:48-3:06:35, 3:07:11-49, 3:29:57-3:30:37. In these specific instances, Frogan does not address how her friends are portrayed in *The Nuke*.

       ii.     On numerous occasions, Frogan makes utterances that are completely incoherent. *See e.g.,* Ex. H at 1:25:44-46, 1:36:31-52, 1:37:26-31, 1:53:19-22, 2:25:56-69, 2:27:15-24, 3:19:34-3:29:09, 3:34:45-50.

       iii.     On other occasions, Frogan will discuss completely unrelated topics, such as: (1) the purported harassment of her friend (Ex. H at 1:35:10-37); (2) an emergency notification she received (*id.* at 2:03:41-54); (3) thanking another streamer for raiding (*i.e.*, directing viewers to) Frogan's stream (*id.* at 2:06:39-56, 2:07:40); (4) discussing a dispute between Ethan and Daniel Keem p/k/a Keemstar (*id.* at 2:34:01-07, 2:34:23-24); (5) arguing with her chat on completely unrelated points (*id.* at 2:12:31-36, 3:21:38-45, 3:22:05:07); and (6) discussing members of the crew for the *H3 Podcast* (*id.* at 2:18:07-29, 2:19:17-47, 2:20:00-16, 2:20:40-50, 3:15:49-3:16:00).

       iv.     In other instances, Frogan merely narrates what is shown in *The Nuke*. *See e.g.*, Ex. H at 1:12:16-24, 1:36:29-30, 2:02:22-32, 2:42:06-11, 2:42:06-11, 3:10:40-41.

       v.     Frequently, Frogan engages in superficial *ad hominem* attacks on Ethan without any further discussion, such as calling him stupid, crashing out, having a mental breakdown and other personal attacks. *See e.g.*, Ex. H at 1:50:51-1:11:00, 1:52:25-26, 1:53:50-55, 1:59:51-2:00:04, 2:02:08-21, 2:05:01-54, 2:13:10-22, 3:12:57-3:13:29, 3:35:18-3:37:07.

vi. Frogan complains about the length of *The Nuke* with little explication. *See e.g.*, Ex. H at 1:20:54-1:21:06, 1:37:59-1:38:03, 1:40:12-17, 1:54:13-17, 2:00:05-11, 2:07:30.

vii. Frogan plays the bingo game created by H3Snark. *See e.g.*, Ex. H at 19:53, 1:11:38-42, 1:11:57, 1:14:18; 1:14:34, 1:54:25-28, 1:54-44-1:55:36, 1:57:33-38, 2:12:55-2:13:01.

viii. Other times, Frogan makes brief and surface level insults and complaints about *The Nuke*, such as: (1) claiming she is disgusted watching *The Nuke* (Ex. H at 1:12:35-42); (2) claiming *The Nuke* is just a clip compilation with voiceovers (*id.* 1:21:15-18); (3) complaining how Hasan's dog, Kaya, is portrayed (*id.*, 1:48:06-20, 1:53:07-12); (4) calling *The Nuke* a "content sparkler" (*id.*, at 2:03:23-31, 2:03:55-2:04:18); (5) complaining about *The Nuke's* use of the Miami Boys Choir (*id.*, at 2:08:16-25); and (6) brief insults of the sound effects, editing and graphics used in *The Nuke* (*id.*, at 1:22:09-12, 1:27:27-28, 2:24:14-16, 2:30:27-35).

j. In other instances, Frogan makes blithe and unsupported false assertions about *The Nuke* and Ethan. Frogan's inability or unwillingness to substantiate her comments demonstrates that – if Frogan's primary purpose was to critique *The Nuke* – she would have taken the time to substantiate her assertions. The lack of substantiation further emphasizes that Frogan's primary purpose was – not to critique *The Nuke* – but to provide a substitute for the original. Below are some examples of Frogan's unsubstantiated false assertions:

i. That Ethan should not provide political analysis. Ex. H at 1:29:20-31, 1:22:59-1:23:03. The irony of this comment is that Frogan proves that she is incompetent at providing political analysis herself. For example, when *The Nuke* discusses Hasan's tweet to Senator Cotton of the schematics of the gun used to assassinate Shinzo Abi, Frogan initially confuses Senator Cotton with Senator Chuck Schumer of New York (who is Jewish) and only realizes her mistake when

her chat points out that "AR" (*i.e.*, the abbreviation for Arkansas) is in Senator Cotton's username. *Id.* at 3:29:19-56.

    ii. Ethan doesn't care about Muslims. Ex. H at 1:19:44-53.

    iii. Falsely claiming Arabs have not killed Israelis; rather, only Israelis have killed Arabs (Palestinians have killed 1,706 Israelis just since Oct 7, 2023).[44] Ex. H at 1:28:21-27.

    iv. Ethan is not a democrat. Ex. H at 1:15:11-25.

    v. Hila called for killing "baby militants." Ex. H at 1:26:46-48.

    vi. Ethan is dishonest. Ex. H at 2:35:51-2:36:17.

    vii. That the clips used in *The Nuke* lack context – despite failing to provide or explain the omitted context. Ex. H at 1:22:12-16.

    viii. That the clips used in *The Nuke* were pulled from Destiny's subreddit. Ex. H at 1:22:17-29, 1:23:15-19, 2:03:32-37, 2:22:36-45, 3:31:13-16. Not only does Frogan fail to substantiate this assertion, she does not explain how this alters the meaning or content of the clips used in *The Nuke.*

  k. In the rare instances where Frogan does engage with the content of *The Nuke*, her comments primarily concern her favorite topic: herself. Most of these observations have little to no critical bearing on the style or substance of *The Nuke.* The remainder involve making repetitive comments to defend herself – demonstrating Frogan could have used far less of *The Nuke* to make her critiques and defend herself. Examples include.

    i. Frogan expressing excitement that she was included in *The Nuke.* Ex. H at 1:32:59-1:33:08, 1:40:29-32.

    ii. Indulging in her fantasy that Ethan is obsessed with her

[44] Royal United Services Institute, *Israel and Gaza: A Ceasefire, Not Peace*, (≈Feb.–Mar. 2025) *available at*: https://www.rusi.org/resource/israel-and-gaza-a-ceasefire-not-peace.html.

(when the opposite is clearly the case). Ex. H at 1:45:00-03, 1:45:19-51, 1:46:32-45, 1:49:15-19.

iii. Repeatedly regurgitating her bitterness at *The Nuke's* joke that she is paid by Qatar. Ex. H at 1:49:42-1:50:08, 1:51:57-1:52:00, 2:02:30-2:03:23, 2:28:17-27.

iv. Expressing bewilderment at what was wrong with her comments and posts attacking Ethan. Ex. H at 1:33:24-30, 1:33:54-58, 1:34:06-10.

v. Gloating over her rising star award. Ex. H at 1:45:52-1:46:16.

vi. Thanking Ethan for using a recent picture of her. Ex. H at 1:46:17-27.

vii. Taking issue with being described as Hasan's "head mod" despite *The Nuke* never making that claim. *Compare* Ex. H at 1:24:10-44 *with Id.* at 1:24:45-52, 1:46:52-56.

viii. During the segment of *The Nuke* critiquing Frogan for her comments towards Ludwig, Frogan repeats the same explanation and apology throughout the segment. Ex. H at 2:45:17-2:49:27.

ix. During the segment of *The Nuke* critiquing Frogan for her comment that she wishes veterans get PTSD, Frogan: (1) repeats her assertion that the clip was taken out of context (but when the context is show – *i.e.*, that her comment does not apply to veterans who confess their sins – it does not ameliorate the criticism); (2) repeatedly stating she is embarrassed by what she said, despite continuing to laugh over her statements about veterans; and (3) falsely stating she was banned for thirty days due to her statements – when the actual reason for her ban was the racial tier list she hosted at TwitchCon.[45] Ex. H at 2:49:27-2:52:35.

[45] We know for certain that the ban was for the TwitchCon panel and not Frogan's statements about veterans because all the panelists received the same thirty day ban on the same day. Rich Stanton, PC Gamer "Under pressure from pro-Israel group, Twitch bans several Arab streamers over a month-old TwitchCon panel" (October, (continued).

x.    During the segment of *The Nuke* critiquing Frogan's X post on October 7th, Frogan repeats her paltry and unpersuasive attempt to excuse her post by focusing solely on the time it was made (*i.e.* the morning of October 7th on the east coast – which was over ten hours after the attacks began).[46] Ex. H at 2:52:52-2:55:30. Frogan also strategically omits that she liked several posts on X praising Hamas on October 7th. *See e.g.*, ¶ 19(b), *supra*.

xi.    During the segment of *The Nuke* critiquing Frogan's panel at TwitchCon 2024 (Ex. H at 3:00:33-3:17:23), Frogan makes such a transparent attempt at damage control that her chat calls her out for it. *Id.* at 3:14:11-17. Frogan's damage control consists of:

1.    Making brief statements that are minimally related or completely unrelated to *The Nuke* (Ex. H at 3:00:33-3:31:48);

2.    Repeatedly denying she knew that the word "Sabra" means a Jew born in Israel – despite claiming to be an expert in the Middle East (Ex. H at 3:01:49-58, 3:09:19-22, 3:14:45-3:15:02);

3.    Providing no substantive response to being called antisemitic (Ex. H at 3:02:36-3:03:17, 3:04:03-3:05:15);

4.    Shifting the focus from the discussion on Jews from Arab countries to her family's expulsion during the 1948 War (Ex. H at 3:03:28-3:04:03);

5.    Repeatedly attempting (albeit unsuccessfully) to minimize Denims' comment that Ethan should be put into a new category called "Zionist" (Ex. H. at 3:10:40-41, 3:10:59-3:11:19, 3:15:15-16, 3:16:26-27) and that

22, 2025), *available at*: https://www.pcgamer.com/gaming-industry/under-pressure-from-pro-israel-group-twitch-bans-several-arab-streamers-over-a-month-old-twitchcon-panel/ If Frogan's statements about veterans constituted as separate infraction, she would have received additional sanctions from those received by her fellow panelists.

[46] Taija Perry Cook, Snopes, "Timeline: The Oct. 7 Hamas Attack and Israel's Retaliatory War on Gaza" (Nov. 30, 2023) *available at*: https://www.snopes.com/articles/465623/oct-7-hamas-attack-and-israeli-retaliation/

Ethan is a Zionist because of his takes on Palestine (*id.* at 3:11:26-30);

6. Making the bizarre claim that she has no role is creating thumbnail or uploading the video of the racial tier list from TwitchCon to her podcast channel (Ex. H. at 3:12:15-22); and

7. Claiming that it is easy to "debunk blatant lies" – yet failing to debunk anything material or substantive (Ex. H at 3:14:18-21).

xii. During the segment of *The Nuke* on Twitch banning the creation of new accounts in Israel and Palestine (Ex. H at 3:16:28-3:21:29), Frogan repeats the same critique that the ban included Palestine. *Id.* at 3:17:24-29, 3:17:35-39, 3:18:23-37, 3:19:24-34, 3:20:10-12, 3:20:34-40, 3:21:26-29.

l. To be certain, there are brief and fleeting moments when Frogan makes a highly transformative use of *The Nuke*. Where *The Nuke* seeks to expose how Hasan radicalizes people online to be antisemitic and anti-Israeli, Frogan attempts to use *The Nuke* for the exact opposite purpose: to radicalize her audience to be more antisemitic and anti-Israeli. The transformative nature of these moments are undermined (if not erased) by showing far more of *The Nuke* than is necessary to achieve this purpose. Examples include:

i. On two occasions, *The Nuke* discusses Mizrahi Jews living in Israel. Ex. H at 1:28:55-1:32:07, 3:03:26-47. When *The Nuke* discusses that the number of Mizrahi Jews expelled from Arab countries exceeded the number of Palestinians expelled during the Naqba, Frogan makes the facially frivolous assertion that this is a form of "erasing the Naqba." *Id.* at 1:29:24-27. Frogan does not explain how recognizing the tragedy that occurred to Mizrahi Jews erases the tragedy of the Naqba. Rather, Frogan provides an anecdote about how her paternal grandparents were told to leave and come back in four months. *Id.* at 1:30:26-1:31:04.

ii. On three occasions, Frogan accuses Ethan of conflating Judaism with Zionism. Ex. H at 2:08:38-2:09:02, 2:17:28-29, 3:11:34-55. Not only

58
COMPLAINT

is it cruelly ironic that someone who hates Israel has the audacity to opine on this issue, it also reveals Frogan's fundamental lack of understanding of Jewish people.[47] A 2019-2020 Pew Research Center survey of 4,718 American Jews found 82% considered caring about Israel to be "essential" or "important" to what it means to be Jewish.[48] In another poll conducted in December 2024 of 800 American-Jewish adults, "70% think anti-Zionist movements are antisemitic by definition" and only "9% strongly disagree with that statement."[49]

m.      *The Nuke* takes the vast majority of the screen for Frogan's "group viewing session" – while Frogan sequesters herself to a small portion of the screen that deemphasizes her presence. Frogan's objective was to provide a large and unobstructed view of *The Nuke* to her audience – which further emphasizes her primary purpose was to provide a substitute for the original.

n.      Frogan's use of *The Nuke* was highly commercial. During her "group viewing session" of *The Nuke*, Frogan: (1) repeatedly calls upon her

[47] A "Zionist" is someone who believes in the right of Jewish self-determination in their ancestral homeland. It is a broad umbrella that includes those who "consider the rights of Palestinians to be fundamental to Zionism's success." Frequently, "policies carried out by the Israeli government that harm and suppress Palestinians are often conflated by anti-Zionists as representing Zionism as a whole." This conflation has "a marginalizing effect on Jews" and is often "indistinguishable from anti-Semitism in its expression" because it uses "anti-Semitic tropes." Encyclopedia Brittanica, "Zionism" *available at*: https://www.britannica.com/topic/Zionism
[48] Justin Nortey, Pew Research Center "U.S. Jews have widely differing views on Israel" (May 21, 2021) *available at*: https://www.pewresearch.org/short-reads/2021/05/21/u-s-jews-have-widely-differing-views-on-israel/; Pew Research Center, "Jewish Americans in 2020, Appendix A: Survey methodology" (May 11, 2021) *available at*: https://www.pewresearch.org/religion/2021/05/11/appendix-a-survey-methodology-4-2/
[49] The Jewish Majority, "New Poll: Jewish Voice for Peace Does Not Represent Vast Majority of U.S. Jewish Community" (February 12, 2025), *available at*: https://img1.wsimg.com/blobby/go/2921c434-f7d7-43f4-ade6-3a5591444c85/downloads/97dc308b-4559-4e42-a55e-53c77f75c044/Press%20release%202.11.2025.pdf?ver=1739292818681

audience to pay her for a subscription to her channel;[50] (2) thanks new subscribers;[51] and (3) promotes her podcast.[52] Both before and during Frogan's "group viewing session" of *The Nuke*, Frogan places her paid subscription goal prominently on the screen, including (1) a "Chat Powerpoint Topic" (*see e.g.*, Ex. H at 28:13); (2) "Heart Cake Baking Stream" (*id.* at 1:15:59); and (3) "Sleep Stream" (*id.* at 3:02:22). Indeed, during her "group viewing session" of *The Nuke*, Frogan received numerous paid subscriptions and donations – which would result in an announcement playing over *The Nuke*. Further, Frogan received advertising revenue from her "group viewing session" of *The Nuke*. Finally, on her Twitch page where Frogan's "group viewing session" was located, Frogan placed buttons soliciting paid subscriptions and donations beneath the video of Frogan's "group view session" of *The Nuke*.

63.     As to the second fair use factor, the fact *The Nuke* was released a minute prior to Frogan's "group viewing session" does not weigh in her favor. Further, while containing numerous documentary and factual elements, *The Nuke* contains numerous creative elements, which weigh against fair use.

64.     As to the third fair use factor, this factor weighs heavily against fair use. It is readily apparent Frogan's use was excessive for any potential criticism of *The Nuke* – particularly in light of minimal level of commentary and highly commercial nature of Frogan's "group viewing session." This is particularly true when Frogan repeatedly provides brief statements (many of which have little to not critical bearing on *The Nuke*) after showing long unadulterated segments of *The Nuke*.

65.     The fourth (and most important) fair use factor weighs the most heavily against fair use. It is readily apparent that Frogan intended (and succeeded)

[50] *See e.g.*, Ex. H at 1:44:12-29, 1:52:01-06, 2:10:24-38, 2:29:22-26.
[51] *See e.g.*, Ex. H at 1:11:23-27, 1:22:30-38, 1:52:56, 2:11:20, 2:30-42-47, 2:39:20-22, 2:45:10-12, 2:52:16-24, 3:14:28-29, 3:21:59-3:22:04.
[52] *See e.g.*, Ex. H at 1:41:01-05, 1:41:15-17, 3:07:50-54.

to provide a market substitute for *The Nuke* for the reasons set forth below:

        a.     The statements identified in Paragraph 62.a above.

        b.     Showing *The Nuke* in its entirety with minimal commentary.

        c.     Starting her "group viewing session" a minute after *The Nuke* was released to the public when the interest in *The Nuke* was at its apex.

        d.     The First Inducement Post and Second Inducement Post by the H3Snark Mods.

        e.     Due to Frogan's siphoning the audience for *The Nuke* to her "group viewing session," TEI lost views and advertising revenue it would ordinarily receive from the individuals who watched Frogan's "group viewing session" instead of *The Nuke*.

        f.     Frogan's conduct did become widespread. Several other members of Hasan's Waiting Room conducted a "group viewing session" of *The Nuke* immediately after its release – which resulted in further lost views and lost advertising revenue to TEI.

## FIRST CLAIM FOR RELIEF

### (For Direct Copyright Infringement – Against Frogan)

66.    TEI incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

67.    TEI is the sole owner of the copyrights in *The Nuke* and registered it with the USCO.

68.    Frogan accessed *The Nuke* from TEI's YouTube channel, h3h3Productions.

69.    TEI did not grant any license, authorization or consent for Frogan to exploit *The Nuke* in any manner. Rather, Frogan's "group viewing session" of *The Nuke* constituted an unauthorized reproduction, public performance and derivative work of *The Nuke* in violation of TEI's rights as set forth in 17 U.S.C. Section 106.

61
COMPLAINT

70. Due to Frogan's acts of copyright infringement, TEI has suffered damages in an amount to be established at trial.

71. Due to Frogan's acts of copyright infringement, Frogan obtained profits they would not have realized but for her infringement of TEI's copyrights in *The Nuke*.

72. Frogan's acts of copyright infringement were done with actual or constructive knowledge of TEI's rights, such that said acts of copyright infringement were willful, intentional, malicious and/or taken with reckless disregard for TEI's rights.

## SECOND CLAIM FOR RELIEF

### (Contributory Copyright Infringement – Against The H3 Snark Mods)

73. TEI incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

74. The H3Snark Mods (and each one of them) knew Frogan's "group viewing session" would infringe TEI's copyrights in *The Nuke*.

75. The H3Snark Mods (and each one of them) are responsible for the First Inducement Post and Second Inducement Post.

76. The First Inducement Post and Second Inducement Post induced, caused and/or materially contributed to Frogan's infringement of *The Nuke*.

77. Due to the H3Snark Mods' contributory infringement, TEI has suffered damages in an amount to be established at trial.

78. The H3Snark Mods' acts of contributory infringement were made with actual or constructive knowledge of TEI's rights, such that said acts of contributory infringement were willful, intentional, malicious and/or taken with reckless disregard for TEI's rights.

## PRAYER FOR RELIEF

WHEREFORE, TEI prays for judgment against Frogan and the H3Snark

Mods (collectively, "Defendants") as follows:

a. That TEI be awarded Defendants' (and each of their) profits, plus TEI's losses, attributable to Defendants' infringements of *The* Nuke, the exact sum to be proven at the time of trial; or, if elected, statutory damages in the amount of $150,000 as available under 17 U.S.C. Section 504;

b. TEI be awarded it reasonable attorneys' fees and costs under 17 U.S.C. Section 505;

c. TEI be awarded pre-judgment interest as allowed by law; and

d. TEI be awarded such further relief as the Court deems proper.

## JURY TRIAL DEMAND

TEI demands a jury trial on all issues so triable pursuant to Federal Rule of Civil Procedure 38 and the 7th Amendment to the United State Constitution.

Dated: June 19, 2025                **HEAH BAR-NISSIM LLP**

By  /s/ Rom Bar-Nissim
        ROM BAR-NISSIM
        Attorneys for Plaintiff Ted
        Entertainment, Inc.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| TED ENTERTAINMENT, INC.,<br>a California corporation,<br><br>          Plaintiff,<br><br>  v.<br><br>KACEY CAVINESS p/k/a KACEYTRON,<br>an individual,<br><br>and<br><br>DOES 1-10,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)  Case No. 4:25-cv-459<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT FOR COPYRIGHT INFRINGEMENT**

1

2



Kaceytron: She Smoked More than She Spoke

"I know a lot of people have been wanting to watch this without necessarily supporting Ethan

Klein. So, we're going to watch it."

– Kaceytron Prior to Reacting to *Content Nuke: Hasan Piker*

"What is happening? I'm trying to follow, but I lost the plot."

– Kaceytron Reacting to *Content Nuke: Hasan Piker*

2

**<u>INTRODUCTION</u>**

1. This lawsuit is about ending the practice of lazy reaction videos that copy entire copyrighted works and purposefully siphon views and revenue away from the original. Over seven years ago, the owners of Plaintiff Ted Entertainment, Inc. ("TEI") – Ethan and Hila Klein – established the legal standard for fair use reaction videos in *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34 (S.D.N.Y. 2017). As a genre, reaction videos "vary widely in terms of purpose, structure, and the extent to which they rely on potentially copyrighted material." Reaction videos, "like the Klein video" that "intersperse ***short*** segments of another's work with criticism and commentary," constitute fair use.[1]  In contrast, reaction videos that are "more akin to a ***group viewing session***" do not. *Id.*, at 40 fn.1, 45-47 (emphasis added).

2. This case concerns a "group viewing session" hosted by Defendant Kacey Caviness p/k/a Kaceytron ("Kaceytron"). Kaceytron specifically intended her "group viewing session" to siphon the maximum number of views and revenue away from TEI's copyrighted work *Content Nuke: Hasan Piker* ("*The Nuke*") to herself. Kaceytron successfully achieved her objective by releasing her "group viewing session" of *The Nuke* minutes after its official release and showing it in its entirety. Kaceytron greatly profited from her "group viewing session" of *The Nuke* through advertising revenue, donations and paid subscriptions.

3. The moderators of the H3Snark subreddit (the "H3Snark Mods") knew that Kaceytron's "group viewing session" would serve as an alternative to watching *The Nuke* on TEI's YouTube channel. Kaceytron has a long and well-documented history of copyright infringement. The H3Snark Mods were aware of this fact. As such, they successfully promoted

---

[1] The Kleins' video from *Hosseinzadeh* was entitled *The Big, The BOLD, The Beautiful* and is available here: https://youtu.be/CXUs5FOo-JE?si=74MWM26Wn26KmO4o

Kaceytron's "group viewing session" on the H3Snark subreddit ("H3Snark") as a substitute for *The Nuke*.

4.      Like most lazy reaction videos, Kaceytron's "group viewing session" of *The Nuke* is nearly devoid of critical commentary. Instead, Kaceytron uses her "group viewing session" as an opportunity to engage in public degeneracy, such as:

      a.      Continuously smoking copious quantities of cannabis resulting in Kaceytron becoming so obliterated that – instead of providing any commentary – she stares blankly at her computer;

      b.      Even more striking, Kaceytron peppers her "group viewing session" with the sounds of loud gastral intestinal emissions.

5.      Due to Kaceytron's highly inebriated state, she watched long, unadulterated portions of *The Nuke* for minutes on end without interruption. On the rare occasion that Kaceytron was coherent, her remarks were brief, surface-level, repetitive and/or self-admittedly uninformed. Kaceytron's poverty of commentary fails to provide "new information, new aesthetics, new insights or understandings" on *The Nuke*. *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith* ("*Warhol*"), 598 U.S. 508, 541 (2023).

6.      Kaceytron's unauthorized, highly commercial exploitation of *The Nuke* is a quintessential example of copyright infringement – *i.e.*, using copyrighted content "to get attention [and] avoid the drudgery in working up something fresh." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994). This lawsuit is to hold Kaceytron accountable for her infringement of *The Nuke* and the H3Snark Mods accountable for their contributory infringement.

## JURISDICTION AND VENUE

7.      This action arises under the Copyright Act, 17 U.S.C. § 101, *et seq.*

8.      This Court has federal question jurisdiction under 28 U.S.C. §§ 1331, 1338(a-b).

9.      Venue in this judicial district is proper under 28 U.S.C. §§ 1391(c) and 1400(a) because a substantial part of the acts and omissions giving rise to the claims occurred in this judicial district.

## PARTIES

10.      TEI is a California corporation with its principal place of business located in Los Angeles County, CA. TEI is a production company that produces content for social media, namely YouTube.

11.      Kaceytron is an online streamer who releases content on social media platforms, namely Twitch, and resides in Blue Springs, Missouri.

12.      The H3Snark Mods consist of Does Nos. 1-10. The true names and exact location of Does Nos. 1-10 are presently unknown to TEI, which therefore sues said Doe defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and exact locations when the same have been ascertained. Below is a summary of what is known about Does Nos. 1-6.

a.      Doe No. 1 is female, the founder of H3Snark and one of the H3Snark Mods. She previously used the Reddit username "u/ozempicdealer" – which Doe No. 1 subsequently deleted. Her last post using this handle was on February 12, 2025. Doe No. 1 also uses the Discord handle "yoggiebearx" and the screen name "parishilton."

b.      Doe No. 2 is female, resides in Canada and is the head moderator of the H3Snark Mods. Doe No. 2 currently uses the following Reddit usernames: (1)

5

u/h3snarkmodteam2; (2) u/RomanPeee; and (3) u/Right_Salamander (currently idle). Previously, Doe No. 2 used the following Reddit usernames – which were either deleted by Doe No. 2 or suspended by Reddit for violating its Content Policy: (1) u/kavkav2 (deleted); (2) u/h3snarkmodteam3 (deleted); (3) u/Wrong_Salamanderr (deleted); (4) u/Right_Salamanderr (suspended); (5) u/PurePress (suspended); and (6) u/KitchenMukbangStar (deleted). On Discord, Doe No. 2 uses the screen names "Sally" and "alitern."

   c.  Doe No. 3 began as a user of H3Snark and was subsequently made an H3Snark Mod. Initially, Doe No. 3 used the Reddit username "u/sarahornejewetts" – which she subsequently deleted. After deleting this account, Doe No. 3 used the Reddit username "u/jewettsarahorne."

   d.  Doe No. 4's account name on Discord is "rozzwhalenm."

   e.  Doe No. 5 is male and goes by the name Tony. Doe No. 5 was made an H3Snark Mod. His account name on Discord is "frompu."

   f.  Doe No. 6 was made an H3Snark Mod. Doe No. 6's account name on Discord is "No_Reception."

   g.  Doe Nos. 7-10 are the remaining H3Snark Mods.

## **FACTUAL ALLEGATIONS**

**Background of TEI**

13.  TEI was founded in 2016 by Ethan and Hila Klein. The Kleins rose to prominence on YouTube with two channels, "h3h3Productions" (their primary channel) and "Ethan and Hila"[2] (their secondary channel). The Kleins created highly stylized reaction videos to other YouTube videos. The Kleins' reaction videos "intersperse[d] relatively short segments" of the

---

[2] The "Ethan and Hila" channel was later renamed to "Hila Klein."

original video "with long segments of the Kleins' commentary." *Hosseinzadeh*, 276 F.Supp.3d at 40. After TEI was established, the Kleins assigned both channels to TEI.

14.     In 2016, the Kleins were sued for copyright infringement, defamation and misrepresentation under 17 U.S.C. Section 512(f) by Matt Hosseinzadeh p/k/a Matt Hoss/The Bold Guy ("Matt Hoss"). The copyright claim concerned a reaction video uploaded to their "Ethan and Hila" YouTube channel. The video, entitled *The Big, The Bold, The Beautiful* (the "Klein video"), was a critical and humorous reaction to Matt Hoss' video, *Bold Guy vs. Parkour Girl* (the "Hoss video"). As the Court in *Hosseinzadeh* explained:

> The Klein video opens with commentary and discussion between Ethan and Hila Klein, followed by segments of the Hoss video which they play, stop, and continue to comment on and criticize. The Klein video, which is almost fourteen minutes long, intersperses relatively short segments of the Hoss video with long segments of the Kleins' commentary, ultimately using three minutes and fifteen seconds of the five minute, twenty-four second long Hoss video. The Klein video is harshly critical of the Hoss video, and includes mockery of [Matt Hoss'] performance and what the [Kleins] consider unrealistic dialog and plotlines. In addition, defendants' commentary refers to the Hoss video as quasi-pornographic and reminiscent of a "Cringetube" genre of YouTube video known for "cringe"- worthy sexual content. As critical as it is, the Klein video is roughly equivalent to the kind of commentary and criticism of a creative work that might occur in a film studies class.

