No. 26-3553

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

TED ENTERTAINMENT, INC.

*Plaintiff-Appellee,*

v.

DOE DEFENDANTS,

*Defendants-Appellants.*

Appeal From Order Denying Motion to Quash Or, In The Alternative,
Protective Order
Issued April 29, 2026

Hon. Sallie Kim
Northern District of California Case No. 3:25-mc-80296-SK
Hon. Sallie Kim

_____

## DECLARATION OF LEAH ROSA VULIĆ IN SUPPORT OF DOE DEFENDANTS-APPELLANTS' RESPONSE TO PLAINTIFF-RESPONDENT TED ENTERTAINMENT, INC.'S MOTION TO DISMISS FOR LACK OF JURISDICTION

_____

Karl S. Kronenberger
Jeffrey M. Rosenfeld
Leah Rosa Vulić
KRONENBERGER ROSENFELD, LLP
548 Market St. #85399
San Francisco, CA 94104

1

(415) 955-1155
karl@kr.law
jeff@kr.law
leah@kr.law

*Attorneys for Defendants-Appellants*
*Doe Defendants*

<u>**DECLARATION OF LEAH ROSA VULIĆ**</u>

I, Leah Rosa Vulić, do hereby state and declare as follows:

1. I am an attorney at law, duly licensed to practice in the State of California and the United States Court of Appeals for the Ninth Circuit. I am an associate at the law firm of Kronenberger Rosenfeld, LLP, and counsel of record for Appellants/Defendants Does ("Does"). I have personal knowledge of the facts contained in this declaration and, if called and sworn as a witness, I could and would competently testify thereto. I make this declaration in support of Does' response to Respondent Ted Entertainment, Inc. ("TEI")'s motion to dismiss Does' appeal for lack of jurisdiction ("Motion").

2. Reddit is a website and message board home to thousands of discussion communities, designed to bring users together in honest conversations, fostered by its users' ability to speak anonymously. (RBN Decl. Ex. 6 (Does' Motion to Quash), p. 3.) A "subreddit" is a smaller community within Reddit on a particular topic, created and moderated by Reddit users. (RBN Decl. Ex. 6, p. 1 &

n.1.) Reddit moderators ("mods") are unpaid volunteers who set and enforce Reddit and subreddit community rules, norms, and expectations, including removing inappropriate content; mods may also facilitate discussions within subreddits. (RBN Decl. Ex. 6, p. 4.)

3.    Attached hereto as **Exhibit 8** is a true and correct copy of the Notice of Electronic Filing reflecting Docket Entry 2 in the Northern District of California miscellaneous action underlying Does' Motion to Quash TEI's subpoenas to Reddit and Discord, *In re Subpoenas to Reddit, Inc. and Discord, Inc.*, N.D. Cal. Case No. 3:25-mc-80296-SK ("Miscellaneous Action"). The entry shows the action was assigned to Magistrate Judge Sallie Kim upon filing on September 23, 2025.

4.    Attached hereto as **Exhibit 9** is a true and correct copy of the Northern District of California's General Order No. 44, entered January 1, 2018. This was the General Order No. 44 in effect at the time the Miscellaneous Action was filed.

5.    On January 6, 2026, the Clerk in the Miscellaneous Action issued a notice directing the parties to file a consent or declination to proceed before a magistrate judge by January 20, 2026. Attached hereto as **Exhibit 10** is a true and correct copy of that notice, Docket Entry 31 in the Miscellaneous Action.

6. On January 20, 2026, both Does and TEI filed signed "Consent or Declination to Magistrate Judge Jurisdiction" forms in the Miscellaneous Action agreeing to proceed before a magistrate for all purposes. Attached hereto as **Exhibits 11 and 12** are true and correct copies of Does' and TEI's respective consent forms. The forms state that:

In accordance with the provisions of 28 U.S.C. § 636(c), I voluntarily consent to have a United States magistrate judge conduct all further proceedings in this case, including trial and entry of final judgment. **I understand that appeal from the judgment shall be taken directly to the United States Court of Appeals for the Ninth Circuit.**

(Emphasis added).

7. On September 22, 2025, Does filed their Notice of Motion and Motion to Quash TEI's subpoenas to Reddit, Inc. and Discord, Inc. ("MTQ") in the Miscellaneous Action, seeking to prevent disclosure of their identifying information and, in the alternative, requesting a protective order.[1] A copy of Does'

---

[1] In their Motion to Quash, Does explained that the Subpoenas sought not only identifying information for H3Snark moderators, but also information and communications concerning accounts that did not belong to H3Snark moderators. RBN Decl. Ex. 6 p. 9.

MTQ is attached to the Declaration of Rom Bar-Nissim filed in connection with TEI's Motion as Exhibit 6.

8. On October 20, 2025, TEI filed its Opposition to the Doe Defendants' MTQ in the Miscellaneous Action. Attached hereto as **Exhibit 13** is a true and correct copy of TEI's opposition.

9. On April 20, 2026, the district court magistrate judge held a hearing on Does' MTQ in the Miscellaneous Action.

10. On April 29, 2026, Magistrate Judge Kim entered her order denying the MTQ (the "Order"). A copy of the Order is attached as Exhibit 7 to the Declaration of Rom Bar-Nissim in support of TEI's Motion.

11. On May 29, 2026, Does filed both a notice of appeal in the Miscellaneous Action (Ninth Circuit Case No. 26-3553, the "Appeal"), and, as a protective measure to preserve their appellate rights, a Petition for Writ of Mandamus (Ninth Circuit Case No. 26-3513, the "Mandamus Action"). Attached hereto as **Exhibit 14** is a true and correct copy of the Notice of Appeal filed in the Northern District of California on May 29, 2026. Attached hereto as **Exhibit 15** is a true and correct copy of the Petition for Writ of Mandamus filed in this Court on May 29, 2026.

12. On April 17, 2026, defendant Alexandra Marwa Saber ("Denims") filed a Motion for Partial Judgment on the Pleadings ("MPJOP") in *Ted*

*Entertainment, Inc. v. Saber, et al.*, Case No. 2:25-cv-05564-WLH-PD (the

"Denims Action"), defending her reaction video to *Content Nuke: Hasan Piker*

("Nuke") as fair use. On June 5, 2026, the United States District Court for the

Central District of California held a hearing on Denims' MPJOP. Attached as

**Exhibit 16** is a true and correct copy of the court's civil minutes from that hearing,

Docket Entry 42, which reflect that after hearing oral argument, "[t]he Court took

the matter **UNDER SUBMISSION**."[2]

13.     On July 1, 2026, the docket in the Denims Action reflects entry of an

order granting Denims' MPJOP as to TEI's *Content Nuke: Hasan Piker* ("*Nuke*")

(the "Denims Order"). Although the Denims Order's internal CM/ECF header

reflects a filed date of June 29, 2026, the docket confirms it was not entered until

July 1, 2026, and it was therefore not served on the parties via ECF, or otherwise

publicly available, until that date (*see* Ex. 23 hereto). The Denims Order held that

Denims' reaction stream of *Nuke* constituted fair use as a matter of law. Attached

hereto as **Exhibit 17** is a true and correct copy of the Denims Order.

---

[2] The minute order identifies "Leena M. Charlton" and "Eitan Sirkovich" as the attorneys present for Plaintiff and Defendant, respectively. Neither name corresponds to counsel of record in the Denims Action: Rom Bar-Nissim of Heah Bar-Nissim LLP represents TEI, and Benjamin Kassis of Frost LLP represents Denims. This appears to be a clerical error in the minute order and does not affect the substance of the ruling.

14. Also on July 1, 2026, Does filed a Federal Rule of Appellate Procedure 28(j) letter in both this Appeal and the Mandamus Action, advising the respective panels of the Denims Order. Attached hereto as **Exhibits 18** and **19** are true and correct copies of the 28(j) letters filed in the Mandamus Action and this Appeal, respectively.

15. On July 13, 2026, the court in the Denims Action granted a joint stipulation by TEI and Denims to dismiss TEI's claim as to the second video underlying its copyright infringement claims, "The H3 Show #105: Countdown to Doomsday" ("*Countdown*"), without prejudice, and to defer the deadline for Denims to move for attorneys' fees until after any appeal. Attached hereto as **Exhibit 20** are true and correct copies of the stipulation and the order granting the stipulation.

16. On the same date, the court in the Denims Action separately entered judgment in favor of Denims and against TEI as to *Nuke* (the "Denims Judgment"). Attached hereto as **Exhibit 21** is a true and correct copy of the Denims Judgment.

17. On July 15, 2026, the court in the Denims Action issued a Report on the Filing or Determination of an Action re Copyright. A true and correct copy of that report is attached hereto as **Exhibit 22**. The Denims Action is now closed. Attached hereto as **Exhibit 23** is a true and correct copy of the docket for the Denims Action, which I obtained on August 2, 2026, reflecting its closed status. I

7

have annotated Exhibit 23 to show the "closed" status and date of termination (July 13, 2026, the date the Denims Judgment was entered).

18. On July 8, 2026, the Ninth Circuit panel assigned to the Mandamus Action issued an order directing TEI, as real party in interest, to answer Does' Mandamus Petition. Attached hereto as **Exhibit 24** is a true and correct copy of that order.

19. On July 22, 2026, TEI filed its Answering Brief to the Mandamus Petition. Attached hereto as **Exhibit 25** is a true and correct copy of TEI's Answering Brief.

20. On July 29, 2026, Does filed their Reply in support of their Mandamus Petition. (Mandamus Action D.E. 18.1.)

21. On December 2, 2025, TEI and Kacey Caviness p/k/a "Kaceytron," a defendant in a related copyright action pending in the Western District of Missouri, *Ted Entertainment, Inc. v. Caviness, et al.*, Case No. 4:25-cv-00459-BCW (the "Caviness Action") (*see* Motion at p. 3), filed a stipulation for dismissal without prejudice as to Caviness only, based on a settlement between those parties. On December 8, 2025, the court entered an order dismissing the Caviness Action without prejudice as to Caviness only, *i.e.*, not as to Does.

22. On May 20, 2026, clerk's default was entered against defendant Morgan Kamal Majed p/k/a "Frogan" in another related copyright action by TEI

8

pending in the Central District of California, *Ted Entertainment, Inc. v. Majed, et al.*, Case No. 2:25-cv-05565-JFW-MAA (the "Majed Action") (*see* Motion at p. 3).

23. On June 30, 2026, TEI filed an Application for Default Judgment against Majed in the Majed Action. TEI's supporting memorandum quotes the Order denying Does' MTQ, the same Order at issue in this Appeal, and its discussion of "hatewatching," in connection with TEI's argument regarding fair use. Attached hereto as **Exhibit 26** is a true and correct copy of the relevant excerpt of TEI's memorandum in support of its Application for Default Judgment, which was filed in the Majed Action at Docket Entry 19-1. As Exhibit 26 shows, TEI cites to the Order as purported evidence that Does committed contributory infringement, even though the Order did not reach such a conclusion and such a finding is not necessary for TEI's default judgment against Majed.

24. Following entry of the Order, Does did not file an emergency motion to stay enforcement of the Order or the Subpoenas because TEI agreed, on the record and in communications with counsel, that it would voluntarily refrain from seeking enforcement of the Subpoenas at the present time. However, should TEI change its position, Does remain prepared to promptly seek an emergency motion to stay of enforcement of the Subpoenas in this Court.

I declare under penalty of perjury that the contents of this declaration are true and correct.

Executed this 3rd day of August, 2026.

s/ Leah Rosa Vulić

Leah Rosa Vulić

Exhibit 8

# Ema A. Tilton

| | |
|---|---|
| **From:** | Leah Vulic |
| **Sent:** | Tuesday, September 23, 2025 9:20 AM |
| **To:** | Jeff Rosenfeld; Ema A. Tilton |
| **Subject:** | FW: Activity in Case 3:25-mc-80296-SK IN RE. SUBPOENAS TO REDDIT, INC. AND DISCORD, INC. Case Assigned by Intake |

**From:** ECF-CAND@cand.uscourts.gov <ECF-CAND@cand.uscourts.gov>
**Sent:** Tuesday, September 23, 2025 8:10 AM
**To:** efiling@cand.uscourts.gov
**Subject:** Activity in Case 3:25-mc-80296-SK IN RE. SUBPOENAS TO REDDIT, INC. AND DISCORD, INC. Case Assigned by Intake

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## California Northern District

## Notice of Electronic Filing

The following transaction was entered on 9/23/2025 at 8:10 AM and filed on 9/23/2025

| | |
|---|---|
| **Case Name:** | IN RE. SUBPOENAS TO REDDIT, INC. AND DISCORD, INC. |
| **Case Number:** | 3:25-mc-80296-SK |
| **Filer:** | |
| **Document Number:** | 2(No document attached) |

**Docket Text:**
**Case assigned to Magistrate Judge Sallie Kim.**

**(mbc, COURT STAFF) (Filed on 9/23/2025)**

**3:25-mc-80296-SK Notice has been electronically mailed to:**

Leah Rosa Vulic      leah@kr.law

**3:25-mc-80296-SK Please see [Local Rule 5-5](); Notice has NOT been electronically mailed to:**

Exhibit 9

A.    PURPOSE

This plan is adopted pursuant to 28 U.S.C. § 137 and Civil Local Rule 3-3(a). The purpose of the plan is to:

1. Provide an equitable system for a proportionate division of the caseload among the district and magistrate judges of the court;

2. Ensure that cases are randomly and blindly assigned, except as otherwise provided herein to promote efficient case management;

3. Provide for necessary adjustments to caseload assignments; and

4. Provide a basis for monitoring the operation of the case assignment system.

B.    ADMINISTRATION

The Executive Committee shall have the power to make and review all orders of assignment and reassignment consistent with this plan. As provided in Civil L.R. 77-2(e), the Clerk, when directed by the committee or as specifically provided for in this plan, may sign orders on behalf of the Executive Committee.

C.    CASE NUMBERS

Each case commenced in or transferred to the court pursuant to Civil L.R. 3-2 shall be assigned a case number by the Clerk upon filing. A separate sequence of case numbers shall be maintained for criminal and civil cases. Case numbers shall conform to the format approved by the Administrative Office of the United States Courts.

D.    ASSIGNMENT OF CASES

1. Unless otherwise required by the Executive Committee, cases shall be assigned by the Clerk to the judges holding chambers in the courthouse or courthouses serving the county in which the action arises.

2. Cases shall be assigned blindly and at random by the Clerk by means of an automated system approved by the judges of the court. Such system will be designed to accomplish the following:

   a. Proportionate, random and blind assignment of cases;

   b. Except as set forth in paragraphs (D)(4) through (D)(7), an approximately equal distribution among the active judges of the court of newly filed civil and criminal cases within each of the case categories established by the court

   c. A high level of security so as to reasonably avoid prediction of the results of any case assignment;

   d. A system of credits and debits to adjust for reassignments of cases among and between judges;

   e. A record of all assignments and reassignments made.

3. Notwithstanding any other provision of the Assignment Plan, the Clerk shall maintain a district-wide system of assignment for prisoner petitions (including death penalty habeas corpus), bankruptcy, intellectual property rights, Social Security, federal tax

suits, antitrust and securities class actions. Venue for cases in these categories shall be proper in any courthouse in this District. These cases shall not be reassigned on the basis of intra-district venue.

4. Notwithstanding any other provision of the Assignment Plan, the Clerk shall assign cases transferred to this District pursuant to Federal Rule of Criminal Procedure 20 in the following manner. Assignment of Rule 20 cases shall be made prior to execution of a consent to transfer in the manner set forth in Criminal L.R. 20-1. Any subsequent Rule 20 proceeding involving the same defendant and arising out of the same or superseding charges shall be deemed to be a related case and shall be assigned to the originally assigned judge.

5. Notwithstanding any other provision of the Assignment Plan, the Clerk shall assign any non-capital habeas petition filed by a prisoner to the same judge who was assigned any previous petitions filed by or on behalf of that prisoner.

6. Notwithstanding any other provision of the Assignment Plan, the Clerk shall assign any non-habeas civil complaint filed by a prisoner within five (5) years after the filing of the first civil complaint by that party to the same judge to whom the first such complaint was assigned. After five (5) years, the next new civil complaint filed by that prisoner shall be assigned to a different judge, in accordance with paragraph (D)(2) above, who shall then be assigned that prisoner's civil filings for the next five (5) years. Thereafter, a different judge shall be assigned for each subsequent five-year period.

7. Notwithstanding any other provision of the assignment plan, the Clerk shall assign a bankruptcy matter to the same judge who was assigned any previously filed bankruptcy matter arising from the same case in the United States Bankruptcy Court.

E. ASSIGNMENT OF CASES TO MAGISTRATE JUDGES

1. The full-time magistrate judges of this District shall be included in the civil case assignment system in the same manner as active district judges, except for capital habeas corpus petitions, securities class actions, and bankruptcy appeals or bankruptcy withdrawal of reference cases. With respect to such assignments, the following shall apply:

   a. In cases assigned at filing to a magistrate judge, the magistrate judge shall conduct all proceedings including a jury or bench trial and shall order the entry of a final judgment upon the written consent of all parties in the case in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

   b. In all cases assigned at filing to a magistrate judge the Clerk shall provide all parties with a copy of the forms adopted by the court for "Notice of Assignment of Case To A United States Magistrate Judge for Trial." The form shall indicate that upon written consent of the parties the magistrate judges of this District have been designated to conduct any and all proceedings in a civil case, including a jury or nonjury trial and order the entry of a final judgment. Prior to the magistrate judge taking any dispositive action in the case, the Clerk shall obtain from the parties written consent to the jurisdiction of the magistrate judge in accordance with 28 U.S.C. §636(c) and Fed. R. Civ. P. 73.

   c. If a party declines to consent to a United States magistrate judge, the Clerk shall reassign the case to a district judge on a random basis or in accordance with paragraphs (D)(5) and (D)(6), if applicable.

2. Upon filing, the following will be assigned to a magistrate judge for all pretrial proceedings. When the case is ready for trial, upon consent of the parties, it will be retained by the magistrate judge for trial. If all parties do not so consent, the Clerk will randomly assign the case to a district judge in the division where the case is pending.

   a. All actions filed by the United States to recover on a claim for a debt;

   b. Pre-judgment or post-judgment applications by the United States under the Federal Debt Collection Procedures Act.

3. Upon filing, unless exempted by Local Rule, order of a judge of this court, or other provision of this general order, all civil miscellaneous matters will be randomly assigned in the first instance to a magistrate judge who will either resolve the matter or, if necessary, prepare a report and recommendation and request assignment of the matter to the district judge who was the general duty judge on the date the miscellaneous matter was filed. Any objections to the magistrate judge's order or report and recommendation will be resolved by that district judge. See Fed. R. Civ. P. 72. Matters from the Eureka division shall be reassigned, as necessary, to the general duty judge.

4. For cases reassigned to a magistrate judge subsequent to initial case assignment (e.g. at a case management conference), the parties may consent to the assignment of a magistrate judge sitting in any division.

| | | |
|---|---|---|
| ADOPTED: | JULY 22, 1997 | FOR THE COURT: |
| AMENDED: | JULY 18, 2000 | |
| AMENDED: | MARCH 1, 2002 | |
| AMENDED: | JANUARY 30, 2003 | |
| AMENDED: | AUGUST 26, 2003 | |
| AMENDED: | APRIL 28, 2008 | |
| AMENDED: | JANUARY 4, 2010 | |
| AMENDED: | MAY 29, 2012 | |
| AMENDED: | MARCH 19, 2013 | |
| AMENDED: | DECEMBER 17, 2013 | |
| AMENDED: | JUNE 24, 2015 | |
| AMENDED: | APRIL 19, 2016 | |
| AMENDED: | JUNE 20, 2017 | |
| AMENDED: | JANUARY 1, 2018 | |

PHYLLIS J. HAMILTON
CHIEF JUDGE

Exhibit 10

**Ema A. Tilton**

| | |
|---|---|
| **From:** | ECF-CAND@cand.uscourts.gov |
| **Sent:** | Tuesday, January 6, 2026 2:03 PM |
| **To:** | efiling@cand.uscourts.gov |
| **Subject:** | Activity in Case 3:25-mc-80296-SK IN RE. SUBPOENAS TO REDDIT, INC.  AND DISCORD, INC. Clerk's Notice re: Consent or Declination |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## U.S. District Court

## California Northern District

## Notice of Electronic Filing

The following transaction was entered on 1/6/2026 at 2:03 PM PST and filed on 1/6/2026

| | |
|---|---|
| **Case Name:** | IN RE. SUBPOENAS TO REDDIT, INC. AND DISCORD, INC. |
| **Case Number:** | 3:25-mc-80296-SK |
| **Filer:** | |
| **Document Number:** | 31(No document attached) |

**Docket Text:**
**CLERK'S NOTICE Re: Consent or Declination: Plaintiff and Movant shall file a consent or declination to proceed before a magistrate judge by 1/20/2026 . Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms.**

**(This is a text-only entry generated by the court. There is no document associated with this entry.) (bxl, COURT STAFF) (Filed on 1/6/2026)**

**3:25-mc-80296-SK Notice has been electronically mailed to:**

Jeffrey Michael Rosenfeld    jeff@kr.law, ecf@kr.law

Karl Stephen Kronenberger    karl@kr.law, ecf@KRInternetlaw.com

Leah Rosa Vulic    leah@kr.law

Rom Aric Bar-Nissim    rom@heahbarnissim.com

**3:25-mc-80296-SK Please see [Local Rule 5-5](); Notice has NOT been electronically mailed to:**

Exhibit 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE. SUBPOENAS TO REDDIT, INC.

       Plaintiff(s),

    v.

       Defendant(s).

Case No. 3:25-mc-80296-SK

**CONSENT OR DECLINATION TO MAGISTRATE JUDGE JURISDICTION**

**INSTRUCTIONS:** Please indicate below by checking **one** of the two boxes whether you (if you are the party) or the party you represent (if you are an attorney in the case) choose(s) to consent or decline to magistrate judge jurisdiction in this matter. Sign this form below your selection.

☑ **CONSENT to Magistrate Judge Jurisdiction**

In accordance with the provisions of 28 U.S.C. § 636(c), I voluntarily **consent** to have a United States magistrate judge conduct all further proceedings in this case, including trial and entry of final judgment. I understand that appeal from the judgment shall be taken directly to the United States Court of Appeals for the Ninth Circuit.

**OR**

☐ **DECLINE Magistrate Judge Jurisdiction**

In accordance with the provisions of 28 U.S.C. § 636(c), I **decline** to have a United States magistrate judge conduct all further proceedings in this case and I hereby request that this case be reassigned to a United States district judge.

DATE: January 20, 20 26    NAME: Leah Rosa Vulic

s/Leah Rosa Vulic

*Signature*

COUNSEL FOR (OR "PRO SE"): Movants/Defendants Does

Exhibit 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re Subpoena to Reddit and Discord

Plaintiff(s),

v.

Defendant(s).

Case No. 3:25-mc-80296-SK

**CONSENT OR DECLINATION TO MAGISTRATE JUDGE JURISDICTION**

**INSTRUCTIONS:** Please indicate below by checking **one** of the two boxes whether you (if you are the party) or the party you represent (if you are an attorney in the case) choose(s) to consent or decline to magistrate judge jurisdiction in this matter. Sign this form below your selection.

☑ **CONSENT to Magistrate Judge Jurisdiction**

In accordance with the provisions of 28 U.S.C. § 636(c), I voluntarily **consent** to have a United States magistrate judge conduct all further proceedings in this case, including trial and entry of final judgment. I understand that appeal from the judgment shall be taken directly to the United States Court of Appeals for the Ninth Circuit.

**OR**

☐ **DECLINE Magistrate Judge Jurisdiction**

In accordance with the provisions of 28 U.S.C. § 636(c), I **decline** to have a United States magistrate judge conduct all further proceedings in this case and I hereby request that this case be reassigned to a United States district judge.

DATE: January 20 , 20 26        NAME: Rom Bar-Nissim

/s/ Rom Bar-Nissim
*Signature*

COUNSEL FOR (OR "PRO SE"): Plaintiff/Respondent Ted Entertainment, Inc.

Exhibit 13

ROM BAR-NISSIM (SBN: 293356)
Rom@HeahBarNissim.com
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

Attorneys for Respondent/Plaintiff
TED ENTERTAINMENT, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE. SUBPOENAS TO REDDIT, INC. AND DISCORD, INC. | Case No.: 3:25-mc-80296-SK |
| | (Case No. 2:25-cv-05564-WLH-PD, Pending in Central District of California) |
| | **TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS' MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.** |

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION: NO ONE LIKES A CRYBULLY..........................................................................1

II. STATEMENT OF FACTS.......................................................................................................2

    A.    TEI and its Owners – Ethan and Hila Klein .........................................................2

    B.    H3Snark ...................................................................................................................3

    C.    The Creation, Dissemination and Infringement of The Nuke ...........................6

III. LEGAL STANDARD..........................................................................................................8

IV. TEI'S *PRIMA FACIE* CASE OF CONTRIBUTORY COPYRIGHT
    INFRINGEMENT AGAINST THE H3SNARK MODS .....................................................8

    A.    Denims Engaged in Direct Infringement .............................................................9

    B.    The H3Snark Mods Fail to Demonstrate Fair Use ............................................9

        1.    The H3Snark Mods Fail to Show They Made a Fair Use.....................10

        2.    The H3Snark Mods Fail to Show Denims Made a Fair Use ................10

    C.    The H3Snark Mods Knew of Denims' Infringement............................................19

    D.    The H3Snark Mods Induced Denims' Infringement .........................................22

V.    THE BALANCING TEST FAVORS DISCLOSURE .........................................................23

VI.    A PROTECTIVE ORDER IS UNWARRANTED..............................................................25

VII.    CONCLUSION.............................................................................................................26

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agdal v. X Corp. In Int. to Twitter,*
   2025 WL 81594 (N.D. Cal. Jan. 13, 2025) ............................................................................ 8, 23

*Amazon Content Services LLC v. DeBarr,*
   -- F.Supp.3d --, 2025 WL 2217715 (C.D. Cal. Aug. 4, 2025) ...................................................... 8

*Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith,*
   598 U.S. 508 (2023) ...................................................................................... 10, 11, 12, 17

*Arista Records, LLC v. Doe 3,*
   604 F.3d 110 (2d Cir. 2010) ................................................................................................ 19

*Atari Interactive, Inc. v. Redbubble, Inc.,*
   515 F.Supp.3d 1089 (N.D. Cal. 2021) ..................................................................................... 9

*Bangkok Broad. & T.V. Co., Ltd. v. IPTV Corp.,*
   742 F.Supp.2d 1101 (C.D. Cal. 2010) ................................................................................... 19

*Bartz v. Anthropic PBC,*
   787 F.Supp.3d 1007 (N.D. Cal. 2025) ................................................................................... 18

*Baugher,*
   2021 WL 4942658 .............................................................................................. 8, 9, 10, 23

*Cognosphere Pte. Ltd. v. X Corp.,*
   2024 WL 4227594 (N.D. Cal. Sept. 18, 2024) ................................................................ 8, 23, 24

*De Fontbrune v. Wofsy,*
   39 F.4th 1214 (9th Cir. 2022) ......................................................................................... 10, 11

*Doe 1 v. GitHub,*
   672 F.Supp.3d 837 (N.D. Cal. 2023) ..................................................................................... 25

*Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate,*
   596 F.3d 1036 (9th Cir. 2010) ............................................................................................. 25

*Does 1 Thru XXIII v. Advanced Textile Corp.*,

  214 F.3d 1058 (9th Cir. 2000) ................................................................................. 25

*Elvis Presley Enterprises, Inc. v. Passport Video*,

  349 F.3d 622 (9th Cir. 2003) ............................................................................ 11, 17

*Erickson Prods., Inc. v Kast*,

  921 F.3d 822 (9th Cir. 2019) .................................................................................. 19

*Furie v. Infowars, LLC*,

  401 F.Supp.3d 952 (C.D. Cal. 2019) ....................................................................... 20

*Hachette Book Grp, Inc. v. Internet Archive*,

  115 F.4th 163 (2d Cir. 2024) ............................................................................ 17, 18

*Harper & Row Pub., Inc. v. Nation Enters.*,

  471 U.S. 536 (1985)................................................................................................ 17

*Hosseinzadeh v. Klein*,

  246 F.Supp.2d (S.D.N.Y. 2017) ........................................................ 3, 10, 12, 17, 21

*In re DMCA Subpoena to Reddit, Inc.*,

  441 F.Supp.3d 875 (N.D. Cal. 2020) ................................................................ 8, 9, 23

*In re DMCA § 512(h) Subpoena to Twitter*,

  608 F.Supp.3d 868 (N.D. Cal. 2022) ........................................................................ 8

*In re Reddit*,

  2024 WL 477519 (N.D. Cal. Feb. 7, 2024) .............................................................. 23

*Lenz v. Uni. Music Corp.*,

  815 F.3d 1145 (9th Cir. 2016) ............................................................................. 9, 21

*Luvdarts, LLC v. AT&T Mobility, LLC*,

  710 F.3d 1068 (9th Cir. 2013) ................................................................................ 21

*McGucken v. Ocean Pub. Ltd.*,

  42 F.4th 1149 (9th Cir. 2022) ............................................................................ 16, 18

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,

  545 U.S. 913 (2005)................................................................................................ 22

3

*Mishiyev v. UMG Recordings, Inc.*,

   2025 WL 2625525 (M.D. Fla. Sept. 11, 2025)..................................................................21

*Monge v. Maya Magazines, Inc.*,

   688 F.3d 1164 (9th Cir. 2012) ...................................................................................... 11, 16

*Nat. Fire Protection Assoc., Inc. v. UpCodes, Inc.*,

   753 F.Supp.3d 933 (C.D. Cal. 2024) ...................................................................................18

*Penguin Random House LLC v. Colting*,

   270 F.Supp.3d 736 (S.D.N.Y. 2017) ....................................................................................11

*Shaffer v. Kavarnos*,

   2025 WL 2299173 (S.D.N.Y. Aug. 7, 2025)........................................................................21

*VHT, Inc. v. Zillow Group, Inc.*,

   918 F.3d 723 (9th Cir. 2019) ...............................................................................................17

**Statutes**

17 U.S.C. Section 512(f).............................................................................................................21

17 U.S.C. § 106...........................................................................................................................9

17 U.S.C. § 107...........................................................................................................................9

**Rules**

Federal Rules of Evidence 602, 802, 805, 901, 1002-1003 ..........................................................2

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

Plaintiff/Respondent Ted Entertainment, Inc. ("TEI") respectfully submits its Opposition to the Motion to Quash (Dkt. No. 1) ("Motion") of Movants/Defendants Does (collectively, the "H3Snark Mods").

## I. INTRODUCTION: NO ONE LIKES A CRYBULLY

Piracy as criticism is not a thing. This case is about piracy. It is not about stifling criticism. To the contrary, this case is about the ***lack of sufficient criticism*** to justify promoting a watch party showing copyrighted works – in their entirety – at the exact moment they were released to the public for express purpose of commercial gain.

TEI is the copyright owner of: (1) *The H3 Show # 104: Countdown to Doomsday* ("Countdown Episode"); and (2) *Content Nuke: Hasan Piker* ("*The Nuke*"). Defendant Alexandra Marwa Saber p/k/a Denims ("Denims") hosted an online watch party (the "Watch Party") of the Countdown Episode and *The Nuke* (collectively, the "Works").

Denims' Watch Party broadcast: (1) the Countdown Episode concurrently with its live broadcast and nearly in its entirety; and (2) *The Nuke* immediately after its public release and in its entirety. Her statements and lack of critical commentary demonstrate that Denims' objective was to commercialize her Watch Party and have it serve as a substitute for the Works.

The H3Snark Mods are contributorily liable for Denims' infringement of the Works. The H3Snark Mods had actual knowledge that Denims was broadcasting the Works without permission from TEI. This is evidenced by ***three*** pinned community posts on the r/H3Snark subreddit the day before and during Denims' infringement to promote her Watch Party. Further, by not watching Denims' Watch Party prior to promoting it, the H3Snark Mods could not have formed any opinion on whether she made a fair use of the Works. Rather, all they knew was that Denims was showing the Works without authorization. Despite this, the H3Snark Mods still promoted her Watch Party.

TEI subpoenaed Reddit, Inc. and Discord, Inc. for personal identifying information about the H3Snark Mods. This is TEI's only option to identify the H3Snark Mods and hold them accountable for contributing to Denims' infringement of the Works. Obtaining the H3Snark Mods identities is essential to naming them in the lawsuit and serving them with the Complaint.

The H3Snark Mods treat this Court like their subreddit. They use their Motion and

1

supporting declarations as subterfuge to traffic in falsehoods and gross misrepresentations about the owners of TEI, Ethan Klein ("Ethan") and Hila Klein ("Hila") (collectively, the "Kleins").[1] The H3Snarks call these falsehoods "criticism." When the Kleins respond to this "criticism," the H3Snark Mods claim the Kleins are engaging in "harassment," "abuse" and "threats." Not only does this fail to demonstrate the Kleins' are averse to and seek to silence criticism, it shows the Kleins are willing to directly confront it. Rather, the opposite is true: it is the H3Snark Mods that reveal they are unable to handle the Kleins responding to and exposing their "criticism" as falsehoods and gross misrepresentations.

TEI and the Kleins have gone to great lengths to accommodate the H3Snark Mods' concerns. They informed the H3Snark Mods that they will: (1) not publicly disclose their personal identifying information; (2) not publicly address or refer to the H3Snark Mods in their individual capacities; (3) instruct their audience not to contact, harass or harm the H3Snark Mods in any manner; and (4) narrow the scope of the subpoenas. The H3Snark Mods' omission of these concessions is intentional because it counters their narrative, which they ask this Court to adopt. The H3Snark Mods, however, are not the Kleins' victims. They are their victimizers.[2]

Therefore, for the reasons set forth in this opposition, TEI respectfully requests that this Court deny the Motion in its entirety.

## II.    STATEMENT OF FACTS

### A.    TEI and its Owners – Ethan and Hila Klein

TEI is a production company that produces online content, primarily for YouTube. It owns the YouTube channels "h3h3Productions" and "H3Podcast." JKD, ¶ 8. TEI is best known for producing The H3 Show f/k/a The H3 Podcast – which is publicly released on the H3 Podcast YouTube channel. *Id.* At the time the events relevant to this dispute occurred, TEI released four

---

[1] The H3Snark Mods frequently cite Reddit posts and other materials authored by third parties to support their claims. TEI objects to each of these as hearsay and lacking personal knowledge, foundation and proper authentication. Insofar as clips are part of those posts, TEI objects under the best evidence rule as well. Federal Rules of Evidence 602, 802, 805, 901, 1002-1003.

[2] TEI will refrain from addressing the H3Snark Mods' outlandish claims in this brief. Instead, it will focus on the material facts and law to this case. TEI and its owners apologize for needing to address the H3Snark Mods claims in their joint declaration and attorney declaration. *See* Joint Declaration of Ethan Klein and Hila Klein ("JKD"), ¶¶ 25 (fn. 18), 35-97; Declaration of Rom Bar-Nissim ("RBN Decl."), ¶¶ 3-40, 56, 79-80. The Kleins' greatest concern is that the Court takes the H3Snark Mods assertions at face value and signs off on their counterfactual narrative.

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS' MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

live broadcasts of The H3 Show a week (three public and one for paying members). *Id.* The h3h3Productions channel contains scripted and highly edited commentary videos. *Id.*, ¶¶ 8-9. Both forms of content provide comedic commentary on current events and public figures. *Id.*

TEI is owned by the Kleins. JKD, ¶ 7. The Kleins pioneered fair use reaction videos on YouTube and established legal precedent on the issue in *Hosseinzadeh v. Klein*, 246 F.Supp.2d 34 (S.D.N.Y. 2017). JKD, ¶ 10. The Kleins co-host The H3 Show and collaborate together on videos for the h3h3Productions channel. *Id.*, ¶¶, 7, 9.

The Kleins are high-profile Jewish Israeli-Americans. JKD, ¶ 11. Hila was born in Israel, while Ethan emigrated to Israel for a period of time and became a citizen. *Id.* For years, the Kleins have consistently spoken out against Israel's occupation of the Palestinian territories and the atrocities committed by the Israeli government against the Palestinian people. *Id.*, ¶¶ 18-19.

Prior to October 7, 2023, Ethan hosted a political comedy podcast with the prominent leftist streamer, Hasan Piker ("Hasan"). JKD, ¶ 22. After October 7th, friction grew between Hasan and the Kleins. *Id.* While the Kleins publicly stated Israel was committing a genocide in Gaza and condemned how Israel was conducting the war, the Kleins still advocated for a two-state solution and condemned political violence and terrorism. *Id.* In contrast, Hasan justified political violence and terrorism and advocated for the immediate dismantling of the State of Israel. *Id.* The public disagreement between the Kleins and Hasan led to supporters of Hasan and his perspective to attack the Kleins as genocide supporters and participants. *Id.*

**B.    H3Snark**

Snark subreddits are a relatively new genre of message boards on Reddit. JKD, ¶ 20. They are comprised of "fallen fans" of a particular creator. *Id.*, ¶ 21. They have a notorious reputation for cyberbullying, spreading falsehoods and engaging in invasive and obsessive behavior. *Id.*, ¶ 20. One subreddit was even implicated in the suicide of an online content creator by her widow. *Id.*

Snark subreddits are also hubs of copyright infringement. RBN Decl., ¶ 13; JKD, ¶ 21. They satiate the ravenous appetite of fallen fans to "hate watch" the content by providing unauthorized alternatives to the original – describing it as "ethical viewing." JKD, ¶ 21.

r/H3Snark is a snark subreddit that targets the Kleins and TEI content. JKD, ¶ 23. While

H3Snark was established before October 7th, its user base grew tremendously after the public schism between Hasan and the Kleins following October 7th. *Id.* H3Snark became the central location to attack the Kleins and falsely brand them as advocating the genocide of Palestinians. *Id.*, ¶¶ 23, 38-40.

H3Snark also became a hub for copyright infringement of TEI content. RBN Decl., ¶¶ 7-19, Exs. 49-56. Despite the fallen fans' hatred of the Kleins, they religiously hate watched TEI's content. *Id.* The H3Snark Mods were keenly aware of the appetite of H3Snark users for TEI content. *Id.* Additionally, they were aware that the users wanted to consume TEI content through unauthorized means to avoid supporting TEI and the Kleins (*i.e.*, providing views to TEI content, which would increase the content's visibility and advertising revenue). *Id.*

The H3Snark Mods enthusiastically supplied their users with market substitutes for TEI content. Initially, the H3Snark Mods would provide links to TEI content that was located – not on TEI's authorized YouTube channels – but on YewTube. RBN Decl., ¶¶ 9-14, Exs. 49-53. As one H3Snark Mod stated: "***We encourage folks to watch on yewtube since it doesn't play ads or contribute to their view counts***." *Id.*, ¶ 12, Exs. 50, 53. The H3Snark Mods disseminated these links on megathread posts pinned to the top of the H3Snark page. *Id.* The H3Snark Mods also spammed YewTube links of TEI content during live chats hosted by the H3Snark Mods on H3Snark. *Id.*, ¶¶ 9-10, Exs. 50-51. Once the broadcast was complete, the H3Snark Mods would delete the live chat to destroy the evidence of their contributory infringement. *Id.*, ¶ 11.

The H3Snark Mods provided instructions to its users on how to download TEI content (specifically paywalled content) for reupload onto H3Snark. RBN Decl., ¶ 8, Ex. 49. On the "tools-tips-guides" page of H3Snark's wiki page, the H3Snark Mods provided instructions on how to download "Members-Only" content for reposting onto H3Snark. *Id.* H3Snark users followed these instructions and uploaded entire episodes of paywalled content onto H3Snark. *Id.*, ¶ 7.

On August 1, 2024, TEI reached a breaking point regarding the infringement of TEI's content on H3Snark. RBN Decl., ¶ 7. On that date, TEI discovered that its paywalled video, *H3 Podcast BTS #53* (which was 23:24 minutes) was uploaded in its entirety onto H3Snark. *Id.* The title of the post did not contain a critical aspect or solicit criticism. *Id.* Rather, it merely described

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

the contents of the video: "H3 Live Show Behind the Scenes." *Id.* The post had two short comments that had no critical bearing on the style or substance of the video. *Id.*

At that point, TEI decided to issue DMCA takedowns for H3Snark posts that met very specific and exacting criteria. RBN Decl., ¶¶ 3-19. First, TEI would only target posts containing TEI content that had a non-critical, descriptive title and did not solicit criticism. *Id.*, ¶ 4 Second, TEI would only target posts where: (1) the H3Snark Mods locked the post, which made it impossible for anyone to comment or critique the content; and/or (2) lacked comments with any critical bearing on the content at the time of the DMCA takedown. *Id.* If the title or comments of the post had even marginal critical bearing on the style or substance of the clip, TEI refrained from issuing a DMCA takedown. *Id.* This exacting standard was established for the express purpose of staying well clear of silencing any criticism. *Id.*, ¶ 5.

From August 1, 2024 to November 26, 2024, TEI issued six DMCA takedowns of H3Snark posts and one for a comment containing a YewTube link. RBN Decl., ¶¶ 3-19, Exs. 49-56. Each of the posts or the comment subject to TEI's DMCA takedowns met the aforementioned criteria. *Id.* A thorough fair use analysis was provided with each DMCA Takedown to explain TEI's good faith belief why the post or comment did not qualify as fair use. *Id.*

H3Snark retaliated against the DMCA takedowns. They made pinned community posts and megathreads attacking the DMCA takedowns, along with the Kleins and TEI's counsel as abusing the DMCA takedown system. RBN Decl., ¶¶ 20-21. H3Snark began soliciting individuals to file counternotifications. *Id.*, ¶ 23. TEI received two counternotifications for the seven takedowns it issued. *Id.*, ¶¶ 23-29. The first counternotification was clearly fraudulent and issued by the H3Snark Mods. *Id.*, ¶ 24-26. Reddit ultimately recognized it was fraudulent and refused to honor the first counternotification. *Id.*, ¶ 27, Ex. 59. The second counternotification complied with the statutory requirements for a counternotification – which Reddit honored as required by law. *Id.*, ¶ 28. However, the statement justifying the second counterclaim demonstrated the issuer failed to consider the fair use factors as required by law. *Id.*, ¶¶ 29-30, Ex. 60.

The H3Snark Mods' claim that H3Snark was intended as a "safe space" for "good faith criticism" of the Kleins warrants closer scrutiny. The "criticism" most frequently levied against the

Kleins in H3Snark was that they advocated the genocide of Palestinians and supporting Israel's actions in Gaza. JKD, ¶¶ 38-41, Ex. 70.

The declarations of the H3Snark Mods are replete with assertions that contain material omissions, gross misrepresentations and outlandish and false conspiracy theories. JKD, ¶¶ 35-97. While the Kleins do their utmost to address these assertions, some of the most absurd claims are worth highlighting. One of the claims is that the Kleins sent human skulls to themselves to elicit sympathy after being investigated based on a fraudulent report to the Los Angeles County Department of Child and Family Services. *Id.*, ¶ 77. Another claim is the Kleins are using the subpoenas as a fishing expedition because Ethan wore a "fishing" hat when discussing the subpoenas. *Id.*, ¶ 72. Yet another claim is that Ethan intends to kill them based on quoting the film *Taken*. *Id.*, ¶ 73.

The H3Snark Mods claim that the Kleins intend to publicly retaliate against them also warrants closer scrutiny. While the H3Snark Mods feel they are entitled to make false and outlandish claims against the Kleins as a form of "criticism" (no matter how horrific or abusive), they consider the Kleins' public statements defending themselves against these allegations and criticizing the H3Snark Mods as a form of abuse and harassment. This double standard epitomizes the H3Snark Mods abuse and harassment of the Kleins: they seek protection for their "criticism," but seek to punish the Kleins for exercising their First Amendment right to refute this "criticism."

**C.** **The Creation, Dissemination and Infringement of *The Nuke***

Beginning in mid October 2024, the Kleins reached a breaking point. JKD, ¶ 24. They kept witnessing how Hasan radicalized people to – not be pro-Palestinian – but pro-terrorism. *Id.* They were fed up with how H3Snark was repeatedly branding them as genocide supporters. *Id.* As such, the Kleins – through TEI – decided to create a documentary that exposed how Hasan radicalizes individuals online to support terrorism against Jews and Israelis. *Id.*

*The Nuke* was created over the course of several months. JKD, ¶ 25. It utilized a combination of comedy, commentary, archival materials, audio and visual effects, montage and editing to lampoon and criticize Hasan and the platform that enables him, Twitch. *Id.*, Exs. E, 69. The duration of *The Nuke* is of a feature length film, totaling over one hour and forty-two

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

minutes. *Id.*, ¶ 25, Ex. E.

The Kleins (particularly Ethan) promoted the video frequently before its release on January 31, 2025. JKD, ¶ 28. The public interest in the video – including on H3Snark – was immense. *Id. The Nuke* was originally set to release on January 30, 2025. *Id.*, ¶ 29. On that date, the H3Snark Mod u/jewettornesarah made a pinned community post on H3Snark to maximize its visibility (the "1/30/25 Post"). RBN Decl., ¶ 35; Dkt. No. 7, p. 103.

The 1/30/25 Post was entitled "MEGATHREAD | Content Nuke – **Where to Watch** & Discussion." Dkt. No. 7, p. 103 (emphasis added). The 1/30/25 Post provided links to various creators, including Denims, as a place "*to watch the nuke without showing support for H3*" (*i.e.*, TEI). *Id.* (emphasis added). The 1/30/25 Post stated they were providing links to creators, like Denims, because they "supported" H3Snark "by engaging directly with" the H3Snark Mods. *Id.*

On January 31, 2025, TEI broadcast the Countdown Episode at around 12:24 p.m. PST on the H3 Podcast YouTube channel. JKD, ¶ 30. It was intended to drum up interest for the release of *The Nuke* and cover various topics and current events. *Id.* At 1:30 p.m. when the Countdown Episode completed, TEI released *The Nuke* on the h3h3Productions YouTube channel. *Id.*

During the broadcast of the Countdown Episode, the H3Snark Mod u/h3snarkmodteam made a pinned community post on H3Snark to maximize its visibility (the "First 1/31/25 Post). RBN Decl., ¶ 38; Dkt. No. 7, p. 133. The title for the post was "DENIMS is LIVE reacting now to today's H3 podcast episode and the 'content nuke' video Ethan is publishing in about an hour." *Id.* It contained a hyperlinked picture of Denims that took users directly to her homepage where people could view her Watch Party of the Countdown Episode. *Id.*; RBN Decl., ¶¶ 38, 40, Ex. 62.

Shortly after *The Nuke* was released, the H3Snark Mod u/h3snarkmodteam created another pinned community post on H3Snark to maximize its visibility (the "Second 1/31/25 Post"). RBN Decl., ¶ 39; Dkt. No. 7, p. 116. It contained text featuring Denims as a place "to watch reactions to this video." *Id.* Next to her name was the word "**Link**" written in bold and underlined that took users directly to Denims' homepage where they could view her Watch Party of *The* Nuke. *Id.*; RBN Decl., ¶¶ 39-40, Ex. 62. The H3Snark Mods also provided links to other creators, but Denims was at the top of the list. Dkt. No. 7, p. 116. The list included information on

whether they were currently streaming *The Nuke* or would be doing so shortly. *Id.*

## III.    LEGAL STANDARD

Currently, there is a split in authority regarding the standard to disclose a doe defendant's identity via subpoena when "the anonymous speech at issue constitutes copyright infringement or relates to illegal activity[.]" *Agdal v. X Corp. In Int. to Twitter*, 2025 WL 81594, *4 (N.D. Cal. Jan. 13, 2025). "[S]ome courts have concluded that that a First Amendment analysis can be dispensed with altogether while others have concluded that consideration of the First Amendment concerns is still appropriate." *Id.* (collecting authorities).

Some courts have adopted the following test: (1) "the party seeking the disclosure must demonstrate a *prima facie* case on the merits of its underlying, in this case, copyright claim;" and (2) "the Court balances the need for the discovery against the First Amendment interest at stake." *Cognosphere Pte. Ltd. v. X Corp.*, 2024 WL 4227594, *3 (N.D. Cal. Sept. 18, 2024); *Baugher v. GoDaddy.com LLC*, 2021 4942658, *3 (D. Ariz. Oct. 22, 2021) (same); *In re DMCA § 512(h) Subpoena to Twitter*, 608 F.Supp.3d 868, 876 (N.D. Cal. 2022) (same).

As this Court is well-aware, another court has rejected the balancing of the equities part of the inquiry because "it is not well suited for a copyright dispute" since "the First Amendment does not protect anonymous speech that infringes copyright." *In re DMCA Subpoena to Reddit, Inc.*, 441 F.Supp.3d 875, 882 (N.D. Cal. 2020). Rather, First Amendment considerations are adequately addressed examining "fair use in the context" of "whether there was a prima facie case of copyright infringement." *Id.* at 883. Irrespective of which test applies, the Motion must be denied.

## IV.    TEI'S *PRIMA FACIE* CASE OF CONTRIBUTORY COPYRIGHT INFRINGEMENT AGAINST THE H3SNARK MODS

The *prima facie* showing requires a plaintiff to "produce competent evidence supporting a finding of each fact that is essential to a given cause of action." *Baugher*, 2021 WL 4942658, *3. The elements of contributory copyright infringement are: "(1) direct infringement by a third party; (2) that the defendant knew or had reason to know of the third party's infringing activity; and (3) the defendant induced, caused or materially contributed to the infringing conduct." *Amazon Content Services LLC v. DeBarr*, -- F.Supp.3d --, 2025 WL 2217715, *4 (C.D. Cal. Aug. 4, 2025).

### A.    Denims Engaged in Direct Infringement

The elements of direct copyright infringement are: "(1) ownership of a valid copyright and (2) violation by the alleged infringer of at least one of the exclusive rights granted to copyright infringement." *Baugher*, 2021 WL 4942658, *3.

"Copyright registration establishes a prima facie case of ownership." *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F.Supp.3d 1089, 1111 (N.D. Cal. 2021). TEI registered the Works with the United States Copyright Office. The registration number for: (1) the Countdown Episode is PAu 4-257-253; and (2) *The Nuke* is PAu 4-256-429. JKD, ¶¶ 26, 34; RBN Decl., ¶¶ 34, 37; Exs. 5-6.

On January 31, 2025, Denims hosted her Watch Party of the Works. RBN Decl., ¶ 41. TEI never authorized Denims' use of the Works in any manner. JKD, ¶ 31. As such, her Watch Party violated TEI's right to publicly perform, reproduce and create derivatives of the Works. *See* 17 U.S.C. § 106(1-2 & 4). As such, TEI has proven of underlying direct infringement.

### B.    The H3Snark Mods Fail to Demonstrate Fair Use

The Ninth Circuit makes "clear that the burden of proving fair use is always on the putative infringer." *Lenz v. Uni. Music Corp.*, 815 F.3d 1145, 1152-53 (9th Cir. 2016). This applies with equal force in the context of subpoenas seeking to identify anonymous individuals for copyright infringement. *See Baugher*, 2021 WL 4942658, *4 (quoting *Lenz*); *cf. In re DMCA Subpoena to Reddit, Inc.*, 441 F.Supp.3d at 883 (holding the movant/defendant must "establish[] he made fair use of the copyrighted works" to quash the subpoena).

Fair use is codified in Section 107 of the Copyright Act. The statute sets forth four non-exclusive factors courts consider to evaluate fair use:

1. [T]he purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
2. [T]he nature of the copyrighted work;
3. [T]he amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
4. [T]he effect of the use upon the potential market for or value of the copyrighted work

17 U.S.C. § 107.

### 1.    The H3Snark Mods Fail to Show They Made a Fair Use

The H3Snark Mods incorrectly argue that they made a fair use of the Works by facilitating commentary and criticism of them by users of H3Snark. Dkt. No. 1, pp. 15:6-16:14, 28:5-9. The Ninth Circuit has rejected this argument: the "end-user's utilization of the product is largely irrelevant" to fair use. *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1224 (9th Cir. 2022). This has been applied with equal force in motions to quash seeking to unmask anonymous copyright infringers:

> Posting a work and implicitly inviting comment or criticism is the same as simply copying the work; any work made public will always inspire an opinion in the reader, but the reader's implicit opinion is not the same as comment or criticism formed and made by the blogger who copies the copyright-protected work.

*Baugher*, 2021 WL 4942658, *4.

These cases are in accord with the Supreme Court's mandate that fair use must examine "the specific 'use' of the copyrighted work" at issue. *Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith* ("*Warhol*") 598 U.S. 508, 533 (2023). The H3Snark Mods did not provide any commentary of the Works in the First 1/31/25 Post or Second 1/31/25 Post (collectively, the "1/31/25 Posts"). Dkt. No. 7, pp. 116, 133. Whether ***third-parties*** commented on the Works in the 1/31/25 Posts is irrelevant because the issue here is the ***H3Snark Mods*** use – not third parties.[3]

Therefore, the H3Snark Mods' argument fails as a matter of law.

### 2.    The H3Snark Mods Fail to Show Denims Made a Fair Use

#### a.    The First Factor Weighs Heavily Against Fair Use

The first fair use factor "relates to the problem of substitution" – *i.e.*, whether the new work "supersedes" or "supplant[s]" the original. *Warhol*, 598 U.S. at 527. The "central question" is whether the secondary work "adds something new, with a further purpose or different character." *Id.* at 528. The mere fact that a secondary use has "some further purpose" or "add[s] something new … does ***not*** render such uses fair." *Id.* at 528-529 (emphasis added). Rather, "whether an allegedly infringing use has a further purpose or different character" is "a ***matter of degree***, and the degree of difference ***must*** be weighed against other considerations, like

---

[3] The H3Snark Mods claim that the "text of the Megathreads made clear that their purpose was for discussion about streamers' reaction and commentary" fails to withstand scrutiny. Dkt. No. 1, p. 27:12-13. Neither the title or contents of the 1/31/25 Posts referenced "discussion" or "commentary" whatsoever. Dkt. No. 7, pp. 116, 133. Further, as the Court in *Hosseinzadeh* makes clear, not all reaction videos are equal fair use. 276 F.Supp.3d at 40 fn. 1.

10

commercialism." *Id.* at 532 (emphasis added). When "the purposes of the works *overlap*" or the secondary use does "not serve an '*entirely different function*' than the originals," the first fair use factor does not favor fair use. *De Fontbrune*, 39 F.4th at 1225 (emphasis added).

The "first factor also relates to the justification for the use" both in the "broad" and "narrower sense." *Warhol*, 598 U.S. at 531-532. In the "broad sense," a use is justified if it has a "distinct purpose" that "furthers the goal of copyright … without diminishing the incentive to create." *Id.* at 531. A use is justified in the "narrower sense" when it "is reasonably necessary to achieve the user's new purpose." *Id.* Such justification is "particularly relevant to assessing fair use" where "wide dissemination of a secondary work would otherwise run *the risk of substitution for the original* or licensed derivatives." *Id.* (emphasis added). Again, "the question of justification is one of degree." *Id.*

When examining criticism, "each quoted passage" must serve "a different purpose (an object of criticism)." *Warhol*, 598 U.S. at 528 fn. 4. Consequently, "a court must consider each use within the whole to determine whether the copying is fair." *Id.* The first fair use factor does *not* favor fair use when "*a defendant copies more than is necessary to facilitate 'comment or criticism*.'" *Penguin Random House LLC v. Colting*, 270 F.Supp.3d 736, 751 (S.D.N.Y. 2017) (emphasis added). "The law is clear that, to be considered transformative criticism, the aspects of a work that reproduce another's protected expression *must be in service of commentary on that work*. It is not enough for part of a work to have a transformative purpose." *Id.* (emphasis added).

When "clips are played without much interruption, if any" or "used in excess of [the] benign purpose," the use is "not consistently transformative." *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 628-629 (9th Cir. 2003). Additionally, "wholesale copying sprinkled with [spoken] commentary" fails to transform a work. *Id.*; *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1174, 1176 (9th Cir. 2012) (same). Further, when "the commentary has no critical bearing on the substance or style of the original composition, the claim to fairness in borrowing from another's work diminishes according (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." *Warhol*, 598 U.S. at 530-531.

The degree to which a secondary use has a different purpose or character "must be

11

weighed against other considerations, like commercialism." *Warhol*, 598 U.S. at 525. "The undisputed commercial character of [the defendant's] use, though not dispositive, tends to weigh against a finding of fair use." *Id.* at 537. The first factor "does not" favor "any user who wants to reach different buyers, in different markets, consuming different products." *Id.* at 548 fn. 22.

*Hosseinzadeh* provides useful guidance because it expressly addresses the issue of fair use in the context of reaction videos. As the court noted, reaction videos "vary widely in terms of purpose, structure, and the extent to which they rely on potentially copyrighted material." *Hosseinzadeh,* 276 F.Supp.3d at 40 fn. 1. Reaction videos that "intersperse **short segments** of another's work with criticism and commentary" are considered a fair use. *Id.* (emphasis added) When a reaction video is more "akin to a group viewing session," it is not considered fair use. *Id.* at 40, 45-47 (providing analysis of all four fair use factors).

The primary purpose of Denims' Watch Party was to provide a substitute for the Works and exploit them for commercial gain, as explained below.

**Countdown Episode**: Denims streamed almost the entirety of the Countdown Episode concurrently with TEI's original broadcast. RBN Decl., ¶¶ 43-44; Ex. K at 9:30-1:15:26. Consequently, people viewed Denims' Watch Party of the Countdown Episode instead of the original broadcast – as it would make little sense to view both. As Denims herself once recognized: "***If someone watches content on someone's else's stream***, ***there is a very low likelihood that they're going to go watch it separately and give you the view or the like.***" RBN Decl., ¶¶ 49, 50(d), Ex. 64 at 36:00-36:13; *see also Id.* at 30:00-30:13 (similar statement).

The commercial purpose of Denims' Watch Party of the Countdown Episode is immediately evident. Denims commercially exploited the Countdown Episode by receiving paid subscriptions, donations and advertising revenue during her Watch Party of the Countdown Episode. RBN Decl., ¶ 44; Ex. K at 9:30-1:15:26. Further, Denims used the Countdown Episode to promote her Watch Party of *The Nuke* by: (1) placing a chyron at the top of her screen stating: "CONTENT NUKE DROPS AT 1:30 PM PST" (*id.* beginning at 0:34); (2) adding a countdown timer for when *The Nuke* would be publicly released (*id.* beginning at 16:48); and (3) encouraging people to view her Watch Party instead of *The Nuke* by stating: "***If you want to watch it, you***

*know, come enjoy the watch party somewhere else*." *Id.* at 23:40-47.

It is equally evident that any criticism of the Countdown Episode was an afterthought. Denims watched long sections of the Countdown Episode with little to no interruption for several minutes at a time.[4] She even let the Countdown Episode play for 2:21 minutes while she was off camera. Ex. K at 39:18-41:40. When she returned, Denims was silent for an additional minute. *Id.* at 41:41-42:41. When Denims did speak, she provided (in the aggregate) only: (1) 4:43 minutes of brief and superficial commentary with little to no critical bearing on the original;[5] (2) 43 seconds of partially related commentary that meanders into unrelated topics;[6] and (3) 2:12 minutes of unrelated or unintelligible comments.[7] During 1:03:56 hour runtime of Denims' Watch Party, she lets the Countdown Episode play uninterrupted for nearly 88% of the time. *Id.* at 9:30-1:15:26.

*__The Nuke__*: Denims started her Watch Party of *The Nuke* one-minute after its release to the public and showed *The Nuke* in its entirety. JKD, ¶ 30; RBN Decl., ¶ 45; Ex. K at 1:15:19. At its peak, Denims received approximately 45,000 concurrent viewers – the most concurrent viewers of Denims' entire career. RBN Decl., ¶ 46, Ex. 63. Denims' purpose was to commercially exploit *The Nuke* for personal gain. On 174 separate occasions, she received paid subscriptions, donations and advertising revenue during her Watch Party of *The Nuke*. RBN, Decl., ¶ 47; *see also* Ex. K at 1:15:19-5:06:20.

Denims made several statements that emphasized her primary purpose was to commercialize her Watch Party and offer it as a substitute for *The Nuke*.

- The title of her stream was: "ETHAN KLEIN HASAN CONTENT NUKE **WATCH PARTY THIS IS NOT A DRILL**." RBN Decl., ¶ 48, Ex. 62 (emphasis added).

---

[4] Ex. K at 9:30-12:09, 12:14-14:36, 14:55-16:25, 17:45-18:51, 19:06-20:25, 24:09-25:22, 23:40-26:40, 26:48-27:18, 27:25:30:22, 30:27-32:23, 33:41-35:59; 36:05-36:37, 37:22-38:16, 38:20-39:07, 42:53-44:36, 44:43-45:21, 45:24-46:06, 46:17-46:48, 46:52-48:04, 48:23-50:40, 50:45-51:49, 51:58-54:12, 54:19-54:43, 54:48-56:44, 57:02-58:42, 59:08-59:54, 1:00:01-1:01:45, 1:01:57-1:02:50, 1:03:16-1:04:04, 1:04:06-1:05:36, 1:07:47:1:09:05, 1:09:13-1:10:20, 1:11:39-1:13:05, 1:13:45-1:14:22, 1:14:35-1:15:18.

[5] *Id.* at 12:09-13, 14:37-54, 16:26-27, 17:02-16, 17:37-44, 32:24-33:40, 36:00-04, 37:19-21, 38:17-19, 42:42-52, 44:37-42, 45:22-23, 46:07-16, 46:49-51, 51:50-57, 54:13-18, 54:44-47, 56:45-57:01, 58:43-44, 58:52-59:07, 59:55-1:00:00, 1:01:46-56,  1:05:37-43, 1:05:55-1:06:47, 1:07:02-07, 1:07:44-46, 1:09:6-12, 1:10:21-28, 1:10:58-11:02, 1:11:31-38, 1:15:19-26.

[6] *Id.* at 18:52-19:05, 50:41-44, 1:02:51-1:03:15

[7] *Id.* at 20:20-23:39, 23:40-47, 24:02-08, 25:23-40, 26:41-47, 27:19-31, 30:23-26, 36:38-39, 48:05-22, 1:04:05, 1:07:20-22, 1:13:06-44, 1:14:23-24.

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

- Prior to her Watch Party, Denims stated: "*If you want to watch it, you know, come enjoy the watch party somewhere else*." Ex. K at 23:40-47. Additionally, Denims read a message from her chat stating: "We're relying on you to stay live so *we don't give more views to the Nuke*" – to which Denims replied: "Yeah, I'm going to. I'm going to stream it since he confirmed it's coming out today. We're going to stream it." Ex. J at 4:48:38-4:48:48.

- Prior to and throughout her Watch Party of *The Nuke*, Denims prominently displayed the chyron "*Watching* Hasan Content Nuke From Ethan Klein." Ex. K beginning at 1:15:03.

- During her Watch Party, Denims responded to a chatter by stating: "Unfortunately, we are *watching* the Ethan Nuke." Ex. K at 2:06:09-23.

- Immediately after her watch party, Denims stated: "Well guys, if you enjoyed *not giving any views to that terrible video*, follow, subscribe, throw a prime, if you like the content if you enjoyed your time here. … I appreciated you guys tuning in with me because, I'm going to be honest, I did not want to *watch* that by myself."[8] Ex. K at 5:07:45-5:08:09.

- The following day, Denims stated: "And I know all of those people *didn't want to give the video another view*. Which is why they *watched it with me*." RBN Decl., ¶ 48(f), Ex. L.

Denims' conduct during her Watch Party was fully consistent with her statements. Denims failed to address the majority of points raised in *The Nuke*. RBN Decl., ¶ 45. On *74* separate occasions, Denims plays *The Nuke* uninterrupted for 30 seconds or more (and frequently a minute or longer) – accounting for 70% of *The Nuke*.[9]

During the Watch Party, Denims admits she was not providing sufficient commentary

---

[8] A "prime" refers to a free paid subscription to a Twitch channel provided by Amazon Prime.
[9] Ex. K at 1:15:38-1:16:09, 1:16:56-1:19:10, 1:19:33-1:20:59, 1:21:41-1:22:11; 1:24:12-1:25:14, 1:25:43-1:27:28, 1:36:01-1:37:10, 1:37:44-1:38:15, 1:39:16-1:39:55, 1:41:47-1:43:05, 1:46:59-1:48:12, 1:48:18-1:49:15, 1:57:33-1:58:07, 1:58:51-2:00:37, 2:00:58-2:01:29, 2:01:56-2:02:45, 2:03:31-2:04:07, 2:06:24-2:07:24, 2:11:07-2:12:01, 2:12:26-2:13:04, 2:13:30-2:14:20, 2:16:19-2:17:08, 2:17:16-2:18:00, 2:18:15-2:19:40, 2:20:34-2:22:20, 2:29:01-2:31:19, 2:32:01-2:33:00, 2:33:32-2:35:10, 2:39:46-2:41:04, 2:42:04-2:43:53, 2:45:04-2:45:35, 2:45:47-2:47:04, 2:47:26-2:47:56, 2:48:04-2:49:50, 2:51:20-2:52:29, 2:57:25-2:58:13, 2:59:23-3:00:39, 3:04:52-3:05:36, 3:06:16-3:07:17, 3:10:42-3:11:21, 3:12:02-3:12:57, 3:16:59-3:17:46, 3:17:49-3:18:20, 3:24:15-3:25:32, 3:25:48-3:36:53, 3:28:23-3:29:49, 3:26:27-3:37:38, 3:40:15-3:40:55, 3:41:29-3:42:48, 3:44:41-3:45:33, 3:48:32-3:49:12, 3:51:04-3:43:45, 3:56:03-3:56:56, 3:59:16-3:59:50, 4:00:44-4:02:23, 4:12:58-4:13:32, 4:19:37-4:20:09, 4:21:51-4:22:36, 4:23:49-4:24:30, 4:25:57-4:26:30, 4:28:24-4:29:10, 4:36:07-4:36:47, 4:38:05-4:39:40, 4:39:47-4:40:25, 4:41:17-4:42:12, 4:43:11-4:44:23, 4:45:39-4:46:11, 4:46:49-4:47:32, 4:47:52-4:48:30, 4:52:41-4:53:41, 4:54:53-4:55:31, 5:00:50-5:01:36, 5:04:00-5:04:31, 5:05:24-5:06:20

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

because she did not want to pause *The Nuke* frequently. Ex. K at 3:00:53-3:01:36, 3:01:49-3:02:09. When she does speak, Denims frequently makes short comments with no critical bearing on the style or substance of *The Nuke*, such as (1) incoherent and unclear utterances;[10] (2) speaking with her chat about unrelated or minimally related topics;[11] (3) discussing unrelated or minimally related topics;[12] (4) providing brief and superficial comments with little to no elaboration;[13] (5) frequently expressing confusion by a particular excerpt due to not prescreening *The Nuke*.[14]

In the rare instances where Denims does provide lengthier commentary, her comments have no critical bearing on the style or substance of *The* Nuke. Examples include: (1) discussing China's credit score system (Ex. K at 1.22:40-1:24:11), which was not discussed in *The Nuke* whatsoever; (2) after the discussion of Hasan's apologia for China's genocide of the Uyghurs, Denims attacks the United States as worse than China because of issues with disability benefits, incarceration levels and treatment of transgender individuals (*id.* at 1:25:43-1:35:51), which has nothing to do with *The Nuke*; and (3) after the critique of Morgan Kama Majed p/k/a Frogan ("Frogan"), Denims goes on a diatribe on why Frogan is more American than her (*id.* at 4:14:35-4:19:36), which has nothing to do with *The Nuke*.

To be certain, there are moments when Denims makes a highly transformative use of *The Nuke* (albeit infrequently and inconsistently). Where *The Nuke* seeks to expose how Hasan radicalizes individuals to hate Jews and Israel, Denims occasionally uses *The Nuke* to radicalize individuals to hate Jews and Israel. The inconsistent and infrequent nature of this transformation, however, fails to justify showing *The Nuke* in its entirety immediately upon release for an express commercial purpose by playing large portions of it uninterrupted or with minimal commentary.[15]

[10] *Id.* at 1:19:11-15, 1:21:00-07, 1:22:12-14, 2:12:02-04, 2:14:55-56, 2:37:05-14, 2:47:57-2:48:03, 3:24:35-3:24:14, 4:24:47-56, 4:31:01-18; 4:52:36-40.
[11] *Id.* at 3:19:42-3:20:19, 3:20:24-34, 3:23:35-3:24:14, 3:29:45-3:30:14, 3:37:46-50, 3:38:52-3:39:12, 3:43:41-55, 3:48:13-16, 3:50:15-30, 3:50:44-3:51:03, 4:02:32-35, 4:21:34-50, 4:22:37-52, 4:31:40-53, 4:34:14-44, 4:42:17-19.
[12] *Id.* at 1:37:37-43, 1:38:23-33, 1:58:48-50, 4:46:35-38, 2:06:05-08, 2:39:09-45, 2:45:36-46, 3:01:37-48, 4:20:10-32, 4:32:58-4:33:06, 4:35:39-4:36:06, 4:40:58-4:41:07
[13] *Id.* at 1:21:14-40, 5:04:58-5:05:23, 1:46:42-50, 2:03:28-30, 2:16:17-18, 2:17:09-15, 2:19:41-2:20:03, 2:41:05-07, 4:43:56-4:54:08, 3:46:23-37, 3:59:51-56, 4:30:29-30, 4:57:40-51
[14] *Id.* at 1:39:16-55, 1:41:47-1:43:22, 1:38:34-1:39:15, 1:46:59-1:48:17, 3:03:21-49, 3:40:15-3:41:28, 4:38:05-4:39:40.
[15] The H3Snark Mods' analysis of the first factor is intentionally vague, at a high level of abstraction and lacks a single timestamp. Dkt. No. 1, pp. 21:24-22:19. TEI's complaint went into (continued).

In sum, the first fair use factor weighs heavily against fair use.

### b. The Second Factor Weighs Against Fair Use

The second fair use factor (*i.e.*, "the nature of the copyrighted work") "typically has not been terribly significant in the overall fair use balancing." *McGucken v. Ocean Pub. Ltd.*, 42 F.4th 1149, 1161 (9th Cir. 2022). It examines "the extent to which [the original work] is creative and whether it is unpublished." *Id.* Even when a work "document[s] a real event," the work can still be "creative because [it is] the product of many technical and artistic decisions." *Id.* Whether a work is published asks whether the author exhausted the "right to control the first public appearance" of the work. *Monge*, 688 F.3d at 1178. The mere fact a work is published "does not weigh in favor of fair use." *McGucken*, 42 F.4th at 1162.

The fact the Works were published does not weigh in favor of fair use because Denims streamed: (1) the Countdown Episode concurrently with its broadcast; and (2) *The Nuke* one minute after its release. RBN Decl., ¶ 45; Ex. K at 1:15:19. Further, while containing numerous documentary and factual elements, both Works contained numerous creative elements, which weighs against fair use.[16] JKD, ¶ 25 & fn. 18, Ex. 69; *see generally* Ex. K.

Therefore, the second fair use factor weighs against fair use.

### c. The Third Factor Weighs Heavily Against Fair Use

The third fair use factor examines "the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *McGucken*, 42 F.4th at 1162. Consequently, the third fair use "factor circles back to the first factor because the extent of permissible copying varies with the purpose and character of the use." *Id.*

When "the amount used is substantial with respect to the infringing work, it is evidence of exacting detail why Denims failed to sufficiently transform *The Nuke* and provided timestamps and citations. *Compare* Dkt. No. 7, ¶ 2, Ex. 1, pp. 49:17-75:28 *with* Dkt. No. 1, pp. 21:24-22:19. It is no accident why the H3Snark Mods fail to address the gravamen of TEI's argument. By acknowledging that the ***extent*** of Denims' commentary was insufficient to justify showing *The Nuke* in its entirety immediately upon release, the H3Snark Mods would have to acknowledge that this case is not about silencing criticism, but a lack of it.

[16] The H3Snark Mods argue that, because *The Nuke* contains preexisting materials, it is only entitled to "thin" copyright protection under the second fair use factor. Dkt. No. 1, pp. 32:15-33:14. This argument is specious and ignores the countless creative decisions – such as creation of original footage, performance, voice over, editing, graphics, comedy, juxtapositions, montages and other creative elements that comprise *The Nuke*. JKD, ¶ 25 & fn. 18, Ex. 69.

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

the value of the copyrighted work." *Elvis Presley*, 349 F.3d at 630. Indeed, "[c]opying an entire work militates against a finding of fair use." *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 744 (9th Cir. 2019). If, however, "the new user only copies as much as necessary for his or her intended use, this factor will not weigh against the new user." *Elvis Presley*, 349 F.3d at 630.

Once again, *Hosseinzadeh* is insightful. In the aggregate, the reaction video at issue used "three minutes and fifteen seconds of the five minute, twenty-four second long" original video – *i.e.*, approximately 60% of the original. *Hosseinzadeh*, 276 F.Supp.3d at 40.  The reaction video, however, was "almost fourteen minutes long" and "intersperse[d] relatively ***short segments*** of the [original] video with ***long segments*** of ... commentary." *Id.* (emphasis added). Ultimately, the Court found that the third factor was "neutral" because, while the Kleins copied "a great deal" of the original, "the 'extent' and 'quality and importance' of the video clips used by [the Kleins] were … ***plainly necessary to the commentary and critique***." *Id.* at 46 (emphasis added).

Here, Denims streamed *The Nuke* in its entirety and the Countdown Episode nearly in its entirety. As discussed in Section V.B.2.a, Denims failed to provide commentary or criticism on significant portions (if not the majority) of both Works. Such use was clearly unnecessary and excessive of any potential criticism or commentary Denims provided on the Works themselves.[17]

### d.  The Fourth Factor Weighs Heavily Against Fair Use

This factor is "undoubtedly the single most important element of fair use." *Harper & Row Pub., Inc. v. Nation Enters.,* 471 U.S. 536, 566 (1985). "While the first fair use factor considers whether and to what extent an original work and secondary use have substitutable purposes, the fourth factor focuses on actual or potential market substitution." *Warhol*, 598 U.S. at 536 fn. 12.

The fourth factor is tied to the other factors. "The first and fourth factors are closely related, as the more copying is done to achieve a purpose that is the same or substantially similar to the original, the more likely it is that the copy will serve as a 'satisfactory substitute for the original.'" *Hachette Book Grp, Inc. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024). Also, the "third and fourth factors are interrelated, as ***the greater the amount and substantiality of the***

---

[17] The H3Snark Mods concede the "third factor weighs against a find of fair use here." Dkt. No. 1, p. 28 fn. 14. No further explanation is provided. The reason is self-evident: it requires admitting that Denims failed to comment on the majority of points raised in both Works and, therefore, her "commentary" was not consistently transformative.

*use, 'the greater the likelihood that the secondary work might serve as an effectively competing substitute for the original*.'" *Id.* at 187-188 (emphasis added). Further, when "a case involves commercial use, such as here, 'the defendant must rebut that presumption of market effect.'" *Nat. Fire Protection Assoc., Inc. v. UpCodes, Inc.*, 753 F.Supp.3d 933, 965 (C.D. Cal. 2024).

The fourth factor "encompasses both (1) the extent of market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original and the market for derivative works." *McGucken*, 42 F.4th at 1163. Even when there is "little direct evidence of actual market harm," "to negate fair use," the plaintiff "need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." *Id.* (original emphasis).

At bottom, the fourth factor "asks whether consumers treat a challenged use 'as a market replacement' for the copyrighted work[.]" *Nat. Fire*, 753 F.Supp.3d at 965. The fourth fair use "factor points *against fair use when a copyist makes copies available that displace demand for copies the copyright owner already makes available or readily could*." *Bartz v. Anthropic PBC*, 787 F.Supp.3d 1007, 1031 (N.D. Cal. 2025) (emphasis added).

Denims knew her Watch Party was a market substitute for the Works. She said so herself when reading messages from her chat. Examples include: (1) "*If you want to watch it, you know, come enjoy the watch party somewhere else*." (Ex. K at 23:40-47); (2) Denims read a message from her chat stating: "We're relying on you to stay live so *we don't give more views to the Nuke*" – to which Denims replied: "Yeah, I'm going to. I'm going to stream it since he confirmed it's coming out today. We're going to stream it." (*id.*, at 4:48:38-4:48:48); (3) "Well guys, if you enjoyed *not giving any views to that terrible video*, follow, subscribe, throw a prime, if you like the content if you enjoyed your time here. (*id.* at 5:07:45-5:08:09); and (4) The day after her Watch Party, Denims stated: "And I know all of those people *didn't want to give the video another view*. Which is why they *watched it with me*." Ex. L.

Further, Denims' Watch Party served as a market substitute for the originals is evidenced by the tens of thousands of individuals who watched her Watch Party before they had any

opportunity to watch the Works. RBN Decl., ¶ 46, Ex. 63; JKD, ¶¶ 30, 33. These individuals watched Denims' Watch Party instead of the Works because Denims streamed them concurrently or immediately after the public release of the Works. *Id.*, Ex. K at 9:30-1:15:26.

Denims knew her Watch Party (as a general matter) took views away from the original. In a debate with the creator Jay Exci in 2022, Denims admitted multiple times that her watch parties are substitutes for the original: "***If someone watches content on someone's else's stream***, ***there is a very low likelihood that they're going to go watch it separately and give you the view or the like.***" RBN Decl., ¶¶ 49-50, Ex. 64 at 36:00-36:13. In that same discussion, she also admitted:

> There's no point of watching something a second time. You already watched it. Maybe, like, if you're watching it with some other people or something or it's been a long time, you might re-watch the video. ***But once you watch the video in one place, it's pretty unlikely you're going to go back and watch it again.***

RBN Decl., ¶ 50(d), Ex. 64 at 30:00-30:13.

TEI lost ad revenue for the Works as a result of Denims' Watch Party.[18] JKD, ¶ 33. As her viewers admitted, people watched Denims' Watch Party in lieu of the original Works. *Id.* Further, other individuals also hosted watch parties of *The Nuke* by showing it in its entirety immediately upon release with minimal commentary. RBN Decl., ¶¶ 52-54, Exs. 65-66; JKD, ¶ 33.

Therefore, all the fair use factors decisively weigh against fair use.

## C.    The H3Snark Mods Knew of Denims' Infringement

The knowledge requirement of contributory infringement requires either: (1) "actual knowledge of specific acts of infringement"; (2) "willful blindness of specific facts"; or (3) there is "reason to know" of specific acts of infringement. *Erickson Prods., Inc. v Kast*, 921 F.3d 822, 831 (9th Cir. 2019). "The standard for the knowledge requirement is objective[.]" *Bangkok Broad. & T.V. Co., Ltd. v. IPTV Corp.*, 742 F.Supp.2d 1101, 1118 (C.D. Cal. 2010); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (same).

Here, the H3Snark Mods knew that Denims was streaming both Works. The title of the First 1/31/25 Post was "DENIMS is LIVE reacting now to today's H3 podcast episode and the

---

[18] YouTube videos are monetized through ad revenue received from views. JKD, ¶ 32. The greatest demand for a YouTube video is immediately and shortly after its release. *Id.* Further, the views and search results a video receives, the more it is promoted through YouTube's algorithm – which further increases the number of views and advertising revenue. *Id.*

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

'content nuke' video Ethan is publishing in about an hour" – *i.e.* Denims was ***currently*** streaming the Countdown Episode and would stream *The Nuke* upon its release. Dkt. No. 7, p. 136.

The Second 1/31/25 Post was titled "Ethan Klein's Content Nuke on Hasan Piker | H3 Snark Megathread" with the text "Places to watch reactions to this video:" Dkt. No. 7, p. 113. The Second 1/31/25 Post contained a list of creators and whether they were streaming *The Nuke* (*e.g.*, "*(LIVE NOW),*" "*(GOING LIVE SOON),*" "*(Live but not reacting yet)*" or "(not reacting yet)"). *Id.* (original emphasis). For Denims, the Second 1/31/25 Post stated: "**Denims (Twitch) | Link** *(LIVE NOW)*" – *i.e.*, Denims was ***currently*** streaming *The Nuke*. *Id.* (original emphasis). Therefore, the H3Snark Mods knew that Denims was exploiting the Works when they made the 1/31/25 Posts.[19]

The H3Snark Mods do not testify that Denims had a license to use the Works. Indeed, proving the existence of a license was their burden as well.[20] *Furie v. Infowars*, *LLC* 401 F.Supp.3d 952, 968 (C.D. Cal. 2019) ("The existence of an implied license is an affirmative defense to a claim of copyright infringement and the burden of proof is ultimately on the party seeking to avoid infringement liability.").

To the contrary, the 1/30/25 Post proves the H3Snark Mods knew (or had reason to know) that Denims and other creators did not seek permission from TEI to exploit the Works by stating: (1) they were providing links "to watch the nuke ***without showing support for H3***" – *i.e.*, TEI would not receive any benefit because the use was unauthorized; and (2) they were promoting creators who "supported" H3Snark "by engaging directly" with the H3Snark Mods – *i.e.*, creators who would stream the Works without seeking permission from TEI. Dkt. No. 7, p. 103. This proves the only thing the H3Snark Mods knew for certain was Denims' use of the Works was

[19] The H3Snark Mods assert the Second 1/31/25 Post linked directly to *The Nuke*. Dkt. No. 1, p. 27:15-16 (citing Dkt. No. 8, ¶ 38). The hyperlink was hidden in the letter "i" in the word "this" in the phrase "Places to watch reactions to this video." *Id.* In contrast, the links to other creators – including Denims who was at the top of the list – were displayed prominently with the word "**Link**" in bold and underlined that directed users to their respective streams. Dkt. No. 7, pp. 116. The claim that the hyperlink being confined to the letter "i" was an accident strains credulity. This was no accident; it was intentional to provide the imprimatur linking to the original when the Second 1/31/25 Post was clearly intended to direct viewers to Denims' Watch Party. Also, the First 1/31/25 Post did not have a link to the Countdown Episode whatsoever. Dkt. No. 7, p. 133.
[20] The H3Snark Mods claim that Ethan stated TEI was "opening our IP to the world" as to "clips." Dkt. No. 8, ¶¶ 51-53, 59 (citing fn. 43). Here, Denims did not use clips but *The Nuke* in its entirety and the Countdown Episode nearly in its entirety. Therefore, this statement is inapplicable. Further, it is meritless argument to claim TEI has either abandoned their copyrights or granted a license to them. RBN Decl., ¶¶ 32-33.

unauthorized – *i.e.*, knowledge of infringement.

The H3Snark Mods' arguments against knowledge fail to withstand scrutiny. First, they argue the posts stated that "Denims would be *reacting to the Nuke* and *Countdown*, *i.e.*, engaging in commentary and criticism." This argument fails as a matter of law because *Hosseinzadeh* expressly stated not all reaction videos are fair use. 246 F.Supp.3d at 40 fn.1.

Second, the H3Snark Mods argue that they did not know about Denims' infringement because they "did not view Denims' stream while it was live." Dkt. No. 1, p. 25:24-26. This is a fatal admission. To begin, this argument goes to the H3Snark Mods' purported *subjective* belief – which is irrelevant because knowledge is an *objective* inquiry. Regardless, the H3Snark Mods could not – as a matter of law – form any opinion about whether Denims made a fair use without reviewing and analyzing her Watch Party in its entirety before making that determination. *See Lenz*, 815 F.3d at 1154-55; *Mishiyev v. UMG Recordings, Inc.*, 2025 WL 2625525, *3 (M.D. Fla. Sept. 11, 2025); *Shaffer v. Kavarnos*, 2025 WL 2299173, *2 & fn. 2 (S.D.N.Y. Aug. 7, 2025).[21]

Rather, the H3Snark Mods pay "lip service to the consideration of fair use by claiming [they] formed a good faith belief when there is evidence to the contrary." *Lenz*, 815 F.3d at 1154. They promoted Denims' unauthorized use of the Works without first determining whether she made a fair use. This is also the epitome of willful blindness. It proves the H3Snark Mods: (1) "subjectively believed infringement was likely occurring"; and "(2) took deliberate actions to avoid learning about the infringement." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013).[22]

Therefore, TEI has met its burden to demonstrate the H3Snark Mods had knowledge of Denims' infringement of the Works.

[21] The cited cases hold that, prior to issuing a DMCA takedown or counternotification, the issuer must form a subjective good faith belief regarding fair use. They further state that, to form a good faith belief on fair use, the issuer must watch the material in its entirety and conduct a fair use analysis *before* issuing the takedown or counternotification. This is why TEI did not issue a DMCA Takedown for 1/31/25 Posts; it would have risked exposure for claim for DMCA misrepresentation under 17 U.S.C. Section 512(f) by issuing them prematurely. RBN Decl., ¶ 51.

[22] The H3Snark Mods argument would also lead to perverse results. It incentivizes defendants to either: (1) claim they believed someone would make a fair use; or (2) purposefully avoid examining a particular use of a copyrighted work before promoting the unauthorized use. This would create a "get out of liability free card" for anyone accused of contributory infringement.

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

**D.    The H3Snark Mods Induced Denims' Infringement**

The Supreme Court held that inducement of copyright infringement includes: (1) "advertising an infringing use"; (2) "active steps taken to encourage direct infringement"; and/or (3) "actively and knowingly aid[ing] and abet[ing] another's direct infringement." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.* ("*Grokster*"), 545 U.S. 913, 936 (2005).

Here, the H3Snark Mods advertised, encouraged and actively and knowingly aided and abetted Denims' infringing use of the Works by directing viewers to her Watch Party through the 1/31/25 Posts. Dkt. No. 7, pp. 116 & 133. The links in both posts took viewers directly to Denims' homepage where they could view her Watch Party.[23] *Id.* Denims even admitted that the H3Snark Mods were responsible for "signal boosting" her Watch Party, which increased the views. Ex. L.

Further, the H3Snark Mods "aim[ed] to satisfy a known source of demand for copyright infringement." – *i.e.*, intent to achieve an unlawful objective. *Grokster*, 545 U.S. at 939. The 1/30/25 Post demonstrates the H3Snark Mods intent to satisfy their users' desire for unauthorized versions of the Works. In the post, the H3Snark Mods stated: "***Hey everyone, we've seen a lot of comments about <u>wanting to watch the nuke without showing support for H3</u>***" – *i.e.*, recognizing their users wanted to consume unauthorized versions of *The Nuke*. Dkt. No. 7, p. 107 (emphasis added). The post provided links to individuals who "supported" H3Snark "by engaging with [the H3Snark Mods] directly or citing [H3Snark] posts in their own critiques of H3" – *i.e.*, individuals who would stream the Works without seeking permission from TEI. *Id.* Further, the H3Snark Mods provided links for their users so they could "***watch along***" with Denims and other creators – *i.e.*, an infringing watch party. *Id* (emphasis added)*.

This is reinforced by the H3Snark Mods' prior history of providing infringing YewTube links to deprive TEI of advertising revenue. The H3Snark Mods knew H3Snark users wanted unauthorized versions of TEI content, even stating they "***encourage[d] folks to watch on yewtube since it doesn't play ads or contribute to [TEI's] view counts***." RBN Decl., ¶ 12, Exs. 51, 53.

---

[23] The H3Snark Mods falsely claim the links in the 1/30/25 Post and 1/31/25 Posts did not link to "any specific video or stream" but the creators' homepages. Dkt. No. 1, p. 27:9-10 (citing Dkt. No. 8, ¶¶ 34-35, 40, 130). This is an attempt to exploit the Court's potential lack of familiarity with Twitch. A Twitch streamer's live broadcast to the public is only available on their homepage; only videos of prior streams have a designated URL. RBN Decl., ¶¶ 38(b), 40, Ex. 62.

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

Further reinforcing that the H3Snark Mods intended to achieve an unlawful purpose is the timing of the 1/31/25 Posts. The First 1/31/25 Post directing users to Denims' Watch Party of the Countdown Episode was posted at 12:33 p.m. PST – *i.e.*, a few minutes after the Countdown Episode began. Dkt. No. 8, ¶ 33; RBN Decl., ¶ 36; JKD, ¶ 30. The Second 1/31/25 Post directing users to Denims' Watch Party of *The Nuke* was posted at 1:43 p.m. PST – *i.e.*, 13 minutes after *The Nuke* was made publicly available. Dkt. No. 8, ¶ 38; RBN Decl., ¶ 36; JKD, ¶ 30. By offering alternatives for the Works before anyone could finish watching them independently, the H3Snark Mods intended users to view Denims' Watch Party in lieu of the Works.

Therefore, TEI has made its *prima facie* showing of contributory infringement.

## V.   THE BALANCING TEST FAVORS DISCLOSURE

As a threshold matter, because TEI "has successfully demonstrated a *prima facie* claim of copyright infringement and the [H3Snark Mods] have not demonstrated fair use, the [H3Snark Mods] have little, if any, First Amendment protection against disclosure of their identities." *Baugher*, 2021 WL 4942658, *5; *see also Agdal*, 2025 WL 81594, *5 (since the speech at issue "infringe[s]" TEI's "copyright in the Video … the speech at issue is entitled to only minimal First Amendment protection."); *see also In re DMCA Subpoena to Reddit*, 441 F.Supp.3d at 882 (balance of the equities is not required because "the First Amendment does not protect anonymous speech that infringes copyright"). The balancing test considers four factors:

> [W]hether (1) the subpoena seeking the information was issued in good faith and not for any improper purpose, (2) the information sought relates to a core claim or defense, (3) the identifying information is directly and materially relevant to that claim or defense, and (4) information sufficient to establish or to disprove that claim or defense is unavailable from any other source.

*Cognosphere*, 2024 WL 4227594, *3.

**Good faith**: When a copyright owner "seek[s] evidence to enforce those rights, in a circumstance of what appears to be direct copyright infringement typical of piracy, is a hallmark of good faith." *Cognosphere*, 2024 WL 4227594, *7. "Courts found that establishing a *prima facie* case of copyright infringement should weigh in favor of discovery absent other convincing reasons." *Id.*; *cf. In re Reddit,* 2024 WL 477519, *3 (N.D. Cal. Feb. 7, 2024) ("A higher standard for unmasking a non-party witness exists than for unmasking a potential defendant").

TEI's sole purpose is to enforce its copyrights against the H3Snark Mods in the lawsuits against Denims, Frogan and Kaceytron. JKD, ¶ 5; RBN Decl., ¶ 75. Neither TEI nor its owners have any intention to pursue any other claim against the H3Snark Mods at this time. *Id.* Further, the Kleins have made multiple attempts to ameliorate the H3Snark Mods' concerns by: (1) offering to not speak about the H3Snark Mods if they abstain from talking about them (as it would remove the need to defend themselves); (2) not publicly discuss their names; and (3) encouraging their audience to refrain from contacting the H3Snark Mods in any manner. JKD, ¶ 5; RBN Decl., ¶ 70, 73-74, Ex. 67. Clearly, these gestures of good faith did not satisfy the H3Snark Mods.

The H3Snark Mods devote much of their Motion and almost all of their declarations to argue TEI and the Kleins exhibit bad faith. The declarations of the Kleins and TEI's counsel refute these assertions and demonstrate these claims based on intentional misrepresentations and omissions that fail to withstand scrutiny. JKD, ¶¶ 25,  35-97; RBN Decl, ¶¶ 3-40, 56, 79-80. Far from showing that TEI or the Kleins are unable to take their "criticism," the H3Snark Mods reveal that they are the ones adverse to criticism by grossly distorting the factual record to paint the Kleins addressing, disputing and refuting their "criticism" as "harassment," "abuse," and "threats."

**Core to claim/Directly and materially relevant**: Courts have recognized that "seeking information necessary to start any litigation or enforcement proceedings (*i.e.*, the identities of the persons behind the [anonymous] accounts)" is "information sought [that] is directly and materially relevant to a core claim." *Cognosphere*, 2024 WL 4227594, *7-8. Indeed, such information is "critical to the claim, because without the information," a plaintiff "has no starting point for whom to name as a defendant." *Id.*, *8. Therefore, the information sought in the subpoenas are absolutely essential for TEI to pursue its claim of contributory infringement. RBN Decl., ¶ 76.

**No alternatives**: No alternative means exist to identify the H3Snark Mods. RBN Decl., ¶ 77. TEI has employed private investigators and even was able to find an informant within the H3Snark Mods – but still could not find their identities or location. *Id.* Therefore, there is no alternative to obtain the personal identifying information of the H3Snark Mods.

In sum, the balance of the equities favor TEI and not the H3Snark Mods.

## VI.     A PROTECTIVE ORDER IS UNWARRANTED

"The normal presumption in litigation is that parties must use their real names." *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate* ("*Kamehameha*"), 596 F.3d 1036, 1042 (9th Cir. 2010). Parties may proceed pseudonymously only "in the unusual case when nondisclosure of the party's identity is necessary … to protect a person from harassment, injury, ridicule or personal embarrassment." *Does 1 Thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-68 (9th Cir. 2000) (internal quotes omitted).

Courts "must balance five factors" to determine whether proceeding pseudonymously is proper: "(1) the severity of the threatened harm, (2) the reasonableness of the anonymous party's fears, … (3) the anonymous party's vulnerability to such retaliation, (4) the prejudice to the opposing party, and (5) the public interest." *Kamehameha*, 596 F.3d at 1042.

Here, the H3Snark Mods have failed to identify any threat directed at them. Rather, any fears they have articulated are based on falsehoods, gross distortions of the truth, rank speculation and the Kleins attempting to defend themselves. JKD, ¶¶ 33-97, RBN Decl, ¶¶ 3-40, 56, 79-80. Further, as discussed in Section V regarding good faith, the Kleins have made multiple attempts to ameliorate the H3Snark Mods' concerns – but the H3Snark Mods have rejected these offers.

The prejudice to TEI is readily apparent. By disclosing the H3Snark Mods' identity to the Court only, it severely hampers TEI's ability to conduct discovery and proceed with the case. RBN Decl., ¶ 78; *see also Doe 1 v. GitHub*, 672 F.Supp.3d 837, 854 (N.D. Cal. 2023) ("pseudonymity may pose certain logistical challenges during discovery").

The H3Snark Mods' actual concern is transparent: they wish to avoid being treated with the same courtesy with which they treated the Kleins. They should not be allowed to enjoy anonymity based on making intentional falsehoods to this Court. As the H3Snark Mods themselves admit, there is tremendous public interest in the outcome of this Motion. It addresses the public scourge of copyright infringement as a form of cyberbullying. Justice Louis D. Brandeis stated it best: "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." Therefore, the H3Snark Mods request for protective order should be denied.

25

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

## VII.   <u>CONCLUSION</u>

For the reasons set forth above, TEI respectfully requests this Court to deny the Motion.

Dated: October 20, 2025                                **HEAH BAR-NISSIM LLP**

                                                       By   /s/ ROM BAR-NISSIM
                                                            ROM BAR-NISSIM
                                                            Attorneys for Respondent/Plaintiff Ted
                                                            Entertainment, Inc.

TED ENTERTAINMENT, INC.'S OPPOSITION TO THE DOE DEFENDANTS'
MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.

Exhibit 14

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
Jeffrey M. Rosenfeld (Bar No. 222187)
Leah Rosa Vulic (Bar No. 343520)
548 Market St. #85399
San Francisco, CA 94104
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@kr.law
jeff@kr.law
leah@kr.law

Attorneys for Movants/Defendants Does

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE. SUBPOENAS TO REDDIT, INC. AND DISCORD, INC.** | Case No. 3:25-mc-80296-SK <br><br> **DOES' NOTICE OF APPEAL AND REPRESENTATION STATEMENT** |

Case No. 3:25-mc-80296-SK

**DOES' NTC OF APPEAL AND REPRESENTATION STATEMENT**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that Movants/Defendants Does ("Does") hereby appeal to the United States Court of Appeals for the Ninth Circuit from this Court's Order [D.E. 45] ("Order"), entered on April 29, 2026, denying Does' motion to quash Plaintiff Ted Entertainment, Inc. ("TEI")'s subpoenas to non-parties Reddit, Inc. ("Reddit") and Discord, Inc. ("Discord"), denying Does' request for a protective order, and denying Does' request for attorney's fees.

This Court's Order is immediately appealable to the Ninth Circuit Court of Appeals as a final judgment under 28 U.S.C. §636(c)(3) and 28 U.S.C. §1291: "Upon entry of judgment in any case referred under [28 U.S.C. §636(c)(1)], an aggrieved party may appeal directly to the appropriate United States court of from the judgment of the magistrate judge in the same manner as an appeal from any other judgment of a district court." 28 U.S.C. §636(c)(3).

All parties consented to jurisdiction of the magistrate judge [D.E. 32, 33] (the parties "voluntarily **consent**[ed] to have a United States magistrate judge conduct all further proceedings in this case, including trial and entry of final judgment. I understand that appeal from the judgment shall be taken directly to the United States Court of Appeals for the Ninth Circuit."), after the Clerk's notice [D.E. 31], to resolve this miscellaneous civil case in which Does moved to quash TEI's subpoenas, the sole matter adjudicated in this action. Further, the special designation requirement of magistrate judge jurisdiction is satisfied by the Court's General Order No. 44, Assignment Plan, entered by Chief Judge Phyllis J. Hamilton effective January 1, 2018 (as of the time of filing of the instant miscellaneous civil case)[1], Section (E)(3), which provides in relevant part:

> Upon filing, unless exempted by Local Rule, order of a judge of this court, or other provision of this general order, **all civil miscellaneous matters** will be randomly assigned in the first instance to a **magistrate judge who will either resolve the matter** or, if necessary, prepare a report and recommendation and request assignment of the matter to the district judge who was the general duty judge on the date the miscellaneous matter was filed.

---

[1] A true and correct copy of General Order 44 effective January 1, 2018 is attached hereto as **Exhibit A**.

KRONENBERGER ROSENFELD

(emphasis added). *See Ashker v. Newsom*, 968 F.3d 975, 982 (9th Cir. 2020); *Roell v. Withrow*, 538 U.S. 580, 585 (2003) ("A judgment entered by 'a magistrate judge designated to exercise civil jurisdiction under [§ 636(c)(1)]' is to be treated as a final judgment of the district court, appealable 'in the same manner as an appeal from any other judgment of a district court.'"), quoting 28 U.S.C. §636(c)(3); *see also Prater v. Dep't of Corr.*, 76 F.4th 184, 197 (3d Cir. 2023) ("§ 636(c) finality equals § 1291 finality").

Further, the Court's Order disposed of the sole issued presented in this miscellaneous civil action, i.e., Does' Motion to Quash TEI's subpoenas, including Does' request for a protective order (which this Court denied) and Does' request for attorney's fees (which this Court denied). [D.E. 45 at 11-12.] This Court specifically held that "[t]o the extent that the parties have further concerns about disclosure of information about the Doe Defendants, the parties should seek relief from the Central District of California." [D.E. 45 at 11.] There is nothing further for this Court to adjudicate in this miscellaneous civil case. Thus, the Court's Order is immediately appealable to the Ninth Circuit as a final decision under 28 U.S.C. §1291, made by a magistrate judge properly designated and consented to by all appearing parties, with full jurisdiction to finally resolve the matter pursuant to 28 U.S.C. §636(c)(1) and General Order 44(E)(3).

Alternatively, the Court's Order is also immediately appealable under the collateral order doctrine. *Cohen v. Beneficial Indus. Loan Corp*, 337 U.S. 541, 546 (1949); *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000); *U.S. v. Griffin*, 440 F.3d 1138, 1141-42 (2006). Under the collateral doctrine, the Court of Appeals may review any order which meets three criteria: the order must 1) conclusively determine the disputed question, 2) resolve an important issue completely separate from the merits of the action, and 3) be effectively unreviewable on appeal from a final judgment. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545-47 (1949). The effect is that appealability is a "practical[,] rather than a technical[,] construction. *See id.* at 546.

The rule expressed in *Cohen* has been applied to discovery orders relating to privileged documents: "Though not a final resolution of the case, an order for the production of documents over which a privilege is asserted is appealable as finally resolving a collateral discovery issue."

KRONENBERGER ROSENFELD

*Wachtel v. Health Net, Inc.*, 482 F.3d 225, 228 (3d Cir. 2007) (citing *Cohen,* 337 U.S. at 546; *In re Ford Motor Co.*, 110 F.3d 954, 962–63 (3d Cir. 1997)). Similar standards have also been applied by this Court in analogous matters involving subpoenas seeking access to sensitive materials such as grand jury records. *See In Re Barker*, 741 F.2d 250, 252 (9th Cir. 1984) ("The disclosure order, which conclusively resolved the only issue in an independent judicial proceeding, is a 'final decision' and therefore immediately appealable.") (quoting *In re Sells*, 719 F.2d 985, 988 (9th Cir. 1983)). The Court's Order here, which finally resolved the only issue presented to the Court in this independent judicial proceeding, i.e., Does' motion to quash Plaintiff's subpoenas to Reddit and Discord, meets the collateral order doctrine criteria.

Finally, the Court's Order is appealable under *Perlman* exception. *See Perlman v. United States*, 247 U.S. 7 (1918). In *Perlman*, the Supreme Court held that a district court's directing a third party to produce evidence or documents is immediately appealable if the third party cannot be expected to risk contempt solely to create a final order. *See id*. The *Perlman* exception has been applied in the limited class of cases where denial of immediate review would render impossible any review whatsoever of an individual's claims. *See United States v. Ryan*, 402 U.S. 530, 533, 91 S. Ct. 1580, 1582, 29 L. Ed. 2d 85 (1971). Here, like *Perlman*, the Order compels disinterested third parties, Reddit and Discord, to produce information that would reveal the Does' identities, while the Does assert a constitutional privilege in remaining anonymous. Because the subpoenas are directed to Reddit and Discord, the Does are unable to obtain review by refusing compliance and risking contempt, and Does are also unable to rely on Reddit and Discord to incur contempt to protect Does' First Amendment rights. Therefore, under these circumstances, the Order is appealable under *Perlman*.

## CONCLUSION

The district court's Order granting Plaintiff's Motion to Compel finally resolves the only question at issue, and Does' Motion to Quash the subpoenas is the only matter pending before the court. The Order is appealable pursuant to 28 U.S.C. §636(c)(1) and 28 U.S.C. §1291.

//

//

Respectfully Submitted,

DATED: May 29, 2026                          **KRONENBERGER ROSENFELD, LLP**


By:    /s/ Leah Rosa Vulić
                Leah Rosa Vulić

Attorneys for Movants/Defendants Does

**REPRESENTATION STATEMENT**
**Ninth Circuit Rule 3-2(b)**

Pursuant to Ninth Circuit Rule 3-2 (b), the following identifies all parties to this action and their respective counsel:

Counsel for Appellants/Movants-Defendants Does:

KARL S. KRONENBERGER
JEFFREY M. ROSENFELD
LEAH ROSA VULIĆ
KRONENBERGER ROSENFELD, LLP
548 Market Street, #85399
San Francisco, California 94104
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@kr.law
jeff@kr.law
leah@kr.law

Counsel for Plaintiff/Appellee Ted Entertainment, Inc.:

ROM BAR-NISSIM (SBN: 293356)
Rom@HeahBarNissim.com
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

Case No. 3:25-mc-80296-SK

5

**DOES' NTC OF APPEAL AND**
**REPRESENTATION STATEMENT**

**CERTIFICATE OF SERVICE**

I am a resident of the state of Arizona, over the age of eighteen years and not a party to this action. My business address is 548 Market Street #85399, San Francisco, California, 94104.

I hereby certify that on May 29, 2026, I served:

**1) DOES' NOTICE OF APPEAL AND REPRESENTATION STATEMENT**

on the parties listed below as follows:

*Discord Inc.*:

c/o CT CORPORATION
330 N BRAND BLVD SUITE 700
GLENDALE, CA 91203

| X | BY OVERNIGHT DELIVERY, via Federal Express. |

| X | (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. |

Additionally, I hereby certify that on May 29, 2026, I served:

**1) DOES' NOTICE OF APPEAL AND REPRESENTATION STATEMENT**

on the parties listed below as follows:

*Counsel for Reddit Inc.*:

Alan Garza
Ryan Mrazik
Perkins Coie
405 Colorado Street Suite 1700
Austin, TX 78701
agarza@perkinscoie.com
rmrazik@perkinscoie.com

| X | BY EMAIL to the address(es) listed above. |

| X | (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. |

DATED: May 29, 2026

_____
Ema Tilton

KRONENBERGER ROSENFELD

# Exhibit A

GENERAL ORDER NO. 44
ASSIGNMENT PLAN

A.    PURPOSE

This plan is adopted pursuant to 28 U.S.C. § 137 and Civil Local Rule 3-3(a). The purpose of the plan is to:

1.  Provide an equitable system for a proportionate division of the caseload among the district and magistrate judges of the court;

2.  Ensure that cases are randomly and blindly assigned, except as otherwise provided herein to promote efficient case management;

3.  Provide for necessary adjustments to caseload assignments; and

4.  Provide a basis for monitoring the operation of the case assignment system.

B.    ADMINISTRATION

The Executive Committee shall have the power to make and review all orders of assignment and reassignment consistent with this plan. As provided in Civil L.R. 77-2(e), the Clerk, when directed by the committee or as specifically provided for in this plan, may sign orders on behalf of the Executive Committee.

C.    CASE NUMBERS

Each case commenced in or transferred to the court pursuant to Civil L.R. 3-2 shall be assigned a case number by the Clerk upon filing. A separate sequence of case numbers shall be maintained for criminal and civil cases. Case numbers shall conform to the format approved by the Administrative Office of the United States Courts.

D.    ASSIGNMENT OF CASES

1.  Unless otherwise required by the Executive Committee, cases shall be assigned by the Clerk to the judges holding chambers in the courthouse or courthouses serving the county in which the action arises.

2.  Cases shall be assigned blindly and at random by the Clerk by means of an automated system approved by the judges of the court. Such system will be designed to accomplish the following:

    a.  Proportionate, random and blind assignment of cases;

    b.  Except as set forth in paragraphs (D)(4) through (D)(7), an approximately equal distribution among the active judges of the court of newly filed civil and criminal cases within each of the case categories established by the court

    c.  A high level of security so as to reasonably avoid prediction of the results of any case assignment;

    d.  A system of credits and debits to adjust for reassignments of cases among and between judges;

    e.  A record of all assignments and reassignments made.

3.  Notwithstanding any other provision of the Assignment Plan, the Clerk shall maintain a district-wide system of assignment for prisoner petitions (including death penalty habeas corpus), bankruptcy, intellectual property rights, Social Security, federal tax

suits, antitrust and securities class actions. Venue for cases in these categories shall be proper in any courthouse in this District. These cases shall not be reassigned on the basis of intra-district venue.

4. Notwithstanding any other provision of the Assignment Plan, the Clerk shall assign cases transferred to this District pursuant to Federal Rule of Criminal Procedure 20 in the following manner. Assignment of Rule 20 cases shall be made prior to execution of a consent to transfer in the manner set forth in Criminal L.R. 20-1. Any subsequent Rule 20 proceeding involving the same defendant and arising out of the same or superseding charges shall be deemed to be a related case and shall be assigned to the originally assigned judge.

5. Notwithstanding any other provision of the Assignment Plan, the Clerk shall assign any non-capital habeas petition filed by a prisoner to the same judge who was assigned any previous petitions filed by or on behalf of that prisoner.

6. Notwithstanding any other provision of the Assignment Plan, the Clerk shall assign any non-habeas civil complaint filed by a prisoner within five (5) years after the filing of the first civil complaint by that party to the same judge to whom the first such complaint was assigned. After five (5) years, the next new civil complaint filed by that prisoner shall be assigned to a different judge, in accordance with paragraph (D)(2) above, who shall then be assigned that prisoner's civil filings for the next five (5) years. Thereafter, a different judge shall be assigned for each subsequent five-year period.

7. Notwithstanding any other provision of the assignment plan, the Clerk shall assign a bankruptcy matter to the same judge who was assigned any previously filed bankruptcy matter arising from the same case in the United States Bankruptcy Court.

E.    ASSIGNMENT OF CASES TO MAGISTRATE JUDGES

1. The full-time magistrate judges of this District shall be included in the civil case assignment system in the same manner as active district judges, except for capital habeas corpus petitions, securities class actions, and bankruptcy appeals or bankruptcy withdrawal of reference cases. With respect to such assignments, the following shall apply:

    a. In cases assigned at filing to a magistrate judge, the magistrate judge shall conduct all proceedings including a jury or bench trial and shall order the entry of a final judgment upon the written consent of all parties in the case in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

    b. In all cases assigned at filing to a magistrate judge the Clerk shall provide all parties with a copy of the forms adopted by the court for "Notice of Assignment of Case To A United States Magistrate Judge for Trial." The form shall indicate that upon written consent of the parties the magistrate judges of this District have been designated to conduct any and all proceedings in a civil case, including a jury or nonjury trial and order the entry of a final judgment. Prior to the magistrate judge taking any dispositive action in the case, the Clerk shall obtain from the parties written consent to the jurisdiction of the magistrate judge in accordance with 28 U.S.C. §636(c) and Fed. R. Civ. P. 73.

    c. If a party declines to consent to a United States magistrate judge, the Clerk shall reassign the case to a district judge on a random basis or in accordance with paragraphs (D)(5) and (D)(6), if applicable.

2. Upon filing, the following will be assigned to a magistrate judge for all pretrial proceedings. When the case is ready for trial, upon consent of the parties, it will be retained by the magistrate judge for trial. If all parties do not so consent, the Clerk will randomly assign the case to a district judge in the division where the case is pending.

   a. All actions filed by the United States to recover on a claim for a debt;

   b. Pre-judgment or post-judgment applications by the United States under the Federal Debt Collection Procedures Act.

3. Upon filing, unless exempted by Local Rule, order of a judge of this court, or other provision of this general order, all civil miscellaneous matters will be randomly assigned in the first instance to a magistrate judge who will either resolve the matter or, if necessary, prepare a report and recommendation and request assignment of the matter to the district judge who was the general duty judge on the date the miscellaneous matter was filed. Any objections to the magistrate judge's order or report and recommendation will be resolved by that district judge. See Fed. R. Civ. P. 72. Matters from the Eureka division shall be reassigned, as necessary, to the general duty judge.

4. For cases reassigned to a magistrate judge subsequent to initial case assignment (e.g. at a case management conference), the parties may consent to the assignment of a magistrate judge sitting in any division.

| | | |
|---|---|---|
| ADOPTED: | JULY 22, 1997 | FOR THE COURT: |
| AMENDED: | JULY 18, 2000 | |
| AMENDED: | MARCH 1, 2002 | |
| AMENDED: | JANUARY 30, 2003 | |
| AMENDED: | AUGUST 26, 2003 | |
| AMENDED: | APRIL 28, 2008 | |
| AMENDED: | JANUARY 4, 2010 | |
| AMENDED: | MAY 29, 2012 | |
| AMENDED: | MARCH 19, 2013 | |
| AMENDED: | DECEMBER 17, 2013 | |
| AMENDED: | JUNE 24, 2015 | |
| AMENDED: | APRIL 19, 2016 | |
| AMENDED: | JUNE 20, 2017 | |
| AMENDED: | JANUARY 1, 2018 | |

PHYLLIS J. HAMILTON
CHIEF JUDGE

3

Exhibit 15

No. 26-_____

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

In re Doe Defendants

*Petitioners*,

v.

United States District Court for the Northern District of California,

*Respondent,*

Ted Entertainment, Inc.,

*Real Party in Interest.*

On Petition for Writ of Mandamus to the
United States District Court
for the Northern District of California
No. 3:25-mc-80296-SK
Hon. Sallie Kim

---

## PETITION FOR WRIT OF MANDAMUS

---

Karl S. Kronenberger
Jeffrey M. Rosenfeld
Leah Rosa Vulić
KRONENBERGER ROSENFELD, LLP
548 Market St. #85399

San Francisco, CA 94104
(415) 955-1155
karl@kr.law
jeff@kr.law
leah@kr.law

*Attorneys for Petitioners*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION................................................................2

ISSUES PRESENTED................................................................................3

RELIEF SOUGHT ....................................................................................4

STATEMENT OF FACTS ...........................................................................4

    A.    H3, r/H3Snark, and Does' Anonymous Political Speech ........................4

    B.    *Nuke* and Countdown: Highly Political and Controversial Works ..........6

    C.    Discussion of *Nuke* and Countdown on r/H3Snark: the Megathreads.....7

    D.    The Underlying Lawsuit: TEI's Suit against Denims. ...........................10

    E.    TEI's Parallel Copyright Lawsuits ...........................................11

    F.    TEI's Selective and Pretextual Enforcement of its Copyrights .............11

    G.    Does Shut Down the Subreddit ................................................12

    H.    Does' Motion to Quash and the District Court's Order .........................13

    I.    Use of the Order in the Underlying Fair-Use Proceeding......................18

ARGUMENT .........................................................................................19

    I.    The district court's Order is erroneous as a matter of law. ....................20

        A. The Order failed to apply the correct legal standard...............20

            1. TEI's Subpoenas would have been quashed under *Highfields*..................................................................21

i

B. The Order failed to apply controlling authority. ......................24

C. The Order's refusal to consider fair use is clear error.............26

    1. The Order adopted *Moneybags'* framework but omitted the fair use analysis....................................................26

    2. Fair use is a threshold requirement for finding infringement..............................................................27

D. The district court erred by failing to consider the First Amendment generally and failing to balance the equities.......29

    1. The nature of Does' speech demanded First Amendment consideration.............................................................30

    2. The Court's framework eviscerates First Amendment considerations entirely................................................30

    3. Does' concrete harm outweighs TEI's pretextual copyright claims.........................................................32

II.    Does will be irreparably harmed without the requested relief. ..............33

III.    Does have no other adequate means to obtain relief. .............................34

IV.    The district court's Order is an oft-repeated error manifesting persistent disregard of the federal rules. ................................................................35

V.    The Order raises new and important problems, or issues of law of first impression.........................................................................................35

ii

CONCLUSION ................................................................................36

iii

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A&M Recs., Inc. v. Napster, Inc.*,

  239 F.3d 1004 (9th Cir. 2001).................................................................... 28

*Art of Living Found. v. Does 1-10*,

  No. 10-CV-05022-LHK, 2011 WL 5444622 (N.D. Cal. Nov. 9, 2011).......Passim

*Barnes v. YouTube, Inc.*,

  No. 25-CV-05901-VKD, 2026 WL 412470 (N.D. Cal. Feb. 13, 2026) .............. 29

*Bauman v. United States District Court,*

  557 F.2d 650 (9th Cir. 1977).............................................................................. 3

*Columbia Pictures Industries, Inc. v. Fung*,

  710 F.3d 1020 (9th Cir. 2013)........................................................................ 14

*Cox Commc'ns, Inc. v. Sony Music Ent.*,

  146 S. Ct. 959 (2026) ...............................................................................Passim

*Doe v. Cahill,*

  884 A.2d 451 (Del. 2005) ................................................................................ 33

*Highfields Capital Mgmt., L.P. v. Doe*,

  385 F. Supp. 2d 969 (N.D. Cal. 2005) ......................................................Passim

//

*In re Anonymous Online Speakers*,

    661 F.3d 1168 (9th Cir. 2011)....................................................................... 13, 20

*In re Cement Antitrust Litig. (MDL No. 296)*,

    688 F.2d 1297 (9th Cir. 1982)............................................................................ 36

*In re DMCA Section 512(h) Subpoena to Twitter, Inc.*,

    608 F. Supp. 3d 868 (N.D. Cal. 2022) ........................................................Passim

*In re DMCA Subpoena to Reddit, Inc.*,

    441 F. Supp. 3d 875 (N.D. Cal. 2020) .......................................................... 28, 25

*In re Kirkland*,

    75 F.4th 1030 (9th Cir. 2023) ....................................................................... 20, 27

*In re Williams-Sonoma, Inc.*,

    947 F.3d 535 (9th Cir. 2020)........................................................................... 3, 33

*Lenz v. Universal Music Corp.*,

    815 F.3d 1145 (9th Cir. 2016)............................................................................. 28

*Perfect 10, Inc. v. Amazon.com, Inc.*,

    508 F.3d 1146 (9th Cir. 2007).............................................................................. 28

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,

    494 F.3d 788 (9th Cir. 2007)............................................................................... 14

*Perry v. Schwarzenegger*,

    591 F.3d 1147 (9th Cir. 2010)............................................................................. 20

*Reno v. ACLU,*

   521 U.S. 844 (1977) .................................................................................. 33


**<u>Statutes</u>**

17 U.S.C. §107 ............................................................................................ 28

17 U.S.C. §101 .............................................................................................. 2

28 U.S.C. §636(c)(1) ............................................................................... 2, 34

28 U.S.C. §1291 ......................................................................................... 34

28 U.S.C. §1651(a) ................................................................................. 3, 34


**<u>Rules</u>**

Fed. R. Civ. P. 45 ................................................................................... 2, 17

Fed. R. Civ. P. 45(d)(3) .............................................................................. 12

vi

## INTRODUCTION

This petition arises from a district court order denying Petitioners Movants/ Defendants' ("Does") motion to quash subpoenas issued by Plaintiff Ted Entertainment, Inc. ("TEI") seeking identities of anonymous critics. TEI's subpoenas are part of a three-lawsuit campaign using contributory copyright infringement to silence political critics.

The district court's order is clearly erroneous on multiple grounds. First, the court refused to apply the evidentiary standard Ninth Circuit precedent requires before unmasking anonymous speakers engaged in First Amendment-protected speech. Second, having borrowed a DMCA-derived framework to evaluate TEI's Rule 45 subpoenas, the court then excised the very component that gives that framework its constitutional legitimacy—fair use inquiry—deferring it to the underlying court. The court's reasoning has already backfired: TEI immediately seized on the order's incomplete *prima facie* findings to argue in the underlying proceeding that the named defendant's use was not fair use. Third, the court failed entirely to apply binding Supreme Court authority clarifying the knowledge and intent required for contributory infringement. Fourth, the court reduced its equities balancing to a single observation, i.e. that TEI needs Does' identities to proceed with its lawsuit. The district court's approach would swallow First Amendment protections in every case involving anonymous defendants.

1

This case presents all five *Bauman* factors for mandamus relief. Does have no adequate alternative remedy; the harm at issue, *i.e.* the permanent loss of anonymity to a plaintiff that has publicly threatened to destroy their lives, is irreversible and not correctable on appeal. The order is clearly erroneous; the district court has been reversed before for the same category of error in an unmasking subpoena case; and the petition raises issues of first impression, including: whether a court must determine fair use before compelling disclosure of anonymous speakers' identities in a copyright case; and whether a plaintiff issuing an unmasking subpoena in a copyright infringement claim must establish the elements of its claim with competent evidence.

Does respectfully request that this Court issue a writ of mandamus directing the district court to vacate its order and quash TEI's subpoenas.

## STATEMENT OF JURISDICTION

This is a civil action in which the district court had original jurisdiction pursuant to Fed. R. Civ. P. Rule 45. The underlying action was brought pursuant to the Copyright Act, 17 U.S.C. §§101, *et seq*. The action involves Does' First Amendment rights to anonymous speech.

Does have filed a concurrent Notice of Appeal. The appealability of an order denying a motion to quash third-party subpoenas entered by a magistrate judge with full consent jurisdiction under 28 U.S.C. §636(c)(1)—and separately, whether

2

such an order is immediately appealable under the collateral order doctrine or the *Perlman* exception—presents unsettled questions this Court need not resolve to grant relief here. Does file this petition protectively to ensure timely relief regardless of how this Court resolves jurisdiction over the appeal.

This Court has authority to issue the writ under the All Writs Act, 28 U.S.C. §1651(a), and Federal Rule of Appellate Procedure 21. *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 538 (9th Cir. 2020); *Bauman v. United States District Court, 557* F.2d 650 (9th Cir. 1977) ("*Bauman*").

## ISSUES PRESENTED

1.     Whether mandamus or, alternatively, appellate jurisdiction lies where an order denying a motion to quash identity-revealing subpoenas entered by a consent magistrate judge will irreversibly disclose anonymous speakers' identities.

2.     Whether the district court clearly erred by categorically exempting a copyright-labeled unmasking subpoena from the heightened evidentiary standard that Ninth Circuit precedent requires when the speech at issue is criticism, commentary, or political debate, regardless of the plaintiff's claim.

3.     Whether the district court clearly erred by borrowing the DMCA-subpoena framework to evaluate a contributory copyright claim against anonymous speakers while simultaneously declining to conduct the fair-use analysis.

4.     Whether the district court clearly erred by crediting allegations of

knowledge and material contribution to infringement where Does' uncontested evidence contradicted those allegations.

5.      Whether the district court clearly erred by treating the plaintiff's need to identify Doe defendants as satisfied by a pleading inquiry, when any standard sufficient to protect First Amendment rights to anonymous speech requires an independent evidentiary showing.

## RELIEF SOUGHT

Petitioners request a writ of mandamus directing the United States District Court for the Northern District of California ("NDCA") to vacate its order dated April 29, 2026 (D.E. 45[1] ("Order")) denying their Motion to Quash Subpoenas to Reddit, Inc. and Discord, Inc., and any other relief this Court deems just and proper.

## STATEMENT OF FACTS

**A.      H3, r/H3Snark, and Does' Anonymous Political Speech**

The H3 Podcast ("H3 Podcast") is a YouTube show hosted by Ethan and Hila Klein (the "Kleins") and produced and distributed through the Kleins' company, TEI. (D.E. 7, Ex. 1 ("Compl."), ¶¶12, 15; D.E. 1 ("MTQ") at 3:1-17.) The H3 Podcast covers controversial political topics, pop culture, and online

---

[1] Unless otherwise indicated or defined, citations refer to the docket entry (D.E.) of the NDCA; video exhibits are not submitted but are available upon request.

"drama." (Compl. ¶12; MTQ 3:1-17.) The H3 Podcast has devoted significant attention to the conflict in the Middle East. (Compl. ¶¶25, 27.) Ethan Klein previously co-hosted the "Leftovers" podcast with Hasan Piker ("Piker"), a political commentator; however, their relationship ended amid a public dispute over the Israeli-Palestinian conflict. (MTQ 3:8-17.)

Reddit is an online discussion platform comprising user-created communities, designed to facilitate candid conversations in significant part through user anonymity. (MTQ 3:24-26.) Reddit users participate in topic-specific "subreddits," moderated by unpaid volunteers who set and enforce community rules, remove inappropriate content, and facilitate discussion in accordance with Reddit's policies. (MTQ 3:26-4:4.)

The r/H3Snark subreddit ("Subreddit") was created in April 2023 as a moderated forum for critics of Ethan Klein and the H3 Podcast. (MTQ 4:5-6.) The Subreddit became a refuge for "fallen fans" who had been banned from H3's official subreddit after posting critical comments; and served as a space where current and former fans of the H3 Podcast could discuss the Kleins, their political views, and political and current events candidly without fear of retaliation. (MTQ 4:5-25.) Its content included anonymous discussions of Ethan Klein's conduct and commentary, including discussions about the ongoing conflict in the Middle East. (MTQ 4:9-11.)

Does were moderators of the Subreddit, who enforced rules to foster constructive commentary and prohibit harassment. (MTQ 4:14-25.) Does sought to comply with copyright and fair use principles by removing infringing content, updating moderation policies, and implementing an automated copyright disclaimer that appeared on every post ("AutoMod Disclaimer"). (MTQ 4:26-5:5.) Does were never compensated for their roles as moderators. (MTQ 4:1.)

**B.** *Nuke* **and Countdown: Highly Political and Controversial Works**

Beginning in December 2024, the Kleins created *Content Nuke: Hasan Piker* ("*Nuke*"), which they describe as a "tragi-comic documentary" critiquing Piker, his role in public discourse on the Middle East, and the livestreaming platform Twitch. (Compl. ¶¶38, 40.) *Nuke* largely comprises facts, historical events, and news reporting rather than original narrative or fictional content. (Compl. ¶40.a-g & Exs. D, E.) Six of its seven sections are framed as political analysis or commentary. (Compl. ¶40.) TEI even characterizes *Nuke* as a work of political commentary and documentary-style analysis. (Compl. ¶40.a-g.)

TEI registered *Nuke* with the United States Copyright Office ("USCO") on January 27, 2025[2], four days before its public release. (Compl. ¶38.) TEI excluded from its registration "preexisting footage, preexisting photograph(s), and

---

[2] TEI had never before registered any of its videos with the USCO.

6

preexisting music"; these elements make up the vast majority of *Nuke*. (MTQ 6:17-20; D.E. 7 Ex. 5; D.E. 8 ¶¶136-143.)

TEI promoted *Nuke* extensively on the H3 Podcast, building anticipation for its late-January 2025 release. (Compl. ¶43.) As TEI's own promotion stoked public interest, there was a corresponding interest among viewers and critics to comment on and criticize *Nuke* in spaces where they would not be silenced or attacked. (MTQ 6:25-26.) By that time, TEI-controlled spaces, such as the H3 Podcast YouTube channel, had grown hostile toward criticism, often banning critics. (MTQ 6:26-28.)

On the day of *Nuke*'s release, the H3 Podcast aired its regular live show themed around the film's debut ("Countdown") (Compl. ¶41 & Ex. F.) TEI sought a copyright registration for Countdown only after discovering fellow content creator Alexandra Marwa Saber ("Denims") "reacted" to it. (Compl. ¶42.) "Reaction" videos are common in online content creation. (*See* MTQ 7:7-9; D.E. 16 at 3:4-6.)

## C. Discussion of *Nuke* and Countdown on r/H3Snark: the Megathreads

Because of TEI's promotion of *Nuke*, the Subreddit saw a sharp increase in user submissions about anticipated third-party reactions to it. (MTQ 7:9-12.) Content creators, including Denims, publicly announced that they planned to live-react, or provide real-time commentary while viewing *Nuke*. (MTQ 7:7-9.)

To manage this activity surge, centralize discussion and commentary, and facilitate moderation, Does created the "Megathreads." (MTQ 7:12-16.) Megathreads are standard organization posts that aggregate discussion about a particular event, allowing moderators to channel conversations into a single location.[3] (MTQ 7:14; D.E. 8 ¶6.) The Megathreads linked to the Twitch and YouTube landing pages for users that had announced plans to react to *Nuke.* (MTQ 7:12-18, 8:8-9; Compl. Exs. G-I.) The Megathreads were meant to facilitate lawful, real-time commentary and critique; the links did not include unauthorized mirrors, VODs (videos on demand), or download links. (MTQ 8:8-12.) Each Megathread included the AutoMod Disclaimer. (MTQ 8:8-12.)

**First Megathread:** The First Megathread (Compl. Ex. G) was posted on January 30, 2025, the day before *Nuke* and Countdown were released. (MTQ 7:19-24.) The Megathread announced a centralized place to discuss *Nuke*, invited users to "react/comment/update," and reminded users to follow the Subreddit's rules, including those governing copyright and fair use. (Compl. Ex. G; MTQ 7:19-24.) The Megathread included links to the homepages of creators who had indicated

---

[3] Does published megathreads for each H3 Podcast episode to centralize discussion, hyperlinking directly to H3's own YouTube broadcasts. (D.E. 8, ¶¶6, 32.) Does' AutoModerator thus automatically posted a link to Countdown as part of the Subreddit's practice. (D.E. 8 ¶32, fn. 36.)

they planned to stream reaction videos, including a link to Denims' Twitch channel. (Compl. Ex. G; MTQ 7:19-24.)

**Second Megathread:** The second Megathread (Compl. Ex. I) was posted on January 31, 2025, three minutes after the Countdown episode began. (MTQ 8:3-6.) It linked to Denims' Twitch channel and included a pinned moderator comment providing links to the other streamers who had said they would react to *Nuke*. (MTQ 8:3-6; Compl. Ex. I.)

**Third Megathread:** The third Megathread (Compl. Ex. H) was posted three minutes after *Nuke* was released. (MTQ 8:1-3.) It **embedded TEI's own live broadcast of *Nuke* as a thumbnail and link as the most prominent content**; it offered "Places to watch *reactions* to this video" (emphasis added), listing streamers who had indicated they would react with transformative commentary to *Nuke*. (MTQ 8:1-3; Compl. Ex. H; D.E. 23 ¶¶17-17.10.) This Megathread placed TEI's own source of *Nuke* first, automatically directing users who clicked on the embedded thumbnail to TEI's YouTube upload of *Nuke*. (MTQ 8:1-3; Compl. Ex. H; Reply 6:4-10; D.E. 23 ¶¶17-17.10.)

**Does' Lack of Involvement in Reaction Videos:** Does did not coordinate with Denims regarding her decision to react to *Nuke*. (MTQ 9:25-26.) Does did not watch Denims' stream, or any other live reaction stream to *Nuke*. (MTQ 8:13-14, 9:24.) Thus, Does could not have known about the content of any streamer's

9

reaction video. (MTQ 17:18-20.)

**No Notice of Alleged Infringement from TEI:** TEI did not notify Does that it believed any reaction stream was infringing. (MTQ 9:26-10:2.) TEI did not comment on any Megathread, send a ModMail message through Reddit's platform, request removal of any links, or issue any DMCA takedown notices, even though its attorney was monitoring the Subreddit. (MTQ 9:26-10:2; D.E. 16 at 7:16-8:1; D.E. 16-1 ¶¶35, 38-39.) Accordingly, Does did not know of specific infringement by Denims or any other streamer. (MTQ 9:26-10:2; 17:10-18:3.)

## D.     The Underlying Lawsuit: TEI's Suit against Denims.

On June 19, 2025, TEI filed the underlying lawsuit against Denims and Does 1-10, Case No. 2:25-cv-05564-WLH-PD, in the Central District of California ("CDCA") (the "Denims Action"). (Compl.)  TEI alleged that Denims directly infringed its copyrights in *Nuke* and Countdown ("Work(s)"), by playing the Works during her Twitch stream, and pausing them to criticize and comment on them. (Compl.) TEI admits that Denims' use of the Works was "highly transformative." (Compl. ¶70.o.)

TEI also alleges that Does contributorily infringed TEI's copyrights in the Works by publishing the Megathreads. (Compl. ¶44.) According to TEI, by "promot[ing]" Denims' stream, Does induced, caused, and/or materially contributed to Denims' alleged infringement. (Compl. ¶¶2-3, 44, 83-87.)

10

Shortly after filing, TEI stipulated with Denims to allow TEI to serve subpoenas ("Subpoenas") on Reddit and Discord to obtain Does' identifying information. (D.E. 7 Exs. 8-9.) The CDCA court granted the stipulation. (D.E. 7 Ex. 9.) The CDCA did not issue any findings or analysis of the standards governing unmasking anonymous speakers. (D.E. 7 Ex. 9.)

**E.      TEI's Parallel Copyright Lawsuits**

The same day TEI filed the Denims Action, it filed two nearly identical copyright infringement lawsuits against other streamers who had reacted to *Nuke*, again naming Does as alleged contributory infringers: *Ted Entertainment, Inc. v. Kacey Caviness and Does 1-10*, Case No. 4:25-cv-00459-BCW (W.D. Mo.) ("Kaceytron"); *Ted Entertainment v. Morgan Kamal Majed and Does 1-10*, Case No. 2:25-cv-05565-JFW-MAA (C.D. Cal.) ("Frogan").

**F.      TEI's Selective and Pretextual Enforcement of its Copyrights**

The day TEI filed its three lawsuits, Ethan Klein publicly described the release of *Nuke* as a "trap" for streamers, boasting that "the trap was set and it worked even better than I imagined." (MTQ 10:20-27.) Before making this statement, the Kleins had repeatedly denounced the Subreddit and their online critics. (MTQ at 5:7-10, 5:21-23.)

Ethan Klein has stated his intent that Does "lose everything that they care about and I will be the one who makes them lose those things"; that he "will spend

11

and go to any limit …to annihilate [Does], for any cost"; that he will "destroy [Does'] lives proudly and happily…and…stand proud on their fucking proverbial grave"; that he will "feast on the fucking ashes of the lives that I will ruin;" and "this is [his] dream come true." (MTQ 11:17-12:17; D.E. 7 Ex. 21; D.E. 8 ¶¶72.1, 73.1, 74.1, 175, 278; D.E. 23 ¶21.3.1.) With respect to identifying Does, he stated: "…what happens with that information, I don't know. The unfortunate thing is that court filings are all public, so if their private information shows up there, then I literally can't help it." (D.E. 8 ¶72.1; D.E. 7 Ex. 21.)

Other content creators reacted to *Nuke*. (MTQ 10:28-11:5; D.E. 16-1 ¶¶55-56.) Tellingly, streamer xQc, with roughly ten times Denims' following, reacted to *Nuke* and received about 94,000 viewers—more than double the peak viewership of Denims' stream. (MTQ 10:28-11:5.) But because xQc's reaction stream was favorable to *Nuke*, neither Ethan Klein nor TEI sued him. (MTQ 10:28-11:5.)

## G.  Does Shut Down the Subreddit

After the Kleins threatened to sue Does for defamation in February 2025 (post-*Nuke* but pre-lawsuits), Does placed the Subreddit on a temporary break. (D.E. 7 Ex. 18; D.E. 8 ¶¶146, 179, 197.3; D.E. 20 at 11:15-17.) Does then voluntarily closed the Subreddit permanently in May. (D.E. 7 Ex. 18.) Since then, Does have not publicly discussed the H3 Podcast or the Kleins; the silencing of this critical forum is already complete.

12

**H.      Does' Motion to Quash and the District Court's Order**

On September 22, 2025, Does opened a miscellaneous civil action in the NDCA and moved to quash TEI's Subpoenas pursuant to Fed. R. Civ. P. 45(d)(3). (D.E. 1.) In that motion, Does argued and submitted evidence as to:

(1)    **Heightened standard/First Amendment context.** Because TEI seeks to unmask anonymous political critics, and because of the political context of the Subreddit, the court was required to apply a heightened standard and demand a real evidentiary basis for each element of TEI's contributory infringement claim. (MTQ 13:1-16:5.) Does highlighted that the nature of the speech should be a driving force in choosing a standard for unmasking, and district court authority requiring a prima facie evidentiary showing and a meaningful balancing of equities in anonymity cases. *See In re Anonymous Online Speakers*, 661 F.3d 1168, 1177 (9th Cir. 2011); *Highfields Capital Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969, 975-76 (N.D. Cal. 2005); *In re DMCA Section 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868 (N.D. Cal. 2022). (MTQ 13:1-16:5.)

(2)    **No knowledge of infringement.** TEI could not show that Does had actual knowledge that Denims' stream was infringing. (MTQ 16:19-18:3.) Does did not watch Denims' stream, received no notice from

TEI concerning any infringing stream, posted two of the Megathreads before *Nuke* was released, and linked to TEI's original upload of *Nuke* in the third Megathread. (MTQ 17:10-18:3.)

(3) **No inducement or material contribution.** Creating pinned discussion threads that link to a streamer's public channel does not constitute inducement or material contribution under this Court's precedents. *See Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1032, 1034 (9th Cir. 2013); *see also Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007). (MTQ 18:4–20:4; D.E. 20 at 7:5–9:4.)

(4) **Denims' stream was fair use.** Denims' reaction stream was a fair use of TEI's works. (MTQ 20:10-24:14; D.E. 20 at 9:20-10:21.) It was transformative, focused on commentary and criticism, and not a market substitute for TEI's own uploads. (MTQ 20:10-24:14; D.E. 20 at 9:20-10:21.) TEI offered no competent evidence to the contrary. (MTQ 20:10–24:14; D.E. 20 at 9:20–10:21.)

(5) **The Megathreads were fair use.** The Megathreads constituted fair use. (MTQ 20:5-9; D.E. 20 at 9:5-19; Compl. Exs. G-I.) They contained no copies of TEI's works, organized critical discussion, and—in the only Megathread posted after *Nuke*'s release—directed

14

users to TEI's official upload. (MTQ 20:5-9; D.E. 8 ¶45; D.E. 20 at 7:7-10, 9:5-19; D.E. 23 ¶¶17-17.10.)

(6) **Severe, non-correctable harm from unmasking.** Does submitted specific evidence of the irreversible harm that would result if their identities were disclosed, and the burden of defending three simultaneous federal copyright suits brought by a plaintiff whose principal publicly vowed to "destroy [their] lives" and "feast on the … ashes of the lives that I will ruin." (MTQ 11:15-12:17; D.E. 8 *passim.*; D.E. 23 *passim.*)

TEI opposed the motion and submitted declarations confirming, among other things, that its counsel actively monitored the Subreddit at the time of the Megathreads, while declining to notify Does of the alleged infringement. (D.E. 16; D.E. 16-1 ¶¶35, 38-39; D.E. 16-2.) Does filed a reply with evidence rebutting TEI's declarations. (D.E. 20, 23.) TEI then objected to Does' reply evidence. (D.E. 24.)

On March 25, 2026, Does filed a Statement of Recent Decision regarding the Supreme Court's decision in *Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959 (2026), which clarified the intent and substantial-non-infringing-use requirements for secondary copyright liability. (D.E. 35.)

The district court set a hearing, issued a notice of questions, and ordered the

15

parties to upload video exhibits. (D.E. 36–38, 40.) After the hearing and the video uploads, the court issued a written Order on April 29, 2026, denying the motion to quash in full. (D.E. 45.)

In that Order, the district court adopted an internally inconsistent framework that borrowed from DMCA unmasking cases while refusing to apply the fair-use inquiry those cases treat as essential. (D.E. 45.) The District Court's Order:

1) Held that *Highfields* does not apply because this is a copyright infringement case, but nonetheless purported to find an evidentiary basis for TEI's claims and "balance the equities" in deciding whether anonymous speakers could be unmasked. (Order at 4–11.)

2) Applied a *prima facie* pleading standard to evaluate TEI's showing of direct infringement by Denims and contributory infringement by Does, accepting allegations of ownership and copying without integrating fair use into that inquiry. (Order at 5–10.)

3) Refused to consider fair use in deciding whether TEI had made the requisite prima facie showing. Specifically, the district court:

a. Acknowledged Northern District authority holding that, before a copyright claimant may compel disclosure of an anonymous speaker's identity, the claimant must show the challenged use was not fair use;

16

b.      Held that requirement applies only in the DMCA-subpoena context, not on a Rule 45 motion to quash;

c.      Therefore treated TEI's allegations of ownership and copying as sufficient to establish a prima facie case of direct infringement, leaving fair use entirely to the underlying action because "that issue will be litigated fully in another forum"; and

d.      Did not address whether the Megathreads themselves were a fair use of TEI's Works (Order at 7–10).

4)      Found a *prima facie* case of contributory infringement based on the conclusion that Does understood and facilitated "hatewatching" of TEI's works, without applying the requirements of *Fung* and *Cox* that secondary liability hinges on intent to foster infringement, shown by clear expression or a service tailored to infringement and incapable of substantial non-infringing uses, not mere knowledge. (Order at 8–10.)

5)      Declined to address *Cox* at all, despite Does' Statement of Recent Decision, even though *Cox* clarified that secondary liability requires that a defendant intend its service be used for infringement—either through specific acts of encouragement or a service design geared to infringement without capability of significant non-infringing uses—and that mere knowledge is insufficient.

17

6)     Concluded that TEI's need for identifying information outweighed Does' interest in anonymity, notwithstanding Does' evidence of "public exposure, real risk of retaliation[,] actual harm, and the financial and other burdens of defending the Action," because TEI could not otherwise identify, serve, and proceed against them. (Order at 10-11.)

## I.    Use of the Order in the Underlying Fair-Use Proceeding

On March 2, 2026, upon stipulation by TEI and Denims, the CDCA court stayed the Denims Action pending resolution of Does' motion to quash, including any appeal. (D.E. 44.) On March 30, 2026, the CDCA court approved a limited carve-out to permit Denims to file a motion for partial judgment on the pleadings ("MPJOP") on whether her use of *Nuke* is fair use. (D.E. 44.) Under the stipulated schedule, the MPJOP was fully briefed by May 8, 2026, and is set for hearing on June 5, 2026. (D.E. 44.)

On May 1, 2026, two days after the Order, TEI filed its opposition and a request for judicial notice in the Denims Action. (CDCA D.E. 36, 37.) TEI urged the CDCA court to treat the Order as "adjudicative fact" and asserted that the Order's "findings concern the first and fourth fair use factor." (CDCA D.E. 37.) TEI specifically relied on the Order's "hatewatching" discussion and its statement that viewers watched Nuke "without giving any benefit to TEI" to argue that

18

Factor 1 favors TEI in Denims' MPJOP because the supposed purpose of Denims' stream was to provide a substitute viewing experience rather than criticism. (CDCA D.E. 36 at 4:19-25.) TEI cited the Order as proof viewers watched Denims' stream as a substitute for the original as proof of market substitution. (CDCA D.E. 36 at 5:9-11, 24:7-9.)

TEI went so far as to tell the CDCA that the Order "found that TEI alleged *and* proved that the H3Snark Mods directed potential viewers of *The Nuke* to view Denims' watch party as a substitute for the original" (emphasis in TEI's opposition), asking the CDCA to rely on that finding in adjudicating Denims' MPJOP. (CDCA D.E. 36 at 2:21-24.) In short, TEI is already using the Order's one-sided prima facie and "hatewatching" findings as substantive evidence against fair use in the forum the Order said would "fully" decide that issue.

## ARGUMENT

In *Bauman*, the Ninth Circuit established five factors to determine whether supervisory mandamus is appropriate. *Bauman*, 557 F.2d 650 (9th Cir. 1977). These factors are:

1. whether the petitioner has no other adequate means, such as direct appeal, to attain the requested relief;

2. whether the petitioner will be damaged or prejudiced in a way not correctable on appeal;

19

3. whether the district court's order is clearly erroneous as a matter of law;

4. whether the order is an oft-repeated error or manifests persistent disregard of the federal rules; and

5. whether the order raises new and important problems or issues of first impression.

*Id.* at 654-55. Not every factor need be present at once, but absence of the third factor, clear error, is dispositive. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010) ("*Perry*"). The *Bauman* factors are weighed holistically to determine whether, on balance, they justify the invocation of "this extraordinary remedy." *In re Kirkland*, 75 F.4th 1030, 1040-41 (9th Cir. 2023).

## I. The district court's Order is erroneous as a matter of law.

### A. The Order failed to apply the correct legal standard.

The District Court refused to apply the *Highfields* test because "*Highfields* involved claims for trademark infringement and unfair competition, not copyright law." Order at 4:23-5:3; *Highfields Capital Management, L.P. v. Doe*, 385 F. Supp. 2d 969 (N.D. Cal. 2005) ("*Highfields*"). That reasoning is irreconcilable with Ninth Circuit authority: "the *nature of the speech* should be a driving force in choosing a standard by which to balance the rights of anonymous speakers in discovery disputes." *In re Anonymous Online Speakers*, 661 F.3d 1168, 1177 (9th Cir. 2011) (emphasis added) ("*Anonymous*").

20

Applying this reasoning, the court in *Art of Living Found. v. Does 1-10*, No. 10-CV-05022-LHK, 2011 WL 5444622, at *5-6 (N.D. Cal. Nov. 9, 2011) ("*AoL*"), a copyright case, held that *Highfields* governs when allegedly infringing conduct is accompanied by "critical, anonymous commentary" carrying substantial First Amendment value. Here, the Subreddit served as a forum for critics of Ethan Klein and the H3 Podcast that often spoke about political topics. (Compl. ¶¶25, 27; MTQ 4:5-11.) Similarly, Does created the Megathreads to facilitate lawful, real-time commentary and critique of TEI's Works. (MTQ 8:10-12.) This is the precise speech the *Highfields* test was designed to safeguard. Thus, the District Court erred by not applying *Highfields*.

### 1. TEI's Subpoenas would have been quashed under *Highfields*.

Had the District Court applied the *Highfields* standard, as required by Ninth Circuit authority, it would have been required to quash the Subpoenas. In *Highfields*, the court held the relevant inquiry as requiring: (1) the plaintiff to "adduce competent evidence" of wrongful conduct causing real harm, and (2) then can the court "assess and compare the magnitude of the harms" on each side. *Highfields* at 974–75. If the district court had applied this test—as it was required to do—TEI would neither have cleared the evidentiary hurdle nor prevailed at the balance of harms, which favors Does. *First*, TEI adduced no evidence that Does

purported contributory infringement caused it real harm. Specifically, TEI failed to submit competent evidence: 1) that Denims engaged in the underlying direct copyright infringement, as opposed to a fair use, 2) knowledge of specific acts of infringement, more than generalized knowledge of the possibility of infringement, or 3) inducement or material contribution. The district court casually referenced TEI's "evidence," but it failed to undertake any independent evaluation of that evidence, and failed to consider Does' competing evidence. (Order at 9-10.) Thus, for example, the district court completely failed to consider whether there was any evidence of knowledge of specific acts of infringement. (*Id.*) Does' alleged wrongdoing consists entirely of posting Megathreads that linked to the public Twitch and YouTube landing pages of streamers who had already publicly announced plans to react to TEI's videos. (MTQ at 7–8.) The Megathreads contained no unauthorized copies, VODs, or download links, and each carried the AutoMod Disclaimer. (MTQ at 8.) In fact, Does did not watch Denims' stream, and could not have known whether her use was infringing. (MTQ at 8.) Does' actions are insufficient to satisfy the intent requirement for finding contributory liability for copyright infringement under *Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959, 967 (2026) ("*Cox*"). Any reasonable review of the evidence shows that Does lacked knowledge of specific acts of infringement, and that Denims' underlying conduct was a fair use. The district court did not consider this evidence

22

as required under *Highfields*; instead, it adopted an Urban Dictionary definition of "hatewatching" to determine Does' liability. (Order at 9-10.)

*Second,* the balance of equities weighs strongly in favor of Does. Even if TEI adduced competent evidence, the second factor of *Highfields* weighs in favor of protecting Does' interest in remaining anonymous over TEI's need to proceed with its lawsuit. (Order at 10-11.) Contrary to the district court's analysis, this factor requires more than TEI needing Does' identities to litigate its case. Under *Highfields*, the district court must weigh "the extent of the harm to defendant's First Amendment and privacy interests" against the harm to the plaintiff, "in light of the strength of the underlying claim." *Highfields* at 980; *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 876 (N.D. Cal. 2022). Here, no such weighing occurred. The court accepted that TEI "cannot proceed" without the identities and stopped there—without considering the documented risk of harassment and doxing to Does. (MTQ at 11-12.) This harm is not speculative; TEI's principal has publicly expressed his intent to commit such harm. (MTQ at 11-12.)

The district court also failed to consider the broader chilling effect on anonymous political commentary in online communities. (Order at 10-11.) In *Highfields*, the court found the balance favored the anonymous speaker because "enforcing a subpoena in this kind of setting poses a real threat to chill protected

23

comment on matters of interest to the public." *Highfields* at 976. That concern applies here as Does' Subreddit is meant to foster a forum dedicated to criticizing TEI's content. (MTQ at 3-4.) Allowing TEI to unmask Does has already chilled criticism of online personalities that the First Amendment and *Highfields* are meant to protect.

**B.     The Order failed to apply controlling authority.**

In *Cox*, the Supreme Court held contributory infringement is only found if a service is intended to be used for infringement. *Id.* at 967. Intent for purposes of contributory infringement can be established in two ways. *See id.* First, if the party actively encouraged infringement through *specific acts. Id.* Second, if the service is tailored to infringement by not being capable of substantial or commercially significant non-infringing uses. *Id.*

The Supreme Court held Cox could not be held contributorily liable for its subscribers' infringement under this framework. *Id.* The Court found that Cox "neither induced its [internet service] users' infringement nor provided a service tailored to infringement." *Id.* The Court added that Sony failed to provide "evidence of express promotion, marketing, and intent to promote" infringement. *Id.* Further, the Court determined Cox's internet service was not tailored to infringement because it was capable of "substantial" or "commercially significant" noninfringing uses. *Id.* Indeed, the Court held that "[m]ere knowledge that a

service will be used to infringe is insufficient to establish the required intent to infringe" and that "contributory liability cannot rest only on a provider's knowledge of infringement and insufficient action to prevent it." *Id.* at 968, 969.

The district court's Order failed to consider Does' contributory infringement under *Cox*. Instead, the district court used a two-part test where contributory infringement is found if a party: (1) has knowledge of infringement, and (2) either materially contributes to or induces that infringement. (Order at 8:25-9:6.) The district court determined Does' actions satisfied this test. (Order at 9:12-10:11.) In doing so, the district court summarily concluded that Does "knew Denims' 'group viewing session' infringed or intended to infringe TEI's copyrighted works and induced, caused and/or materially contributed to Denims' infringement." (Order at 9:11-16.)

The district court did not point to any "evidence of [Does'] express promotion, marketing, and intent to promote infringement" of TEI's Works. *Cox*, at 969. Nor could it. Does simply posted links to Denims' (and other online personalities') homepages in a Reddit discussion thread dedicated to criticizing TEI's upcoming works. (MTQ at 6-8.) Further, even if Does knew Denims intended to infringe TEI's Works, that alone is insufficient under *Cox*.

Accordingly, the District Court erred as a matter of law by not analyzing Does' contributory infringement under *Cox*.

### C. The Order's refusal to consider fair use is clear error.

Despite authority holding that a plaintiff must make a prima facie case that the infringement did *not* constitute fair use before allowing unmasking, the district court abdicated its responsibility to consider fair use to the CDCA at another time. (Order at 8.)

#### 1. The Order adopted *Moneybags'* framework but omitted a fair use analysis.

The court adopted the three-part DMCA *Moneybags* framework from *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 876 (N.D. Cal. 2022) ("*Moneybags*"). (Order at 4-5.) The *Moneybags* framework requires: (1) notice and opportunity to defend anonymity; (2) a prima facie showing on the merits; and (3) a balancing of equities. *Id.*

But the district court failed to apply a crucial component of the test: "To make a prima facie case of copyright infringement for the purposes of obtaining a subpoena, [] a party must make a prima facie case that the infringing use did not constitute fair use." *Moneybags* at 879. While the Order acknowledged that Northern District authority requires exactly that analysis (Order at 7), the district court held that only applies to DMCA subpoenas, not on a Rule 45 motion to quash, because "the District Court in the underlying action will determine the issue of fair use" and "that issue will be litigated fully in another forum." (Order at 7-8.)

26

Accordingly, the Order failed to follow *Moneybags'* instruction that DMCA subpoenas incorporate Rule 45, and that the distinctions between the two do not require different tests. *See Moneybags* at 876-77.

Refusing to consider fair use in a Rule 45 unmasking subpoena directly conflicts with Northern District authority. In *Moneybags*, the party seeking unmasking argued against traditional unmasking tests (prima facie claim; balancing of equities) because it issued a DMCA subpoena and copyright law has some First Amendment protection "built in." *Moneybags* at 876-77. The court rejected this, finding it "raise[d] serious constitutional concerns." *Id*. The Order's distinctions here similarly fail; there is no substantive difference in the constitutional considerations applicable to a Rule 45 subpoena. *Moneybags* already addressed the Rule 45/DMCA subpoena distinctions: "None of these distinctions support application of a different test." *Moneybags* at 877. *See In re Kirkland*, 75 F.4th 1030, 1041 (9th Cir. 2023) (clear error where prior authority prohibits the lower court's action)

### 2. Fair use is a threshold requirement for finding infringement.

The Order held that for a Rule 45 unmasking subpoena, fair use is an "affirmative defense," and it only requires consideration for a DMCA subpoena. (Order at 7-8.) The Ninth Circuit has expressly rejected this characterization:

"Given that 17 U.S.C. § 107 expressly authorizes fair use, labeling it as an affirmative defense that excuses conduct is a misnomer." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1152 (9th Cir. 2016); *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 887 (N.D. Cal. 2020) (overturning magistrate's denial of motion to quash). *Lenz* concretely established that fair use is not just excused by the law, it is "wholly authorized" by it. 815 F.3d at 1152-53. The Order's holding that TEI established a prima facie case for infringement—without considering fair use—is clear error.

This is not a technicality. TEI brought a contributory infringement claim against Does, and it was required to adduce competent evidence of *each element* of its claim. *Highfields* at 975-76; *AoL* at **5-6 (applying more rigorous standard in copyright infringement case where nature of speech was critical). Contributory infringement requires an underlying act of direct infringement. *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n. 2 (9th Cir. 2001); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007). If Denims' use of the Works was fair, no direct infringement occurred. If no direct infringement occurred, contributory infringement is legally impossible. If contributory infringement is legally impossible, there is no cognizable copyright claim against Does—and no basis to unmask them at all. The Order's acceptance of bare allegations of ownership and copying as a "*prima facie*" case of direct

28

infringement, while reserving the fair use question for another day, is not merely procedurally irregular. It makes the Order's infringement conclusion untenable under the structure of copyright law itself.

**D.      The district court erred by failing to consider the First Amendment generally and failing to balance the equities.**

First, the Order held that *Highfields* was "not applicable to a copyright action," because *Highfields* involved claims for trademark. (Order at 4.) The court thus ignored Northern District authority applying a First Amendment balancing test to copyright infringement cases where First Amendment concerns are implicated, *AoL* at *4-10, and other authority the *District Court itself relied on* to establish the standard it applied. (Order at 5, citing *Barnes v. YouTube, Inc.*, No. 25-CV-05901-VKD, 2026 WL 412470, at *3 (N.D. Cal. Feb. 13, 2026) ("the Ninth Circuit requires a court to consider and weigh both the anonymous speaker's *First Amendment interest* and the subpoenaing party's need for identifying information." (emphasis added)).[4] The district court then erred in failing to balance the equities, despite recognizing that such balancing is required even in copyright cases.

//

---

[4] *Barnes*, uniquely, involved a DMCA subpoena issued in a full copyright infringement case. As discussed herein, this does not change the analysis.

1. **The nature of Does' speech demanded First Amendment consideration.**

The nature of the speech is a driving force in choosing a standard by which to balance the rights of anonymous speakers. *See Anonymous* at 1177. Further, while fair use *may* "wholly encompass[] free expression concerns in some cases, that is not true in all cases—and it is not true in a case like this…it is possible for a speaker's interest in anonymity to extend beyond the alleged infringement." *See Moneybags* at 877-78.

*Moneybags* raised a hypothetical analogous here: an anonymous blogger writes hundreds of blog posts criticizing a powerful political figure, Mr. X, and in one, includes a copyrighted image of Mr. X. *Id.* at 878. If Mr. X sued for copyright infringement, the court needs to consider interests on both sides, *even if* the post did not constitute fair use. *See id.* That applies here. Does moderated the Subreddit, a forum organized to critique a prominent public figure on matters of political controversy. (MTQ at 4.) The Order did not acknowledge, let alone weigh, this dimension. This is clear error.

2. **The Court's framework eviscerates First Amendment considerations entirely.**

The Order's "balancing" analysis is fatally flawed. The governing standard requires the Court to "balance the equities, weighing the potential harm to the party

seeking disclosure against the speaker's interest in anonymity, in light of the strength of the underlying claim." *Moneybags* at 876. The Order acknowledged that Does submitted evidence of "public exposure, real risks of retaliation[,] actual harm, and the financial and other burdens of defending the Action." (Order at 10.) It then resolved the entire balance by finding TEI needed Does' identities to pursue its claims. (Order at 11.) That is not a balance. It is an observation that plaintiffs who sue anonymous speakers need to identify them, which is true of every case against unknown defendants, and distinguishes nothing.

The Order's rationale would eliminate First Amendment balancing from every copyright case involving anonymous defendants, despite *Moneybags*' clear warning that a speaker's interest in anonymity may extend beyond the alleged infringement. *Id.* at 878. Regardless of whether the court recognizes this as "*Highfields*" balancing, district courts in this Circuit routinely balance the equities to protect First Amendment rights, regardless of the claim's label. Indeed, the *Moneybags* court found that even a properly supported *prima facie* claim did not automatically resolve the equities in the plaintiff's favor, and in *that* case, which is factually similar to Does' case, the court held it would "quash the subpoena in a heartbeat." *Id.* at 881-83.

If naming anonymous speakers as defendants automatically satisfies the balancing inquiry, First Amendment balancing will never occur.

### 3. Does' concrete harm outweighs TEI's pretextual copyright claims.

Does established concrete harm from disclosure of their identities. TEI's principal publicly stated his intent to make Does "lose everything [] they care about," "destroy [] their lives proudly and happily…and…stand on their fucking proverbial grave," "feast on the fucking ashes of the lives that [he] will ruin," and that if Does' "private information shows up [in public]…[he] literally can't help it." (Facts, Section F, *supra*.) Does did not claim generalized anxieties about defending a lawsuit (or three); rather, Ethan Klein made targeted statements about releasing Does' identities, connected explicitly to the subpoena process. (*Id.*) The harm has already materialized: Does shut the Subreddit permanently and ceased all public comment. (D.E. 8 *passim.*; D.E. 23 *passim.*) The district court did not consider any of these chilling effects.

Evidence of TEI's pretext required further weighing. Unmasking subpoenas, regardless of the claim, require courts to ensure that the subpoena is a genuine effort to protect cognizable rights, not a mechanism to punish critics. *See Highfields* at 980 (enforcing a subpoena in this kind of setting poses a real threat to chill protected comment on matters of interest to the public); *see AoL* at *6-9. Ethan Klein publicly described *Nuke*'s release as a deliberate "trap." (MTQ at 10.) TEI then sued only critical reactions to *Nuke* while ignoring those who reacted

32

favorably and drew more viewers. (MTQ at 10-11.) During the district court proceedings, TEI revealed private identifying information of three of its critics in its own opposition papers. (D.E. 16-1 Exs. 60, 68, & p. 146.) The Order ignored this evidence entirely.

## II. Does will be irreparably harmed without the requested relief.

The Order ignores that deferring consideration of a fair use analysis to the CDCA will eviscerate the First Amendment interests at stake. "It is clear that speech over the internet is entitled to First Amendment protection." *Doe v. Cahill*, 884 A.2d 451, 456 (Del. 2005) (citing *Reno v. ACLU*, 521 U.S. 844 (1977)). Pertinently, First Amendment protection extends to anonymous speech online. *Id.*

As stated above, a fair use analysis—whether under *Highfields* or the DMCA framework—protects Does' right to remain anonymous by ensuring TEI can state a prima facie case of its claim against Denims and Does. *Supra* §I.C.1. Waiting for the CDCA to engage in the fair use analysis the district court should have undertaken will be too late. "[I]t is not enough to say that a speaker could assert their right to anonymity after their identity has been revealed; at that point, the damage will have been done." *Moneybags* at 877. This concrete, irreparable harm to Does cannot be remedied on appeal.

As this Court has recognized, mandamus is appropriate where a discovery order threatens disclosure that will moot the protected interest before appeal. *In re*

33

*Williams-Sonoma, Inc.*, 947 F.3d at 538-40.

### III. Does have no other adequate means to obtain relief.

Does have pursued all permissible methods of appellate review to avoid irreparable injury. Specifically, Does have filed a concurrent Notice of Appeal from the district court's Order. That appeal rests on three independent theories of appellate jurisdiction: (1) that because the magistrate judge presided over this proceeding with full consent jurisdiction under 28 U.S.C. §636(c)(1), the Order denying Does' motion to quash is an effectively final judgment directly appealable to this Court under 28 U.S.C. §1291; (2) that the Order is immediately appealable under the *Perlman* doctrine; and (3) that the Order satisfies the collateral order doctrine. Does file this petition protectively and concurrently because the appealability of an order denying a motion to quash a third-party subpoena entered by a consent-jurisdiction magistrate judge presents unsettled questions this Court need not resolve to grant relief here.

The critical point is that Does require both avenues—the concurrent appeal and this petition—precisely because neither alone is adequate. If this Court concludes it lacks appellate jurisdiction over the concurrent appeal, mandamus under 28 U.S.C. §1651(a) is the only remaining path. If this Court has jurisdiction over the appeal, mandamus is independently necessary because the irreparable harm will occur before any ordinary appellate schedule allows review.

34

Because Reddit and Discord may comply on a normal compliance timeline, and because no ordinary briefing schedule allows this Court to resolve even an expedited appeal before that compliance occurs, mandamus is the only mechanism capable of preventing the irreparable injury in time. Does have no other adequate means to attain this relief. Whether or not this Court ultimately concludes that appellate jurisdiction exists over the concurrent appeal, the first *Bauman* factor is satisfied: mandamus is the only practical avenue to preserve a constitutional interest that, once lost, is gone forever. This is precisely the extraordinary circumstance that justifies the supervisory writ.

## IV. The district court's Order is an oft-repeated error manifesting persistent disregard of the federal rules.

The magistrate judge who issued this Order was previously overturned in an unrelated case for failing to correctly analyze fair use in the context of a copyright infringement unmasking subpoena. *See In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875 (N.D. Cal. 2020). Repeating her errors, here, the magistrate judge refused to consider fair use and refused to balance the equities, as required by controlling authority. This factor supports mandamus relief.

## V. The Order raises new and important problems, or issues of law of first impression.

The Ninth Circuit has recognized that its "supervisory mandamus authority

35

is particularly appropriate when an important question of law would repeatedly evade review because of the collateral nature of the issues." *In re Cement Antitrust Litig. (MDL No. 296)*, 688 F.2d 1297, 1304 (9th Cir. 1982). This case presents at least two important questions not squarely resolved by Ninth Circuit precedent but likely to reappear: (1) what *prima facie* showing is required when a plaintiff uses Rule 45, rather than the DMCA subpoena procedure, to identify anonymous critics based on a contributory copyright infringement claim, and (2) must a court consider fair use when analyzing a subpoena seeking to unmask an anonymous speaker issued under Rule 45.

The district court's reasoning in the Order is likely to recur, paving a dangerous roadmap allowing public figures (or anyone) to weaponize copyright law to silence anonymous critics. If left unaddressed, the Order's roadmap enables individuals to evade a pillar of the First Amendment protections afforded to anonymous speakers simply by bringing a copyright claim as a basis to unmask, and effectively silence, anonymous online critics.

## CONCLUSION

In conclusion, the district court dispensed with every unmasking test; failed to consider fair use; accepted speculation about the purpose and intent of allegedly infringing content that required closer scrutiny; determined TEI established contributory infringement while ignoring Supreme Court precedent; and discarded

36

Does' documented harms while ignoring the chilling effect on First Amendment-protected anonymous speech. This is clear error, and this Court should grant Does' writ.

Respectfully Submitted,

DATED: May 29, 2026         **KRONENBERGER ROSENFELD LLP**

s/ Leah Rosa Vulić
Karl S. Kronenberger
Jeffrey M. Rosenfeld
Leah Rosa Vulić

*Attorneys for Petitioners Does*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure ("FRAP") 21(d) and 32(g)(1), counsel certifies that this petition for writ of mandamus contains 7,716 words, excluding the items exempted by FRAP 32(f).

This Petition for Writ of Mandamus complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font.

DATED: May 29, 2026                    By:   s/ Leah Rosa Vulić

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the foregoing Petition for Writ of Mandamus and accompanying Appendix with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

I further certify that a copy of this Petition and accompanying Appendix is being served on all parties to the district-court proceeding, and a copy is being provided to the Honorable Sallie Kim, United States Magistrate Judge, as required by Federal Rule of Appellate Procedure 21(a).

DATED: May 29, 2026                    By:    s/ Leah Rosa Vulić

Exhibit 16

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:25-cv-05564-WLH-PD | Date | June 5, 2026 |
|---|---|---|---|

| Title | Ted Entertainment, Inc. v. Alexandra Marwa Saber, et al. |
|---|---|

| Present: The Honorable | WESLEY L. HSU, United States District Judge |
|---|---|

| Claudia Garcia-Marquez | CourtSmart |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Leena M. Charlton | Eitan Sirkovich |

**Proceedings:**    DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO
COMPLAINT [35]


The matter was called, and counsel stated their appearances.  The Court's Tentative
Ruling was issued on June 4, 2026, and reviewed by counsel. The Court heard oral argument.
The Court took the matter **UNDER SUBMISSION** and a ruling will be issued.


:    30

Initials of Deputy Clerk    cgm

Exhibit 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:25-cv-05564-WLH-PD | | Date | June 29, 2026 |
|---|---|---|---|---|
| Title | *Ted Entertainment, Inc. v. Alexandra Marwa Saber et al.* | | | |

Present: The Honorable    WESLEY L. HSU, United States District Judge

| Claudia Garcia-Marquez | None |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None | None |

**Proceedings:    (IN CHAMBERS) ORDER RE DEFENDANT'S MOTION FOR
JUDGMENT ON THE PLEADINGS [35]**

The Court is in receipt of Defendant's Motion for Judgment on the Pleadings.
(MJOP, Dkt. No. 35).  The matter is fully briefed, and the Court heard oral argument on
June 5, 2026.  For the reasons explained herein, the Court **GRANTS** the Motion.

**I.    BACKGROUND**

Plaintiff Ted Entertainment, Inc. ("Plaintiff") sued Defendant Alexandra Marwa
Saber ("Defendant" or "Denims").[1]  (Compl., Dkt. No. 1).  Plaintiff brings the following
claims for relief: (i) Direct Copyright Infringement against Denims and (ii) Contributory
Copyright Infringement against The H3Snark Mods[2].  (*Id.*).  Plaintiff is "production
company that produces content for social media, namely YouTube." (*Id.* ¶ 9).  Defendant
is an online streamer who releases content on social media platforms, namely Twitch.
(*Id.* ¶ 10).  Plaintiff, through its owner YouTuber Ethan Klein ("Klein"), filed this action
seeking statutory damages against Defendant for her alleged livestreamed "reaction" to

---

[1] Plaintiff also sued Does 1-10.
[2] The H3Snark Mods are comprised of Does Nos. 1-10.  The true names and exact location of Does Nos.
1-10 are presently unknown to Plaintiff.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Plaintiff's "tragi-comic documentary" entitled Content Nuke: Hasan Piker ("The Nuke") posted on Plaintiff's YouTube channel on January 31, 2025.  The Nuke centered on the allegedly controversial political ideologies of the "alt-left" Twitch streamer Hasan Piker ("Piker") regarding the Israel-Palestine conflict.  (*Id*. ¶ 40).

The Nuke contains "original footage, highly edited montages, parodic skits and archival materials."  (*Id*.).  The Nuke can be divided into seven sections:  (1) The Prologue; (2) the Twitch Parody Sketch; (3) the Houthi Section; (4) the Hezbollah Section; (5) the Hamas Section; (6) the Twitch Section; and (7) the Conclusion.  (*Id*.).  It contains original footage, highly edited montages, parodic skits and archival materials. (*Id*.).  The first section "walks the audience through Ethan's thesis of The Nuke: that Hasan radicalizes his audience with genocidal and antisemitic terrorist propaganda," the second section involves a parody mocking how Twitch "has embraced Hasan's extremist rhetoric" and the third section focuses on how Piker allegedly radicalizes his audience by glorifying and disseminating Houthi propaganda.  (*Id*.).  The fourth section focuses on Piker's interactions with Hezbollah propaganda, the fifth section focuses on Piker's interactions with Hamas propaganda and the sixth section explores Twitch's alleged role in enabling Piker to violate Twitch's Community Guidelines.  (*Id*.).  In the final section, Klein presents the two motivations behind The Nuke, which are to "stop Hasan's infiltration of mainstream media" and "to hold Twitch accountable for enabling antisemitic and anti-Israel animus on its platform."  (*Id*.).  The film aims to "expose how Piker radicalizes people online to be antisemitic and anti-Israeli" and criticizes Twitch as a platform.  (*Id.* ¶ 70.o).

On January 27, 2024, Plaintiff submitted its application to register The Nuke with the United States Copyright Office (the "USCO").  (*Id.* ¶ 38).  On January 28, 2025, the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

USCO received the deposit copy of The Nuke.  (*Id.*).  The registration number for The Nuke is PAu 4-256-429.

Throughout Defendant's live stream, Defendant provides commentary pertaining to criticism of The Nuke.  Indeed, Plaintiff states, "[w]here The Nuke seeks to expose how Piker radicalizes people online to be antisemitic and anti-Israeli, Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan."  (Compl. ¶ 70.o).  During the live stream, Defendant contends that The Nuke resembles a "high school video project" or "middle school project."  (Live Stream Video, Dkt. No. 34, Ex. K at 1:21:14-40, 5:04:58-5:05:23).  Defendant also complains about the documentary's editing, the sources the documentary relies upon and supposed inconsistencies of Klein's statements (*id.*, Ex. K at 2:41:05-07, 4:43:56-4:54:18) and that the video treats the audience as "morons" as it allegedly attempts to "trick" them (*id.*, Ex. K at 3:46:23-37).  As further support of Defendant's commentary throughout the live stream, the Complaint states that Defendant "frequently makes comments that are later contradicted by The Nuke itself."  (Compl. ¶ 70.i).

Defendant offers further criticism of the subject documentary during her live stream.  (*See generally* Compl.).  Following one of the documentary creator's criticism of Piker's apologia of China's genocide of the Uyghurs, Defendant comments,  (1) on the treatment of Uyghurs; (2) "so much of American media is focused on pointing out how evil Chine is,"; (3) stating that disabled Americans lose disability benefits when they get married; (4) incarceration levels in the United States. (Live Stream Video, Ex. K at 1:25:43-1:36:05).  Additionally, during the live stream, Defendant (1) challenges Klein's perception of Piker's sentiments regarding the interaction between imports and the fleeing of Jewish people from Israel (Live Stream Video, Ex. K at 2:36:47-2:37:04); (2) disputes Klein's account of the events of the occurrence of sexual violence of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

hostages (Compl. ¶ 70.i.v; Live Stream Video, Ex. K at 3:33:49-3:35:34, 3:42:49-3:45:33); (3) critiques Klein's discussion of Twitch's enforcement and moderation decisions (Compl. ¶¶ 70.l.xv-xvii, 70.i.vi); and (4) discusses her perspectives on Zionism and Judaism (Live Stream Video, Ex. K at 4:33:48-4:34:02).[3]

On June 19, 2025, Plaintiff filed the Complaint. (*See generally* Compl.). On April 17, 2026, Defendant filed the instant Motion. (*See generally* MJOP.). Plaintiff filed its Opposition (Opp'n, Dkt. No. 36), to which Defendant filed her Reply (Reply, Dkt. No. 39). On May 1, 2026, Plaintiff filed its request for judicial notice. (RJN, Dkt. No. 37).

## II. DISCUSSION

### A. <u>Legal Standard</u>

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c) ("Rule 12(c)"). A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a motion to dismiss under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), and the "principal difference … is the time of filing." *Dworkin v. Hustler Magazine, Inc*., 867 F.2d 1188, 1192 (9th Cir. 1989). The same standard applies to motions brought under either rule. *Id.* Thus, the issue presented by a Rule 12(c) motion is the same as that posed in a Rule 12(b)(6) motion: whether the factual allegations of the complaint state a plausible claim for relief. *Cafasso v. Gen. Dynamics C4 Sys*., 637 F.3d 1047, 1054-55 & n.4 (9th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[3] Defendant provides additional timestamps for Defendant's "notable instances of pauses for commentary, reaction and analysis." S*ee, e.g.*, Live Stream Video, Ex. K at 1:48:00 to 1:50:30; 1:52:00 to 1:57:31; 2:23:00 to 2:29:00; 2:49:53 to 2:51:00; 3:13:00 to 3:15:24; 3:29:00 to 3:33:48; 4:29:58 to 4:34:05.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

544, 556 (2007)).

In evaluating a motion for judgment on the pleadings, the court must "accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard,* 581 F.3d 922, 925 (9th Cir. 2009); *see also Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989) ("For purposes of the motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false."). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach*, 896 F.2d at 1550.

### B. <u>Analysis</u>[4]

Defendant moves for judgment on the pleadings as to Plaintiff's first claim for relief for direct copyright infringement as to The Nuke based on the Second Affirmative

---

[4] Plaintiff requests that the Court take judicial notice of specific documents and court records. (Request for Judicial Notice, Dkt. No. 37). First, Plaintiff requests that the Court take judicial notice of a video entitled "The Big, The BOLD, The Beautiful," which was a reaction video to the work Bold Guy vs Parkour Girl in *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34 (S.D.N.Y. 2017) (*Id*. at 1). This video was filed with the District Court for the Southern District of New York in an action entitled *Hosseinzadeh v. Klein et al*. (Case No. 1:16-cv-03081-KBF). (*Id*. at 2). Likewise, Plaintiff request the Court take judicial notice of a video entitled "Bold Guy vs Parkour Girl," which was the plaintiff's work in *Hosseinzadeh*. (*Id*. at 1). This video file was also filed in the *Hosseinzadeh*. (*Id*. at 3). The Court finds it appropriate to take judicial notice of the existence of these two video files, which are of public record. It is axiomatic that courts "may take judicial notice of . . . matters of public record." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 fn. 6 (9th Cir. 2006) (citing *Burbank-Glendale-Pasadena Airport Authority v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998)); *see also* Cal. Evid. Code § 452(d) ("Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States."). Additionally, Plaintiff separately requests judicial notice of the complaint filed in *Ted Entertainment, Inc. v. Majed et al*. (C.D. Cal. Case No. 2:25-cv-05565-JFW-MAA) ("*Majed* Action") and the allegations contained therein, the complaint filed

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Defense of fair use, as pled in Defendant's Answer.  (MJOP at 6).  "[T]he 'fair use' doctrine . . . [is] an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'"  *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  "[T]he fair use of a copyrighted work… for purposes such as criticism, comment, news reporting, teaching…, scholarship, or research, is not an infringement of copyright." 17 U.S.C.A § 107.  The "four non-exclusive factors" courts consider when determining fair use are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

---

in the action entitled *Ted Entertainment, Inc. v. Caviness et al.* (W.D. Mo. Case No. 4:25-cv-00459-BCW) ("*Caviness* Action") and the allegations contained therein, the video of the watch party of The Nuke at issue in the *Majed* Action, which was filed as Exhibit H with this instant action's Complaint and the April 29, 2026 order by Honorable Sallie Kim of the Northern District of California denying the motion to quash of the Doe defendants in the miscellaneous action entitled In re Subpoenas to Reddit, Inc. and Discord, Inc. (Case No. 3:25-mc-80296-SK). The Court finds these filings subject to judicial notice.  *See* Cal. Evid. Code § 452(d) ("Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States.").  Lastly, Plaintiff requests the Court to take judicial notice of the video file, attached as Exhibit H, to the complaint in *Caviness*, which is a video file of the watch party at issue in that case.  Likewise, the Court finds these filings as subject to judicial notice.  *See* Cal. Evid. Code § 452(d) ("Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States.").  Plaintiff has not asked the Court to take judicial notice of the truth of the contents of the videos.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

*Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 451 (9th Cir. 2020) (quoting 17 U.S.C. § 107(1)-(4)); *see Google*, 593 U.S. at 19 (finding that the four factors "set forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances."). Fair use is a "flexible" concept and "its application may well vary depending on context." *Google*, 593 U.S. at 20.

Additionally, "when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion for dismiss.[5]" *Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1064 (C.D. Cal. 2017).

### 1. The Purpose and Character of the Use

#### a. Transformative Nature

Defendant moves for judgment on the pleadings, in part, because of the transformative nature of her use. (MJOP at 7). "The first statutory factor examines 'the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.'" *Dr. Seuss*, 983 F.3d at 451 (quoting 17 U.S.C. § 107(1)). "This factor has taken on a heightened significance because it influences the lens through which we consider two other fair use factors." *Id*.

"The central inquiry under the first factor is whether the new work is 'transformative.'" *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013); *see Dr. Seuss*, 983 F.3d at 452 ("The term 'transformative' does not appear in § 107, yet it permeates copyright analysis."). Transformative works "'add [] something new' to an existing work, endowing the first with 'new expression, meaning, or message,' rather than 'merely supersed[ing] the objects of the original creation.'" *SOFA*,

---

[5] A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a motion to dismiss under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), and the "principal difference … is the time of filing." *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

709 F.3d at 1278 (alterations in original) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).  The Court in *Campbell* held that the "central purpose of this investigation is to see . . . whether the new work merely 'supersede[s] the object' of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'"  *Campbell,* 510 U.S. at 579 (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841)).  In contrast, "commentary [that] has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly."  *Campbell,* 510 U.S. at 580.

The Court deems Defendant's use as transformative.  Throughout the live stream, Defendant provides commentary pertaining to criticism of The Nuke.  Defendant contends that The Nuke resembles a "high school video project" or "middle school project."  (Live Stream Video, Ex. K at 1:21:14-40, 5:04:58-5:05:23).  During the subject live stream, Defendant complains about the documentary's editing (*id.*, Ex. K at 2:41:05-07, 4:43:56-4:54:08) and that the video treats the audience as "morons" and is attempting to "trick" them (*id.*, Ex. K at 3:46:23-37).  The Complaint further states that "she frequently makes comments that are later contradicted by The Nuke itself."  (Compl. ¶ 70.i).  Notably, "the fair use inquiry does not ask whether the criticism or parody of the copyrighted work is just or *accurate*, or mean-spirited . . . but simply whether the use is of the kind that copyright is designed to protect."  *See Weinberg v. Dirty World, LLC*, No. 16-9179, 2017 WL 5665023, at *8 (C.D. Cal. July 27, 2017) (emphasis added) (finding fair use where copyrighted image of a model was posted on a website with comments underneath including "every time I saw her, I thought she is super ugly and awkward

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

looking" and wondering how the model could get "married to that rich guy and [be] a model.").

Defendant offers other criticism of the subject documentary during her live stream. (*See generally* Compl.).  Following one of the documentary creator's criticism of Piker's apologia of China's genocide of the Uyghurs, Defendant comments,  (1) on the treatment of Uyghurs; (2) "so much of American media is focused on pointing out how evil Chine is,"; (3) stating that disabled Americans lose disability benefits when they get married; (4) incarceration levels in the United States. (Live Stream Video, Ex. K at 1:25:43-1:36:05).  Additionally, during the live stream, Defendant (1) challenges Klein's perception of Piker's sentiments regarding the interaction between imports and the fleeing of Jewish people from Israel (Live Stream Video, Ex. K at 2:36:47-2:37:04); (2) disputes Klein's account of the events of the occurrence of sexual violence of hostages (Compl. ¶ 70.i.v; Live Stream Video, Ex. K at 3:33:49-3:35:34, 3:42:49-3:45:33); (3) critiques Klein's discussion of Twitch's enforcement and moderation decisions (Compl. ¶¶ 70.l.xv-xvii, 70.i.vi); and (4) discusses her perspectives on Zionism and Judaism (Live Stream Video, Ex. K at 4:33:48-4:34:02).[6]

The Court finds Defendant's criticism and commentary within the live stream video to demonstrate the following "telltale signs of transformative use": (1) "further purpose or different character" in the defendant's work, i.e., "the creation of new information, new aesthetic, new insights and understanding" and (2) "the use of quoted matter as 'raw material,' instead of repackaging it and 'merely supersed[ing] the objects of the original creation.'"  (*Dr. Seuss*, 983 F.3d at 453) (quoting *Seltzer v. Green Day*,

---

[6] Defendant provides additional timestamps for Defendant's "notable instances of pauses for commentary, reaction and analysis."  S*ee, e.g.*, Live Stream Video, Ex. K at 1:48:00 to 1:50:30; 1:52:00 to 1:57:31; 2:23:00 to 2:29:00; 2:49:53 to 2:51:00; 3:13:00 to 3:15:24; 3:29:00 to 3:33:48; 4:29:58 to 4:34:05.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Inc., 725 F.3d 1170, 1176 (9th Cir. 2013)).  The undisputed purpose of Defendant's
livestream is to contest, criticize and mock Plaintiff's message, which the courts have
found weighs in favor of fair use due to its transformative nature.  *See Hosseinzadeh v.
Klein*, 276 F. Supp. 3d 34, 45 (S.D.N.Y. 2017) (finding that the first factor weighed in
defendant's favor as the defendant's reaction video was "quintessential criticism and
comment."); *Equals Three, LLC v. Jukin Media, Inc*., 139 F. Supp. 3d 1094, 1104 (C.D.
Cal. 2015) (finding transformative use where host reacted to and commented on original
videos).

The facts here closely align with those in *Stebbins v. Alphabet Inc*., No. 22-CV-
00546-JSW, 2025 WL 2233208 (N.D. Cal. July 2, 2025).  *In Stebbins,* the court found the
subject livestreams to be "highly transformative works" because the livestreams involved
the viewing of the subject video "for seconds at a time before pausing to respond and
critique" the subject video.  2025 WL 2233208, at *4.  The subject video, created by the
plaintiff, provided the plaintiff's analysis and opinions regarding a video game.  *Id*.  The
livestreams, however, provided commentary on the subject video as well as several
additional hours regarding other videos produced by the plaintiff and his comments
thereon.  *Id*.  The relevant livestream in *Stebbins* "paus[ed] . . . and comment[ed] on
Plaintiff's Retrospective with the purpose of reviewing or mocking the video."  *Id*. at 5.
"This criticism is at the heart of the fair use doctrine, and it would lose meaning without
reproduction of Plaintiff's video."  *Id*.; *see Andy Warhol Found. for the Visual Arts, Inc.
v. Goldsmith*, 598 U.S. 508, 532 (2023) (noting "commentary or criticism that targets an
original work may have compelling reason to 'conjure up' the original by borrowing
from it.").  As in *Stebbins*, Defendant's livestream provided commentary on The Nuke
and sharp criticism of the claims made within the documentary.  Throughout the
livestream, Defendant often paused The Nuke to offer spontaneous reactions, engaged

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

with her audience through a live chat and provided real-time commentary interspersed with tangential discussions. (*See, e.g.*, Live Stream Video, Ex. K at 1:48:00 to 1:50:30; 1:52:00 to 1:57:31; 2:23:00 to 2:29:00; 2:49:53 to 2:51:00; 3:13:00 to 3:15:24; 3:29:00 to 3:33:48; 4:29:58 to 4:34:05).

Further, the courts have recognized that the differences in viewing experiences and uses weigh in favor of a finding of fair use. *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, Inc., 907 F. Supp. 1361, 1379 (N.D. Cal. 1995) ("Because [defendant's] use of copyrighted materials served a completely different function than that of the plaintiffs, this [first] factor weighs in [defendant's] favor."). The difference in viewing experiences here is undisputed. Indeed, Plaintiff states, "[w]here The Nuke seeks to expose how Piker radicalizes people online to be antisemitic and anti-Israeli, Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan." (Compl. ¶ 70.o).

In opposition, Plaintiff presents unsuccessful arguments. (*See generally* Opp'n). First, Plaintiff cites *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1225 (9th Cir. 2022), for the proposition that the purposes of Plaintiff's video and Defendant's livestream "overlap" to undermine Defendant's transformative argument. (*Id*. at 8). Here, Plaintiff has conceded that the purposes of both videos do *not* overlap by stating, "[w]here The Nuke seeks to expose how Hasan radicalizes people online to be antisemitic and anti-Israeli, Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan." (Compl. ¶ 70.o). Additionally, the two subject videos are disparate from the subject works in *De Fontbrune,* which did overlap in nature. In *De Fontbrune,* "The Picasso Project" and the subject photographs both presented the works of Picasso with the shared purpose of documenting Picasso's works. 39 F.4th at 1225. As

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

previously established, the subject videos in this matter do not share such an overlapping purpose.

Second, Plaintiff cites to *Monge v. Maya Mag.*, Inc., 688 F.3d 1164, 1174 (9th Cir. 2012), for the proposition that Defendant engaged in "wholesale copying sprinkled with [spoken] commentary," which the court in *Monge* found "at best minimally transformative." *Id*. at 1176. Defendant's livestream went beyond merely reproducing or supplanting The Nuke, however. Rather, as set forth above, the livestream incorporated real-time commentary, criticism and analysis that altered the purpose and character of the original work. Accordingly, unlike the defendant in *Monge*, Defendant did not simply repackage or republish the underlying work with incidental commentary but instead used the work in furtherance of a distinct expressive purpose.

During oral argument, Plaintiff argues that due to Defendant's "hate-watching"[7] of The Nuke, "the entire purpose of Denim's watch party was to hate-watch TEI's work without giving any benefit to TEI." Plaintiff provided this argument to diminish Defendant's claim of transformative use. As in *Stebbins*, Defendant's livestream provided commentary on The Nuke and sharp criticism of the claims made within the documentary. Although the Court finds some merit in Plaintiff's position regarding hate-watching, it is insufficient to negate the transformative nature of Defendant's work. Defendant often paused The Nuke to offer spontaneous reactions, engaged with her audience through a live chat and provided real-time commentary interspersed with tangential discussions. Defendant did not simply repackage or republish the underlying work with incidental commentary but instead used the work in furtherance of a distinct expressive purpose.

---

[7] "Hate-watching" can be understood as the intentional consumption of expressive media, not for enjoyment, but for the purpose of criticism as the viewer remains engaged despite finding the content objectionable.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

Further, Plaintiff presented a "piecemeal" argument during oral argument and asserted that Defendant, through her reaction video, could potentially demonstrate fair use as to pieces of her video but "not as to other pieces."  Plaintiff does not present authority to support this argument.  The Court also does not find authority or a bright-line rule to endorse Plaintiff's argument.  Indeed, in *Stebbins*, with respect to the subject livestreams, the defendants viewed the subject video "for seconds at a time before pausing to respond and critique" the subject video.  2025 WL 2233208, at *4.  The court in *Stebbins* did not hold that certain pauses or portions of the video, accompanied by Defendants' criticism, constituted fair use while others did not.  *Id*.  Instead, the court found the subject livestreams to be "highly transformative works."

For the foregoing reasons, the Court finds Defendant's use to be transformative.

### b.  Commercial Use

"The second part of the first fair use factor involves whether the new use is commercial—*i.e.*, 'whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.'"  *DraftExpress, Inc. v. Whistle Sports, Inc.*, 2022 WL 16962285, at *3 (C.D. Cal. Aug. 2, 2022) (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985).  Critically, "the more transformative the new work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use."  *Campbell*, 510 U.S. at 579.  The commercial use factor concerns "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise."  *Seltzer,* 725 F.3d at 1178.  The court in *DraftExpress* found that even if the relevant video "were considered at least partially commercial, its transformative nature offsets the significance of any commercialism."  2022 WL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

16962285, at \*3; *see Google*, 593 U.S. at 32 ("many common fair uses are indisputably commercial.").

Here, Defendant contends that her use was not sufficiently commercial to outweigh the transformative.  (MJOP at 12).  As Defendant is a livestreamer, she is eligible to receive subscriptions, donations and advertising revenue during her Twitch broadcasts, regardless of the content nature of her use, so there is no doubt that there was a commercial use of the subject work.  But the Court finds distinguishable Defendant's use from the intentional exploitation of copyrighted works for monetary gain that preclude a finding of fair use.  *See generally Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 779 (9th Cir. 2006) (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001)) ("A commercial use 'is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies.'"); *DraftExpress*, 2022 WL 16962285, at \*3 (quoting *Seltzer*, 725 F.3d at 1178) ("Although Whistle's social media presence may serve to promote its business and indirectly boost revenue, the commercial use factor concerns 'the degree to which the new user exploits the copyright for commercial gain— as opposed to incidental use as part of a commercial enterprise.'").  Defendant's transformation of the original work heavily outweighs the commercial nature of its use.  S*ee SOFA*, 709 F.3d at 1278-79 ("[B]ecause [defendant]'s use of the clip is transformative, the fact that *Jersey Boys* is a commercial production is of little significance."); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (finding that a work's "commercial qualities become less important" where use is highly transformative).

Accordingly, under the analysis of the first factor, the Court finds that Defendant's use weighs in favor of fair use.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

*2. Nature of the Copyrighted Work*

Defendant avers that the documentary and informational nature of The Nuke favors fair use.  (MJOP at 14).  The second statutory factor considers the "the nature of the copyrighted work." 17 U.S.C. § 107(2).  This factor "recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works, 'with the consequence that fair use is more difficult to establish when the former works are copied.'" *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc*., 109 F.3d 1394, 1402 (9th Cir. 1997) (quoting *Campbell*, 510 U.S. at 586).  The Ninth Circuit held that this factor addresses "two aspects of the work: the extent to which it is creative and whether it is unpublished." *Monge*, 688 F.3d at 1177.  The Ninth Circuit has held that a product is creative where it is "the product of many technical and artistic decisions." *McGucken v. Pub Ocean Ltd*., 42 F.4th 1149, 1161 (9th Cir. 2022).  With respect to publication, while a work's unpublished state would weigh against fair use, "the converse is not necessarily true." *Dr. Seuss*, 983 F.3d at 456.  The Ninth Circuit recognized, however, that this second factor "has not been terribly significant in the overall fair use balancing." *Penguin Books,* 109 F.3d at 1402.

Here, The Nuke is a creative work with significant informational contents.  As explained by Plaintiff, The Nuke is a "tragi-comic documentary critiquing Hasan and Twitch."  (Compl. ¶ 40).  It contains original footage, highly edited montages, parodic skits and archival materials.  (*Id*.).  The Nuke is divided into seven sections.  (*Id*.).  The first section "walks the audience through Ethan's thesis of The Nuke: that Hasan radicalizes his audience with genocidal and antisemitic terrorist propaganda," the second section involves a parody mocking how Twitch "has embraced Hasan's extremist rhetoric" and the third section focuses on how Piker allegedly radicalizes his audience by glorifying and disseminating Houthi propaganda.  (*Id*.).  Additionally, the fourth section

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

focuses on Piker's interactions with Hezbollah propaganda, the fifth section focuses on Piker's interactions with Hamas propaganda and the sixth section explores Twitch's alleged role in enabling Piker to violate Twitch's Community Guidelines. (*Id.*). In the final section, Klein summarizes the two motivations for making The Nuke, which are to "stop Hasan's infiltration of mainstream media" and "to hold Twitch accountable for enabling antisemitic and anti-Israel animus on its platform." (*Id.*).

Accordingly, the Court finds that the nature of the subject work weighs against a finding of fair use. As set forth above, however, this factor alone is not "terribly significant in the overall fair use balancing." *Penguin Books,* 109 F.3d at 1402.

3. *The Amount and Substantiality of The Portion in Relation to the Copyrighted Work as a Whole*

The third statutory factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" favors fair use. 17 U.S.C. § 107(3). The third factor looks to the "quantitative amount and qualitative value of the original work used in relation to the justification for that use." *Seltzer*, 725 F.3d at 1178; *see Hosseinzadeh*, 276 F. Supp. 3d at 46 (noting the third factor considers the proportion of the copyrighted work used "and then how well tailored that use was to the allegedly infringing work's proper purpose—no matter how large or long the allegedly infringing work is."). "The law is clear, however, that quantity alone is not determinative." *Hosseinzadeh*, 276 F. Supp. 3d at 46. This factor "circles back to the first factor because 'the extent of permissible copying varies with the purpose and character of the use.'" *Dr. Seuss Enters*, 983 F.3d at 456 (*Campbell*, 510 U.S. at 586-87).

The courts have found that copying another work in its entirety is not dispositive as to infringement if necessary for the intended transformative use. *See Hosseinzadeh*, 276 F. Supp. at 46 ("[A] great deal of Plaintiff's work was copied, but such copying was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

plainly necessary to the commentary and critique."); *Stebbins*, 2025 WL 2233208, at *6 ("Even if the Court were to credit Plaintiff's claim that Creetosis copied the entirety of the Retrospective, that would not be dispositive. Creetosis used the Retrospective clips in order to further the Livestream's "transformative purpose of critical commentary."); *Seltzer*, 725 F.3d at 1178-79 (finding the entire work necessary for the alleged infringer's intended use and "[g]iven that fact, this court has acknowledged that this factor will not weigh against an alleged infringer, even when he copies the whole work, if he takes no more than is necessary for his intended use."). In *Seltzer*, the Ninth Circuit found the copying of the entirety of the original work "d[id] not weigh against Green Day." *Seltzer*, 725 F.3d at 1179.

Here, Defendant showed the "entirety (or nearly the[] entirety)" of The Nuke. (Compl. ¶ 2). "It is evident that to comment on and critique a work, clips of the original may be used." *Hosseinzadeh*, 276 F. Supp. at 46; *see Campbell*, 510 U.S. at 588, 114 S.Ct. 1164 ("[P]arody must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable . . . [c]opying does not become excessive in relation to parodic purpose merely because the portion taken was the original's heart."). The court in *Hosseinzadeh* recognized that "[w]ithout using actual clips, the commentary and critique here would lose context and utility." 276 F. Supp. at 46. Here, the "extent" and "quality and importance" of the video clips used by Defendant was reasonable to accomplish the transformative purpose of critical commentary. *Id*.

Accordingly, the Court finds this factor does not weigh against Defendant.

### 4. *Effect of the Use on the Potential Market*

The fourth factor asks what effect the allegedly infringing use has on the "potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor considers "the extent of market harm caused by the particular actions of the alleged infringer but

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. Where the allegedly infringing use does not substitute for the original and serves a "different market function[]," such factor weighs in favor of fair use. *Id*. at 591. In *Campbell*, the Court found that when a use is transformative, market substitution "is at least less certain, and market harm may not be so readily inferred." *Id*. "Indeed, as to parody pure and simple, it is more likely that the new work will not affect the market for the original in a way cognizable under this factor, that is, by acting as a substitute for it." *Id*. Thus, where the original work and the new work serve "different market functions," such that there is no market substitution, the new work is more likely to be fair use. *Id*.

Defendant's livestream is not a market substitute for The Nuke because someone watching the former will have a "very different experience" from watching the latter. *Hosseinzadeh* v. Klein, 276 F. Supp. at 47. Anyone seeking to watch The Nuke, a scripted and edited documentary, would have a distinctly different experience watching Defendant's fragmented start-and-stop livestream, which featured spontaneous reaction, live chat interaction, sharp criticism throughout and extrinsic source material. *See, e.g., Stebbins*, 2025 WL 2233208, at *7 (finding a lack of a market substitution because "[a]nyone seeking to watch the Livestreams would have a fundamentally different viewing experience than a person seeking to watch the Retrospective."); *Hosseinzadeh*, 276 F. Supp. 3d at 47 ("[A]nyone seeking to enjoy [the original] on its own will have a very different experience watching the [reaction] video . . ."); *Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 651-52 (9th Cir. 2020) ("[A] person wishing to purchase the sheet music for 'Magic' in order to play or perform that song would necessarily purchase the sheet music for the song itself from

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

the owner of the performance rights—not the sheet music for 'Rainmaker.'"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821-22 (9th Cir. 2003) (finding no market harm where a person could not use the allegedly infringing work, a thumbnail photograph, as a substitute for the copyrighted high-resolution photograph). Indeed, Plaintiff's own allegations suggest as much: "Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan." (Compl. ¶ 70.o).

The decision in *Hughes v. Benjamin*, 437 F. Supp. 3d 382, 394 (S.D.N.Y. 2020) is highly instructive. There, the court held,

> Here, there is no danger that *SJW Levels of Awareness* will usurp the market of progressive commentaries such as *We Thought She Would Win*. Benjamin's target audience (generally political conservatives and libertarians) is obviously not the same as Hughes's target audience (generally political liberals). Moreover, although *SJW Levels of Awareness* is comprised entirely of portions of *We Thought She Would Win*, there is no reason to think that Hughes's audience will abandon her progressive YouTube channel to watch the derisively-titled *SJW Levels of Awareness* on a conservative YouTube channel simply because it contains parts of her work.

*Hughes,* 437 F. Supp. at 394. Accordingly, the Court finds that Defendant's livestream is not a market substitute for The Nuke.

Because three of the four fair use factors strongly favor Defendant, including the most important factor (purpose and character of use), the Court concludes that the fair use defense applies as a matter of law. Thus, Defendant's Motion for Judgment on the Pleadings is **GRANTED**.

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

**III.   CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Judgment on the Pleadings.  The Court **ORDERS** Defendant to prepare and submit a proposed Judgment in this matter within seven (7) days of this Order.

**IT IS SO ORDERED.**

Exhibit 18



July 1, 2026

Molly C. Dwyer
Clerk of Court
United States Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

**VIA ECF**

**RE:** ***Doe Defendants v. United States District Court for the Northern District of California, San Francisco***; **Case No. 26-3513**
**Notice of Supplemental Authority under FRAP 28(j) and Ninth Cir. R. 28-6**

Dear Ms. Dwyer:

Pursuant to Federal Rule of Appellate Procedure 28(j) and Ninth Cir. R. 28-6, Petitioners Doe Defendants provide notice of the Central District of California's recent decision in the underlying action, ***Ted Entertainment, Inc. v. Saber***, **No. 2:25-cv-05564-WLH-PD (C.D. Cal.)**, in which TEI alleges that streamer Alexandra "Denims" Saber directly infringed TEI's works *Content Nuke: Hasan Piker* ("*Nuke*") and *Countdown*. On June 29, 2026, the Central District court issued an order granting Denims' motion for partial judgment on the pleadings as to ***Nuke***, holding that Denims' use of Nuke is fair use as a matter of law under 17 U.S.C. §107. A copy of the Central District's order is attached hereto as **Exhibit A**.

Molly C. Dwyer
July 1, 2026
Page **2** of **3**

TEI issued subpoenas seeking identifying information for Reddit moderators who allegedly posted links to Denims' content. The Northern District Court denied the motion to quash, finding that TEI had sufficiently alleged contributory copyright infringement grounded in Denims' alleged direct infringement, without making a fair use determination. The Central District's fair-use ruling eliminates direct infringement as to *Nuke* and confirms that Denims' stream was "wholly authorized by the law," not infringement, as to that work. *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153–54 (9th Cir. 2016).

This development bears directly on Petitioners' arguments that (1) the subpoena lacks a viable direct infringement predicate; (2) the omission of any fair-use analysis in the Rule 45 order was outcome-determinative; and (3) the First Amendment balance under *Highfields Cap. Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969, 974-76 (N.D. Cal. 2005) and *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) weighs strongly against unmasking anonymous political speakers where the primary use at issue has now been adjudicated fair use.

The Central District's Order shows the clear error of the NDCA court: if fair use is not considered on an unmasking subpoena, anonymous speakers will be harmed by the disclosure of their identities when there is no legal claim sufficient to justify stripping their anonymity. Respectfully, Does ask the Court to consider the Central District's Order in its consideration of their mandamus petition.

Molly C. Dwyer
July 1, 2026
Page **3** of **3**

Respectfully submitted,

KRONENBERGER ROSENFELD, LLP

s/ Leah Rosa Vulić

Leah Rosa Vulić

## CERTIFICATE OF COMPLIANCE

I hereby certify that this letter complies with the word limit of Federal Rule

of Appellate Procedure 28(j) because the body of the letter contains 349 words.

s/ Leah Rosa Vulić
Leah Rosa Vulić

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing Notice

of Supplemental Authority under Federal Rule of Appellate Procedure 28(j) and

Ninth Cir. R. 28-6 with the Clerk of the Court for the United States Court of

Appeals for the Ninth Circuit by using the appellate ACMS system.

DATED: July 1, 2026                    s/ Leah Rosa Vulić
                                        Leah Rosa Vulić

Exhibit A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:25-cv-05564-WLH-PD | Date | June 29, 2026 |
|---|---|---|---|
| Title | *Ted Entertainment, Inc. v. Alexandra Marwa Saber et al.* | | |

Present: The Honorable    WESLEY L. HSU, United States District Judge

| Claudia Garcia-Marquez | None |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None | None |

**Proceedings:**    **(IN CHAMBERS) ORDER RE DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS [35]**

The Court is in receipt of Defendant's Motion for Judgment on the Pleadings. (MJOP, Dkt. No. 35). The matter is fully briefed, and the Court heard oral argument on June 5, 2026. For the reasons explained herein, the Court **GRANTS** the Motion.

## I.    BACKGROUND

Plaintiff Ted Entertainment, Inc. ("Plaintiff") sued Defendant Alexandra Marwa Saber ("Defendant" or "Denims").[1] (Compl., Dkt. No. 1). Plaintiff brings the following claims for relief: (i) Direct Copyright Infringement against Denims and (ii) Contributory Copyright Infringement against The H3Snark Mods[2]. (*Id.*). Plaintiff is "production company that produces content for social media, namely YouTube." (*Id.* ¶ 9). Defendant is an online streamer who releases content on social media platforms, namely Twitch. (*Id.* ¶ 10). Plaintiff, through its owner YouTuber Ethan Klein ("Klein"), filed this action seeking statutory damages against Defendant for her alleged livestreamed "reaction" to

---

[1] Plaintiff also sued Does 1-10.
[2] The H3Snark Mods are comprised of Does Nos. 1-10. The true names and exact location of Does Nos. 1-10 are presently unknown to Plaintiff.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

Plaintiff's "tragi-comic documentary" entitled Content Nuke: Hasan Piker ("The Nuke") posted on Plaintiff's YouTube channel on January 31, 2025. The Nuke centered on the allegedly controversial political ideologies of the "alt-left" Twitch streamer Hasan Piker ("Piker") regarding the Israel-Palestine conflict. (*Id*. ¶ 40).

The Nuke contains "original footage, highly edited montages, parodic skits and archival materials." (*Id*.). The Nuke can be divided into seven sections: (1) The Prologue; (2) the Twitch Parody Sketch; (3) the Houthi Section; (4) the Hezbollah Section; (5) the Hamas Section; (6) the Twitch Section; and (7) the Conclusion. (*Id*.). It contains original footage, highly edited montages, parodic skits and archival materials. (*Id*.). The first section "walks the audience through Ethan's thesis of The Nuke: that Hasan radicalizes his audience with genocidal and antisemitic terrorist propaganda," the second section involves a parody mocking how Twitch "has embraced Hasan's extremist rhetoric" and the third section focuses on how Piker allegedly radicalizes his audience by glorifying and disseminating Houthi propaganda. (*Id*.). The fourth section focuses on Piker's interactions with Hezbollah propaganda, the fifth section focuses on Piker's interactions with Hamas propaganda and the sixth section explores Twitch's alleged role in enabling Piker to violate Twitch's Community Guidelines. (*Id*.). In the final section, Klein presents the two motivations behind The Nuke, which are to "stop Hasan's infiltration of mainstream media" and "to hold Twitch accountable for enabling antisemitic and anti-Israel animus on its platform." (*Id*.). The film aims to "expose how Piker radicalizes people online to be antisemitic and anti-Israeli" and criticizes Twitch as a platform. (*Id*. ¶ 70.o).

On January 27, 2024, Plaintiff submitted its application to register The Nuke with the United States Copyright Office (the "USCO"). (*Id*. ¶ 38). On January 28, 2025, the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

USCO received the deposit copy of The Nuke.  (*Id.*).  The registration number for The Nuke is PAu 4-256-429.

Throughout Defendant's live stream, Defendant provides commentary pertaining to criticism of The Nuke.  Indeed, Plaintiff states, "[w]here The Nuke seeks to expose how Piker radicalizes people online to be antisemitic and anti-Israeli, Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan."  (Compl. ¶ 70.o).  During the live stream, Defendant contends that The Nuke resembles a "high school video project" or "middle school project."  (Live Stream Video, Dkt. No. 34, Ex. K at 1:21:14-40, 5:04:58-5:05:23).  Defendant also complains about the documentary's editing, the sources the documentary relies upon and supposed inconsistencies of Klein's statements (*id.*, Ex. K at 2:41:05-07, 4:43:56-4:54:18) and that the video treats the audience as "morons" as it allegedly attempts to "trick" them (*id.*, Ex. K at 3:46:23-37).  As further support of Defendant's commentary throughout the live stream, the Complaint states that Defendant "frequently makes comments that are later contradicted by The Nuke itself."  (Compl. ¶ 70.i).

Defendant offers further criticism of the subject documentary during her live stream.  (*See generally* Compl.).  Following one of the documentary creator's criticism of Piker's apologia of China's genocide of the Uyghurs, Defendant comments,  (1) on the treatment of Uyghurs; (2) "so much of American media is focused on pointing out how evil Chine is,"; (3) stating that disabled Americans lose disability benefits when they get married; (4) incarceration levels in the United States. (Live Stream Video, Ex. K at 1:25:43-1:36:05).  Additionally, during the live stream, Defendant (1) challenges Klein's perception of Piker's sentiments regarding the interaction between imports and the fleeing of Jewish people from Israel (Live Stream Video, Ex. K at 2:36:47-2:37:04); (2) disputes Klein's account of the events of the occurrence of sexual violence of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

hostages (Compl. ¶ 70.i.v; Live Stream Video, Ex. K at 3:33:49-3:35:34, 3:42:49-3:45:33); (3) critiques Klein's discussion of Twitch's enforcement and moderation decisions (Compl. ¶¶ 70.l.xv-xvii, 70.i.vi); and (4) discusses her perspectives on Zionism and Judaism (Live Stream Video, Ex. K at 4:33:48-4:34:02).[3]

On June 19, 2025, Plaintiff filed the Complaint.  (*See generally* Compl.).  On April 17, 2026, Defendant filed the instant Motion.  (*See generally* MJOP.).  Plaintiff filed its Opposition (Opp'n, Dkt. No. 36), to which Defendant filed her Reply (Reply, Dkt. No. 39).  On May 1, 2026, Plaintiff filed its request for judicial notice.  (RJN, Dkt. No. 37).

## II.    DISCUSSION

### A. <u>Legal Standard</u>

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c) ("Rule 12(c)").  A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a motion to dismiss under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), and the "principal difference … is the time of filing."  *Dworkin v. Hustler Magazine, Inc*., 867 F.2d 1188, 1192 (9th Cir. 1989).  The same standard applies to motions brought under either rule.  *Id.*  Thus, the issue presented by a Rule 12(c) motion is the same as that posed in a Rule 12(b)(6) motion: whether the factual allegations of the complaint state a plausible claim for relief.  *Cafasso v. Gen. Dynamics C4 Sys*., 637 F.3d 1047, 1054-55 & n.4 (9th Cir. 2011).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[3] Defendant provides additional timestamps for Defendant's "notable instances of pauses for commentary, reaction and analysis."  S*ee, e.g.*, Live Stream Video, Ex. K at 1:48:00 to 1:50:30; 1:52:00 to 1:57:31; 2:23:00 to 2:29:00; 2:49:53 to 2:51:00; 3:13:00 to 3:15:24; 3:29:00 to 3:33:48; 4:29:58 to 4:34:05.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

544, 556 (2007)).

In evaluating a motion for judgment on the pleadings, the court must "accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard,* 581 F.3d 922, 925 (9th Cir. 2009); *see also Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989) ("For purposes of the motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false."). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach*, 896 F.2d at 1550.

### B. Analysis[4]

Defendant moves for judgment on the pleadings as to Plaintiff's first claim for relief for direct copyright infringement as to The Nuke based on the Second Affirmative

---

[4] Plaintiff requests that the Court take judicial notice of specific documents and court records. (Request for Judicial Notice, Dkt. No. 37). First, Plaintiff requests that the Court take judicial notice of a video entitled "The Big, The BOLD, The Beautiful," which was a reaction video to the work Bold Guy vs Parkour Girl in *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34 (S.D.N.Y. 2017) (*Id*. at 1). This video was filed with the District Court for the Southern District of New York in an action entitled *Hosseinzadeh v. Klein et al*. (Case No. 1:16-cv-03081-KBF). (*Id*. at 2). Likewise, Plaintiff request the Court take judicial notice of a video entitled "Bold Guy vs Parkour Girl," which was the plaintiff's work in *Hosseinzadeh*. (*Id*. at 1). This video file was also filed in the *Hosseinzadeh*. (*Id*. at 3). The Court finds it appropriate to take judicial notice of the existence of these two video files, which are of public record. It is axiomatic that courts "may take judicial notice of . . . matters of public record." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 fn. 6 (9th Cir. 2006) (citing *Burbank-Glendale-Pasadena Airport Authority v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998)); *see also* Cal. Evid. Code § 452(d) ("Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States."). Additionally, Plaintiff separately requests judicial notice of the complaint filed in *Ted Entertainment, Inc. v. Majed et al*. (C.D. Cal. Case No. 2:25-cv-05565-JFW-MAA) ("*Majed* Action") and the allegations contained therein, the complaint filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Defense of fair use, as pled in Defendant's Answer.  (MJOP at 6).  "[T]he 'fair use' doctrine . . . [is] an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'"  *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  "[T]he fair use of a copyrighted work… for purposes such as criticism, comment, news reporting, teaching…, scholarship, or research, is not an infringement of copyright." 17 U.S.C.A § 107.  The "four non-exclusive factors" courts consider when determining fair use are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

---

in the action entitled *Ted Entertainment, Inc. v. Caviness et al.* (W.D. Mo. Case No. 4:25-cv-00459-BCW) ("*Caviness* Action") and the allegations contained therein, the video of the watch party of The Nuke at issue in the *Majed* Action, which was filed as Exhibit H with this instant action's Complaint and the April 29, 2026 order by Honorable Sallie Kim of the Northern District of California denying the motion to quash of the Doe defendants in the miscellaneous action entitled In re Subpoenas to Reddit, Inc. and Discord, Inc. (Case No. 3:25-mc-80296-SK). The Court finds these filings subject to judicial notice.  *See* Cal. Evid. Code § 452(d) ("Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States.").  Lastly, Plaintiff requests the Court to take judicial notice of the video file, attached as Exhibit H, to the complaint in *Caviness*, which is a video file of the watch party at issue in that case.  Likewise, the Court finds these filings as subject to judicial notice.  *See* Cal. Evid. Code § 452(d) ("Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States.").  Plaintiff has not asked the Court to take judicial notice of the truth of the contents of the videos.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

*Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 451 (9th Cir. 2020) (quoting 17 U.S.C. § 107(1)-(4)); *see Google*, 593 U.S. at 19 (finding that the four factors "set forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances."). Fair use is a "flexible" concept and "its application may well vary depending on context." *Google*, 593 U.S. at 20.

Additionally, "when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion for dismiss.[5]" *Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1064 (C.D. Cal. 2017).

> 1. *The Purpose and Character of the Use*
>
> a. Transformative Nature

Defendant moves for judgment on the pleadings, in part, because of the transformative nature of her use. (MJOP at 7). "The first statutory factor examines 'the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.'" *Dr. Seuss*, 983 F.3d at 451 (quoting 17 U.S.C. § 107(1)). "This factor has taken on a heightened significance because it influences the lens through which we consider two other fair use factors." *Id.*

 "The central inquiry under the first factor is whether the new work is 'transformative.'" *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013); *see Dr. Seuss*, 983 F.3d at 452 ("The term 'transformative' does not appear in § 107, yet it permeates copyright analysis."). Transformative works "'add [] something new' to an existing work, endowing the first with 'new expression, meaning, or message,' rather than 'merely supersed[ing] the objects of the original creation.'" *SOFA*,

---

[5] A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a motion to dismiss under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), and the "principal difference … is the time of filing." *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

709 F.3d at 1278 (alterations in original) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).  The Court in *Campbell* held that the "central purpose of this investigation is to see . . . whether the new work merely 'supersede[s] the object' of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'"  *Campbell,* 510 U.S. at 579 (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841)).  In contrast, "commentary [that] has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly."  *Campbell,* 510 U.S. at 580.

The Court deems Defendant's use as transformative.  Throughout the live stream, Defendant provides commentary pertaining to criticism of The Nuke.  Defendant contends that The Nuke resembles a "high school video project" or "middle school project."  (Live Stream Video, Ex. K at 1:21:14-40, 5:04:58-5:05:23).  During the subject live stream, Defendant complains about the documentary's editing (*id*., Ex. K at 2:41:05-07, 4:43:56-4:54:08) and that the video treats the audience as "morons" and is attempting to "trick" them (*id*., Ex. K at 3:46:23-37).  The Complaint further states that "she frequently makes comments that are later contradicted by The Nuke itself."  (Compl. ¶ 70.i).  Notably, "the fair use inquiry does not ask whether the criticism or parody of the copyrighted work is just or *accurate*, or mean-spirited . . . but simply whether the use is of the kind that copyright is designed to protect."  *See Weinberg v. Dirty World, LLC*, No. 16-9179, 2017 WL 5665023, at *8 (C.D. Cal. July 27, 2017) (emphasis added) (finding fair use where copyrighted image of a model was posted on a website with comments underneath including "every time I saw her, I thought she is super ugly and awkward

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

looking" and wondering how the model could get "married to that rich guy and [be] a model.").

Defendant offers other criticism of the subject documentary during her live stream. (*See generally* Compl.).  Following one of the documentary creator's criticism of Piker's apologia of China's genocide of the Uyghurs, Defendant comments, (1) on the treatment of Uyghurs; (2) "so much of American media is focused on pointing out how evil Chine is,"; (3) stating that disabled Americans lose disability benefits when they get married; (4) incarceration levels in the United States. (Live Stream Video, Ex. K at 1:25:43-1:36:05).  Additionally, during the live stream, Defendant (1) challenges Klein's perception of Piker's sentiments regarding the interaction between imports and the fleeing of Jewish people from Israel (Live Stream Video, Ex. K at 2:36:47-2:37:04); (2) disputes Klein's account of the events of the occurrence of sexual violence of hostages (Compl. ¶ 70.i.v; Live Stream Video, Ex. K at 3:33:49-3:35:34, 3:42:49-3:45:33); (3) critiques Klein's discussion of Twitch's enforcement and moderation decisions (Compl. ¶¶ 70.l.xv-xvii, 70.i.vi); and (4) discusses her perspectives on Zionism and Judaism (Live Stream Video, Ex. K at 4:33:48-4:34:02).[6]

The Court finds Defendant's criticism and commentary within the live stream video to demonstrate the following "telltale signs of transformative use": (1) "further purpose or different character" in the defendant's work, i.e., "the creation of new information, new aesthetic, new insights and understanding" and (2) "the use of quoted matter as 'raw material,' instead of repackaging it and 'merely supersed[ing] the objects of the original creation.'"  (*Dr. Seuss*, 983 F.3d at 453) (quoting *Seltzer v. Green Day*,

---

[6] Defendant provides additional timestamps for Defendant's "notable instances of pauses for commentary, reaction and analysis."  S*ee, e.g.*, Live Stream Video, Ex. K at 1:48:00 to 1:50:30; 1:52:00 to 1:57:31; 2:23:00 to 2:29:00; 2:49:53 to 2:51:00; 3:13:00 to 3:15:24; 3:29:00 to 3:33:48; 4:29:58 to 4:34:05.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Inc., 725 F.3d 1170, 1176 (9th Cir. 2013)).  The undisputed purpose of Defendant's livestream is to contest, criticize and mock Plaintiff's message, which the courts have found weighs in favor of fair use due to its transformative nature.  *See Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 45 (S.D.N.Y. 2017) (finding that the first factor weighed in defendant's favor as the defendant's reaction video was "quintessential criticism and comment."); *Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1104 (C.D. Cal. 2015) (finding transformative use where host reacted to and commented on original videos).

The facts here closely align with those in *Stebbins v. Alphabet Inc.*, No. 22-CV-00546-JSW, 2025 WL 2233208 (N.D. Cal. July 2, 2025).  *In Stebbins,* the court found the subject livestreams to be "highly transformative works" because the livestreams involved the viewing of the subject video "for seconds at a time before pausing to respond and critique" the subject video.  2025 WL 2233208, at *4.  The subject video, created by the plaintiff, provided the plaintiff's analysis and opinions regarding a video game.  *Id*.  The livestreams, however, provided commentary on the subject video as well as several additional hours regarding other videos produced by the plaintiff and his comments thereon.  *Id*.  The relevant livestream in *Stebbins* "paus[ed] . . . and comment[ed] on Plaintiff's Retrospective with the purpose of reviewing or mocking the video."  *Id*. at 5.  "This criticism is at the heart of the fair use doctrine, and it would lose meaning without reproduction of Plaintiff's video."  *Id*.; *see Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 532 (2023) (noting "commentary or criticism that targets an original work may have compelling reason to 'conjure up' the original by borrowing from it.").  As in *Stebbins*, Defendant's livestream provided commentary on The Nuke and sharp criticism of the claims made within the documentary.  Throughout the livestream, Defendant often paused The Nuke to offer spontaneous reactions, engaged

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

with her audience through a live chat and provided real-time commentary interspersed with tangential discussions.  (*See, e.g.*, Live Stream Video, Ex. K at 1:48:00 to 1:50:30; 1:52:00 to 1:57:31; 2:23:00 to 2:29:00; 2:49:53 to 2:51:00; 3:13:00 to 3:15:24; 3:29:00 to 3:33:48; 4:29:58 to 4:34:05).

Further, the courts have recognized that the differences in viewing experiences and uses weigh in favor of a finding of fair use.  *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, Inc., 907 F. Supp. 1361, 1379 (N.D. Cal. 1995) ("Because [defendant's] use of copyrighted materials served a completely different function than that of the plaintiffs, this [first] factor weighs in [defendant's] favor.").  The difference in viewing experiences here is undisputed.  Indeed, Plaintiff states, "[w]here The Nuke seeks to expose how Piker radicalizes people online to be antisemitic and anti-Israeli, Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan."  (Compl. ¶ 70.o).

In opposition, Plaintiff presents unsuccessful arguments.  (*See generally* Opp'n). First, Plaintiff cites *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1225 (9th Cir. 2022), for the proposition that the purposes of Plaintiff's video and Defendant's livestream "overlap" to undermine Defendant's transformative argument.  (*Id*. at 8). Here, Plaintiff has conceded that the purposes of both videos do *not* overlap by stating, "[w]here The Nuke seeks to expose how Hasan radicalizes people online to be antisemitic and anti-Israeli, Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan." (Compl. ¶ 70.o).  Additionally, the two subject videos are disparate from the subject works in *De Fontbrune,* which did overlap in nature.  In *De Fontbrune,* "The Picasso Project" and the subject photographs both presented the works of Picasso with the shared purpose of documenting Picasso's works.  39 F.4th at 1225.  As

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

previously established, the subject videos in this matter do not share such an overlapping purpose.

Second, Plaintiff cites to *Monge v. Maya Mag*., Inc., 688 F.3d 1164, 1174 (9th Cir. 2012), for the proposition that Defendant engaged in "wholesale copying sprinkled with [spoken] commentary," which the court in *Monge* found "at best minimally transformative." *Id*. at 1176. Defendant's livestream went beyond merely reproducing or supplanting The Nuke, however. Rather, as set forth above, the livestream incorporated real-time commentary, criticism and analysis that altered the purpose and character of the original work. Accordingly, unlike the defendant in *Monge*, Defendant did not simply repackage or republish the underlying work with incidental commentary but instead used the work in furtherance of a distinct expressive purpose.

During oral argument, Plaintiff argues that due to Defendant's "hate-watching"[7] of The Nuke, "the entire purpose of Denim's watch party was to hate-watch TEI's work without giving any benefit to TEI." Plaintiff provided this argument to diminish Defendant's claim of transformative use. As in *Stebbins*, Defendant's livestream provided commentary on The Nuke and sharp criticism of the claims made within the documentary. Although the Court finds some merit in Plaintiff's position regarding hate-watching, it is insufficient to negate the transformative nature of Defendant's work. Defendant often paused The Nuke to offer spontaneous reactions, engaged with her audience through a live chat and provided real-time commentary interspersed with tangential discussions. Defendant did not simply repackage or republish the underlying work with incidental commentary but instead used the work in furtherance of a distinct expressive purpose.

---

[7] "Hate-watching" can be understood as the intentional consumption of expressive media, not for enjoyment, but for the purpose of criticism as the viewer remains engaged despite finding the content objectionable.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Further, Plaintiff presented a "piecemeal" argument during oral argument and asserted that Defendant, through her reaction video, could potentially demonstrate fair use as to pieces of her video but "not as to other pieces." Plaintiff does not present authority to support this argument. The Court also does not find authority or a bright-line rule to endorse Plaintiff's argument. Indeed, in *Stebbins*, with respect to the subject livestreams, the defendants viewed the subject video "for seconds at a time before pausing to respond and critique" the subject video. 2025 WL 2233208, at *4. The court in *Stebbins* did not hold that certain pauses or portions of the video, accompanied by Defendants' criticism, constituted fair use while others did not. *Id*. Instead, the court found the subject livestreams to be "highly transformative works."

For the foregoing reasons, the Court finds Defendant's use to be transformative.

### b. Commercial Use

"The second part of the first fair use factor involves whether the new use is commercial—*i.e.*, 'whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.'" *DraftExpress, Inc. v. Whistle Sports, Inc.*, 2022 WL 16962285, at *3 (C.D. Cal. Aug. 2, 2022) (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985). Critically, "the more transformative the new work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579. The commercial use factor concerns "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise." *Seltzer,* 725 F.3d at 1178. The court in *DraftExpress* found that even if the relevant video "were considered at least partially commercial, its transformative nature offsets the significance of any commercialism." 2022 WL

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

16962285, at *3; *see Google*, 593 U.S. at 32 ("many common fair uses are indisputably commercial.").

Here, Defendant contends that her use was not sufficiently commercial to outweigh the transformative. (MJOP at 12). As Defendant is a livestreamer, she is eligible to receive subscriptions, donations and advertising revenue during her Twitch broadcasts, regardless of the content nature of her use, so there is no doubt that there was a commercial use of the subject work. But the Court finds distinguishable Defendant's use from the intentional exploitation of copyrighted works for monetary gain that preclude a finding of fair use. *See generally Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 779 (9th Cir. 2006) (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001)) ("A commercial use 'is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies.'"); *DraftExpress*, 2022 WL 16962285, at *3 (quoting *Seltzer*, 725 F.3d at 1178) ("Although Whistle's social media presence may serve to promote its business and indirectly boost revenue, the commercial use factor concerns 'the degree to which the new user exploits the copyright for commercial gain— as opposed to incidental use as part of a commercial enterprise.'"). Defendant's transformation of the original work heavily outweighs the commercial nature of its use. S*ee SOFA*, 709 F.3d at 1278-79 ("[B]ecause [defendant]'s use of the clip is transformative, the fact that *Jersey Boys* is a commercial production is of little significance."); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (finding that a work's "commercial qualities become less important" where use is highly transformative).

Accordingly, under the analysis of the first factor, the Court finds that Defendant's use weighs in favor of fair use.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

### 2. *Nature of the Copyrighted Work*

Defendant avers that the documentary and informational nature of The Nuke favors fair use. (MJOP at 14). The second statutory factor considers the "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor "recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works, 'with the consequence that fair use is more difficult to establish when the former works are copied.'" *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc*., 109 F.3d 1394, 1402 (9th Cir. 1997) (quoting *Campbell*, 510 U.S. at 586). The Ninth Circuit held that this factor addresses "two aspects of the work: the extent to which it is creative and whether it is unpublished." *Monge*, 688 F.3d at 1177. The Ninth Circuit has held that a product is creative where it is "the product of many technical and artistic decisions." *McGucken v. Pub Ocean Ltd*., 42 F.4th 1149, 1161 (9th Cir. 2022). With respect to publication, while a work's unpublished state would weigh against fair use, "the converse is not necessarily true." *Dr. Seuss*, 983 F.3d at 456. The Ninth Circuit recognized, however, that this second factor "has not been terribly significant in the overall fair use balancing." *Penguin Books,* 109 F.3d at 1402.

Here, The Nuke is a creative work with significant informational contents. As explained by Plaintiff, The Nuke is a "tragi-comic documentary critiquing Hasan and Twitch." (Compl. ¶ 40). It contains original footage, highly edited montages, parodic skits and archival materials. (*Id*.). The Nuke is divided into seven sections. (*Id*.). The first section "walks the audience through Ethan's thesis of The Nuke: that Hasan radicalizes his audience with genocidal and antisemitic terrorist propaganda," the second section involves a parody mocking how Twitch "has embraced Hasan's extremist rhetoric" and the third section focuses on how Piker allegedly radicalizes his audience by glorifying and disseminating Houthi propaganda. (*Id*.). Additionally, the fourth section

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

focuses on Piker's interactions with Hezbollah propaganda, the fifth section focuses on Piker's interactions with Hamas propaganda and the sixth section explores Twitch's alleged role in enabling Piker to violate Twitch's Community Guidelines.  (*Id.*).  In the final section, Klein summarizes the two motivations for making The Nuke, which are to "stop Hasan's infiltration of mainstream media" and "to hold Twitch accountable for enabling antisemitic and anti-Israel animus on its platform." (*Id.*).

Accordingly, the Court finds that the nature of the subject work weighs against a finding of fair use.  As set forth above, however, this factor alone is not "terribly significant in the overall fair use balancing." *Penguin Books,* 109 F.3d at 1402.

3.  *The Amount and Substantiality of The Portion in Relation to the Copyrighted Work as a Whole*

The third statutory factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" favors fair use.  17 U.S.C. § 107(3).  The third factor looks to the "quantitative amount and qualitative value of the original work used in relation to the justification for that use." *Seltzer*, 725 F.3d at 1178; *see Hosseinzadeh*, 276 F. Supp. 3d at 46 (noting the third factor considers the proportion of the copyrighted work used "and then how well tailored that use was to the allegedly infringing work's proper purpose—no matter how large or long the allegedly infringing work is.").  "The law is clear, however, that quantity alone is not determinative." *Hosseinzadeh*, 276 F. Supp. 3d at 46.  This factor "circles back to the first factor because 'the extent of permissible copying varies with the purpose and character of the use.'" *Dr. Seuss Enters*, 983 F.3d at 456 (*Campbell*, 510 U.S. at 586-87).

The courts have found that copying another work in its entirety is not dispositive as to infringement if necessary for the intended transformative use. *See Hosseinzadeh*, 276 F. Supp. at 46 ("[A] great deal of Plaintiff's work was copied, but such copying was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

plainly necessary to the commentary and critique."); *Stebbins*, 2025 WL 2233208, at *6

("Even if the Court were to credit Plaintiff's claim that Creetosis copied the entirety of

the Retrospective, that would not be dispositive. Creetosis used the Retrospective clips in

order to further the Livestream's "transformative purpose of critical commentary.");

*Seltzer*, 725 F.3d at 1178-79 (finding the entire work necessary for the alleged infringer's

intended use and "[g]iven that fact, this court has acknowledged that this factor will not

weigh against an alleged infringer, even when he copies the whole work, if he takes no

more than is necessary for his intended use.").  In *Seltzer*, the Ninth Circuit found the

copying of the entirety of the original work "d[id] not weigh against Green Day."

*Seltzer*, 725 F.3d at 1179.

Here, Defendant showed the "entirety (or nearly the[] entirety)" of The Nuke.

(Compl. ¶ 2).  "It is evident that to comment on and critique a work, clips of the original

may be used."  *Hosseinzadeh*, 276 F. Supp. at 46; *see Campbell*, 510 U.S. at 588, 114

S.Ct. 1164 ("[P]arody must be able to 'conjure up' at least enough of that original to

make the object of its critical wit recognizable . . . [c]opying does not become excessive

in relation to parodic purpose merely because the portion taken was the original's heart.").

The court in *Hosseinzadeh* recognized that "[w]ithout using actual clips, the commentary

and critique here would lose context and utility."  276 F. Supp. at 46.  Here, the "extent"

and "quality and importance" of the video clips used by Defendant was reasonable to

accomplish the transformative purpose of critical commentary.  *Id*.

Accordingly, the Court finds this factor does not weigh against Defendant.

### 4. *Effect of the Use on the Potential Market*

The fourth factor asks what effect the allegedly infringing use has on the "potential

market for or value of the copyrighted work." 17 U.S.C. § 107(4).  This factor considers

"the extent of market harm caused by the particular actions of the alleged infringer but

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. Where the allegedly infringing use does not substitute for the original and serves a "different market function[]," such factor weighs in favor of fair use. *Id*. at 591. In *Campbell*, the Court found that when a use is transformative, market substitution "is at least less certain, and market harm may not be so readily inferred." *Id*. "Indeed, as to parody pure and simple, it is more likely that the new work will not affect the market for the original in a way cognizable under this factor, that is, by acting as a substitute for it." *Id*. Thus, where the original work and the new work serve "different market functions," such that there is no market substitution, the new work is more likely to be fair use. *Id*.

Defendant's livestream is not a market substitute for The Nuke because someone watching the former will have a "very different experience" from watching the latter. *Hosseinzadeh* v. Klein, 276 F. Supp. at 47. Anyone seeking to watch The Nuke, a scripted and edited documentary, would have a distinctly different experience watching Defendant's fragmented start-and-stop livestream, which featured spontaneous reaction, live chat interaction, sharp criticism throughout and extrinsic source material. *See, e.g., Stebbins*, 2025 WL 2233208, at *7 (finding a lack of a market substitution because "[a]nyone seeking to watch the Livestreams would have a fundamentally different viewing experience than a person seeking to watch the Retrospective."); *Hosseinzadeh*, 276 F. Supp. 3d at 47 ("[A]nyone seeking to enjoy [the original] on its own will have a very different experience watching the [reaction] video . . ."); *Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 651-52 (9th Cir. 2020) ("[A] person wishing to purchase the sheet music for 'Magic' in order to play or perform that song would necessarily purchase the sheet music for the song itself from

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

the owner of the performance rights—not the sheet music for 'Rainmaker.'"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821-22 (9th Cir. 2003) (finding no market harm where a person could not use the allegedly infringing work, a thumbnail photograph, as a substitute for the copyrighted high-resolution photograph).  Indeed, Plaintiff's own allegations suggest as much:  "Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan."  (Compl. ¶ 70.o).

The decision in *Hughes v. Benjamin*, 437 F. Supp. 3d 382, 394 (S.D.N.Y. 2020) is highly instructive.  There, the court held,

> Here, there is no danger that *SJW Levels of Awareness* will usurp the market of progressive commentaries such as *We Thought She Would Win*. Benjamin's target audience (generally political conservatives and libertarians) is obviously not the same as Hughes's target audience (generally political liberals).  Moreover, although *SJW Levels of Awareness* is comprised entirely of portions of *We Thought She Would Win*, there is no reason to think that Hughes's audience will abandon her progressive YouTube channel to watch the derisively-titled *SJW Levels of Awareness* on a conservative YouTube channel simply because it contains parts of her work.

*Hughes*, 437 F. Supp. at 394.  Accordingly, the Court finds that Defendant's livestream is not a market substitute for The Nuke.

Because three of the four fair use factors strongly favor Defendant, including the most important factor (purpose and character of use), the Court concludes that the fair use defense applies as a matter of law.  Thus, Defendant's Motion for Judgment on the Pleadings is **GRANTED**.

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

**III.     CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Judgment on the Pleadings.  The Court **ORDERS** Defendant to prepare and submit a proposed Judgment in this matter within seven (7) days of this Order.

**IT IS SO ORDERED.**

Exhibit 19



July 1, 2026

Molly C. Dwyer
Clerk of Court
United States Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

**VIA ACMS**

**RE:** ***Ted Entertainment, Inc. v. Doe Defendants***; **Case No. 26-3553**
**Notice of Supplemental Authority under FRAP 28(j) and Ninth Cir. R.**
**28-6**

Dear Ms. Dwyer:

Pursuant to Federal Rule of Appellate Procedure 28(j) and Ninth Cir. R. 28-6, Appellants Doe Defendants provide notice of the Central District of California's recent decision in the underlying action, ***Ted Entertainment, Inc. v. Saber***, **No. 2:25-cv-05564-WLH-PD (C.D. Cal.)**, in which TEI alleges that streamer Alexandra "Denims" Saber directly infringed TEI's works *Content Nuke: Hasan Piker* ("*Nuke*") and *Countdown*. On June 29, 2026, the Central District Court issued an order granting Denims' motion for partial judgment on the pleadings as to ***Nuke***, holding that Denims' use of Nuke is fair use as a matter of law under 17 U.S.C. §107. A copy of the Central District's order is attached hereto as **Exhibit A**.

The order being appealed (N.D. Cal. D.E. 45) denied Does' motion to quash TEI's subpoenas to Reddit and Discord. The subpoenas seek identifying

**www.kr.law**

548 Market Street, Suite 85399, San Francisco, CA 94104 | Phone: 415-955-1155 | Fax: 415-955-1158

Molly C. Dwyer
July 1, 2026
Page **2** of **3**

information for Reddit moderators who allegedly posted links to Denims' content.

The Northern District Court denied the motion to quash, finding that TEI had

sufficiently alleged contributory copyright infringement grounded in Denims'

alleged direct infringement, without making a fair use determination. The Central

District's fair-use ruling eliminates direct infringement as to *Nuke* and confirms

that Denims' stream was a use "wholly authorized by the law," not infringement,

as to that work. *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153–54 (9th

Cir. 2016).

This development is pertinent to whether TEI has a viable infringement

predicate to support the subpoenas, whether omission of fair-use analysis in D.E.

45 was harmless, and whether the balance between TEI's interests and Does' First

Amendment right to anonymous political speech favors quashing TEI's subpoenas.

*See Highfields Cap. Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969, 974-76 (N.D. Cal.

2005); *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011).

Respectfully submitted,

KRONENBERGER ROSENFELD, LLP

s/ Leah Rosa Vulić

Leah Rosa Vulić

Molly C. Dwyer
July 1, 2026
Page **3** of **3**

## CERTIFICATE OF COMPLIANCE

I hereby certify that this letter complies with the word limit of Federal Rule

of Appellate Procedure 28(j) because the body of the letter contains 295 words.

s/ Leah Rosa Vulić
Leah Rosa Vulić

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing Notice

of Supplemental Authority under Federal Rule of Appellate Procedure 28(j) and

Ninth Cir. R. 28-6 with the Clerk of the Court for the United States Court of

Appeals for the Ninth Circuit by using the appellate ACMS system.

DATED: July 1, 2026                    s/ Leah Rosa Vulić
                                       Leah Rosa Vulić

Exhibit A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:25-cv-05564-WLH-PD | | Date | June 29, 2026 |
|---|---|---|---|---|
| Title | *Ted Entertainment, Inc. v. Alexandra Marwa Saber et al.* | | | |

Present: The Honorable    WESLEY L. HSU, United States District Judge

| Claudia Garcia-Marquez | None |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None | None |

**Proceedings:    (IN CHAMBERS) ORDER RE DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS [35]**

The Court is in receipt of Defendant's Motion for Judgment on the Pleadings. (MJOP, Dkt. No. 35). The matter is fully briefed, and the Court heard oral argument on June 5, 2026. For the reasons explained herein, the Court **GRANTS** the Motion.

## I.    BACKGROUND

Plaintiff Ted Entertainment, Inc. ("Plaintiff") sued Defendant Alexandra Marwa Saber ("Defendant" or "Denims").[1] (Compl., Dkt. No. 1). Plaintiff brings the following claims for relief: (i) Direct Copyright Infringement against Denims and (ii) Contributory Copyright Infringement against The H3Snark Mods[2]. (*Id.*). Plaintiff is "production company that produces content for social media, namely YouTube." (*Id.* ¶ 9). Defendant is an online streamer who releases content on social media platforms, namely Twitch. (*Id.* ¶ 10). Plaintiff, through its owner YouTuber Ethan Klein ("Klein"), filed this action seeking statutory damages against Defendant for her alleged livestreamed "reaction" to

---

[1] Plaintiff also sued Does 1-10.
[2] The H3Snark Mods are comprised of Does Nos. 1-10. The true names and exact location of Does Nos. 1-10 are presently unknown to Plaintiff.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Plaintiff's "tragi-comic documentary" entitled Content Nuke: Hasan Piker ("The Nuke") posted on Plaintiff's YouTube channel on January 31, 2025. The Nuke centered on the allegedly controversial political ideologies of the "alt-left" Twitch streamer Hasan Piker ("Piker") regarding the Israel-Palestine conflict. (*Id*. ¶ 40).

The Nuke contains "original footage, highly edited montages, parodic skits and archival materials." (*Id*.). The Nuke can be divided into seven sections: (1) The Prologue; (2) the Twitch Parody Sketch; (3) the Houthi Section; (4) the Hezbollah Section; (5) the Hamas Section; (6) the Twitch Section; and (7) the Conclusion. (*Id*.). It contains original footage, highly edited montages, parodic skits and archival materials. (*Id*.). The first section "walks the audience through Ethan's thesis of The Nuke: that Hasan radicalizes his audience with genocidal and antisemitic terrorist propaganda," the second section involves a parody mocking how Twitch "has embraced Hasan's extremist rhetoric" and the third section focuses on how Piker allegedly radicalizes his audience by glorifying and disseminating Houthi propaganda. (*Id*.). The fourth section focuses on Piker's interactions with Hezbollah propaganda, the fifth section focuses on Piker's interactions with Hamas propaganda and the sixth section explores Twitch's alleged role in enabling Piker to violate Twitch's Community Guidelines. (*Id*.). In the final section, Klein presents the two motivations behind The Nuke, which are to "stop Hasan's infiltration of mainstream media" and "to hold Twitch accountable for enabling antisemitic and anti-Israel animus on its platform." (*Id*.). The film aims to "expose how Piker radicalizes people online to be antisemitic and anti-Israeli" and criticizes Twitch as a platform. (*Id*. ¶ 70.o).

On January 27, 2024, Plaintiff submitted its application to register The Nuke with the United States Copyright Office (the "USCO"). (*Id*. ¶ 38). On January 28, 2025, the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

USCO received the deposit copy of The Nuke. (*Id.*). The registration number for The Nuke is PAu 4-256-429.

Throughout Defendant's live stream, Defendant provides commentary pertaining to criticism of The Nuke. Indeed, Plaintiff states, "[w]here The Nuke seeks to expose how Piker radicalizes people online to be antisemitic and anti-Israeli, Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan." (Compl. ¶ 70.o). During the live stream, Defendant contends that The Nuke resembles a "high school video project" or "middle school project." (Live Stream Video, Dkt. No. 34, Ex. K at 1:21:14-40, 5:04:58-5:05:23). Defendant also complains about the documentary's editing, the sources the documentary relies upon and supposed inconsistencies of Klein's statements (*id.*, Ex. K at 2:41:05-07, 4:43:56-4:54:18) and that the video treats the audience as "morons" as it allegedly attempts to "trick" them (*id.*, Ex. K at 3:46:23-37). As further support of Defendant's commentary throughout the live stream, the Complaint states that Defendant "frequently makes comments that are later contradicted by The Nuke itself." (Compl. ¶ 70.i).

Defendant offers further criticism of the subject documentary during her live stream. (*See generally* Compl.). Following one of the documentary creator's criticism of Piker's apologia of China's genocide of the Uyghurs, Defendant comments, (1) on the treatment of Uyghurs; (2) "so much of American media is focused on pointing out how evil Chine is,"; (3) stating that disabled Americans lose disability benefits when they get married; (4) incarceration levels in the United States. (Live Stream Video, Ex. K at 1:25:43-1:36:05). Additionally, during the live stream, Defendant (1) challenges Klein's perception of Piker's sentiments regarding the interaction between imports and the fleeing of Jewish people from Israel (Live Stream Video, Ex. K at 2:36:47-2:37:04); (2) disputes Klein's account of the events of the occurrence of sexual violence of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

hostages (Compl. ¶ 70.i.v; Live Stream Video, Ex. K at 3:33:49-3:35:34, 3:42:49-3:45:33); (3) critiques Klein's discussion of Twitch's enforcement and moderation decisions (Compl. ¶¶ 70.l.xv-xvii, 70.i.vi); and (4) discusses her perspectives on Zionism and Judaism (Live Stream Video, Ex. K at 4:33:48-4:34:02).[3]

On June 19, 2025, Plaintiff filed the Complaint. (*See generally* Compl.). On April 17, 2026, Defendant filed the instant Motion. (*See generally* MJOP.). Plaintiff filed its Opposition (Opp'n, Dkt. No. 36), to which Defendant filed her Reply (Reply, Dkt. No. 39). On May 1, 2026, Plaintiff filed its request for judicial notice. (RJN, Dkt. No. 37).

## II.    DISCUSSION

### A. Legal Standard

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c) ("Rule 12(c)"). A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a motion to dismiss under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), and the "principal difference … is the time of filing." *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). The same standard applies to motions brought under either rule. *Id.* Thus, the issue presented by a Rule 12(c) motion is the same as that posed in a Rule 12(b)(6) motion: whether the factual allegations of the complaint state a plausible claim for relief. *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1054-55 & n.4 (9th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[3] Defendant provides additional timestamps for Defendant's "notable instances of pauses for commentary, reaction and analysis." S*ee, e.g.*, Live Stream Video, Ex. K at 1:48:00 to 1:50:30; 1:52:00 to 1:57:31; 2:23:00 to 2:29:00; 2:49:53 to 2:51:00; 3:13:00 to 3:15:24; 3:29:00 to 3:33:48; 4:29:58 to 4:34:05.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

544, 556 (2007)).

In evaluating a motion for judgment on the pleadings, the court must "accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard,* 581 F.3d 922, 925 (9th Cir. 2009); *see also Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989) ("For purposes of the motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false."). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach*, 896 F.2d at 1550.

B. **Analysis**[4]

Defendant moves for judgment on the pleadings as to Plaintiff's first claim for relief for direct copyright infringement as to The Nuke based on the Second Affirmative

_____

[4] Plaintiff requests that the Court take judicial notice of specific documents and court records. (Request for Judicial Notice, Dkt. No. 37). First, Plaintiff requests that the Court take judicial notice of a video entitled "The Big, The BOLD, The Beautiful," which was a reaction video to the work Bold Guy vs Parkour Girl in *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34 (S.D.N.Y. 2017) (*Id.* at 1). This video was filed with the District Court for the Southern District of New York in an action entitled *Hosseinzadeh v. Klein et al.* (Case No. 1:16-cv-03081-KBF). (*Id.* at 2). Likewise, Plaintiff request the Court take judicial notice of a video entitled "Bold Guy vs Parkour Girl," which was the plaintiff's work in *Hosseinzadeh*. (*Id.* at 1). This video file was also filed in the *Hosseinzadeh*. (*Id.* at 3). The Court finds it appropriate to take judicial notice of the existence of these two video files, which are of public record. It is axiomatic that courts "may take judicial notice of . . . matters of public record." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 fn. 6 (9th Cir. 2006) (citing *Burbank-Glendale-Pasadena Airport Authority v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998)); *see also* Cal. Evid. Code § 452(d) ("Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States."). Additionally, Plaintiff separately requests judicial notice of the complaint filed in *Ted Entertainment, Inc. v. Majed et al.* (C.D. Cal. Case No. 2:25-cv-05565-JFW-MAA) ("*Majed* Action") and the allegations contained therein, the complaint filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Defense of fair use, as pled in Defendant's Answer.  (MJOP at 6).  "[T]he 'fair use' doctrine . . . [is] an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'"  *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  "[T]he fair use of a copyrighted work… for purposes such as criticism, comment, news reporting, teaching…, scholarship, or research, is not an infringement of copyright." 17 U.S.C.A § 107.  The "four non-exclusive factors" courts consider when determining fair use are:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

---

in the action entitled *Ted Entertainment, Inc. v. Caviness et al*. (W.D. Mo. Case No. 4:25-cv-00459-BCW) ("*Caviness* Action") and the allegations contained therein, the video of the watch party of The Nuke at issue in the *Majed* Action, which was filed as Exhibit H with this instant action's Complaint and the April 29, 2026 order by Honorable Sallie Kim of the Northern District of California denying the motion to quash of the Doe defendants in the miscellaneous action entitled In re Subpoenas to Reddit, Inc. and Discord, Inc. (Case No. 3:25-mc-80296-SK). The Court finds these filings subject to judicial notice.  *See* Cal. Evid. Code § 452(d) ("Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States.").  Lastly, Plaintiff requests the Court to take judicial notice of the video file, attached as Exhibit H, to the complaint in *Caviness*, which is a video file of the watch party at issue in that case.  Likewise, the Court finds these filings as subject to judicial notice.  *See* Cal. Evid. Code § 452(d) ("Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States.").  Plaintiff has not asked the Court to take judicial notice of the truth of the contents of the videos.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

*Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 451 (9th Cir. 2020) (quoting 17 U.S.C. § 107(1)-(4)); *see Google*, 593 U.S. at 19 (finding that the four factors "set forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances."). Fair use is a "flexible" concept and "its application may well vary depending on context." *Google*, 593 U.S. at 20.

Additionally, "when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion for dismiss.[5]" *Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1064 (C.D. Cal. 2017).

### 1. The Purpose and Character of the Use

#### a. Transformative Nature

Defendant moves for judgment on the pleadings, in part, because of the transformative nature of her use. (MJOP at 7). "The first statutory factor examines 'the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.'" *Dr. Seuss*, 983 F.3d at 451 (quoting 17 U.S.C. § 107(1)). "This factor has taken on a heightened significance because it influences the lens through which we consider two other fair use factors." *Id.*

"The central inquiry under the first factor is whether the new work is 'transformative.'" *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013); *see Dr. Seuss*, 983 F.3d at 452 ("The term 'transformative' does not appear in § 107, yet it permeates copyright analysis."). Transformative works "'add [] something new' to an existing work, endowing the first with 'new expression, meaning, or message,' rather than 'merely supersed[ing] the objects of the original creation.'" *SOFA*,

---

[5] A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a motion to dismiss under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), and the "principal difference … is the time of filing." *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

709 F.3d at 1278 (alterations in original) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).  The Court in *Campbell* held that the "central purpose of this investigation is to see . . . whether the new work merely 'supersede[s] the object' of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell,* 510 U.S. at 579 (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841)).  In contrast, "commentary [that] has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly." *Campbell,* 510 U.S. at 580.

The Court deems Defendant's use as transformative.  Throughout the live stream, Defendant provides commentary pertaining to criticism of The Nuke.  Defendant contends that The Nuke resembles a "high school video project" or "middle school project."  (Live Stream Video, Ex. K at 1:21:14-40, 5:04:58-5:05:23).  During the subject live stream, Defendant complains about the documentary's editing (*id*., Ex. K at 2:41:05-07, 4:43:56-4:54:08) and that the video treats the audience as "morons" and is attempting to "trick" them (*id*., Ex. K at 3:46:23-37).  The Complaint further states that "she frequently makes comments that are later contradicted by The Nuke itself."  (Compl. ¶ 70.i).  Notably, "the fair use inquiry does not ask whether the criticism or parody of the copyrighted work is just or *accurate*, or mean-spirited . . . but simply whether the use is of the kind that copyright is designed to protect." *See Weinberg v. Dirty World, LLC*, No. 16-9179, 2017 WL 5665023, at *8 (C.D. Cal. July 27, 2017) (emphasis added) (finding fair use where copyrighted image of a model was posted on a website with comments underneath including "every time I saw her, I thought she is super ugly and awkward

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

looking" and wondering how the model could get "married to that rich guy and [be] a model.").

Defendant offers other criticism of the subject documentary during her live stream. (*See generally* Compl.). Following one of the documentary creator's criticism of Piker's apologia of China's genocide of the Uyghurs, Defendant comments, (1) on the treatment of Uyghurs; (2) "so much of American media is focused on pointing out how evil Chine is,"; (3) stating that disabled Americans lose disability benefits when they get married; (4) incarceration levels in the United States. (Live Stream Video, Ex. K at 1:25:43-1:36:05). Additionally, during the live stream, Defendant (1) challenges Klein's perception of Piker's sentiments regarding the interaction between imports and the fleeing of Jewish people from Israel (Live Stream Video, Ex. K at 2:36:47-2:37:04); (2) disputes Klein's account of the events of the occurrence of sexual violence of hostages (Compl. ¶ 70.i.v; Live Stream Video, Ex. K at 3:33:49-3:35:34, 3:42:49-3:45:33); (3) critiques Klein's discussion of Twitch's enforcement and moderation decisions (Compl. ¶¶ 70.l.xv-xvii, 70.i.vi); and (4) discusses her perspectives on Zionism and Judaism (Live Stream Video, Ex. K at 4:33:48-4:34:02).[6]

The Court finds Defendant's criticism and commentary within the live stream video to demonstrate the following "telltale signs of transformative use": (1) "further purpose or different character" in the defendant's work, i.e., "the creation of new information, new aesthetic, new insights and understanding" and (2) "the use of quoted matter as 'raw material,' instead of repackaging it and 'merely supersed[ing] the objects of the original creation.'" (*Dr. Seuss*, 983 F.3d at 453) (quoting *Seltzer v. Green Day*,

---

[6] Defendant provides additional timestamps for Defendant's "notable instances of pauses for commentary, reaction and analysis." S*ee, e.g.*, Live Stream Video, Ex. K at 1:48:00 to 1:50:30; 1:52:00 to 1:57:31; 2:23:00 to 2:29:00; 2:49:53 to 2:51:00; 3:13:00 to 3:15:24; 3:29:00 to 3:33:48; 4:29:58 to 4:34:05.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Inc., 725 F.3d 1170, 1176 (9th Cir. 2013)).  The undisputed purpose of Defendant's livestream is to contest, criticize and mock Plaintiff's message, which the courts have found weighs in favor of fair use due to its transformative nature.  *See Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 45 (S.D.N.Y. 2017) (finding that the first factor weighed in defendant's favor as the defendant's reaction video was "quintessential criticism and comment."); *Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1104 (C.D. Cal. 2015) (finding transformative use where host reacted to and commented on original videos).

The facts here closely align with those in *Stebbins v. Alphabet Inc.*, No. 22-CV-00546-JSW, 2025 WL 2233208 (N.D. Cal. July 2, 2025).  *In Stebbins,* the court found the subject livestreams to be "highly transformative works" because the livestreams involved the viewing of the subject video "for seconds at a time before pausing to respond and critique" the subject video.  2025 WL 2233208, at *4.  The subject video, created by the plaintiff, provided the plaintiff's analysis and opinions regarding a video game.  *Id*.  The livestreams, however, provided commentary on the subject video as well as several additional hours regarding other videos produced by the plaintiff and his comments thereon.  *Id*.  The relevant livestream in *Stebbins* "paus[ed] . . . and comment[ed] on Plaintiff's Retrospective with the purpose of reviewing or mocking the video."  *Id*. at 5.  "This criticism is at the heart of the fair use doctrine, and it would lose meaning without reproduction of Plaintiff's video."  *Id*.; *see Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 532 (2023) (noting "commentary or criticism that targets an original work may have compelling reason to 'conjure up' the original by borrowing from it.").  As in *Stebbins*, Defendant's livestream provided commentary on The Nuke and sharp criticism of the claims made within the documentary.  Throughout the livestream, Defendant often paused The Nuke to offer spontaneous reactions, engaged

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

with her audience through a live chat and provided real-time commentary interspersed with tangential discussions. (*See, e.g.*, Live Stream Video, Ex. K at 1:48:00 to 1:50:30; 1:52:00 to 1:57:31; 2:23:00 to 2:29:00; 2:49:53 to 2:51:00; 3:13:00 to 3:15:24; 3:29:00 to 3:33:48; 4:29:58 to 4:34:05).

Further, the courts have recognized that the differences in viewing experiences and uses weigh in favor of a finding of fair use. *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, Inc., 907 F. Supp. 1361, 1379 (N.D. Cal. 1995) ("Because [defendant's] use of copyrighted materials served a completely different function than that of the plaintiffs, this [first] factor weighs in [defendant's] favor."). The difference in viewing experiences here is undisputed. Indeed, Plaintiff states, "[w]here The Nuke seeks to expose how Piker radicalizes people online to be antisemitic and anti-Israeli, Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan." (Compl. ¶ 70.o).

In opposition, Plaintiff presents unsuccessful arguments. (*See generally* Opp'n). First, Plaintiff cites *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1225 (9th Cir. 2022), for the proposition that the purposes of Plaintiff's video and Defendant's livestream "overlap" to undermine Defendant's transformative argument. (*Id*. at 8). Here, Plaintiff has conceded that the purposes of both videos do *not* overlap by stating, "[w]here The Nuke seeks to expose how Hasan radicalizes people online to be antisemitic and anti-Israeli, Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan." (Compl. ¶ 70.o). Additionally, the two subject videos are disparate from the subject works in *De Fontbrune*, which did overlap in nature. In *De Fontbrune*, "The Picasso Project" and the subject photographs both presented the works of Picasso with the shared purpose of documenting Picasso's works. 39 F.4th at 1225. As

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

previously established, the subject videos in this matter do not share such an overlapping purpose.

Second, Plaintiff cites to *Monge v. Maya Mag*., Inc., 688 F.3d 1164, 1174 (9th Cir. 2012), for the proposition that Defendant engaged in "wholesale copying sprinkled with [spoken] commentary," which the court in *Monge* found "at best minimally transformative." *Id*. at 1176. Defendant's livestream went beyond merely reproducing or supplanting The Nuke, however. Rather, as set forth above, the livestream incorporated real-time commentary, criticism and analysis that altered the purpose and character of the original work. Accordingly, unlike the defendant in *Monge*, Defendant did not simply repackage or republish the underlying work with incidental commentary but instead used the work in furtherance of a distinct expressive purpose.

During oral argument, Plaintiff argues that due to Defendant's "hate-watching"[7] of The Nuke, "the entire purpose of Denim's watch party was to hate-watch TEI's work without giving any benefit to TEI." Plaintiff provided this argument to diminish Defendant's claim of transformative use. As in *Stebbins*, Defendant's livestream provided commentary on The Nuke and sharp criticism of the claims made within the documentary. Although the Court finds some merit in Plaintiff's position regarding hate-watching, it is insufficient to negate the transformative nature of Defendant's work. Defendant often paused The Nuke to offer spontaneous reactions, engaged with her audience through a live chat and provided real-time commentary interspersed with tangential discussions. Defendant did not simply repackage or republish the underlying work with incidental commentary but instead used the work in furtherance of a distinct expressive purpose.

---

[7] "Hate-watching" can be understood as the intentional consumption of expressive media, not for enjoyment, but for the purpose of criticism as the viewer remains engaged despite finding the content objectionable.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Further, Plaintiff presented a "piecemeal" argument during oral argument and asserted that Defendant, through her reaction video, could potentially demonstrate fair use as to pieces of her video but "not as to other pieces." Plaintiff does not present authority to support this argument. The Court also does not find authority or a bright-line rule to endorse Plaintiff's argument. Indeed, in *Stebbins*, with respect to the subject livestreams, the defendants viewed the subject video "for seconds at a time before pausing to respond and critique" the subject video. 2025 WL 2233208, at *4. The court in *Stebbins* did not hold that certain pauses or portions of the video, accompanied by Defendants' criticism, constituted fair use while others did not. *Id*. Instead, the court found the subject livestreams to be "highly transformative works."

For the foregoing reasons, the Court finds Defendant's use to be transformative.

b. Commercial Use

"The second part of the first fair use factor involves whether the new use is commercial—*i.e.*, 'whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.'" *DraftExpress, Inc. v. Whistle Sports, Inc.*, 2022 WL 16962285, at *3 (C.D. Cal. Aug. 2, 2022) (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985). Critically, "the more transformative the new work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579. The commercial use factor concerns "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise." *Seltzer,* 725 F.3d at 1178. The court in *DraftExpress* found that even if the relevant video "were considered at least partially commercial, its transformative nature offsets the significance of any commercialism." 2022 WL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

16962285, at *3; *see Google*, 593 U.S. at 32 ("many common fair uses are indisputably commercial.").

Here, Defendant contends that her use was not sufficiently commercial to outweigh the transformative. (MJOP at 12). As Defendant is a livestreamer, she is eligible to receive subscriptions, donations and advertising revenue during her Twitch broadcasts, regardless of the content nature of her use, so there is no doubt that there was a commercial use of the subject work. But the Court finds distinguishable Defendant's use from the intentional exploitation of copyrighted works for monetary gain that preclude a finding of fair use. *See generally Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 779 (9th Cir. 2006) (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001)) ("A commercial use 'is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies.'"); *DraftExpress*, 2022 WL 16962285, at *3 (quoting *Seltzer*, 725 F.3d at 1178) ("Although Whistle's social media presence may serve to promote its business and indirectly boost revenue, the commercial use factor concerns 'the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise.'"). Defendant's transformation of the original work heavily outweighs the commercial nature of its use. S*ee SOFA*, 709 F.3d at 1278-79 ("[B]ecause [defendant]'s use of the clip is transformative, the fact that *Jersey Boys* is a commercial production is of little significance."); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (finding that a work's "commercial qualities become less important" where use is highly transformative).

Accordingly, under the analysis of the first factor, the Court finds that Defendant's use weighs in favor of fair use.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

*2. Nature of the Copyrighted Work*

Defendant avers that the documentary and informational nature of The Nuke favors fair use. (MJOP at 14). The second statutory factor considers the "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor "recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works, 'with the consequence that fair use is more difficult to establish when the former works are copied.'" *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997) (quoting *Campbell*, 510 U.S. at 586). The Ninth Circuit held that this factor addresses "two aspects of the work: the extent to which it is creative and whether it is unpublished." *Monge*, 688 F.3d at 1177. The Ninth Circuit has held that a product is creative where it is "the product of many technical and artistic decisions." *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1161 (9th Cir. 2022). With respect to publication, while a work's unpublished state would weigh against fair use, "the converse is not necessarily true." *Dr. Seuss*, 983 F.3d at 456. The Ninth Circuit recognized, however, that this second factor "has not been terribly significant in the overall fair use balancing." *Penguin Books,* 109 F.3d at 1402.

Here, The Nuke is a creative work with significant informational contents. As explained by Plaintiff, The Nuke is a "tragi-comic documentary critiquing Hasan and Twitch." (Compl. ¶ 40). It contains original footage, highly edited montages, parodic skits and archival materials. (*Id.*). The Nuke is divided into seven sections. (*Id.*). The first section "walks the audience through Ethan's thesis of The Nuke: that Hasan radicalizes his audience with genocidal and antisemitic terrorist propaganda," the second section involves a parody mocking how Twitch "has embraced Hasan's extremist rhetoric" and the third section focuses on how Piker allegedly radicalizes his audience by glorifying and disseminating Houthi propaganda. (*Id.*). Additionally, the fourth section

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

focuses on Piker's interactions with Hezbollah propaganda, the fifth section focuses on Piker's interactions with Hamas propaganda and the sixth section explores Twitch's alleged role in enabling Piker to violate Twitch's Community Guidelines.  (*Id*.).  In the final section, Klein summarizes the two motivations for making The Nuke, which are to "stop Hasan's infiltration of mainstream media" and "to hold Twitch accountable for enabling antisemitic and anti-Israel animus on its platform."  (*Id*.).

Accordingly, the Court finds that the nature of the subject work weighs against a finding of fair use.  As set forth above, however, this factor alone is not "terribly significant in the overall fair use balancing."  *Penguin Books,* 109 F.3d at 1402.

3.  *The Amount and Substantiality of The Portion in Relation to the Copyrighted Work as a Whole*

The third statutory factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" favors fair use.  17 U.S.C. § 107(3).  The third factor looks to the "quantitative amount and qualitative value of the original work used in relation to the justification for that use."  *Seltzer*, 725 F.3d at 1178; *see Hosseinzadeh*, 276 F. Supp. 3d at 46 (noting the third factor considers the proportion of the copyrighted work used "and then how well tailored that use was to the allegedly infringing work's proper purpose—no matter how large or long the allegedly infringing work is.").  "The law is clear, however, that quantity alone is not determinative." *Hosseinzadeh*, 276 F. Supp. 3d at 46.  This factor "circles back to the first factor because 'the extent of permissible copying varies with the purpose and character of the use.'"  *Dr. Seuss Enters*, 983 F.3d at 456 (*Campbell*, 510 U.S. at 586-87).

The courts have found that copying another work in its entirety is not dispositive as to infringement if necessary for the intended transformative use.  *See Hosseinzadeh*, 276 F. Supp. at 46 ("[A] great deal of Plaintiff's work was copied, but such copying was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

plainly necessary to the commentary and critique."); *Stebbins*, 2025 WL 2233208, at *6 ("Even if the Court were to credit Plaintiff's claim that Creetosis copied the entirety of the Retrospective, that would not be dispositive. Creetosis used the Retrospective clips in order to further the Livestream's "transformative purpose of critical commentary.""); *Seltzer*, 725 F.3d at 1178-79 (finding the entire work necessary for the alleged infringer's intended use and "[g]iven that fact, this court has acknowledged that this factor will not weigh against an alleged infringer, even when he copies the whole work, if he takes no more than is necessary for his intended use."). In *Seltzer*, the Ninth Circuit found the copying of the entirety of the original work "d[id] not weigh against Green Day." *Seltzer*, 725 F.3d at 1179.

Here, Defendant showed the "entirety (or nearly the[] entirety)" of The Nuke. (Compl. ¶ 2). "It is evident that to comment on and critique a work, clips of the original may be used." *Hosseinzadeh*, 276 F. Supp. at 46; *see Campbell*, 510 U.S. at 588, 114 S.Ct. 1164 ("[P]arody must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable . . . [c]opying does not become excessive in relation to parodic purpose merely because the portion taken was the original's heart."). The court in *Hosseinzadeh* recognized that "[w]ithout using actual clips, the commentary and critique here would lose context and utility." 276 F. Supp. at 46. Here, the "extent" and "quality and importance" of the video clips used by Defendant was reasonable to accomplish the transformative purpose of critical commentary. *Id*.

Accordingly, the Court finds this factor does not weigh against Defendant.

### 4. *Effect of the Use on the Potential Market*

The fourth factor asks what effect the allegedly infringing use has on the "potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor considers "the extent of market harm caused by the particular actions of the alleged infringer but

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. Where the allegedly infringing use does not substitute for the original and serves a "different market function[]," such factor weighs in favor of fair use. *Id*. at 591. In *Campbell*, the Court found that when a use is transformative, market substitution "is at least less certain, and market harm may not be so readily inferred." *Id*. "Indeed, as to parody pure and simple, it is more likely that the new work will not affect the market for the original in a way cognizable under this factor, that is, by acting as a substitute for it." *Id*. Thus, where the original work and the new work serve "different market functions," such that there is no market substitution, the new work is more likely to be fair use. *Id*.

Defendant's livestream is not a market substitute for The Nuke because someone watching the former will have a "very different experience" from watching the latter. *Hosseinzadeh* v. Klein, 276 F. Supp. at 47. Anyone seeking to watch The Nuke, a scripted and edited documentary, would have a distinctly different experience watching Defendant's fragmented start-and-stop livestream, which featured spontaneous reaction, live chat interaction, sharp criticism throughout and extrinsic source material. *See, e.g., Stebbins*, 2025 WL 2233208, at *7 (finding a lack of a market substitution because "[a]nyone seeking to watch the Livestreams would have a fundamentally different viewing experience than a person seeking to watch the Retrospective."); *Hosseinzadeh*, 276 F. Supp. 3d at 47 ("[A]nyone seeking to enjoy [the original] on its own will have a very different experience watching the [reaction] video . . ."); *Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 651-52 (9th Cir. 2020) ("[A] person wishing to purchase the sheet music for 'Magic' in order to play or perform that song would necessarily purchase the sheet music for the song itself from

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

the owner of the performance rights—not the sheet music for 'Rainmaker.'"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821-22 (9th Cir. 2003) (finding no market harm where a person could not use the allegedly infringing work, a thumbnail photograph, as a substitute for the copyrighted high-resolution photograph). Indeed, Plaintiff's own allegations suggest as much: "Denims attempts to use The Nuke for the exact opposite purpose: to radicalize her audience to be antisemitic and anti-Israeli, along with defending Hasan." (Compl. ¶ 70.o).

The decision in *Hughes v. Benjamin*, 437 F. Supp. 3d 382, 394 (S.D.N.Y. 2020) is highly instructive. There, the court held,

> Here, there is no danger that *SJW Levels of Awareness* will usurp the market of progressive commentaries such as *We Thought She Would Win*. Benjamin's target audience (generally political conservatives and libertarians) is obviously not the same as Hughes's target audience (generally political liberals). Moreover, although *SJW Levels of Awareness* is comprised entirely of portions of *We Thought She Would Win*, there is no reason to think that Hughes's audience will abandon her progressive YouTube channel to watch the derisively-titled *SJW Levels of Awareness* on a conservative YouTube channel simply because it contains parts of her work.

*Hughes,* 437 F. Supp. at 394. Accordingly, the Court finds that Defendant's livestream is not a market substitute for The Nuke.

Because three of the four fair use factors strongly favor Defendant, including the most important factor (purpose and character of use), the Court concludes that the fair use defense applies as a matter of law. Thus, Defendant's Motion for Judgment on the Pleadings is **GRANTED**.

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

**III.    CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Judgment on the Pleadings.  The Court **ORDERS** Defendant to prepare and submit a proposed Judgment in this matter within seven (7) days of this Order.

**IT IS SO ORDERED.**

Exhibit 20

Rom Bar-Nissim (SBN: 293356)
Rom@HeahBarNissim.com
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

Attorneys for Plaintiff
Ted Entertainment, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TED ENTERTAINMENT, INC., a California Corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>ALEXANDRA MARWA SABER f/k/a MARWA TALATT ABDELMONEM p/k/a DENIMS, an individual, and DOES 1-10,<br><br>        Defendants. | Case No. 2:25-cv-05564-WLH-PD<br><br>*Hon. Wesley L. Hsu*<br><br>**JOINT STIPULATION RE: (1) DISMISSAL OF THE "COUNTDOWN EPISODE" CLAIM WITHOUT PREJUDICE; AND (2) DEFERRING DEADLINE FOR MOTION FOR ATTORNEYS' FEES UNTIL AFTER APPEAL**<br><br>Action filed:    June 19, 2025 |

**WHEREAS**, plaintiff Ted Entertainment, Inc. ("TEI") commenced this action by filing its complaint ("Complaint") on June 19, 2025 alleging: (1) direct copyright infringement against defendant Alexandra Marwa Saber p/k/a Denims ("Denims"); and (2) contributory copyright infringement against Does 1-10 (the "H3Snark Mods") (Dkt. No. 1);

**WHEREAS,** the Complaint alleged two of TEI's works were infringed: (1) *Content Nuke: Hasan Piker* ("The Nuke"); and (2) *The H3 Show #104 – Countdown to Doomsday* ("Countdown Episode");

**WHEREAS,** on April 17, 2026, Denims filed a motion for judgment on the pleadings as to The Nuke only (Dkt. No. 35) (the "Motion");

**WHEREAS,** on June 29, 2026, this Court granted the Motion and gave Denims seven days to file a proposed judgment (Dkt. No. 45) (the "Order");

**WHEREAS,** there still exists in the Complaint a claim for direct copyright infringement against Denims as to the Countdown Episode;

**WHEREAS,** TEI and Denims (collectively, the "Parties") have agreed to stipulate to dismissal of the claim of direct copyright infringement as to the Countdown Episode against Denims without prejudice pursuant to FRCP 41(a)(1)(A)(ii);

**WHEREAS,** pursuant to FRCP 54(d)(1), Denims has fourteen days after entry of judgment to file a motion for attorneys' fees and costs;

**WHEREAS,** TEI intends to file a notice of appeal of the Order; and

**WHEREAS,** to avoid duplicative or potentially unnecessary motion practice and for purposes of judicial economy, TEI and Denims have reached a stipulation to defer the deadline for the filing of Denims' motion for attorneys' fees and costs in this action to until 30 days after all appeals of the order have been exhausted, with Denims reserving all rights with respect to such attorneys' fees and costs.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by and between the Parties, that: (1) TEI's claim of direct copyright infringement as to

2

the Countdown Episode against Denims is hereby dismissed without prejudice pursuant to FRCP 41(a)(1)(A)(ii); and (2) the deadline for Denims to file her motion for attorneys' fees and costs in this action shall be 30 days following the conclusion of appellate proceedings.

**SO STIPULATED AND AGREED.**

Dated: July 6, 2026                    **HEAH BAR-NISSIM LLP**

                                       By  /s/ Rom Bar-Nissim
                                           ROM BAR-NISSIM
                                           Attorneys for Plaintiff Ted
                                           Entertainment, Inc.


Dated: July 6, 2026                    **FROST LLP**

                                       By  /s/ Benjamin Kassis
                                           BENJAMIN KASSIS
                                           BENJAMIN GRUSH
                                           Attorneys for Defendant
                                           Alexandra Marwa Saber p/k/a
                                           Denims

## L.R. 5-4.3.4 Attestation

Pursuant to Civil L.R. 5-4.3.4(a)(2)(i), the filer attest that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TED ENTERTAINMENT, INC.,<br><br>       Plaintiff,<br><br>   vs.<br><br>ALEXANDRA MARWA SABER et al.,<br><br>      Defendants. | Case No. 2:25-cv-05564-WLH-PD<br><br>**ORDER GRANTING JOINT STIPULATION REGARDING DISMISSAL OF THE "COUNTDOWN EPISODE" CLAIM AND DEFERRING DEADLINE FOR MOTION FOR ATTORNEYS' FEES [46]** |

## **ORDER**

Upon consideration of the Joint Stipulation, and finding good cause therefor, the Court hereby rules as follows:

1.  Plaintiff's claim of direct copyright infringement as to the Countdown Episode against Denims is hereby **DISMISSED** without prejudice, pursuant to FRCP 41(a)(1)(A)(ii); and

2.  The deadline for Defendants to file the potential motion for attorneys' fees and costs shall be continued until 30 days after all appeals of this Court's June 29, 2026 order are exhausted.

DATE:    July 13, 2026

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE

Exhibit 21

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TED ENTERTAINMENT, INC., | Case No. 2:25-cv-05564-WLH-PD |
| Plaintiff, | **JUDGMENT** |
| vs. | |
| ALEXANDRA MARWA SABER et al., | |
| Defendants. | |

This matter came before the Court on the Motion for Partial Judgment on the Pleadings filed by Defendant Alexandra Marwa Saber p/k/a Denims' ("Denims") pursuant to Federal Rule of Civil Procedure 12(c) on April 17, 2026 (the "Motion," Dkt. No. 35).

The Motion sought judgment on the First Claim for Relief for Direct Copyright Infringement alleged by Plaintiff Ted Entertainment, Inc. ("TEI") against Denims—Plaintiff's sole claim against Denims—insofar as the claim is based on the work identified in the Complaint as *Content Nuke: Hasan Piker* ("The Nuke"), on the ground that Denims' use of The Nuke constitutes fair use as a matter of law under 17 U.S.C. § 107.

Having considered the Motion, TEI's Opposition (Dkt. No. 36) and Request for Judicial Notice (Dkt. No. 37), Denims' Reply (Dkt. No. 39), the pleadings and the materials lodged with and incorporated into the Complaint, and the arguments of counsel at the hearing held on June 5, 2026, the Court, on June 29, 2026, entered its Order **GRANTING** the Motion (Dkt. No. 45, the "Order"), holding Denims' use of The Nuke constitutes fair use as a matter of law and TEI's First Claim for Relief therefore fails insofar as it is based on The Nuke.

On July 6, 2026, by stipulation of the parties pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) (Dkt. No. 46), TEI's First Claim for Relief insofar as the claim is based on the work identified in the Complaint a*s The H3 Show #104 – Countdown to Doomsday* ("Countdown Episode"), was dismissed without prejudice.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** as follows:

1.    Judgment is entered in favor of Defendant Alexandra Marwa Saber p/k/a Denims and against Plaintiff Ted Entertainment, Inc. on TEI's First Claim for Relief for Direct Copyright Infringement as to the "The Nuke."

2.    Plaintiff TEI shall take nothing on its First Claim for Relief.

3.     Denims, as the prevailing party, may recover costs and attorneys' fees incurred in this action by application and motion under 17 U.S.C. § 505, Federal Rule of Civil Procedure 54(d), and the Local Rules of this Court, subject to any forthcoming order of this Court with respect to the timing of the filing of such application and motion.

4.     The Court retains jurisdiction to adjudicate all other matters collateral to this Judgment.

**IT IS SO ORDERED, ADJUDGED, AND DECREED.**

Dated: July 13, 2026

_____
HON. WESLY L. HSU
UNITED STATES DISTRICT JUDGE

Exhibit 22

AO 121 (Rev. 06/16)

| TO: | REPORT ON THE |
|---|---|
| **Register of Copyrights** <br> **U.S. Copyright Office** <br> **101 Independence Ave. S.E.** <br> **Washington, D.C. 20559-6000** | **FILING OR DETERMINATION OF AN** <br> **ACTION OR APPEAL** <br> **REGARDING A COPYRIGHT** |

In compliance with the provisions of 17 U.S.C. 508, you are hereby advised that a court action or appeal has been filed on the following copyright(s):

| ☑ ACTION    ☐ APPEAL | COURT NAME AND LOCATION |
|---|---|
| DOCKET NO.    DATE FILED <br> 2:25-cv-05564-WLH-PD    6/19/2025 | United States District Court, Central District of California |

| PLAINTIFF | DEFENDANT |
|---|---|
| Alexandra Marwa Saber f/k/a Marwa Talatt Abdelmonem p/k/a Denims; Does 1-10 | Alexandra Marwa Saber f/k/a Marwa Talatt Abdelmonem p/k/a Denims; Does 1-10 |

| COPYRIGHT REGISTRATION NO. | TITLE OF WORK | AUTHOR OR WORK |
|---|---|---|
| 1 PAu 4-256-429 | Content Nuke: Hasan Piker | Ted Entertainment, Inc. |
| 2 PAu004257253 | The H3 Show #105: Countdown to Doomsday | Ted Entertainment, Inc. |
| 3 | | |
| 4 | | |
| 5 | | |

In the above-entitled case, the following copyright(s) have been included:

| DATE INCLUDED | INCLUDED BY <br> ☐ Amendment    ☐ Answer    ☐ Cross Bill    ☐ Other Pleading | |
|---|---|---|
| **COPYRIGHT REGISTRATION NO.** | **TITLE OF WORK** | **AUTHOR OF WORK** |
| 1 | | |
| 2 | | |
| 3 | . | |

In the above-entitled case, a final decision was rendered on the date entered below. A copy of the order or judgment together with the written opinion, if any, of the court is attached.

| COPY ATTACHED <br> ☐ Order    ☒ Judgment | WRITTEN OPINION ATTACHED <br> ☐ Yes    ☒ No | DATE RENDERED <br> 07/13/2026 |
|---|---|---|

| CLERK <br> Brian D. Karth | (BY) DEPUTY CLERK <br> Lori Muraoka | DATE <br> 07/15/2026 |
|---|---|---|

| | 1) Upon initiation of action, <br> mail copy to Register of Copyrights | 2) Upon filing of document adding copyright(s), <br> mail copy to Register of Copyrights | 3) Upon termination of action, <br> mail copy to Register of Copyrights |
|---|---|---|---|

**DISTRIBUTION:**

4) In the event of an appeal, forward copy to Appellate Court          5) Case File Copy

Exhibit 23



**CM/ECF**    Query    Reports ▾    Utilities ▾    Help    Log Out

ACCO,(PD ),CLOSED,DISCOVERY,MANADR,PROTORD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:25-cv-05564-WLH-PD

Ted Entertainment, Inc. v. Alexandra Marwa Saber et al
Assigned to: Judge Wesley L. Hsu
Referred to: Magistrate Judge Patricia Donahue
Cause: 17:501 Copyright Infringement

Date Filed: 06/19/2025
Date Terminated: 07/13/2026
Jury Demand: Both
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

**Plaintiff**

**Ted Entertainment, Inc.**
*a California corporation*

represented by **Rom Bar-Nissim**
Heah Bar-Nissim LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
310-432-2836
Email: rom@heahbarnissim.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Alexandra Marwa Saber**
*an individual*
*formerly known as*
Marwa Talatt Abdelmonem
*other*
Denims

represented by **Benjamin Gregory Kassis**
Frost, LLP
10960 Wilshire Boulevard, Suite 2100
Los Angeles, CA 90024
424-254-0441
Fax: 424-600-8504
Email: ben@frostllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Grush**
Frost LLP
10960 Wilshire Blvd, Suite 2100
Los Angeles, CA 90024
424-254-0441
Fax: 424-600-8504
Email: bgrush@frostllp.com
*ATTORNEY TO BE NOTICED*

**David Tiraturyan**
Frost LLP
10960 Wilshire Boulevard, Suite 2100
Los Angeles, CA 90024
424-254-0441
Fax: 424-600-8504
Email: david1@frostllp.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Does**
*1-10*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/19/2025 | 1 | COMPLAINT Receipt No: ACACDC-39935780 - Fee: $405, filed by Plaintiff Ted Entertainment, Inc.. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H, # 9 Exhibit Exhibit I, # 10 Exhibit Exhibit J, # 11 Exhibit Exhibit K, # 12 Exhibit Exhibit L) (Attorney Rom Bar-Nissim added to party Ted Entertainment, Inc.(pty:pla))(Bar-Nissim, Rom) (Entered: 06/19/2025) |
| 06/19/2025 | 2 | CIVIL COVER SHEET filed by Plaintiff Ted Entertainment, Inc.. (Bar-Nissim, Rom) (Entered: 06/19/2025) |
| 06/19/2025 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening,, 1 filed by Plaintiff Ted Entertainment, Inc.. (Bar-Nissim, Rom) (Entered: 06/19/2025) |
| 06/19/2025 | 4 | CERTIFICATE of Interested Parties filed by Plaintiff Ted Entertainment, Inc., (Bar-Nissim, Rom) (Entered: 06/19/2025) |
| 06/19/2025 | 5 | REPORT ON THE FILING OF AN ACTION regarding a copyright (Initial Notification) filed by Ted Entertainment, Inc.. (Bar-Nissim, Rom) (Entered: 06/19/2025) |
| 06/19/2025 | 6 | NOTICE OF LODGING filed *by Plaintiff Ted Entertainment, Inc.* re Complaint (Attorney Civil Case Opening,, 1 (Bar-Nissim, Rom) (Entered: 06/19/2025) |
| 06/20/2025 | 7 | NOTICE OF ASSIGNMENT to District Judge Wesley L. Hsu and Magistrate Judge Patricia Donahue. (ghap) (Entered: 06/20/2025) |
| 06/20/2025 | 8 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (ghap) (Entered: 06/20/2025) |
| 06/20/2025 | 9 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (ghap) (Entered: 06/20/2025) |
| 06/20/2025 | 10 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening,, 1 as to Defendant Alexandra Marwa Saber. (ghap) (Entered: 06/20/2025) |
| 06/26/2025 | 11 | STANDING ORDER FOR CASES ASSIGNED TO Judge Wesley L. Hsu. (hc) (Entered: 06/26/2025) |
| 07/01/2025 | 12 | PROOF OF SERVICE Executed by Plaintiff Ted Entertainment, Inc., upon Defendant Alexandra Marwa Saber served on 6/24/2025, answer due 7/15/2025. Service of the Summons and Complaint were executed upon Defendant Alexandra Marwa Saber in compliance with Federal Rules of Civil Procedure by personal service (Bar-Nissim, Rom) (Entered: 07/01/2025) |
| 07/14/2025 | 13 | Notice of Appearance or Withdrawal of Counsel: for attorney Benjamin Gregory Kassis counsel for Defendant Alexandra Marwa Saber. Adding Benjamin Gregory Kassis as counsel of record for Alexandra Marwa Saber for the reason indicated in the G-123 Notice. Filed by Defendant Alexandra Marwa Saber. (Attorney Benjamin Gregory Kassis added to party Alexandra Marwa Saber(pty:dft))(Kassis, Benjamin) (Entered: 07/14/2025) |
| 07/14/2025 | 14 | NOTICE of Interested Parties filed by Defendant Alexandra Marwa Saber, (Kassis, Benjamin) (Entered: 07/14/2025) |
| 07/14/2025 | 15 | STIPULATION Extending Time to Answer the complaint as to Alexandra Marwa Saber answer now due 8/14/2025, re Complaint (Attorney Civil Case Opening,, 1 filed by Defendant Alexandra Marwa Saber.(Kassis, Benjamin) (Entered: 07/14/2025) |
| 07/16/2025 | 16 | STIPULATION to Expedite Discovery filed by Plaintiff Ted Entertainment, Inc.. (Attachments: # 1 Exhibit Exhibit A - Proposed Subpoena to Reddit, Inc., # 2 Exhibit Exhibit B - Proposed Subpoena to Discord, Inc., # 3 Proposed Order Proposed Order)(Bar-Nissim, Rom) (Entered: 07/16/2025) |
| 07/16/2025 | 17 | Corrected STIPULATION to Expedite Discovery filed by Plaintiff Ted Entertainment, Inc.. (Attachments: # 1 Exhibit Exhibit A - Proposed Subpoena to Reddit, Inc., # 2 Exhibit Exhibit B - Proposed Subpoena to Discord, Inc., # 3 Proposed Order Proposed Order)(Bar-Nissim, Rom) (Entered: 07/16/2025) |
| 07/31/2025 | 18 | ORDER GRANTING JOINT STIPULATION RE: GRANTING PLAINTIFF LEAVE TO SERVE THIRD-PARTY SUBPOENAS PRIOR TO THE RULE 26(f) CONFERENCE 17 by Judge Wesley L. Hsu. 1. The Stipulation is GRANTED; 2. TEI may immediately serve the subpoena attached as Exhibit A to the Stipulation on third-party Reddit, Inc. ("Reddit Subpoena"), accompanied by this Order and shall include the date the Reddit Subpoena was issued and the date of compliance; and 3. TEI may immediately serve the subpoena attached as Exhibit B to the Stipulation on third-party Discord, Inc. ("Discord Subpoena"), accompanied by this Order and shall include the date the Discord Subpoena was issued and the date of compliance. (lom) (Entered: 08/01/2025) |

| | | |
|---|---|---|
| 08/14/2025 | 19 | ANSWER to Complaint (Attorney Civil Case Opening),, 1 with JURY DEMAND filed by Defendant Alexandra Marwa Saber.(Kassis, Benjamin) (Entered: 08/14/2025) |
| 09/02/2025 | 20 | ORDER SETTING RULE 26(f) SCHEDULING CONFERENCE by Judge Wesley L. Hsu. A Scheduling Conference is set for 9/26/2025 at 1:00 PM. See Attached Order for Details. If all parties agree to the dates in the 26(f)report, the matter will be taken off calendar and no appearance by counsel will be required. by Judge Wesley L. Hsu. (hc) (Entered: 09/02/2025) |
| 09/12/2025 | 21 | JOINT REPORT Rule 26(f) Discovery Plan ; estimated length of trial 5-7 days, filed by Plaintiff Ted Entertainment, Inc... (Bar-Nissim, Rom) (Entered: 09/12/2025) |
| 09/17/2025 | 22 | ORDER/REFERRAL to ADR Procedure No 1 by Judge Wesley L. Hsu. Case ordered to Magistrate Judge Patricia Donahue for Settlement Conference. ADR Proceeding to be held no later than 8/28/2026. (hc) (Entered: 09/17/2025) |
| 09/17/2025 | 23 | CIVIL PRETRIAL SCHEDULE AND TRIAL ORDER by Judge Wesley L. Hsu. The Scheduling Conference scheduled for 9/26/2025 is hereby VACATED. The pretrial schedule governing this case is set forth in the far right column labeled "Court Order" located on the parties' Schedule of Pretrial and Trial Dates Worksheet, which accompanies this Order. If the parties wish to set additional or alternative dates, they must file a stipulation and proposed order setting forth the dates requested and demonstrating good cause. Setting additional or alternative dates may be especially appropriate in class actions, patent cases, or cases for benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). Please refer to the Court's Standing Order for Newly Assigned Civil Cases for requirements for specific motions, discovery, certain types of filings, courtesy copies, emailing signature items to chambers, settlement, and other matters pertaining to all civil cases. Schedule of Pretrial and Trial Dates Worksheet: Final Pretrial Conference set for 10/02/2026 03:00 PM; 08/17/2026 Jury Trial set for 10/26/2026 09:00 AM. See order for additional deadlines and information. (lom) (Entered: 09/17/2025) |
| 09/17/2025 | 24 | STANDING ORDER FOR MOTIONS FOR SUMMARY JUDGMENT by Judge Wesley L. Hsu. READ THIS ORDER CAREFULLY. IT CONTROLS THIS CASE AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES. (lom) (Entered: 09/17/2025) |
| 09/30/2025 | 25 | STIPULATION for Protective Order filed by Defendant Alexandra Marwa Saber.(Grush, Benjamin) (Entered: 09/30/2025) |
| 09/30/2025 | 26 | Amended STIPULATION for Protective Order filed by Defendant Alexandra Marwa Saber.(Kassis, Benjamin) (Entered: 09/30/2025) |
| 10/02/2025 | 27 | STIPULATED PROTECTIVE ORDER by Magistrate Judge Patricia Donahue. 25 , 26 [See document for details.] (san) (Entered: 10/02/2025) |
| 01/22/2026 | 28 | Joint STIPULATION to Stay Case filed by Plaintiff Ted Entertainment, Inc.. (Attachments: # 1 Proposed Order)(Bar-Nissim, Rom) (Entered: 01/22/2026) |
| 03/02/2026 | 29 | ORDER GRANTING JOINT STIPULATION TO STAY PROCEEDINGS PENDING RESOLUTION OF THE DOE DEFENDANTS' MOTION TO QUASH 28 by Judge Wesley L. Hsu. The present action is STAYED pending final resolution of the motion to quash ("Quash Motion") filed by the Doe defendants (collectively, the"H3Snark Mods") in the action pending in the United States District Court for the Northern District of California entitled In re Subpoenas to Reddit, Inc. and Discord, Inc. (N.D. Cal. Case No.: 3:25-mc-80296-SK) (the "Quash Motion Action"). [See order for details] (lom) (Entered: 03/03/2026) |
| 03/20/2026 | 30 | Joint STIPULATION to Lift Stay FOR LIMITED PURPOSE OF FILING MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS filed by Defendant Alexandra Marwa Saber. (Attachments: # 1 Proposed Order)(Grush, Benjamin) (Entered: 03/20/2026) |
| 03/23/2026 | 31 | Notice of Appearance or Withdrawal of Counsel: for attorney David Tiraturyan counsel for Defendant Alexandra Marwa Saber. Adding David Tiraturyan as counsel of record for Alexandra Marwa Saber for the reason indicated in the G-123 Notice. Filed by Defendant Alexandra Marwa Saber. (Attorney David Tiraturyan added to party Alexandra Marwa Saber(pty:dft))(Tiraturyan, David) (Entered: 03/23/2026) |
| 03/30/2026 | 32 | ORDER GRANTING JOINT STIPULATION TO LIFT STAY FOR LIMITED PURPOSE OF FILING MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS 30 by Judge Wesley L. Hsu. 1. The Stipulation is GRANTED. 2. The stay is lifted for the limited purpose of the MJOP. 3. The Parties shall meet and confer regarding a briefing schedule for the MPJOP and shall submit a proposed briefing schedule to the Court within five days of the entry of this Order. (lom) (Entered: 03/31/2026) |
| 04/02/2026 | 33 | Joint STIPULATION for Hearing re Stipulation and Order,, Set/Clear Flags, 32 , Joint STIPULATION to Correct Notice of Lodging 6 , Complaint (Attorney Civil Case Opening),, 1 filed by Plaintiff Ted Entertainment, Inc.. (Attachments: # 1 Proposed Order)(Bar-Nissim, Rom) (Entered: 04/02/2026) |
| 04/02/2026 | 34 | NOTICE OF LODGING filed re Stipulation for Hearing,, Stipulation to Amend/Correct, 33 (Bar-Nissim, Rom) (Entered: 04/02/2026) |
| 04/17/2026 | 35 | NOTICE OF MOTION AND MOTION for Judgment on the Pleadings as to Complaint filed by Defendant Alexandra Marwa Saber. Motion set for hearing on 6/5/2026 at 01:30 PM before Judge Wesley L. Hsu. (Attachments: # 1 Declaration of Benjamin Kassis, # 2 Proposed Order Proposed Order) (Kassis, Benjamin) (Entered: 04/17/2026) |
| 05/01/2026 | 36 | OPPOSITION to NOTICE OF MOTION AND MOTION for Judgment on the Pleadings as to Complaint 35 filed by Plaintiff Ted Entertainment, Inc.. (Bar-Nissim, Rom) (Entered: 05/01/2026) |
| 05/01/2026 | 37 | REQUEST FOR JUDICIAL NOTICE re NOTICE OF MOTION AND MOTION for Judgment on the Pleadings as to Complaint 35 filed by Plaintiff Ted Entertainment, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Declaration)(Bar-Nissim, Rom) (Entered: 05/01/2026) |
| 05/01/2026 | 38 | NOTICE OF LODGING filed re Response in Opposition to Motion 36 , Request for Judicial Notice, 37 (Bar-Nissim, Rom) (Entered: 05/01/2026) |
| 05/08/2026 | 39 | REPLY Support NOTICE OF MOTION AND MOTION for Judgment on the Pleadings as to Complaint 35 filed by Defendant Alexandra Marwa Saber. (Kassis, Benjamin) (Entered: 05/08/2026) |
| 05/11/2026 | 40 | STATUS REPORT *PURSUANT TO THE COURT'S MARCH 2, 2026 ORDER [DKT. NO. 29]* filed by Plaintiff Ted Entertainment, Inc.. (Attachments: # 1 Exhibit)(Bar-Nissim, Rom) (Entered: 05/11/2026) |
| 06/03/2026 | 41 | SCHEDULING NOTICE AND (IN CHAMBERS) ORDER CHANGING THE TIME OF THE MOTION for Judgment on the Pleadings as to Complaint 35 scheduled for 6/05/2026 by Judge Wesley L. Hsu: The Court, on its own motion, changes the time to 2:15 PM. The hearing will proceed in-person at the First Street Courthouse, Courtroom 9B. IT IS SO ORDERED.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (cgm) TEXT ONLY ENTRY (Entered: 06/03/2026) |
| 06/05/2026 | 42 | MINUTES OF DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COMPLAINT 35 Hearing held before Judge Wesley L. Hsu. The Court's Tentative Ruling was issued on June 4, 2026, and reviewed by counsel. The Court heard oral argument. The Court took the matter UNDER SUBMISSION and a ruling will be issued. Court Recorder: CourtSmart. (lom) (Entered: 06/05/2026) |
| 06/06/2026 | 43 | COMPACT DISC Order for date of proceedings 06/05/2026 to 06/05/2026 filed by Plaintiff Ted Entertainment, Inc.. Court will contact Rom Bar-Nissim at Rom@HeahBarNissim.com with any questions regarding this order. Transcript portion requested: Pre-Trial Proceeding: Hearing for Motion for Judgement on the Pleadings on June 5, 2026. FEE PAID. (Bar-Nissim, Rom) (Entered: 06/06/2026) |
| 06/10/2026 | 44 | STATUS REPORT *PURSUANT TO THE COURT'S MARCH 2, 2026 ORDER [DKT. NO. 29]* filed by Plaintiff Ted Entertainment, Inc.. (Bar-Nissim, Rom) (Entered: 06/10/2026) |
| 06/29/2026 | 45 | MINUTES (IN CHAMBERS) ORDER RE DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS 35 by Judge Wesley L. Hsu Granting 35 MOTION: For the foregoing reasons, the Court GRANTS Defendant's Motion for Judgment on the Pleadings. The Court ORDERS Defendant to prepare and submit a proposed Judgment in this matter within seven (7) days of this Order. (see document for further details) (bm) (Entered: 07/01/2026) |
| 07/06/2026 | 46 | STIPULATION for Extension of Time to File Motion for Attorneys' Fees and Costs filed by Plaintiff Ted Entertainment, Inc.. (Attachments: # 1 Proposed Order)(Bar-Nissim, Rom) (Entered: 07/06/2026) |
| 07/06/2026 | 47 | NOTICE OF LODGING filed *[Proposed Judgment]* re Order on Motion for Judgment on the Pleadings, 45 (Attachments: # 1 Proposed Judgment)(Kassis, Benjamin) (Entered: 07/06/2026) |
| 07/13/2026 | 48 | ORDER GRANTING JOINT STIPULATION REGARDING DISMISSAL OF THE "COUNTDOWN EPISODE" CLAIM AND DEFERRING DEADLINE FOR MOTION FOR ATTORNEYS' FEES 46 by Judge Wesley L. Hsu. The Court hereby rules as follows: 1. Plaintiff's claim of direct copyright infringement as to the Countdown Episode against Denims is hereby DISMISSED without prejudice, pursuant to FRCP 41(a)(1)(A)(ii); and 2. The deadline for Defendants to file the potential motion for attorneys' fees and costs shall be continued until 30 days after all appeals of this Court's June 29, 2026 order are exhausted. (lom) (Entered: 07/14/2026) |
| 07/13/2026 | 49 | JUDGMENT 45 by Judge Wesley L. Hsu. IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows: 1. Judgment is entered in favor of Defendant Alexandra Marwa Saber p/k/a Denims and against Plaintiff Ted Entertainment, Inc. on TEI's First Claim for Relief for Direct Copyright Infringement as to the "The Nuke." 2. Plaintiff TEI shall take nothing on its First Claim for Relief. 3. Denims, as the prevailing party, may recover costs and attorneys' fees incurred in this action by application and motion under 17 U.S.C. § 505, Federal Rule of Civil Procedure 54(d), and the Local Rules of this Court, subject to any forthcoming order of this Court with respect to the timing of the filing of such application and motion. (MD JS-6, Case Terminated). (lom) (Entered: 07/15/2026) |
| 07/13/2026 | 50 | REPORT ON THE DETERMINATION OF AN ACTION Regarding a Copyright. (Closing) (Attachments: # 1 Judgment) (lom) (Entered: 07/15/2026) |

### PACER Service Center

**Transaction Receipt**

08/02/2026 01:52:40

| PACER Login: | kb2344kr | Client Code: | h3snark |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 2:25-cv-05564-WLH-PD End date: 8/3/2026 |
| Billable Pages: | 6 | Cost: | 0.60 |

Exhibit 24

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUL 8 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: DOE DEFENDANTS. _____ DOE DEFENDANTS, Petitioners, v. UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO, Respondent, TED ENTERTAINMENT, INC., Real Party in Interest. | No. 26-3513 D.C. No. 3:25-mc-80296-SK Northern District of California, San Francisco ORDER |

Before: SCHROEDER, CHRISTEN, and COLLINS, Circuit Judges.

Real party in interest must file an answer to this petition for a writ of mandamus within 14 days. *See* Fed. R. App. P. 21(b).

The district court may also address the petition if it so desires. If the district court elects to address the petition, it may file an answer with this court or issue a supplemental order and serve a copy on this court.

Petitioners may file a reply within 7 days after service of the answer(s).

The clerk will send a copy of this order to the district court and Magistrate

Judge Kim.

Exhibit 25

No. 26-3513

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE DOE DEFENDANTS,

*Petitioners and Defendants-Movants*,

v.

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

*Respondent*,

TED ENTERTAINMENT, INC.,

*Real Party in Interest and Plaintiff-Respondent*.

On Petition for Writ of Mandamus to the United States District Court
for the Northern District of California
Case No. 3:25-mc-80296-SK
Hon. Sallie Kim

## ANSWERING BRIEF TO PETITION FOR WRIT OF MANDAMUS

ROM BAR-NISSIM (SBN 293356)
ROM@HEAHBARNISSIM.COM
Heah Bar-Nissim LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

**Attorneys for Real Party in Interest
Ted Entertainment, Inc.**

1

**TABLE OF CONTENTS**

I.   **INTRODUCTION** ................................................................1

II.  **FACTUAL BACKGROUND** ............................................3

    A.   **TEI and its Owners** ....................................................3

    B.   **H3Snark** ........................................................................4

    C.   **The Works and their Infringement** ........................5

III. **RELEVANT PROCEDURAL HISTORY** ......................7

IV.  **LEGAL STANDARD** ......................................................10

V.   **THE PETITION FAILS TO SATISFY THE CLEAR ERROR STANDARD AS A MATTER OF LAW** ........11

VI.  **THE PETITION FAILS THE CLEAR ERROR STANDARD ON THE FACTS** .....................................16

    A.   **The Quash Order Applied the Proper Standard** 16

    B.   **The Petition Fails to Refute TEI's *Prima Facie* Showing of Contributory Copyright Infringement** ..............................................................17

        1.   **Denims Engaged in Direct Infringement** ... 17

        2.   **Petitioners Knew of Denims' Infringement** ........................................................18

        3.   **Petitioners Induced Denims' Infringement** ........................................................19

    C.   **Insofar as Fair Use May Be Considered, Petitioners Failed to Show that Petitioners or Denims Made a Fair Use of TEI's Works** ...........22

        1.   **Petitioners Fail to Show They Made a Fair Use of the Works** ...........................................24

**2.** **Petitioners Fail to Show that Denims Made a Fair Use of the Works** ............................... 26

**3.** **The MPJOP Order is Flawed** ..................... 39

**D.** **Petitioners Fail to Show the Balance of Equities Weighs in Their Favor** ............................................. 40

**VII.** **CONCLUSION** ................................................................ 43

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Agdal v. X Corp. In Int. to Twitter*,

   2025 WL 81594 (N.D. Cal. Jan, 13, 2025) ..................................... 12

*Ambrosetti v. Oregon Cath. Press*,

   151 F.4th 1211 (9th Cir. 2025) ....................................................... 11

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,

   598 U.S. 508 (2023) ................................................. 26, 27, 28, 29, 35

*Arista Records, LLC v. Doe 3*,

   604 F.3d 110 (2d Cir. 2010) ........................................................... 14

*Art of Living Foundation v. Does*,

   2011 WL 3501830 (N.D. Cal. Aug. 10, 2011) ............................... 12

*Art of Living Foundation v. Does*,

   2011 WL 5444622 (N.D. Cal. Nov. 9, 2011) ............... 13, 15, 23, 41

*Atari Interactive, Inc. v. Redbubble, Inc.*,

   515 F.Supp.3d 1089 (N.D. Cal. 2021) ........................................... 18

*Barnes v. YouTube, Inc.*,

   2026 WL 412470 (N.D. Cal. Feb. 13, 2026) ................. 12, 13, 15, 41

*Bartz v. Anthropic PBC*,

   787 F.Supp.3d 1007 (N.D. Cal. 2025) ........................................... 36

*Baugher v. GoDaddy.com LLC*,

2021 WL 4942658

(D. Ariz. Oct. 22, 2021)..............................13, 14, 17, 23, 25, 40, 41

*Campbell v. Acuff-Rose Music, Inc.*,

510 U.S. 569 (1994)....................................................................24

*Cognosphere Pte. Ltd. v. X Corp.*,

2024 WL 4227594 (N.D. Cal. Sept. 18, 2024)........13, 15, 41, 42, 43

*Cox Communications, Inc. v. Sony Music Entertainment*,

146 S.Ct. 959 (2026)...........................................................18, 19, 20

*De Fontbrune v. Wofsy*,

39 F.4th 1214 (9th Cir. 2022) ...................................................24, 27

*Elvis Presley Enterprises, Inc. v. Passport Video*,

349 F.3d 622 (9th Cir. 2003) ..............................................28, 29, 30

*Harper & Row Publishers, Inc. v. Nation Enterprises,*

471 U.S. 539 (1985).................................................................24, 35

*Highfields Capital Management, L.P. v. Doe*,

385 F.Supp.2d 969 (N.D. Cal. 2005).............................................16

*Hosseinzadeh v. Klein*,

246 F.Supp.3d 34 (S.D.N.Y. 2017) ............................................3, 29

2

*In re Bundy*,

    840 F.3d 1034 (9th Cir. 2016) ........................................................ 11

*In re Creech*,

    119 F.4th 1114 (9th Cir. 2024) ................................................. 10, 11

*In re DMCA Subpoena to Reddit, Inc.*

    441 F.Supp.3d 875 (N.D. Cal. 2020) ........... 12, 13, 14, 23, 25, 26, 41

*In re DMCA Subpoena to Reddit, Inc.*

    2026 WL 1847873 (N.D. Cal. June 26, 2026) ......... 13, 14, 23, 25, 41

*In re DMCA § 512(h) Subpoena to Twitter, Inc.*

    608 F.Supp.3d 868 (N.D. Cal. 2022) ...................... 12, 13, 14, 16, 41

*In re O'Brien*,

    312 F.3d 1135 (9th Cir. 2002) ........................................................ 17

*In re Orr*,

    178 F.4th 525 (9th Cir. 2026) ........................................................ 10

*In re Swift Transportation Co. Inc.*,

    830 F.3d 913 (9th Cir. 2016) ......................................................... 11

*Lenz v. Universal Music Corp.*,

    815 F.3d 1145 (9th Cir. 2016) ................................................. 14, 23

*McGucken v. Pub Ocean Ltd.*,

    42 F.4th 1149 (9th Cir. 2022) ...................................... 28, 34, 35, 36

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,

   545 U.S. 913 (2005)...........................................................................20

*National Fire Protection Association, Inc. v. UpCodes, Inc.*,

   753 F.Supp.3d 933 (C.D. Cal. 2024) ................................................36

*Nazemian v. NVIDIA Corp.*,

   2026 WL 1229583 (N.D. Cal. May 5, 2026)..............................17, 18

*Penguin Random House LLC v. Colting*,

   270 F.Supp.3d 736 (S.D.N.Y. 2017) .................................................28

*Signature Management Team, LLC v. Automattic, Inc.*,

   941 F.Supp.2d 1145 (N.D. Cal. 2013).....................12, 13, 14, 15, 40

*Smythe v. Doe*,

   2015 WL 12819174 (C.D. Cal. Nov. 17, 2015) ..............................12

*Sony Music Ent. Inc. v. Does 1-40*,

   326 F.Supp.2d 556 (S.D.N.Y. 2004) ................................................14

*Strike 3 Holdings, LLC v. Meta Platforms, Inc.*,

   --F.Supp.3d--, 2026 WL 1697633 (N.D. Cal. June 11, 2026).........18

*VHT, Inc. v. Zillow Group, Inc.*,

   918 F.3d 723 (9th Cir. 2019) ...........................................................35

5

**Statutes**

17 U.S.C. §106.............................................................................17, 18

17 U.S.C. §107.............................................................................24, 29

17 U.S.C. §512(h) ............................................................................ 12

**Other Authorities**

H.R. Rep. No. 94-1476 ...................................................................... 24

Real Party in Interest and Plaintiff-Respondent Ted Entertainment, Inc. ("TEI") hereby submits its answering brief to the Petition for Writ of Mandamus (the "Petition") of Petitioners and Defendants-Movants Does (collectively, the "Petitioners").

## I. <u>INTRODUCTION</u>

The Petition must be denied because it fails to demonstrate clear error in the district court's April 29, 2026 Order denying Petitioners' motion to quash (the "Quash Order"). The Quash Order addressed Petitioners' First Amendment challenge to TEI's subpoenas to Reddit, Inc. and Discord, Inc. (collectively, the "Subpoenas"). The Subpoenas seek Petitioners' personal identifying information to name and serve them with a lawsuit alleging claims of contributory copyright infringement against them.

The Petition fails to show clear error for several reasons. First, there can be no clear error as a matter of law. The Ninth Circuit has never addressed a First Amendment challenge to a subpoena seeking to unmask an anonymous copyright defendant. Furthermore, district courts have applied different tests (including as to fair use) to address the issue.

Next, the Petition fails on the facts. Contrary to Petitioners'

1

assertions, the district court employed the correct test adopted by the majority of district courts. Moreover, the Petition fails to refute that TEI made a *prima facie* evidentiary showing of Petitioners' contributory copyright infringement of the two works at issue: (1) *The H3 Show #104 – Countdown to Doomsday* (the "*Countdown Episode*"); and (2) *Content Nuke: Hasan Piker* ("*The Nuke*") (collectively, the "Works").

Regardless, even if fair use is part of the analysis (which it is not), Petitioners cannot prove their two Reddit posts directing users to the January 31, 2025 stream of co-defendant Alexandra Marwa Saber p/k/a Denims ("Denims") constituted fair use. Nor have Petitioners proven Denims made fair use of the Works.[1]

Finally, contrary to Petitioners' assertions, the balance of equities does not weigh in their favor. Petitioners made five evidentiary submissions comprised of hundreds of pages and hours of videos. Those submissions failed to persuade the court because they

---

[1] The order in the underlying action finding Denims made a fair use of *The Nuke* is flawed and will be appealed. While addressing the order is beyond the scope of this brief, TEI shall touch upon those flaws in Section VI.C.3, *infra*. If necessary, this Court should order supplemental briefing by the parties to address the order.

2

were replete with falsehoods and gross misrepresentations of the underlying facts. *See* Fns. 3-4, *infra*.

Therefore, for the reasons set forth herein, TEI requests this Court to deny the Petition.

## II.    FACTUAL BACKGROUND

### A.    TEI and its Owners

TEI is a production company that produces online content. It owns the YouTube channels "h3h3Productions" (which contains scripted and highly edited commentary videos) and "H3Podcast" (which airs podcast episodes). 2-SER-263, ¶8-9.

TEI earns revenue through paid memberships and advertising revenue that is split with YouTube. The more views a YouTube video receives, the more it gains advertising revenue and traction in YouTube's algorithm, which increases the video's visibility, views and advertising revenue. 2-SER-270, ¶32; 2-SER-263, ¶8.

TEI's owners are Ethan and Hila Klein. 2-SER-283, ¶7. They pioneered fair use reaction videos, including setting precedent in *Hosseinzadeh v. Klein*, 246 F.Supp.3d 34 (S.D.N.Y. 2017). 2-SER-283-284, ¶10.

Prior to October 7, Ethan co-hosted a political comedy podcast

with the streamer, Hasan Piker. After October 7, friction grew between the two. While the Kleins publicly condemned Israel's actions as a genocide, they advocated a two-state solution and condemned terrorism. In contrast, Piker justified terrorism and advocated dismantling Israel. This schism led Piker's supporters to attack the Kleins as genocide supporters. 2-SER-288, ¶22.

### B. H3Snark

Snark subreddits are a genre of message boards on Reddit comprised of "fallen fans" of a particular public figure. 2-SER-287-288, ¶¶20-21. Petitioners are the moderators of H3Snark – a snark subreddit obsessed with the Kleins. Its user base grew significantly after the public schism between Piker and the Kleins and became the central location to attack the Kleins. 2-SER-288, ¶23; 2-SER-272-279, ¶¶38-39.

H3Snark also became a hub for copyright infringement of TEI's content. H3Snark users had a ravenous appetite for "hatewatching" TEI's content. Petitioners knew their users desired TEI's content but did not want to drive views and advertising revenue to TEI. 2-SER-355-363, ¶¶7-19; 2-SER-389-421.

In response, Petitioners supplied their users with pirated

4

substitutes of TEI's content – which they called "ethical viewing." Petitioners would provide links to TEI's content on the pirate website, YewTube. 2-SER-356-359, ¶¶9-14; 2-SER-389-402. YewTube provides unauthorized access to YouTube videos and publicly performs them outside of the YouTube platform, which deprives the original of views, advertising revenue and visibility. Petitioners even admitted this by stating: "We encourage folks to watch on yewtube since it doesn't play ads or contribute to [TEI's] view counts." 2-SER-358, ¶12; 2-SER-391-392; 2-SER-401-402; ER-78, ¶30.

Petitioners provided these links through: (1) community posts visible to all H3Snark users at the top of H3Snark's page; and (2) during live chats hosted on H3Snark (which Petitioners deleted after TEI's live broadcast ended). 2-SER-356-358, ¶¶9-11; 2-SER-391-395. Petitioners also provided their users instructions on how to download TEI's paywalled content and upload it to H3Snark – which resulted in entire paywalled episodes uploaded to H3Snark where viewers could watch them for free. 2-SER-355-356, ¶¶7-8; 2-SER-389-390.

## C.    <u>The Works and their Infringement</u>

The Kleins decided to create a documentary on how Piker radicalizes people to support terrorism. *The Nuke* was created over

5

several months and utilized a combination of comedy, commentary, archival materials, audio and visual effects, montage and editing to criticize Piker. Its final duration was one hour and forty-two minutes. 2-SER-269, ¶¶24-25; 2-SER-317-320; Ex. E.[2]

The Kleins promoted *The Nuke* heavily before its release on January 31, 2025. Public interest in *The Nuke* was immense, particularly on H3Snark. 2-SER-269-270, ¶28. On January 30, 2025, Petitioners created a community post visible to all H3Snark users titled: "MEGATHREAD | Content Nuke – Where to Watch & Discussion" (the "1/30/25 Post"). It provided links to various creators (including Denims) as a place "to watch the nuke without showing support for h3" (*i.e.*, TEI). 2-SER-369, ¶35; ER-143.

On January 31, 2025, TEI broadcast the *Countdown Episode* to build interest in *The Nuke*, along with covering other topics. During the broadcast, Petitioners created another community post titled: "DENIMS is LIVE reacting now to today's H3 podcast episode and the 'content nuke' video Ethan is publishing in about an hour" (the

---

[2] TEI has filed a motion to submit various video exhibits that were concurrently filed with the complaint in the underlying action and by Petitioners in the present action. Dkt. No. 12.1. All citations reference the complaint exhibit letter.

"First 1/31/25 Post"). It contained a hyperlinked picture of Denims that took users directly to her stream (the "Watch Party") of the Countdown Episode. 2-SER-370-372, ¶¶38, 40; ER-173; 2-SER-456-457.

Shortly afterward, TEI released *The Nuke*. Petitioners created another community post titled: "Ethan Klein's Content Nuke on Hasan Piker | H3 Snark Megathread" (the "Second 1/31/25 Post"). It stated "Places to watch reactions to this video" with a link to Denims' Watch Party of *The Nuke*. 2-SER-370-371, ¶¶39-40; ER-156.

## III.   <u>RELEVANT PROCEDURAL HISTORY</u>

On June 19, 2025, TEI initiated the underlying action titled *Ted Entertainment, Inc. v. Saber et al.* (C.D. Cal. Case No. 2:25-cv-05564-WLH-PD) (the "Underlying Action"). The complaint alleged: (1) direct infringement of the *Countdown Episode* and *The Nuke* against Denims; and (2) contributory infringement of both Works against Petitioners. ER-62-176.

Prior to the Rule 26(f) conference, TEI and Denims filed a stipulation for TEI to serve the Subpoenas, which was granted. ER-180-212; ER-214-215. The same day TEI served the Subpoenas, Petitioners' counsel contacted TEI's counsel to inform TEI that

Petitioners would file a motion to quash the Subpoenas (the "Motion"). ER-442-443, ¶¶57-58.

On September 22, 2025, Petitioners filed their Motion and supporting papers in the action titled: *In re Subpoenas to Reddit, Inc. and Discord, Inc.* (N.D. Cal. Case No. 3:25-mc-80296-SK). ER-17-50. Shortly thereafter, the court granted Petitioners' request to file additional declarations for *in camera* review. 2-SER-510.

On October 20, 2025, TEI filed its opposition to the Motion. ER-383-413. In the supporting papers, TEI was forced to debunk countless falsehoods and conspiracy theories in Petitioners' declaration.[3] Notable examples include: (1) the Kleins sent human skulls to themselves to elicit sympathy after being investigated by the Los Angeles County Department of Child and Family Services based on a fraudulent report; (2) the Subpoenas were a fishing expedition because Ethan wore a "fishing hat" when discussing them; and (3) Ethan intended to kill them based on quoting the film *Taken.* 2-SER-299, ¶¶73-74; 2-SER-304-306, ¶77; 2-SER-340-347.

---

[3] *See* 2-SER-269, ¶25 fn.18; 2-SER-271-316 ,¶¶35-94; 2-SER-317-352; 2-SER-354-372, ¶¶3-40; 2-SER-381, ¶56; 2-SER-386-388, ¶¶79-80; 2-SER389-457; Exs. D-F.

8

On November 3, 2025, Petitioners filed their reply brief and supporting papers containing new arguments and evidence that did not respond to TEI's opposition. ER-450-531. Unable to address these new arguments and evidence (which were also based on falsehoods and mischaracterizations), TEI was confined to lodging objections. 1-SER-247-253; *see also* N.D. Cal. Local Rule 7-3.

On December 9, 2025, Petitioners filed an administrative motion and supporting papers that improperly introduced additional evidence and substantive argument. 1-SER-176-246. In its opposition and supporting papers, TEI debunked Petitioners' assertions.[4] Despite the local rules not authorizing replies for administrative motions, Petitioners filed a reply brief and additional evidence. 1-SER-11-24; *see also* N.D. Cal. Local Rule 7-11.

On April 15, 2026, the Court provided the parties notice of questions to be addressed at the hearing that primarily concerned the appropriate legal standard. 1-SER-9-10. Immediately after the Motion was heard on April 20, 2026, the Court ordered TEI to file a corrected video exhibit of Denims' Watch Party and TEI complied. 1-SER-6-8.

---

[4] 1-SER-27-153, ¶¶4-10; 1-SER-159-168, ¶¶17-19

9

On April 29, 2026, the Court issued the Quash Order denying the Motion. ER-5-16.

On May 29, 2026, Petitioners initiated two matters in this Court. The first is the present petition. The second is an appeal titled *Ted Entertainment, Inc. v. Doe Defendants* (Case No. 26-3553).

Concurrently, Denims filed a motion for judgment on the pleadings as to *The Nuke* (but not the *Countdown Episode*) based on fair use. ER-532-560. The court in the Underlying Action granted the motion (the "MPJOP Order"), which Petitioners filed with this Court. Dkt. No. 10.1

## IV.    LEGAL STANDARD

A "writ of mandamus is a drastic and extraordinary remedy reserved for really extraordinary causes." *In re Creech*, 119 F.4th 1114, 1119 (9th Cir. 2024). This Court weighs five factors to determine whether to grant the Petition. *Id.* at 1120. The most important factor is "whether the district court's order is clearly erroneous as a matter of law" – which "is a necessary condition for granting a writ of mandamus." *In re Orr*, 178 F.4th 525, 532 (9th Cir. 2026).

The clear error "standard is demanding." *In re Creech*, 119

10

F.4th at 1120. The Petition cannot be granted "simply because a district court commits an error, even one that would ultimately require reversal on appeal." *Id.* at 1121. Rather, "the standard requires [a] firm conviction that the district court misinterpreted the law or committed a clear abuse of discretion." *Id.* (cleaned up).

The standard is "especially deferential" when appellate review involves the "abuse of discretion" standard. *In re Bundy*, 840 F.3d 1034, 1041 (9th Cir. 2016). "[R]ulings concerning discovery" – like the Quash Order – are subject to the "abuse of discretion standard." *Ambrosetti v. Oregon Cath. Press,* 151 F.4th 1211, 1218 (9th Cir. 2025).

## V.      THE PETITION FAILS TO SATISFY THE CLEAR ERROR STANDARD AS A MATTER OF LAW

The "absence of controlling precedent weighs strongly against a finding of clear error." *In re Swift Transportation Co. Inc.*, 830 F.3d 913, 916-17 (9th Cir. 2016). If "no prior Ninth Circuit authority prohibited the course taken by the district court, its ruling is not clearly erroneous." *Id.* at 917. Here, the Ninth Circuit has never articulated the standard for determining a First Amendment challenge to a subpoena seeking to unmask an anonymous copyright

infringement defendant.

Further, courts have noted the lack of uniform case law when "the anonymous speech at issue constitutes copyright infringement or relates to illegal activity[.]" *Agdal v. X Corp. In Int. to Twitter*, 2025 WL 81594, *4 (N.D. Cal. Jan, 13, 2025). "[S]ome courts have concluded that a First Amendment analysis can be dispensed with altogether while others have concluded that consideration of the First Amendment concerns is still appropriate." *Id.* (citing *In re DMCA § 512(h) Subpoena to Twitter, Inc.* ("*Twitter*"), 608 F.Supp.3d 868, 876 (N.D. Cal. 2022); *Art of Living Foundation v. Does*, 2011 WL 3501830, *3 (N.D. Cal. Aug. 10, 2011); *In re DMCA Subpoena to Reddit, Inc.* ("*Reddit 2020*"), 441 F.Supp.3d 875, 882 (N.D. Cal. 2020); *Smythe v. Doe*, 2015 WL 12819174, *1 (C.D. Cal. Nov. 17, 2015)).

Nearly all cases addressing a First Amendment challenge to a subpoena seeking to unmask an anonymous copyright infringement defendant were decided in the context of a motion to quash a subpoena issued under 17 U.S.C. §512(h) ("DMCA Subpoena"). [5] The

---

[5] *Twitter*, 608 F.Supp.3d at 875; *Barnes v. YouTube, Inc.*, 2026 WL 412470, *2 (N.D. Cal. Feb. 13, 2026); *Signature Management Team,*

only exception is *Art of Living Foundation v. Does*, 2011 WL 5444622 (N.D. Cal. Nov. 9, 2011).

The majority of cases employ the following test: (1) "the party seeking the disclosure must demonstrate a *prima facie* case on the merits of its underlying … copyright claim;" and (2) "the Court balances the need for the discovery against the First Amendment interest at stake." *Cognosphere*, 2024 WL 4227594, *3; *Baugher*, 2021 WL 4942658, *3; *Twitter*, 608 F.Supp.3d at 876; *Barnes*, 2026 WL 412470, *3; *Art of Living*, 2011 WL 5444622, *7; *Signature*, 941 F.Supp.2d at 1157; *Reddit 2026*, 2026 WL 1847873, *4.

In *Reddit 2020*, the court only required a *prima facie* showing. 441 F.Supp.3d at 882. It rejected the balance of equities inquiry because "it is not well suited for a copyright dispute" since "the First Amendment does not protect anonymous speech that infringes copyright." *Id.*

In *Signature*, the court employed a test from the Southern

---

*LLC v. Automattic, Inc.*, 941 F.Supp.2d 1145, 1148 (N.D. Cal. 2013); *In re DMCA Subpoena to Reddit, Inc.* ("*Reddit 2026*"), 2026 WL 1847873, *2 (N.D. Cal. June 26, 2026); *Cognosphere Pte. Ltd. v. X Corp.*, 2024 WL 4227594, *2 (N.D. Cal. Sept. 18, 2024); *Baugher v. GoDaddy.com LLC*, 2021 WL 4942658, *1 (D. Ariz. Oct. 22, 2021); *Reddit 2020*, 441 F.Supp.3d at 877.

13

District of New York that the Second Circuit subsequently adopted. 941 F.Supp.2d at 1158 (citing *Sony Music Ent. Inc. v. Does 1-40*, 326 F.Supp.2d 556, 565-67 (S.D.N.Y. 2004)); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010). This standard examines: "(1) whether the party seeking discovery made a prima facie claim of copyright infringement; (2) the specificity of the discovery request; (3) the absence of alternative means to obtain the subpoenaed information; (4) the central need for [the] subpoenaed information; and (5) the expectation of privacy for the party opposing discovery." *Signature*, 941 F.Supp.2d at 1158.

Amongst these cases, there is no uniformity on the role of fair use. *Baugher*, *Reddit 2020* and *Reddit 2026* addressed the defendant's assertion of fair use when seeking to rebut a plaintiff's *prima facie* showing under their respective tests.[6] *Twitter* placed the burden on the plaintiff to refute fair use[7] – despite this Court's holding that it is "clear that the burden of proving fair use is always on the putative infringer." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1152-53

---

[6] *Baugher*, 2021 WL 4942658, *4; *Reddit 2020*, 441 F.Supp.3d at 882-886; *Reddit 2026*, 2026 WL 1847873, *4-10.

[7] *Twitter*, 608 F.Supp.3d at 879.

14

(9th Cir. 2016). *Cognosphere* and *Barnes* noted that the party opposing the subpoena asserted fair use but did not meaningfully argue the affirmative defense in its briefing.[8]

Most notable, *Art of Living* (the only non-DMCA Subpoena case) and *Signature* refused to conduct a fair use analysis. In *Art of Living*, the party moving to quash argued fair use to refute the *prima facie* showing. 2011 WL 5444622, *3. The court declined to address the issue because there was a pending motion for summary judgment on fair use. *Id.*, *8 fn.6. The court did note that "the circumstances here create a substantial question as to whether the doctrine applies." *Id.*, *6.

In *Signature*, the court applied the tests articulated in both *Art of Living* and *Sony*. 941 F.Supp.2d at 1157-58. The Court noted that the parties disputed "whether a fair use defense would be viable." *Id.* at 1156 fn.8. As in *Art of Living*, the Court in *Signature* did not address fair use when it applied the *Art of Living* test. *Signature*, 941 F.Supp.2d at 1157. In applying the *Sony* test, the Court stated that fair use should be addressed in the underlying copyright action. *Signature*,

---

[8] *Cognosphere*, 2024 WL 4227594, *6; *Barnes*, 2026 WL 412470, *4 fn.3.

941 F.Supp.2d at 1158.

Therefore, the Petition must be denied because it fails to demonstrate clear error as a matter of law.

## VI. THE PETITION FAILS THE CLEAR ERROR STANDARD ON THE FACTS

### A. The Quash Order Applied the Proper Standard

The Quash Order stated the applicable legal standard: (1) "require[d] the party seeking disclosure to make a prima facie showing on the merits of their claim;" and (2) "balance the equities, weighing the potential harm to the party seeking disclosure against the speaker's interest in anonymity, in light of the strength of the underlying claim." ER-009 (quoting *Twitter*, 608 F.Supp.3d at 876).

This standard is identical to the majority of cases addressing subpoenas seeking to unmask anonymous copyright defendants. *See* Section V, *supra*. Therefore, Petitioners' assertion that the Quash Order failed to employ the proper standard is false.[9]

---

[9] Notably, the language quoted from *Twitter* in the Quash Order expressly cites *Highfields Capital Management, L.P. v. Doe*, 385 F.Supp.2d 969, 974-75 (N.D. Cal. 2005). *Twitter*, 608 F.Supp.3d at 876.

16

**B.** **The Petition Fails to Refute TEI's *Prima Facie* Showing of Contributory Copyright Infringement**

Petitioners omit material evidence from the record that is necessary to determine TEI's *prima facie* showing (and even Petitioners' assertion of fair use). Specifically, Petitioners omit: (1) the two Works at issue; (2) Denims' Watch Party; (3) the exhibits to the declaration of TEI's counsel; and (4) the Kleins' joint declaration and exhibits. The "failure to present a sufficient record can itself serve as a basis for summary affirmance." *In re O'Brien*, 312 F.3d 1135, 1137 (9th Cir. 2002).

Regardless, TEI made its *prima facie* showing by "produc[ing] competent evidence supporting a finding of each fact that is essential to [the] cause of action." *Baugher*, 2021 WL 4942658, \*3. The elements of contributory infringement are that the defendant: "(1) had knowledge of a third party's infringement; and (2) induced that infringement[.]" *Nazemian v. NVIDIA Corp.*, 2026 WL 1229583, \*5 (N.D. Cal. May 5, 2026).

**1.** **Denims Engaged in Direct Infringement**

The elements of direct copyright infringement are: (1) ownership of a valid copyright and (2) violation of one of the exclusive rights in 17 U.S.C. §106. *Baugher*, 2021 WL 4942658, \*3.

17

"Copyright registration establishes a prima facie case of ownership." *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F.Supp.3d 1089, 1111 (N.D. Cal. 2021). TEI registered the Works[10] and never authorized Denims' use of the Works. 2-SER-270, ¶31; 2-SER-372, ¶41; Exs. J-K. Consequently, she violated TEI's right to reproduce and publicly perform the Works. 17 U.S.C. §106(1)(4).

### 2.     Petitioners Knew of Denims' Infringement

While mere knowledge is no longer sufficient to establish contributory infringement, *Cox Communications, Inc. v. Sony Music Entertainment*, 146 S.Ct. 959, 968 (2026), knowledge is nevertheless relevant in establishing intent, which *can* support a claim of contributory infringement. *See Strike 3 Holdings, LLC v. Meta Platforms, Inc.*, --F.Supp.3d--, 2026 WL 1697633, *8-9 (N.D. Cal. June 11, 2026); *Nazemian*, 2026 WL 1229583, *5-6. Here, there is ample evidence of knowledge.

Petitioners knew that Denims was streaming both Works. The title for the First 1/31/25 Post was "DENIMS is LIVE reacting now to today's H3 podcast episode and the 'content nuke' video Ethan is

---

[10] 2-SER-269, ¶26; 2-SER-271, ¶34; 2-SER-369-370, ¶¶34, 37.

publishing in about an hour." It contained a hyperlinked photograph of Denims that took users directly to her Watch Party. ER-173. Therefore, Petitioners knew Denims was currently exploiting the *Countdown Episode* and would exploit *The Nuke* when they made the First 1/31/25 Post.

The Second 1/31/25 Post was titled "Ethan Klein's Content Nuke on Hasan Piker | H3 Snark Megathread" with the text "Places to watch reactions to th*i*s video." In the list of creators reacting to *The Nuke*, the post stated: "**Denims (Twitch) | <u>Link</u>** *(LIVE NOW)*". ER-156 (original emphasis). Therefore, Petitioners knew that Denims was streaming *The Nuke* when they made the Second 1/31/25 Post.[11]

### 3. <u>Petitioners Induced Denims' Infringement</u>

The Supreme Court held that a defendant is "contributorily liable for [a] user's infringement only if it intended that the provided service be used for infringement." *Cox Communications, Inc. v. Sony Music Entertainment, Inc.*, 146 S.Ct. 959, 967 (2026). Intent "can be

---

[11] While the Second 1/31/25 Post contained a link to *The Nuke*, it was in the letter "i" of the word "this" in the phrase "Places to watch reactions to th*i*s video." In contrast, the word "**<u>Link</u>**" next to Denims' name was bold and underlined. ER-156. The reason for this difference is Petitioners wanted to make accessing Denims' Watch Party easy and provide the imprimatur of linking to the original.

shown only if the party induced the infringement[.]" *Id.* A party "induces infringement if it actively encourages infringement through specific acts." *Id.*

Petitioners intended for their First 1/31/25 Post and Second 1/31/25 Post to encourage Denims' infringing use of both Works. Through these posts, Petitioners encouraged Denims' infringement by directing H3Snark users away from the Works to Denims' Watch Party by advertising her Watch Party and providing links to it. ER-156; ER-173.

Further, Petitioners "aim[ed] to satisfy a known source of demand for copyright infringement" – *i.e.*, intent to achieve an unlawful objective. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 939 (2005). The 1/30/25 Post demonstrates Petitioners' intent by stating: "Hey everyone, we've seen a lot of comments about wanting to watch the nuke without showing support for H3" – *i.e.*, acknowledging their users wanted to consume unauthorized versions of *The Nuke*. ER-143.

Petitioners' intent is further evidenced by the timing of the posts. The First 1/31/25 Post was posted at 12:33 p.m. PST – *i.e.*, a few minutes after the *Countdown Episode* began. ER-173; ER-242,

20

¶33; 2-SER-370, ¶36. The Second 1/31/25 Post was posted at 1:43 p.m. PST – *i.e.*, 13 minutes after *The Nuke* was publicly released. ER-156; ER-243-244, ¶38; 2-SER-270, ¶30. By offering alternatives for the Works almost contemporaneously with their original broadcast, Petitioners helped Denims siphon views away from the Works to herself. Petitioners achieved this objective by directing their users – who were the most eager viewers of the Works – away from the originals to Denims' Watch Party as a substitute.

Petitioners' intent is further evidenced by their history of providing H3Snark users pirated versions of TEI's content. Petitioners provided their users links to YewTube – a website that publicly performs YouTube videos outside the YouTube platform and deprives the original of views, advertising revenue and visibility. As Petitioners stated, they "encourage[d] folks to watch on yewtube since it doesn't play ads or contribute to [TEI's] view counts." 2-SER-356-358, ¶¶9-12; 2-SER-391-402; ER-78, ¶30.

The Quash Order expressly recognized Petitioners' intent to encourage Denims' infringement.

> TEI does not merely allege these facts but points to specific evidence that [Petitioners] specifically instructed other potential viewers to watch Denims' 'watch party' as an 'ethical' way to watch TEI's programs. [Citing

21

Petitioners' posts] In this context, opponents of the Kleins wanted to watch their shows but did not want to give them 'views' on YouTube or other streaming platforms that reward content creators based on their number of viewers. It appears that the entire purpose of watching Denims' watch party was to watch TEI's programming in a manner that did not benefit TEI. (*See id. providing a list of content creators for people to watch* The Nuke "without showing support for H3").

TEI's allegations, supported by evidence, create a prima facie claim for contributory copyright infringement against [Petitioners]. Although it may seem counterintuitive that opponents of the Kleins would want to watch the Kleins' programs, they were engaging in a cultural phenomenon known as "hate watching."

….

Here, the entire purpose of Denims' watch party was to "hatewatch" TEI's works without giving any benefit to TEI. There is credible evidence that [Petitioners] understood this goal and facilitated this goal by encouraging other people to watch Denims' watch party.

ER-13-14.

Therefore, Petitioners fail to refute TEI's *prima facie* showing

of contributory copyright infringement.

## C.  **Insofar as Fair Use May Be Considered, Petitioners Failed to Show that Petitioners or Denims Made a Fair Use of TEI's Works**

The Quash Order correctly held that – in the context of a Rule

45 subpoena (as opposed to a DMCA Subpoena) – the fair use

22

analysis should be reserved for the underlying action. ER-11:19-12:22. As the Quash Order correctly noted, DMCA Subpoena actions are distinct because: (1) they are standalone civil cases; and (2) a DMCA Subpoena requires a DMCA takedown, which necessitates analyzing fair use before issuance. ER-11:19-12:22. The Quash Order is in accord with the only non-DMCA Subpoena case, which reserved the fair use analysis to the underlying action. *Art of Living*, 2011 WL 5444622, *3 & 8 fn.6.[12]

Even if fair use is analyzed in the non-DMCA Subpoena context, Petitioners failed to make this showing. As previously stated, the Ninth Circuit makes "clear that the burden for proving fair use is always on the putative infringer." *Lenz*, 815 F.3d at 1152-53. This also applies to motions to quash subpoenas seeking to identify anonymous copyright infringers. *See Baugher*, 2021 WL 4942658, *4; *Reddit 2020*, 441 F.Supp.3d at 883; *Reddit 2026*, 2026 WL 1847873, *5.

The Copyright Act contains four factors courts consider to evaluate fair use:

1. [T]he purpose and character of the use, including whether such use is of a commercial nature or is for

---

[12] Both cases also involved a pending motion on fair use.

nonprofit educational purposes;

2.  [T]he nature of the copyrighted work;

3.  [T]he amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4.  [T]he effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. §107.

Fair use "is not to be simplified with bright-line rules" and requires a "case-by-case analysis." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). "[E]ach case raising the question must be decided on its own facts." *Harper & Row Publishers, Inc. v. Nation Enterprises* ("*Harper*"), 471 U.S. 539, 560 (1985) (quoting H.R. Rep. No. 94-1476, p. 65 (1976)).

### 1. Petitioners Fail to Show They Made a Fair Use of the Works

Petitioners claim they made a fair use by facilitating H3Snark users' commentary and criticism of the Works. The Ninth Circuit has rejected this argument: the "end-user's utilization of the product is largely irrelevant" to fair use. *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1224 (9th Cir. 2022). This applies with equal force to motions to quash subpoenas seeking to unmask anonymous copyright infringers:

Posting a work and implicitly inviting comment or criticism is the same as simply copying the work; any

24

> work made public will always inspire an opinion in the reader, but the reader's implicit opinion is not the same as comment or criticism formed and made by the blogger who copies the copyright protected work.

*Baugher*, 2021 WL 4942658, *4.

Here, Petitioners' posts did not provide any commentary on the Works. The title of the First 1/31/25 Post was: "DENIMS is LIVE reacting now to today's H3 podcast episode and the 'content nuke' video Ethan is publishing in about an hour." It did not contain any further text in the body of the post. ER-173. The title of the Second 1/31/25 Post was "Ethan Klein's Content Nuke on Hasan Piker | H3 Snark Megathread." The body's only text was: "Places to watch reactions to this video" with a list of creators, links to their pages and whether they were currently streaming *The Nuke*. ER-156.

Petitioners' posts stand in stark contrast to those in *Reddit 2026* and *Reddit 2020*. In *Reddit 2026*, the post's title was "PBA: Weaponizing SA [*i.e.*, Sexual Assault], Homophobia, and Moms for his Angry Rant" and "the body of the posts provide[d] criticisms of [the plaintiff's] language, including his references to an individual's mother, anal sex, and child abuse." *Reddit 2026*, 2026 WL 1847873, *6. The post contained a 27-second clip from a nearly 16-hour live stream to evidence the critique. *Id.* In *Reddit 2020*, the user posted a

25

one-page Jehovah's Witness advertisement from a multipage magazine. *Reddit 2020*, 441 F.Supp.3d at 878-879. The advertisement was posted on an existing post criticizing the organization's fundraising and data collection practices. *Id.* These uses do not resemble Petitioners' posts whatsoever.

Therefore, Petitioners fail to show they made a fair use of the Works.

### 2. Petitioners Fail to Show that Denims Made a Fair Use of the Works

This Court should abstain from deciding whether Denims made a fair use until the forthcoming direct appeal from the MPJOP Order. Out of an abundance of caution, TEI shall explain why Denims failed to make a fair use of the Works.

### a. The First Factor Weighs Against Fair Use

The first factor relates to the problem of "substitution" – *i.e.*, whether the secondary use "supersedes" or "supplant[s]" the original. *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith* ("*Warhol*"), 598 U.S. 508, 527 (2023). The "central question" is whether the secondary use "adds something new, with a further purpose or different character." *Id.* at 528. The mere fact that a

secondary use has "some further purpose" or "add[s] something new

… does not render such uses fair." *Id.* at 528-529. Rather, "whether an

allegedly infringing use has a further purpose or different character" is

"a matter of degree[.]" *Id.* at 532. Secondary uses that do "not serve

an 'entirely different function' than the originals" are not generally

considered fair use. *De Fontbrune*, 39 F.4th at 1225.

The "first factor also relates to the justification for the use" both

in the "broad" and "narrower sense." *Warhol*, 598 U.S. at 531-532. A

use is justified in the "broad sense" if it has a "distinct purpose" from

the original "without diminishing the incentive to create." *Id.* at 531. A

use is justified in the "narrower sense" when it "is reasonably

necessary to achieve the user's new purpose." *Id.* Such justification is

"particularly relevant to assessing fair use" where "wide

dissemination of a secondary work would otherwise run the risk of

substitution for the original[.]" *Id.* Again, "the question of justification

is one of degree." *Id.*

Even criticism is "not entitled to a presumption of fairness."

*Warhol*, 598 U.S. at 532 fn.7. To qualify as transformative criticism,

"each quoted passage" must serve "a different purpose (an object of

criticism)." *Id.* at 528 fn.4. Consequently, "a court must consider each

27

use within the whole to determine whether the copying is fair." *Id.* The first factor does not favor fair use when "a defendant copies more than is necessary to facilitate 'comment or criticism.'" *Penguin Random House LLC v. Colting*, 270 F.Supp.3d 736, 751 (S.D.N.Y. 2017). "The law is clear that, to be considered transformative criticism, the aspects of a work that reproduce another's protected expression must be in service of commentary on that work. It is not enough for part of a work to have a transformative purpose." *Id.* When "clips are played without much interruption, if any" or "used in excess of [the] benign purpose," such uses fail to sufficiently transform a work. *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 628-29 (9th Cir. 2003).[13]

Most important, when "the commentary has no critical bearing on the substance or style of the original composition, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of commerciality, loom larger." *Warhol*, 598 U.S. at 530-31.

*Hosseinzadeh* provides useful guidance. As the court noted,

---

[13] Overruled on other grounds in *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1158 (9th Cir. 2022).

28

reaction videos "vary widely in terms of purpose, structure, and the extent to which they rely on potentially copyrighted material." 276 F.Supp.3d 34, 40 fn.1 (S.D.N.Y. 2017). A reaction video that "intersperses relatively short segments" of the original "with long segments of the [secondary user's] commentary" constitutes fair use. *Id.* at 40. Reaction videos that are more "akin to a group viewing session" (*i.e.*, a watch party) are not considered fair use. *Id.* at 40 fn.1. Due to this difference, the court clarified it was "not ruling here that all 'reaction videos' constitute fair use." *Id.*

The first factor also examines whether the use was commercial. 17 U.S.C. § 107(1). Commercialism examines "the degree to which the new user exploits the copyrighted work for commercial gain—as opposed to incidental use as part of a commercial enterprise." *Elvis*, 349 F.3d at 627. "The undisputed commercial character of [a defendant's] use, though not dispositive, tends to weigh against a finding of fair use." *Warhol*, 598 U.S. at 537.

*Countdown Episode*: Denims streamed almost the entire *Countdown Episode* concurrently with TEI's live broadcast. 2-SER-372-373, ¶¶43-44; Ex. K at 9:30-1:15:26. As Denims herself admitted: "If someone watches content on someone else's stream, there is a very

29

low likelihood that they're going to go watch it separately and give you the view or the like." 2-SER-376-379, ¶¶49-50.

Denims' Watch Party of the *Countdown Episode* was for a commercial purpose because she solicited and received paid subscriptions and donations, including advertising revenue. 2-SER-373, ¶44; Ex. K at 9:30-1:15:26. She also used her Watch Party of the *Countdown Episode* to promote her Watch Party of *The Nuke* by:

- Placing a banner on the top of her screen stating: "CONTENT NUKE DROPS AT 1:30 PM PST" (Ex. K beginning at 0:34);

- Adding a timer for when *The Nuke* would be released (*id.* beginning at 16:48);

- Encouraging people to view her Watch Party instead of *The Nuke* by stating: "If you want to watch it, you know, come enjoy the watch party somewhere else." *Id.* at 23:40-47.

Since Denims was "not advertising a scholarly critique or historical analysis" of TEI's Works, "but instead [sought] to profit at least in part from [the Works'] inherent entertainment value," her use was commercial. *Elvis,* 349 F.3d at 627.

Denims watched long sections of the *Countdown Episode* with little to no interruption for several minutes at a time. ER-108, fn.37

30

(compiling timestamps from Exhibit K). Denims even let the *Countdown Episode* play for 2:21 minutes while she was off camera. Ex. K at 39:18-41:40. Upon returning, Denims was silent for another minute. *Id.* at 41:41-42:41. When she did speak, she provided in total: (1) 4:43 minutes of brief commentary with little to no critical bearing on the original; (2) 43 seconds of partially related commentary; and (3) 2:12 minutes of unrelated or unintelligible comments. ER-109, fns. 38-40 (compiling timestamps from Exhibit K). During the 1:03:56 hour runtime, Denims let the *Countdown Episode* play uninterrupted nearly 88% of the time.

*The Nuke*: Denims' Watch Party of *The Nuke* began one minute after its public release and was shown in its entirety. 2-SER-373, ¶45; Ex. K at 1:15:19. Denims received approximately 45,000 concurrent viewers – the most she had to date. 2-SER-375, ¶46; 2-SER-458-459. On 174 separate occasions, she received paid subscriptions and donations – in addition to advertising revenue. 2-SER-375, ¶47; Ex. K at 1:15:19-5:06:20.

Denims' statements show her purpose was to host a watch party of *The Nuke* by:

- Titling her stream as a "watch party" (2-SER-375-376, ¶48; 2-

31

SER-456-457);

- Stating: "If you want to watch it, you know, come enjoy the watch party somewhere else." (Ex. K at 23:40-47);

- When a viewer stated "We're relying on you to stay live so we don't give more views to the Nuke," Denims replied with: "Yeah, I'm going to" and "We're going to stream it" (Ex. J at 4:48:38-4:48:48);

- Placing a banner on the screen stating she was "Watching" *The Nuke* (Ex. K beginning at 1:15:03);

- When asked by a viewer, she said she was "watching" *The Nuke* (Ex. K at 2:06:09-23);

- Saying she "did not want to watch" *The Nuke* by herself. Ex K at 5:07:45-5:08:09.

Denims' statements reveal her commercial purpose. When her Watch Party ended, she said: "Well guys, if you enjoyed not giving any views to that terrible video, follow, subscribe, throw a prime, if you like the content if you enjoyed your time here" – all while H3Snark was visible on her screen. 2-SER-375-376, ¶48; Ex. K at 5:07:45-5:08:09.

Denims failed to address the majority of points raised in *The*

32

*Nuke*. 2-SER-273-275, ¶45; ER-118:13-119:27. On 74 separate occasions, she let *The Nuke* play uninterrupted for 30 seconds or more (27 of which were over a minute and one over two minutes). This comprised over 70 minutes of *The Nuke – i.e.*, 70% of its total runtime. ER-114:10-117:22 (compiling timestamps from Exhibit K). Denims even told her audience she did not want to pause *The Nuke* more frequently to provide additional commentary. Ex. K at 3:00:53-3:02:09.

When Denims did speak, she frequently made short comments with no critical bearing on the style or substance of *The Nuke*. Examples include: (1) making incoherent statements; (2) speaking with her chat about unrelated topics; (3) going on unrelated tangents; (4) providing brief comments with little to no elaboration; and (5) frequently expressing confusion at what was depicted. ER-120:5-121:16 (compiling timestamps from Exhibit K); ER-123:3-19 (same). While there were moments where Denims did criticize *The Nuke*, the extent of that criticism was insufficient to justify commercially exploiting *The Nuke* in its entirety immediately upon release.

### b. The Second Factor Weighs Against Fair Use

The second factor examines "the extent to which [the original work] is creative and whether it is unpublished." *McGucken*, 42 F.4th at 1161. When a work "document[s] a real event," the work can still be "creative because [it is] the product of many technical and artistic decisions." *McGucken*, 42 F.4th at 1161. While containing numerous documentary and factual elements, both Works contained numerous creative elements, which makes them creative and weighs against fair use. 2-SER-260, ¶25; 2-SER-317-320; *see generally* Exs. E-F. Further, Denims' exploitation of the Works immediately after their release "does not weigh in favor of fair use." *McGucken*, 42 F.4th at 1162.

### c. The Third Factor Weighs Against Fair Use

The third factor examines "the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *McGucken*, 42 F.4th at 1162. The third "factor circles back to the first factor because the extent of permissible copying varies with the purpose and character of the use." *Id.*

34

"Copying an entire work militates against a finding of fair use." *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 744 (9th Cir. 2019).

Petitioners conceded that the "third factor weighs against a finding of fair use". ER-44 fn.14. While providing no explanation, the reason is evident: Denims failed to comment on significant portions (if not the majority) of both Works–*i.e.*, her use was grossly excessive.

### d. The Fourth Factor Weighs Against Fair Use

The fourth factor is "undoubtedly the single most important element of fair use." *Harper*, 471 U.S. at 566. Its focus is "on actual or potential market substitution." *Warhol*, 598 U.S. at 536 fn.12. It "encompasses both (1) the extent of market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original[.]" *McGucken*, 42 F.4th at 1163. Even when there is "little direct evidence of actual market harm," "to negate fair use," the plaintiff "need only show that if the challenged use should become widespread, it would adversely affect the

35

*potential* market" for the original. *Id.* (original emphasis).

At bottom, the fourth factor "asks whether consumers treat a challenged use 'as a market replacement'" for the original. *National Fire Protection Association, Inc. v. UpCodes, Inc.*, 753 F.Supp.3d 933, 965 (C.D. Cal. 2024). This "factor points against fair use when a copyist makes copies available that displace demand for copies the copyright owner already makes available[.]" *Bartz v. Anthropic PBC,* 787 F.Supp.3d 1007, 1031 (N.D. Cal. 2025).

Petitioners succeeded in driving H3Snark users away from the Works by offering Denims' Watch Party as a substitute. The screenshots below from Denims' chat during her Watch Party dispel any doubt that Petitioners' users viewed Denims' Watch Party as a substitute for the originals.

Ex. K at 00:13:14.

Ex. K at 00:27:25.

Ex. K at 00:28:12.

36



supportingorfeeding: It would be funny af if his nuke lost initial viewers because people their reactions to it today

Ex. K at 28:20.

unLucky_801: Chat watch it with denims don't try to watch it on your own, don't give him

Ex. K at 1:03:57.

NorthBoundTrain: dont watch it on h3's channel

Ex. K at 1:14:23.

verdanteclipse: Never heard of denims before but I wanted to watch the Ethan crash out wit giving him any views. Denims definitely has star power, no wonder she has more live viewer rn.

Ex. K at 3:05:29.

drfeltcher: Chat....remember don't go watch this on Ethan's channel or comment. He hate viewers as well and we shouldn't give them to him

Ex. K at 3:12:26.

CtrlSaltEsc: thank you for providing a way to cringe at the video without feeding it a view

Ex. K at 5:08:07.

jkmoran99: Thank you for helping us avoid the sin of giving Ethan views

Ex. K at 5:08:57.

Her chat further commented on the unprecedented number of

viewers.

Att4ck_Th3_Bl0ck: Did I miss something... are you normally at 39K viewers on your streams?

Ex. K. at 3:47:57.

ChiidishNA: 40k on Denims, 9 hour stream whats going on here

Ex. K at 4:11:55

eliashunterwood: whats with the 40k viewers?

Ex. K at 4:18:43.

Denims' chat noted the immediate drop-off in viewers after *The Nuke* stopped playing (Ex. K at 5:06:22) – *i.e.*, the vast majority of viewers were there to watch *The Nuke*, not her.

iAMcashier: instant drop to 8k viwers

Ex. K at 5:07:03

2terrySD: maybe it wasnt viewbots, the view count fell back to 7k straight after

Ex. K at 5:10:03.

Additionally, other individuals identified in Petitioners' 1/30/25 Post and Second 1/31/25 Post hosted watch parties of *The Nuke* and commercially exploited it in its entirety immediately upon release.  2-SER-270-271, ¶33; 2-SER-379-381, ¶¶52-56.  These various watch parties (including Denims' Watch Party) siphoned views, advertising revenue and visibility away from the Works. The harm was particularly acute because the greatest demand for a YouTube video is immediately after its release. 2-SER-270, ¶32.

Therefore, Petitioners fail to show Denims made a fair use of both Works.

38

### 3.    The MPJOP Order is Flawed

While this Court is not in a position to review the MPJOP Order finding that Denims' Watch Party of *The Nuke* was a fair use (which is not yet embodied in an appealable order), TEI will briefly discuss it to dispel the idea that it undermines TEI's *prima facie* showing.

To begin, the MPJOP Order only addresses *The Nuke* and not Denims' use of the *Countdown Episode*. Further, TEI intends to appeal the MPJOP Order (and has stated so in a stipulation filed in the Underlying Action on July 6, 2026).

Identifying and addressing all of the errors of the MPJOP Order would require supplemental briefing. Below are some (but not all) of the material errors of the MPJOP:

- The MPJOP Order directly conflicts with *Warhol*. As discussed in Section VI.C.2.a, *supra*, *Warhol* requires that a use be justified in the broad and narrow sense – which necessitates a transformative use of each excerpt used from the original. The MPJOP Order stated the exact opposite.

- The MPJOP Order omitted material facts alleged in the complaint and contained in the attached exhibits, most notably:
  - Denims' Watch Party occurred immediately upon *The*

39

*Nuke*'s release when public interest was at its apex;

o Anything related to Petitioners' conduct in directing H3Snark users to Denims' Watch Party, including the Quash Order's discussion on the same;

o Denims' failure to comment on significant portions of *The Nuke*;

o Denims' numerous statements expressing her intent to host a "watch party" and siphon views away from TEI to herself;

o Significant portions of Denims' statements that had little to no critical bearing on *The Nuke*.

Therefore, the MPJOP Order should not be relied upon. If the Court finds it necessary, it should request supplemental briefing to address the errors of the MPJOP Order.

## D. Petitioners Fail to Show the Balance of Equities Weighs in Their Favor

To begin, almost all cases where courts found a plaintiff made a *prima facie* showing, the balance of the equities favored disclosure. *See Baugher*, 2021 WL 4942658, *5; *Cognosphere*, 2024 WL 4227594, *7-8; *Barnes*, 2026 WL 412470, *4-5; *Signature*, 941 F.Supp.2d at 1157. Conversely, when the plaintiff fails to make a

40

*prima facie* showing (or fair use applies), the balance of equities always weighs against disclosure (or is not addressed whatsoever).[14] *Twitter*, 608 F.Supp.3d at 881-883; *Reddit 2026*, 2026 WL 1847873, *10; *Reddit 2020*, 441 F.Supp.3d at 882-887. This illustrates *Reddit 2020's* point that the balance of equities is "not well suited for a copyright dispute." *Id.* at 882.

Next, since TEI "successfully demonstrated a *prima facie* claim of copyright infringement and [Petitioners] have not demonstrated fair use, [Petitioners] have little, if any, First Amendment protection against disclosure of their identities." *Baugher*, 2021 WL 4942658, *5. "Courts have found that establishing a *prima facie* case of copyright infringement should weigh in favor of discovery absent other convincing reasons." *Cognosphere*, 2024 WL 4227594, *7.

TEI's sole purpose is to enforce its copyrights. TEI's owners made multiple attempts to ameliorate the Petitioners' concerns by: (1) offering to not speak about Petitioners (so long as it is reciprocated); (2) not publicly disclosing their names; (3) encouraging their audience to refrain from contacting Petitioners in any manner; (4) requiring that

---

[14] The only exception is *Art of Living*, which noted there was "a substantial question" whether fair use applied. 2011 WL 5444522, *6.

41

they make another *prima facie* claim before any other lawsuit or claim against Petitioners can proceed; and (5) narrowing the scope of the Subpoenas. 2-SER-261-262, ¶¶4-5; 2-SER-384-386, ¶¶70, 73-75; 2-SER-463-492; 1-SER-26-27, ¶¶3-4.

Further, the court entertained Petitioners' five submissions of "evidence" purporting to show TEI's bad faith. ER-51-382; 2-SER-510; ER-471-515; 1-SER-176-239; 1-SER-11-17. Not only were these submissions insufficient to tip the equities in Petitioners' favor; they were replete with falsehoods that TEI was forced to debunk. *See* Fns. 3-4, *supra*. Despite this, the Quash Order preserved Petitioners' anonymity in the Underlying Action. ER-15:24-16:3.

Courts also favor disclosure when "the information sought relates to a core claim or defense" and "the identifying information is directly and materially relevant to that claim or defense." *Cognosphere*, 2024 WL 4227594, *3. "[S]eeking information necessary to start any litigation or enforcement proceedings (*i.e.*, the identities of the persons behind the [anonymous] accounts)" is "information sought [that] is directly and materially relevant to a core claim." *Id.*, *7-8. Such information is "critical to the claim, because without the information," a plaintiff "has no starting point for whom

42

to name as a defendant." *Id.*, *8. Therefore, the information sought is essential for TEI to pursue its claims. 2-SER-385, ¶76.

Disclosure is also favored when the "information sufficient to establish or to disprove that claim or defense is unavailable from any other source." *Cognosphere*, 2024 WL 4227594, *3. There are no alternatives to find Petitioners' personal identifying information. 2-SER-386, ¶77.

Therefore, Petitioners fail to demonstrate the balance of equities weighs in their favor.

## VII.  CONCLUSION

For the reasons set forth above, the Petition should be denied.

DATED: July 22, 2026          **Heah Bar-Nissim LLP**

                              By:    */s/ Rom Bar-Nissim*
                                     Rom Bar-Nissim
                                     Attorneys for Real Party in
                                     Interest and Plaintiff-
                                     Respondent Ted Entertainment,
                                     Inc.

43

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure ("FRAP") 21(d) and 32(g)(1), counsel certifies that this answering brief contains 7,795 words, excluding the items exempted by FRAP Rule 32(f).

This Motion complies with the formatting, typeface and type-styles requirements of FRAP Rules 32(a)(5) and 32(a)(5-6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font that is double-spaced.

DATED: July 22, 2026                    By: <u>/s/ Rom Bar-Nissim</u>

1

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing Answering Brief to Petition for Writ of Mandamus with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

DATED: July 22, 2026                    By: /s/ Rom Bar-Nissim

Exhibit 26

Rom Bar-Nissim (SBN: 293356)
Rom@HeahBarNissim.com
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

Attorneys for Plaintiff
Ted Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TED ENTERTAINMENT, INC., a California Corporation,<br><br>                    Plaintiff,<br><br>    v.<br><br>MORGAN KAMAL MAJED p/k/a FROGAN, an individual, and DOES 1-10<br><br>                    Defendants. | Case No.: 2:25-cv-5565-JFW-MAA<br><br>[Assigned for all purposes to the Hon. John F. Walter]<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF TED ENTERTAINMENT, INC.'S APPLICATION FOR DEFAULT JUDGMENT AGAINST DEFENDANT MORGAN KAMAL MAJED**<br><br>Action Filed: June 19, 2025<br><br>Date: August 10, 2026<br>Time: 1:30 p.m.<br>Courtroom: 7A |

1

MPA ISO TEI'S APPLICATION FOR DEFAULT JUDGMENT AGAINST MAJED

## **MEMORANDUM OF POINTS AND AUTHORITIES**

Pursuant to Federal Rule of Civil Procedure ("FRCP") 55(b)(2), Plaintiff Ted Entertainment, Inc. ("TEI") respectfully requests this Court to grant its Application for Default Judgment against Defendant Morgan Kamal Majed p/k/a Frogan ("Frogan") for the reasons set forth below.

## I.    **INTRODUCTION**

Defendant Frogan successfully raised nearly $40,000 to "defend" herself from TEI's copyright infringement claim. Instead of using these funds to defend herself, Frogan evaded service and refused to respond to TEI's complaint. Even after default was entered, she continued to solicit and accept donations by claiming the present action was not over.

Frogan's hope is that this Court issues a lenient default judgment that slaps her on the wrist, while she quietly pockets the money she raised. This Court must send a message: there are serious consequences to engaging in willful and malicious copyright infringement and default judgment is not a "get out of jail free" card. As such, TEI respectfully requests this Court to enter default judgment and grant TEI: (1) $150,000 in statutory damages or, alternatively, $39,179 in actual damages (whichever is greater); (2) $30,404 in attorneys' fees; and (3) authorize TEI to submit a bill of costs.

## II.    **STATEMENT OF FACTS**

Frogan abandoned a career in public health to become an online extremist political streamer and provocateur. Dkt. No. 1 ("Cmpt."), ¶¶ 16-17. Some notable examples of her online career include: (1) wishing veterans receive PTSD; (2) offering to make a cake recreating September 11th if she received a certain amount of contributions; (3) hosting a panel involving a racial tier list with "Arab" at the top and "Loves Sabra" (*i.e.*, Loves Israelis) at the bottom; and (4) fabricating multiple claims that she is being persecuted by Jews and Zionists. *Id.*, pp. 9:9-

10:23, 36:11-37:21.[1]

Prior to the massacre of October 7th, Frogan was an effusive fan of TEI's content, including its owners Ethan and Hila Klein. Cmpt., pp. 7:11-17, 10:23-11:2. After October 7th, this completely changed. Beginning on October 7th, Frogan made several social media posts that expressed her support for Hamas and outlandish conspiracy theories – including the false claim that Israelis harvested the skin and organs of dead Palestinians. *Id.*, pp. 11:2-12:28. When Ethan Klein quietly unfollowed her on Twitter, Frogan, made a public spectacle of the situation to solicit sympathy and attack Ethan. *Id.*, p. 12:1-5.

Frogan continued to target the owners of TEI. In the racial tier list discussed above (which was hosted by Frogan's streaming platform, Twitch), Ethan was the first person placed in the "Loves Sabra" category – with one participant even stating a new category for "Zionist" should be created for Ethan. Cmpt., pp. 36:26-37:21. Frogan placed Ethan in the "Loves Sabra" category as an attack on Ethan and his wife Hila (who is a sabra). *Id*.

Beginning in late 2024, Ethan and Hila (through TEI) began working on the audiovisual work *Content Nuke: Hasan Piker* ("*The Nuke*"). Cmpt., ¶¶ 36-38. *The Nuke* is a tragi-comic documentary that chronicles how the prominent leftist online personality, Hasan Piker, radicalizes his audience to support communism and terrorism against Jews and Israelis. Cmpt., pp. 30:1-39:18 (summarizing *The Nuke*); *see also* Ex. D (deposit copy of *The Nuke*); Ex. E (broadcast copy of *The Nuke*).[2] On January 28, 2025, TEI registered *The Nuke* with the Copyright Office and it was given the registration number of PAu 4-256-429. Cmpt., ¶ 38; Declaration of Rom Bar-Nissim ("RBN Decl."), ¶ 2; Ex. 1.

---

[1] Citations to page numbers of the Complaint are to the ECF page numbers.

[2] As explained in the Complaint, the deposit copy of *The Nuke* varied slightly from the broadcast version, namely (1) the deposit copy did not contain the conclusion that was contained in the broadcast version; (2) the deposit copy did not black out footage of Hamas releasing hostages in November 2023; (3) the deposit copy did not blur footage of the Houthis entering the bridge of the *Galaxy Leader*; and (4) minor visual edits. Cmpt., ¶ 39.

MPA ISO TEI'S APPLICATION FOR DEFAULT JUDGMENT AGAINST MAJED

Ethan began promoting *The Nuke* heavily in January 2025 and public interest was high. Cmpt., ¶ 41. The Doe defendants (collectively, the "H3Snark Mods") promoted various watch parties of *The Nuke* to the users of the H3Snark subreddit – *i.e.*, a message board of "fallen fans" of the Kleins and TEI's content. Cmpt., ¶¶ 21-25, 41-43, Exs. F-G. The H3Snark Mods had a history of engaging in piracy of TEI's copyrighted works. Cmpt., pp. 17:14-28:13. As the Honorable Sallie Kim explained in her April 29, 2026 Order denying the H3Snark Mods motion to quash:

> Although it may seem counterintuitive that opponents of the Kleins would want to watch the Kleins' programs, they were engaging in a cultural phenomenon known as "hatewatching."

The Urban Dictionary defines the term "hatewatch" as follows:

> A hatewatched show is one the viewer genuinely despises but cannot stop watching, This could be because it is so "<u>important</u>: they feel they have to, because it has enough promise that they hope it gets better, because it's so well-crafted in it's [sic] terribleness that the badness itself is noteworthy, or because they enjoy the <u>adrenaline</u> that pure revulsion can bring. Whatever the reason, the hatewatcher can't look away from the trainwreck.

RBN Decl., ¶ 3, Ex. 2 at 9:26-10:6 (original emphasis); *In re Subpoenas to Reddit, Inc. and Discord, Inc.* (N.D. Cal. Case No. 3:25-mc-80296-SK), Dkt. No. 45.

The H3Snark Mods made two highly visible community posts that directed H3Snark users to watch Frogan's watch party of *The Nuke* instead of the original. Cmpt., ¶ 42, Exs. F-G. The first was made on January 30, 2025 (*i.e.*, the day before *The Nuke* was publicly released) and featured Frogan (with a link to her stream on Twitch) as a place "to watch the nuke without showing support for H3" (*i.e.*, TEI). Cmpt., p. 40:2-13, Ex. F. The second was made shortly after *The Nuke* was released on January 31, 2025 and featured Frogan as a place "to watch reactions to" *The Nuke* with a link to her stream on Twtich. *Id.*, p. 40:14-22; Ex. G.

Frogan also promoted her watch party of *The Nuke*. The day before *The Nuke* was released, Frogan encouraged her audience to deprive TEI of views by viewing the watch parties of *The Nuke* by other Twitch streamers, including her own. Cmpt., pp. 46:22-47:6; Ex. I. In the hour leading up to *The Nuke*'s release, Frogan

MPA ISO TEI'S APPLICATION FOR DEFAULT JUDGMENT AGAINST MAJED

impractical, if not impossible' default judgment is appropriate." *Wareka*, 2024 WL 4867233, *4 (quoting *PepsiCo*, 238 F.Supp.2d at 1177).

Here, Frogan had over ten months to respond to the complaint but failed to appear, respond or otherwise participate in this action. Therefore, this factor weighs in favor of default judgment because the policy for favoring decisions on the merits is inapplicable in this case.

## V. CONCLUSION

For the reasons set forth above, TEI respectfully requests that this Court award it: (1) $150,000 in statutory damages or, alternatively, $39,179 in disgorged profits – whichever is greater; (2) $30,404 in attorneys' fees' and (3) grant TEI leave to submit its Bill of Costs.

Dated: June 29, 2026                    **HEAH BAR-NISSIM LLP**

By  /s/ Rom Bar-Nissim
ROM BAR-NISSIM
Attorneys for Plaintiff Ted
Entertainment, Inc.

## <u>PROOF OF SERVICE</u>

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I, the undersigned, declare that I am, and was at the time of service of the papers herein referred to, over the age of eighteen years and not a party to the within action or proceeding.  My business address is the law firm of Heah Bar-Nissim LLP, 1801 Century Park East, Suite 2400, Los Angeles, CA 90067.

On June 29, 2026, I served the following document(s) **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF TED ENTERTAINMENT, INC.'S APPLICATION FOR DEFAULT JUDGMENT AGAINST DEFENDANT MORGAN KAMAL MAJED**

| | |
|---|---|
| Bahram Niknia<br>NIKNIA LAW FIRM, INC.<br>1875 Century Park East<br>Suite 1240<br>Los Angeles, CA 90067 | Attorney for Defendant Morgan Kamal Majed p/k/a Frogan |

**[X]     BY MAIL:** I enclosed the document(s) identified above in a sealed envelope or package addressed to the persons addressed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary  course of business with the United States Postal Service, in a sealed envelope with postage fully paid. attached the document(s) to an email sent to the email addresses set forth above

I declare under penalty of perjury that the foregoing is true and correct and a member of the bar of this Court.

Executed this June 29, 2026, at Los Angeles, CA.

*/s/ Rom Bar-Nissim*

Rom Bar-Nissim

1
MPA ISO TEI'S APPLICATION FOR DEFAULT JUDGMENT AGAINST MAJED