*Hosseinzadeh*, 276 F.Supp.3d at 40 (footnote and internal citations omitted).

15.     On August 23, 2017, the Court granted summary judgment for the Kleins on all of Matt Hoss claims. *Hosseinzadeh*, 276 F.Supp.3d at 45-48. For the copyright infringement claim, the Court found the Klein video made a fair use of the Hoss video.

16.     In 2017, TEI established *The H3 Podcast* channel on YouTube. On the new channel, TEI produced podcast episodes that were less structured than the reaction videos the Kleins previously made. To ensure any use of unlicensed copyrighted content qualified as fair use, TEI formulated and refined best practices based on the principles from *Hosseinzadeh*, which

included: (1) whenever feasible, prescreening the original work and outlining the criticism and commentary before the broadcast; (2) ensuring the commentary was directly related to the style and/or substance of the original work; (3) only broadcasting the portion of the original work that would be subject to critique; (4) pausing the original work frequently to provide critique; and (5) ensuring that the duration of commentary was substantially longer than the portion of the original work show immediately before the commentary.

**Kaceytron: Flamebait Fixture**

17. Kaceytron has been streaming for over a decade. She has amassed approximately 540,000 followers on Twitch – her streaming platform of choice.

18. Kaceytron is not known for her intellectual acumen or analytic prowess. Despite desperately wanting to be taken seriously by the alt-left online commentary community, Kaceytron's claim to fame is her public acts of degeneracy and brazen acts of copyright infringement.[3] Kaceytron's streams comprise of her watching unlicensed, third-party content while smoking copious quantities of cannabis and impersonating (albeit unintentionally) the cartoon characters Beavis and Butthead.[4]

19. Sometimes, Kaceytron is not even conscious while streaming unlicensed, third-party content. The most infamous example occurred in June 2023 during one of Kaceytron's subathons (*i.e.*, a streaming marathon to acquire more paying subscribers). During the subathon, Kaceytron streamed entire episodes of the television show *Kitchen Nightmares* while passed out

---

[3] Kaceytron – like most of Hasan Piker's Waiting Room – is hopelessly in love with him. Her penchant for engaging in perversity in public always seems to get the better of her. The most unnerving example involving streaming herself sniffing Hasan Piker's bedsheets. Hasanabi Productions, "Hasan Reacts to Kaceytron Sniffing his Bedsheets" (June 3, 2021), *available at*: https://youtu.be/P1T3jISmWAk?si=akvmPGHVsKIMRrvF
[4] *Compare* Ex. H *with* Nerdy stuff, "Beavis and Butt-Head laughing," *available at:* https://youtu.be/U7UBy1usnrg?si=wLRtlZHsGObvp7P0

8

from her overzealous consumption of cannabis.[5]

20.     On June 25, 2023, Kaceytron was temporarily banned by Twitch due to her chronic copyright infringement.[6] When the ban became public, Kaceytron posted the following on X: "and ill do it again" (original spelling).[7]

**Background of H3Snark**

21.     H3Snark is part of a genre of message boards – known as subreddits – on the website, Reddit. Snark subreddits comprise of "fallen fans" of a particular entertainer. Over time, there have been numerous snark subreddits regarding TEI's podcasts and of the Kleins. Many were banned by Reddit for violating its Content Policy – such as r/Frenemies and r/Frenemies2.

22.     H3Snark was created on August 30, 2023 by Doe No. 1 – who was a fanatical Trisha Paytas ("Trisha") fan. Doe No. 1 became a "fallen fan" when the TEI series, *Frenemies* (which was co-hosted by Ethan and Trisha), ended abruptly in June 2021.

23.     H3Snark became a haven for "fallen fans" of TEI's podcasts and the Kleins. While the average viewer would move on with their lives after becoming disinterested in a podcast, H3Snark "fallen fans" religiously watch TEI produced content with orgiastic hatred. H3Snark enables these deranged and chronically unemployed fallen fans to share their perverse pleasure of hate-watching TEI content with others by providing infringing clips and links to TEI content.

24.     Beginning in the fall of 2023, H3Snark experienced a surge of new users who

---

[5] LSF Mirror, "Kaceytron sleeping during subathon while broadcasting Kitchen Nightmares," *available at* https://arazu.io/t3_15jo8xq/?timeframe=all&category=hot
[6] Rahman Shaukat, GameRant, "Twitch Has Banned Kaceytron" (June 26, 2023) *available at*: https://gamerant.com/twitch-banned-kaceytron/
[7] Kaceytron, X, (June 25, 2023 at 9:52 p.m.), *available at*: https://x.com/kaceytron/status/1673192392692834305

were "fallen fans" of the TEI series, *Leftovers*. The show was co-hosted by Ethan and the most prominent alt-left streamer on the website Twitch, Hasan Piker p/k/a HasanAbi ("Hasan"). On September 14, 2023, Ethan and Hasan debated various issues concerning China and Taiwan, such as whether Taiwan should be independent, the propriety of China's subjugation of Tibet and the genocide of the Uyghurs.[8] Due to Ethan pushing back on Hasan's pro-China positions, several *Leftover* fans who had an ecclesiastical parasocial relationship with Hasan flocked to H3Snark because they felt Ethan was critiquing them personally.

25.     The surge of new users to H3Snark exploded after October 7, 2023. The Kleins are dual Israeli-American citizens. Hila was born and raised in Israel, where she served as a secretary during her mandatory conscription into the Israeli Defense Forces ("IDF").[9] While both Ethan and Hila are highly supportive of Palestinian self-determination and extremely critical of Israel and its government, the Kleins support a two-state solution as the best interim solution to the conflict.[10]

26.     In the wake of October 7th, Hasan emerged as the modern incarnation of The Grand Mufti Hajj Amin al-Husseini ("Al-Husseini").[11] Like Al-Husseini, Hasan became a

---

[8] H3 Podcast, "Joe Biden Is Getting Impeached – Leftovers #57," at 50:06 (September 14, 2023), *available at*: https://www.youtube.com/live/EeFuFKH-uOo?si=J3-Z-J7jWtkpv_Bu&t=3006

[9] H3 Podcast Highlights, *Hila From H3H3 Discusses Her Time In the Israeli Military (IDF)* (Apr. 23, 2022), at 0:40-1:04, *available at*: https://www.youtube.com/watch?v=ytOl5hbTrCY.

[10] H3 Podcast, *i made a mistake. i'm sorry. – H3TV #93* (October 9, 2023), at 2:03:40-2:03:58, 2:05:14-2:05:20, 3:35:56-3:36:17, *available at*: https://www.youtube.com/live/ZNFeRPMOu8g?si=4jE4j8SsuGKOuiPL; H3 Podcast, *Israel vs. Gaza – Leftovers #61* (Oct. 12, 2023), at 8:26-9:20, 1:15:22-1:15:38, 2:52:33-2:52:41, *available at*: https://www.youtube.com/live/JFznOHunD_c?si=vtd4HrejPjU6kzzx; H3 Podcast, *Jay Shetty Exposed By Ex-Girlfriend & He Lied About Being A Monk – After Dark #139* (March 2, 2024), at 2:24:16-2:24:31, *available at*: https://www.youtube.com/live/5XrPXgcKwVc?si=893H-4SIKBG46jLD

[11] World War Two, *The Nazi-Islam Alliance? – Amin al-Husseini – WW2 Biography Special* (Dec. 21, 2021), *available at*: https://youtu.be/K07j-wuL8sw?si=en3seNLjS0JRmxHj; The World History Channel, *Why Did The Grand Mufti Of Palestine Collaborate With Nazi*

passionate advocate and highly charismatic leader of the Palestinian cause.[12] Like Al-Husseini,

Hasan used his massive platform to spread genocidal rhetoric about anyone advocating for the

right of Jewish self-determination in their ancestral homeland (*i.e.*, Zionists).[13] The primary

difference between Hasan and Al-Husseini is that Al-Husseini worked with the Nazis and

advocated the annihilation of Jews while Hasan advocates the annihilation of all Zionists.[14] Since

the vast majority of Jews in the United States say caring about Israel is "essential" or

"important," this would necessarily include the vast majority of Jews[15] – even if they support the

---

*Germany?* (Jan. 30, 2025), *available at*: https://youtu.be/aVeXPFY7shI?si=ZT4GYoa27xKF6-kG; Casual Historian, *How the Zionists responded to World War Two and the Holocaust* (Feb. 8, 2025), *available at*: https://youtu.be/w6NrUiUhYiA?si=EswHI27G-9MW8OH4; Casual Historian, *The Palestine Mandate: The Origins of the Israeli-Palestinian Conflict (Supercut)* (Dec. 28, 2023), *available at*: https://youtu.be/vUuR-3tw9p8?si=EzAVrpG5IZHUKa8Y; United States Holocaust Memorial Museum, Holocaust Encyclopedia, "Hajj Amin al-Husayni: Wartime Propagandist," *available at*: https://encyclopedia.ushmm.org/content/en/article/hajj-amin-al-husayni-wartime-propagandist?parent=en%2F11094; United States Holocaust Memorial Museum, Holocaust Encyclopedia, "Hajj Amin Al-Husayni: Arab nationalist and Muslim Leader," *available at*: https://encyclopedia.ushmm.org/content/en/article/hajj-amin-al-husayni-arab-nationalist-and-muslim-leader?parent=en%2F11104; Wikipedia, "Amin al-Husseini," *available at*: https://en.wikipedia.org/wiki/Amin_al-Husseini

[12] Benny Morris, *1948: A History of the First Arab–Israeli War, p.* 23 (Yale Univ. Press 2008).

[13] Philip Mattar, *The Mufti of Jerusalem: Al-Hajj Amin Al-Husayni and the Palestinian National Movement, pp.* 105–06 (Rev. ed. Columbia Univ. Press 1992). Britannica, "Zionism," *available at*: https://www.britannica.com/topic/Zionism; Jewish Virtual Library, "Zionism: A Definition of Zionism," *available at*: https://www.jewishvirtuallibrary.org/a-definition-of-zionism; *see also* Tracy Wilkinson, Los Angeles Times, "Is Zionism patriotism or racism? Big disagreements over a word in use for 125 years" (May 22, 2024), *available at:* https://www.latimes.com/world-nation/story/2024-05-22/zionism-disagreement-over-a-word-in-use-for-125-years; Jewish Virtual Library, "Zionism: Table of Contents," *available at*: https://www.jewishvirtuallibrary.org/zionism

[14] Jeffrey Herf, *Nazi Propaganda for the Arab World, p.* 213 (Yale Univ. Press 2009); Kause-Michael Mallman and Martin Cuppers (Translated by Krista Smith) *Nazi Palestine* (2010); David Patterson, *A Genealogy of Evil: Anti-Semitism from Nazism to Islamic Jihad* (Cambridge Univ. Press 2010).

[15] Backa A. Alper, Pew Research Center, "How U.S. Jews are experiencing the Israel-Hamas war" (April 2, 2024), *available at*: https://www.pewresearch.org/short-reads/2024/04/02/how-us-jews-are-experiencing-the-israel-hamas-war/; Justin Nortey, Pew Research Center, "U.S. Jews have widely differing views on Israel" (May 21, 2021), *available at*: https://www.pewresearch.org/short-reads/2021/05/21/u-s-jews-have-widely-differing-views-on-

11

Palestinian cause and vehemently condemn the actions of the Israeli government.



Al-Husseini Meets Adolf Hitler, November 28, 1941



Al-Husseini With His Close Friend Heinrich Himmler, 1943

israel/; The Jewish Majority, "New Poll: Jewish Voice for Peace Does Not Represent Vast majority of U.S. Jewish Community" (Feb. 12, 2025), *available at*: https://img1.wsimg.com/blobby/go/2921c434-f7d7-43f4-ade6-3a5591444c85/downloads/97dc308b-4559-4e42-a55e-53c77f75c044/Press%20release%202.11.2025.pdf?ver=1739292818681

12

"Arabs, rise as one man and fight for your sacred rights. Kill the Jews wherever you find them.

This pleases God, history and religion. This saves your honor.

God is with you." – Al Husseini (March 1, 1944 on Nazi radio)

27.     On October 12, 2023, the last episode of *Leftovers* aired. It was comprised of a discussion between Ethan and Hasan regarding the Israel/Palestinian conflict and the events of October 7th.[16] During the discussion, Ethan expressed his support of the Palestinian cause and empathy for their suffering, along with condemning Israeli Prime Minister Benyamin Netanyahu. At the same time, Ethan attempted to humanize the victims of October 7th to Hasan in the hope that empathy and mutual understanding could begin to heal the divide. Hasan was unpersuaded and the relationship with Ethan and Hasan began to deteriorate.

28.     In the aftermath of the falling out between Ethan and Hasan, H3Snark became a radioactive hub of "fallen fans" of TEI content and the Kleins. It became a focal point for spreading vicious lies, outlandish conspiracy theories and hallucinatory misrepresentations about the Kleins.

**The Rampant Copyright Infringement on H3Snark**

29.     Despite their hatred towards the Kleins, the users of H3Snark had an insatiable appetite for TEI's content. The H3Snark users, however, did not want TEI to receive any views or advertising revenue from their consumption of TEI's content. As a result, H3Snark became a locus of copyright infringement of TEI content – as detailed below.

30.     One method the H3Snark Mods employed to consume TEI content was to share links of TEI content on YewTube – a website that provides unauthorized access to YouTube

---

[16] H3 Podcast, "Israel vs Gaza – Leftovers #61" (October 12, 2023), *available at*: https://www.youtube.com/live/JFznOHunD_c?si=Cbfod032xwJ5e-FQ

13

videos and publicly performs them, which constitutes copyright infringement. *See Hunley v. Instagram, LLC,* 73 F.4th 1060, 1073-74 (9th Cir. 2023). YewTube had particular appeal to H3Snark Mods and H3Snark users because a video watched on YewTube does not result in a view or advertising revenue to the original on YouTube.

31.     H3Snark Mods conducted live chats when TEI content was broadcast live. During the live chats, the H3Snark Mods would spam the chat with YewTube links of the broadcast. Once the livestream ended, the H3Snark Mods concealed the evidence of their copyright infringement by deleting the live chat logs. Below are true and correct screenshots of the H3Snark mods spamming the live chat with YewTube links to TEI copyrighted content.





32.     Through various comments to posts, Doe No. 3 (*i.e.*, u/sarahornejewetts)

encouraged H3Snark users to use YewTube as an alternative to watching the TEI's video on its

official channel. Doe No. 3's comments were later wiped.  Due to Doe No. 3's efforts, the user

was annointed as one of the H3Snark Mods. Some examples are contained below.

15

a. In August 2024, the u/PearlUnicorn created the post: "For those who wonder why Snarkers watch, moments like the second button failure." Below is a true and correct screenshot of Doe No. 3 stating: "*We encourage folks to watch on yewtube since it doesn't play ads or contribute to their view counts*." As can be noted, Doe No. 3's comment was subsequently wiped from August 2024 post.





b. On August 28, 2024, the H3Snark Moderators created a post entitled "MEGATHREAD: The H3 Show – Aug 28 2024." Below is a true and correct screenshot of Doe No. 3 providing a link to the TEI video *Content Court: Jack Doherty – H3 Show #48* on

16

YewTube.[17] As can be noted, Doe No. 3's comment has been wiped from the August 28, 2024 post.



33.　　　Under the H3Snark wiki page for "tools-tips-guides," H3Snark Mods also instructed H3Snark users on how to create clips of TEI content so these clips could be posted on H3Snark. At one point, the H3Snark Mods even instructed users how to download "Members-Only" content (*i.e.*, TEI content only accessible to paying members) so that they could be posted on H3Snark. To hide their inducement of copyright infringement, the H3Snark Mods deleted the



---

[17] While Doe No. 3's post just contained a hyperlink labeled "Watch on Yewtube," the link would direct users to https://yewtu.be/watch?v=DCw4csgcEsk.

portion on downloading "Members-Only" content from the guide. A true and correct screenshot of the portion regarding "Members-Only" content is provided below.

**TEI Issues Takedown Notices for Infringing Posts and Comments on H3Snark**

34.      TEI began to fight back against the copyright infringement on H3Snark by issuing takedown notices pursuant to 17 U.S.C. Section 512(c)(3) ("DMCA Takedowns"). TEI was extremely surgical about which H3Snark posts would be subject to DMCA Takedowns. Relying on the most pertinent fair use decisions,[18] TEI issued DMCA Takedowns only for: (1) posts/comments that uploaded an entire TEI episode onto Reddit – particularly paywalled TEI content; (2) comments that provided a YewTube link to entire episodes of TEI content; or (3) posts that contained a clip of TEI content with a descriptive, non-critical title and the comments were locked by the H3Snark Mods or there were no comments after several hours.

a.      August 1, 2024 DMCA Takedown: On August 1, 2024, TEI issued a DMCA Takedown for the H3Snark post entitled "H3 Live Show Behind the Scenes." The post contained a complete version of TEI's video *H3 Podcast BTS #53* – which was "Members Only" content (*i.e.*, accessible only to paying members of *The H3 Podcast* YouTube channel). On August 2, 2024 (*i.e.* one day later), Reddit honored this DMCA Takedown.

b.      August 30, 2024 DMCA Takedown: On August 30, 2024, TEI issued a DMCA Takedown for a comment by Doe No. 3 (*i.e.*, u/sarahornejewetts) on the H3Snark Post entitled "MEGATHREAD: The H3 Show - Aug 28, 2024" (the "8/30/24 Takedown"). The

---

[18] *In re DMCA Subpoena to Reddit, Inc.*, 441 F.Supp.3d 875, 883-886 (N.D. Cal. 2020); *Hughes v. Benjamin*, 437 F.Supp.3d 382, 390-394 (S.D.N.Y. 2020); *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1157-1164 (9th Cir. 2022); *Warhol*, 598 U.S. at 525-550; *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 627-631 (9th Cir. 2003); *Hosseinzadeh*, 276 F.Supp.3d at 41-42, 45-47; *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170-1183 (9th Cir. 2012).

18

comment contained a YewTube link to the TEI video *Content Court: Jack Doherty – H3 Show #48*.[19] On September 9, 2024 (*i.e.*, nine days later), Reddit honored the 8/30/24 Takedown.

   c.  September 18, 2024 DMCA Takedown: On September 18, 2024, TEI issued a DMCA Takedown for the H3Snark post entitled "Ethan and Dan confirm that posting to snark will get you banned" (the "9/18/24 Takedown"). The post solely comprised of a clip from the TEI video *Ethan Debates Anti-Semitic Sneako Fan – H3 Show #55*. The post contained no comments because the H3 Snark Mods locked the post. Reddit never informed TEI whether the 9/18/24 Takedown was honored.

   d.  November 22, 2024 DMCA Takedowns: On November 22, 2024, TEI issued two DMCA Takedowns:

    i.  First Takedown: The first DMCA Takedown was for the H3Snark post "ethan talks positively about celebrity poker tour's sponsor, a sports gambling app named fliff h3 show #83." The post contained a clip from the TEI video *We Play Poker w/ Ninja, Impractical Jokers, & More! – H3 Show #83*. The post contained two comments: (1) "Dude ur flair is actually fucking frying me rn" (original spelling); and (2) "The downfall is real man." The post contained no further comments because the H3Snark Mods locked the post. On November 29, 2024 (*i.e.*, seven days later), Reddit informed TEI that it honored this DMCA Takedown.

    ii.  Second Takedown: The second DMCA Takedown was for the H3Snark post entitled "Ethan describes his issues with Hasan as 'personal beef.'" This post contained a clip from the TEI video entitled *Logan Paul Posted F\*\*\*KING INSANE Cringe –*

---

[19] The comment for u/sarahornejewetts (*i.e.*, Doe No. 3) no longer exists on the post, but a screenshot of it is show in connection with Paragraph 32.b, *supra*.

*H3 Show #84.* At the time this DMCA Takedown was issued, the post had been up for over two hours and had no comments at that time (but 130 upvotes).[20] On December 5, 2024 (*i.e.*, nearly two weeks later), Reddit informed TEI that it honored this DMCA Takedown.

      e.      November 26, 2024 DMCA Takedowns: On November 26, 2024, TEI issued two DMCA Takedowns.

      i.      First Takedown: The first DMCA Takedown was for the H3Snark post "LB says '[far leftists] hate israel because israel is backed by the west' and this can lead to antisemitism. Ethan agrees, then says freedom of religion, speech, press, and to 'control what happens in your own work space' would be under state-control in communism – h3 show #85." (original spelling and brackets). The post contained a clip from the TEI video entitled *I Haven't Been Well – H3 Show #85.* The post contained no comments because the H3Snark Mods locked the post. On December 6, 2024 (*i.e.*, ten days later), Reddit informed TEI that it honored this DMCA Takedown.

      ii.      Second Takedown: The second DMCA Takedown for the H3Snark post "Lena asks Lonerbox about civilians and doesn't get a direct answer: 'It's always civilians are dying… BUT… and then theres a reason for justifying it.'" (original ellipses and spelling) (the "Second 11/26/24 Takedown"). The post contained a clip from the TEI video entitled *I Haven't Been Well – H3 Show #85.* The post contained no comments because the H3Snark Mods locked the post. On December 6, 2024 (*i.e.*, ten days later), Reddit informed TEI that it honored this DMCA Takedown.

---

[20] After this DMCA Takedown was issued (but before Reddit honored it), the post received additional comments. A true and correct PDF printout of the post taken on November 22, 2024 is attached hereto as Exhibit A. *Compare* Ex. A *with* https://www.reddit.com/r/h3snark/comments/1gxofik/ethan_describes_his_issues_with_hasan_as _personal/

**The H3Snark Mods' Efforts to Issue Fraudulent Counternotifications**

35.     The H3Snark Mods made a concerted effort to issue fraudulent counternotifications to TEI's DMCA Takedowns, as detailed below:

a.     On January 15, 2025, Reddit informed TEI that a so-called counternotification was issued against both the 8/30/24 Takedown the 9/18/24 Takedown (the "First Fraudulent Counternotification").[21] The First Fraudulent Counternotification was issued on October 18, 2024 – *i.e.*, Reddit informed TEI nearly three months later.

i.     On its face, the First Fraudulent Counternotification failed to satisfy the requirements of 17 U.S.C. Section 512(g)(3) because it failed to include: (1) the issuer's address and telephone number; (2) consent to jurisdiction and service of process; and (3) a statement made under penalty of perjury.

ii.     Further, the First Fraudulent Counternotifications contained numerous indicia of being fraudulent because: (1) it was a single counternotification for posts made by two different users (*i.e.* u/sarahornejewetts and u/obrienpotatoes); and (2) it misrepresented that the 8/30/24 Takedown was for the post and not the comment with the YewTube link.

iii.     It was also evident the First Fraudulent Counternotification was issued by the H3Snark Mods because it stated: (1) "We are writing to contest the removal of two posts from ***our subreddit*** under alleged copyright claims" (emphasis added); (2) "***We believe these reports may have been filed by fans rather than the legitimate copyright holder***"

---

[21] A true and correct copy of the First Fraudulent Counternotification is attached hereto as Exhibit B.

(emphasis added) – despite the fact that TEI's counsel's contact information was provided in both the 8/30/24 Takedown and 9/18/24 Takedown; and (3) the name of the issuer was "Michael Anderson" – a generic name that would make it impossible to identify the issuer of the First Fraudulent Counternotification.

     iv.    On January 16-17, 2025 (*i.e.*, two days after receiving the First Fraudulent Counternotification), TEI explained in exacting detail the facts and law demonstrating the First Fraudulent Counternotification was invalid. On March 18, 2025 (*i.e.*, over two months later), Reddit responded that it agreed that the First Fraudulent Counternotification was invalid – but claimed that it would refuse to honor the 8/30/24 Takedown because the post only linked to TEI's video on YouTube. The same day, TEI explained to Reddit that this was false because the 8/30/24 Takedown explicitly stated it was directed at the comment by Doe No. 3 (*i.e.*, u/sarahornejewetts) and contained a YewTube link, including providing a screenshot for the comment. To date, Reddit has not responded.

     b.    Additionally, on March 18, 2025 (the same day Reddit informed TEI that the First Fraudulent Counternotification was invalid), Reddit notified TEI that another counternotification was issued regarding the 9/18/24 Takedown (the "Second Fraudulent Counternotification").[22] The Second Fraudulent Counternotification was issued on December 5, 2024 (*i.e.*, Reddit notified TEI three and a half months later).

     i.    The Second Fraudulent Counternotification contained no indicia that the issuer considered the four fair use factors prior to issuing the Second Fraudulent Counternotification – which is unlawful. *See Hosseinzadeh*, 276 F.Supp.3d at 36; *Hughes*, 437

---

[22] A true and correct copy of the Second Fraudulent Counternotification is attached hereto as Exhibit C.

F.Supp.3d at 394-395; *cf Lenz v. Universal Music Group*, 815 F.2d 1145, 1149, 1154-55 (9th Cir. 2016). Further, the language of the Second Fraudulent Counternotification demonstrated the issuer – u/obrienpotatoes – did not understand fair use in general, by stating: (1) "This was an abuse of the fair use system" (which is bizarre because the u/obrienpotatoes was claiming fair use, not TEI); and (2) the conclusory assertion "Even so, it would still be allowed under fair use" without any analysis. This is further emphasized by an April 11, 2025 post on X by @obrienpotatoes1. In the post, @obrienpotatoes posted the cease and desist letter sent by TEI's counsel and defended the Reddit post by claiming it was only "A MINUTE AND A HALF LONG CLIP" – *i.e.*, only focusing on the amount used and not the other fair use factors.[23]

ii.  The Second Fraudulent Counternotification also echoed language similar to the First Fraudulent Counternotification – indicating the H3Snark Mods worked with u/obrienpotatoes to issue the Second Fraudulent Counternotification, namely: "This subreddit has also been mercy to many **bad faith brigades** recently, so ***I do not believe this appeal was filed by the actual copyright owner***" (emphasis added) – despite the 9/18/24 Takedown containing TEI's counsel's contact information.

iii.  Additionally, after the Second 11/26/24 Takedown was issued, one of the H3Snark Mods (who later deleted their account) left a comment on the post stating: "I reached out via DM to discuss how to appeal these, if you're willing to fill out the form." This further emphasizes the H3Snark Mods coordinated a campaign of issuing fraudulent counternotifications to enable H3Snark's copyright infringement of TEI's works.

c.  The H3Snark Mods went on a public relations campaign to paint TEI's DMCA Takedowns as fraudulent to cover up their copyright infringement. To achieve this

---

[23] *See* https://x.com/obrienpotatoes1/status/1910711822212067372

objective, the H3Snark Mods authored several posts misrepresenting the facts.[24]

        d.      After Ethan became vocal about pursuing claims against H3Snark, the H3Snark Mods began deleting their posts, comments and accounts *en masse* to perpetuate their false narrative and conceal their copyright infringement (along with other illegal activity, such as organized harassment and defamation).

        e.      On March 5, 2025, a YouTuber by the name of "The Law" posted a video on YouTube entitled *Dear H3Snark, I see you.*[25] In the video, The Law admits he was a former H3Snark user who came to reject the obsessive and destructive behavior he saw taking over the subreddit. He documented the acts of copyright infringement by H3Snark users and H3Snark Mods (and other unlawful conduct), including their attempts to conceal their unlawful conduct. The video documents:

        i.      The H3Snark Mods deleted posts after Ethan announced plans to pursue legal action against H3Snark for harassment (1:18-1:41);

        ii.      How the H3Snark Mods abused the live chat feature on Reddit to promote harassment and defamatory statements, including promoting some of the egregious offenders into H3Snark Mods (2:02-4:54);

        iii.      How the H3Snark Mods use "sock puppet accounts" (*i.e.*, using a

---

[24] https://www.reddit.com/r/h3snark/comments/1h851se/false_copyright_strike_tracker_megathread_ethan/;
https://www.reddit.com/r/h3snark/comments/1fdmu80/h3ethan_klein_is_abusing_the_copyright_system_by/;
https://www.reddit.com/r/h3snark/comments/1h79qk3/another_false_copyright_strike_likely_from_ethan/;
https://www.reddit.com/r/h3snark/comments/1hvtb5v/confirmed_ethan_klein_hired_an_attorney_to_issue/

[25] The Law, *Dear H3Snark, I see you.* (March 3, 2025), *available at:* https://youtu.be/lfjbgNjo0Oc?si=zbNomCBmxySgCuvU

24

false online identity for deceptive purposes) to conceal their identities while engaging in harassment – which were deleted after Ethan announced he would pursue legal action against H3Snark (4:55-6:51); and

        iv.      How the H3Snark Mods purposefully lied about TEI's DMCA Takedowns to conceal their copyright infringement and obfuscate their intent to siphon views and ad revenue away from TEI (6:52-9:11).

**TEI Creates and Registers *The Nuke***

36.      By the fall of 2024, Ethan and Hila Klein's concern reached a fever pitch over Hasan radicalizing his audience with propaganda from Ansar Allah a/k/a The Houthis, Hezbollah and Hamas. The Kleins were equally concerned with Twitch's refusal to enforce its Community Guidelines against Hasan and his so-called "Waiting Room" – *i.e.*, other Twitch streamers, like Kaceytron, who parrot Hasan and parasitically leach off his audience by broadcasting immediately before or after his streams.

37.      Hasan and his Waiting Room hijacked the necessary and important discussion of the Israeli-Palestinian conflict and the Gaza War. They employed genocidal rhetoric that painted all Israelis as subhuman warranting annihilation. The term "Zionist" lost all meaning and quickly mutated into a thinly-veiled dog whistle for Jews.[26] To combat the tsunami of hateful rhetoric,

---

[26] The term "Zionist" was used as a slur to paint anyone who supported the existence of Israel or a two-state solution as a Kahanist (Jewish Supremacist) or Israeli Religious Nationalist. In the most recent Israeli Legislative Election in 2022, the coalition of these parties only received 10.84% of the vote. Wikipedia, "Kahanism" *available at*: https://en.wikipedia.org/wiki/Kahanism; Institute for Middle Eastern Understanding, "Fact Sheet: Meir Kahane & The Extremist Kahanist Movement" (May 17, 2024), *available at*: https://imeu.org/article/fact-sheet-meir-kahane-the-extremist-kahanist-movement; Wikipedia, "National Religious Party," *available at*: https://en.wikipedia.org/wiki/National_Religious_Party; The Israel Democracy Institute, "National Religious Party (Mafdal)," *available at*: https://en.idi.org.il/israeli-elections-and-parties/parties/national-religious-party/; Wikipedia, "2022 Israeli legislative election," *available*

25

Ethan and Hila Klein – through TEI – created *Content Nuke: Hasan Piker.*

38.     *The Nuke* was written, shot and edited from December 2024 through January 2025.  On January 27, 2025 (*i.e.*, four days before the Nuke was publicly released on TEI's h3h3Productions YouTube channel), TEI submitted its application to register *The Nuke* with the United States Copyright Office (the "USCO").  On January 28, 2025, the USCO received the deposit copy of the Nuke (the "Deposit Copy").  The registration number for *The Nuke* is PAu 4-256-429.

39.     The Deposit Copy varied slightly from the broadcast version of *The Nuke* (the "Broadcast Version"). First, the Deposit Copy did not contain the conclusion and sponsor segment that was contained in the Broadcast Version. Second, to prevent *The Nuke* from being age-restricted by YouTube (which would limit its reach), TEI was required to fully blur out the footage of the Houthis entering the bridge of the *Galaxy Leader* and black out the footage of Hamas releasing hostages from November 2023. Third, minor visual edits were made. Ultimately, all of the Deposit Copy was incorporated into the Broadcast Version.[27]

### ***The Nuke***

40.     *The Nuke* is a tragi-comic documentary critiquing Hasan and Twitch. It consists of original footage, highly edited montages, parodic skits and archival materials (a great deal of which are owned by TEI). *The Nuke* can be divided into seven sections: (1) The Prologue; (2) The Twitch Parody Sketch; (3) The Houthi Section; (4) The Hezbollah Section; (5) The Hamas Section; (6) The Twitch Section; and (7) The Conclusion.

---

*at*: https://en.wikipedia.org/wiki/2022_Israeli_legislative_election.

[27] TEI is concurrently-filing with this Complaint a Notice of Lodging accompanied by a flash drive containing various video exhibits referenced in the Complaint (the "Flash Drive"). A true and correct copy of the Deposit Copy is located on the Flash Drive as Exhibit D. A true and correct copy of the Broadcast Version is located on the Flash Drive as Exhibit E.

a. <u>The Prologue (Ex. E at 0:00:00-0:25:40)</u>: The prologue walks the audience through Ethan's thesis of *The Nuke*: that Hasan radicalizes his audience with genocidal and antisemitic terrorist propaganda.

i. While admitting both himself and Hasan are polarizing figures with controversial takes, Ethan explains he grew concerned with Hasan's rhetoric after hearing him excuse Russian and Chinese genocide and imperialism, namely Hasan's positions on Crimea, Tibet, Taiwan and the Uyghurs.

ii. Once October 7th occurred, Ethan's concerns were exacerbated. He received a torrent of antisemitic comments from Hasan's audience and saw Hasan downplay the sexual violence perpetrated by Hamas on October 7th.

iii. Ethan explains that the primary difference of opinion between him and Hasan (and his audience). While both are aligned on supporting the Palestinian cause – including condemning Israeli Prime Minister Benyamin Netanyahu, Israeli settlements and Israeli settlers, they differ in one key aspect regarding how to solve the conflict: Ethan believes in a two-state solution, while Hasan (and his audience) believe in a one-state solution.

iv. Ethan articulates the concerns Israelis have with a one-state solution: Israel has been at war with its Arab neighbors since the country's inception. As a nation of refugees, the idea of suddenly becoming a minority raises legitimate concerns – particularly for the Mizrahi Jews (*i.e.*, Jews from Arab countries) who were expelled from Arab countries.

v. Ethan then shows archival footage of Hasan: (1) supporting terrorism and glorifying terrorists; (2) admitting to hiding his "power level" (*i.e.*, extremism) because it is a more palatable way to introduce young people into the "radicalization funnel"; (3) conceding to being a propagandist; and (4) expressing vitriolic hatred of liberals. Ethan further

27

points out that Twitch takes no action to moderate Hasan.

vi. Ethan ends The Prologue by expressing his underlying fear that he played a role in mainstreaming Hasan and that he radicalized Ethan's audience.

b. The Twitch Parody Sketch (Ex. E at 0:25:41-0:30:39): The next section involves Ethan parodying a Twitch advertising executive. In the scene, Ethan mocks how Twitch has embraced Hasan's extremist rhetoric and rebrands terrorism as socially acceptable. After the sketch ends, Ethan shows a media bias report that ranked Hasan as one of the most extreme and unreliable news sources.

c. The Houthis Section (Ex. E at 0:30:40-0:55:33): The Houthi Section focuses on Hasan radicalizing his audience by glorifying and disseminating Houthi propaganda.

i. Ethan beings with an overview of various Houthi atrocities and how they contradict leftist values. Examples include recruiting child soldiers, shelling and blocking aid to civilians, ruining agricultural land with mines, oppressing women and members of the LGBTQ community, torturing and killing women and slavery. Ethan also highlights the Houthi's antisemitism – such as performing Nazi salutes and the slogan on their flag calling for "Death to Israel" and "Curse Upon the Jews."

ii. Ethan critiques Hasan's coverage of the Houthis by using his stream with Nick Polom p/k/a Nmplol ("Nick") as a case study. Hasan exploits Nick's political naiveté by putting on a Houthi propaganda music video and leaving Nick alone who watches in abject horror. Ethan cites Twitch's Community Guidelines – which explicitly prohibit showing terrorist propaganda for any purpose. Despite this, Twitch refuses to enforce its Community Guidelines against Hasan. Hasan downplays the fact that the Houthi propaganda video is terrorist propaganda to Nick by describing the video as merely a "musical" and the Houthis as "musical

28

people." When Hasan mischaracterizes the hijacking of the ship the *Galaxy Leader* as an effective deterrent against Israel, Ethan debunks Hasan's assertions that the ship was in Houthi waters, destined to Israel or an Israeli ship. Ethan also excoriates Hasan for minimizing the Houthis taking the crew of the *Galaxy Leader* hostage.

iii. Ethan also critiques Hasan's misguided belief that, if Israeli commerce is disrupted, Israelis will leave Israel. Ethan demonstrates 80% of Israelis were born in the country and have nowhere else to go. This is exacerbated by the fact that the majority of Jewish Israelis fled (or are descendants from those who fled) Arab countries. The argument that Jews will "return where they came from" is ahistorical and denies their connection of Jews to the Middle East. Rather, it furthers an antisemitic conspiracy theory that questions the origins of the Jews in an attempt to brand Jewish Israelis as outsiders and colonizers.

iv. Ethan shows another example of Hasan watching and praising a different Houthi propaganda music video. To mock Hasan's laudatory coverage of this video, Ethan juxtaposes the Houthi music video with a highly edited version of the Miami Boys Jewish Choir singing "Yerushalim."

v. Ethan lambasts Hasan's interview of the Houthi terrorist Rashid Al-Haddad a/k/a Tim "Houthi" Chalamet ("Al-Haddad"). Al-Haddad became a viral sensation on TikTok when he shot footage of himself boarding the *Galaxy Leader*. Ethan mocks Hasan's self-described "journalism" through a montage of Hasan acting like a fan girl, asking frivolous questions and blindly accepting Al-Haddad's answers – particularly his absurd claim that he danced with the crew taken hostage and that he successfully convinced the crew to hate Israel.

vi. Ethan exposes Hasan's subsequent attempts to downplay Al-Haddad's Houthi connections as disingenuous and a form of bigotry. Not only did Hasan believe

29

he was speaking with a Houthi and promoted the interview as being with a Houthi, Al-Haddad's social media posts admitted and reinforced this fact. When confronted with Al-Haddad's social media posts that fail to distinguish between Jews and Zionists, Hasan engages in all forms of apologia to excuse Al-Haddad's genocidal and antisemitic rhetoric. Hasan even grotesquely compares Al-Haddad to Anne Frank – which Ethan mocks as the Twitch advertising executive.

vii. The Houthi section ends with Ethan excoriating Hasan with a montage of him cynically deflecting and evading criticism by exploiting the term "genocide." This hypocrisy is highlighted by footage of Hasan from a few years ago where he was unable to locate Yemen on a map (and even confusing it with Israel).

d. The Hezbollah Section (Ex. E at 0:55:44-1:01:43): The Hezbollah Section focuses on Hasan radicalizing his audience by disseminating and glorifying Hezbollah propaganda.

i. Ethan begins by highlighting some of Hezbollah's atrocities and how they contradict leftist values. Examples include engaging in terrorism resulting in the deaths of thousands of civilians, the assassination of Lebanese Prime Minister Rafik Al-Hariri, hijacking airplanes, firing 15,000 rockets in civilian areas, being a designated terrorist group and its participation in the Syrian genocide to prop up the dictator Bashar Al-Assad.

ii. Next, Ethan critiques Hasan by juxtaposing scenes of him downplaying and excusing Hezbollah's genocidal terrorism and praising Hassan Nasrallah (Hezbollah's former leader) with Nasrallah's numerous antisemitic and genocidal statements against Jews.

iii. Ethan goes on to critique Hasan's lazy and ignorant apologia for Hezbollah and analysis of the conflict, such as branding any criticism of Hezbollah as

Islamophobic and Hasan telling Nick that Israel attacked Lebanon because "they were just there." Ethan refutes these assertions by demonstrating Hezbollah began firing rockets at Israel the day after October 7th, killed over 100 Israelis and displaced over 200,000. Ethan questions how Hasan's falsehoods help his position when, in reality, Hasan's misrepresentations only exacerbate the conflict.

    e.  The Hamas Section (Ex. E at 1:01:44-1:11:50): The Hamas Section focuses on Hasan radicalizing his audience by disseminating and glorifying Hamas propaganda, coupled with denying the atrocities of October 7th.

      i.  Ethan begins by highlighting some of Hamas' atrocities and how they contradict leftist values. Examples include recruiting children, committing hundreds of suicide bombings that target civilians, firing 50,000 rockets into civilian areas, oppression of women, punishing homosexuality by death, stealing aid intended for Gazans for its own military use or exploiting Gazans by selling the aid back to them.

      ii.  Next, Ethan critiques Hasan's reaction to a Hamas propaganda video from November 2023 involving the release of hostages. Hasan gushes effusively over Hamas' treatment of the hostages. He even makes the absurd claim that hostages released in the future will chose to stay in Gaza rather than return to Israel. When a member of Hasan's audience points out the hostages are traumatized, Hasan claims the hostages are "just chillin." Ethan correctly points out that these scenes are staged by Hamas, that the hostages are still being held at gunpoint and provided instructions on how to behave, such as "keep waving."

      iii.  Ethan goes on to lambast Hasan's reaction to a Hamas propaganda video depicting Hamas creating homemade sniper rifles. Hasan plays the entire clip without any commentary or criticism. Once complete, Hasan's explanation for showing the video is a

31

nonsensical word salad of buzzwords that have nothing to do with the contents of the video.

iv. Ethan goes on to address Hasan's grotesque denial of sexual violence perpetrated by Hamas on October 7th. He shows a montage of numerous clips of Hasan explicitly denying the sexual violence of October 7th and scoffing at President Biden and Vice-President Harris discussing said violence. Ethan refutes Hasan's denials by showing clips of victim testimony from Sheryl Sandberg's documentary *Screams Before Silence* and displayed the conclusion of a United Nations report that stated:

> Overall, based on the totality of information gathered from multiple and independent sources at the different locations, there are reasonable grounds to believe that conflict-related sexual violence occurred at several locations across the Gaza periphery, including in the form of rape and gang rape, during the 7 October 2023 attacks. Credible circumstantial information which may be indicative of some forms of sexual violence, including genital mutilation, sexualized torture, or cruel, inhuman and degrading treatment, was also gathered.

v. Ethan concludes the section by addressing the heart of the matter. Hasan exacerbates the Israeli-Palestinian conflict by denying the suffering of Israeli victims to hold up Hamas as unimpeachable. As Ethan poignantly states:

> This conflict will never end until people realize that Palestinian liberation and Israeli security are not mutually exclusive. You need both. And it can be done, but not while people like Hasan lie, propagandize and incite hate. It's people like him, ironically, that prolong the conflict indefinitely. There's no space for conversation. There is no space for rational thought. There is no space for nuance. My position on Palestine is like five degrees off from where Hasan is. And to him and his community, I'm the devil. I'm a Nazi. It's delusional thinking. And it's destructive to their own cause.

f. The Twitch Section (Ex. E at 1:11:51-1:40:29): The Twitch Section explores the role Twitch plays in enabling Hasan and his Waiting Room to violate Twitch's Community Guidelines.

i. Ethan begins by critiquing Twitch's Chief Executive Officer, Dan

32

Clancy ("Clancy"). He points to Clancy's ineffectiveness as a CEO, namely rolling back his initiative to change revenue splits and the size of sponsor logos on stream – along with laying off significant portions of Twitch staff. Clancy explicitly states he is a fan of Hasan and is aware of his rhetoric. Clancy even sang Hasan "Happy Birthday" and forced Twitch employees to sing along while being filmed. Ethan also discusses the creepiness of Clancy's penchant for e-girls (*i.e.*, young, female Twitch streamers whose streams are about highlighting their physical assets) by pointing to two examples of Clancy's stories feature on the Twitch app being completely populated by e-girls.

ii.     Next, Ethan discusses another Twitch streamer who is a member of Hasan's Waiting Room, Morgan Kamal Majed p/k/a Frogan, by showcasing numerous instances of her moral bankruptcy. Despite Frogan claiming to support the Palestinian cause, she condemned the large streamer, Ludwig Ahgren ("Ludwig"), by telling him to keep his $10,000 donation to Palestine because Ludwig decided not to organize a charity drive for Palestinians (even though he encouraged his viewers to donate).

iii.     Ethan also highlights numerous instances of Frogan's cruelty. In one clip, Frogan wishes soldiers to get PTSD. A few days later – after the clip caused tremendous controversy – Frogan watched the clip while giggling and justifying her take. Despite veterans receiving protected status under Twitch's Community Guidelines, Twitch did nothing to sanction Frogan for these statements. In another clip, Frogan conducts a subathon where she promises to make a cake recreating September 11th if she reaches a certain goal. Once again, Twitch did nothing. Ethan highlights a tweet that Frogan made on the morning of October 7th, while the massacre was still ongoing. Frogan's tweet stated: "leftists preach and foam at the mouth at the thought of a revolution happening in america, but as soon as it happens in the

middle east what they're doing is wrong" (original spelling). Ethan juxtaposes this tweet with audio of cell phone conversations of victims of October 7th speaking their parents during their final moments.

iv.     Ethan critiques how Twitch props up Frogan, by refusing to sanction her, giving her awards and featuring her on Twitch's home page. He also mocks Frogan being nominated for a rising star award by her friends twice.

v.     Most notably, Ethan lambasts Twitch for allowing Frogan to host a panel at Twitchcon 2024. The panel involved a racial tier list with "Arab" at the top and "Loves Sabra" at the bottom. While the premise of the tier list is who can say the word "Habibi" (an Arabic term of affection), the term "Loves Sabra" was a dog whistle for Jews and Israelis for several reasons. First, Sabra is a well-known Israeli commercial hummus brand that is on the Boycott, Divestment and Sanctions list. Second, the term "Sabra" means a Jew born in Israel. Third, it falsely asserts Israelis misappropriated Arab culture and identity. As evidenced by a clip from Frogan's podcast, the purpose of disseminating this disinformation is to deny the long historical ties of Jews to the Middle East and the Levant. Ethan further highlights the hypocrisy and bigotry of these false claims by noting Arab culture and cuisine is Israeli culture and cuisine because the majority of Israeli Jews are from Arab countries or direct descendants of Jews from Arab countries. Fourth, Ethan was put in the "Loves Sabra" category with Denims (another member of Hasan's Waiting Room) "joking" that there should be a lower category for Zionist. Fifth, Ethan notes that Ben Shapiro ("Shapiro") is put in the thumbnail for the video with Ethan – despite Shapiro not being put on the list whatsoever. Rather, the only explanation is that both Ethan and Shapiro are Jewish and married to women born in Israel. Sixth, Ethan notes that the title of the video is *How Arab Are These Twitch Streamers?!* – which belies the assertion that the

34

ranking was merely about hummus. Ethan concludes this segment to point out the hypocrisy of the panel claiming to be concerned with minorities, while refusing to acknowledge why their tier list makes a Jewish man uncomfortable. Finally, Ethan marvels that Twitch approved the panel in the first place.

vi. Ethan critiques a Q&A session Clancy conducted on Twitch shortly after the controversy over the racial tier list erupted. Several chatters for the Q&A session asked Clancy to address the antisemitism on Twitch – all of whom were banned from the chat.

vii. Ethan addresses the yearlong ban Twitch imposed to prevent Israeli users from creating new Twitch accounts. The ban was enacted on October 13, 2023 (*i.e.*, six days after October 7th) – which is also the Global Day of Jihad (a day of mass rage, called for by Hamas leader, Khaled Mashal).[28] Despite numerous instances of Israeli Twitch streamers communicating directly with Twitch about the issue and trying to raise awareness online, Twitch either ignored or obfuscated the issue until there was a massive public outcry.

viii. Ethan goes on to excoriate Twitch for reinstating three well-known antisemites shortly after the ban was discovered: (1) Al-Haddad; (2) Nicolas 'Nico' Kenn De Balinthazy p/k/a Sneako; and (3) Amrou Fudl p/k/a Mryon Gaines from Fresh and Fit. Once again, Twitch reversed course after a public outcry.

---

[28] Andrew Jeong, Washington Post, "*France Bans Pro-Palestinian Protests Amid Call for Hamas 'Day of Rage'*" (Oct. 13, 2023) *available at*: https://www.washingtonpost.com/world/2023/10/13/france-palestine-protest-hamas-day-of-rage/; Simon Wiesenthal Ctr., "*Hamas Call for Worldwide 'Day of Rage'*", (Oct. 2023), *available at*: https://www.wiesenthal.com/about/news/hamas-call-for-worldwide.html; ABC News Live, "*Hamas Declares 'Day of Rage'*" (Oct. 13, 2023), https://www.youtube.com/watch?v=dOoNLREwxJs; Meredith Deliso, ABC News, "*Hamas 'Day of Rage' Protests Break Out in Middle East and Beyond*" (Oct. 13, 2023), https://abcnews.go.com/International/hamas-day-rage-protests-break-middle-east/story?id=103955873.

35

ix.    Ethan points out how antisemitism and anti-Israel animus appears institutionalized at Twitch. Ethan cites two Twitch employees in leadership positions who made antisemitic and anti-Israel posts online. First is Fadzai Madzingira ("Madzingira") – who was investigated and suspended from her role in the British media regulatory agency, Oxcom. Madzingira was called out in the middle of the United Kingdom's Parliament for her anti-Israel and antisemitic posts shortly after October 7th. After she resigned, Madzingira was hired by Twitch as a Senior Manager in Twitch's Trust & Safety Policy department (*i.e.*, the department responsible for the Community Guidelines). Another example is Bridget Kyeremateng – who is Twitch's Senior Manager for Inclusive Marketing – and has a history of making antisemitic and anti-Israel posts, including shortly after October 7th.

x.    Ethan concludes the section by critiquing Twitch's biased and inconsistent enforcement of its Community Guidelines. He uses the ban of Steven Bonnell II p/k/a Destiny ("Destiny") as a case study. Destiny was permanently banned from Twitch for calling the streamer and transactivist Clara Sorrenti p/k/a Keffals "inbred." A montage is shown of Hasan repeatedly referring to Jews and Israelis as "inbred" or laughing at Jews being called "inbred." Hasan received no punishment from Twitch because he is Clancy's favorite streamer. Ethan recaps other examples of Hasan flagrant violations of Twitch's Community Guidelines that resulted in no consequences. Not only did Hasan call Jews and Israelis "inbred" and platformed terrorists and terrorist propaganda, Hasan threatened Senator Tom Cotton by replying to Senator Cotton's tweet with a schematic of the weapon used to assassinate Japanese Prime Minister Shinzo Abi. This is followed by a montage of numerous instances of alt-left streamers on Twitch making death threats without any (or minimal) consequences from Twitch.

36

g.    Conclusion (Ex. E at 1:40:30-1:42:05: Ethan ends *The Nuke* by summarizing the two reasons why he made the video. First, to stop Hasan's infiltration of mainstream media. Second, to hold Twitch accountable for enabling antisemitic and anti-Israel animus on its platform.

**H3Snark Promotes Kaceytron as a Substitute to Watching *The Nuke***

41.    Throughout January 2025, Ethan built up public interest in *The Nuke* by frequently discussing it on *The H3 Show*. The audience of Hasan and his Waiting Room – who comprised a large portion of the users on H3Snark – anticipated *The Nuke* with religious fervor to defend their proverbial Grand Mufti from criticism. These fanatics, however, did not want to watch the authorized version *The Nuke* because TEI would reap the benefits from the views and resulting advertising revenue.

42.    The H3Snark Mods knew that there was a huge demand to watch *The Nuke* through unauthorized channels and promoted "group viewing sessions" of *The Nuke* as follows:

a.    On January 30, 2025 (*i.e.*, the day before *The Nuke* was released), Doe No. 3 (*i.e.*, u/Jewettornesarah) – as an H3 Snark Mod and on behalf of the H3Snark Mods – created a pinned post entitled "MEGATHREAD | Content Nuke – Where to Watch & Discussion" ("First Inducement Post"). As a pinned community post, the First Inducement Post was featured at the very top of the H3Snark page in the "Community highlights" section before any other posts were visible. The H3Snark Mods did this to maximize the visibility of the First Inducement Post. The First Inducement Post featured Kaceytron as a place "to watch the nuke without showing support for H3" (*i.e.*, TEI) and a link was provided to her stream on Twitch. The First Inducement Post also stated that Kaceytron "supported" H3Snark "by engaging directly with [the H3Snark Mods] directly."  A true and correct PDF printout of the First Inducement Post is attached hereto as

Exhibit F.

b.      On January 31, 2025 (*i.e.*, the day *The Nuke* was released), the H3Snark Mods created and updated a pinned community post entitled "Ethan Klein's Content Nuke on Hasan Piker | H3 Snark Megathread" (the "Second Inducement Post"). The Second Inducement Post was also a pinned community post that was featured at the very top of the H3Snark page to maximize visibility. The Second Inducement Post featured Kaceytron as a place "to watch reactions to this video" (*i.e.*, *The Nuke*) and a link was provided to her stream on Twitch. A true and correct PDF printout of the Second Inducement Post is attached hereto as Exhibit G.

c.      At some point after January 31, 2025, the H3Snark Mods deleted the First Inducement Post and Second Inducement Post to conceal their contributory infringement of *The Nuke*.

43.      The H3Snark Mods were well aware of Kaceytron's reputation for copyright infringement and lazy reaction videos. As such, the H3Snark Mods knew that it was highly likely Kaceytron's reaction to *The Nuke* would be an infringing "group viewing session" of *The Nuke* and not a fair use. The H3Snark Mods coordinated with Kaceytron to direct H3Snark users to Kaceytron's "group viewing session" of *The Nuke* noting she was "*Live but not reacting yet*" to the Nuke. Ex G (original emphasis).

**The Law of Fair Use and Reaction Videos**

44.      Fair use is codified in Section 107 of the Copyright Act. The statute sets forth four non-exclusive factors courts consider to evaluate fair use:

1. [T]he purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
2. [T]he nature of the copyrighted work;
3. [T]he amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
4. [T]he effect of the use upon the potential market for or value of the copyrighted

work

45.     The first fair use factor "relates to the problem of substitution" – *i.e.*, whether the new work "supersedes" or "supplant[s]" the original. *Warhol*, 598 U.S. at 527. The "central question" is whether the secondary work "adds something new, with a further purpose or different character." *Id.* at 528. The mere fact that a secondary use has "some further purpose" or "add[s] something new … does ***not*** render such uses fair." *Id.* at 528-529 (emphasis added). Rather, "whether an allegedly infringing use has a further purpose or different character" is "a ***matter of degree***, and the degree of difference ***must*** be weighed against other considerations, like commercialism." *Id.* at 532 (emphasis added).

46.     While a "use that has a further purpose or different character is said to be 'transformative[,]' … 'transformativeness' is a matter of degree." *Warhol*, 598 U.S. at 529. Indeed, "an overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works." *Id.* "To preserve that right, the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." *Id.*

47.     The "first factor also relates to the justification for the use" both in the "broad sense" and the "narrower sense." *Warhol*, 598 U.S. at 531-532. A use is justified in the "broad sense" if it has a "distinct purpose" that "furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." *Id.* at 531. A use is justified in the "narrower sense" when it "is reasonably necessary to achieve the user's new purpose." *Id.* Such justification is "particularly relevant to assessing fair use" where "wide dissemination of a secondary work would otherwise run the risk of substitution for the original or licensed derivatives." *Id.* Again, "the question of justification is one of degree." *Id.*

48.     A "critical book review" illustrates how a secondary use must be justified both in

the broad and narrow sense. *Warhol*, 598 U.S. at 528 fn. 4. In the broad sense, the use of the original serves "a different purpose than the book" (*i.e.,* criticism and commentary). *Id.* In the narrow sense, "each quoted passage within the review likely serves a different purpose (an object of criticism) than it does in the book." *Id.* Critically, this "may not always be so" and "a court must consider each use within the whole to determine whether the copying is fair." *Id*. Consequently, "[e]ven book reviews are not entitled to a presumption of fairness." *Id., 598 U.S.* at 532 fn. 7.

49.     There are several indicia of when a use for criticism or commentary is not sufficiently transformative to justify a secondary use.

a.     When the "commentary has no critical bearing on the substance or style of the original composition, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." *Warhol*, 598 U.S. at 530-531. Indeed, "a loose topical connection" with the original work is equally problematic. *McGucken*, 42 F.4th at 1159.

b.     When "a defendant copies more than is necessary to facilitate 'comment or criticism.'" *Penguin Random House LLC v. Colting*, 270 F.Supp.3d 736, 751 (S.D.N.Y. 2017). "The law is clear that, to be considered transformative criticism, the aspects of a work that reproduce another's protected expression must be in service of commentary on that work. It is not enough for part of a work to have a transformative purpose." *Id.*

c.     When the "use" of the copyrighted work "is not consistently transformative." *Elvis Presley*, 349 F.3d at 628. For example when "clips are played without much interruption, if any" or "used in excess of [the] benign purpose." *Id.* at 629.

d.     The use of "voice overs," "headlines or captions"  or "wholesale copying

sprinkled with written commentary," fails to sufficiently transform a copyrighted work under the first fair use factor. *Monge*, 88 F.3d at 1174, 1176; *Elvis Presley*, 349 F.3d at 628-629. Additionally, "[w]hen a copyrighted work is used simply to illustrate what that work already depicts, the infringer adds no further purpose or different character" and "copyright law treats the infringer as freeriding on the inherent value of the original work." *McGucken*, 42 F.4th at 1158.

e.      The first fair use factor "does not" favor "any user who wants to reach different buyers, in different markets, communing different products." *Warhol*, 598 U.S. at 548 fn. 22.

50.      As mentioned, the degree to which a secondary use has a different purpose or character, "must be weighed against other considerations, like commercialism." *Warhol*, 598 U.S. at 525. "The undisputed commercial character of [the defendant's] use, though not dispositive, tends to weigh against a finding of fair use." *Id*. at 537.

51.      Commercialism examines "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise." *Elvis Presley*, 349 F.3d at 627. Courts consider whether the defendant was "motivated by profits" and "profited from the publication." *Monge*, 688 F.3d at 1176. Further, if the defendant "is not advertising a scholarly critique or historical analysis, but instead seeks to profit at least in part from the inherent entertainment value" of the original, the use is commercial. *Elvis Presley*, 349 F.3d at 628. Finally, commercialism exists "when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work." *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006).

52.      In *Hosseinzadeh*, the Court found the first fair use factor favored fair use because the Klein video was "quintessential criticism and comment … on the Hoss video" – namely

41

consistent "mockery" of Matt Hoss' "performance … dialog and plotlines." 276 F.Supp.3d at 40, 45-46. The Klein video was consistently transformative by "intersperse[ing] relatively short segments of the Hoss video with long segments of the Kleins' commentary." *Id.* at 40.

53.     The second fair use factor (*i.e.*, "the nature of the copyrighted work") "typically has not been terribly significant in the overall fair use balancing." *McGucken*, 42 F.4th at 1161. This factor examines "the extent to which [the original work] is creative and whether it is unpublished." *Id.* Even when a work "document[s] a real event," the work can still be "creative because [it is] the product of many technical and artistic decisions." *Id.* Whether a work is published is defined by whether the author exhausted the "right to control the first public appearance" of the work. *Monge*, 688 F.3d at 1178. The mere fact a work is published "does not weigh in favor of fair use." *McGucken*, 42 F.4th at 1162.

54.     In *Hosseinzadeh*, the Court found the second fair use factor "weigh[ed] against a finding of fair use" because the Hoss video was "a creative work" – despite the work being published. 276 F.Supp.3d at 46.

55.     The third fair use factor examines "the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *McGucken*, 42 F.4th at 1162. Consequently, the third fair use "factor circles back to the first factor because the extent of permissible copying varies with the purpose and character of the use." *Id.*

56.     When "the amount used is substantial with respect to the infringing work, it is evidence of the value of the copyrighted work." *Elvis Presley*, 349 F.3d at 630. Indeed, "[c]opying an entire work militates against a finding of fair use." *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 744 (9th Cir. 2019). If, however, "the new user only copies as much as necessary for his or her intended use, this factor will not weigh against the new user." *Elvis*

*Presley*, 349 F.3d at 630.

57. In *Hosseinzadeh*, the Court found that the third fair use factor was "neutral" because, while the Klein video copied "a great deal" of the Hoss video, "the 'extent' and 'quality and importance' of the video clips used by [the Kleins] were … plainly necessary to the commentary and critique." 276 F.Supp.3d at 46.

58. The fourth fair use factor is the "undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 536, 566 (1985). "While the first fair use factor considers whether and to what extent an original work and secondary use have substitutable purposes, the fourth factor focuses on actual or potential market substitution." *Warhol*, 598 U.S. at 536 fn. 12.

59. The fourth fair use factor "encompasses both (1) the extent of market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original and the market for derivative works." *McGucken*, 42 F.4th at 1163. Even when there is "little direct evidence of actual market harm" caused by the secondary use, "to negate fair use," the plaintiff "need only show that if the challenged use should become widespread, it would adversely affect the ***potential*** market for the copyrighted work." *Id.* (original emphasis).

60. The fourth fair use factor also "must take into account the public benefits the copying will likely produce." *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 35 (2021). In other words, does the use "serve copyright's goal of enriching public knowledge." *Warhol*, 598 U.S. at 531 (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (Level, J.). When the original work is associated with "dangerous misinformation," it does not serve the

43

public benefit and results in "actual and reputational harm" to the market for the original work –
even when the "primary markets … do not meaningfully overlap." *National Academy of
Television Arts and Sciences, Inc. v. Multimedia System Design, Inc.*, 551 F.Supp.3d 408
(S.D.N.Y. 2021).

61.     In *Hosseinzadeh*, the Court found the fourth fair use factor "weighs in favor of a
determination of fair use." 276 F.Supp.3d at 47. The Klein video did not "usurp[] demand for the
copyrighted work, thereby resulting in a loss for the infringee or unjust enrichment for the
infringer." *Id.* at 46. To the contrary, "the Klein video [did] not serve as a market substitute for
the Hoss video" because the Klein video "transform[ed] the Hoss video from a skit into fodder
for caustic, moment-by-moment commentary and mockery." *Id.* at 47. Consequently, "the Klein
video does not offer a substitute for the original." *Id.*

**Kaceytron's "Group Viewing Session" Failed to Make a Fair Use of *The Nuke***

62.     It is readily apparent that the primary purpose of Kaceytron's use of *The Nuke*
was to offer a "group viewing session" of *The Nuke* as a substitute for the original.[29] This is
evidenced by:

       a.     Kaceytron begins her "group viewing session" thirteen minutes after *The
Nuke* was released to the public. Ex. H at 0:00:30. The timing of Kaceytron's "group viewing
session" of *The Nuke* demonstrates that she did not prescreen it to formulate her opinions prior to
broadcast. Rather, Kaceytron timed her "group viewing session" to occur shortly after *The Nuke*
was released to capitalize on the great public interest in *The Nuke* and siphon as many viewers as
possible away from the original to herself. In other words, her priority was to personally benefit

---

[29] A true and correct copy of Kaceytron's January 31, 2025 broadcast is located on the Flash
Drive as Exhibit H.

from providing a substitute for the original and any commentary and criticism was a mere afterthought.

b.　　Immediately prior to watching *The Nuke*, Kaceytron states: "***I know a lot of people have been wanting to watch this without necessarily supporting Ethan Klein. So, we're going to watch it***." Ex. H at 0:01:02-1:12. This demonstrates that Kaceytron knew her audience wanted a substitute for *The Nuke* and she was more than happy to provide one.

c.　　Kaceytron's "group viewing session" suffers from a poverty of any commentary in general – let alone on the style or substance of *The Nuke* itself. For example, over the course of ten minutes, Kaceytron makes five short comments (some completely unrelated to *The Nuke*): (1) "I don't know anything about this stuff"; (2) "Here we go, right"; (3) "So now he cares about genocide?"; (4) "I mean, it's true. America is bad"; and (5) "What's wrong with him saying that. It's true." Ex. H at 0:07:46-18:00. By showing the entirety of *The Nuke* without providing extensive commentary that eclipsed the amount shown demonstrates that commentary was a mere afterthought for Kaceytron.

d.　　Kaceytron admits that she has "no idea about, like, world politics, geopolitical politics or anything like that" or capable of commenting on the vast majority of the points raised in *The Nuke*. Ex. H at 0:23:13-24:13. In other words, Kaceytron admits she is not competent to provide meaningful commentary on the substance of *The Nuke*.

e.　　Relatedly, Kaceytron repeatedly states she needs to watch *The Nuke* again with "Mike's analysis." Ex. H at 22:55, 25:59, 29:55. The "Mike" Kaceytron is referring to is Michael W. Beyer p/k/a Central Committee/Mike from PA ("Beyer"). Beyer is a failed nepo baby who is a prolific purveyor of misinformation to the public for over a decade. As explained below, Kaceytron's reliance on Beyer as a source of reliable information is misplaced and

45

misguided.

      i.      Beyer is the son of former Pennsylvania State Representative, Karen Beyer, who was a Republican. Losing her seat in 2010, Beyer changed his party affiliation from Republican to Democrat to run against State Representative Justin Simmons – that man who defeated his mother in the republican primary of 2010.[30]

      ii.      Beyer had the great privilege of going to and completing law school at the University of Pittsburg.[31] Despite having an opportunity many would envy, Beyer squandered his education. After law school, he became "a real estate consultant to his family" and had not "relied on or applied his legal training to impart legal advice in such endeavor." *In re Beyer*, 115 A.3d 835, 837 fn. 2 (Penn. 2014). He did not "actively prepar[e] for the bar examination," had "not yet scheduled himself to take the bar, nor did he claim to be working with the law for a lawyer or a judge as a 'nonlawyer assistant.'" *Id.*

      iii.      In 2014, Beyer ran against Representative Simmons for his mother's prior seat. In his petition, Beyer stated his occupation was a "lawyer." *In re Beyer*, 115 A.3d at 836-837. The Pennsylvania Supreme Court took the drastic remedy of invalidating Beyer's petition because "his description of occupation [was] both materially defective and issued with knowledge it could mislead electors as to his credential for the office of lawmaker." *Id.* at 836. While Beyer eventually ran as a write-in candidate, he lost the election by 22.2%.

      iv.      Afterwards, Beyer blamed his local Democratic party for the

---

[30] WFMZ-TV, "Michael Beyer's name stricken from May ballot by Pennsylvania Supreme Court: Republican-turned-Democrat candidate called himself a lawyer, but isn't" (May 5, 2014), *available at*: https://www.wfmz.com/news/insideyourtown/michael-beyers-name-stricken-from-may-ballot-by-pennsylvania-supreme-court/article_8fec537f-54f8-54e1-a50d-425203bf6844.html.

[31] Ballotpedia, "Michael Beyer," *available at*: https://ballotpedia.org/Michael_Beyer

46

misrepresentation in his petition – claiming they were responsible for completing it.[32] Beyer's "alibi" raises more questions than answers, particularly given that he was a law school graduate, such as: (1) Did Beyer sign the petition without reviewing it first?; (2) Did Beyer sign the petition first and the Democratic party subsequently completed it?; and (3) Is Beyer engaging in another misrepresentation?

        v.      After failing at a political career that was handed to him on a silver platter, Beyer became a streamer. Over time, his politics grew more radical and he began to traffic in baseless conspiracy theories, falsehoods and online harassment.[33]

        f.      Indeed, Kaceytron is often too obliterated to comment on *The Nuke* and, instead, stares blankly at her computer screen. In a span of two hours and seven minutes, Kaceytron smokes marijuana (frequently in a highly concentrated form through a vaporizer) for nearly nineteen minutes – which is three minutes more that Kaceytron speaks during her "group viewing session." *See* Ex. H at 11:07, 27:02, 37:47, 48:17, 51:21, 52:11, 52:12, 53:44, 1:05:59, 1:07:52, 1:11:52, 1:48:48, 1:51:55, 2:04:18. At one point, Kaceytron is so wasted that she states: "What is happening. I'm trying to follow, but I lost the plot." *Id.* at 36:03.

        g.      More notable than her dearth of commentary and copious consumption of cannabis is the sound of – what appears to be – Kaceytron repeatedly emitting flatulence on stream. *See e.g.,* Ex. H at 2:25, 4:53, 22:37, 53:38, 1:55:58.

        h.      *The Nuke* takes the vast majority of the screen for Kaceytron's reaction. Kaceytron's objective was to provide a large and unobstructed view of *The Nuke* to her audience.

---

[32] Mike From PA, "Omaha Mayoral Candidate Mark Gudgel Disavows Destiny due to Past Behavior" (March 4, 2021) at 1:27-2:20, *available at*: https://www.youtube.com/watch?v=cs_eCFrQTjw&t=112s.

[33] Rob's Media, "Idiot Influencers – Mike From PA" (April 27, 2025), *available at*: https://youtu.be/u4121rdYFT0?si=mxKDUZdoxE-9tZ2X

In contrast, Kaceytron sequesters herself to a small portion of the screen that deemphasizes her presence – particularly relative to *The Nuke. See generally*, Ex. H.

63. Kaceytron's use of *The Nuke* was highly commercial. Throughout her "group viewing session" of *The Nuke*, Kaceytron solicits donations and her donation goal at the top of the screen. *See generally*, Ex. H. On her Twitch page where Kaceytron's "group viewing session" was located, Kaceytron solicited paid subscriptions, donations and bits (a different form of monetary compensation on Twitch). Each time Kaceytron receives a donation or paid subscriptions, an announcement would play over *The Nuke*. Indeed, during her "group viewing session" of *The Nuke*, Kaceytron received numerous paid subscriptions and donations. Further, Kaceytron received advertising revenue from her "group viewing session" of *The Nuke*.

64. As to the second fair use factor, the fact *The Nuke* was released thirteen minutes prior to Kaceytron's "group viewing session" does not weigh in her favor. Further, while containing numerous documentary and factual elements, *The Nuke* contains numerous creative elements, which weigh against fair use.

65. As to the third fair use factor, this factor weighs heavily against fair use. It is readily apparent that Kaceytron's use was excessive for any potential criticism of *The Nuke* – particularly in light of the minimal level of commentary and highly commercial nature of Kaceytron's "group viewing session." This is particularly true when Kaceytron repeatedly provides brief statements (many of which have little to no critical bearing on *The Nuke*) after showing long unadulterated segments of *The Nuke*.

66. The fourth (and most important) fair use factor weighs the most heavily against fair use. It is readily apparent that Kaceytron intended (and succeeded) to provide a market substitute for *The Nuke* for the reasons set forth below:

a.      Kaceytron's statement before her "group viewing session" that "I know a lot of people have been wanting to watch this without necessarily supporting Ethan Klein. So, we're going to watch it." Ex. H at 0:01:02-1:12.

b.      Showing *The Nuke* in its entirety with minimal commentary.

c.      Starting her "group viewing session" thirteen minutes after *The Nuke* was released to the public when the interest in *The Nuke* was at its apex.

d.      The First Inducement Post and the Second Inducement Post by the H3Snark Mods.

e.      Due to Kaceytron's siphoning the audience for *The Nuke* to her "group viewing session," TEI lost views and advertising revenue it would ordinarily receive from the individuals who watched Kaceytron's "group viewing session" instead of *The Nuke*.

f.      Kaceytron's conduct did become widespread. Several other members of Hasan's Waiting Room conducted a "group viewing session" of *The Nuke* immediately after its release – which resulted in further lost views and lost advertising revenue to TEI.

## FIRST CLAIM FOR RELIEF

### (For Direct Copyright Infringement – Against Kaceytron)

67.      TEI incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

68.      TEI is the sole owner of the copyrights in *The Nuke* and registered it with the USCO.

69.      Kaceytron accessed *The Nuke* from TEI's YouTube channel, h3h3Productions.

70.      TEI did not grant any license, authorization or consent for Kaceytron to

49

exploit *The Nuke* in any manner. Rather, Kaceytron's "group viewing session" of *The Nuke* constituted an unauthorized reproduction, public performance and derivative work of *The Nuke* in violation of TEI's rights as set forth in 17 U.S.C. Section 106.

71. Due to Kaceytron's acts of copyright infringement, TEI has suffered damages in an amount to be established at trial.

72. Due to Kaceytron's acts of copyright infringement, Kaceytron obtained profits they would not have realized but for her infringement of TEI's copyrights in *The Nuke*.

73. Kaceytron's acts of copyright infringement were done with actual or constructive knowledge of TEI's rights, such that said acts of copyright infringement were willful, intentional, malicious and/or taken with reckless disregard for TEI's rights.

## SECOND CLAIM FOR RELIEF

### (Contributory Copyright Infringement – Against The H3 Snark Mods)

74. TEI incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

75. The H3Snark Mods (and each one of them) knew Kaceytron's "group viewing session" would infringe TEI's copyrights in *The Nuke*.

76. The H3Snark Mods (and each one of them) are responsible for the First Inducement Post and Second Inducement Post.

77. The First Inducement Post and Second Inducement Post induced, caused and/or materially contributed to Kaceytron's infringement of *The Nuke*.

78. Due to the H3Snark Mods' contributory infringement, TEI has suffered damages in an amount to be established at trial.

50

79.     The H3Snark Mods' acts of contributory infringement were made with actual or constructive knowledge of TEI's rights, such that said acts of contributory infringement were willful, intentional, malicious and/or taken with reckless disregard for TEI's rights.

## PRAYER FOR RELIEF

WHEREFORE, TEI prays for judgment against Kaceytron and the H3Snark Mods (collectively, "Defendants") as follows:

a.     That TEI be awarded Defendants' (and each of their) profits, plus TEI's losses, attributable to Defendants' infringements of *The Nuke*, the exact sum to be proven at the time of trial; or, if elected, statutory damages in the amount of $150,000 as available under 17 U.S.C. Section 504;

b.     TEI be awarded it reasonable attorneys' fees and costs under 17 U.S.C. Section 505;

c.     TEI be awarded pre-judgment interest as allowed by law; and

d.     TEI be awarded such further relief as the Court deems proper.

## JURY TRIAL DEMAND

TEI demands a jury trial on all issues so triable pursuant to Federal Rule of Civil Procedure 38 and the 7th Amendment to the United State Constitution.

51

## DESIGNATION OF PLACE OF TRIAL

Plaintiff Ted Entertainment, Inc. hereby designates Kansas City, Missouri as the place of trial of the above-styled matter.

Respectfully submitted,

By:  /s/ James J. Kernell
James J. Kernell, #48850
AVEK IP, LLC
7285 West 132nd Street, Suite 340
Overland Park, Kansas 66213
Telephone:  913-549-4700
Facsimile:  913-549-4646
Email:  jkernell@avekip.com

Rom Bar-Nissim (*pro hac vice pending*)
HEAH BAR-NISSIM
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone:  310-432-2836
Email:  rom@heahbarnissim.com

*Attorneys for Plaintiff*
*Ted Entertainment, Inc.*

52

# EXHIBIT 4

ROM BAR-NISSIM (SBN: 293356)
Rom@HeahBarNissim.com
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

Attorneys for Plaintiff
TED ENTERTAINMENT, INC.

BENJAMIN KASSIS (SBN 298844)
ben@frostllp.com
BENJAMIN GRUSH (SBN 335550)
bgrush@frostllp.com
FROST LLP
10960 Wilshire Boulevard, Suite 2100
Los Angeles, California 90024
Telephone: (424) 254-0441
Facsimile: (424) 600-8504

Attorneys for Defendant
ALEXANDRA MARWA SABER p/k/a DENIMS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TED ENTERTAINMENT, INC., a California Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ALEXANDRA MARWA SABER f/k/a MARWA TALATT ABDELMONEM p/k/a DENIMS, an individual, and DOES 1-10<br><br>Defendants. | Case No.: 2:25-cv-05564-WLH-PD<br><br>**DISCOVERY MATTER**<br><br>**JOINT STIPULATION RE: GRANTING PLAINTIFF LEAVE TO SERVE THIRD-PARTY SUBPOENAS PRIOR TO THE RULE 26(f) CONFERENCE** |

JOINT STIPULATION RE: GRANTING PLAINTIFF LEAVE TO SERVE THIRD-PARTY SUBPOENAS
PRIOR TO THE RULE 26(f) CONFERENCE

**WHEREAS,** plaintiff Ted Entertainment, Inc. ("TEI") commenced this action by filing its complaint ("Complaint") on June 19, 2025 alleging: (1) direct copyright infringement against defendant Alexandra Marwa Saber p/k/a Denims ("Denims"); and (2) contributory copyright infringement against Does 1-10 (the "H3Snark Mods") (Dkt. No. 1);

**WHEREAS,** on June 24, 2025, Denims was served with the Complaint (Dkt. No. 12);

**WHEREAS,** on June 30, 2025, counsel for Denims contacted counsel for TEI to discuss various preliminary matters related to the present action;

**WHEREAS,** also on June 30, 2025, counsel for TEI responded to counsel for Denims and explained, *inter alia*, TEI's intention to file an *ex parte* application seeking expedited discovery to subpoena Reddit, Inc. ("Reddit") and Discord, Inc. ("Discord") to obtain personal identifying information of the H3Snark Mods prior the conference of counsel under Federal Rule of Civil Procedure Rule 26(f) (the "Application") for the purpose of naming the H3Snark Mods in the Complaint and serving the H3Snark Mods with the Complaint;

**WHEREAS,** also on June 30, 2025, counsel for Denims responded to counsel for TEI and requested, *inter alia*, to set up a time to meet and confer regarding the Application;

**WHEREAS,** counsel for TEI and Denims (collectively, the "Parties") agreed to meet and confer on July 1, 2025;

**WHEREAS,** on July 1, 2025, counsel for the Parties conducted a telephonic meet and confer regarding the grounds and necessity for the Application;

**WHEREAS,** counsel for Denims agreed that TEI's request to seek expedited discovery from Reddit and Discord to obtain personal identifying information of the H3Snark Mods to name them in the Complaint and serve the H3Snark Mods with the Complaint is warranted under the circumstances;

**WHEREAS,** to avoid unnecessary motion practice and conserve the

1

JOINT STIPULATION RE: GRANTING PLAINTIFF LEAVE TO SERVE THIRD-PARTY SUBPOENAS
PRIOR TO THE RULE 26(f) CONFERENCE

resources of the Parties and this Court, the Parties have entered into this joint stipulation to request this Court to grant TEI leave to serve subpoenas on Reddit and Discord on condition that counsel for Denims first review the aforementioned subpoenas;

**WHEREAS,** due to a preplanned Fourth of July holiday vacation, the earliest counsel for Denims could review the proposed subpoenas to Reddit and Discord was July 10, 2025;

**WHEREAS,** on July 10, 2025, counsel for TEI sent counsel for Denims the proposed subpoenas to Reddit and Discord – to which counsel for Denims does not object;

**WHEREAS,** a true and correct of the proposed document subpoena to Reddit is attached hereto and incorporated herein as **Exhibit A** (with the date and time of compliance and date of the subpoena was issued left blank); and

**WHEREAS,** a true and correct copy of the proposed document subpoena to Discord is attached hereto and incorporated herein as **Exhibit B** (with the date and time of compliance and date of the subpoena was issued left blank).

**THEREFORE, IT IS HEREBY STIPULATED**, by and between the Parties through their respective attorneys of record respectfully request that: (1) this Court grant the Stipulation; (2) that TEI be granted leave to serve the proposed subpoenas attached as Exhibit A to Reddit and Exhibit B to Discord prior to the conference of counsel under Federal Rule of Civil Procedure Rule 26(f); and (3) the Court enter the Order lodged concurrently herewith.

Dated: July 16, 2025

**HEAH BAR-NISSIM LLP**

By  /s/ Rom Bar-Nissim
ROM BAR-NISSIM
Attorneys for Plaintiff Ted
Entertainment, Inc.

Dated: July 16, 2025                    **FROST LLP**

                                        By  /s/ Ben Kassis
                                        BEN KASSIS
                                        BENJAMIN GRUSH
                                        Attorneys for Defendant
                                        Alexandra Marwa Saber p/k/a
                                        Denims

Pursuant to Civil L.R. 5-4.3.4(a)(2)(1), the filer attest that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

JOINT STIPULATION RE: GRANTING PLAINTIFF LEAVE TO SERVE THIRD-PARTY SUBPOENAS
PRIOR TO THE RULE 26(f) CONFERENCE

# Exhibit A

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | | |
|---|---|---|
| Ted Entertainment, Inc. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    2:25-cv-05564-WLH-PD |
| Alexandra Marwa Saber f/k/a Marwa Talatt Abdelmonem p/k/a Denims; Does 1-10 | ) ) ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                             Reddit, Inc.

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:   See Attachment

| Place: Heah Bar-Nissim LLP c/o Parasec, 2804 Gateway Oaks Drive, Ste. 100, Sacramento, CA 95833 | Date and Time: |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

|  *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Rom Bar-Nissm |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Plaintiff Ted Entertainment, Inc. _____ , who issues or requests this subpoena, are:
Rom Bar-Nissim; Heah Bar-Nissim LLP; 1801 Century Park East, Suite 2400, Los Angeles, CA 90067; Email: Rom@HeahBarNissim.com; Tel: (310) 432-2836

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  2:25-cv-05564-WLH-PD

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT TO SUBPOENA TO REDDIT, INC.
## DEFINITIONS

1.      The term "ACCOUNT INFORMATION" shall have the same meaning as used in REDDIT'S DATA COLLECTION WEBPAGE – *i.e.*, "this includes things like your username, avatar, and email address (if you verify your account with an email")

2.      The term "COMMUNICATION(S)" shall refer to every manner or means of disclosure, transfer, transmission, or exchange of information, whether orally or by DOCUMENTS and whether face-to-face, in person, in a group, by telephone, by letter, facsimile, telex or telecopy, or by any other process, electric, electronic or otherwise, and includes any DOCUMENTS as defined herein including any medium which abstracts, digests, records, or transcribes any such communication, or any subsequent review or discussion of such communication.

3.      The term "DOCUMENT(S)" shall have the broadest meaning permitted by F.R.C.P. Rules 34(a) and 45(a), and shall include, without limitation, any tangible record of intelligence or information, whether handwritten, typed, printed or otherwise visually or orally reproduced, including information stored on magnetic or optical media or in solid state storage devices, notes, drafts, reports, films, videotape, drawings, graphs, photographs, illustrations, agreements, letters, test data, circuit diagrams, software structure charts, software flow charts, software functional specifications, software code, data flow diagrams, hardware schematic diagrams, hardware logic diagrams, field maintenance print sets, timing diagrams, technical summaries, product description documents, software description documents, World Wide Web internet pages (whether archived or current), laboratory or engineers' notebooks, project or progress reports, database information, whether for prototypes or production products, and the like that are in possession, custody, or control of REDDIT or to which REDDIT otherwise has

access.  Any such documents bearing on any sheet (front or back), margins, attachment, or enclosure thereof, any mark that is not a part of the original text or reproduction thereof, is to be considered and produced as a separate document.

4.    The term "H3SNARK" shall mean the subreddit on REDDIT entitled r/h3snark.

5.    The term "H3SNARK MODS" shall refer to the REDDIT users who are MODERATORS of H3SNARK.

6.  The terms "IDENTIFY" and "IDENTIFYING" means:

(a) when used with respect to a PERSON shall mean providing the PERSON's full name, business and/or residential address and telephone number;

(b) when used with respect to a DOCUMENT shall mean to IDENTIFY the DOCUMENT'S author, signor, sender, addresses and all recipients; to state the DOCUMENT'S title, date and number of pages; if the DOCUMENT has been produced by any party to this litigation, to state the DOCUMENT'S bates number; to describe its subject matter; and to state the DOCUMENT'S present location, the name and address of any PERSONS currently having custody or control of it, and any other descriptive information necessary to IDENTIFY such DOCUMENT sufficiently in a subpoena duces tecum or a request for production; and

(c) when used with respect to a COMMUNICATION other than a DOCUMENT shall mean to IDENTIFY the PERSON making the COMMUNICATION, its recipients, and all natural persons who were present at the time the COMMUNICATION was made, and to state the date, place and subject matter of the COMMUNICATION.

7.    The term "LOCATION INFORMATION" shall have the same meaning as used on REDDIT'S DATA COLLECTION WEBPAGE – *i.e.*, "If you decide to share your location with us, we collect that information from your mobile device. We may also get your approximate location through your IP address."

8. The term "MODERATORS" shall have the same meaning as used by REDDIT on the webpage entitled "What's a moderator?" located at: https://support.reddithelp.com/hc/en-us/articles/204533859-What-s-a-moderator

9. The terms "PERSON" and "PERSONS" mean and include natural persons and, without limitation, companies, firms, associations, proprietorships, partnerships, joint ventures, agencies, consortiums, associations, societies, corporations, and other legal entities, as well as their parents, subsidiaries, and affiliates, and all divisions, departments and units of any of them.

10. The term "PERSONAL IDENTIFYING INFORMATION" shall mean ACCOUNT INFORMATION, LOCATION INFROMATION, TRANSACTIONAL INFORMATION and USAGE INFORMATION.

11. The term "REDDIT" shall mean third-party Reddit, Inc. and/or anyone acting on its behalf, including employees, attorneys, insurance companies, accountants, investigators, representatives, parent companies, business entities and any other PERSON or entity acting on its behalf.

12. The term "REDDIT'S DATA COLLECTION WEBPAGE" shall mean the webpage entitled "What information does Reddit collect about me and my account" and located at: https://support.reddithelp.com/hc/en-us/articles/360043048412-What-information-does-Reddit-collect-about-me-and-my-account.

13. The term "TRANSACTIONAL INFORMATION" shall have the same meaning as used on REDDIT'S DATA COLLECTION WEBPAGE – *i.e.*, "billing information such as your name, address, payment type, and purchase details."

14. The term "USAGE INFORMATION" shall have the same meaning as used on REDDIT'S DATA COLLECTION WEBPAGE – *i.e.*, "data about how you access and use Reddit such as your login and IP information, browser type,

operating system, device and search terms."

15.     As used herein, the connectives "and" and "or" shall be construed either disjunctively or conjunctively so as to acquire the broadest possible meaning.

16.     As used herein, the terms "any," "all," and "each" shall be construed as "any, all, and each" inclusively.

17.     As used herein, the use of the singular form of any word shall include the plural and vice versa.

18.     Masculine forms of any noun or pronoun shall embrace and be read to include the feminine or neuter, as the context may make appropriate.

## INSTRUCTIONS

A.     REDDIT shall quote each Subpoenaed Documents and Information ("Request") in full immediately preceding the statement of any answer, response, or objection thereto.

B.     Each Request solicits all information obtainable by REDDIT, including its attorneys, investigators, agents, employees and representatives.

C.     Pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") Rules 34(b)(2)(B) and 45(d)(2)(B), each Request must be responded to separately and state whether: (1) REDDIT will allow inspection or related activities in response to the Request; (2) REDDIT will produce copies or of electronically stored information instead of inspection in response to the Request; or (3) an objection to the Request.

D.     Pursuant to F.R.C.P. Rules 34(b)(2)(B) and 45(d)(2)(B), an objection to any Request must state with specificity the grounds for objecting to the Request, including the reasons. Pursuant to F.R.C.P. Rule 34(b)(2)(C), REDDIT must specify whether any responsive materials to a Request are being withheld on the basis of said objection.  General, boilerplate or conclusory objections are not proper

objections and shall be disregarded. *U.S. ex rel. O'Connell v. Chapman University*, 245 F.R.D. 646, 650 (C.D. Cal. 2007).

E.      Pursuant to F.R.C.P. Rule 34(b)(2)(C), if a Request is objected to only in part, the objection must specify which part and permit inspection or produce documents as to the remainder of the Request.

F.      Pursuant to F.R.C.P. Rule 34(b)(2)(D), if the objection is to the form for producing electronically stored information or if no form is specified in the Request, the response to the Request must state the form or forms to be produced.

G.      Pursuant to F.R.C.P. Rules 34(b)(2)(E)(i) and 45(e)(1)(B), all DOCUMENTS or electronically stored information must be produced as they are kept in the usual course of business or must be organized and labeled to correspond to the categories in the Request.

H.      Pursuant to F.R.C.P. Rule 34(b)(2)(E)(ii), if a Request does not specify a form for producing electronically stored information, such information must be produced in a form or forms which the information is ordinarily maintained or in a reasonable usable form or forms.

I.      Where a claim of privilege, immunity, or other protection from discovery (collectively, "Privilege") is asserted in objecting to any Request or any portion thereof, REDDIT shall furnish the following information for each such claim:

1.      The nature of the Privilege (including work product) that is being claimed, and, if the Privilege is being asserted in connection with a claim or defense governed by state law, indicate the state's Privilege rule being invoked;

2.      The Request or specific portion of the Request to which the assertion of Privilege relates;

3.      If the Privilege is being asserted for a particular

COMMUNICATION, a description of the COMMUNICATION, including:

    a.    the date of the COMMUNICATION or disclosure;

    b.    IDENTIFY the PERSONS involved in the COMMUNICATION, including without limitation, the PERSONS' names, addresses, employments, and titles;

    c.    IDENTIFY where/how the COMMUNICATION occurred, including the specific location where the COMMUNICATION occurred and/or medium of the COMMUNICATION; and

    d.    a summary of the COMMUNICATION'S subject matter.

4.    If the Privilege is being asserted for a particular DOCUMENT, a description of the DOCUMENT, including:

    a.    the date of the DOCUMENT;

    b.    IDENTIFY the PERSON who authored or prepared of the DOCUMENT, including without limitation, the PERSON'S name, address, employment, and title;

    c.    IDENTIFY each PERSON who has sent or had access to or custody of the DOCUMENT, together with an identification of employment of each said PERSON;

    d.    the location of the DOCUMENT; and

    e.    a summary of the DOCUMENT'S subject matter.

J.    If any DOCUMENT or thing otherwise responsive to any Request has been lost, discarded, or destroyed since its preparation or receipt, SERVICE shall IDENTIFY, as completely as possible, the DOCUMENT or thing, state the Request to which it would be responsive, and give full particulars or circumstances under which the DOCUMENT or thing was lost or destroyed, including, without

limitation, each DOCUMENT'S date, the general nature of the DOCUMENT (*e.g.*, letter, memorandum, telegram, etc.), the subject matter of the DOCUMENT, each PERSON who authored the DOCUMENT, each PERSON indicated as an addressee or copy recipient, or known by REDDIT to have received a copy of the DOCUMENT or thing, and the DOCUMENT'S former custodians.  In addition, as to each such DOCUMENT or thing, the following information shall be supplied:

1.  date of disposal, loss, or destruction;

2.  manner of disposal, loss, or destruction;

3.  reason for disposal or destruction, or an explanation of the loss;

4.  IDENTIFY the PERSON(S) authorizing the disposal or destruction;

5.  IDENTIFY the PERSON(S) having knowledge of the disposal, loss, or destruction; and

6.  IDENTIFY the PERSON(S) who destroyed, lost, or disposed of the DOCUMENT or thing.

K.  If, in responding to any of these Requests, REDDIT encounters any ambiguity in construing either the Request, a definition, or an instruction, REDDIT shall state with specificity the matter deemed ambiguous and identify the construction chosen or used is responding to the Request. *Gilbert v. Citigroup, Inc.*, 2009 WL 10692463, *7 (N.D. Cal., Apr. 2, 2009); *Minna v. Rowley*, 2022 WL 3636364, *3 (E.D. Cal., Aug. 23, 2022); *Pulsecard, Inc. v. Discover Card Services, Inc.*, 168 F.R.D. 295, 310 (D. Kan. 1996).

L.  In producing material responsive to these Requests, REDDIT shall produce all material within its possession, custody or control – which extends not only to information within its immediate knowledge or possession – but includes an affirmative duty to seek that information reasonably available to it from its employees, agents, or other subject to its control. *Rogers v. Giurbino*, 288 F.R.D.

469, 485 (S.D. Cal. 2012). Where no responsive information is within REDDIT'S possession, custody or control, REDDIT must state with sufficient specificity under oath the steps taken to conduct a reasonable inquiry and exercise due diligence. *Id.*

M.      Any objection to a Request on the grounds that such information is in the possession of the requesting party is improper. *Bretana v. Int'l Collection Corp.*, 2008 WL 4334710, *4 (N.D. Cal., Sept. 22, 2008); *Brotherhood Mutual Insurance Co. v. Vinkov*, 2020 WL 6489326, *6 (C.D. Cal., Oct. 5, 2020).

N.      Pursuant to F.R.C.P. Rule 26(e), these Requests shall be deemed continuing and supplemental answers shall be required if REDDIT directly or indirectly obtains further information after his initial response.

O.      Any objection to a Request on the grounds that "discovery is ongoing" is improper. Rather, REDDIT must respond and supplement its responses should discovery alter its response. *See MCC Controls v. Hal Hays Construction*, 2020 WL 6034321, *3 (C.D. Cal. Jul. 23, 2020); *DIRECTTV, Inc. v. Puccinelli*, 224 F.R.D. 677, 689 (D. Kan. 2004); F.R.C.P. Rule 26(e).

P.      Any objection to a Request on the grounds that producing responsive information to a Request is overly burdensome must state with specificity the reasons why producing such information to the Request is overly burdensome. *L.A. Terminals, Inc. v. United National Insurance Co.*, 340 F.R.D. 390, 397 fn. 2 (C.D. Cal. 2022); *Shaw v. Experian Information Solutions, Inc.*, 306 F.R.D. 293, 301 (S.D. Cal. 2015); *In re Subpoena Duces Tecum*, 451 B.R. 823, 831 (C.D. Cal. 2011).

## SUBPOENAED DOCUMENTS AND INFORMATION

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 1:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/ozempicdealer.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 2:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL

IDENTIFYING INFORMATION of REDDIT user u/h3snarkmodteam.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 3:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/h3snarkmodteam2.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 4:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/RomanPeee.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 5:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/Right_Salamander.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 6:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/kavkav2.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 7:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/h3snarkmodteam3.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 8:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/Wrong_Salamanderr.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 9:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/Right_Salamanderr.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 10:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/PurePress.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 11:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL

IDENTIFYING INFORMATION of REDDIT user u/KitchenMukbangStar.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 12:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/sarahornejewetts.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 13:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/jewettsarahorne.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 14:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of REDDIT user u/jewettornesarah.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 15:**

All DOCUMENTS and COMMUNICATIONS containing the usernames of the H3SNARK MODS who were MODERATORS of H3SNARK from January 1, 2025 through February 28, 2025.

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 16:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of the H3SNARK MODS who were MODERATORS of H3SNARK from January 1, 2025 through February 28, 2025.

# Exhibit B

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | | |
|---|---|---|
| Ted Entertainment, Inc. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  2:25-cv-05564-WLH-PD |
| Alexandra Marwa Saber f/k/a Marwa Talatt Abdelmonem p/k/a Denims; Does 1-10 | ) ) ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Discord, Inc.

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
See Exhibit A

| Place:  Heah Bar-Nissim LLP c/o Parasec, 2804 Gateway Oaks Drive, Ste. 100, Sacramento, CA 95833 | Date and Time: |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Rom Bar-Nissm |
| _____ *Signature of Clerk or Deputy Clerk* | | _____ *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Plaintiff Ted Entertainment, Inc. _____ , who issues or requests this subpoena, are:
Rom Bar-Nissim; Heah Bar-Nissim LLP; 1801 Century Park East, Suite 2400, Los Angeles, CA 90067;
Email: Rom@HeahBarNissim.com; Tel: (310) 432-2836

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  2:25-cv-05564-WLH-PD

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT TO SUBPOENA TO DISCORD, INC.

## DEFINITIONS

1.      The term "ACCOUNT INFORMATION" shall have the same meaning as used in DISCORD'S PRIVACY POLICY – *i.e.*, "email address and/or phone number", "birthday," "additional information to verify your age" and "additional information" to "verify your account" like "a verified phone number."

2.      The term "COMMUNICATION(S)" shall refer to every manner or means of disclosure, transfer, transmission, or exchange of information, whether orally or by DOCUMENTS and whether face-to-face, in person, in a group, by telephone, by letter, facsimile, telex or telecopy, or by any other process, electric, electronic or otherwise, and includes any DOCUMENTS as defined herein including any medium which abstracts, digests, records, or transcribes any such communication, or any subsequent review or discussion of such communication.

3.      The term "DEVICE INFORMATION" shall have the same meaning as "Information about your device" as used in DISCORD'S PRIVACY POLICY – *i.e.*, "information about the device you are using to access the services," such as "your IP address, operating system information, browser information, and information about your device settings."

4.      The term "DISCORD" shall mean third-party, Discord, Inc. and/or anyone acting on its behalf, including employees, attorneys, insurance companies, accountants, investigators, representatives, parent companies, business entities and any other PERSON or entity acting on its behalf.

5.      The term "DISCORD'S PRIVACY POLICY" shall mean DISCORD's privacy policy that is located at: https://discord.com/privacy#3

6.      The term "DOCUMENT(S)" shall have the broadest meaning permitted by F.R.C.P. Rules 34(a) and 45(a), and shall include, without limitation, any tangible record of intelligence or information, whether handwritten, typed,

printed or otherwise visually or orally reproduced, including information stored on magnetic or optical media or in solid state storage devices, notes, drafts, reports, films, videotape, drawings, graphs, photographs, illustrations, agreements, letters, test data, circuit diagrams, software structure charts, software flow charts, software functional specifications, software code, data flow diagrams, hardware schematic diagrams, hardware logic diagrams, field maintenance print sets, timing diagrams, technical summaries, product description documents, software description documents, World Wide Web internet pages (whether archived or current), laboratory or engineers' notebooks, project or progress reports, database information, whether for prototypes or production products, and the like that are in possession, custody, or control of DISCORD or to which DISCORD otherwise has access.  Any such documents bearing on any sheet (front or back), margins, attachment, or enclosure thereof, any mark that is not a part of the original text or reproduction thereof, is to be considered and produced as a separate document.

7.  The terms "IDENTIFY" and "IDENTIFYING" means:

(a) when used with respect to a PERSON shall mean providing the PERSON's full name, business and/or residential address and telephone number;

(b) when used with respect to a DOCUMENT shall mean to IDENTIFY the DOCUMENT'S author, signor, sender, addresses and all recipients; to state the DOCUMENT'S title, date and number of pages; if the DOCUMENT has been produced by any party to this litigation, to state the DOCUMENT'S bates number; to describe its subject matter; and to state the DOCUMENT'S present location, the name and address of any PERSONS currently having custody or control of it, and any other descriptive information necessary to IDENTIFY such DOCUMENT sufficiently in a subpoena duces tecum or a request for production; and

(c) when used with respect to a COMMUNICATION other than a DOCUMENT shall mean to IDENTIFY the PERSON making the

COMMUNICATION, its recipients, and all natural persons who were present at the time the COMMUNICATION was made, and to state the date, place and subject matter of the COMMUNICATION.

8.      The term "PAYMENT INFORMATION" shall have the same meaning as "Payment information" as used in DISCORD'S PRIVACY POLICY – *i.e.*, "valid payment method and associated billing information, including your full name and billing information" and "bank account information to facilitate payments, tax identification information, and copies of government issued identification required to identify users in accordance with regulatory obligations."

9.      The terms "PERSON" and "PERSONS" mean and include natural persons and, without limitation, companies, firms, associations, proprietorships, partnerships, joint ventures, agencies, consortiums, associations, societies, corporations, and other legal entities, as well as their parents, subsidiaries, and affiliates, and all divisions, departments and units of any of them.

10.      The term "PERSONAL IDENTIFYING INFORMATION" shall mean ACCOUNT INFORMATION, DEVICE INFORMATION and PAYMENT INFORMATION.

11.      As used herein, the connectives "and" and "or" shall be construed either disjunctively or conjunctively so as to acquire the broadest possible meaning.

12.      As used herein, the terms "any," "all," and "each" shall be construed as "any, all, and each" inclusively.

13.      As used herein, the use of the singular form of any word shall include the plural and vice versa.

14.      Masculine forms of any noun or pronoun shall embrace and be read to include the feminine or neuter, as the context may make appropriate.

## INSTRUCTIONS

A.       DISCORD shall quote each Subpoenaed Documents and Information ("Request") in full immediately preceding the statement of any answer, response, or objection thereto.

B.       Each Request solicits all information obtainable by DISCORD, including its attorneys, investigators, agents, employees and representatives.

C.       Pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") Rules 34(b)(2)(B) and 45(d)(2)(B), each Request must be responded to separately and state whether: (1) DISCORD will allow inspection or related activities in response to the Request; (2) DISCORD will produce copies or of electronically stored information instead of inspection in response to the Request; or (3) an objection to the Request.

D.       Pursuant to F.R.C.P. Rules 34(b)(2)(B) and 45(d)(2)(B), an objection to any Request must state with specificity the grounds for objecting to the Request, including the reasons. Pursuant to F.R.C.P. Rule 34(b)(2)(C), DISCORD must specify whether any responsive materials to a Request are being withheld on the basis of said objection.  General, boilerplate or conclusory objections are not proper objections and shall be disregarded. *U.S. ex rel. O'Connell v. Chapman University*, 245 F.R.D. 646, 650 (C.D. Cal. 2007).

E.       Pursuant to F.R.C.P. Rule 34(b)(2)(C), if a Request is objected to only in part, the objection must specify which part and permit inspection or produce documents as to the remainder of the Request.

F.       Pursuant to F.R.C.P. Rule 34(b)(2)(D), if the objection is to the form for producing electronically stored information or if no form is specified in the Request, the response to the Request must state the form or forms to be produced.

G.       Pursuant to F.R.C.P. Rules 34(b)(2)(E)(i) and 45(e)(1)(B), all DOCUMENTS or electronically stored information must be produced as they are

kept in the usual course of business or must be organized and labeled to correspond to the categories in the Request.

H. Pursuant to F.R.C.P. Rule 34(b)(2)(E)(ii), if a Request does not specify a form for producing electronically stored information, such information must be produced in a form or forms which the information is ordinarily maintained or in a reasonable usable form or forms.

I. Where a claim of privilege, immunity, or other protection from discovery (collectively, "Privilege") is asserted in objecting to any Request or any portion thereof, DISCORD shall furnish the following information for each such claim:

1. The nature of the Privilege (including work product) that is being claimed, and, if the Privilege is being asserted in connection with a claim or defense governed by state law, indicate the state's Privilege rule being invoked;

2. The Request or specific portion of the Request to which the assertion of Privilege relates;

3. If the Privilege is being asserted for a particular COMMUNICATION, a description of the COMMUNICATION, including:

a. the date of the COMMUNICATION or disclosure;

b. IDENTIFY the PERSONS involved in the COMMUNICATION, including without limitation, the PERSONS' names, addresses, employments, and titles;

c. IDENTIFY where/how the COMMUNICATION occurred, including the specific location where the COMMUNICATION occurred and/or medium of the COMMUNICATION; and

d. a summary of the COMMUNICATION'S subject

matter.

4.     If the Privilege is being asserted for a particular DOCUMENT, a description of the DOCUMENT, including:

a.     the date of the DOCUMENT;

b.     IDENTIFY the PERSON who authored or prepared of the DOCUMENT, including without limitation, the PERSON'S name, address, employment, and title;

c.     IDENTIFY each PERSON who has sent or had access to or custody of the DOCUMENT, together with an identification of employment of each said PERSON;

d.     the location of the DOCUMENT; and

e.     a summary of the DOCUMENT'S subject matter.

J.     If any DOCUMENT or thing otherwise responsive to any Request has been lost, discarded, or destroyed since its preparation or receipt, SERVICE shall IDENTIFY, as completely as possible, the DOCUMENT or thing, state the Request to which it would be responsive, and give full particulars or circumstances under which the DOCUMENT or thing was lost or destroyed, including, without limitation, each DOCUMENT'S date, the general nature of the DOCUMENT (*e.g.*, letter, memorandum, telegram, etc.), the subject matter of the DOCUMENT, each PERSON who authored the DOCUMENT, each PERSON indicated as an addressee or copy recipient, or known by DISCORD to have received a copy of the DOCUMENT or thing, and the DOCUMENT'S former custodians.  In addition, as to each such DOCUMENT or thing, the following information shall be supplied:

1.     date of disposal, loss, or destruction;

2.     manner of disposal, loss, or destruction;

3.     reason for disposal or destruction, or an explanation of the loss;

4.      IDENTIFY the PERSON(S) authorizing the disposal or destruction;

5.      IDENTIFY the PERSON(S) having knowledge of the disposal, loss, or destruction; and

6.      IDENTIFY the PERSON(S) who destroyed, lost, or disposed of the DOCUMENT or thing.

K.      If, in responding to any of these Requests, DISCORD encounters any ambiguity in construing either the Request, a definition, or an instruction, DISCORD shall state with specificity the matter deemed ambiguous and identify the construction chosen or used is responding to the Request. *Gilbert v. Citigroup, Inc.*, 2009 WL 10692463, *7 (N.D. Cal., Apr. 2, 2009); *Minna v. Rowley*, 2022 WL 3636364, *3 (E.D. Cal., Aug. 23, 2022); *Pulsecard, Inc. v. Discover Card Services, Inc.*, 168 F.R.D. 295, 310 (D. Kan. 1996).

L.      In producing material responsive to these Requests, DISCORD shall produce all material within its possession, custody or control – which extends not only to information within its immediate knowledge or possession – but includes an affirmative duty to seek that information reasonably available to it from its employees, agents, or other subject to its control. *Rogers v. Giurbino*, 288 F.R.D. 469, 485 (S.D. Cal. 2012). Where no responsive information is within DISCORD'S possession, custody or control, DISCORD must state with sufficient specificity under oath the steps taken to conduct a reasonable inquiry and exercise due diligence. *Id.*

M.      Any objection to a Request on the grounds that such information is in the possession of the requesting party is improper. *Bretana v. Int'l Collection Corp.*, 2008 WL 4334710, *4 (N.D. Cal., Sept. 22, 2008); *Brotherhood Mutual Insurance Co. v. Vinkov*, 2020 WL 6489326, *6 (C.D. Cal., Oct. 5, 2020).

N.      Pursuant to F.R.C.P. Rule 26(e), these Requests shall be deemed

continuing and supplemental answers shall be required if DISCORD directly or indirectly obtains further information after his initial response.

O.      Any objection to a Request on the grounds that "discovery is ongoing" is improper. Rather, DISCORD must respond and supplement its responses should discovery alter its response. *See MCC Controls v. Hal Hays Construction*, 2020 WL 6034321, *3 (C.D. Cal. Jul. 23, 2020); *DIRECTTV, Inc. v. Puccinelli*, 224 F.R.D. 677, 689 (D. Kan. 2004); F.R.C.P. Rule 26(e).

P.      Any objection to a Request on the grounds that producing responsive information to a Request is overly burdensome must state with specificity the reasons why producing such information to the Request is overly burdensome. *L.A. Terminals, Inc. v. United National Insurance Co.*, 340 F.R.D. 390, 397 fn. 2 (C.D. Cal. 2022); *Shaw v. Experian Information Solutions, Inc.*, 306 F.R.D. 293, 301 (S.D. Cal. 2015); *In re Subpoena Duces Tecum*, 451 B.R. 823, 831 (C.D. Cal. 2011).

## SUBPOENAED DOCUMENTS AND INFORMATION

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 1:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of the DISCORD user with the handle "yoggiebearx".

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 2:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of the DISCORD user with the screenname "allitern".

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 3:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of the DISCORD user with the handle "rozzwhalenm".

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 4:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of the DISCORD user with the handle "frompu".

**SUBPOENAED DOCUMENTS AND INFORMATION NO. 5:**

All DOCUMENTS and COMMUNICATIONS containing the PERSONAL IDENTIFYING INFORMATION of the DISCORD user with the handle "No_Reception".

# EXHIBIT 5

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TED ENTERTAINMENT, INC., a California Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ALEXANDRA MARWA SABER f/k/a MARWA TALATT ABDELMONEM p/k/a DENIMS, an individual, and DOES 1-10<br><br>Defendants. | Case No.: 2:25-cv-05564-WLH-PD<br><br>**DISCOVERY MATTER**<br><br>**ORDER GRANTING JOINT STIPULATION RE: GRANTING PLAINTIFF LEAVE TO SERVE THIRD-PARTY SUBPOENAS PRIOR TO THE RULE 26(f) CONFERENCE** |

Upon consideration of the Joint Stipulation Re: Granting Plaintiff Leave to Serve Third-Party Subpoenas Prior to the Rule 26(f) Conference ("Stipulation") of Plaintiff Ted Entertainment, Inc. ("TEI") and Defendant Alexandra Marwa Saber p/k/a Denims ("Denims"), and for good cause shown, the Court hereby rules as follows:

1. The Stipulation is GRANTED;

2. TEI may immediately serve the subpoena attached as Exhibit A to the Stipulation on third-party Reddit, Inc. ("Reddit Subpoena"), accompanied by this Order and shall include the date the Reddit Subpoena was issued and the date of compliance; and

3. TEI may immediately serve the subpoena attached as Exhibit B to the Stipulation on third-party Discord, Inc. ("Discord Subpoena"), accompanied by this Order and shall include the date the Discord Subpoena was issued and the date of compliance.

**IT IS SO ORDERED.**

DATED: July 31, 2025

_____

WESLEY L. HSU
UNITED STATES DISTRICT JUDGE

# EXHIBIT 6

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
Jeffrey M. Rosenfeld (Bar No. 222187)
Leah Rosa Vulic (Bar No. 343520)
548 Market St. #85399
San Francisco, CA 94102
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@kr.law
jeff@kr.law
leah@kr.law

Attorneys for Movants/Defendants Does

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE. SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.** | Case No. 3:25-mc-80296 |
| | (Case No. 2:25-cv-05564-WLH-PD, Pending in Central District of California) |
| | **MOVANTS DOE DEFENDANTS' NOTICE OF MOTION AND MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | Date: TBD |
| | Time: TBD |
| | Ctrm: TBD |
| | Before: TBD |

Case No. 3:25-mc-80296

**DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ........................................................................ 1

INTRODUCTION: Everybody Hates a Critic ......................................................... 1

STATEMENT OF ISSUES ...................................................................................... 2

STATEMENT OF FACTS ........................................................................................ 2

    A. TEI, Ethan Klein, Hasan Piker, and Denims: A Web of Reactionary Content.............. 2

    B. The H3Snark Subreddit: A Safe and Anonymous Space for Criticism of H3 ............... 3

    C. Ethan lays a trap: *Nuke* and *Countdown* ................................................. 6

        1. TEI promotes *Nuke* heavily as a controversial piece, and registers copyrights........ 6

        2. Denims live-reacts; Does facilitate safe criticism and foster conversation. ............ 7

    D. The Instant lawsuit and Subpoenas ........................................................ 8

        1. Complaint Allegations, Procedural Background, and Subpoenas ......................... 8

        2. The Falsity of TEI's Allegations Against Does ....................................... 9

        3. The Complaint and Ethan's own words show bad faith and pretext. ................... 10

        4. Does face real harm and retaliation if unmasked; discourse will be silenced. ....... 11

ARGUMENT ........................................................................................ 13

  I. Legal Standard ............................................................................ 12

    A. Quashing a Subpoena Generally .......................................................... 12

    B. Standard for Unmasking Anonymous Speaker .............................................. 13

        1. Motion to Dismiss Analysis (*Seescandy)* ........................................... 14

        2. Real Evidentiary Basis (*Highfields*) ............................................... 14

        3. *Highfields* test applies here. ..................................................... 15

  II. TEI cannot meet is initial burden. ....................................................... 16

    A. TEI has not stated—and cannot substantiate—a claim for contributory infringement. 16

        1. TEI cannot show requisite knowledge for contributory infringement................... 16

        2. TEI cannot show that Does induced, caused, or materially contributed to any direct infringement. ...................................................................... 18

        3. Does' Megathreads were fair use........................................................ 20

Case No. 3:25-mc-80296         i         **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

KRONENBERGER ROSENFELD

B. Denims' use was fair use. ........................................................................................ 20

    1. Denims' use was transformative and does not supersede the original use. ........... 21

    2. TEI's highly factual works supports greater dissemination. ................................. 22

    3. Denims' use did not negatively impact the market; it increased it. ....................... 22

    4. Stripping unoriginal elements, TEI's thin copyrights deserve little protection. ..... 24

III.    Even if TEI had met its initial burden, the balance of harms weighs in favor of Does ...................................................................................................................... 24

IV.    If Does' motion is not granted, Does request a protective order. ............................... 25

V.    Does Reserve their right to seek their attorney's fees. ................................................ 25

KRONENBERGER ROSENFELD

Case No. 3:25-mc-80296                ii        **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*A&M Recs., Inc. v. Napster, Inc.*,

239 F.3d 1004 (9th Cir. 2001) ........................................................................................... 23

*Apple Computer, Inc. v. Microsoft Corp.*,

35 F.3d 1435 (9th Cir. 1994) ............................................................................................. 24

*Art of Living Found. v. Does 1-10*,

2011 WL 5444622 (N.D. Cal. Nov. 9, 2011) ............................................................. 15, 24, 25

*Atari Interactive, Inc. v. Redbubble, Inc.*,

515 F. Supp. 3d 1089 (N.D. Cal. 2021) ............................................................................. 17

*Awtry v. Glassdoor, Inc.*,

2016 WL 1275566 (N.D. Cal. Apr. 1, 2016) .................................................................. 17, 24

*Baugher v. GoDaddy.com LLC*,

2021 WL 4942658 (D. Ariz. Oct. 22, 2021) .................................................................. 15, 16

*BMG Rts. Mgmt. (US) LLC v. Joyy Inc.*,

644 F. Supp. 3d 602 (C.D. Cal. 2022) ............................................................................... 16

*Campbell v. Acuff-Rose Music, Inc.*,

510 U.S. 569 (1994) ................................................................................................. 20, 21, 23

*Columbia Ins. Co. v. seescandy.com*,

185 F.R.D. 573 (N.D. Cal. 1999) ...................................................................................... 14

*Columbia Pictures Indus., Inc. v. Fung*,

710 F.3d 1020 (9th Cir. 2013) ...................................................................................... 18, 19

*Columbia Pictures v. Bunnell*,

2006 WL 5383789 (C.D. Cal. May 10, 2006) .................................................................... 17

*Does I thru XXIII v. Advanced Textile Corp.*,

214 F.3d 1058 (9th Cir. 2000) .......................................................................................... 25

//

KRONENBERGER ROSENFELD

KRONENBERGER ROSENFELD

*Eldred v. Ashcroft*,

537 U.S. 186 (2003) ........................................................................................... 20

*Equals Three, LLC v. Jukin Media, Inc.*,

139 F. Supp. 3d 1094 (C.D. Cal. 2015) ............................................................. 22

*Ets-Hokin v. Skyy Spirits, Inc.*,

323 F.3d 763 (9th Cir. 2003) ............................................................................. 24

*Fonovisa, Inc. v. Cherry Auction, Inc.*,

76 F.3d 259 (9th Cir. 1996) ............................................................................... 19

*Glass Egg Digital Media v. Gameloft, Inc.*,

2019 WL 2499710 (N.D. Cal. June 17, 2019) ................................................... 13

*Google LLC v. Oracle Am., Inc.*,

593 U.S. 1 (2021) ......................................................................................... 21, 23

*Harper & Row Publishers, Inc. v. Nation Enters.*,

471 U.S. 539 (1985) ........................................................................................... 22

*Highfields Cap. Mgmt., L.P. v. Doe*,

385 F. Supp. 2d 969 (N.D. Cal. 2005) .......................................................... 14, 15

*Highfields Cap. Mgmt., L.P. v. Doe*,

2005 WL 8188026 (N.D. Cal. May 31, 2005) ................................................... 26

*In re Anonymous Online Speakers*,

661 F.3d 1168 (9th Cir. 2011) ........................................................................... 14

*In re DMCA Subpoena to Reddit, Inc.*,

441 F. Supp. 3d 875 (N.D. Cal. 2020) .............................................................. 20

*In re DMCA § 512(h) Subpoena to Twitter, Inc.*,

608 F. Supp. 3d 868 (N.D. Cal. 2022) .................................................... 13, 21, 24

*In re Gliner*,

133 F.4th 927 (9th Cir. 2025) ........................................................................... 13

*In re PGS Home Co. Ltd.*,

2019 WL 6311407 (N.D. Cal. Nov. 25, 2019) .................................................. 16

Case No. 3:25-mc-80296     iv     **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

*Kavanaugh v. Klein*,

2025 WL 999183 (Cal. Ct. App. Apr. 3, 2025) .......................................................... 11

*Kechara House Buddhist Ass'n Malaysia v. Does*,

2015 WL 5538999 (N.D. Cal. Sept. 18, 2015) ........................................................... 16

*Keen v. Bowley*,

2024 WL 3259040, n. 59 (C.D. Cal. July 1, 2024) ....................................................... 3

*Lenz v. Universal Music Corp.*,

815 F.3d 1145 (9th Cir. 2016) ....................................................................... 20, 21

*Los Angeles News Serv. v. CBS Broad., Inc.*,

305 F.3d 924 (9th Cir.) ................................................................................. 23

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,

658 F.3d 936 (9th Cir. 2011) ...................................................................... 18, 19

*Luvdarts, LLC v. AT & T Mobility, LLC*,

710 F.3d 1068 (9th Cir. 2013) .............................................................. 16, 17, 18

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,

545 U.S. 913 (2005) ................................................................................. 18, 19

*Monge v. Maya Magazines, Inc.*,

688 F.3d 1164 (9th Cir. 2024) .......................................................................... 23

*Music Grp. Macao Com. Offshore Ltd. v. Does*,

82 F. Supp. 3d 979 (N.D. Cal. 2015) ............................................................ 24, 25

*Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc.*,

753 F. Supp. 3d 933 (C.D. Cal. 2024) .................................................................. 23

*Perfect 10, Inc. v. Amazon.com, Inc.*,

508 F.3d 1146 (9th Cir. 2007) ...................................................................... 16, 20

*Perfect 10, Inc. v. Giganews, Inc.*,

2015 WL 1746406 (C.D. Cal. Mar. 6, 2015) .......................................................... 17

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,

494 F.3d 788 (9th Cir. 2007) ....................................................................... 16, 18

Case No. 3:25-mc-80296     v     **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

*Perry v. Schwarzenegger*,

591 F.3d 1126 (9th Cir. 2009) ...................................................................................... 13

*Robinson v. Binello*,

771 F. Supp. 3d 1114 (N.D. Cal. 2025) ........................................................................ 16

*Schneider v. YouTube, LLC*,

649 F. Supp. 3d 872 (N.D. Cal. 2023) .......................................................................... 18

*Seltzer v. Green Day, Inc.*,

725 F.3d 1170 (9th Cir. 2013) ...................................................................................... 21

*Signature Mgmt. Team, LLC v. Automattic, Inc.*,

941 F. Supp. 2d 1145 (N.D. Cal. 2013) ........................................................................ 25

*Sobhani v. @Radical.Media Inc.*,

257 F. Supp. 2d 1234 (C.D. Cal. 2003) ........................................................................ 24

*Sony Music Ent. Inc. v. Does 1-40*,

326 F. Supp. 2d 556 (S.D.N.Y. 2004) .......................................................................... 15

*Tarantino v. Gawker Media, LLC*,

2014 WL 2434647 (C.D. Cal. Apr. 22, 2014) .............................................................. 16

*VHT, Inc. v. Zillow Grp., Inc.*,

918 F.3d 723 (9th Cir. 2019) ........................................................................................ 19

*YZ Prods., Inc. v. Redbubble, Inc.*,

545 F. Supp. 3d 756 (N.D. Cal. 2021) ..................................................................... 17, 18

**Statutes**

17 U.S.C. §107 ............................................................................................................. 20, 21, 22

18 U.S.C. §2701 ....................................................................................................................... 9

47 U.S.C. §230 ......................................................................................................................... 5

**Rules**

Fed. R. Civ. P. 26 ............................................................................................................... 13, 25

Case No. 3:25-mc-80296       vi       **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

KRONENBERGER ROSENFELD

Fed. R. Civ. P. 45 ............................................................................................ 13, 25

KRONENBERGER ROSENFELD

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that, on a date and time to be determined, Movants/Defendants Does ("Does") will and hereby do move this Court to quash subpoenas issued by Plaintiff Ted Entertainment, Inc. ("Plaintiff" or "TEI") to non-parties Reddit, Inc. ("Reddit") and Discord, Inc. ("Discord") (the "Subpoenas"). The Subpoenas seek identifying information for numerous Reddit and Discord accounts in Plaintiff's civil action filed in the District Court for the Central District of California on June 19, 2025, *Ted Entertainment, Inc. v. Alexandra Marwa Saber and Does 1-10*, Case No. 2:25-cv-05564-WLH-PD (the "Action").

TEI's subpoenas should be quashed because: 1) TEI has not and cannot state a claim against Does for contributory copyright infringement; and 2) the balance of equities weighs in favor of Does' anonymity and quashing TEI's Subpoenas in their entirety. Does request that this Court quash the Subpoenas with prejudice, or in the alternative, enter a protective order; award attorney's fees; and grant such further and other relief as the Court deems just and proper.

## INTRODUCTION: Everybody Hates a Critic

On its face, the Action is about copyright infringement. At its heart, however, the Action is about stifling criticism and seeking retribution by unmasking individuals for perceived reputational harms TEI attributes to Does, unrelated to TEI's intellectual property rights.

TEI publishes the H3 Podcast, a popular live comedy and commentary podcast hosted primarily by Ethan Klein. This Motion arises from TEI's attempt to compel disclosure of Does' identities in the Action, where TEI has sued Denims, a Twitch streamer, and Does 1-10, who are or were moderators of a subreddit[1] critical of TEI, its owners, and their H3 Podcast. TEI purportedly seeks to hold Does accountable for alleged contributory copyright infringement for posting links to Denims' Twitch channel, on which Denims live-reacted to TEI's public content. In reality, TEI has not and cannot allege facts stating a claim for contributory infringement against Does, and the Action and Subpoenas are a thinly veiled pretext for obtaining Does' identities in order to expose, punish, and dox Does for their roles as moderators of the critical subreddit, H3Snark.

---

[1] A subreddit is a smaller community within Reddit, created and moderated by other Reddit users. https://support.reddithelp.com/hc/en-us/articles/204553569-What-are-communities-or-subreddits.

Case No. 3:25-mc-80296                    1          **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

TEI improperly seeks to use the Court's subpoena authority not for legitimate discovery, but to unmask and intimidate anonymous Does, whose only action was hosting lawful, critical discussions of H3 and its content. The Subpoenas broadly demand account information from Reddit and Discord despite clear facts that: (a) none of the Does uploaded, distributed, or provided copies of the allegedly infringed works; (b) the posts that TEI alleges constitute unlawful contributory copyright infringement, were created to centralize critical discussion and provided URLs to publicly-accessible Twitch and YouTube user channels, which Does understood would host only fair use commentary; and (c) no evidence exists of any coordination between the Does and Denims, or between the Does and any other Twitch or YouTube streamers. Additionally, Denims' allegedly infringing Twitch stream itself constituted fair use of an already very thin copyright registration.

This matter transcends copyright concerns. It directly implicates whether powerful entities can exploit judicial mechanisms to silence anonymous critics. At stake is the fundamental First Amendment right to anonymous speech on public matters—a right the Supreme Court has recognized as essential. Allowing TEI's Subpoenas would subject Does to significant harassment, reputational harm, and professional repercussions solely for engaging in lawful speech. More broadly, allowing the Subpoenas will send a chilling message to internet moderators and commenters: criticize wealthy and influential individuals, and risk being unmasked in federal court.

<div align="center">

**STATEMENT OF ISSUES**

</div>

1) What legal standard applies when a plaintiff seeks to unmask anonymous speakers engaged in First Amendment-protected criticism, under the guise of a contributory copyright infringement claim?

2) Has TEI established a cause of action against Does sufficient to warrant unmasking?

3) Even if TEI has established a cause of action against Does, do balancing factors, both public and private, weigh in favor of TEI's ability to unmask Does?

<div align="center">

**STATEMENT OF FACTS**

</div>

**A.     TEI, Ethan Klein[2], Hasan Piker, and Denims: A Web of Reactionary Content**

---

[2] Because Ethan and Hila share the same last name, this motion refers to them by their first names to avoid confusion; no disrespect is intended. *See Keen v. Bowley*, 2024 WL 3259040, at \*7, n. 59 (C.D. Cal. July 1, 2024).

Case No. 3:25-mc-80296                    2        **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

KRONENBERGER ROSENFELD

Ethan Klein ("Ethan") is an Israeli-American YouTuber and podcaster, best known as the host of the H3 Podcast and co-creator of the YouTube channel h3h3Productions, with his wife Hila Klein ("Hila"). (Vulic Decl. Ex. A ("Compl.") ¶¶12, 25.) Together, Ethan and Hila own Plaintiff TEI[3], a production company that broadcasts the H3 Podcast. (Compl. ¶¶12, 15.) Ethan is frequently in the public eye for his outspoken views, online controversies, and social media presence, maintaining over 5.7 million subscribers on his primary channel. (Doe Decl. ¶¶3, 5, 11, 14, 20, 97, 110, 159, 173, 174.)

Ethan formerly collaborated with Hasan Piker, another high-profile online content creator, as co-hosts on the "Leftovers" series on YouTube. (Compl. ¶24.) Ethan and Piker's partnership drew a large following due to their contrasting backgrounds and lively debates on internet issues, politics, and news. (Doe Decl. ¶7.) Their relationship soured over deepening political disagreements, especially regarding the Israeli-Palestinian conflict and the events following October 7, 2023. (Compl. ¶27.) After the podcast's end, their relationship declined as public criticism and social media jabs escalated into a highly public feud. (Doe Decl. ¶16.) They have exchanged critical videos, hosted a live debate in May 2025 that drew widespread attention, and discussed each other's platforms and communities, often highlighting and criticizing each other's political views on the Israeli-Palestinian conflict. (Doe Decl. ¶7.)

Twitch streamer Alexandra Marwa Saber ("Denims"), is an online content creator and streamer, known for Twitch live streams and commentary, focusing on reaction content and debates on internet culture and politics. (Doe Decl. ¶20[4].) Denims is one of many critics of Ethan, Hila, and H3, and often discusses H3, its views, and controversies on her live stream. (Doe Decl. ¶20.) Denims is an associate of Piker. (Doe Decl. ¶37.)

**B.    The H3Snark Subreddit: A Safe and Anonymous Space for Criticism of H3**

Reddit is a website and message board home to thousands of communities, designed to bring users together in honest conversations, fostered by its users' abilities to speak anonymously. (Vulić Decl. Exs. 13, 14.) Reddit users communicate and engage through communities called "subreddits."

---

[3] Ethan, Hila, and TEI, and their podcast, may be collectively referred to herein as "H3."
[4] *See also* https://www.twitch.tv/denims/about.

Case No. 3:25-mc-80296                                      **DOES' NTC OF MTN AND MTN TO QUASH**
                                        3                   **SUBPOENAS; MPA**

KRONENBERGER ROSENFELD

(Vulić Decl. Ex. 15.) Moderators (mods) are unpaid volunteers who set community rules, norms, and expectations for subreddits, to ensure Reddit's Rules are enforced; mods also remove inappropriate content and facilitate discussions. (Doe Decl. ¶¶4, 15, 19, 123, 131, 170, 195, 213, 214, 215, 252, 273, 292; Vulić Decl. Exs. 14, 16, 17.)

A subreddit about H3 was created on April 30, 2023 for "fallen fans" of H3 to safely criticize H3, Ethan, and related topics ("H3Snark" or "Subreddit"). (Vulić Decl. Exs. 18, 19.) Fans of H3 were systematically banned from the official H3 subreddit of 580,000+ members when they made critical comments; Ethan and Hila are the head mods of this official H3 subreddit. (Doe Decl. ¶¶25, 29, 173, 211, 252.) Banned users thus used alternative spaces, like r/h3snark, to freely discuss and critique Ethan's increasingly controversial statements about politics, world events, or popular culture topics, and his feuds with other creators and former co-hosts. (*Id*. ¶¶8, 9, 10, 13, 114.) Thus, H3Snark emerged as a moderated subreddit with rules designed to foster a safe space for engaging in critical discussions related to H3 without censorship. (*Id*. ¶¶15, 195, 210, 211, 252, 291, 293.)

Does are or were moderators of H3Snark. (Doe Decl. *passim*.) Given the Subreddit's population of "fallen fans" of H3, its moderators found it essential to ensure an environment free from harassment. (*Id*. ¶¶19, 114, 170, 195, 291.) The mods created rules, set up systems and pages, programmed AutoMod code, and configured apps to assist moderation. (*Id*. ¶¶15, 123, 170, 200, 214, 215, 219, 271.) Rules on what could be discussed on H3Snark were firm and principled on civility. (*Id*. ¶¶15, 19, 170, 195, 196, 213, 292.) The mods aimed to foster a friendly and positive community where people did not harass others based on personal traits. (*Id*. ¶¶15, 170, 195, 213, 221, 270, 291, 292.) Instead, discussions centered on actions or statements made on the H3 Podcast, including concerns about Ethan's use of offensive language, including racial slurs, sexism, racism, and homophobia. (*Id*. ¶¶170, 221, 270.) The mods' efforts were guided by a sincere commitment to maintaining constructive dialogue, and they received positive feedback from many community members who appreciated the respectful environment. (*Id*. ¶¶170, 213, 222.)

Does also took copyright infringement seriously, consistently taking steps to comply with copyright and fair use laws. (*Id*. ¶¶62, 131, 217, 219, 254.) Mods actively removed infringing content, regularly updated their policies, reached out to Reddit admins for guidance, and even

Case No. 3:25-mc-80296

4

**DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

consulted a lawyer to ensure that content shared on the Subreddit remained copyright compliant. (*Id*. ¶¶15, 62, 117, 213, 214, 217, 218, 219.) After October 2024, the Subreddit banned references and links to alternative viewing websites. (*Id*. ¶¶61, 117, 118, 119, 214; Vulić Decl. Ex. 19.) Further, mods created an automated copyright disclaimer, which automatically attached to every single post on the Subreddit ("AutoMod Disclaimer"). (Doe Decl. ¶¶32, 50, 133, 200, 219.)

While mods can set community guidelines, they are not responsible for content posted by Subreddit users. (Doe Decl. ¶15.) Despite this, Ethan has for some time accused the Subreddit and its mods of defaming him, harassing him, engaging in hate crimes against him, and later—after the Subreddit was inactive—sending both Child Protective Services and human skulls to his house. (Doe Decl. ¶¶154, 171, 180, 231, 232, 233, 234; Vulić Decl. Ex. 38.)

To be clear, **Does are not responsible in any way for the atrocious behavior described above, or any instance of harassing or defaming Ethan or H3.** (Doe Decl. *passim*.) Yet, Ethan and H3 have repeatedly attributed such atrocious conduct to Does, and have repeatedly made threats toward and against Does *on the H3 Podcast*. (Doe Decl. *passim*; Vulić Decl. Exs. 21, 22, 24, 41.)

Despite Ethan's claims against Does being false, inaccurate, and/or entirely unsubstantiated, Ethan's attacks on Does are integral to the H3 Podcast, and prime the H3 audience to believe that any and all actions Ethan takes against the Does are justified. (Doe Decl. ¶¶190, 231.) Ethan explicitly uses his podcast to incite his fans against the mods of H3Snark. (Doe Decl. ¶¶172, 231.) Indeed, H3 fans and supporters themselves, incited and emboldened by Ethan, have launched multiple threats against the H3Snark mods. (Doe Decl. ¶¶151, 179, 231, 245.)

In addition to actual threats and incitement, H3 has repeatedly threatened to sue Does. In 2023, these threats escalated, including warnings that Ethan would involve the FBI and pursue legal action for defamation and hate speech. (Doe Decl. ¶¶172, 223; Vulić Decl. Ex. 40.) But Ethan has not brought such lawsuits, because: 1) Does are immune from liability for the actions of the Subreddit users under 47 U.S.C. §230 (Doe Decl. ¶15, 69; Vulić Decl. Ex. 38), and 2) Does' speech is highly protected First Amendment speech, and any legal action against the H3Snark mods under traditional tort theories is subject to strict scrutiny and free speech protections, such as California's anti-SLAPP statute, CCP §425.16. Ethan has also threatened to uncover the H3Snark mods'

**DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

KRONENBERGER ROSENFELD

identities using digital forensics investigators. (Doe Decl. ¶¶70.1, 223, 258.)

Ethan's intentions are clear. He has repeatedly expressed his eagerness to expose Does to their friends, family, workplaces, and schools. (Doe Decl. ¶¶65, 66, 73.1, 197.5, 224, 261, 277; Vulić Decl. Exs. 21.) He even admitted on his podcast to creating his own subreddits to harass Does and the Subreddit. (Doe Decl. ¶¶198, 224, 279.) Reddit itself has found H3-controlled subreddits guilty of harassment on its platform. (Doe Decl. ¶196; Vulić Decl. Ex. 25.)

**C.     Ethan lays a trap: *Nuke* and *Countdown***

**1.     TEI promotes *Nuke* heavily as a controversial piece, and registers copyrights.**

Ethan and Hila, through TEI, created the motion picture *Content Nuke: Hasan Piker* ("*Nuke*"), ostensibly to combat a tsunami of hateful rhetoric regarding the Israeli-Palestinian conflict and the Gaza War, and Piker's role in the surrounding discussion. (Compl. ¶37.) *Nuke* was written, shot, and edited from December 2024 through January 2025. (Compl. ¶38.) TEI submitted a copyright registration application with the United States Copyright Office (the "USCO") for *Nuke* on January 27, 2025 (four days before *Nuke* was publicly released). (Compl. ¶38.) According to TEI, *Nuke* is a "tragi-comic documentary critiquing Hasan and Twitch," comprised of "original footage, highly edited montages, parodic skits and archival matters." (Compl. ¶40.) *Nuke* is largely compromised of informational elements—*i.e.*, facts, history. (Compl. Exs. D, E.) *Nuke*'s copyright registration excludes the "preexisting footage, preexisting photograph(s), and preexisting music" the film uses from other publications, and those elements are present in a staggering amount. (Vulić Decl. Exs. 5-6; Compl. Exs. D, E; Doe Decl. ¶¶136-144.) Indeed, of the 1 hour, 42 minutes, and 5 second-running time of *Nuke*, approximately 5 minutes, 58.5 seconds contains *only* original or new TEI content (accounting for ~5.58% of the total video), and about 1 minute, 1.5 seconds of *Nuke* consists of *only* new TEI content (~1% of the video). (Doe Decl. ¶¶136-143.)

Before its release, Ethan built up public interest in *Nuke* by discussing it on the H3 Podcast. (Compl. ¶43.) With the public interest in *Nuke* came an equal interest in being able to comment on or criticize it through safe channels. (Doe Decl. ¶¶17, 227, 228.) TEI-controlled spaces, such as the H3 Podcast official YouTube channel's live chat and comments section, as well as the H3 official subreddit, had grown increasingly hostile toward criticism. (*Id. passim.*)

Case No. 3:25-mc-80296

6

**DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

On January 31, 2025, H3 hosted its regularly scheduled podcast, but the theme was purportedly to promote the release of *Nuke* ("*Countdown*"). (Compl. ¶41 & Compl. Ex. F.)[5] That same day, H3 published *Nuke* on its YouTube channel, which was publicly viewable. Following publication of *Nuke*, Ethan himself publicly broadcast *Nuke* in full on a continuous 24/7 loop on Twitch starting from March 5 to April 4, 2025. (Vulić Decl. ¶47 & Ex. 47.)

**2.    Denims live-reacts; Does facilitate safe criticism and foster conversation.**

In advance of *Nuke*'s release, several streamers, including Denims, publicly stated that they planned to live-react to the film, *i.e.*, provide reactions and commentary while viewing *Nuke*. (Doe Decl. ¶¶23, 124.) The Subreddit received sharp increases in user submissions about anticipated reactions to *Nuke*, with community members expressing hesitation to watch it directly from H3/TEI (out of fear of retaliation) and a desire to collectively react through alternate streams that aligned with the Subreddit's atmosphere. (*Id*. ¶¶122, 124.) To manage this activity surge, and to consolidate discourse about *Nuke* and reactions to it in a safe space without retaliation, Does created "Megathreads" (standard, organized posts that aggregate discussions about specific events)[6], which had links to creators' public homepages (not to specific videos) who had *already announced their intent to react*. (*Id*. ¶¶34, 38, 40, 122, 124, 126-130, 228, 229.) The Megathreads were created for users to engage with the content indirectly while controlling traffic and maintaining community guidelines—in other words, discussion threads.

The First Megathread (Compl. Ex. G), posted Jan. 30, states Does' intentions of providing a space to discuss *Nuke* (titled "MEGATHREAD | Content Nuke - Where to Watch & Discussion"), to "react/comment/update" on the thread, while instructing users to abide by the Subreddit's rules, including those on copyright and fair use. (Doe Decl. ¶¶122, 131.) It included links to the channels of creators who had indicated that they planned to stream their reactions or post reaction videos in the coming days, including a link to Denims' Twitch channel. (*Id.*)

---

[5] Only *after* TEI discovered that Denims (and others) in fact did what Ethan prodded them to do—watch *Nuke* and react to it—did TEI register *Countdown* with the USCO. (Compl. ¶42.) TEI has never, before this year, registered copyrights in its broadcast or any other work before. (Vulić Decl ¶7, Ex. 7.)

[6] References to numbered Megathreads in this Motion correspond to numbered "Inducement Posts" in the Complaint; Does note that the Third Megathread was posted before the Second Megathread.

Case No. 3:25-mc-80296                                  **DOES' NTC OF MTN AND MTN TO QUASH**
7                      **SUBPOENAS; MPA**

KRONENBERGER ROSENFELD

The Second Megathread (Compl. Ex. H), posted on January 31, three minutes after *Nuke* was released, offered "Places to watch *reactions* to this video" [emphasis added], and included links to live-reacting streamers as well as *H3's own live broadcast* of *Nuke*. (Doe Decl. ¶38.) The Third Megathread (Compl. Ex. I), posted on January 31, 2025, three minutes after *Countdown* began, hyperlinked to Denims' Twitch channel and included a pinned mod comment providing links to the other streamers who would be reacting. (Doe Decl. ¶33.)

The First Megathread was posted *before* release of *Countdown* and *Nuke*; the Third was posted before *Nuke*. (Doe Decl. ¶¶34, 121.) The Megathreads only link directly to official Twitch and YouTube user landing pages. (Compl. Exs. G-I.) The links contain **no unauthorized** mirrors, VODs (video on demand), or download links. (*Id.*) The sole purpose of these Megathread posts was to facilitate lawful, real-time commentary and critique; and each contained the AutoMod copyright disclaimer. (*Id.*; Doe Decl. ¶133; Vulić Decl. Ex. 45.)

Does themselves did not watch any of the streamers live-reacting, including Denims. (Doe Decl. ¶¶43, 108, 135, 169, 201, 227, 255, 276, 294.)

**D.    The instant lawsuit and Subpoenas**

On June 19, 2025, TEI filed three lawsuits: 1) the Action, 2) a lawsuit against Morgan Kamal Majed (Frogan) and Does in the C.D. Cal., Case No. 2:25-cv-05565, and 3) a lawsuit against Kacey Caviness (Kaceytron) and Does in the W.D. Mo., Case No. 4:25-cv-00459-LMC. Frogan and Kaceytron are also streamers who live-reacted to *Nuke*. (Vulić Decl. Exs. 3-4.)

**1.    Complaint Allegations, Procedural Background, and Subpoenas**

TEI alleges that Denims directly infringed on TEI's copyrights in *Nuke* and *Countdown*, by her reactions to both during her 10-hour stream on January 31, 2025[7]. (Compl. ¶¶2, 75-81, Compl. Exs. J-K[8].) TEI further alleges that Does committed contributory infringement by posting links to Denims' Twitch channel. (Compl. ¶¶3, 43-45, 75-81, Compl. Exs. G-I.)

---

[7] Denims answered the Complaint on August 14, 2025. (Vulić Decl. Ex. 12.) Among other defenses, Denims asserted that her use of the works was fair, that TEI had granted express or implied licenses, that TEI filed the Complaint with unclean hands, that TEI suffered no injury or damages, that the Complaint is barred by TEI's own inequitable conduct, and lack of notice. *Id.*
[8] Specific timestamps in the Complaint to Denims' stream do not appear to match the timestamps in the relevant Exhibits, J-K.

Case No. 3:25-mc-80296          8          **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

Before a Rule 26(f) conference, TEI and Denims agreed to allow TEI to take expedited discovery and serve the Subpoenas on Reddit and Discord. (Vulić Decl. Ex. 8.) The Central District of California judge granted their stipulation on July 31, 2025, signing the proposed order filed therewith without any modifications. (*Id.* Ex. 9.) On August 4, 2025, TEI issued the Subpoenas to Reddit and Discord. (*Id*. Exs. 10-11.) The Subpoenas broadly ask for identifying information for Does, and for all moderators of the Subreddit from Jan.1-Feb. 28, 2025.[9] (*Id.* ¶9, Exs. 10-11.)

### 2. The Falsity of TEI's Allegations Against Does

TEI alleges three categories of conduct related to the H3Snark Subreddit: 1) "rampant" infringement, including posting of links to H3 content on YewTube (Compl. ¶¶29-33), 2) "fraudulent" DMCA counternotifications (Compl. ¶35), 3) the Megathreads (Compl. ¶44). Of these categories, only the Megathread allegations directly relate to the alleged inducement. TEI's allegations against Does are: 1) facially incorrect, 2) based on conclusory allegations and assumptions, or 3) not observations about Does at all.

First, the Complaint ignores the text and context of the Megathreads. The actual text of the Megathreads shows their purpose of providing a safe environment to discuss and criticize H3—*i.e.*, they were discussion threads. (Doe Decl. ¶¶6, 32, 33, 34, 44, 45, 122, 123, 125, 126, 227, 228, 229; Compl. Exs. G-I.) The links within the Megathreads were to each streamer's general channel, not to any specific content alleged to be infringing at the time of posting. *Id.* The Megathreads were posted in the Subreddit amidst ongoing debates, criticisms, and discussions of Ethan, Piker, and the political landscape in which those occurred. *Id.*

Second, the Complaint's allegations about Does' "knowledge" of alleged infringement are false, conclusory, and/or would require Does to be precognitive. The First Megathread was made before *Countdown* and *Nuke*, *i.e.*, before Denims reacted to them; the Third was posted before Denims reacted to *Nuke*. (Doe Decl. ¶¶33, 122; Compl. Exs. G, I.) No Doe watched Denims' stream. (Doe Decl. ¶¶43, 108, 135, 169, 201, 227, 255, 276, 294.) No Doe coordinated with Denims in any manner regarding Denims' streaming of *Nuke*. (Doe Decl. ¶¶21, 128, 169.) **TEI never notified Does**

---

[9] Facially, the Subpoenas ask for information that could be construed as violating the Stored Communications Act, 18 U.S.C. §2701, *et seq*. ("SCA"), and for non-mod information. TEI has agreed to limit the Subpoenas' requests so that the SCA is not implicated. (Vulić Decl. ¶9.)

Case No. 3:25-mc-80296      9      **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

**that it believed Denims' stream was infringing/not fair use, until it filed the Action.** (Doe Decl. ¶¶31, 41; Compl. *passim*.)

Contrary to TEI's allegations: Does did not delete the Megathreads to "conceal" infringement; these posts are still available online. (Vulić Decl. ¶45.) The Complaint and exhibits also fail to acknowledge that the Second Megathread included a link to H3's actual live broadcast of *Nuke*. (Doe Decl. ¶¶38-40; Compl. Ex. H.) The Megathreads were not posted amidst "rampant copyright infringement" on H3Snark; Does discouraged copyright infringement, including through Subreddit Rules and AutoMod Copyright Disclaimer, which the Complaint's Exhibits crop out. (Doe Decl. ¶¶50, 134, 217, 218, 219.) References to YewTube links are irrelevant to the alleged inducement; Does later banned use of alt-viewing sites for unrelated reasons; and use of YewTube has not been found to infringe copyrights. (Doe Decl. ¶¶61, 112, 113, 114, 115, 133; Vulić Decl. Ex. 46.) Does had nothing to do with fraudulent DMCA counternotifications, which have no relation to the Megathreads; and mods do not receive DMCA takedowns. (Compl. ¶35; Doe Decl. ¶¶54, 116, 118.)

### 3. The Complaint and Ethan's own words show bad faith and pretext.

The Complaint includes numerous references to non-IP-related conduct, which TEI associates with Does, without substantiation. (Compl. ¶¶ 28, 35(d), 35(e)(ii), 35(e)(iii).) Does have nothing to do with this alleged activity. (Doe Decl. *passim*.) Because this conduct is irrelevant to TEI's infringement claims, its inclusion in the Complaint suggests an alternative motive for bringing the Action.

Ethan's conduct also reveals the Action's pretextual nature. On the day TEI filed, Ethan admitted that the release of *Nuke* was a deliberate "trap" intended to lure streamers into reacting to his work, stating: "the trap was set and it worked even better than I imagined." (approx. 3:51–4:24); "The Snark subreddit has been a frequent and persistent infringer… that's how I knew when this video came out the Snarkers were going to encourage, promote and push streamers…" (5:17–5:26). (Vulić Decl. Ex. 20; *see also* Doe Decl. ¶63.2.) Ethan has repeatedly stated his intent to pursue legal action to discover Does' identities, but for reasons other than alleged copyright infringement. (Doe Decl. ¶¶72.1, 72.2, 94.2, 171, 186, 223; Vulić Decl. Ex. 21.)

Notably, TEI takes *no* issue with another streamer, "xQc," who, like Denims, reacted to

KRONENBERGER ROSENFELD

*Nuke*. *Unlike* Denims, xQc: 1) boasted 1.2 million Twitch followers (compared to Denims' 120,000 as of the date of this filing), 2) peaked at 94,000 live viewers (compared to Denims' 45,800), 3) reacted to *Nuke* for 48 minutes, 30 seconds (compared to Denims' over two hours of reaction time). (Doe Decl. ¶27.) The difference? xQc's reaction was *supportive* of Ethan. *See id*. The takeaway: Ethan does not find "group streaming sessions" infringing, unless they are critical of him.

Ethan is also known for legally targeting those who disagree with him. For example, H3/TEI was involved in an IP lawsuit with TrillerTV (*Triller Fight Club II LLC v. TEI*, 2:21-cv-03942-JAK-KS, C.D. Cal.); Ethan thereafter allegedly defamed Triller's principal, Ryan Kavanaugh, accusing him of fraud. (Doe Decl. ¶¶84, 85.) This led to a years-long lawsuit, in which Ethan filed and lost an anti-SLAPP motion, which was affirmed on appeal, *Kavanaugh v. Klein*, 2025 WL 999183 (Cal. Ct. App. Apr. 3, 2025), *reh'g denied* (Apr. 23, 2025), *review denied* (July 9, 2025). (Doe Decl. ¶¶84, 84.1, 84.2, 84.3, 85, 85.1; Vulić Decl. Ex. 34.)

Ethan has admitted that the mere existence of "snark" communities in general, are what "led to" the creators being sued in these three lawsuits. (Doe Decl. ¶¶63.2, 197.6.)

**4.    Does face real harm and retaliation if unmasked; discourse will be silenced.**

If Does are unmasked, they will face nearly certain risks of retaliation, harassment, and doxing, as shown by H3's track record. Ethan has a long history of trying to "unmask" those who criticize him anonymously, even dedicating an episode of the H3 Podcast titled "Unmasking the Harassment Against Us" where he reviewed dozens of anonymous threads and imagined false conspiracies in which moderation teams all conspired together. (Doe Decl. ¶¶172, 197.3, 281.) Ethan has personally made the following threats against Does:

- *"Listen, guys, at this point you [r/h3snark mods] are totally fucked. ... There's a subpoena that's going to come. You can't erase your data. **We're going to get your IP address and find your information.**"* (Doe Decl. ¶70.1; Vulić Decl. Ex. 21.)
- *"If there's any justice in the world **[the h3snark mods] will lose everything that they care about and I will be the one who makes them lose those things… through legal means. Through any legal means.**"* (Doe Decl. ¶¶73.1, 197.1; Vulić Decl. Ex. 21.)
- *"**I will spend and go to any limit to legally and within the scope of the law is allowed, to annihilate you, for any cost,** because you people are evil, you people are disgusting fucking human beings."* (Doe Decl. ¶¶71.1, 188; Vulić Decl. Ex. 21.)
- *"There is no limit that I will do, legally, **to destroy their lives proudly and happily.** I will do it and I will stand proud on their fucking proverbial grave - in terms of their career."* (Doe Decl. ¶74.1; Vulić Decl. Ex. 21.)

KRONENBERGER ROSENFELD

Ethan has made clear that his motive is not to seek redress for alleged infringement, but to punish and expose Does because he believes they are responsible for harassment against him; they are not, and TEI's lawsuit is a pretext.

In addition to Ethan's own threats against Does, and his incitement of others' threats against Does, Ethan has previously incited others to react against other people he has disputes with. (Doe Decl. *passim*; Vulić Decl. Ex. 26, 34.) As a result of Ethan's direct and indirect threats against Does, past instances of actual retaliation instigated by Ethan against H3 critics, and Ethan's history of personally harassing or instigating harassment against those he disagrees with, Does have legitimate fears of being unmasked. (Doe Decl. *passim*.) Specifically, Does fear potentially being attacked, or worse, killed, over moderating a subreddit. These worries extend to all family and friends connected to Does. Does fear their professional lives being ruined, potential sexual violence, extortion, fans showing up to their home, and endless years of harassment due to Ethan's prolific lies surrounding them. The target he has painted on the moderators would make it unsafe to live openly in any capacity. (*Id.*) Some of Does also have heightened risk of retaliatory harm due to their religious identities. If their real names are revealed, these Does—and their families—face a real risk of being doxed, stalked, or harassed, as has happened to others in similar situations. In this climate, unmasking Does would expose them to significant and unjustified danger.

Further, unmasking Does poses a significant risk of chilling lawful speech on matters of public concern, such as discussion and criticism of polarizing public figures, like Ethan and Piker, and debate about current and historical political events, such as those discussed in *Nuke*.

In contrast, TEI cannot show damage from Does' conduct. Indeed, streamer reactions to *Nuke* helped to boost viewership, which Ethan admits. (Doe Decl. ¶¶30, 51; Vulić Decl. Ex. 28.) Ethan in fact invited the harm he complains of, by encouraging others to watch and react to *Nuke*. (Doe Decl. ¶17.1; Vulić Decl. Ex. 26.)

As such, while TEI has not and cannot state a claim for contributory infringement, even if this Court finds it has, private and public factors require the Court quashing the Subpoenas.

## ARGUMENT

### I.      Legal Standard

## A.   Quashing a Subpoena Generally

Generally, parties may obtain discovery regarding any nonprivileged matter that is relevant to a claim or defense and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). But where discovery encroaches on protected First Amendment speech, a party must show that discovery sought is highly relevant to claims or defenses—a more demanding standard of relevance than the Federal Rules. *See Perry v. Schwarzenegger*, 591 F.3d 1126, 1141 (9th Cir. 2009). Where a party seeks to unmask an anonymous speaker, they must meet a heightened standard. *See, e.g., In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 876 (N.D. Cal. 2022). Further, a court may quash a subpoena if it requires disclosure of privileged or other protected matter, such as First Amendment or otherwise protected speech, or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii), (iv).

Does have standing to move to quash because they have personal rights and privileges with respect to the documents requested in the subpoena, i.e., their identities. *See Glass Egg Digital Media v. Gameloft, Inc.*, No. 17CV04165MMCRMI, 2019 WL 2499710, at *5 (N.D. Cal. June 17, 2019) (collecting cases). This Motion is properly brought in this District because Reddit and Discord reside here, and it is the District in which compliance is required. Fed. R. Civ. P. 45(c)(2)(A), (d)(3).

## B.   Standard for Unmasking Anonymous Speaker

The First Amendment protects a person's right to speak anonymously on the Internet, promoting the robust exchange of ideas and allowing individuals to express themselves freely without fear of economic or official retaliation or concern about social ostracism. *In re Gliner*, 133 F.4th 927, 933 (9th Cir. 2025). Thus, when a party seeks discovery to unmask an anonymous speaker, the test the court uses depends on the nature of the conduct alleged, viewed in *context* of the speech, the only relevant way to view communications. *See Highfields* at 975.

The degree of scrutiny required varies depending on the circumstances and the type of speech at issue. *See In re Anonymous Online Speakers*, 661 F.3d 1168, 1173, 1177 (9th Cir. 2011). Political speech is afforded the highest level of protection. *See id.* at 1173. The balancing of a plaintiff's right to seek redress for alleged harms against the right to speak anonymously is the touchstone. People who have committed no wrong should be able to participate online without fear that someone who

KRONENBERGER ROSENFELD

wishes to harass or embarrass them can file a frivolous lawsuit and thereby gain the power of the court's order to discover their identity. *Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999) ("*Seescandy*").

### 1.   Motion to Dismiss Analysis (*Seescandy*)

The lowest bar is the motion to dismiss or good faith standard. *See In re Anonymous Online Speakers*, 661 F.3d at 1175. The plaintiff must: 1) identify the missing party with specificity to show the defendant is a real person who could be sued in federal court; 2) identify all previous steps taken to locate the defendant; 3) establish to the Court's satisfaction that the lawsuit could withstand a motion to dismiss; and 4) file a request for discovery with the Court, with reasons justifying the specific discovery requested, identifying a limited number of persons on whom discovery would be served and for which there is a reasonable likelihood that discovery will lead to identifying information making service of process possible.[10] *See Seescandy* at 578-80.

### 2.   Real Evidentiary Basis (*Highfields*)

*Highfields Cap. Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969 (N.D. Cal. 2005) ("*Highfields*"), established the "real evidentiary basis" standard, a two-part test for unmasking anonymous speakers. Because an unmasking subpoena will always invade at least in some measure important rights that are fundamental and fragile, Courts have a special duty to protect against unjustified invasion. *See id.* at 975. First, the plaintiff must persuade the court there is a real evidentiary basis the defendant engaged in wrongful conduct causing real harm to plaintiff's interests that the *laws plaintiff invoked* were intended to protect. *Id.* at 975. (emphasis added.) Plaintiff may not simply plead and pray; allegation and speculation are insufficient. *Id.* This high evidentiary bar is necessary because Rule 8 and 12(b)(6) standards offer too little protection to a defendant's competing interests. *See id.* Thus, the plaintiff must adduce *competent evidence*, addressing *all* of the inferences of fact plaintiff must prove to prevail on at least one cause of actions plaintiff asserts. *Id.* (emphasis in original). A subpoena may not be enforced if any *essential* fact or finding lacks requisite evidentiary support. *Id.*

---

[10] Since TEI failed to file a motion seeking permission for early discovery, instead stipulating for this relief with Denims, TEI has not yet raised the standard for seeking early discovery which the court must consider, and accordingly, the Central District judge did not make the findings required to unmask an anonymous speaker.

Case No. 3:25-mc-80296

14

**DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

at 976.

Second, *only* if the plaintiff makes a sufficient evidentiary showing, the court assesses and compares the magnitude of the harms that would be caused to plaintiff's and defendant's competing interests by a ruling in favor of either side. *See id.* If enforcing the subpoena would cause *relatively little harm* to a defendant's First Amendment and privacy rights, and issuance is necessary to enable plaintiff to protect against or remedy *serious wrongs*, the court would deny the motion to quash. *Id.* (emphasis added).

This Court has found the *Highfields* test necessary in copyright infringement cases where the defendant's speech is political, religious, or literary, or the claims are based on critical, anonymous commentary. *See Art of Living Found. v. Does 1-10*, 2011 WL 5444622, at \*\*5-6 (N.D. Cal. Nov. 9, 2011) ("*AoL*"); *see also Baugher v. GoDaddy.com LLC*, 2021 WL 4942658, at \*3 (D. Ariz. Oct. 22, 2021). The focus is the "nature" of defendant's speech, *not* the cause of action alleged by the plaintiff. *See AoL* at \*5 (emphasis added). Where online speech raises at least some constitutional protections, the *Highfields* test is used. *See Baugher*, 2021 WL 4942658, at \*3 (where the nature of the speech is public criticism, even if not explicitly political or religious, and disclosure of an anonymous speaker's identity could have a chilling effect on such public criticism, then at least some First Amendment concerns are at stake).[11]

### 3.   The *Highfields* test applies here.

Here, Does acted in furtherance of their First Amendment right to speak anonymously on the Internet. *Nuke* and *Countdown* are controversial, politically charged pieces, sparking commentary, and criticism; indeed, the purpose of H3Snark and the Megathreads was to provide a *safe* space for commentary about H3. (Doe Decl. *passim*.) In posting the Megathreads, Does centralized and fostered discussions about and criticisms of the works. Unmasking Does for facilitating these conversations would have a chilling effect on public criticisms of the works and H3 generally. *See*

---

[11] Another test, borrowing from both *Seescandy* and other authority, and applied sometimes in anonymous copyright infringement cases, requires a concrete showing of a prima facie claim, specificity of the discovery request, absence of alternative means to obtain the requested information, a central need for the subpoenaed information to advance the claim, considered against the party's expectation of privacy. *See Sony Music Ent. Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 565 (S.D.N.Y. 2004). This is a somewhat lower bar than *Highfields*, but incorporates a balancing of the interests.

*Baugher*, 2021 WL 4942658, at \*3. Thus, the court must go beyond the pleadings to find whether an evidentiary basis exists for the requested discovery; TEI cannot rely solely on the complaint's allegations. *See In re PGS Home Co. Ltd.*, 2019 WL 6311407, at \*5 (N.D. Cal. Nov. 25, 2019); *Kechara House Buddhist Ass'n Malaysia v. Does*, 2015 WL 5538999, at \*4 (N.D. Cal. Sept. 18, 2015).

## II.     TEI cannot meet is initial burden.

### A.     TEI has not stated—and cannot substantiate—a claim for contributory infringement.

Contributory copyright infringement is a form of secondary liability with roots in the tort-law concepts of enterprise liability and imputed intent. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007) ("*Visa*"). In the Ninth Circuit, a defendant contributorily infringes if it (1) has knowledge of a third party's infringing activity, and (2) "induces, causes, or materially contributes to the infringing conduct." *Visa* at 795. In addition to establish contributory liability, a plaintiff must first establish direct infringement by third parties; secondary liability cannot exist in the absence of direct infringement by another. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007); *Tarantino v. Gawker Media, LLC*, 2014 WL 2434647, at \*3 (C.D. Cal. Apr. 22, 2014). An allegation that defendant merely provided the means to accomplish an infringing activity is insufficient. *See Tarantino* at \*3.

### 1.     TEI cannot show requisite knowledge for contributory infringement.

For contributory infringement liability to attach, a defendant must possess more than a generalized knowledge of the possibility of infringement. *See Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013); *Robinson v. Binello*, 771 F. Supp. 3d 1114, 1125 (N.D. Cal. 2025) (to be generally aware of copyright-related risks is not enough); *BMG Rts. Mgmt. (US) LLC v. Joyy Inc.*, 644 F. Supp. 3d 602, 609 (C.D. Cal. 2022). Rather, the plaintiff must put forth evidence that the defendant had *specific* knowledge of *specific* infringing content, and then failed to take simple measures to prevent further damage. *See Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1115 (N.D. Cal. 2021), *aff'd in part, appeal dismissed in part*, 2023 WL 4704891 (9th Cir. July 24, 2023); *Perfect 10, Inc. v. Giganews, Inc.*, 2015 WL 1746406, at \*\*4-5 (C.D. Cal.

Case No. 3:25-mc-80296     16     **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

Mar. 6, 2015).

Simply facilitating infringement, without knowledge of direct infringement by third parties, will not result in secondary liability. *See Columbia Pictures v. Bunnell*, 2006 WL 5383789, at *4 (C.D. Cal. May 10, 2006). Moreover, mere conclusory allegations that a defendant had the required knowledge of infringement are plainly insufficient. *See YZ Prods., Inc. v. Redbubble, Inc.*, 545 F. Supp. 3d 756, 763 (N.D. Cal. 2021), citing *Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013). In determining whether a plaintiff has set forth a "real evidentiary basis" for knowledge, "entirely speculative" evidence does not satisfy the test. *See Awtry v. Glassdoor, Inc.*, 2016 WL 1275566, at *14 (N.D. Cal. Apr. 1, 2016).

The pertinent question here is whether Does had knowledge that Denims' use was infringing, as opposed to fair. TEI's allegations of knowledge fall far short. The Megathreads clearly state that Does understood that Denims would be *reacting to Nuke* and *Countdown*, *i.e.*, engaging in commentary and criticism. TEI alleges, based on nothing more than speculation, that Does were "well aware of Denims' reputation for copyright infringement and lazy reaction videos." (Compl. ¶45.) Even taking TEI at its word, which the Court cannot do, knowledge of a "reputation" for lazy reaction videos is simply not specific knowledge that Denims actually infringed *Nuke* and *Countdown* on her Jan. 31 stream—and, Does knew nothing of the sort. (Doe Decl. ¶20.)

TEI has not alleged, and cannot show, that Does watched Denims' stream such that they could know whether it was infringing, and not fair use; indeed, Does did not watch Denims' stream. (*Id*. ¶¶43, 108, 135, 169, 201, 227, 255, 276, 294.) All TEI alleges is that Does "knew it was **highly likely**" Denims' reaction "**would be**" an infringing "group viewing session" and not a fair use, *i.e.*, generalized knowledge of *potential* that Denims' stream *might* infringe. Indeed, every single allegation about Does' knowledge *assumes* Does will *guess* Denims' future acts. This is not enough.

Does' evidence, compared to TEI's unsubstantiated allegations, shows the opposite of knowledge. Does did not view Denims' stream while it was live. (*Id*. ¶¶43, 108, 135, 169, 201, 227, 255, 276, 294.) Even if Does had watched Denims' stream, TEI has not shown that Does recognized Denims' use as infringing, and not fair use. Indeed, TEI **did not notify Does** that it considered Denims' use to be infringing. (Doe Decl. ¶31.) TEI did not send Does a demand to remove the links.

Case No. 3:25-mc-80296                    17          **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

TEI did not notify Does indirectly, through a DMCA takedown notice. Because Does had no way of knowing, and did not in fact know, of specific infringement, the knowledge requirement is not satisfied. The analysis should stop here. *See YZ Prods.* at 763; *Luvdarts*, 710 F.3d at 1073 n. 2.

**2.      TEI cannot show that Does induced, caused, or materially contributed to any direct infringement.**

The next question is whether creating a discussion thread, which includes a link to a streamer's channel, where the streamer reacts to a live broadcast while providing her own commentary and criticism, and users visiting the thread engage in their own debate about the live broadcast and reactions thereto, constitutes contributory infringement. It does not.

Liability for contributory copyright infringement requires proof that a defendant induces, causes, or materially contributes to the infringing conduct. *Visa* at 795. A defendant may infringe contributorily by intentionally inducing or encouraging direct infringement through specific acts or through use of a product or device. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("*Grokster*"). Inducement liability requires evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use. *See Schneider v. YouTube, LLC*, 649 F. Supp. 3d 872, 878 (N.D. Cal. 2023). Material contribution to infringement requires substantial assistance to the *infringing activity*. *See Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 943 (9th Cir. 2011). (emphasis added).

If a plaintiff alleges a defendant induced by provision of a service,[12] the defendant must have promoted the service's use with the *object* of infringing copyright." *Visa* at 801, citing *Grokster* at 937. Mere knowledge of infringing potential or actual infringing use is not enough to subject a defendant to liability. *See id.* Moreover, it is crucial for a plaintiff to establish that defendants communicated an inducing message to their users. *See id.* The "improper object" of infringement "must be plain and must be affirmatively communicated through words or actions." *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019), citing *Fung*, 710 F.3d at 1034. Only where a

---

[12] The inducement copyright doctrine applies to services available on the Internet as well as to devices or products. *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1033 (9th Cir. 2013).

Case No. 3:25-mc-80296          18          **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

service is "good for nothing else" but infringement, there is no legitimate public interest in its unlicensed availability, and there is no injustice in presuming or imputing an intent to infringe, will an activity give rise to inducement liability. *See Grokster* at 932-33.

TEI alleges that Does promoted Denims as a substitute to watching *Nuke*, and created and pinned the Megathreads, in coordination with Denims, to direct users to Denims' "group viewing session." (Compl. ¶¶43-45.) These allegations are conclusory, unsubstantiated, and contradicted by the Complaint Exhibits and evidence.

Here, Does created the Megathreads to centralize and facilitate discussion about the works and reactions thereto. (Doe Decl. ¶¶6, 122-124.) The links in the Megathreads directed users to creators' homepages, not to any specific video or stream. (*Id*. ¶¶34, 35, 40, 130.) The Megathreads were "pinned" in a routine moderation practice to make topic-specific threads accessible and visible for the users of the Subreddit. (*Id*. ¶123.) The text of the Megathreads made clear that their purpose was for discussion about streamers' reaction and commentary, which is what happened. (Compl. Exs. G-I.) Indeed, Does' expectation was that Denims would create a fair use of the works. (Doe Decl. ¶¶20, 34, 42, 254.) One of the Megathreads linked directly to *H3's own broadcast* of *Nuke*, debunking TEI's theory that the purpose was to divert traffic *away* from it. (Doe Decl. ¶¶38.) Does did not provide the server space, *i.e.*, site and facilities, for Denims' alleged infringement, *see Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996); Does' Megathreads were not an "essential step" in the infringement process. The Megathreads were not "good for nothing else but" "encouraging" or "assisting" Denims' alleged infringement. And, Denims would have reacted to *Countdown* and *Nuke* whether the Megathreads existed or not, erasing any theory of material contribution.

TEI cannot show any coordination between Does and Denims, or any other streamer, whatsoever—and there was none. (Doe Decl. ¶¶21, 128-129.) TEI appears to attempt to show inducement through its allegations about instructions on "clipping" content[13] and use and encouragement of YewTube. (Compl. ¶¶30-33.) But this happened months before Denims' stream,

---

[13] The "instruction" for "clipping" content also included an instruction that users not infringe on copyright when clipping, which TEI omits.

Case No. 3:25-mc-80296

19

**DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

KRONENBERGER ROSENFELD

and thus are not relevant to Denims' stream. Further, H3Snark mods disallowed use of these products and services on the Subreddit in an explicit decision to ban alternative viewing sites. (Doe Decl. ¶¶ 61, 117, 118, 119, 214.) Thus, TEI has not established that Does induced, caused, or materially contributed to any infringement.

### 3.    Does' Megathreads were fair use.

Moreover, Does' Megathreads were a fair use under 17 U.S.C. §107 where Does referenced the works for criticism and commentary and transformed the works, and where the Megathreads themselves in no way replaced the originals. TEI's Subpoenas should be quashed for this additional reason. *See In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 884-886 (N.D. Cal. 2020).

### B.    Denims' use was fair use.

There can be no contributory infringement without direct infringement. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007). And if a use of a copyrighted work is fair, it is not infringement at all. *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151 (9th Cir. 2016). Because Denims' use of *Nuke* and *Countdown*, as a whole, was fair, there is no direct infringement for which Does can be found contributorily liable.

The fair use doctrine permits and requires courts to avoid rigid application of the copyright statute when it would stifle the very creativity which that law is designed to foster. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) ("*Campbell*"). Indeed, copyright's purpose is to *promote* the creation and publication of free expression. *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (emphasis in original). The task is not to be simplified with bright-line rules; the statute, like the doctrine it recognizes, calls for case-by-case analysis. *Campbell* at 577.

Courts explore and evaluate together, in light of the purposes of copyright, the following four factors when considering whether the use of a work is "fair":

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole[14]; and (4) the effect of the use on the potential market for or value of the copyrighted work.

---

[14] The third factor weighs against a finding of fair use here.

Case No. 3:25-mc-80296                                   **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

20

17 U.S.C. §107; *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1175 (9th Cir. 2013).

Ordinarily, the defendant bears the burden of proving fair use. *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153 (9th Cir. 2016). But "[t]o make a prima facie case of copyright infringement for the purposes of obtaining a subpoena, then, a party must make a prima facie case that the infringing use did not constitute fair use." *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 879 (N.D. Cal. 2022). TEI has not made such a showing here.

**1.      Denims' use was transformative and does not supersede the original use.**

The first factor, "purpose and character," considers the reasons for, and nature of, the copier's use of an original work. *Warhol* at 528. The central question is whether the new work merely "supersedes" the objects of the original creation, supplanting it, or instead adds something new, with a further purpose or different character—whether the work is transformative. *Warhol* at 528; *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 3 (2021). Criticism, comment, and news reporting are precisely the sorts of copying that courts and Congress most commonly have found to be fair uses. *Warhol* at 528, citing 17 U.S.C. §107. This is because criticism of a work ordinarily does not supersede the objects of, or supplant, it; rather, it uses the work to serve a distinct end. *Id*. The more transformative the new work, the less will be the significance of the other factors. *See Campbell* at 569.

In the typical "non-transformative" case, the use is one which makes no alteration to the expressive content or message of the original work. *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013). In contrast, an allegedly infringing work is typically viewed as transformative as long as new expressive content or message is apparent, even where the allegedly infringing work makes few physical changes to the original or fails to comment on the original. *See id.* Indeed, an expression of the author's apparent distaste for the original work fits squarely within fair use. *See In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 880 (N.D. Cal. 2022).

Here, Denims' use was transformative. Denims adds new content and a new purpose to *Nuke* and *Countdown*. Denims' stream commented upon and criticized *Countdown* and *Nuke*, directly responding to and highlighting controversial content of the works, not simply recounting what was shown. *See Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1104 (C.D. Cal. 2015); Compl. Ex. K. During her 10-hour-long stream, of which almost 5 hours addresses the works,

Case No. 3:25-mc-80296

21

**DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

Denims repeatedly: pauses the films; comments on and critiques the works, Ethan, and his political views; adds additional facts and context (referencing public and different sources); mocks the works; and engages with her audience. *Id.* Further, *because* Denims reacted live, she was able to interact with her audience and their immediate impressions and own critiques of the works. *Id.* That TEI disagrees with or dislikes Denims' commentary and criticism is precisely what makes the use transformative—Denims provides an alternative viewpoint, new content, and a new message. In contrast, a reaction video that merely repeats and supports a work, without adding a new message— like xQc's stream—would likely *not* be transformative.

It is true that the degree of transformation required to make "transformative" use of an original must go beyond that to qualify as a derivative. *Warhol* at 529. But TEI would never "transform" its own work into the character and purpose that Denims did—precisely because it is *critical* of TEI and H3.

Finally, in analyzing the first factor, courts consider whether the work is commercial, but that is usually of little significance, as most of the categories of examples of fair use in the preamble to Section 107 are uses which are or could be commercial. Here, Denims did not seek to profit from the inherent entertainment value of *Nuke*; her goal was to criticize it and offer her commentary. Viewers who wanted to watch *Nuke* in its original form, would not have watched Denims' stream.

Because Denims' stream added new expressive content and a different message, this factor weighs in favor of fair use.

**2.     TEI's highly factual works supports greater dissemination.**

This factor looks at the extent to which the copied work is creative and whether it is unpublished. The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy. *Harper & Row Publishers, Inc. v. Nation Enters*., 471 U.S. 539, 563 (1985). Here, TEI's works were largely factual. Although they contained some creative elements, the vast majority of the content comprised factual news and other creators' content. TEI's works were also published, and TEI later broadcast *Nuke* on a 24/7 loop on Twitch. This weighs in favor of fair use.

**3.     Denims' use did not negatively impact the market; it increased it.**

The fourth factor, market effect, is the single most important element of fair use. *Monge v.*

Case No. 3:25-mc-80296                                                    **DOES' NTC OF MTN AND MTN TO QUASH**
                                                22                        **SUBPOENAS; MPA**

*Maya Magazines, Inc.*, 688 F.3d 1164, 1180 (9th Cir. 2024). This factor asks whether consumers treat the challenged use as a market replacement for the original, or a market complement that does not impair demand for the original. *Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc.*, 753 F. Supp. 3d 933, 965 (C.D. Cal. 2024). Where the second use is transformative, market harm may not be so readily inferred. *See Campbell* at 591. The importance of the fourth factor will vary also with the relative strength of the showing on the other factors. *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1016 (9th Cir. 2001). Effect on potential market requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market" for the original. *Campbell* at 590. The more transformative the new work, the less likely the new work's use of copyrighted materials will affect the market. *See Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 941 (9th Cir.), *opinion amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002).

The court must also consider the source of the loss. A "lethal parody, like a scathing theatre review," may kill the demand for the original, but this kind of harm is not cognizable under the Copyright Act. *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 35 (2021), citing *Campbell* at 591-92. Finally, the court must take into account the public benefits the copying will likely produce. *See id.*

Here, there is little to no market effect on *Nuke*, because the viewers watching Denims' Stream, would not have watched TEI's *Nuke* anyway. Denims' reaction video scathingly criticized the works; it was not meant as, and was not, a replacement for the original. In fact, Ethan *encouraged* use of and reactions to his content. (Doe Decl. ¶¶51, 30.1.) H3 celebrated *other* streamers' reaction videos, like xQc's, which were *supportive* of *Nuke.* Arguably such reactions would have greater market harm on *Nuke*, belying TEI's allegations of harm from Denims' critical reaction. TEI offers no evidence that viewers who watch Denims' stream did so in replacement of watching *Nuke*. Further, widespread release of reaction videos criticizing a work would not, and do not, replace the original—a person wanting to view *Nuke* without critical commentary, will—and did—still watch the original.

Finally, TEI's own broadcasting of *Nuke* in a 24/7 loop starting on March 5, weighs against

Case No. 3:25-mc-80296    23    **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

a finding of market harm. (Vulić Decl. Ex. 47.) The first, second, and fourth factors weigh in favor of fair use.

### 4. Stripping unoriginal elements, TEI's thin copyrights deserve little protection.

Only the elements of a work that are protectable are compared to determine the ultimate question of illicit copying. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994). Here, TEI's registrations excluded preexisting footage, preexisting photos, and preexisting music; indeed, these are not protectable. But *Nuke* was comprised almost entirely of preexisting footage, much of it unauthorized derivative works of Piker's own content. (Doe Decl. ¶¶136-143.) *See Sobhani v. @Radical.Media Inc.*, 257 F. Supp. 2d 1234, 1238 (C.D. Cal. 2003). Subtracting these unoriginal elements, TEI is left with only a "thin" copyright, protecting against only virtually identical copying. *See Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003). The thinness of TEI's copyrights, extending only to the original aspects of the works, weighs in favor of fair use.

### III. Even if TEI had met its initial burden, the balance of harms weighs in favor of Does.

Because the nature of Does' speech sounds in the First Amendment—centralization of discussion to critique a public figure and discuss matters of public interest and political concern—this Court must balance the equities at issue, considering the context of the use. *See In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 8810 (N.D. Cal. 2022); *Awtry v. Glassdoor, Inc.*, No. 16-MC-80028-JCS, 2016 WL 1275566, at *15 (N.D. Cal. Apr. 1, 2016).

The balancing test requires the court to compare the magnitude of the harms that would be caused to plaintiff's and defendants' competing interests by ordering defendants' identities to be disclosed. *See Music Grp. Macao Com. Offshore Ltd. v. Does*, 82 F. Supp. 3d 979, 986 (N.D. Cal. 2015). The specific circumstances surrounding the speech serve to give context to the balancing exercise. *See AoL* at *5 (quoting *Anonymous Online Speakers* at 1177). Only if disclosing defendant's identity would cause relatively little harm to the defendant's First Amendment and privacy rights, but be necessary to enable to protect against or remedy serious wrongs the law invoked was designed to protect, should the court allow disclosure. *Highfields* at 976. Furthermore,

KRONENBERGER ROSENFELD

the court must ask whether disclosure of a defendant's identity would deter other critics from exercising *their* First Amendment rights. *AoL* at *7-8. Clearly, enforcing a subpoena in this setting poses a real threat, chilling protected comment on matters of interest to the public. *Highfields* at 980.

Here, the personal harms to Does by allowing unmasking, as well as the public harms to online speech and discourse generally, would be irreparable in the private sense and long-reaching in the public sense. (Doe Decl. *passim.*)

Persons in the place of Does—moderators of a public platform, the purpose of which is to comment on and critique a public figure and political matters of public concern—have real First Amendment interests in communicating anonymously. But if the court allows TEI's Subpoenas, it would enable TEI to impose a considerable price on Does' use of the vehicle of anonymous speech— including public exposure, real risks of retaliation and actual harm, and the financial and other burdens of defending the Action. *Highfields* at 980-81. Very few would-be commentators are prepared to bear costs of this magnitude. *Id.* So, when word gets out that the price tag of criticizing Ethan is *this high*—that speech will disappear. *See id.* But *that*, is precisely what Ethan Klein wants.

**IV. If Does' motion is not granted, Does request a protective order.**

A court may limit and specify conditions on production, including to protect a party from embarrassment, oppression, or undue burden. *See* Fed. R. Civ. P. 45(d)(C); 26(c). The Ninth Circuit allows parties to preserve their anonymity in the "unusual case" where nondisclosure of the party's identity is necessary to protect them from harassment, injury, ridicule, or personal embarrassment. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000).

If Does' motion is denied or denied in part, Does request a protective order allowing disclosure of Does' identities *only* to the Court, for the reasons stated, *supra*, Statement of Facts, Sections B, D.4. *See Signature Mgmt. Team, LLC v. Automattic, Inc.*, 941 F. Supp. 2d 1145, 1158-59 (N.D. Cal. 2013).

**V. Does reserve their right to seek their attorney's fees.**

Does reserve their right to seek their attorney's fees and costs. TEI brought its suit against Does for an improper purpose, and TEI's claims are obviously insufficient under the law. *See Highfields Cap. Mgmt., L.P. v. Doe*, 2005 WL 8188026, at *6-8 (N.D. Cal. May 31, 2005).

Case No. 3:25-mc-80296      25      **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

Respectfully Submitted,

DATED: September 22, 2025          **KRONENBERGER ROSENFELD, LLP**


By:     s/ Leah Rosa Vulić
                              Leah Rosa Vulić

Attorneys for Movants/Defendants Does

Case No. 3:25-mc-80296          26          **DOES' NTC OF MTN AND MTN TO QUASH SUBPOENAS; MPA**

# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.** | Case No.  25-mc-80296-SK |
| | **ORDER DENYING MOTION TO QUASH SUBPOENAS** |
| | Regarding Docket No. 1 |

Before the Court is the motion filed by Movant Doe Defendants ("Doe Defendants") to quash subpoenas issued by Ted Entertainment, Inc. ("TEI") to non-parties Reddit, Inc. ("Reddit") and Discord, Inc. ("Discord").  (Dkt. No. 1.)  The parties consented to the jurisdiction of the undersigned.  (Dkt. Nos. 32–33.)  Having carefully considered the parties' papers, relevant legal authority, case record, and oral argument, the Court DENIES Doe Defendants' motion for the reasons set forth below.

## BACKGROUND

On June 19, 2025, TEI filed a complaint for copyright infringement against Alexandra Marwa Saber f/k/a Marwa Talatt Abdelmonem p/k/a Denims (hereinafter "Denims") and contributory copyright infringement against the Doe Defendants in the Central District of California (the "underlying action").  (Dkt. No. 1-1, Declaration of Leah Rosa Vulić ("Vulić Decl."), Ex. 1 at pp. 78–79.)  TEI is a production company that produces online content.  (Dkt. No. 16 at p. 7.)  TEI releases live broadcasts of "The H3 Show," on YouTube which provide "comedic commentary on current events and public figures."  (Dkt. No. 16-2, Declaration of Ethan and Hila Klein at ¶¶ 8–9.)  Ethan and Hila Klein (collectively the "Kleins"), the owners of TEI, co-host "The H3 Show."  (*Id.* at ¶¶ 7, 9.)

/ / /

Prior to October 2023, Ethan Klein hosted a political comedy podcast with Hasan Piker. (*Id.* at ¶ 22.)  In October 2023, however, a public disagreement commenced between the Kleins and Hasan Piker due to their respective stances on the Israeli–Palestinian conflict.  (*Id.*)  TEI alleges that a subreddit—titled "r/H3Snark" was created to target the Kleins and TEI content.  (*Id.* at ¶ 23.)  The Kleins further allege the "r/H3Snark" user base, comprised of former TEI fans, significantly increased following their public disagreement with Hasan Piker.  (*Id.* at ¶¶ 21, 23, 38–40.)

TEI alleges that it holds registered copyrights to the following videos: (1) The H3 Show #105: Countdown to Doomsday (the "Countdown Episode"); and (2) Content Nuke: Hasan Piker ("The Nuke").  (Dkt. No. 1-1, Vulić Decl., Ex. 1 at ¶ 2.)  TEI alleges that Denims, a defendant in the underlying action, hosted an online "group viewing session" or "Watch Party" of the Countdown Episode and The Nuke to "siphon views and [take potential] revenue away from TEI's copyrighted works."  (*Id.*)

TEI further alleges that the moderators of the "r/H3Snark" subreddit comprise Does 1-10 in the underlying action.  (*Id.* at ¶ 11.)  TEI states that it does not know the true names or exact locations of the Doe Defendants but provides alleged Reddit and Discord usernames of Does Nos. 1-6.  (*Id.*)  TEI alleges that the Doe Defendants promoted Denims' "watch parties" as an alternative to the TEI's works on the "r/H3Snark" subreddit.  (*Id.* at ¶ 3.)

On July 16, 2025, TEI, in the underlying action, requested leave to issue subpoenas to Reddit and  Discord to obtain personal identifying information of the Doe Defendants pursuant to Federal Rule of Civil Procedure 45.  On July 31, 2025, the District Court in the underlying action granted TEI leave to serve the third-party subpoenas.  On August 4, 2025, TEI served the subpoenas on non-parties Reddit and Discord.  (Dkt. No. 1-1, Vulić Decl., Exs. 10–11.)  The subpoenas, specifically, seek documents and communications containing the personally identifying information of specific Reddit and Discord users.  (*Id.*)

/ / /

/ / /

/ / /

2

The Doe Defendants move to quash TEI's subpoenas.  (Dkt. No. 1.)  TEI opposes and the Doe Defendants filed a reply in support of its motion to quash.[1]  (Dkt. Nos. 16, 20.)  The Court heard oral argument on April 20, 2026.  (Dkt. No. 38.)

## ANALYSIS

### I.      Legal Standard.

Federal Rule of Civil Procedure 45 governs discovery of non-parties.  The scope of permitted discovery under Rule 45 is the same as the scope of discovery permitted under Rule 26(b).  *Beaver Cty. Employers Ret. Fund v. Tile Shop Holdings, Inc.*, 2016 WL 3162218, at *2 (N.D. Cal. June 7, 2016) (citing Fed. R. Civ. P. 45 advisory comm's note (1970); Fed. R. Civ. P. 34(a)).  Rule 26(b) permits a party to obtain discovery "regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).

A court must protect a nonparty subject to a subpoena if the subpoena "requires disclosure of privileged or other protected matter" or the subpoena "subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3).  A court must also limit the frequency or extent of discovery if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)."  Fed. R. Civ. P. 26(b)(2)(C).

---

[1] The Doe Defendants filed an administrative motion to submit additional evidence to support their motion to quash.  (Dkt. No. 25.)  TEI opposed and the Doe Defendants filed a reply. (Dkt. Nos. 28, 30.)  The Court DENIES the Doe Defendants' administrative motion because the proffered evidence is not necessary for the Court to decide the Doe Defendants' motion to quash. *See Schumacher v. Airbnb, Inc.*, No. C 15-5734 CW, 2016 WL 7826667, at *7 (N.D. Cal. Nov. 9, 2016) (denying an administrative motion to submit additional evidence because the evidence was not necessary for the court's determination).

United States District Court
Northern District of California

3

As relevant here, Rule 45 provides that "the court for the district where compliance is required must quash or modify a subpoena that: (i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A). "On a motion to quash a subpoena, the moving party has the burden of persuasion under Rule 45(c)(3), but the party issuing the subpoena must demonstrate that the discovery sought is relevant." *Chevron Corp. v. Donziger*, 2013 WL 4536808, *4 (N.D. Cal. Aug. 22, 2013) (internal citation omitted).

## II.    Doe Defendants' Motion to Quash.

The Doe Defendants move to quash TEI's subpoenas on the grounds that (1) they acted in furtherance of their First Amendment right to speak anonymously, and (2) TEI cannot substantiate its claim for contributory copyright infringement against them. (Dkt. No. 1 at pp. 23–33.) The Court addresses the Doe Defendants' arguments in turn.

### A.    Digital Millenium Copyright Act § 512(h) Subpoena Legal Standard.

As a threshold matter, the Court must determine the applicable legal standard. The Doe Defendants argue that the *Highfields* test applies because their right to anonymous speech is protected by the First Amendment where, as here, the nature of their speech is political. (*Id.* at 22–24) (citing *Highfields Cap. Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969 (N.D. Cal. 2005)). At the motion hearing, TEI explained that it did not issue the subpoenas in question under the Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. § 512(h). Nonetheless, in its opposition, TEI invoked the test outlined in an action involving a subpoena issued under the DMCA—*In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868 (N.D. Cal. 2022). (Dkt. No. 16 at p. 13.)

While the DMCA does not apply here, the Court looks to cases applying the DMCA legal standard because the *Highfields* test is not applicable to a copyright action. *Highfields* involved claims for trademark infringement and unfair competition, not copyright law. *See Highfields*, 385 F. Supp. 2d at 972; *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 882 (N.D. Cal. 2020) (noting that the *Highfields* test "is not well suited for a copyright dispute … because the First Amendment does not protect anonymous speech that infringes copyright."); *Arista Recs.,*

4

*LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) ("[T]o the extent that anonymity is used to mask copyright infringement or to facilitate such infringement by other persons, it is unprotected by the First Amendment.").

In circumstances involving alleged copyright infringement and the First Amendment right to remain anonymous, "the Ninth Circuit requires a court to consider and weigh both the anonymous speaker's First Amendment interest and the subpoenaing party's need for identifying information." *Barnes v. YouTube, Inc.*, No. 25-CV-05901-VKD, 2026 WL 412470, at *3 (N.D. Cal. Feb. 13, 2026). Specifically, "when adjudicating a subpoena or other request for compelled disclosure that would reveal the identity of an anonymous speaker, a court should (1) notify the speaker and provide them with an opportunity to (anonymously) defend their anonymity; (2) require the party seeking disclosure to make a prima facie showing on the merits of their claim; and (3) balance the equities, weighing the potential harm to the party seeking disclosure against the speaker's interest in anonymity, in light of the strength of the underlying claim." *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d at 876.

### B.      The Application of the DMCA Legal Standard.

#### 1.      Opportunity of the Anonymous Speakers to Defend Anonymity.

The parties do not discuss this element in their papers. Because the Court has permitted the Doe Defendants to proceed anonymously, the Court finds that the Doe Defendants' present motion to quash (1) indicates that they received notice of TEI's subpoenas to Reddit and Discord, and (2) serves as a method for the Doe Defendants' to defend their anonymity. *See Barnes*, 2026 WL 412470, at *3 (finding the first DMCA element satisfied because the doe defendant received notice of the subpoena, filed a motion to quash the subpoena, and the court permitted the doe defendant to proceed anonymously).

#### 2.      Prima Facie Case of Denims Copyright Infringement and the Doe Defendants' Contributory Copyright Infringement.

TEI alleges direct copyright infringement against Denims and contributory copyright infringement against the Doe Defendants. (Dkt. No. 1-1, Vulić Decl., Ex. 1 at ¶¶ 74–87.) The Court addresses each argument in turn.

United States District Court
Northern District of California

**a.    Denims' Alleged Copyright Infringement.**

To establish a prima facie case of Denims' copyright infringement, TEI must demonstrate: (1) ownership of the copyrighted material, and (2) violation by the accused infringer of at least one exclusive right granted to copyright holders under 17 U.S.C. § 106. *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001), *as amended* (Apr. 3, 2001), *aff'd sub nom. A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002); *see* 17 U.S.C. § 501(a) (infringement occurs when alleged infringer engages in activity listed in § 106). "Among the exclusive rights enjoyed by copyright holders are the rights to reproduce the copyrighted work and to prepare derivative works based on the copyrighted work." *Barnes*, 2026 WL 412470, at *4 (citing 17 U.S.C. § 106(1), (2)).

TEI alleges direct copyright infringement against Denims. (Dkt. No. 1-1, Vulić Decl., Ex. 1 at ¶¶ 74–81.) The Doe Defendants, in response, argue that Denims did not directly infringe TEI's copyrighted works because Denims' use of the Countdown Episode and The Nuke constituted fair use. (Dkt. No. 1 at p. 28.) The Doe Defendants, specifically, argue that Denims' use was transformative, Denims did not supersede the original use, TEI's works are highly factual, Denims' use did not negatively impact the market, and that TEI's "thin" copyrights deserve little protection. (*Id.* at pp. 28–32.)

In response to the Doe Defendants' fair use argument, TEI argues that neither Denims nor the Doe Defendants' use of TEI's works constitute fair use. (Dkt. No. 16 at pp. 14–15.) Regarding Denims' use, TEI asserts that (1) the primary purpose of Denims' Watch Party was to provide a substitute for TEI's works and exploit them for commercial gain; (2) TEI's works contained numerous creative elements; (3) Denims streamed The Nuke in its entirety and the Countdown Episode nearly in its entirety; and (4) Denims' Watch Party served as a market substitute for TEI's works because thousands of individuals watched her Watch Party before they had the opportunity to watch TEI's works. (*Id.* at pp. 15–24.) TEI further argues that the Doe Defendants' use of TEI's works did not constitute fair use because Denims did not provide sufficient commentary on TEI's works in their alleged "inducement posts" on Reddit and Discord. (*Id.* at p. 15.)

/ / /

Here, the Court finds that TEI's allegations satisfy the prima facie standard to show copyright infringement by Denims. TEI alleges direct copyright infringement against Denims on the grounds that: (1) TEI owned and registered the copyrights in the Countdown Episode and The Nuke with the United States Copyright Office; (2) Denims accessed the Countdown Episode and The Nuke from TEI's YouTube channels without any license, authorization, or consent from TEI; and (3) Denims' "group viewing session" of the Countdown Episode and The Nuke constituted an unauthorized reproduction, public performance, and derivative work of the Countdown Episode and The Nuke in violation of TEI's rights as set forth in 17 U.S.C. § 106. (Dkt. No. 1-1, Vulić Decl., Ex. 1 at ¶¶ 75–78.) TEI further alleges that the registration numbers for the Countdown Episode and The Nuke, respectively, are PAu 4-257-253 and PAu 4-256-429. (*Id.* at ¶ 38; Dkt. No. 16 at p. 14.)

The Doe Defendants argue that this Court should decide the issue of fair use in the present motion to quash, but this Court must only determine whether TEI has made a prima facie allegation of copyright infringement. To argue that TEI did not make a showing of fair use, the Doe Defendants cite the decision by another District Judge. (Dkt. No. 1 at p. 29) (*citing In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d at 879 ("[t]o make a prima facie case of copyright infringement for the purposes of obtaining a subpoena, then, a party must make a prima facie case that the infringing use did not constitute fair use")). The Doe Defendants apply this law to discuss the merits of fair use. (*Id.* at pp. 29–32)

Normally, fair use is an affirmative defense. *See Tresóna Multimedia, LLC v. Burbank High Sch. Music Ass'n*, 953 F.3d 638, 647–52 (9th Cir. 2020). In the context of a DMCA subpoena, however, a court must consider fair use in analyzing a motion to quash. *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153 (9th Cir. 2016) (holding that "for the purposes of the DMCA—fair use is uniquely situated in copyright law so as to be treated differently than traditional affirmative defenses.") Under the DMCA, a copyright owner must first issue a "take-down" notice to a service provider, which notifies the service provider of the claimed infringement. 17 U.S.C. § 512(c)(3). The notice, in part, must include "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(v).

7

Therefore, in the DMCA context, a copyright holder, before sending a take-down notification, must evaluate whether that the allegedly infringing use constitutes fair use. *See* 17 U.S.C. § 512(c)(v); *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d at 886 (noting that a party who served a subpoena under the DMCA "was required to evaluate fair use before sending its take-down [n]otice") (citing *Lenz*, 815 F.3d at 1153)).

In addition, "the [DMCA] subpoena is its own civil case, and the motion to quash is dispositive of the sole issue presented in the case—whether the subpoena should be enforced or not." *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d at 880. In the district court decision cited by the Doe Defendants, the court discussed fair use in the context of a DMCA subpoena. *See In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d at 879–81 (analyzing the fair use factors to find that a copyright owner did not establish a prima facie case of copyright infringement); *see also In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d at 883–87 (addressing fair use to determine whether a DMCA subpoena should be quashed). The structure of the DMCA thus makes it necessary for a court to consider fair use in determining whether to quash a subpoena issued under the DMCA.

In contrast, the Court need not consider fair use in deciding the instant motion to quash a *Rule 45* subpoena. Given the differences between a DMCA and Rule 45 subpoena, the Court declines to analyze the defense of fair use in determining whether TEI has made a prima facie case of contributory copyright infringement. The District Court in the underlying action will determine the issue of fair use. Indeed, a motion for partial judgment on the pleadings regarding whether Denims' use of The Nuke constituted fair use is pending before the District Court in the underlying action. (Dkt. No. 44 at p. 2.) Thus, because that issue will be litigated fully in another forum, there is no need for the Court to address the defense of fair use.

### b.    The Doe Defendants' Alleged Contributory Copyright Infringement.

To establish a prima facie case of the Doe Defendants' contributory copyright infringement, TEI must show that the Doe Defendants: "(1) ha[d] knowledge of [Denims'] infringement and (2) either (a) materially contribute[d] to or (b) induce[d] that infringement." *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007); *see also MG Premium*

8

*Ltd v. Does, No. CV 21-8533-MCS (KKX)*, 2022 WL 3013128 (C.D. Cal. Jan. 18, 2022) (finding that the plaintiff alleged a prima facie case of contributory copyright infringement because the plaintiff alleged the following in its complaint: (1) ownership and registration of the copyrighted work at issue in the case; (2) the defendants knew of the infringing activity; and (3) the defendants actively participated in this infringement by inducing, causing, and contributing to the infringement of the plaintiff's copyright work).

The Doe Defendants contend that (1) TEI cannot show that the "Doe [Defendants] watched Denims' [group viewing session] such that they could know whether [Denims'] use was infringing and not fair use;" and (2) TEI cannot establish that the Doe Defendants induced, caused, or materially contributed to any infringement by "creating a discussion thread, which includes a link to a streamer's channel." (Dkt. No. 1 at pp. 24–28.)

The Court concludes that TEI meets its burden to show a prima facie case of contributory copyright infringement. First, TEI alleges ownership and registration of the copyrighted work at issue in the case. (Dkt. No. 1-1, Vulić Decl., Ex. 1 at ¶¶ 75–76.) Second, TEI alleges that the Doe Defendants knew Denims' "group viewing session" infringed or intended to infringe TEI's copyrighted works and induced, caused, and/or materially contributed to Denims' infringement. (*Id.* at ¶¶ 83–85; Dkt. No. 16 at pp. 24–28.)

TEI does not merely allege these facts but points to specific evidence that the Doe Defendants specifically instructed other potential viewers to watch Denims' "watch party" as an "ethical" way to watch TEI's programs. (Dkt. No. 7, Vulić Decl., Exs. F–G.) In this context, opponents of the Kleins wanted to watch their shows but did not want to give them "views" on YouTube or other streaming platforms that reward content creators based on their number of viewers. It appears that the entire purpose of watching Denims' watch party was to watch TEI's programming in a manner that did not benefit TEI. (*See id.* providing a list of content creators for people to watch The Nuke "without showing support for H3").

TEI's allegations, supported by evidence, create a prima facie claim for contributory copyright infringement against the Doe Defendants. Although it may seem counterintuitive that opponents of the Kleins would want to watch the Kleins' programs, they were engaging in a cultural phenomenon known as "hatewatching."

9

The Urban Dictionary defines the term "hatewatch" as follows:

> A hatewatched show is one the viewer genuinely despises but cannot stop watching. This could be because it is so "<u>important</u>" they feel they have to, because it has enough promise that they hope it gets better, because it's so well-crafted in it's [sic] terribleness that the badness itself is noteworthy, or because they enjoy the <u>adrenaline</u> that pure revulsion can bring. Whatever the reason, the hatewatcher can't look away from the trainwreck.

*Hatewatch*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=hatewatch (last visited April 27, 2026) (emphasis in original).[2]  Here, the entire purpose of Denims' watch party was to "hatewatch" TEI's works without giving any benefit to TEI.  There is credible evidence that the Doe Defendants understood this goal and facilitated this goal by encouraging other people to watch Denims' watch party.

### 3.    Balance of the Equities.

If the Court finds that the Doe Defendants' interest in their anonymity extends beyond their alleged contributory copyright infringement, the Court must "balance the equities, weighing the potential harm to the party seeking disclosure against the speaker's interest in anonymity, in light of the strength of the underlying claim."  *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d at 876.

The Doe Defendants argue that balance of equities weighs in their favor because, if "unmasked," the Doe Defendants would face "public exposure, real risks of retaliation[,] actual harm, and the financial and other burdens of defending the Action."  (Dkt. No. 1 at pp. 32–33.) The Doe Defendants further contend that TEI fans "have a proven track record of harassing and even doxing people who are critical of [TEI] and Ethan [Klein]" and that "[t]here is also great risk to Does from the myriad of content creators covering these lawsuits and this Motion."  (Dkt. No. 20 at p. 17.)

TEI, in response, asserts that the balance of equities weighs in its favor because the Doe Defendants are parties to the underlying action, and, without information about the Doe

---

[2] The Ninth Circuit periodically uses the website "Urban Dictionary" to provide context for slang terms.  *See, e.g., Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032, 1044 n.13 (9th Cir. 2015).

<div style="writing-mode: vertical-rl">United States District Court<br>Northern District of California</div>

United States District Court
Northern District of California

Defendants' identities, TEI cannot proceed with the underlying action. (Dkt. No. 16 at p. 29.) TEI further argues that it issued the subpoenas in good faith and "no alternative means exist to identify" the Doe Defendants. (*Id.* at pp. 28–29.)

Here, the Court concludes that TEI's need for identifying information outweighs the Doe Defendants' interest in anonymity. TEI seeks information identifying the Doe Defendants so that it can proceed with its claims for contributory copyright infringement against the Doe Defendants. (Dkt. No. 16 at p. 29.) The Doe Defendants are defendants in the underlying action, and without information regarding their identities, TEI cannot identify the Doe Defendants as defendants, properly serve them with process, and ultimately, proceed in the underlying action. *See Barnes*, 2026 WL 412470, at *4 (concluding that the plaintiff's need for disclosure of identifying information of a defendant in the action outweighed the Doe defendant's interest in anonymity); *Cognosphere Pte. Ltd. v. X Corp.*, No. 23-mc-80294-PHK, 2024 WL 4227594, at *8 (N.D. Cal. Sept. 18, 2024) (noting that the identity of an anonymous infringer "is materially relevant, if not critical to the claim, because without the information, [the plaintiff] has no starting point for whom to name as a defendant"). The balance of equities thus weighs in favor of TEI.

## III. Doe Defendants' Request for a Protective Order.

The Doe Defendants request a protective order allowing disclosure of their identities only to the Court if the Court denies their motion to quash. (Dkt. No. 1 at p. 33.) TEI, in response, argues that a protective order is not warranted in part because solely disclosing the Doe Defendants' identities to the Court "severely hampers TEI's ability to conduct discovery and proceed with the case." (Dkt. No. 16 at p. 30.) The Court DENIES the motion for protective order because TEI must determine the identities of the Doe Defendants in the underlying action against them.

To the extent that the parties have further concerns about disclosure of information about the Doe Defendants, the parties should seek relief from the Central District of California. Until the Doe Defendants appear in the Central District of California, the Court ORDERS the following: Reddit and Discord may respond to the subpoena to TEI only. Additionally, no party may disclose the identities of the Doe Defendants or any other identifying information about the Doe

11

Defendants to any individual or entity not a party to this matter.  Of course, the District Court in the underlying action may override these protections, once the Doe Defendants make their appearance in that action.

**VI.     Doe Defendants' Request for Attorneys' Fees.**

In their motion to quash, the Doe Defendants noted that they "reserve their right to seek their attorney's fees and costs." (Dkt. No. 1 at p. 33.)  They argue that TEI brought its suit against the Doe Defendants for an improper purpose and that TEI's claims are legally "insufficient."  (*Id.*) Because the Court denies the Doe Defendants' motion to quash, they are not entitled to attorneys' fees.

<div align="center">

**CONCLUSION**

</div>

For the foregoing reasons, the Court DENIES the Doe Defendants' motion to quash the subpoenas issued by TEI to Reddit and Discord.

**IT IS SO ORDERED**.

Dated: April 29, 2026



SALLIE KIM
United States Magistrate Judge

<div align="left">United States District Court<br>Northern District of California</div>

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing Motion to Dismiss for Lack of Jurisdiction; Declaration of Rom Bar-Nissim in Support with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

DATED: July 3, 2026        By: /s/ Rom Bar-Nissim